

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

| | |
|---|---|
| SCOTT O'GRADY, §<br>    Plaintiff, §<br> §<br>v. §<br> §<br>TWENTIETH CENTURY FOX §<br>FILM CORPORATION, and §<br>DISCOVERY COMMUNICATIONS, §<br>INC., §<br>    Defendants §  | **CIVIL ACTION NO. 502CV173**<br><br>**JURY DEMANDED**<br><br>**ORAL ARGUMENT REQUESTED** |

## DEFENDANT TWENTIETH CENTURY FOX FILM CORPORATION'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

Respectfully submitted,

JACKSON WALKER L.L.P.

By: *Charles L. Babcock*   By Permission CDS

Charles L. Babcock
State Bar No. 01479500
Nancy W. Hamilton
State Bar No. 11587925
Cedric D. Scott
State Bar No. 24013474
1401 McKinney, Suite 1900
Houston, TX 77010
(713) 752-4200
(713) 752-4221 – Fax

George L. McWilliams
PATTON, HALTOM, ROBERTS,
    MCWILLIAMS, & GREER, LLP
2900 St. Michael Drive, 4th Floor
Texarkana, Texas 75503
(903) 334-7000
(903) 334-7007 – Fax

**ATTORNEYS FOR DEFENDANT**
**TWENTIETH CENTURY FOX FILM**
**CORPORATION**

61

# TABLE OF CONTENTS

Page

DEFENDANT TWENTIETH CENTURY FOX FILM CORPORATION'S MOTION FOR
SUMMARY JUDGMENT AND BRIEF IN SUPPORT ................................................................1

**I. INTRODUCTION** .................................................................................................................2
    STATEMENT OF UNDISPUTED FACTS ....................................................................8
    **A.**   THE EVENTS INVOLVING PLAINTIFF'S MISSION OVER BOSNIA ......................8
    **B.**   THE PUBLIC RECORD OF PLAINTIFF'S BOSNIAN EXPERIENCE ......................9
    **C.**   PLAINTIFF'S BOOKS: "RETURN WITH HONOR" and "BASHER 52" ................10
    **D.**   PLAINTIFF'S DEAL WITH ORION PICTURES ......................................................10
    **E.**   THE TITLE: *BEHIND ENEMY LINES* ....................................................................11
    **F.**   CREATION OF THE MOVIE *BEHIND ENEMY LINES* .........................................12
    **G.**   THE BBC AND DISCOVERY CHANNEL DOCUMENTARY ...............................18
    **H.**   THE DISCOVERY CHANNEL SPECIAL PROGRAMMING EVENT ......................18
    **I.**    ADVERTISING AND PROMOTION OF THE MOVIE .............................................20
    **J.**    PLAINTIFF'S CONDUCT SUBSEQUENT TO RELEASE OF THE MOVIE ............20

**II. GROUNDS FOR SUMMARY JUDGMENT** .......................................................................21
    **A.**   INVASION OF PRIVACY BY MISAPPROPRIATION AS TO THE MOVIE (FAC –
       COUNT I PARAGRAPHS 45-49) ...........................................................................21
    **B.**   INVASION OF PRIVACY BY MISAPPROPRIATION AS TO THE CHALLENGED
       MATERIAL (FAC – COUNT I PARAGRAPHS 45-49)..............................................21
    **C.**   LANHAM ACT AS TO THE MOVIE (FAC – COUNT II PARAGRAPHS 50-53)......22
    **D.**   LANHAM ACT AS TO THE CHALLENGED MATERIAL (FAC – COUNT II
       PARAGRAPHS 50-53) .............................................................................................22
    **E.**   UNFAIR COMPETITION, FALSE ADVERTISING AND UNJUST ENRICHMENT22
    **F.**   TORTIOUS INTERFERENCE (FAC – COUNT IV – FAC PARAGRAPHS 57-58) ...22
    **G.**   CONSPIRACY (FAC – COUNT V PARAGRAPHS 59-60) .........................................23

**III. ARGUMENT AND AUTHORITIES** ................................................................................23
    **A.**   INVASION OF PRIVACY BY MISAPPROPRIATION AS TO THE MOVIE ............23
    **B.**   INVASION OF PRIVACY BY MISAPPROPRIATION AS TO THE CHALLENGED
       MATERIAL........................................................................................................29
    **C.**   THE LANHAM ACT CLAIM AS TO THE MOVIE FAILS AS A MATTER
       OF LAW .................................................................................................................35
    **D.**   LANHAM ACT AS TO THE CHALLENGED MATERIAL ......................................40
    **E.**   PLAINTIFF'S STATE LAW CLAIMS FOR UNFAIR COMPETITION, FALSE
       ADVERTISING, UNJUST ENRICHMENT FAIL AS A MATTER OF LAW ............44
    **F.**   TORTIOUS INTERFERENCE CLAIM FAILS AS A MATTER OF LAW ..................45
    **G.**   THE CONSPIRACY CLAIM FAILS AS A MATTER OF LAW ..................................48

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) ............................................................29

*Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 103 S. Ct. 2875 (1983) ......................33, 35

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548 (1986) ............................................29, 45

*Dastar Corp. v. Twentieth Century Fox Film Corp.*, 123 S. Ct. 2041 (2003) .........................35, 36

*ETW Corp. v. Jireh Publ'g, Inc.*, 2003 WL 21414521
    (6th Cir. June 20, 2003) .............................................................36, 38, 39, 41, 43, 45

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S. Ct. 2997 (1974) ................................................28

*Groden v. Random House*, 61 F.3d 1045 (2nd Cir. 1995) ......................................................30, 32

*Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180 (9th Cir. 2001) ................................28, 29, 36

*Jamison v. Texas*, 318 U.S. 413, 63 S. Ct. 669 (1943) .................................................................33

*Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 72 S. Ct. 777 (1952) ............................27, 28, 36, 37

*King v. Ames*, 179 F.3d 370 (5th Cir. 2000) .................................................................................40

*Lane v. Random House, Inc.*, 985 F. Supp. 141 (D.D.C. 1995) .................................30, 31, 32, 33

*Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894 (9th Cir. 2002) ...........................................38, 39

*Matthews v. Wozencraft*, 15 F.3d 432 (5th Cir. 1994) .................................3, 6, 24, 25, 26, 28, 29

*Murdock v. Pennsylvania*, 319 U.S. 105, 63 S. Ct. 870 (1943) .....................................................33

*New Kids On The Block v. News America Publishing, Inc.*, 745 F. Supp. 1540 (C.D.Cal.
    1990), *aff'd*, 971 F.2d 302 (9th Cir. 1992) .............................................................................38, 42

*Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 108 S.
    Ct. 2667 (1988) ...........................................................................................................34, 35

*Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989) .........................................5, 6, 36, 37, 38, 39, 41

*Ruffin-Steinback v. dePasse*, 82 F. Supp. 2d 723 (E.D. Mich. 2000), *aff'd*, 267 F.3d 457
    (6th Cir. 2001) .............................................................................................3, 5, 24, 29, 34, 35

*Sanchez v. Leggett & Myer, Inc.*, 187 F.3d 486 (5th Cir. 1999) .....................................................3

*Seale v. Gramercy Pictures*, 949 F. Supp. 331 (E.D. Pa. 1996) ........3, 5, 24, 36, 37, 38, 39, 41, 42

ii

*Stewart Glass & Mirror, Inc. v. U.S.A. Glass, Inc.*, 17 F. Supp. 2d 649 (E.D. Tex. 1998), *aff'd*, 200 F.3d 307 (5th Cir. 2000) ................................................................................47

*Taylor Publ'g Co. v. Jostens, Inc.*, 36 F. Supp. 2d 360 (E.D. Tex. 1999), *aff'd*, 216 F.3d 465 (5th Cir. 2000) ..........................................................................................................44

*Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658 (5th Cir. 2000) ..................6, 37, 38

*Whitehead v. Paramount Pictures Corp.*, 53 F. Supp. 2d 38 (D.D.C. 1999) ........................3, 4, 24

## STATE CASES

*Allied Capital Corp. v. Cravens*, 67 S.W.3d 486 (Tex. App.—Corpus Christi 2002, no pet.) ................................................................................................................................46

*Bank One, Texas, N.A. v. Stewart*, 967 S.W.2d 419 (Tex. App.—Houston [14th Dist.] 1998, pet. denied) ..............................................................................................................48

*Denker v. Twentieth Century-Fox Film Corp.*, 10 N.Y. 2d 339 (1961) ...................................12

*KTRK Television v. Felder*, 950 S.W.2d 100 (Tex. App.—Houston [14th Dist.] 1997, no writ) ............................................................................................................................45, 47, 49

*McGraw-Hill Book Co. v. Random House, Inc.*, 32 Misc. 2d 704, 225 N.Y.S.2d 646 (1962) ..............................................................................................................................12

*Operation Rescue - Nat'l v. Planned Parenthood of Houston and Southeast Texas, Inc.*, 975 S.W.2d 546 (Tex. 1998) .............................................................................................48

*Rogers v. Dallas Morning News, Inc.*, 889 S.W.2d 467 (Tex. App.—Dallas 1994, writ denied) ..........................................................................................................................45, 47

*Tenneco Inc. v. Enterprise Products Co.*, 925 S.W.2d 640 (Tex. 1996) .................................29

*Tilton v. Marshall*, 925 S.W.2d 672 (Tex. 1996) .............................................................3, 48

*Wal-Mart Stores, Inc., v. Sturges*, 52 S.W.3d 711 (Tex. 2001) .........................................46, 47

## STATUTES

15 U.S.C. §1125(a)(1) .............................................................................................35, 36, 40

15 U.S.C. Section 1125(a) ...............................................................................................35

15 U.S.C. Section 1125(a)(1) ............................................................................................39

Fed. R. Civ. P. 56(b) ....................................................................................................1, 45

Tex. Const. Art. I, § 8 .....................................................................................................29

## MISCELLANEOUS

PROSSER AND KEETON ON THE LAW OF TORTS Section 117 at 853 (5th ed. 1984) ......25

Rosen & Babcock, *Of and Concerning Real People and Writers of Fiction*, 7 Comm. / Ent. L.J. 221, 226 (1985) ....................................................................................................................7

*Samuel D. Warren & Louis D. Brandeis, The Right to Privacy,* 4 Harv. L. Rev. 193 (1890)...............................................................................................................................................26

Street, *Citizen Kane*, 46 History Today 48 ....................................................................................6

Thomas Wolfe, *Look Homeward Angel* at 15 (Simon & Schuster New York 1997) (1929)..................................................................................................................................................6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TEXARKANA DIVISION

| | | |
|---|---|---|
| **SCOTT O'GRADY,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 502CV173** |
| | § | |
| **TWENTIETH CENTURY FOX** | § | **JURY DEMANDED** |
| **FILM CORPORATION, and** | § | |
| **DISCOVERY COMMUNICATIONS,** | § | **ORAL ARGUMENT REQUESTED** |
| **INC.,** | § | |
| | § | |
| **Defendants** | § | |

### DEFENDANT TWENTIETH CENTURY FOX FILM CORPORATION'S
### MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

TO THE HONORABLE COURT:

Twentieth Century Fox Film Corporation ("Fox Film") moves for summary judgment

pursuant to Fed. R. Civ. P. 56(b) on all claims asserted by Scott O'Grady ("O'Grady" or "Plaintiff"),

because the pleadings, depositions, answers to interrogatories, and responses to requests for

admissions, together with the declarations and exhibits in the summary judgment record, show that

there is no genuine issue as to any material fact and Fox Film is entitled to judgment as a matter of

law. The summary judgment evidence relied upon herein is indexed as follows: Appendix I –

Deposition Excerpts; Appendix II – Declarations and DCI's Rule 56 Statement of Undisputed Facts;

Appendix III – Responses to Interrogatories and Requests for Admissions; and Appendix IV –

Exhibits; and Appendix V – DVD Exhibits Made From Videotape Exhibits.[1]

---

[1] The Defendants have submitted a single summary judgment record. Unless noted otherwise, the exhibit numbers referenced in this brief correspond to the numbered exhibits used in the depositions.

## I.

## INTRODUCTION

The movie "Behind Enemy Lines" (the "Movie") (Ex. 8A), produced by Fox Film, premiered on November 30, 2001. (Godsick Depo. at 41:19-22)  The Movie was inspired by the events involving Plaintiff's survival and rescue after his F-16 plane was shot down over Bosnia in 1995. (Davis Depo. at 11:1-12:7) These were events that, at the time, saturated television broadcasts, were well-chronicled in the newspapers (Ex. 6, 6A, 6B, 14, 14A, 14B, 14C), and were the subject of public congressional hearings. (Ex. 9)  Both before and after its premiere, Plaintiff expressed, through interviews, newspaper reports and television appearances, his favorable review of the Movie. (Ex. 10; Ex. 11A; Ex. 17)

However, sometime between November 30, 2001 and August 19, 2002 (the date Plaintiff filed this lawsuit), Plaintiff changed his story.  In stark contrast to his earlier, numerous public endorsements, Plaintiff now challenges Fox Film's right to make and advertise the Movie, complaining:  (1) that the Movie was based on events involving Plaintiff, as a result of which Fox Film was required to obtain Plaintiff's permission to produce the Movie ("Fox never obtained . . . [Plaintiff's] permission to produce its movie 'BEHIND ENEMY LINES,' which was based on [Plaintiff's] story" [First Amended Complaint ("FAC") at ¶ 33]); and (2) Fox Film should not have advertised the Movie during the Discovery Channel's November 28, 2001 airing of Discovery Channel's own documentary about the 1995 events involving O'Grady (about which O'Grady does not complain) because "Fox's sponsorship of the program would lead consumers to believe, incorrectly, that [Plaintiff] was affiliated with and endorsed the Fox movie, and that the Fox movie was [Plaintiff's] story."  (FAC at ¶ 36)  Based on these two primary allegations, Plaintiff has pleaded the following causes of action against Fox Film in the First Amended Complaint:  (a) common law

- 2 -

claims for (i) invasion of privacy by misappropriation[2] (Count 1), (ii) unfair competition (Count 3), (iii) tortious interference with prospective business relations (Count 4), (iv) civil conspiracy (Count 5)[3]; and (b) a federal claim for violation of the Lanham Act (Count 2).

This case presents two easily answered but nonetheless important questions affecting the freedom of literary expression constitutionally guaranteed to authors and producers of artistic works. First, may the creator of a fictional literary work, such as the Movie, base the work, in part, on newsworthy and public events without first obtaining the permission from the people who were involved in those events. The answer to this question is well-settled in the courts, including the Fifth Circuit, which hold that there is no liability for appropriating the story of another's life. *Matthews v. Wozencraft*, 15 F.3d 432, 438 n.5 (5th Cir. 1994) (affirming, under Texas law, the district court's summary judgment against the plaintiff on his claim for misappropriation/invasion of privacy arising out of a fictionalized account of events experienced by the plaintiff and involving a character based upon the plaintiff).[4]   Moreover, the Movie is expressive speech protected under the First Amendment.

The second issue raised by Plaintiff is to what extent may Fox Film advertise its Movie on the Discovery Channel network in conjunction with Discovery Channel's airing of a documentary about the downed pilot whose experience inspired the Movie. Both factually and legally the answer is straight forward:  Plaintiff has no claim.

---

[2] This tort is sometimes referred to as the right of publicity. *See Ruffin-Steinback v. dePasse*, 82 F.Supp. 2d 723, 728-29 (E.D. Mich. 2000), *aff'd*, 267 F.3d 457 (6th Cir. 2001).

[3] As the Court is no doubt aware, there is no separate cause of action for conspiracy. *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996) ("liability for conspiracy depends on participation in some underlying tort..."); *see also Sanchez v. Leggett & Myer, Inc.*, 187 F.3d 486, 491 (5th Cir. 1999).

[4] *See also Ruffin-Steinback*, 82 F.Supp.2d at 730 (there is no violation of a right of publicity arising out of a television mini-series "depicting one's life-story without his or her permission, particularly where some of the events are fictionalized . . ."); *Seale v. Gramercy Pictures*, 949 F. Supp. 331, 337 (E.D. Pa. 1996) ("The Defendants' use of the Plaintiff's name and likeness [in a film, in a pictorial history book, and on the cover of a home video] was for the purpose of First Amendment expression: the creation, production, and promotion of a motion picture and history book which integrates fictitious people and events with historical people and events . . ."); *Whitehead v. Paramount Pictures Corp.*, 53 F.Supp.2d 38, 53 (D.D.C. 1999) ("there is no tort for invasion of privacy for appropriating the story of another's life.").

In addition to his complaints about the Movie, Plaintiff challenges the Fox Film advertising. Fox Film provided to Discovery Communications, Inc. ("DCI") two advertisements for the Movie ("the Advertisements") which were aired during the November 28, 2001 television program – "Behind Enemy Lines: The Scott O'Grady Story" on the Discovery Channel ("November 28 DCI Documentary"). (Ex. 335) The Plaintiff also complains of additional material which he refers to as "special advertisements" (FAC at ¶ 37). These consist of what Plaintiff describes as material inserted in the November 28 DCI Documentary "in the same format." *Id.* This material is referred to by DCI as "interstitials" and is described more fully in DCI's Statement of Undisputed Facts. The interstitials included material provided by Fox Film, including trailers for the Movie, interviews with the actors and "behind the scene" footage, which was edited by DCI and combined with material from its documentary on O'Grady into an element that was intended to highlight the fact versus fiction in the November 28 DCI Documentary as opposed to the Movie (the "Interstitials"). (SOF at 55-56).

Plaintiff also complains of material broadcast by DCI prior to November 28, 2001 to encourage viewers to "tune in" to the November 28 DCI Documentary. (FAC at ¶ 37). These are referred to as "Tune Ins." Collectively the "Advertisements," the "Interstitials" and the "Tune-Ins" are referred to throughout this brief as the **"Challenged Material."**[5]. The Advertisements may be found in the record at Exhibit 335 which shows the DCI Documentary as aired. The Interstitials may be found in this exhibit as well. The Tune-Ins and the Interstitials may also be found at Exhibit 114. A transcript of these two exhibits may be found at Exhibits 335A and 114A respectively.

Plaintiff makes two important concessions with respect to the Challenged Material. First, he concedes that Fox Film never used his name or likeness in any advertising. (O'Grady ["OG"] Depo.

---

[5] Fox Film includes the Interstitials in the term "Challenged Material" because of Plaintiff's characterization of them as "special advertising" in this pleading . Fox Film does not agree with this characterization, because they are editorial content.

Vol. 1 at 127:11-128:6)  Second, he admits that he contractually agreed that DCI (as successor in interest to the British Broadcasting Corporation) ("BBC") was entitled to "ALL RIGHTS...FOR ALL PURPOSES EVERYWHERE," of the BBC/DCI documentary, including all television.  (OG Depo. at Vol. 3 at 449:1-450:2; Ex. 44 at ¶ 5 Pl.'s Resp. to DCI's Request for Admissions No. 3)

Fox Film has found no reported case where, under these conceded facts, liability has attached.  This is not surprising since, even absent these admissions, the cases allow the creator of a literary work use of the name or likeness of the individual to advertise the work absent permission.  So, for example, the musical group, The Temptations, have no claim for use of their names in a fictionalized account of their careers.  *Ruffin-Steinback v. dePasse,* 267 F.3d 457, 462 (6th Cir. 2001) ("[plaintiff's] fictionalized [likeness] in a work protected by the First Amendment and the advertising incidental to such use [does] not give rise to a claim for relief under the [plaintiff's rights] of publicity...").

Neither does the former Black Panther Party leader, Bobby Seale, have a claim even though his name and likeness were used to advertise a pictorial history book and home video about the Panthers.  *Seale,* 949 F. Supp. at 337 (granting partial summary judgment against the plaintiff on his claims based on right of publicity and the Lanham Act where "[t]he Defendants' use of the Plaintiff's name and likeness on the cover of the pictorial history book and on the cover for the home video clearly related to the content of the book and the film . . .").  The famous dancer, Ginger Rogers, had no claim over the movie "Fred and Ginger" about two fictitious ballroom dancers despite the obvious use of her name and that of her well-known partner, Fred Astaire.  *Rogers v. Grimaldi,* 875 F.2d 994, 999 (2d Cir. 1989) (affirming defense motions for summary judgment on right of publicity and Lanham Act claims).  In *Rogers,* the Second Circuit stated: "We believe that in

- 5 -

general the [Lanham] Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression." *Id.*

Finally, in *Wozencraft*, the movie and book *Rush* were heavily advertised and the Court found that "there is substantial evidence that the character "Jim Raynor" in *Rush* is based upon (plaintiff) and that the public recognized him as that character." *Wozencraft* 15 F.3d at 436. Yet, the Fifth Circuit affirmed summary judgment under Texas law and the First Amendment for the defendants.

Indeed, the Fifth Circuit, citing *Rogers,* has acknowledged that overextension of Lanham Act restrictions intrudes on First Amendment values and that the Court "must construe the Lanham Act narrowly to avoid such a conflict." *Westchester Media v. PRL USA Holdings, Inc.,* 214 F. 3d 658, 663 (5th Cir. 2000) This is especially so here, where Plaintiff concedes in his deposition that Fox Film never used his name or likeness in any advertisement for the Movie, including the ones Plaintiff challenges. (OG Depo. Vol. 1 at 127:11-128:6)

If the law were otherwise, publishers could not distribute and advertise unauthorized biographies such as *The Clinton Wars,* the recent account by Sidney Blumenthal of President Clinton's administration,[6] or legendary films such as *Citizen Kane,* widely acknowledged to have been inspired by the life of William Randolph Hearst,[7] or novels such as Robert Coover's *The Public Burning,* which told of Richard Nixon's supposed fantasies about Julius and Ethel Rosenberg.[8]

What our jurisprudence recognizes is that: "Fiction is not fact, but fiction is fact selected and understood... Fiction is fact arranged and charged with purpose." Thomas Wolfe, *Look Homeward*

---

[6] The Court will notice President Clinton's name and picture on the attached advertisement for the book. (Ex. 23)

[7] "As the story unfolds, the parallels between Hearst and Kane are obvious: both controlled newspaper empires; both frequently distorted the truth for a good story in the tradition of "yellow journalism"; both supported war with Spain in 1898; both dabbled in politics and both ended their lives cocooned in large buildings (San Simeon and Xanadu) surrounded by precious art objects." Street, *Citizen Kane,* 46 History Today 48, 49 (1996) (attached as Ex. 24).

[8] "Using the Rosenberg trial, the dramatic last minute delay, and the impending execution as focal points, Coover weaves a compelling fantasy that recreates with mythic power the whole tone and tenor of the Cold War period..." (Ex. 47) (Dust Jacket of *The Public Burning*).

*Angel* at 15 (Simon & Schuster New York 1997) (1929).  Creators of literary works and the laws which touch them acknowledge that "real life experiences are the source of all artistic inspiration.  A writer, states William Faulkner, requires three things: experience, observation and imagination.  Thus, one of his tools in creating believable characters in credible situations is the environment he knows."  Rosen & Babcock, *Of and Concerning Real People and Writers of Fiction*, 7 Comm. / Ent. L.J. 221, 226 (1985).  Plaintiff here ignores these literary and legal realities and, accordingly, has no claim under Texas or Federal law and – to the extent he does – the First Amendment and/or Article I, Section 8 of the Texas Constitution bar the application of those laws to the undisputed facts.

The material facts here are not disputed.[9]  The Movie was inspired by the events surrounding Plaintiff's 1995 experience in Bosnia. (Davis Depo. at 11:1-12:7)  The Movie's plot, however, departs from Scott O'Grady's real life experiences and takes off in a number of different directions, as Mr. O'Grady concedes.  (OG Depo. Vol. 1 at 136:15-165:5; Ex. 7)

In his deposition, Plaintiff also admitted that the extensive advertising of the Movie NEVER used his name or likeness:

> Q:      Is there any advertisement for the Movie that you've ever seen that has your face in it?  Your picture in it?
>
> A:      Not to my knowledge.
>
> . . .
>
> Q: [A]ny advertisement that…advertised the movie, Behind Enemy Lines, that… had the name Scott O'Grady in it?  Have you ever seen such an advertisement?
>
> A:      Not to my knowledge.
>
> Q: . . .[H]as there ever been…an advertisement for the movie, Behind Enemy Lines, that has used your likeness or image that you've ever seen?
>
> A:      Not to my knowledge.

---

[9] Where a dispute exists we have adopted Plaintiff's version of the events for the purposes of this motion only.

(OG Depo. Vol. 1 at 127:11-128:6)

Indeed, if anything, Plaintiff exploited the Movie to advance his own commercial interests through paid appearances on nationally syndicated television programs such as "HOT TICKET" (Ex.10) where, in addition to promoting his book (*Return with Honor*), O'Grady endorsed *Behind Enemy Lines* with a "HOT" rating:

> "Well, I thought it was a good movie. I was entertained. So, I will go ahead and give it "HOT.""

(Quote of O'Grady in Ex. 11A)

Similarly, O'Grady appeared on the syndicated television show *Entertainment Tonight* (*"ET"*), where he reviewed the Movie but also plugged a *proposed* movie based on the book *Good To Go* by Mary Pat Kelly which chronicled Plaintiff's experiences and quoted him extensively.[10] O'Grady also freely endorsed the Movie in newspaper articles such as *The Spokesman Review*, of Spokane, Washington, where he concedes he was accurately quoted as saying "I read the script way back when and it's not my story. They (Fox Film) just went ahead and took the concept of my story, which was a public event, and turned it into a Hollywood movie." (Ex. 17)  He added that Hollywood's tendency to copy real events doesn't bother him – "[t]hat's literary license and freedom of speech." *Id.*  He concedes the accuracy of this quote as well. (OG Depo. Vol. 1 at 79:12-83:3). O'Grady said further, "I hope it's a good movie. I have nothing but good to say about a movie if it is a positive movie that is patriotic. I wish them all the success with it." (Ex. 17)

## STATEMENT OF UNDISPUTED FACTS

### A.   THE EVENTS INVOLVING PLAINTIFF'S MISSION OVER BOSNIA

1.   Plaintiff was a United States Air Force pilot flying an F-16 jet, and in 1995 was assigned to the U.S. Air Force base near Aviano, Italy. (FAC at ¶ 7)

---

[10] Mr. O'Grady and Ms. Kelly were negotiating a business venture at the time of the *ET* broadcast but it never came to fruition. (OG Depo. Vol. 2 at 306:13-307:6; Kelly Depo. at 65:21-68:6)

2.  On June 2, 1995, while flying high above the Bosnian war zone, a Serbian missile hit the F-16 jet piloted by Plaintiff forcing him to eject. (FAC at ¶¶ 10 and 11)

3.  Upon landing in an opening in a wooded area he evaded capture for six days and survived by drinking rainwater and eating insects. (FAC at ¶¶ 11 and 12)

4.  On June 7, 1995, Plaintiff made radio contact with a U.S. fighter jet. (FAC at ¶ 13)

5.  During the early morning of June 8, 1995, Plaintiff emerged from a Bosnian forest and boarded a waiting Marine helicopter sent to rescue him. The helicopter was fired upon as it lifted off and flew to a waiting aircraft carrier. (FAC at ¶ 14)

6.  Between June 2 and 8, 1995, the events involving Plaintiff were "the dominant news story in the United States and indeed, throughout the world" (FAC at ¶ 15), although his name was not released until the rescue was completed. (Ex. 6B, *see* "Downed Pilot Rescued by NATO team," by Air Force News Service)

## B.  THE PUBLIC RECORD OF PLAINTIFF'S BOSNIAN EXPERIENCE

1.  Following his rescue, Plaintiff participated in "many news conferences and interviews", including an extended interview with the British Broadcasting Company ("BBC"). (FAC at ¶ 17; OG Depo. Vol. 2 at 322:2-323:4; Exs. 6, 6A, 6B, 14, 14A, 14B and 14C, which is a collection of these news articles and broadcasts)

2.  Plaintiff was hosted by President Clinton at a White House luncheon. (FAC at ¶ 16)

3.  Plaintiff also agreed to be interviewed for a book by author Mary Pat Kelly, who conducted taped conversations with Plaintiff about his experiences. She included some of these conversations verbatim in the book *Good to Go*, published in 1996. (OG Depo. Vol. 1 at 51:5-54:10; Kelly Depo. at 41:22-42:15)

4.  *Good to Go* (Ex. 13) used seven photographs of Plaintiff, including his name and picture on the book's cover. The full title was "*'Good to Go': The Rescue of Scott O'Grady From Bosnia.*" (OG Depo. Vol. 1 at 49:19-50:6; Ex. 13) One of the images used in the book was an artist's rendering of Plaintiff's rescue scene which was commissioned by Sikorsky Aircraft Corporation and used as a promotional advertisement. (OG Depo. Vol. 1 at 73:17-74:22) Plaintiff never sought compensation for the use of his photograph in the painting, nor did he complain to the artist or to Sikorsky Aircraft Corporation. (OG Depo. Vol. 1 at 76:25-77:18)

5.  Plaintiff did not receive any compensation with respect to *Good to Go* and did not seek any. (OG Depo. Vol. 1 at 59:20-60:5)

6.  Plaintiff and Ms. Kelly discussed a movie deal regarding *Good to Go* but it never came to fruition. (OG Depo. Vol. 2 at 306:13-307:6; Kelly Depo. at 65:21-68:6)

7.  Plaintiff also granted extensive interviews to The History Channel, which produced a one-hour special entitled: "Escape! Escape From Bosnia: The Scott O'Grady Story." (Ex. 317)

O'Grady's name is used to advertise this product which is sold over the Internet. (Ex. 317; Declaration of Kathy Adair at ¶ 1) He never received compensation for this program. (OG Depo. Vol. 3 at 526:16-18) Plaintiff signed a release to the company, FilmRoos, Inc. which produced The History Channel program. (Ex. 313) The release states in part: "I hereby consent to being videotaped by FilmRoos, Inc. and grant FilmRoos, its agents, successors, assignees, designees, and licensees the right to use my name, voice, picture, and statements made by me… (Ex. 313; OG Depo. Vol. 3 at 525:14-526:9)

8.      Plaintiff also accurately reported his experiences in military and "extensive" government debriefings following his rescue. (OG Depo. Vol. 1 at 66:15-67:3) He was aware of, but did not participate in, a Congressional investigation regarding the incident which resulted in a publicly available transcript detailing Plaintiff's experiences and those of his rescuers. (OG Depo. Vol. 1 at 60:6-25) The Congressional Hearings were conducted between June 7, 1995 and September 25, 1996, in 10 different sessions. (Ex. 9)

9.      In addition, various agencies of the U.S. Government gave press briefings regarding Plaintiff's experiences (Ex. 6B), and there were many documents posted on the internet from participants in the events. (Ex. 6)

10.     Plaintiff's rescue was the subject of numerous publicly available and broadcast news articles, press conferences and hearings, including: Congressional hearings on June 7, 1995 and July 11, 1995; Department of Defense briefings including a News Briefing (on June 2, 1995), two News Briefings, a Press Advisory, and two News Releases (all on June 8, 1995); an Allied Forces Southern Europe News Release (on June 8, 1995); numerous newspaper articles, including those in the *Los Angeles Times, New York Times, New York Post, Washington Post*, the *Atlanta Journal-Constitution* and other major newspapers; lengthy magazine articles in *Time Magazine, Newsweek Magazine* and *U.S. News & World Report* in June, 1995; numerous television broadcasts on ABC, CBS, and NBC including a 45-minute broadcast on ABC's *Nightline* on June 8, 1995. (Exs. 6, 6A, 6B, 14, 14A, 14B and 14C)

## C.   PLAINTIFF'S BOOKS:  "RETURN WITH HONOR" and "BASHER 52"

1.      Plaintiff co-authored a book entitled "*Return With Honor*," which chronicled his life story including the events in Bosnia. (Ex. 3)

2.      He also co-authored a children's book, entitled "*Basher 52*," which is "basically the same story" as *Return With Honor*. (Ex. 5; OG Depo. Vol. 1 at 170:2-5)

## D.   PLAINTIFF'S DEAL WITH ORION PICTURES

1.      Plaintiff signed a contract with Orion Pictures to create a movie based on his experiences but the picture was never made because Orion "disbanded." (OG Depo. Vol. 1 at 84:4-85:4) Plaintiff is not aware of any other reason why that movie was not made. (OG Depo. Vol. 1 at 84:12-85:6) Plaintiff specifically admits that he knows of no evidence suggesting that Fox had anything to do with Orion's decision not to make that movie. (OG Depo. Vol. 1 at 84:12-85:6)

2. The working title for Plaintiff's proposed movie was: *"Return with Honor."* (Ex. 18)

3. Pursuant to his Orion agreement, Plaintiff, on January 22, 2001, has regained the right to develop a movie of his life story subject to repayment to Orion's successor of monies advanced by Orion. (Ex. 19; OG Depo. Vol. 1 at 92:3-95:8)

## E.   THE TITLE: *BEHIND ENEMY LINES*

1. The title *Behind Enemy Lines* has been used in more than 30 books, movies and other literary works beginning in 1946 and continuing to this date. (Ex. 304)

2. Some of the books and movies that have used the title are: *"Behind Enemy Lines: Heroic Missions of WWII"* (1998 Moviecraft Inc. documentary); *"Behind Enemy Lines"* starring Robert Patrick (1988 Eastern Film Management Corporation movie); *"Fortress Europe – Behind Enemy Lines on D-Day"* (International Historic Films, Inc. documentary); *"Behind Enemy Lines"* starring Thomas Ian Griffith (Orion home video movie); *"Recon Marine – Behind Enemy Lines"* (Tully Entertainment movie); *"Behind Enemy Lines"* from *"Escape Stories: Amazing Tales of Wartime Escapes"* (2003 Discovery Communications, Inc. documentary); *"Behind Enemy Lines: The True Story of a French Jewish Spy in Nazi Germany"* by Marthe Cohn, Wendy Holden (2002 Harmony Books); *"Road to Baghdad: Behind Enemy Lines: The Adventure of an American Soldier in the Gulf War"* by Martin Stanton (2003 Presidio Press book); *"Commandos Behind Enemy Lines"* (Interactive Video); *"Behind Enemy Lines"* (Computer Game on CD); *"SPYS/Behind Enemy Lines"* (Music CD) *"Behind Enemy Lines – Civil War Spies, Raiders, and Guerillas"* by Wilmer L. Jones (2003 Taylor Publishing Book) (Ex. 20); *"Behind Enemy Lines"* by Cindy Dees (2002 Silhouette book) (Ex. 302); *"Behind Enemy Lines"* A Field Manual for God's Army by Chuck Dean (1997 WordSmith Publishing book) (Ex. 303)

3. The original script for the Movie was conceived by John Davis in 1995 and was titled *Behind Enemy Lines*. (Davis Depo. at 14:10-15:24; 29:18-24)

4. Plaintiff's hard cover book, published in 1995, *Return With Honor*, did not contain the phrase "Behind Enemy Lines" in the title or anywhere in the text of the book. (Ex. 5)

5. Plaintiff's paperback book, published in 1997, added an overline to the title which stated: "An American Fighter Pilot's Heroic Tale of Survival Behind Enemy Lines." (Ex. 5) (OG Depo. Vol. 1 at 167:10-19)

6. Plaintiff has no registered copyright for the overline: "An American Fighter Pilot's Heroic Tale of Survival Behind Enemy Lines." (OG Depo. Vol. 1 at 167:24-168:8; Declaration of Susie Kunzle ("Kunzle Decl.") at ¶ 3; Ex. A to Kunzle Decl.)

7. Plaintiff's literary agent recognized that there is no protected right in a title when she was confronted with a complaint from a Vietnam Veteran who was a pilot shot down behind enemy lines and authored a book titled *"Return with Honor,"* the same title later used by Plaintiff for his book. (Ex. 176; Newberg Depo. at 23:18-26:24)

8.    Plaintiff's book publisher responded to the complaint about use of the title *Return With Honor* by stating: "It is well established that titles are not entitled to copyright protection. *Denker v. Twentieth Century-Fox Film Corp.* 10 N.Y. 2d 339 (1961)("The Greatest Story Ever Told"); *McGraw-Hill Book Co. v. Random House, Inc.*, 32 Misc. 2d 704, 225 N.Y.S. 2d 646 (1962)("P.T. 109, John F. Kennedy in World War II")." (Ex. 176)

9.    Plaintiff does not claim copyright or trademark protection for the title: *Behind Enemy Lines.* (OG Depo. Vol. 1 at 167:24-168:8; Ex. A to Kunzle Decl.) (copyright registration) (Ex. A to Kunzle Decl.) (Affidavit of no trademark registration)

10.   In a 1999 news broadcast titled "Behind Enemy Lines", ABC News reported on an American pilot (not O'Grady) shot down over Bosnia who ejected from his plane and evaded Serbian forces before he was rescued by helicopter. (Ex. 12)

**F.    CREATION OF THE MOVIE *BEHIND ENEMY LINES***

1.    A VHS copy of the Movie is attached as Ex. 8A.  A DVD copy of the Movie is attached as Ex. 8.

2.    The Movie was prompted by Fox Film's desire to make a movie that could be loosely based on the events that Fox Film and the independent film producer, John Davis, and others had seen on the news, that being a pilot who was shot down, Scott O'Grady. (Davis Depo. at 11:1-12:7)

3.    Mr. Davis retained Jim and John Thomas to write a script which Mr. Davis received in 1995. The script was originally titled "Behind Enemy Lines". (Davis Depo. at 14:10-15:24; 29:18-24)

4.    The Movie's director, John Moore, was interested in making a movie about the Bosnian civil wars and about the lack of European intervention, the subsequent ethnic cleansing and the massacre in Srebrenica. (Moore Depo. at 31:22-32:5)

5.    The script of the Movie went through several revisions and was presented to John Moore in September 1999. (Davis Depo. at 14:10-24; Moore Depo. at 9:2 6)

6.    The script, as finally approved, has similarities to Plaintiff's real life experiences but "the script of the Fox movie is not Captain O'Grady's actual story." (FAC at ¶ 30)

7.    The claimed similarities between the Movie and Plaintiff's life story are set out in paragraph 30 of the First Amended Complaint as: (i) an American fighter pilot shot down by a surface to air missile; (ii) while on a peace keeping mission over Bosnia; (iii) who must eject from an exploding aircraft and float down in broad daylight behind enemy lines; (iv) who must hide from armed Bosnian Serbs searching for the pilot for several days; (v) radio communications between the rescuers and the pilot play an important role; (vi) Marine rescuers launch off a Navy ship to rescue him in daylight; and (vii) enemy forces fire upon the helicopters as they carry the pilot to safety. (FAC at ¶ 30)

8.     All of the above-claimed similarities were publicly available shortly after the incident in contemporaneous news articles, press conferences conducted by the U.S. government and NATO, and public documents such as the Congressional Record. (*See* Exs. 6, 6A, 6B, 9, 14, 14A, 14B and 14C) Specifically, with respect to each claimed similarity, publicly available material reveals the following:

(A)     AN AMERICAN FIGHTER PILOT SHOT DOWN BY A SURFACE TO AIR MISSILE;

"The SA-6 missile actually caused the F-16 to explode and to begin disintegrating in the air..." (House National Security Committee Hearing, 104-36, July 1995, p. 49)

"I knew immediately when the missile hit...I was engulfed in flames with a cockpit that's disintegrating and violent pitching down motion." (CNN "Early Edition" interview: Captain Scott O'Grady, June 13, 1995, Ex. 6A SOG 003601)

"It had begun six days before, when his F-16 was targeted by an SA-6 surface-to-air missile fired from a Bosnian-Serb stronghold...the SA-6 was able to hurtle up on the "blind spot" in the underbelly of the F-16's defensive pod, blasting into O'Grady's aircraft..." (Time Magazine article entitled "A Pilot's Story" Ex. 6 - SOG 003802)

(B)     WHILE ON A PEACE KEEPING MISSION OVER BOSNIA

"Captain O'Grady was shot down while serving as part of the NATO operation enforcing the United Nations no-fly zone over Bosnia,..." (Ex. 9) (House National Security Committee Hearing, 104-36, July 1995, p. 46)

"...there is a U.S. F-16 down over Bosnia. It was participating in NATO's mission, the NATO mission we've been doing for some time called Deny Flight." (Ex. 6B - SOG 003641 to 3642) (Defense Department Background Briefing Regarding Downed U.S. F-16 Over Bosnia – 12:05 p.m. EDT, Friday, June 2, 1995 – SOG 003641 to 003642)

(C)     WHO MUST EJECT FROM AN EXPLODING AIRCRAFT AND FLOAT DOWN IN BROAD DAYLIGHT BEHIND ENEMY LINES

"The SA-6 missile actually caused the F-16 to explode and to begin disintegrating in the air when Captain O'Grady pulled the handle that ejected him in his ejection seat from the aircraft." (Ex. 9) (House National Security Committee Hearing, 104-36, July 1995, p. 49)

"It ended up being a long ride down, yes." (Ex. 6A) (CNN "Early Edition" interview: Captain Scott O'Grady, June 13, 1995, SOG 003602)

"O'Grady descended through an unlucky break in the clouds, near a major city and road in full view of anyone below. 'I was in the parachute for an extremely long

- 13 -

period of time…'" (Ex. 6) (*Washington Post* article entitled "Pilot's Riveting Tale of Escape and Survival" dated June 11, 1995 – SOG 003628)

…Everybody on the ground could see me.'" (Ex. 6) (*Time Magazine* article entitled "A Pilot's Story" - SOG 003802)

"As Captain O'Grady was descending, he formed a mindset and strategy that was to carry him through the next 6 days. After he passed through the clouds and was able to see the ground below him for the first time, he saw a large town to his west, and along a major east-west road he noticed a group of military vehicles and some men who appeared to be in uniforms looking up in the sky at him." (Ex. 9) (House National Security Committee Hearing, 104-36, July 1995, p. 50)

(D)     WHO MUST HIDE FROM ARMED BOSNIAN SERBS SEARCHING FOR THE PILOT FOR SEVERAL DAYS;

"He decided that once he landed he would move immediately to a hiding position and remain stationary, and that he would only move at night." (Ex. 9) (House National Security Committee Hearing, 104-36, July 1995, p. 50)

"…between June 2 and 6, while the search continued unabated, Captain O'Grady on the ground stayed with his evasion plan, moving from hide-site to hide-site, trying to avoid detection." (Ex. 9) (House National Security Committee Hearing, 104-36, July 1995, p. 51)

"He lay 'totally motionless' for nearly five hours as Serb forces patrolled, sometimes only a few feet away, combing the hills for him. For days afterward, he tried repeatedly to contact the rescuers he was sure would come - and managed to avoid the Serb patrols that wanted to take him prisoner." (Ex. 6) (*Washington Post*, June 9, 1995 article entitled "Pilot Drew Rescuers, Sprinted to 'Copter" – SOG 003608)

"By O'Grady's account, he hid for six tense days…" (Ex. 6) (*Washington Post* article entitled "Pilot's Riveting Tale of Escape and Survival" dated June 11, 1995 – SOG 003628)

(E)     RADIO COMMUNICATIONS BETWEEN THE RESCUERS AND THE PILOT PLAY AN IMPORTANT ROLE;

"'Basher-52 reads you,' said O'Grady, using the 'call sign' that signifies a particular plane and its pilot. 'I'm alive; help.'" (Ex. 6) (*Time Magazine* article entitled "A Pilot's Story" - SOG 003804)

"Because he believed that his command knew he was alive and because he wanted to limit the chances either that the ground searchers might hear his transmissions or that they might electronically intercept his transmissions, he decided to limit his attempts to make radio contact." (Ex. 9) (House National Security Committee Hearing, 104-36, July 1995, p. 50)

"In the meantime, as soon as the command learned of his shootdown, although it had no indications that he had safely ejected, a 24-hour listening watch was immediately established in theater to monitor survival channels and Priority One was established for all intelligence collectors to search for the downed pilot." (Ex. 9) (House National Security Committee Hearing, 104-36, July 1995, p. 50)

On June 7th, "hearing the sound of aircraft in the air, he (O'Grady) moved to the high ground and started frequent attempts to establish communications. Nearly as soon as he started these transmissions, contact was made and the NATO command was alerted that Captain O'Grady was alive and waiting to be recovered." (Ex. 9) (House National Security Committee Hearing, 104-36, July 1995, p. 51)

"…last night at approximately two o'clock in the morning [8 p.m. EDT, June 7], we were able to establish voice contact with Captain Scott F. O'Grady, the pilot of the downed F-16." (Ex. 6B) (U.S. Department of Defense News Release dated June 8, 1995)

"Voice contact was made with the pilot by another NATO aircraft around 0230 (local time); the pilot was using his survival radio." (Ex. 6B) (Allied Forces Southern Europe Public Information Guidance – June 8, 1995 – SOG 003653)

"The daring rescue was set in motion Thursday at 2:08 a.m. (Bosnian time) when a pilot from O'Grady's own squadron…heard and recognized O'Grady's voice, calling on a battery-operated emergency radio, and notified Aviano." (Ex. 6) (*Atlanta Journal-Constitution*, June 9, 1995, article entitled "I'm ready to get the hell out of here" – SOG 003771)

Here is the voice recording of the radio transmission:

Capt. SCOTT O'GRADY: Basher 52, Basher 52.

555th SQUADRON OFFICER: And this is Basher 11, say your call sign.

Capt. SCOTT O'GRADY: This is Basher 52, Can you hear?

555th SQUADRON OFFICER: I understand you are Basher 52.

Capt. SCOTT O'GRADY: This is Basher 52, sitting here.

555th SQUADRON OFFICER: Basher 52, this is Basher 11, you're loud and clear.

Capt. SCOTT O'GRADY: I'm alive, I'm alive.

555th SQUADRON OFFICER: Copy that. What was your squadron in Korea?

- 15 -

Capt. SCOTT O'GRADY: JUVAT, JUVAT.     (*ABC World News Saturday* broadcast on June 10, 1995 at 6:30 p.m. ET) (Ex. 6A)

(F)     MARINE RESCUERS LAUNCH OFF A NAVY SHIP TO RESCUE HIM IN DAYLIGHT;

"Once contact was established, the command had to decide how, when, and where to pick him (O'Grady) up.  After a very short discussion, the commander on the scene decided upon an immediate pickup.  Although it meant a daytime operation, … his understanding of potential threats and the vulnerability of Captain O'Grady to detection argued for an immediate extraction."  (Ex. 9) (House National Security Committee Hearing, 104-36, July 1995, p. 51)

"As quickly as we could turn the capability around – and the closest capability was from KEARSARGE – it was launched at the earliest possible time.  It so happened that it came after sunrise." (Ex. 6B) (June 8, 1995 – 9 a.m. – DOD News Briefing)

"After a positive identification and establishment of his exact location, Admiral Smith ordered a rescue operation consisting of CH-53 Sea Stallion and AH-1 Cobra helicopters off the USS Kearsarge and fixed wing fighter and support aircraft." (Ex. 6B) (U.S. Department of Defense News Release dated June 8, 1995)

"The Marine package was two 53E's, two Cobras, and two Harriers" which were launched from the Kearsarge at approximately 5:45 a.m.  (Ex. 6B) (Department of Defense News Briefing, June 8, 1995 – 9:45 a.m.)

"Search and Rescue forced, including a specialized U.S. Marine Corps team from USS Kearsarge, covered by NATO air forces to suppress the anti-air threat, successfully located and rescued the pilot." (Ex. 6B) (Allied Forces Southern Europe – Public Information Guidance – June 8, 1995, SOG 003653)

"Two Sea Stallion helicopters set down…….and 20 Marines raced out and quickly formed a defensive perimeter around the site…"  (Ex. 6) (*Atlanta Journal-Constitution*, June 9, 1995 article entitled "*I'm ready to get the hell out of here*" – SOG 003772)

"Two helicopters from the Kearsarge,…swept into a clearing just after dawn to pull Capt. Scott F. O'Grady out of his hiding place and briefly traded fire with the Bosnian Serbs." (Ex. 6) (*The Sun* article entitled "Marine rescuers have a lot of experience, not always in successful missions" - June 9, 1995 – SOG 003776)

(G)     ENEMY FORCES FIRE UPON THE HELICOPTERS AS THEY CARRY THE PILOT TO SAFETY.

Marines on the Kearsarge "who were in a ready status, to prepare for an immediate rescue operation" were alerted and "quickly notified the other units who would be

- 16 -

needed to ensure rescue." (Ex. 9) (House National Security Committee Hearing, 104-36, July 1995, p. 51)

"...the two helicopters then departed and began the flight back to the Kearsarge. On the route back, they came under fire from missiles or rockets and some small arms fire, but the recovery force made it back to the Kearsarge without casualties." (Ex. 9) (House National Security Committee Hearing, 104-36, July 1995, p. 51)

"...there was one or more surface-to-air missiles that were fired, and they thought that there was small-arms fire that one or two or more of the helicopters had taken on the way out." (Ex. 6B) (Department of Defense News Briefing, June 8, 1995 – SOG 003663 thru 3700 – also Internet printout of the same briefing)

"...pilots saw tracks of two shoulder-fired, surface-to-air missiles. They jerked the helicopters so violently to evade them that several Marines vomited. Automatic weapons fire damaged one chopper, a spent bullet bouncing off the canteen of Marine Sgt. Maj. Angel Castro." (Ex. 6) (*Atlanta Journal-Constitution*, June 9, 1995 article entitled "I'm ready to get the hell out of here" – SOG 003773)

Also see June 19, 1995 *Newsweek Magazine* article entitled "An American Hero" which includes all details above with timeline diagram (Ex. 6) (SOG 003807 to 3818) and *U.S. News & World Report* dated June 19, 1995 (Ex. 6) (SOG 003819 to 3825) Additionally, see extensive ABC, CBS and NBC television coverage of events as well as the book "*Good to Go*" which recites the events in Plaintiff's own words.

9.    In addition to these well documented details of Plaintiff's situation, two other airmen were shot down over Bosnia, one evaded capture for several days and both were rescued in a similar way. One rescue (of a British pilot on April 16, 1994) preceded Plaintiff's and the other (of a U.S. pilot on March 27, 1999) post-dated it. (Ex. 12)

10.   The U.S. pilot – "Hammer 34" – "bailed out of his crippled jet fighter and was prone in a pitch black, thickly wooded area trying to conceal his whereabouts from Serbian troops," according to the American Forces Information Service. (Ex. 12) "Hammer 34, who was later plucked out of enemy territory in a daring pre-dawn rescue effort." *Id.*

11.   While the Movie shares these common, publicly-available, factual elements with O'Grady's experience, it also was a work of fiction, the product of the Fox Film creative process, as Plaintiff admits. (OG Depo. Vol. 1 at 136:15-165:5; Ex. 7) In fact, the main themes and subplots of the Movie move beyond Plaintiff's experiences because in the Movie, unlike real life, the lead character is initially disenchanted with the military but, by the end of the Movie, has changed his mind. The theatrical work also raises a conflict over the desire to save one person (the pilot), as advocated by the U.S. military officer played by actor Gene Hackman, against the concern that the rescue effort would endanger the entire peace process, a view held by a French NATO officer (Hackman's superior) who refused to authorize the rescue. The Movie also had several sub-plots: the consequences of disobeying orders in an effort to save an American soldier, and the heroic efforts of the character played by Owen Wilson, to retrieve surveillance film showing Serbian atrocities. None of these creative

- 17 -

conflicts were present in Plaintiff's life story, as he admits. Nor did Plaintiff experience the many action scenes portrayed by the Owen Wilson character. *Id.*

12. The Movie was made with the cooperation of the U.S. military (Davis Depo. at 62:3-23); the U.S. Department of Defense and the U.S. Navy reviewed the script and commented on it extensively, providing detailed factual information. (*Id.* at 62:25-63:6)

## G.   THE BBC AND DISCOVERY CHANNEL DOCUMENTARY

1. A year after he was rescued, Plaintiff gave an extended interview with the British Broadcasting Company (the "BBC") (FAC at ¶ 17; Exs. 44, 45), for which he was paid $500. (OG Depo. Vol. 2 at 345:9-15)

2. The payment of $500 by the BBC to Plaintiff was made pursuant to a 1996 agreement executed between the BBC and Plaintiff (the "BBC/O'Grady Release"). (Exs. 44, 45)

3. The BBC produced a documentary entitled "Missing in Action," which was referred to in the BBC/O'Grady Release as "999 Special" (the "BBC Documentary"). (Exs. 44, 45)

4. In the BBC/O'Grady Release, Plaintiff relinquished any rights he had in the compensated interview and granted the BBC the right to broadcast the BBC Documentary anywhere in the world. (Exs. 44, 45)

5. The BBC/O'Grady Release provides that the BBC and "its licensees and assigns" (like DCI) shall be entitled to "ALL RIGHTS" in the material Plaintiff contributed "FOR ALL PURPOSES EVERYWHERE" including, but not limited to, "all television . . . pay cable television and basic cable television," of the materials supplied by Plaintiff. (Ex. 44 at ¶ 5)

6. In the BBC/O'Grady Release, Plaintiff also gave up the right to complain about the editorial treatment of the BBC Documentary and, in fact, he never did complain to the BBC. (Exs. 44, 45; OG Depo Vol. 3 at 482:21-483:24)

7. In 1996, the BBC assigned the BBC Documentary to the Discovery Channel ("DCI"), which changed its title to "Behind Enemy Lines: The Scott O'Grady Story." Otherwise, DCI made no editorial change to the BBC Documentary. (OG Depo. Vol. 2 at 342:10-17) DCI had the right to re-title the BBC Documentary under an assignment from the BBC. (Ex. 228 at DCI 000117) Between mid-1997 and 2001, DCI rebroadcast the documentary in its re-titled format (the "DCI Documentary") over 30 times. (FAC at ¶ 26; Ex. 48)

8. Plaintiff signed a release with the BBC in 1996 which "establishes the scope of rights O'Grady granted to the BBC." (Exs. 44, 45, Pl.'s Resp. to DCI's Request for Admission No. 3)

9. The BBC/O'Grady Release also allowed the BBC and "its licensees and assigns" like DCI to adapt or modify the program (Ex. 44, ¶ 5) and the "programme titles...may be changed at the discretion of the BBC." (Ex. 44, ¶ 15)

## H.   THE DISCOVERY CHANNEL SPECIAL PROGRAMMING EVENT

1.   In the fall of 2001, Kelly Patterson, of the Discovery Channel, proposed to Fox Film a "stunt," which is a "special programming event." In this special programming event, Fox Film would pay to advertise the Movie on the Discovery Channel during the airing of the DCI Documentary. (Patterson Depo. at 50:1-51:10)

2.   In connection with the special programming event, the Discovery Channel also agreed to produce and air certain material known as "Interstitials" and "Tune-Ins" regarding the upcoming November 28 DCI Documentary and the Movie. (Patterson Depo. at 87:7-90:23; 143:1-144:6; 155:16-156:5; Exs. 113, 114)

3.   The Discovery Channel's Interstitials were programming elements intended to support the theme of the fact (in the DCI Documentary) versus fiction of the special programming event (the Movie). (Patterson Depo. at 50:20-24; 64:21-65:12; 167:22-168:4; Anderson Depo. at 41:10-17) The Interstitials consisted of the opening introduction, "bump-ins" leading from the program into advertising, "bump-outs" leading from the advertising back into the programming, and "a sneak peak" of the Movie. (Patterson Depo. at 50:20-24; 167:22-168:4) (See Exhs. 113, 114, 114A, 335 and 335A) The Interstitials included, in part, material provided by Fox Film of interviews with the actors and trailers from the Movie which were edited by DCI and combined with its programming to create an element of a fact versus fiction comparison between the Movie and the DCI Documentary. (Anderson Depo. at 42-44) Additional elements of the Interstitials included "factoids", which were educational elements [e.g.], facts on pilots, the aircraft carrier USS Carl Vinson used in the Movie, survival training, and the nutrition of eating bugs and leaves. (Anderson Depo. at 32:19-34:10) (See Exhs. 113, 114 and 114A)

4.   A "Tune-In", or "promo", is a commercial created from material from the program that is being promoted. (Anderson Depo. at 23:14-24:13) Tune-Ins are intended to encourage viewers to watch the program and typically aired "one to two weeks prior to the event." (Anderson Depo. at 23:19-22) Here, the Tune-Ins showed clips for the November 28 DCI Documentary and stated that the November 28, 2001 airing would be sponsored by the Movie. (See Exhs. 114 and 114A)

5.   The November 28 DCI Documentary as aired included Advertisements for the Movie, the Interstitials, and advertisements for products unrelated to the Movie, such as PetsSmart, Kay Jewelers and Dell Computers. (Patterson Depo. at 188:23-189:11; See Ex. 335, 335A)

6.   None of the Advertisements or promotions for the Movie on the Discovery Channel or otherwise, used Plaintiff's name or likeness. (OG Depo. Vol. 1 at 127:11-128:6)

7.   The Challenged Material consisting of (1) the Advertisements for the Movie aired during the November 28 DCI Documentary, (2) the Interstitials, and (3) the Tune-Ins are the only "advertising" of the Movie that are complained of in Plaintiff's First Amended Complaint. (FAC at ¶¶ 36, 37, 38, 39, 40) Defendants contend that the Interstitials are not advertisements.

8.   A true and correct copy of the November 28 DCI Documentary, including the Interstitials and all third party advertising is reflected in Exs. 335 and 335A (certified copy of transcript).

A true and correct copy of the Tune-Ins and Interstitials without the DCI Documentary programming and the other advertising is reflected in Exs. 114 and 114A (certified copy of transcript). Exhibits 114 and 335 contain all of the Challenged Material.

## I.   ADVERTISING AND PROMOTION OF THE MOVIE

1.   The overall advertising budget for the Movie was between $30 to $40 million (Rothman Depo. at 50:5-10)

2.   None of the advertising or promotion used Plaintiff's name, likeness or image. (OG Depo. Vol. 1 at 127:11-128:6)

3.   Advertising on the Discovery Channel was thought to be appropriate because of the Discovery Channel's demographics. (Godsick Depo. at 47:3-48:11)

4.   Fox Film spent approximately $400,000 on advertising for the Movie with the Discovery Channel over a period of several weeks. (Siskind Depo. at 34:8-35:21; Patterson Depo. at 105:15-106:2) Only a small portion of that money was spent on advertising in conjunction with the November 28 DCI Documentary, that is, the one-time special programming event. (Patterson Depo. at 106:3-19)

## J.   PLAINTIFF'S CONDUCT SUBSEQUENT TO RELEASE OF THE MOVIE

1.   Plaintiff attended a screening of the Movie at the Fox Film studio on November 26, 2001. (OG Depo. Vol. 2 at 295:18-297:13)

2.   Plaintiff taped appearances appearing on *Hot Ticket* on November 26, 2001 and on *ET* on December 1, 2001. (OG Depo. Vol. 1 at 110:13-111:4 and Vol. 2 at 383:4-384:2). He was paid $1,200.00 for his appearance on *Hot Ticket*. (Ex. 21) Plaintiff saw a videotape of the November 28 DCI Documentary with the Movie ads within a few days of its airing. (OG Depo. Vol. 1 at 122:5-123:15)

3.   "Well, I thought it was a good movie. I was entertained. So, I will go ahead and give it "HOT." (Quote of O'Grady in Ex. 11A)

"I read the script way back when and it's not my story. They (Fox Film) just went ahead and took the concept of my story, which was a public event, and turned it into a Hollywood movie." (Ex. 17)

"I hope it's a good movie. I have nothing but good to say about a movie if it is a positive movie that is patriotic. I wish them all the success with it." (Ex. 17)

4.   Plaintiff anticipated this litigation on November 28, 2001. (Pl.'s Resp. to Fox Film's Interrogatories No. 5)

5.   Plaintiff also participated in media coverage regarding the Movie, including appearances on the nationally-syndicated television programs *Hot Ticket* and *Entertainment Tonight* (Exs.

10, 11A, 37 and 37A), and through interviews with the print media.  (*See* Ex. 17, news article quoting Plaintiff about the Movie)

6.     Plaintiff never asked the producers of *Hot Ticket* or *ET* to remove or retract his endorsement of the Movie. (OG Depo. Vol. 1 at 133:11-18)

7.     On October 22, 2001, a representative of Fox Television Studios ("Fox Television") sent Plaintiff a letter inquiring whether Plaintiff would be interested in a "Film for Television." (Ex. 29)

8.     There were communications between Fox Television and Plaintiff but the project never materialized because Plaintiff seemed uninterested.  (Grant Depo. at 48:22-49:5)

9.     Plaintiff concedes that he is not aware of any offers made to him by Fox Television nor is he sure if he would have accepted any offer if made. (OG Depo. Vol. 2 at 220:5-18 and 223:19-224:6)

10.    No discussions were held between Fox Film and Fox Television relating to the made-for-television movie offer proposed by Fox Television to Plaintiff.  (Grant Depo. at 51:9-19)

## II.

## GROUNDS FOR SUMMARY JUDGMENT

Fox Film is entitled to summary judgment as a matter of law on all of Plaintiff's claims as

follows:

A.     **INVASION OF PRIVACY BY MISAPPROPRIATION AS TO THE MOVIE (FAC–COUNT I PARAGRAPHS 45-49)**

1.     **(Ground One) The Misappropriation Claim Fails Because Texas Law Does Not Protect A Person's Life Story**

2.     **(Ground Two) Texas Law Does Not Allow a Misappropriation Claim For Information That Is Newsworthy Or In The Public Domain**

3.     **(Ground Three) The Misappropriation Claim as To The Movie Is Barred Under The First Amendment And The Texas Constitution Art. I § 8**

B.     **INVASION OF PRIVACY BY MISAPPROPRIATION AS TO THE CHALLENGED MATERIAL (FAC – COUNT I PARAGRAPHS 45-49)**

1.     **(Ground Four) The Challenged Material Does Not Use Plaintiff's Name or Likeness Thus Negating an Essential Element of Plaintiff's Claim**

- 21 -

2. (Ground Five) O'Grady Released All Rights Regarding the DCI Documentary, Thereby Waiving Any Right to Complain As to Its Use In The Challenged Material

3. (Ground Six) The Newsworthiness And Incidental Use Privileges Bar the Misappropriation Claim Relating To The Challenged Material

4. (Ground Seven) Even if the Challenged Material Used Plaintiff's Name or Likeness, That Use is Protected by the First Amendment of the United States Constitution and Article I §8 of the Texas Constitution

C. **LANHAM ACT AS TO THE MOVIE (FAC – COUNT II PARAGRAPHS 50-53)**

1. (Ground Eight) False Designation of Origin Claims Under the Lanham Act Do Not Apply To Ideas, Concepts or Communications Such as The Movie

2. (Ground Nine) The Movie Is Not Commercial Speech and Therefore The Lanham Act Does Not Apply Nor Could It Be Applied Consistent With The First Amendment

3. (Ground Ten) There Is No Evidence of a False or Misleading Statement of Fact Thus Negating an Essential Element of Plaintiff's Lanham Act Claim

D. **LANHAM ACT AS TO THE CHALLENGED MATERIAL (FAC – COUNT II PARAGRAPHS 50-53)**

1. (Ground Eleven) The Lanham Act False Advertising Claim Fails Because O'Grady Cannot Prove the Elements of the Claim

2. (Ground Twelve) O'Grady's Lanham Act Claim Against The Challenged Material Fails Because There Is No False Express Endorsement Or Misleading Statement of Fact And Is Precluded By The First Amendment

3. (Ground Thirteen) Plaintiff's Lanham Act Claim As To The Challenged Material Is Barred By The Newsworthy And Incidental Use Privileges

E. **UNFAIR COMPETITION, FALSE ADVERTISING AND UNJUST ENRICHMENT**

1. (Ground Fourteen) There Is No Evidence Of Unlawful Competition, False Advertising and Unjust Enrichment Negating an Essential Element

2. (Ground Fifteen) Plaintiff's Unfair Competition, False Advertising and Unjust Enrichment Claims Are Duplicative Of The Invasion of Privacy and Lanham Act Claims and; Thus, Are Barred By The First Amendment

F. **TORTIOUS INTERFERENCE (FAC – COUNT IV – FAC PARAGRAPHS 57-58)**

1.    **(Ground Sixteen) There is No Evidence of Reasonable Probability of Contract**

2.    **(Ground Seventeen) There is No Evidence of Independently Tortious or Unlawful Acts**

3.    **(Ground Eighteen) There is No Evidence of Intent**

4.    **(Ground Nineteen) The First Amendment and Texas Constitution Bar O'Grady's Tortious Interference Claim**

G.    **CONSPIRACY (FAC – COUNT V PARAGRAPHS 59-60)**

1.    **(Ground Twenty) The Conspiracy Claim Fails Because There Is No Evidence Of An Unlawful Act**

2.    **(Ground Twenty-One) Plaintiff's Conspiracy Claim Is Barred By The First Amendment and Texas Constitution Art. 1 § 8**

### III.

### ARGUMENT AND AUTHORITIES

Plaintiff claims, on the one hand, that "Fox based its film on Captain O'Grady's story," incorporating "all the defining elements" of O'Grady's experience, and that the "lead character in the [Movie] clearly plays a role associated by the public with Captain O'Grady's identity." (FAC at ¶¶ 29-30, 33) Because of this, Plaintiff claims Fox Film has misappropriated his life story. On the other hand, O'Grady also complains that the Challenged Material would confuse the public into thinking the Movie is his story and he endorses it even though it is not and he doesn't. With respect to both of Plaintiff's positions, as we show below, Fox Film is entitled to summary judgment as a matter of law as to all of Plaintiff's claims.

A.    **INVASION OF PRIVACY BY MISAPPROPRIATION AS TO THE MOVIE**

1.    **(Ground One) The Misappropriation Claim As to the Movie Fails Because Texas Law Does Not Protect A Person's Life Story**

O'Grady's claim that Fox Film misappropriated his life story in making the Movie is not actionable under the well settled and binding Fifth Circuit precedent construing Texas law.

- 23 -

*Matthews v. Wozencraft*, 15 F.3d 432 (5th Cir. 1994).  Under Texas law, there are three elements to a

misappropriation claim: (i) that the defendant appropriated the plaintiff's name or likeness for the

value associated with it, and not in an incidental manner or for a newsworthy purpose; (ii) that the

plaintiff can be identified from the publication; and (iii) that there is some advantage or benefit to the

defendant." *Brown v. Ames*, 201 F.3d 654, 657-58 (5th Cir. 2000), *cert. denied, Collectibles, Inc. v.*

*Brown*, 531 U.S. 925, 121 S.Ct. 299 (2000); *Matthews*, 15 F.3d at 437.  "The protection of 'name

and likeness' under Texas law...does not include a person's life story." *Id.* at 437; *see also Ruffin-*

*Steinback*, 82 F.Supp.2d at 730 (citing *Wozencraft*, holding that the production and airing of a mini-

series docu-drama[11] depicting the story of the Temptations was not actionable); *Seale*, 949 F. Supp.

at 337 (holding producers' film depicting a fictionalized account of former Black Panther Bobby

Seale's life story did not constitute a violation of his right of publicity); *Whitehead v. Paramount*

*Pictures Corp.*, 53 F.Supp.2d 38, 53 (D.D.C. 1999)(quoting *Wozencraft* and holding that the

misappropriation prong of common law invasion did not extend to appropriating the story of another

person's life).

    In *Wozencraft*, the Fifth Circuit considered a case on all fours with this one, where a former

undercover narcotics officer filed suit against his ex-wife, the publisher of his ex-wife's book, and a

movie studio alleging, among other things, misappropriation/invasion of privacy. *Matthews*, 15 F.2d

432.  The plaintiff's ex-wife had written a fictional account of the events in the plaintiff's life as an

undercover police officer, and had sold the movie rights to the defendant studio. *Id.*  The Fifth

Circuit rejected the plaintiff's claim that the depiction of some of the events in the plaintiff's life as a

police officer, some of which had been fictionalized, could support a misappropriation claim, finding

---

[11] The term "docu-drama" connotes a type of film or novelization in which real-life events are embellished with fictional dramatic events. *Ruffin-Steinback*, 82 F.Supp.2d at 726 n.1.

"[t]he term 'likeness' does not include general incidents from a person's life, especially when fictionalized."[12] *Id.* at 438.

Here, O'Grady claims that his life experience of being shot down over Bosnia was misappropriated for the Movie. According to O'Grady, the Movie was "based off my experience." (OG Depo. Vol. 1 at 173:12-15) The Movie is "about an American fighter pilot shot down over Bosnia, evading the enemy for a few days and finally rescued in daylight by the United States Marine Corp." (OG Depo. Vol. 2 at 268:1-269:11) O'Grady admits to the parallels between his experience and the Movie in the First Amended Complaint (FAC at ¶ 30) and in his deposition. (OG Depo. Vol. 2 at 270:14-273:20)

Thus, here, as in *Wozencraft*, O'Grady is seeking to protect the narrative of his life story. But "an individual's life, standing alone, lacks the value of a name or likeness that the misappropriation tort protects. Unlike the goodwill associated with one's name or likeness, the facts of an individual's life possess no intrinsic value that will deteriorate with repeated use." *Wozencraft*, 15 F.3d at 438. Under *Wozencraft* and its progeny, therefore, O'Grady's complaint that the Movie is "based off my experience," is not actionable as a matter of law. *See Wozencraft*, 15 F.3d at 437.[13]

## 2. (Ground Two) The Misappropriation Claim to The Movie is Barred. Texas Law Does Not Allow A Misappropriation Claim For Information That Is Newsworthy Or In The Public Domain

On the face of the First Amended Complaint alone (FAC at ¶¶ 10-18) and under the undisputed facts, O'Grady's invasion of privacy claim by misappropriation also does not survive because "[l]iability for misappropriation will not arise when the information in question is in the

---

[12] "Nor is there any liability [for misappropriation] when the plaintiff's character, occupation and general outline of his career, with many incidents in his life, are used as the basis for a figure in a novel who is still clearly a fictional one." *Wozencraft*, 15 F.3d at 438 n.5 (quoting W. Page Keeton et al., PROSSER AND KEETON ON THE LAW OF TORTS Section 117 at 853 (5th ed. 1984)). Rather, "likeness" includes such things as pictures, drawings, and the use of a singer's distinctive voice that one could exploit for commercial advantages. *Id.*

[13] The Fifth Circuit also predicted that [e]ven if a plaintiff could state a claim for misappropriation of events in one's life, Texas courts would recognize a biography exception which would apply here as well. *Wozencraft*, 15 F.3d at 439.

public domain, for the public figure no longer has the right to control the dissemination of the information." *See Wozencraft*, 15 F.3d at 440.

Plaintiff admits that there was extensive media coverage of his experience of being shot down over Bosnia and later being rescued, and that his name, face, and likeness became known worldwide. (FAC at ¶¶ 15-17 ; OG Depo. Vol. 1 at 20:1-21:11; Exs. 6, 6A, 6B, 9, 14A, 14B and 14C) O'Grady admits that his being shot down over Bosnia and rescued was a newsworthy event. Moreover, in his deposition testimony, he admits that the Movie's parallels to his experience were public knowledge. (OG Depo. Vol. 1 at 29:2-30:13) Because O'Grady's experience in Bosnia was public knowledge, *Wozencraft*, is also dispositive of Fox's public domain newsworthy event defense. As the Fifth Circuit noted therein, "[t]o whatever degree and whatever connection a man's life ceases to be private before the publication under consideration has been made, to that extent the protection is withdrawn. . . ." *Wozencraft*, 15 F.3d at 440 (quoting Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193, 214-15 (1890). For these reasons, the public domain/newsworthy defenses apply to defeat the invasion of privacy through misappropriation claim.

**3.    (Ground Three) <u>The Misappropriation Claim As To The Movie Is Barred Under The First Amendment And The Texas Constitution Art. I § 8</u>**

The Movie at issue was prompted by the desire of Fox Film to make a movie loosely based on the events that had been observed in the news by the independent producer John Davis and others in the summer of 1995; namely an American pilot, Scott O'Grady, being shot down over Bosnia during a United Nations peace keeping mission. (Davis Depo. at 11:1-12:7)  The original script, commissioned in 1995, and authored by Jim and John Thomas, was titled "Behind Enemy Lines." (Davis Depo. at 14:10-15:24; 29:18-24)

While the Movie shared several common and publicly available factual elements of O'Grady's experience, it was a work of fiction that was the product of the Fox Film creative process. (OG Depo. Vol. 1 at 136:15-165:5)  The Movie's main themes and subplots move beyond the parallels with O'Grady's experience, such as, for example, the conflict between the desire of the U.S. military officer, played by Gene Hackman, to save the pilot against a view held by the French NATO officer who was Hackman's superior that the rescue effort would endanger the peace process. (OG Depo. Vol. 1 at 154:19-155:25)  These fictional conflicts were not present in O'Grady's life story. (*Id.*; Ex. 7)

Additionally, attention was paid to factual, historical and military detail and accuracy.  The Movie was made with the cooperation of the U.S. military, and both the U.S. Department of Defense and the U.S. Navy reviewed the scripts and commented on them extensively. (Davis Depo. at 62:3-63:6)  The Movie's director, John Moore, was motivated to make a movie about the Bosnian civil wars and about the lack of European intervention, the subsequent ethnic cleansing and the massacre in Srebrenica. (Moore Depo. at 31:24-32:5)

Against this backdrop of creative expression, newsworthy events and human interest, O'Grady seeks monetary damages arising from Fox Film's alleged misappropriation of his life story and commercial exploitation of his name, likeness and identity.  The subject matter of these claims, however, is protected speech under the First Amendment, which operates to bar O'Grady's claims as a matter of law.

The proposition that movies are protected speech under the First Amendment has been settled for more than five decades, since the United States Supreme Court's decision in *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 72 S.Ct. 777 (1952).  "[E]xpression by means of motion pictures is included within the free speech and free press guaranty of the [First Amendment.]" *Joseph Burstyn, Inc. v.*

*Wilson*, 343 U.S. at 502, 72 S.Ct. at 781. In *Burstyn*, which involved a film by Roberto Rossellini entitled "The Miracle," the Supreme Court stated:

> It cannot be doubted that motion pictures are a significant medium for the communication of ideas. They may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought which characterizes all artistic expression. The importance of motion pictures as an organ of public opinion is not lessened by the fact that they are designed to entertain as well as inform.

*Id.* at 501, 72 S.Ct. at 780 (footnote omitted).

Thus, the Supreme Court, in holding that motion pictures are within the ambit of the protection which the First Amendment secures to any form of "speech" or "the press," expressly rejected the contention that "motion pictures do not fall within the First Amendment's aegis because their production, distribution and exhibition is a large-scale business conducted for private profit." *Id.* at 501, 72 S.Ct. at 780. Under *Burstyn*, the Movie falls within the protection of the First Amendment. *See also, Wozencraft*, 15 F.3d 432.

In *Wozencraft*, the Fifth Circuit also affirmed summary judgment on finding that the plaintiff was a public figure and Wozencraft's novel fell within the protection of the First Amendment, stating "[t]he same standards of constitutional protection apply to an invasion of privacy as to libel actions." *Wozencraft*, 15 F.3d at 440 (5th Cir. 1994). Absent a showing of actual malice, the publication was protected by the First Amendment. *Id.*; *see also Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180 (9th Cir. 2001) (holding magazine depiction of Dustin Hoffman as Tootsie was protected under the First Amendment).

Here, as in *Wozencraft*, O'Grady is a public figure under *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997 (1974). (FAC at ¶¶ 15-23; Exs. 6 and 9) Consequently, absent showing of actual malice by clear and convincing evidence, the Movie is protected by the First Amendment. *See Wozencraft*, 15 F.3d at 440. Because there is no evidence, let alone clear and convincing

- 28 -

evidence, that Fox Film acted with actual malice, Fox Film is entitled to summary judgment on all claims emanating from the Movie, as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554 (1986);[14] *see also Anderson v. Liberty Lobby,* 477 U.S. 242 (1986); *Hoffman*, 255 F.3d at 1185.

**B.     INVASION OF PRIVACY BY MISAPPROPRIATION AS TO THE CHALLENGED MATERIAL**

**1.     (Ground Four) The Challenged Material For The Movie Does Not Use Plaintiff's Name or Likeness Thus Negating an Essential Element of Plaintiff's Claim**

O'Grady complains in FAC ¶ 37 that the Challenged Material all are either "advertising" or "special advertising" for the Movie. Yet, he **admitted in his deposition** that Fox Film's advertising for the Movie NEVER used his name or likeness. (OG Depo. at 127:11-128:6) This admission alone must dispose of all his claims regarding the Challenged Material. *See Wozencraft*, 15 F.3d at 438 n.5 (5th Cir. 1994) (essential element of misappropriation claim is use of name or likeness). *See also Ruffin-Steinback*, 82 F.Supp.2d at 728-29.

**2.     (Ground Five) O'Grady Released "ALL RIGHTS" Regarding the DCI Documentary, Thereby Waiving Any Right to Complain as to Its Use In the Challenged Material or Otherwise**

The affirmative defense of waiver can be asserted against a plaintiff who intentionally relinquishes a known right or engages in conduct inconsistent with claiming that right. *Tenneco Inc. v. Enterprise Products Co.*, 925 S.W.2d 640, 643 (Tex. 1996) "A waivable right may spring from law, or in this case, from a contract. . . . A party's express renunciation of a known right can establish a waiver." *Id.*

Here, the BBC/O'Grady Release executed by O'Grady (OG Depo. Vol. 2 at 353: 1-14; Exs. 44, 45, Pl.'s Resp. to DCI's Request for Admission No. 3), expressly states that "[w]ithout further

---

[14] The Movie is also protected by Tex. Const. Art. I, § 8. *See Wozencraft,* 15 F.3d at 440.

payment, the BBC...its/their licensees and assignees shall be entitled...to ALL RIGHTS...FOR ALL PURPOSES EVERYWHERE."

By executing the BBC/O'Grady Release, O'Grady waived any right to complain about Discovery Channel's use of the DCI Documentary including the Challenged Material and the November 28 DCI Documentary as aired. Accordingly, Fox Film is entitled to summary judgment as a matter of law as to the Challenged Material.

3.     (Ground Six) **The Newsworthiness and Incidental Use Privileges Bar The Misappropriation Claim Relating to The Challenged Material For The Fox Film Movie**

O'Grady's misappropriation claims regarding the Challenged Material are also barred by the newsworthiness and incidental use privileges. Advertisements for speech products, including those that are newsworthy, are accorded the same privilege as the underlying work. *Groden v. Random House*, 61 F.3d 1045 (2nd Cir. 1995) (affirming summary judgment on a book publisher's right to advertise a book about the conspiracy theories surrounding the assassination of President Kennedy against Lanham Act and state law invasion of privacy claims by misappropriation on the grounds of the First Amendment and incidental use); *Lane v. Random House, Inc.*, 985 F. Supp. 141, 152 (D.D.C. 1995). "The newsworthiness privilege applies to advertisements for books, films, and other publications concerning matters of public interest. A plaintiff cannot recover for misappropriation based upon the use of his identity or likeness in a newsworthy publication unless the use has 'no real relationship' to the subject matter of the publication." *Lane*, 985 F. Supp. at 146.

In *Lane v. Random House, Inc.*, the plaintiff sued a book publisher over statements made in advertisements for a book evaluating conspiracy theories about President Kennedy's assassination. The plaintiff alleged (1) violation of his exclusive right to publicity and benefit from the value of his identity, reputation and work, (2) misappropriation of celebrity, i.e., non-consensual use of his name,

likeness and reputation to promote and sell the book "*Case Closed*"; and (3) approximation of

personal identity, i.e., exploitation of Lane's identity and persona as the most prominent and

recognizable Warren Commission critic. *Lane*, 985 F.Supp. at 145. The D.C. district court granted

summary judgment on all counts finding them indistinguishable as a matter of law. Lane argued that

Random House exploited his individuality by portraying him in an advertisement for commercial

gain. "According to Lane, his identity and likeness were misappropriated to promote a book not

about him personally, but about conspiracy arguments in which he has been involved as a disputant."

*Lane*, 985 F.Supp. at 146. The court summarily disposed of his arguments as "without merit"

stating:

> Because Lane's picture and quotation are newsworthy and incidentally related to a
> protected speech product, they cannot form the basis for a successful
> misappropriation claim. Random House may invoke either the newsworthiness
> privilege or the incidental use privilege.

*Id.* at 146.

While Lane contended that even if the underlying book was deemed newsworthy, the

advertisement was entitled to a lesser degree of protection, the Court disagreed, holding that:

> While the newsworthiness privilege may not apply to an advertisement for a non-
> speech product, it does apply to advertisements for speech products--even those that
> propose a commercial transaction. Lane's theories about a pivotal and baffling public
> issue are manifestly newsworthy; serious analyses of his theories are derivatively
> newsworthy; and an advertisement promoting the sale of a book containing such
> analyses retains a newsworthiness immunity against a claim of misappropriation.

*Id.* at 147.

The *Lane* court also found the incidental use privilege applicable, and held that Random

House was not liable for infringement of Lane's right of publicity or misappropriation of his identity.

*Id.* at 148.

The "incidental use" privilege "focuses on the public nature of the activities referenced in the

alleged misappropriation. A person's name or likeness 'is not appropriated by mere mention of it, or

- 31 -

by reference to in connection with legitimate mention of his public activities." *Id.* at 147; *Groden*, 61 F.3d 1045. In *Groden*, the Second Circuit, in affirming summary judgment, held that use of Groden's name and photograph in a *New York Times* ad for a book designed to contrast the theories advanced by plaintiff with those discussed in the book, also constituted an incidental use. *Groden*, 61 F.3d at 1049-51.

Both the newsworthiness and incidental use privileges apply here. It is undisputed that O'Grady's ordeal as a pilot shot down over Bosnia is newsworthy and that O'Grady's experience in Bosnia is related to incidents reflected in the Movie. (OG Depo. Vol. 1 at 29:2 - 30:13) Because the Movie and the DCI Documentary are based on the same newsworthy and historical events, namely the Bosnian conflict and an American pilot being shot down, the Challenged Material is also accorded newsworthiness immunity. *See Groden*, 61 F.3d 1045; *Lane*, 985 F.Supp. at 146-147.

The incidental use privilege also applies because where the Challenged Material juxtaposes the DCI Documentary against the Movie's trailers and excerpts from the Movie, the juxtaposition compares and contrasts the facts of O'Grady's experience in Bosnia to those of the fictional character, Chris Burnett (played by Owen Wilson), in the Movie. (Patterson Depo. at 149) The comparison and contrast, which occurs in the Interstitials and Tune-Ins, is itself creative expression, editorial comment, educational, informative and addresses matters of public interest. (See SOF 55-57 and exhibits and deposition testimony cited therein). Thus the Challenged Material not only falls within the incidental use exception but is expressive speech protected under the First Amendment. *See Groden*, 61 F.3d at 1049-51. As the Second Circuit observed in *Groden*, "to hold otherwise would constitute an impermissible restriction on what we deem to be the right of a publisher in informing the public of the nature of the [movie] and comparing it with the works of other authors." *Id.* at 1049. This is particularly compelling in this case where the DCI Documentary and the Movie

concern subject matter that is of significant public interest; that is, American armed forces involved in foreign conflicts, particularly following the tragic events of September 11th, the war waged on terrorism in Afghanistan and the events in The Middle East.

It is important to note that O'Grady is not complaining that Fox Film used his name and likeness to sell an unrelated product. Rather, his claims are all grounded on the Movie which is an artistic expression protected under the First Amendment, concerning issues of public interest and Fox Film's ability to discuss and promote its Movie through the Challenged Material that are incident thereto. As the court observed in *Lane*, "it would be illogical to allow respondents to exhibit [speech products] but effectively preclude advance discussion or promotion of their lawful enterprise." *Lane*, 985 F. Supp. at 147 (quoting *Guliemi v. Spelling Goldberg Prods.*, 603 P.2d 454, 463 (1979)).

Accordingly, the newsworthiness and incidental use privileges defeat O'Grady's invasion of privacy by misappropriation claim regarding the Challenged Material.

4. **(Ground Seven) Even If The Challenged Material Used Plaintiff's Name and Likeness, That Use Is Protected by the First Amendment of the United States Constitution and Article I §8 of the Texas Constitution**

O'Grady's claims for misappropriation regarding the Challenged Material also fails because, where, as here, the underlying work is non-commercial speech and thus entitled to full First Amendment protection, the advertisements for that work are also entitled to full First Amendment protection. *See Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 66-68 n.14, 103 S.Ct. 2875, 2880 (1983) (citing *Murdock v. Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870 (1943) and *Jamison v. Texas*, 318 U.S. 413, 63 S.Ct. 669 (1943)) (recognizing advertisement for religious book cannot be regulated as commercial speech). Assuming, arguendo, that television commercials are generally considered commercial speech, they do not retain their "commercial character when ... inextricably

intertwined with otherwise fully protected speech." *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 796, 108 S.Ct. 2667 (1988). Likewise here, fully protected speech permeates the Challenged Material and the Court cannot parse out the protected speech elements and deem the remainder unprotected. *See Id.*

Recently, the Sixth Circuit in *Ruffin-Steinback v. dePasse*, 267 F.3d 457 (6th Cir. 2001), affirmed summary judgment barring state law right of publicity claims arising out of the airing of a mini-series depicting the Temptations and advertising incidental to such use, holding: "We conclude that the use of plaintiffs' fictionalized likenesses in a work protected by the First Amendment and the advertising incidental to such uses did not give rise to a claim for relief under the plaintiff's rights of publicity." *Ruffin-Steinback v. dePasse*, 267 F.3d at 462.

The *Ruffin-Steinback* court noted that there is a fundamental difference between appropriation of a person's identity for commercial purposes as opposed to a public interest publication. In that case, the district court relied on The Restatement (Third) of Unfair Competition in granting summary judgment, and described the limitation on the right of publicity as follows:

> Section 47 provides:

> The name, likeness and other indicia of a person's identity are used 'for purposes of trade' under the rule stated in Section 46 if they are used in advertising the user's goods or services, or are placed on merchandise marketed by the user. ***However, use 'for the purposes of trade' does not ordinarily include the use of a person's identity in news reporting, <u>commentary, entertainment, works of fiction or nonfiction, or in advertising that is incidental to such uses.</u>***

> (Restatement (Third) of Unfair Competition Section 47 (1995)...comment c explains:

> The use of a celebrity's name or photograph as a part of an article published in a fan magazine or in a feature story broadcast on an entertainment program, for example, will not infringe the celebrity's right of publicity. Similarly, the right of publicity is not infringed by the dissemination of an unauthorized print or broadcast biography. Use of another's identity in a novel, a play, or motion picture is also not ordinarily an infringement. **The fact that the publisher or other user seeks or is successful <u>in</u>**

- 34 -

**obtaining a commercial from an otherwise permitted use of another's identity does not render the appropriation actionable.**

*Ruffin-Steinback*, 82 F.Supp.2d at 729-730 (emphasis added).

Here, O'Grady's complaint about the Challenged Material falls squarely within the permitted use in "entertainment, works of fiction [and] nonfiction [and] in advertising that is incidental to such use" cited above. *See Id.* Like the Movie, the Challenged Material is entitled to the full protection of the First Amendment because it is incidental to, inextricably intertwined and cannot be divorced from the permitted use in the Movie or the November 28 DCI Documentary. *See Ruffin-Steinback,* 82 F.Supp.2d 723;*Bolger* , 463 U.S. at 66-68 n.14; *Riley*, 487 U.S. 781, 796 (1988).

Accordingly, Fox Film is entitled to summary judgment as a matter of law on the state law claims for invasion of privacy by misappropriation.

**C.     THE LANHAM ACT[15] CLAIM AS TO THE MOVIE FAILS AS A MATTER OF LAW**

**1.     (Ground Eight) False Designation of Origin Claims Under the Lanham Act Do Not Apply To Ideas, Concepts or Communications Such as The Movie**

The United States Supreme Court's recent decision in *Dastar Corp. v. Twentieth Century Fox Film Corp.,* observed that in construing the Lanham Act it has been "careful to caution against misuse or over extension."  In doing so, the Court laid to rest the Plaintiff's "false designation of origin claim" under 15 U.S.C. §1125(a)(1)(A), when it held that the phrase "origin of goods" in the

---

[15] Section 43(a) of the Lanham Act provides:

(1) Any person who, on or in connection with any goods or services,. . . uses in commerce any word, term, name, symbol or device or any combination thereof, or any false designation of origin, false or misleading description of fact, which-

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person,

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services or commercial activities.
* * *

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
15 U.S.C. Section 1125(a).

Lanham Act "refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods." *Dastar Corp. v. Twentieth Century Fox Film Corp.,* 123 S.Ct. 2041, 2050 (2003). Thus, the Lanham Act does not apply here where O'Grady claims that his experience was the origin of the Movie, defeating his claims under 15 U.S.C. § 1125(a)(1)(A). *See Id.*

    2.    **(Ground Nine) <u>The Movie Is Not Commercial Speech and Therefore The Lanham Act Does Not Apply Nor Could It Be Applied Consistent with the First Amendment</u>**

Here, in addition to the claims against the content of the Movie, O'Grady alleges Fox Film knew that Captain O'Grady's identity and goodwill were inextricably intertwined with the DCI Documentary titled, "Behind Enemy Lines: The Scott O'Grady Story" and adopted "Behind Enemy Lines" as the title of its new movie with the intent of affiliating Captain O'Grady's identity and goodwill with its film. (FAC at ¶ 32) O'Grady's allegation that Fox Film titled the Movie with the intention of playing off his identity in the title of the DCI Documentary fails because "Behind Enemy Lines" was the title of Fox Film's original script in 1995[16] (Davis Depo. at 29:18-24) and predates the 1996 assignment of the O'Grady documentary "Missing In Action" to DCI. (Ex. 48). Moreover, O'Grady, as he admitted in his deposition, has no proprietary interest in the titles of either the DCI Documentary or the Movie and, therefore, lacks standing to assert claims on the basis of such titles. (OG Depo. Vol. 1 at 167:24-168:8; Ex. A to Kunzle Decl.)

Additionally, even though he pleads a Lanham Act claim, O'Grady's complaints about the Movie do not withstand First Amendment scrutiny. *See e.g. Burstyn,* 343 U.S. at 502, 72 S.Ct. at 781; *ETW Corporation v. Jireh Publishing, Inc.,* 2003 WL 21414521 (6th Cir. June 20, 2003); *Hoffman,* 255 F.3d 1180; *Rogers,* 875 F.2d 994; *Seale,* 949 F.Supp. 331. Courts cannot ignore First

---

[16] Consequently, Plaintiff's claims that Fox Film adopted Behind Enemy Lines as the title of the Movie "with the intent of affiliating Captain O'Grady's identity and goodwill with its film and thereby commercially exploiting the same to increase it's film's revenues" are wholly without merit or basis in fact. (FAC at ¶ 35, lines 19-24)

Amendment concerns when enforcing the Lanham Act. *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 665 (5th Cir. 2000). As set forth above, the Movie is an exercise of artistic expresion entitled to full protection under the First Amendment not commercial speech. *See Burstyn*, 343 U.S. at 501-02. Because it is protected non-commercial speech, the Movie cannot form the basis for a Lanham Act claim. *Rogers*, 875 F.2d at 999; *Seale*, 949 F.Supp. at 339 (E.D. Pa. 1996). *Rogers v. Grimaldi* and *Seale v. Gramercy Pictures* are both misappropriation/invasion of privacy cases where, in addition to state law claims, the plaintiffs unsuccessfully contended the subject movies violated the Lanham Act on the grounds that they confused the public with respect to the celebrity's endorsement, sponsorship or involvement in the movies. *Rogers v. Grimaldi* and *Seale v. Gramercy* are on point with the instant case.

Additionally, O'Grady's Lanham Act claims against the Movie's title cannot withstand First Amendment scrutiny under the precedent set by the Second Circuit in *Rogers v. Grimaldi*. In *Rogers*, the plaintiff brought suit against the producers and distributors of the movie *"Fred and Ginger"* asserting commercial use under the Lanham Act. The film was not about Ginger Rogers and Fred Astaire, but about two fictional Italian cabaret performers who imitated Rogers and Astaire. The Second Circuit, in addressing the tension between the Lanham Act and the First Amendment, noted:

> Though First Amendment concerns do not insulate titles of artistic works from all Lanham Act claims, such concerns must nonetheless inform our consideration of the scope of the Act as applied to claims involving such titles. Titles, like the artistic works they identify, are of a hybrid nature, combining artistic expression and commercial promotion. The title of a movie may be both an integral element of the film-maker's expression as well as a significant means of marketing the film to the public. The artistic and commercial elements of titles are inextricably intertwined. Film makers and authors frequently rely on word-play, ambiguity, irony, and allusion in titling their works. Furthermore, their interest in freedom or artistic expression is shared by their audience. The subtleties of a title can enrich a reader's or viewer's understanding of a work. Consumers of artistic works thus have a dual interest. They have an interest in not being mislead and they also have an interest in

> enjoying the results of the author's freedom of expression. For all these reasons, the expressive element of titles requires more protection than the labeling of ordinary commercial products.

*Rogers v. Grimaldi*, 875 F.2d at 998.

In light of the above considerations, the Second Circuit stated: "Because overextension of Lanham Act restrictions in the area of titles might intrude on First Amendment values, we must construe the Act narrowly to avoid such a conflict." *Rogers*, 875 F.2d at 998; *Westchester Media*, 214 F.3d at 664 (quoting *Rogers*).

The *Rogers* court continued:

> We believe in general that the Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression. **In the context of allegedly misleading titles using a celebrity's name, that balance will normally not support application of the Act unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title <u>explicitly</u> misleads as to the source or the content of the work.**

*Rogers*, 875 F.2d at 999 (footnote omitted)(emphasis added).

As a result, the Second Circuit in *Rogers* adopted a two part balancing test: (1) the first prong requires a determination of whether there is any artistic relationship between the title and the underlying work, and (2) **if the title is artistically relevant to its content, there is no violation of the Lanham unless the "title explicitly misleads as to the source or the content of the work."** *Id.* (footnote omitted); *Westchester Media*, 214 F.3d at 664-65; *Seale*, 949 F.Supp. at 339; *ETW Corporation v. Jiveh Publishing*, 2003 WL 21414521 (6th Cir. June 20, 2003); *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894 (9th Cir. 2002); *New Kids On The Block v. News America Publ'g, Inc.*, 745 F.Supp. 1540 (C.D.Cal. 1990), *aff'd*, 971 F.2d 302 (9th Cir. 1992).

The Second Circuit rejected Rogers' claim that the title of the movie misled consumers into thinking that the film was about her, stating "[i]ndeed, this case well illustrates the need for caution in applying the Lanham Act to titles alleged to mislead as to content." *Id.* at 1001.

- 38 -

In affirming summary judgment for the defendants, the *Rogers* Court held:

> [The] mixture of meanings, with the possibly misleading meaning not the result of explicit misstatement, precludes a Lanham Act claim for false description of content in this case. To the extent that there is a risk that the title will mislead some consumers as to what the work is about, that risk is outweighed by the danger that suppressing an artistically relevant though ambiguous title will unduly restrict expression.

*Rogers*, 875 F.2d at 1001.

In other words, the Lanham Act will not apply where there is artistic relevance to the work unless there is an "explicit" misrepresentation as to the source or content of the work. *Id*; *ETW*, 2003 WL 21414521; *Mattel*, 296 F.3d 894. Applying the "artistic relevance" test to the instant case, there is no doubt that the Lanham Act claim does not survive.

The title, "Behind Enemy Lines," not only bears artistic relevance to the content of the Movie but there is simply no explicit misrepresentation as to its source or content. (See Ex. 8) *"Behind Enemy Lines"*, is obviously relevant and truthful as to the Movie's content. It was not arbitrarily chosen to exploit Scott O'Grady, notably because it does not refer to him, but instead accurately describes and has a genuine relevance to the story which is about an American pilot whose F-18 aircraft is shot down during a recon mission over Bosnia and who must fight to stay alive and evade hostile Serbian forces while trying to recover photographic evidence of mass graves and war atrocities. Indeed, the title has been used to describe stories about military personnel in enemy territory including a U.S. pilot (not O'Grady) shot down over Bosnia. The Movie is protected expression under the First Amendment and its title is artistically relevant to its content. Moreover, there is no false description or misleading description of fact[17] in the title or the Movie that "explicitly misleads as to the source or the content of the work," thus precluding a Lanham Act claim. *Rogers*, 875 F.2d at 999; *Seale* 949 F.Supp. at 339. Accordingly, O'Grady's Lanham Act

---

[17]  15 U.S.C. Section 1125(a)(1); *King*, 179 F.3d at 373-74.

claim fails as a matter of law with respect to the Movie and its title and Fox Film is entitled to summary judgment.

> 3.     **(Ground Ten) <u>There Is No Evidence of False or Misleading Statements of Fact Thus Negating an Essential Element of Plaintiff's Lanham Act Claim</u>**

O'Grady's Lanham Act claims also fail as a matter of law because there is no false statement or misleading representation of fact as to the "affiliation, connection or association" of O'Grady with Fox, "or as to the origin, sponsorship or approval" of Defendants' goods, services or commercial activities by O'Grady. (FAC at ¶ 50); 15 U.S.C. § 1125 (a)(1)(A).

## D.     <u>LANHAM ACT AS TO THE CHALLENGED MATERIAL</u>[18]

> 1.     **(Ground Eleven) The Lanham Act False Advertising Claim Fails Because O'Grady Cannot Prove the Elements of the Claim**

Under Fifth Circuit law, persons bringing a Lanham Act action for false advertising must demonstrate that: (1) the defendants made <u>false statements of fact</u>. . .; (2) those statements deceived or had the potential to deceive a substantial segment of potential customers; (3) the deception was material, in that it tended to influence purchasing decisions; (4) the defendants caused their products to enter interstate commerce; and (5) the claimant has been or is likely to be injured as a result." *Pizza Hut, Inc. v. Papa John's International, Inc.*, 227 F.3d 489, 495 (5th Cir. 2000); *King v. Ames*, 179 F.3d 370, 373-74 (5th Cir. 1999). Here, with the exception of the fourth element, O'Grady cannot prove the existence of each of the foregoing elements of the cause of action. The failure to prove the existence of any element of the prima facie case is fatal to the plaintiff's claim. *See Id., Celotex Corp. v. Catrett*, 47 U.S. at 315, 106 S.Ct. at 2554. Accordingly, Fox is entitled to summary judgment as a matter of law.

> 2.     **(Ground Twelve) <u>O'Grady's Lanham Act False Advertising Claim Against The Challenged Material Fails Because There Is No False Explicit Representation of Endorsement And Is Precluded By the First Amendment</u>**

---

[18] Fox Film incorporates herein its grounds and argument addressed in Sections A-C, supra.

As mentioned above, the gravamen of O'Grady's false advertising claims is that the placement of Challenged Material on the November 28 DCI Documentary "inferred" a collaboration or endorsement by O'Grady. (OG Depo. at 386:12-23) The Lanham Act, however, is not broad enough to encompass an inference or implied endorsement theory, and in this instance it is outweighed by the public interest in First Amendment protected speech. *See ETW Corporation v. Jireh Publishing,* 2003 WL 21414521 (6th Cir. June 20, 2003); *Mattel, Inc.,* 875 F.2d 994; *Seale,* 949 F.Supp. at 340. Here, the underlying work is an artistic expression; there is no evidence of a "false or misleading description of fact" or explicit suggestion of affiliation or endorsement to support the Lanham Act claims and so summary judgment is proper. *See Id.; Rogers,* 875 F.2d at 999.

For example, in *Seale,* a movie case where the plaintiff, like O'Grady, claimed misappropriation and Lanham Act violations in the advertisements for the film, the court granted summary judgment to defendants on the grounds that the use of plaintiff's name and likeness was not actionable under the Lanham Act because the risk of an implied endorsement did not outweigh the First Amendment. Bobby Seale, the civil rights activist, filed suit against the producers of the motion picture "Panther" contending that the defendants used, without his consent, his name and likeness in the film as well as to promote the film, in violation of his common law right of publicity. He further alleged that the defendants' use of his name and likeness to promote and advertise the film constituted unfair competition and false advertising in violation of the Lanham Act. *Seale,* 949 F.Supp. at 333.

The film "Panther," as in the instant case, combined fiction with history. *Id.* at 334. The narrator of the story was a fictitious character named "Judge" who described his involvement with the Black Panther Party in Oakland, California. The historical characters of Black Panther leaders Bobby Seale, Huey Newton, and Eldridge Cleaver were played by actors. Throughout the film, the

- 41 -

fictitious character of Judge described his involvement in the Black Panther Party and narrated major events in the history of the Black Panther Party as the film reenacted those events. *Id.* at 334.

The promotional cover for the home video release of the movie "Panther" contained a photograph of the seven actors who portrayed members of the Black Panther Party in the film. The plaintiff's name was mentioned on the cover in connection with a promotion for the film. *Id.* at 335. In *Seale,* the Plaintiff alleged that the use of his name and likeness to advertise and promote the film gave the consumer public the false impression that he sponsored, endorsed or played a role in the production of the film among other items in violation of the Act. *Id.* at 339.

Applying the *Rogers'* artistic relevance test, the *Seale* court noted that the defendants' use of Plaintiff Bobby Seale's name and likeness to promote the film, pictorial history book, and home video, made no explicit suggestion that the plaintiff endorsed, sponsored or approved these items or that he played a role in their production. *Id.* at 339-40. In granting summary judgment on the Lanham Act claims regarding the alleged false endorsement to promote the film, home video and pictorial history book, the *Seale* court held:

> [t]he use of the Plaintiff's name and likeness in connection with the home video and pictorial history book is clearly related to the content of the film and the pictorial history book, the subject matter of which deals with the Black Panther Party and the Plaintiff's role as the co-founder of the Party.
> * * *
> Accordingly, the court finds as a matter of law that the Defendants' use of the Plaintiff Bobby Seale's name and likeness in connection with its promotion of the film "Panther," the pictorial history book, and home video is not actionable as a violation of section 43(a) of the Lanham Act on the grounds that the **First Amendment guarantee of freedom of expression outweighs any potential risk that the Defendants' use of the Plaintiff's name and likeness, a photograph of the actor who portrayed the Plaintiff in the film, may implicitly suggest that Plaintiff endorsed the film or the pictorial history book.**

*Id.* (emphasis added).[19]

---

[19] The distinction between implied endorsement versus explicit misrepresentation was also addressed by a California district court in *New Kids On The Block,* 745 F. Supp. at 1540. An implied endorsement claim under the Lanham Act was also rejected in favor of the

Under the above cited case law from the Second (*Rogers* and *Groden*), Sixth *(Ruffin-Steinback)* and Ninth (*Mattel* and *New Kids on the Block*) Circuits, allegations of implied endorsement are insufficient to state a Lanham Act claim where the complained of speech relates to the content of an artistic work that is protected by the First Amendment. This was most recently addressed again by the Sixth Circuit in *ETW Corporation v. Jireh Publishing, Inc.*, 2003 WL 21414521 (6th Cir. June 20, 2003) where the plaintiff, a licensing agent for Tiger Woods, filed suit against a publisher of paintings of famous figures in sports alleging, among other claims, violation of the Lanham Act, right of publicity and unfair competition. At issue were limited edition prints depicting Tiger Woods. Woods' name appeared on the envelope enclosing the prints and in a narrative description of the painting. The Sixth Circuit affirmed summary judgment in favor of the defendant under the *Rogers* artistic relevance analysis, rejecting the Lanham Act claim of implied false endorsement, stating "the risk of misunderstanding, not engendered by any explicit indication on the fact of the print, is so outweighed by the interest in artistic expression as to preclude application of the Act." *Id.* at Headnote 18.

Here, there is no doubt that the Challenged Material is clearly related to the Movie. Moreover, O'Grady's claim is not one of express but implied endorsement. Here too, as in *Seale, Rogers, ETW, Mattel, Groden,* and *New Kids On the Block*, there is no explicit representation that O'Grady endorsed the film or had a role in producing it. Indeed, he admitted this in his deposition. (OG Depo. at 127:11-128:6) There is no statement in the Movie, the Challenged Material or the November 28 DCI Documentary that the Movie is endorsed by O'Grady.

---

First Amendment in *New Kids*. In *New Kids*, a trademark infringement case, the district court following *Rogers,* granted summary judgment finding that "the Lanham Act does not apply unless the defendants falsely and explicitly represented that New Kids sponsored or endorsed the use of the 900 number. The risk that some people might think that the New Kids implicitly endorsed or sponsored the Star Magazine's and USA Today's 900 number services is outweighed by the danger of restricting newsgathering and dissemination." *New Kids On the Block,*745 F. Supp. at 1545. "[T]he New Kids' claim of implied endorsement rests on the fact that the poll announcement was in the defendants' publications and this mere relationship is sufficient to state a cause of action for implied endorsement. This is insufficient as a matter of law." *Id.* at 1545 n.6.

As the above cited cases hold, even if there were an ambiguity and the possibility that some consumers may be misled, that is not enough to outweigh the risk and danger of suppressing and restricting otherwise protected speech. The public's interest in the artistic expression of the Movie and the Challenged Material incidental thereto preclude application of the Lanham Act here. Consequently, Fox Film is entitled to summary judgment on the Lanham Act claims as a matter of law.

    **3.**      **(Ground Thirteen) <u>Plaintiff's Lanham Act Claim As To Challenged Material Is Barred By The Newsworthy And Incidental Use Privileges</u>**

Fox Film incorporates herein its argument in Section B.3 supra.

**E.**    **<u>PLAINTIFF'S STATE LAW CLAIMS FOR UNFAIR COMPETITION, FALSE ADVERTISING, UNJUST ENRICHMENT FAIL AS A MATTER OF LAW</u>**

    **1.**      **(Ground Fourteen) <u>There Is No Evidence Of Unlawful Competition or False Advertising Negating An Essential Element</u>**

To establish a claim for unfair competition, the plaintiff must prove "that the defendant committed a separate unlawful act that, in addition to being unlawful, improperly interfered with the plaintiff's ability to conduct business." *Taylor Publ'g Co. v. Jostens, Inc.*, 36 F. Supp.2d 360, 374 (E.D. Tex. 1999), *aff'd*, 216 F.3d 465 (5th Cir. 2000). Plaintiff cannot produce any evidence that Fox Film committed an unlawful act that interfered with Plaintiff's business efforts. By his own admission, Plaintiff believes that his business relationship with Orion Pictures failed because the production company shut down. (OG Depo. Vol. 1 at 84:4-85:6) Furthermore, Plaintiff had ample opportunity to sell and develop his experiences into a film or made-for-television movie and failed to follow through by his own choice. (OG Depo. Vol. 1 at 180:12-182:21) Because Plaintiff cannot produce any evidence that Fox Film committed any unlawful act, he cannot meet his burden of proof necessary to establish a claim for unfair competition.

Likewise, as stated above, Plaintiff cannot show a false statement of fact or endorsement to support a false advertising claim, negating an essential element of that cause of action.

**2.   (Ground Fifteen) Plaintiff's State Law Unfair Competition, False Advertising and Unjust Enrichment Claims Are Duplicative Of The Invasion of Privacy and Lanham Act Claims And Thus Barred By The First Amendment**

Additionally, Plaintiff's unfair competition, false advertising and unjust enrichment claims are grounded on the same facts and are duplicative of Plaintiff's invasion of privacy by misappropriation and Lanham Act claims. Since each of those claims is defeated by the protections of the First Amendment and since there is no false statement of endorsement, these state law claims fail as well. *See ETW Corporation v. Jiveh Publishing,* 2003 WL 21414521 (6th Cir. June 20, 2003); KTRK *Television v. Felder,* 950 S.W.2d 100, 108 (Tex. App.—Houston [14[th] Dist.] 1997, no writ); *Rogers v. Dallas Morning News, Inc.,* 889 S.W.2d 467, 474 (Tex. App.—Dallas 1994, writ denied). Accordingly, Fox Film is entitled to judgment as a matter of law on Plaintiff's claims for unfair competition, false advertising and unjust enrichment.

**F.   TORTIOUS INTERFERENCE CLAIM FAILS AS A MATTER OF LAW**

A party moving for summary judgment is entitled to judgment as a matter of law when the non-moving party has failed to make a sufficient showing of an essential element of a claim on which it carries the burden of proof. Fed. R. Civ. P. 56(c); *Celotex,* 477 U.S. at 323.

To prevail on a claim for tortious interference with prospective business relations, O'Grady must show: (1) a reasonable probability that he would have entered into a contract; (2) independently tortious or unlawful act by defendant to prevent relationship; (3) defendant acted with conscious desire to prevent relationship from occurring or knew that interference was certain or substantially certain to occur as a result of its conduct; and (4) actual damage or harm resulted from defendant's

actions. *Allied Capital Corp. v. Cravens*, 67 S.W.3d 486, 491 (Tex. App.—Corpus Christi 2002, no

pet.); *see also Wal-Mart Stores, Inc., v. Sturges*, 52 S.W.3d 711, 713 (Tex. 2001).

Here, O'Grady alleges that, as a result of Fox Film's actions in producing the Movie, he lost

the opportunity to enter into an agreement or business relationship with Fox Television to produce

any movie based on his experiences. (Pl.'s Resp. to Fox Film's Interrogatory No. 2)  After an

adequate time for discovery in this case, however, O'Grady cannot produce any evidence of one or

more essential elements of his claim for tortious interference with prospective business relations.

1.    **(Ground Sixteen) No Evidence of Reasonable Probability of Contract**

Specifically, Plaintiff cannot show that there was a reasonable probability that he would have

entered into any contract that could have been subjected to any alleged interference by Fox Film.  In

fact, O'Grady testified that, even if Fox Television had made an offer for production of a made-for-

television movie based on his experiences, he was not sure if he would have accepted the offer.  (OG

Depo. Vol. 2 at 220:5-18; SOF at 72)  He further testified that he did not solicit any offers from Fox

Television nor was he aware of any offers made by Fox Television to him.  (OG Depo. Vol. 2 at

223-224:6; SOF at 72)  Further, David Grant, President of Fox Television, testified that the proposed

made-for-television movie project never materialized because O'Grady did not give the impression

that he was committed to a television movie project.  (Grant Depo. at 48:22-49:5; SOF at 71)

2.    **(Ground Seventeen) No Evidence of Independently Tortious or Unlawful Acts**

O'Grady also cannot produce any competent evidence that Fox Film's actions in producing

the Movie were independently tortious or unlawful acts.  Other than his allegations based on Fox

Film making a film inspired in part by his life experiences, O'Grady testified that he did not recall

any other acts that prevented him from making his own movie.  (OG Depo. Vol. 1 at 84:12-85:6)

However, this gains no ground because, as discussed above, the Movie is protected under the First

- 46 -

Amendment and thus, in itself, cannot form the basis for a tortious interference claim. Without evidence that Fox Film's actions were independently wrongful, Plaintiff's claim for tortious interference is not actionable. Even assuming, for argument's sake, that the mere fact that Fox Film was making the Movie may have discouraged other movie studios from proceeding with O'Grady's story, that fact, in itself, does not constitute tortuous interference. "[I]nterference is not unlawful if it resulted from mere spirited competition." *Stewart Glass & Mirror, Inc. v. U.S.A. Glass, Inc.*, 17 F.Supp.2d 649, 657 (E.D. Tex. 1998), *aff'd,* 200 F.3d 307 (5th Cir. 2000).

3.     **(Ground Eighteen) No Evidence of Intent**

Likewise, O'Grady cannot produce any evidence that shows Fox Film's actions were performed with the intention of preventing any prospective business relations from developing. According to David Grant, no discussions were held between Fox Television and anyone at Fox Film relating to the proposed offer to Plaintiff for a made-for-television movie based on his experiences. (Grant Depo. at 51:9-19; SOF at 73) More importantly, David Grant testified that the prospective deal ended on its own due to the lack of commitment and interest from Plaintiff. (Grant Depo. at 48:22-49:5 and 51:20-25; SOF at 70) While the evidence indicates otherwise, even if Plaintiff's prospective deal ended due to any actions taken by Fox Film, "harm that results only from lawful competition is not compensable by the interference tort." *Sturges* 52 S.W.3d at 727; *see also Stewart Glass & Mirror, Inc.,* 17 F.Supp.2d at 657.

4.     **(Ground Nineteen) First Amendment and Texas Constitution Bar O'Grady's Tortious Interference Claims**

Plaintiff's tortious interference claim is grounded on the same facts as the misappropriation and Lanham Act claims. Because each of those claims is barred by the First Amendment so, too is the tortious interference claim. *See KTRK Television,* 950 S.W.2d at 108; *Rogers,* 889 S.W.2d at 474.

For each of the foregoing reasons, Plaintiff is unable to carry his burden of proof on any of the required elements of his claim. Accordingly, Fox Film is entitled to a judgment as a matter of law on Plaintiff's claim for tortious interference with prospective business relations.

## G.   THE CONSPIRACY CLAIM FAILS AS A MATTER OF LAW

### 1.   (Ground Twenty) Plaintiff's Conspiracy Claim Fails Because There Is No Evidence Of An Unlawful Act

The essential elements of a cause of action for civil conspiracy are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the mind on the object or cause to be accomplished; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Operation Rescue – Nat'l v. Planned Parenthood of Houston and Southeast Texas, Inc.*, 975 S.W.2d 546, 553 (Tex. 1998). For there to be a conspiracy, some act must be committed which if done alone would give rise to a cause of action. *Bank One, Texas, N.A. v. Stewart*, 967 S.W.2d 419, 446 (Tex. App.—Houston [14th Dist.] 1998, pet. denied). "[L]iability for conspiracy depends on participation in some underlying tort." *Tilton v. Marshall*, 925 S.W.2d at 681 (Tex. 1996). In the instant suit, Plaintiff cannot establish that Fox Film committed any substantive tort. Further, Plaintiff's conspiracy claim fails as a matter of law because he cannot satisfy all of the necessary elements to establish a valid claim for civil conspiracy. Plaintiff cannot produce any evidence that Fox Film participated in an agreement to accomplish unlawful, overt acts designed to harm Plaintiff. Each of Fox Film's acts in creating and developing the Movie were lawful and not designed to harm Plaintiff. Therefore, Fox Film is entitled to a judgment as a matter of law as to Plaintiff's conspiracy claim.

**2.      (Ground Twenty-One) <u>Plaintiff's Conspiracy Claim Is Barred By The First Amendment and Texas Constitution Art. 1 § 8</u>**

As with Plaintiff's other state law claims, the conspiracy claim is grounded on the same facts and duplicative of the invasion of privacy by misappropriation and Lanham Act Claims and thus are barred by the First Amendment and Art. 1 § 8 of the Texas Constitution. *See KTRK Television,* 950 S.W.2d at 108.

WHEREFORE, Defendant Twentieth Century Fox Film respectively requests that this Court grant this Motion, enter a take-nothing judgment against Plaintiff and for such other and further relief, at law or in equity, to which Defendant may be justly entitled.

Respectfully submitted,

**JACKSON WALKER L.L.P.**

By: _Charles L. Babcock By Permission CDS_
      Charles L. Babcock
      State Bar No. 01479500
      Nancy W. Hamilton
      State Bar No. 11587925
      Cedric D. Scott
      State Bar No. 24013474
      1401 McKinney, Suite 1900
      Houston, TX 77010
      (713) 752-4200
      (713) 752-4221 – Fax

      George L. McWilliams
      PATTON, HALTOM, ROBERTS,
          MCWILLIAMS, & GREER, LLP
      2900 St. Michael Drive, 4th Floor
      Texarkana, Texas 75503
      (903) 334-7000
      (903) 334-7007 – Fax

**ATTORNEYS FOR DEFENDANT
TWENTIETH CENTURY FOX FILM
CORPORATION**

## CERTIFICATE OF SERVICE

    This is to certify that on this _____30th_____ day of June, 2003, a true and correct copy of the foregoing Defendant Twentieth Century Fox Film Corporation's Motion for Summary Judgment and Brief In Support was served via United States Mail, postage prepaid, upon:

    George E. Bowles
    Locke, Liddell & Sapp. L.L.P.
    2200 Ross Avenue, Suite 2200
    Dallas, Texas 75201

    G. William Lavender
    Lavender & Barnette, P.L.C.
    507 Hickory Street
    Texarkana, AR 71854

    Laura R. Handman
    Davis, Wright, Tremaine, L.L.P.
    1500 K Street, N.W., Suite 450
    Washington, D.C. 20005-1272

    Victor Hlavinka
    Atchley, Russell, Waldrop & Hlavinka
    P.O. Box 5517
    Texarkana, TX 75505-5517

                                             *Charles L. Babcock by Permission CLB*
                                        Charles L. Babcock

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION**

| | | |
|---|---|---|
| **SCOTT O'GRADY,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 502CV173** |
| | § | |
| **TWENTIETH CENTURY FOX** | § | **JURY DEMANDED** |
| **FILM CORPORATION, and** | § | |
| **DISCOVERY COMMUNICATIONS,** | § | **ORAL ARGUMENT REQUESTED** |
| **INC.,** | § | |
| | § | |
| **Defendants** | § | |

**JOINT APPENDIX I**

**TO DEFENDANTS, TWENTIETH CENTURY FOX FILM CORPORATION'S
AND DISCOVERY COMMUNICATIONS, INC.'S
MOTIONS FOR SUMMARY JUDGMENT AND BRIEFS IN SUPPORT THEREOF**

**DEPOSITION EXCERPTS**

| | |
|---|---|
| Robert Anderson | Excerpts from the Deposition of Robert Anderson dated May 7, 2003 |
| Mary Clare Baquet | Excerpts from the Deposition of Mary Clare Bacquet dated May 7, 2003 |
| Charles Corzine | Excerpts from the Deposition of Charles Corzine dated June 11, 2003 |
| John A. Davis | Excerpts from the Deposition of John A. Davis dated May 21, 2003 |
| Jeffrey Godsick | Excerpts from the Deposition of Jeffrey Godsick dated March 18, 2003 |
| David Grant | Excerpts from the Deposition of David Grant dated May 21, 2003 |
| Mary Pat Kelly | Excerpts from the Deposition of Mary Pat Kelly dated May 8, 2003 |
| Michelle Marks | Excerpts from the Deposition of Michelle Marks dated May 19, 2003 |
| Thomas R. Mills | Excerpts from the Deposition of Thomas R. Mills dated May 14, 2003 |
| John Moore | Excerpts from the Deposition of John Moore dated May 22, 2003 |

Esther Newberg          Excerpts from the Deposition of Esther Newberg dated May 8, 2003

Scott O'Grady           Excerpts from the Deposition of Scott O'Grady February 20, 2003

Scott O'Grady           Excerpts from the Deposition of Scott O'Grady February 21, 2003

Scott O'Grady           Excerpts from the Deposition of Scott O'Grady June 13, 2003

William O'Grady         Excerpts from the Deposition of William O'Grady dated May 7, 2003

Robert Parsons          Excerpts from the Deposition of Robert Parsons dated May 6, 2003

Kelly Patterson         Excerpts from the Deposition of Kelly Patterson dated May 1, 2003

Mark Roesler            Excerpts from the Deposition of Mark Roesler dated June 20, 2003

Tom Rothman             Excerpts from the Deposition of Tom Rothman dated May 20, 2003

Steven Siskind          Excerpts from the Deposition of Steven Siskind dated March 18, 2003

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| SCOTT O'GRADY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 502CV173 |
| | § | |
| TWENTIETH CENTURY FOX | § | JURY DEMANDED |
| FILM CORPORATION, and | § | |
| DISCOVERY COMMUNICATIONS, | § | ORAL ARGUMENT REQUESTED |
| INC., | § | |
| | § | |
| Defendants | § | |

JOINT APPENDIX II

TO DEFENDANTS, TWENTIETH CENTURY FOX FILM CORPORATION'S
AND DISCOVERY COMMUNICATIONS, INC.'S
MOTIONS FOR SUMMARY JUDGMENT AND BRIEFS IN SUPPORT THEREOF

DECLARATIONS AND DISCOVERY COMMUNICATIONS, INC.'S
RULE 56 STATEMENT OF UNDISPUTED FACTS

A.    Discovery Communications, Inc.'s Rule 56 Statement of Undisputed Facts

1.    Declaration of Susie Kunzle

2.    Declaration of Kathleen M. Adair

3.    Declaration of Vernon G. Chu, Esq.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION**

| | | |
|---|---|---|
| **SCOTT O'GRADY,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 502CV173** |
| | § | |
| **TWENTIETH CENTURY FOX** | § | **JURY DEMANDED** |
| **FILM CORPORATION, and** | § | |
| **DISCOVERY COMMUNICATIONS,** | § | <u>**ORAL ARGUMENT REQUESTED**</u> |
| **INC.,** | § | |
| | § | |
| **Defendants** | § | |


**JOINT APPENDIX III**

**TO DEFENDANTS, TWENTIETH CENTURY FOX FILM CORPORATION'S
AND DISCOVERY COMMUNICATIONS, INC.'S
MOTIONS FOR SUMMARY JUDGMENT AND BRIEFS IN SUPPORT THEREOF**

**RESPONSES TO INTERROGATORIES AND REQUESTS FOR ADMISSIONS**

A.   04/11/03   Plaintiff's Objections and Responses to Defendant Discovery
            Communications, Inc.'s Request for Admission

B.   12/23/02   Plaintiff's Objections and Responses to Defendant Twentieth Century Fox
            Film Corporation's First Set of Interrogatories

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| SCOTT O'GRADY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 502CV173 |
| | § | |
| TWENTIETH CENTURY FOX | § | JURY DEMANDED |
| FILM CORPORATION, and | § | |
| DISCOVERY COMMUNICATIONS, | § | **ORAL ARGUMENT REQUESTED** |
| INC., | § | |
| | § | |
| Defendants | § | |

JOINT APPENDIX IV

TO DEFENDANTS, TWENTIETH CENTURY FOX FILM CORPORATION'S
AND DISCOVERY COMMUNICATIONS, INC.'S
MOTIONS FOR SUMMARY JUDGMENT AND BRIEFS IN SUPPORT THEREOF

EXHIBITS TO MOTION FOR SUMMARY JUDGMENT

Exhibit 3        "Return with Honor" – Book (Hardcover) (Deposition Exhibit No. 3)

Exhibit 4        "Return with Honor – An American Fighter Pilot's Heroic Tale of survival Behind
                 Enemy Lines" – Book (Soft cover) (Deposition Exhibit No. 4)

Exhibit 5        "Basher 52" – Book (Deposition Exhibit No. 5)

Exhibit 6        Collection of news articles

Exhibit 6A       Collection of transcripts of television broadcasts regarding O'Grady rescue

Exhibit 6B       News releases and briefings by Government Agencies regarding O'Grady

Exhibit 7        Stills from the DVD "Behind Enemy Lines" (Deposition Exhibit No. 7)

Exhibit 8        DVD of the Movie "Behind Enemy Lines" (Deposition Exhibit No. 8)

Exhibit 8A       VHS of the Movie "Behind Enemy Lines"

| | |
|---|---|
| Exhibit 9 | Certified Copy of transcript House National Security Committee Hearing 104-36 July 1995 |
| Exhibit 10 | *Hot Ticket* Video (Deposition Exhibit No. 10) (See DVD No. 1, Appendix V) |
| Exhibit 11A | *Hot Ticket* Transcript (Deposition Exhibit No. 11A) |
| Exhibit 12 | Internet articles regarding other pilots shot down in Bosnia and later rescued |
| Exhibit 13 | "Good to Go – the Rescue of Scott O'Grady from Bosnia" by Mary Pat Kelly |
| Exhibit 14 | Video News Clips from Vanderbilt News Archive (Exhibits 14.1 thru 14.21) (See DVD No. 1, Appendix V) |
| Exhibit 14A | Transcripts of Video News Clips from Vanderbilt News Archive (14.1A thru 14.21A) |
| Exhibit 14B | Video of ABC's *Nightline* at 11:30 p.m. on June 8, 1995 (See DVD No. 2, Appendix V) |
| Exhibit 14C | Transcript of ABC's *Nightline* at 11:30 p.m. on June 8, 1995 |
| Exhibit 17 | December 2, 2001, *Spokane Spokesman Review* article and Etoline.com Celebrities Entertainment Tonight Online interview of Scott O'Grady |
| Exhibit 18 | Term Sheet for the Agreement dated January 22, 1996 between Orion Pictures Corporation and Scott O'Grady (Deposition Exhibit No. 18) **(Confidential – Filed Under Seal Pursuant to Agreed Protective Order Dated February 14, 2003)** |
| Exhibit 19 | August 21, 2001 letter to Scott O'Grady from Orion Pictures Corporation (Deposition Exhibit No. 19) **(Confidential – Filed Under Seal Pursuant to Agreed Protective Order Dated February 14, 2003)** |
| Exhibit 20 | Collection of video covers, Internet printout of available books and CD's using the phrase "Behind Enemy Lines" |
| Exhibit 21 | Standard AFTRA Engagement Contract for Single Television Broadcast and for Multiple Television Broadcasts Within One Calendar Week between Scott O'Grady And Paramount Pictures **(Confidential – Filed Under Seal Pursuant to Agreed Protective Order Dated February 14, 2003)** |
| Exhibit 23 | Advertisement and Review of "The Clinton Wars" |
| Exhibit 24 | 46 History Today 48 (1996) |
| Exhibit 27 | Washington Speaker's Bureau 2001 contracts **(Confidential – Filed Under Seal Pursuant to Agreed Protective Order Dated February 14, 2003)** |

Exhibit 28        Washington Speaker's Bureau 2002 contracts **(Confidential – Filed Under Seal Pursuant to Agreed Protective Order Dated February 14, 2003)**

Exhibit 29        October 22, 2001 letter from Fox to O'Grady (Deposition Exhibit No. 29)

Exhibit 37        Videotape of December 21, 2001 *Entertainment Tonight* (Deposition Exhibit No. 37) (See DVD No. 2, Appendix V)

Exhibit 37A       Transcript of December 21, 2001 *Entertainment Tonight* (only that portion concerned with Scott O'Grady)

Exhibit 41        Agreement between BBC and Stacy O'Grady (Deposition Exhibit No. 41)

Exhibit 44        March 22, 2002 Letter from BBC transmitting BBC contract with O'Grady to O'Grady (Deposition Exhibit No. 44)

Exhibit 45        Agreement between BBC and O'Grady including payment to O'Grady of $500 from BBC  (Deposition Exhibit No. 45)

Exhibit 46        Agreement between BBC and Dr. W. O'Grady (Deposition Exhibit No. 46)

Exhibit 47        Dust Jacket of *The Public Burning*

Exhibit 48        The Discovery Channel Telecast History – Behind Enemy Lines: The Scott O'Grady Story (Deposition Exhibit No. 48) **(Confidential – Filed Under Seal Pursuant to Agreed Protective Order Dated February 14, 2003)**

Exhibit 49        Washington Speakers Bureau Information (Deposition Exhibit No. 49)

Exhibit 50        Washington Speakers Bureau Synopsis of Scott O'Grady (Deposition Exhibit No. 50)

Exhibit 57        September 25, 2001 E-mail from Eric Poticha to Peter Liguori (Deposition Exhibit No. 57)

Exhibit 105       September 9, 2002 E-mail to Robert Alan Anderson (Deposition Exhibit No. 105)

Exhibit 106       September 6, 2002 E-mail to Robert Alan Anderson (Deposition Exhibit No. 106)

Exhibit 107       September 3, 2002 E-mail to Robert Alan Anderson (Deposition Exhibit No. 107)

Exhibit 108       November 15, 2001 E-mail to Robert Anderson (Deposition Exhibit No. 108)

Exhibit 113       Transcript of Interstitials and Tune-ins (Deposition Exhibit No. 113)

Exhibit 114       Videotape entitled Scott O'Grady 'Behind Enemy Lines' Compilation Reel 11/28/01 (Deposition Exhibit No. 114) (See DVD No. 2, Appendix V)

Exhibit 114A      Transcript of Videotape of Exhibit 114

Exhibit 116     The Discovery Channel Telecast History – Behind Enemy Lines: The Scott O'Grady Story (Deposition Exhibit No. 116) **(Confidential – Filed Under Seal Pursuant to Agreed Protective Order Dated February 14, 2003)**

Exhibit 119     Actual and Estimated number of households that tuned in to *Behind Enemy Lines: The Scott O'Grady Story* on November 28, 2001 on The Discovery Channel (Deposition Exhibit No. 119) **(Confidential – Filed Under Seal Pursuant to Agreed Protective Order Dated February 14, 2003)**

Exhibit 134     March 27, 2000 Facsimile to Scott O'Grady from Renate Thompson (Deposition Exhibit 134) **(Confidential – Filed Under Seal Pursuant to Agreed Protective Order Dated February 14, 2003)**

Exhibit 135     Speaking Engagements for Calendar Year 2000 for Scott O'Grady (Deposition Exhibit No. 135)

Exhibit 136     Speaking Engagements for Calendar Year 2001 for Scott O'Grady (Deposition Exhibit No. 136)

Exhibit 137     Speaking Engagements for Calendar Year 2002 for Scott O'Grady (Deposition Exhibit No. 137)

Exhibit 144     Synopsis of Scott O'Grady from Washington Speakers Bureau website (Deposition Exhibit No. 144)

Exhibit 148     2003 Brochure – Washington Speakers Bureau (Deposition Exhibit No. 148)

Exhibit 156     July 25, 1996 letter to Dr. W. O'Grady from Sally Dyas of the BBC (Deposition Exhibit No. 156)

Exhibit 157     BBC Contract with William O'Grady (Deposition Exhibit No. 157)

Exhibit 175     January 4, 1996 Letter to Alan Sokol from Diane Cairns (Deposition Exhibit No.175) **(Confidential – Filed Under Seal Pursuant to Agreed Protective Order Dated February 14, 2003)**

Exhibit 176     November 8, 1995 Letter to Colonel George E. Day from Bantam Doubleday (Deposition Exhibit No. 176) **(Confidential – Filed Under Seal Pursuant to Agreed Protective Order Dated February 14, 2003)**

Exhibit 178     January 7, 1997 Memorandum Agreement between Scott O'Grady and Thomas Mills of Track Record Enterprises (Deposition Exhibit No. 178) **(Confidential – Filed Under Seal Pursuant to Agreed Protective Order Dated February 14, 2003)**

Exhibit 179     January 15, 1998 Memorandum Agreement between Scott O'Grady and Thomas Mills of Track Record Enterprises (Deposition Exhibit No. 179) **(Confidential – Filed Under Seal Pursuant to Agreed Protective Order Dated February 14, 2003)**

Exhibit 181    Representation Agreement between Scott O'Grady and Tom Mills of Track Record Enterprises (Deposition Exhibit No. 181) **(Confidential – Filed Under Seal Pursuant to Agreed Protective Order Dated February 14, 2003)**

Exhibit 182    May 19, 1998 Letter to Tom Mills from Kay Ferguson (Deposition Exhibit No. 182) **(Confidential – Filed Under Seal Pursuant to Agreed Protective Order Dated February 14, 2003)**

Exhibit 183    May 26, 1998 Track Record Enterprises Invoice to Kay Ferguson  **(Confidential – Filed Under Seal Pursuant to Agreed Protective Order Dated February 14, 2003)**

Exhibit 228    License Agreements  between BBC and DCI (Bates Nos. DCI 000112 through 123) **(Confidential – Filed Under Seal Pursuant to Agreed Protective Order Dated February 14, 2003)**

Exhibit 299    June 10, 1997 Facsimile to Sally Dyas from Scott O'Grady (Deposition Exhibit No. 299)

Exhibit 302    *"Behind Enemy Lines"* (Silhouette Intimate Moments, No. 1176) (Deposition Exhibit No. 302)

Exhibit 303    *"Behind Enemy Lines"* a Field Manual for God's Army by Chick Dean (Deposition Exhibit No. 303)

Exhibit 304    Collection of books, movies and literary works entitled "Behind Enemy Lines" (Deposition Exhibit No. 304)

Exhibit 312    March 9, 2002 confirmation of O'Grady order of the History Channel Videotape "Escape! Escape from Bosnia: The Scott O'Grady Story" to O'Grady (Deposition Exhibit No. 312) **(Confidential – Filed Under Seal Pursuant to Agreed Protective Order Dated February 14, 2003)**

Exhibit 313    FilmRoos, Inc.  Personal Release signed by Scott O'Grady(Deposition Exhibit No. 313) **(Confidential – Filed Under Seal Pursuant to Agreed Protective Order Dated February 14, 2003)**

Exhibit317    History Channel Documentary "Escape! Escape from Bosnia:  The Scott O'Grady Story" Videotape  (Deposition Exhibit No. 317) (See DVD No. 2, Appendix V)

Exhibit 317A   Transcript of The History Channel Documentary "Escape! Escape from Bosnia: The Scott O'Grady Story"

Exhibit 335    Videotape entitled November 28, 2001 Broadcast of the Discovery Channel Documentary "Behind Enemy Lines:  The Scott O'Grady Story" including all advertisements(Bates No. DCI 00335)

Exhibit 335A   Certified transcript of Videotape Ex. 335 (See DVD No. 3, Appendix V)

Exhibit 336      Discovery Communications, Inc. website

Exhibit 337A   Collection of news articles concerning DCI's awards

Exhibit 337B   Collection of news articles concerning Discovery Channel's programs

Exhibit 338      Anne Hodges, "Discovery Channel Airs O'Grady's Documentary," *The Houston Chronicle*, May 30, 1997 at 1

Exhibit 339      upcomingmovies.com website

Exhibit 340A   Still from interstitial of title of Fox Movie, *Behind Enemy Lines*

Exhibit 340B   Stills from Documentary displaying Discovery Channel logo

Exhibit 340C   Stills from Documentary displaying "Walking with Prehistoric Beasts" logo

Exhibit 340D   Still from interstitial displaying Discovery Channel logo

Exhibit 340E   Still from interstitial displaying Documentary title, *Behind Enemy Lines:  The Scott O'Grady Story*

Exhibit 340F   Still from interstitial displaying Fox logo

Exhibit 340G   Stills from opening interstitial

Exhibit 340H   Stills from factoid on nutritional facts from interstitial "Bump Out"

Exhibit 340I    Stills from factoid on U.S.S. *Carl Vinson* from interstitial "Bump Out"

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| SCOTT O'GRADY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 502CV173 |
| | § | |
| TWENTIETH CENTURY FOX | § | JURY DEMANDED |
| FILM CORPORATION, and | § | |
| DISCOVERY COMMUNICATIONS, | § | ORAL ARGUMENT REQUESTED |
| INC., | § | |
| | § | |
| Defendants | § | |

JOINT APPENDIX V

TO DEFENDANTS, TWENTIETH CENTURY FOX FILM CORPORATION'S
AND DISCOVERY COMMUNICATIONS, INC.'S
MOTIONS FOR SUMMARY JUDGMENT AND BRIEFS IN SUPPORT THEREOF

DVD EXHIBITS MADE FROM VIDEOTAPE EXHIBITS

| | | |
|---|---|---|
| **DVD 1** | **Track 1** | **Video of Exhibit 10 – _Hot Ticket_ (Deposition Exhibit 10)** |
| | **Track 2 thru Track 22** | **Video of Exhibit 14 – News Clips from Vanderbilt University News Archives Nos. 14.1 thru 14.21** |
| **DVD2** | **Track 1** | **Exhibit 14B – Video of ABC's _Nightline_ at 11:30 p.m. on June 8, 1995** |
| | **Track 2** | **Exhibit 37 – December 21, 2001, _Entertainment Tonight_ (O'Grady Segment only) (Deposition Exhibit 37)** |
| | **Track 3** | **Exhibit 114 – Video entitled Scott O'Grady 'Behind Enemy Lines' Compilation Reel 11/28/01 (Deposition Exhibit 114)** |
| | **Track 4** | **Exhibit 317 – The History Channel Documentary entitled "Escape! Escape from Bosnia: The Scott O'Grady Story"** |

**DVD3**          **Track 1**                      **Exhibit 335 – Video entitled November 28, 2001,**
**Broadcast of the Discovery Channel Documentary**
**"Behind Enemy Lines:  The Scott O'Grady Story"**
**including all advertisements (Bates No. DCI 00335)**