

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

SCOTT O'GRADY, §
§
Plaintiff §
§
§
v. § CIVIL ACTION NO. 502CV173
§
TWENTIETH CENTURY FOX § JURY DEMANDED
FILM CORPORATION, and §
DISCOVERY COMMUNICATIONS, §
INC., §
§
Defendants §

## DEFENDANT DISCOVERY COMMUNICATIONS INC.'S
## MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

Laura R. Handman
D.C. Bar No. 444386
Constance M. Pendleton
D.C. Bar No. 456919
1500 K Street, N.W., Suite 450
Washington, D.C. 20005-1272
(202) 508-6600
(202) 508-6699 – Fax

Victor F. Hlavinka
ATCHLELY, RUSSELL, WALDROP, &
HLAVINKA, L.L.P.
1710 Moores Lane
Texarkana, Texas 75505
(903) 792-8246
(903) 792-5801 – Fax

June 30, 2003

53

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................................2

STATEMENT OF UNDISPUTED FACTS ...............................................................5

    A.    Discovery Communications, Inc. and the Discovery Channel ...............................5

    B.    The BBC Documentary "Missing in Action" ......................................................6

    C.    The Documentary *Behind Enemy Lines: The Scott O'Grady Story*
           Broadcast on the Discovery Channel ....................................................................7

    D.    The Special Programming Event On November 28, 2001 ......................................8

    E.    The Interstitials Created By DCI And Approved By Fox For The Special
           Programming Event ...............................................................................................9

    F.    The Broadcast On November 28, 2001 ...............................................................14

    G.    This Lawsuit ........................................................................................................14

GROUNDS FOR SUMMARY JUDGMENT ...........................................................15

ARGUMENT AND AUTHORITIES .........................................................................17

POINT I      THE STANDARD FOR SUMMARY JUDGMENT ...........................................17

POINT II     BASED UPON THE UNDISPUTED MATERIAL FACTS,
               DCI IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S
               COMMERCIAL MISAPPROPRIATION CLAIM ...............................................19

    A.    O'Grady Gave His Consent For Use Of His Name And
           Likeness For Promotion ........................................................................................19

    B.    Even If O'Grady Had Not Given His Consent, The Documentary About
           Public Events Can Not, As A Matter of Law, Constitute Commercial
           Misappropriation ..................................................................................................20

    C.    The Promotions Aired On The Discovery Channel Did Not Constitute
           Commercial Misappropriation ..............................................................................20

           1.    The Promotions On The Discovery Channel Are Protected
                 Under The Newsworthiness Privilege .....................................................21

           2.    The Use, If Any, Of Plaintiff's Name And Likeness For The Movie
                 Would Have Been at Most, Incidental And, As Such, Does
                 Not State A Commercial Misappropriation Claim. ..................................25

i

POINT III    BASED UPON THE UNDISPUTED MATERIAL FACTS, THE
             PROMOTIONS ON THE DISCOVERY CHANNEL DO NOT STATE A
             CLAIM UNDER THE LANHAM ACT OR FOR UNFAIR COMPETITION ....27

        A.   Since Both The Documentary And The Movie Are Protected First
             Amendment Expression, Lanham Act And Unfair Competition Claims
             Can Only Be Stated If There Is No Artistic Relevance And If There Is
             An Explicitly Misleading Statement .....................................................................28

        B.   There Is No Implied Endorsement Arising Out Of The Fact That Both
             The Documentary And The Movie Are About An American Pilot Downed
             In Bosnia. ............................................................................................................31

        C.   The Fact That Promotion For The Movie Was Aired On The Rebroadcast
             Of The Documentary Does Not Imply False Endorsement ..................................32

        D.   Similarity Of Titles Does Not Imply O'Grady's Endorsement Or That The
             Movie Is O'Grady's True Story. ..........................................................................35

        E.   The Reference To O'Grady Is A Nominative Fair Use. ........................................37

POINT IV    PLAINTIFF CANNOT SHOW THAT DCI INTENDED ANY FALSE
             IMPLICATION IN THE PROMOTIONS ON THE DISCOVERY
             CHANNEL ...........................................................................................................39

POINT V     PLAINTIFF CANNOT SATISFY THE ELEMENTS OF A TORTIOUS
             INTERFERENCE CLAIM AGAINST DCI, AND THUS HIS CLAIM
             FAILS AS A MATTER OF LAW...........................................................................43

POINT VI    PLAINTIFF'S CONSPIRACY CLAIM FAILS AS A MATTER OF LAW
             BECAUSE THERE IS NO EVIDENCE THAT DCI COMMITED AN
             INDEPENDENT UNDERLYING TORT .............................................................45

CONCLUSION.........................................................................................................................46

**STATE CASES**

*Allied Capital Corp. v. Cravens*, 67 S.W.3d 486
(Tex. App. – Corpus Christi 2002, no pet.) ..................................................43

*Bank One, Texas, N.A. v. Stewart*, 967 S.W.2d 419
(Tex. App.-Houston [14th Dist.] 1998, pet. denied) .........................................45

*Garcia v. C.F. Jordan, Inc.*, 881 S.W.2d 155
(Tex. App. – El Paso 1994, no writ) .............................................................45

*Guglielmi v. Spelling-Goldberg Products*, 603 P.2d 454 (Cal. 1979) ...........................26

*KTRK Television v. Felder*, 950 S.W.2d 100 (Tex. App.-Houston 1997) ...............................44, 46

*Markman v. Lachman*, 602 S.W.2d 350 (Tex. Civ. App. – Texarkana 1980) ..............................45

*Massey v. Armco Steel Co.*, 652 S.W.2d 932 (Tex. 1983) ...............................................45

*Montana v. San Jose Mercury News*, 34 Cal. App. 4th 790,
40 Cal. Rptr. 2d 639 (Cal. Ct. App. 1995) ...................................................22

*Namath v. Sports Illustrated*, 371 N.Y.S.2d 10,
*aff'd*, 386 N.Y.S.2d 387 (N.Y. 1976) ...........................................................25

*Operation Rescue -Nat'l Planned Parenthood of Houston & Southwest Texas, Inc.*,
975 S.W.2d 546 (Tex. 1998).................................................................45

*Prudential Insurance Co. of America v. Financial Review Services, Inc.*,
29 S.W.3d 74 (Tex. 2000)..................................................................43

*Rand v. Hearst Corp.*, 31 A.D.2d 406, 298 N.Y.S.2d 405, *aff'd*, 26 N.Y.2d 806, 309
N.Y.S.2d 348 (1970)....................................................................26, 27

*Rogers v. Dallas Morning News, Inc.*, 889 S.W.2d 467
(Tex. App.-Dallas, 1994, writ denied) ........................................................44

*Schoellkopf v. Pledger*, 778 S.W.2d 897 (Tex. App -- Dallas 1989, writ denied).......................45

*Storball v. Twentieth Century Fox Film Corp.*, 1993 WL 734117,
30 U.S.P.Q. 2d 1394 (C.D. Cal. 1993)........................................................33

*Tilton v. Marshall*, 925 S.W.2d 672 (Tex. 1996)........................................................45

*Triplex Communications v. Riley*, 900 S.W.2d 716 (Tex. 1995)..........................................45

*Velez v. VV Publishing Corp.*, 135 A.D.2d 47
    (N.Y. App. Div. 1st Dep't 1988) ..........................................................................26

*Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711 (Tex. 2001) ........................................43

## STATUTES AND RULES

15 U.S.C. 1125(a) ...........................................................................................14, 18, 28

Fed. R. Civ. P. 56.................................................................................................1, 17

N.Y. Civ. Rights Law §§ 50 and 51 ..........................................................................18

## MISCELLANEOUS

Restatement (Second) of Torts § 652.................................................................19, 25, 26

TO THE HONORABLE COURT:

Discovery Communications, Inc. ("DCI") moves for summary judgment pursuant to Fed. R. Civ. P. 56(b) on all claims asserted by Scott O'Grady ("O'Grady" or "Plaintiff"), on the ground that the pleadings, depositions, answers to interrogatories, and responses to requests for admissions, together with the declarations and exhibits in the summary judgment record, show that there is no genuine issue as to any material fact and DCI is entitled to judgment as a matter of law.[1]

---

[1] Both defendants have submitted a single summary judgment record:

       Appendix I – Deposition Excerpts;
       Appendix II – Declarations and DCI's Rule 56 Statement of Undisputed Facts;
       Appendix III – Responses to Interrogatories and Requests for Admission;
       Appendix IV – Exhibits.

Unless noted otherwise, the exhibit numbers correspond to the numbered exhibits used in the depositions.

## PRELIMINARY STATEMENT

Plaintiff Scott O'Grady was a pilot flying a peacekeeping mission when his F-16 was shot down in Bosnia on June 2, 1995. He was rescued six days later. Leaving active duty a few months after his rescue, O'Grady has gone on to publish two books and become a regular on the motivational speaker circuit.

The news of O'Grady's six days "behind enemy lines" was widely reported by the national and international news media. The British Broadcasting Corporation (the "BBC") produced an in-depth documentary about O'Grady, for which the BBC interviewed on-camera O'Grady, his family, his fellow pilots, Marine rescuers and their commanding officer. The documentary included portions of these interviews, contemporaneous news footage and re-enactments of the real events with O'Grady's sister and father and with an actor recreating O'Grady's six days "behind enemy lines." O'Grady and his family signed releases and a nominal sum was paid for their appearances. The BBC licensed the documentary to Discovery Communications, Inc. ("DCI"), a defendant in this case, which began broadcasting the documentary on the Discovery Channel under the title *Behind Enemy Lines: The Scott O'Grady Story* (the "Documentary") in June, 1997.

To survive summary judgment, plaintiff has the difficult burden of showing that, although DCI had the right to broadcast the Documentary – a Documentary with which O'Grady cooperated, which had aired 32 times over four years without complaint and which O'Grady proudly lists in his speaker's bio – nonetheless, it was unlawful for DCI to broadcast the Documentary for the 33rd and 34th time on November 28, 2001. O'Grady now comes before the Court contending that this otherwise lawful broadcast was a commercial misappropriation of name and likeness, implied a false endorsement, constituted unfair competition, tortiously interfered with his prospective business relations and was an unlawful conspiracy. He makes these claims purportedly because, along with the advertising for Petsmart and Kay Jewelers and promotions for other programs on the Discovery Channel, the Discovery Channel aired a sneak preview, behind-the-scenes footage, interviews with the actors, producer and director as well as

2

advertising for a new feature film, *Behind Enemy Lines* (the "Movie"), a fictional film inspired by O'Grady's six days "behind enemy lines" in Bosnia and distributed by Twentieth Century Fox Film Corporation ("Fox Film"), also a defendant in this action.

Not in issue in this case because O'Grady does not and can not contest:

- DCI had the right to broadcast the Documentary;

- O'Grady and his family fully cooperated with the production of the Documentary, each signing releases;

- O'Grady does not have exclusive ownership of the widely reported events of his six days "behind enemy lines" and those events could be the basis for a factual documentary, with (as here) or without his permission;

- The Documentary was substantially accurate and O'Grady asserts no claims such as defamation or false light arising out of its contents;

- O'Grady does not have any ownership interest in the title *Behind Enemy Lines: The Scott O'Grady Story*;

- DCI had the right to use O'Grady's name and likeness, including footage from O'Grady's interview, to promote the Documentary and encourage viewers to tune in;

- Not one frame of what was aired on the Discovery Channel that referred to the Movie – not the material created by DCI, not the material created by Fox Film – used O'Grady's name or likeness;

- The promotions on the Discovery Channel <u>never</u> said that the Movie, as contrasted with the Documentary, was a true account of Scott O'Grady's six days "behind enemy lines"; and

- The promotions on the Discovery Channel <u>never</u> said that O'Grady endorsed, authorized or participated in the Movie.

Rather, what O'Grady contends is that, because Fox Film promoted its Movie, *Behind Enemy Lines* about a pilot downed and rescued in Bosnia on the same broadcast as the Documentary about Scott O'Grady, a pilot downed and rescued in Bosnia, also titled *Behind*

*Enemy Lines* but with the identifying tag: *The Scott O'Grady Story* – the broadcast unlawfully <u>implied</u> that the Movie was also a true account of O'Grady's story and that O'Grady had authorized or endorsed the Movie.  While conceding that the promotions for the Documentary can and do – lawfully – use his name or likeness and the promotions referring to the Movie do not, O'Grady contends that, taken together, his name and likeness are used to promote the Movie.  In fact, as a review of the actual broadcast clearly shows, not only is there no express statement that the Movie is O'Grady's story, not only is there no express language of endorsement, not only is his name and likeness used only in reference to the Documentary, but the promotions on the Discovery Channel explicitly, repeatedly and very deliberately distinguish between the true "facts" presented in the Documentary as contrasted with the "fiction" of the Movie inspired by those facts: "the fact and the fiction of true survival," a theme announced in the opening sequence introducing the program.  (Exs. 335, 335A.)

All of O'Grady's claims must be viewed in context – the context not only of the broadcast as a whole as it was actually viewed, but the context of advertising on television generally and movie and broadcast promotions more specifically.  Even more important, the context here are works protected by the First Amendment, whether it is a factual account of a truly newsworthy subject, such as the Documentary, or the Movie inspired by the true story – very public events the reporting or creative uses of which O'Grady does not have exclusive right to control.  At least five Circuits, including the Fifth, have emphasized the need to narrowly construe commercial misappropriation and false endorsement/false advertising claims when, as here, First Amendment protected works are at issue, even at the risk of some public confusion or misunderstanding.  With regard to both the Documentary and the Movie, the choices the broadcasters and filmmakers make about titles, the language and the look of the promotions, are protected by the First Amendment as long as there is "some artistic relevance" between the promotional use of someone's name or likeness and the protected work's content and the use is not "explicitly misleading."  *Rogers v. Grimaldi*, 875 F.2d 994, 1000 (2d Cir. 1989).

Here, the Documentary, its title and its promotion was obviously "relevant" to O'Grady's

4

six days "behind enemy lines," and his name and likeness were used only in reference to the Documentary.  Even if the Court were to find there was reference to O'Grady beyond that promoting the Documentary, the reference bore "some artistic relevance" since the Movie was inspired by O'Grady's real life story and was necessary to contrast between "the fact and fiction of true survival."  Since there is no explicit false representation of the Movie's content and no explicit false statement of endorsement, none of O'Grady's claims can be sustained.

At bottom, O'Grady is apparently miffed that a movie based on his book and for which he has been paid $250,000 (by Orion Pictures), was never made and, instead, a movie was made (by Fox Film) inspired by his story, about a fictional pilot downed in Bosnia and rescued by the Marines, a movie for which he was not paid.  The hard First Amendment truth is, however, no public figure, O'Grady included, has exclusive control over the very public, very newsworthy events of his or her life.  Tacitly acknowledging this fact, O'Grady has instead latched on to the promotions of the Movie on the Discovery Channel as a vehicle to exercise such control – promotions that represent approximately 1% of the Movie's overall marketing budget.  (Siskind Dep. 34:1-35:18; Godsick Dep. 449:22-24, 50:1-12; see also Patterson Dep. 59:9-14, 104:23-107:8; Rothman Dep. 49:11-50:10.)  Courts have consistently refused to permit the Lanham Act, commercial misappropriation, unfair competition, tortious interference and conspiracy to give plaintiff what the First Amendment does not otherwise allow.

## STATEMENT OF UNDISPUTED FACTS[2]

### A.    Discovery Communications, Inc. and the Discovery Channel

Founded 18 years ago, the Discovery Channel has always been dedicated to factual programs about science, technology, engineering and natural history.  (Patterson Dep. 20:1-14, 33:20-23; Ex. 336.)  The factual programming has also always featured history, adventure and exploration, with a special emphasis on military history.  (Baquet Dep. 32:17-33:1; Patterson Dep. 43:17-20, 44:1-6, 11-12, 21-25).  The Discovery Channel has won numerous awards for its

---

[2] DCI's Rule 56 Statement of Undisputed Facts is included in Appendix II.

programming. (Ex 337A.)

The Discovery Channel, along with 11 other channels, are part of Discovery Communications, Inc. (the defendant in this case), a leading non-fiction cable network. (Exs. 36, 337A, 337B.)  Like the Discovery Channel, the programming on the other DCI channels – TLC (The Learning Channel), Animal Planet, Discovery Theater, Travel Channel, Discovery Times, Discovery Kids, Science Channel, Home & Leisure, Discovery Wings, Discovery en Espan ol and HD Theater – is all factual, a hallmark of the Discovery brand. (Ex. 336; Patterson Dep. 20:1-14; 149:10-151:8; Anderson Dep. 49:6-51:16, 77:4-81:19; Baquet Dep. 26:6-28:17, 82:3-84:18.)

### B.    The BBC Documentary *Missing in Action*

The Documentary was originally produced by the BBC between 1995 and 1997, and aired in the United Kingdom under the title *Missing in Action*. (Amended Compl. ¶¶ 17-18.) The BBC created the Documentary with the cooperation of Scott O'Grady himself, who participated in an on-camera interview. (Amended Compl. ¶¶ 17-18; Plf. Dep. 320:3-9; 322:3-323:4). O'Grady's father and sister not only gave on-camera interviews, but also participated in reenactment scenes recreating when they heard O'Grady was missing and when they heard of his safe return. (Plf's Obj. and Responses to DCI's Int. No. 9; Dr. O'Grady Dep. 10:21-18:11; Plf. Dep. 327:10-328:9; 332:21-24; 354:10-17; Exs. 335, 335A.) The documentary combined contemporaneous news footage, BBC on-camera interviews with all the key participants, including not only O'Grady and his family but also his fellow pilots, the Marines who rescued him and their commanding officer, and reenactments by his sister and father as well as by an actor of the six days O'Grady was "behind enemy lines." (Plf.'s Obj. and Responses to DCI's Int. No. 9; Dr. O'Grady Dep. 10:21-18:11; Plf. Dep. 327:10-328:9, 332:21-24, 354:10-17;.Exs. 335, 335A.)

O'Grady's cooperation, and that of his father and sister, is memorialized in releases each of them entered into with the BBC in 1996. (Exs. 41, 44, 45, 46, 157; Plf. Dep. 363:19-364:13; Dr. O'Grady Dep. 22:1-23:13.) The release O'Grady executed defines his "contribution" in the

documentary: "to be interviewed and to participate in short actuality sequence concerning your rescue in Bosnia." (Ex. 45.) O'Grady, his father and sister each granted the BBC, and all licensees and assigns, "ALL RIGHTS" to the BBC documentary without limitation, "FOR ALL PURPOSES EVERYWHERE," specifically agreeing to use of their name, likeness and "contribution" for "trailers" (*i.e.*, promos) and for "promotional...purpose." (Exs. 41, 44, 45, 46, 157) (emphasis in the original.) O'Grady, his father and sister also waived all rights of approval of content and titles; date and time of broadcast was at the discretion of the BBC. (Exs. 41, 44, 45, 46, 157.) They were paid nominal sums for their participation in the Documentary.[3] (Plf. Dep. 345:9-15; Ex. 156; Dr. O'Grady Dep. 19:5-9.)

### C.   The Documentary *Behind Enemy Lines: The Scott O'Grady Story* Broadcast on the Discovery Channel

On September 25, 1996 and again on March 26, 1997, BBC licensed the documentary to BBC Worldwide Americas, Inc. (Exs. A and B to Declaration of Vernon G. Chu ("Chu Decl.")) which in turn licensed the Documentary to DCI d/b/a Discovery Channel (originally The Learning Channel, Inc., which merged with DCI) for a period beginning April 1, 1997 through May 14, 2002. (Exs. C, D and E to Chu Decl.) Thus, by operation of the chain of contracts, DCI obtained all the rights – "all rights for all purposes everywhere" – that O'Grady and his family members originally granted to the BBC, including the right to broadcast their interviews in the Documentary, and to air promotions using their name and likeness, as well as to retitle the Documentary (subject to BBC approval), all without further payment or permission from O'Grady. (Plf.'s Obj. and Responses to DCI's Requests for Admission No. 1; Exs. 41, 44, 45, 46, 157; Exs. A-E to Chu Decl.)

The Discovery Channel began airing the BBC documentary under the title, *Behind Enemy Lines: The Scott O'Grady Story* on June 2, 1997. (Amended Compl. ¶ 26; Exs. 48, 116.) The Discovery Channel broadcast the Documentary with that title 31 more times, the most recent

---

[3] O'Grady admits that he signed the release with the BBC in 1996 (Plf.'s Obj. and Responses to DCI's Requests for Admission No. 3), and that the release establishes the rights O'Grady granted to the BBC. (Plf.'s Obj. and Responses to DCI's Requests for Admission No. 3.)

being March 2001, prior to the rebroadcast on November 28, 2001, the broadcast in issue. (Amended Compl. ¶ 26; Exs. 48, 116.)  At no time during those 4-½ years did O'Grady assert any objection to either the Documentary or the title. (Amended Compl. ¶ 26; Plf. Dep. 361: 21-362:1, 364:14-365:2, 366:4-10, 366:25-367:31; 405:17-23, 406:12-407:4; Mills Dep. 137:18-24; Dr. O'Grady Dep. 29:13-18.)

O'Grady does not assert – and cannot assert after its broadcast 32 other times without objection – any claims arising out of the content of the Documentary, admitting "overall they didn't do a bad job putting it all together." (Plf. Depo. 356:23-358:22.)  In fact, in a June 10, 1997 letter "From the desk of Scott O'Grady" and which he admits bears his signature, he wrote to the BBC, praising the documentary: " 'MISSING IN ACTION' is a hit!  Everyone I have spoken with has made a comment on how well it was done.  I am very pleased with the results. Thank you for all your hard work.  I hope you are doing [well].  CONGRATULATIONS." (Ex. 299) (emphasis in original.)

### D.    The Special Programming Event On November 28, 2001

Like many other television networks, the Discovery Channel has run special programming events in conjunction with the release of new movies by the various different motion picture studios.  (Patterson Dep. 64:21-6.)  In instances where a studio has made a substantial commitment to buy advertising space on the network, the Discovery Channel will broadcast an evening, usually composed of several one hour programs, on topics thematically related to the film and include a sneak preview, behind-the-scenes footage and interviews with the stars and production personnel, usually taken from the studio's electronic press kit that the studio distributes to hundreds of media outlets.[4]  (Anderson Dep. 19:25-20:16; Baquet Dep.

---

[4] Such special programming events which the Discovery Channel and Animal Planet have aired include: a night of factual ape-related programming interspersed with interstitials for Fox's movie *Planet of the Apes*, and an event for Fox's movie *Ice Age*, and events with Universal Studios for its movies *U-571*, *The Mummy Returns* and *Jurassic Park III*. (Patterson Dep. 40:15-22; 107:19-24; 167:1-4.)  Special programming events are also known in the industry as "stunts" or "promotional tie-ins," terms used interchangeably. (Patterson Dep. 43:4-8; 50:1-5; Anderson Dep. 20:1-16;  Baquet Dep. 54:17-55:3; 55:17-20; 58:21-59:5.)

54:23-55:3, 55:15-23; Marks Dep. 50:16-20.)

The special programming event for the Movie was similarly conceived and executed.

Kelly Patterson, whose job is, in part, to conceive of these events, submitted a proposal to Fox

Film for a special programming event, citing the similarity of the stories between the Movie and

the Documentary, both about downed American pilots in Bosnia rescued by the Marines, both

having *Behind Enemy Lines* in their title but with the Documentary bearing the tag: *The Scott

O'Grady Story.* (Patterson Dep. 37:2-23, 41:2-9, 42:6-21, 43:17-20, 44:1-6, 44:10-19, 45:4-46:5,

51:18-52:8, 69:13-24, 70:2-7, 81:17-84:22, 102:23-106:2; *see also* Marks Dep. 54:10-16; Siskind

Dep. 26:14-20; Ex. 339; Baquet Dep. 31:14-33:19, 39:23-25, 40:1-17.)  As originally conceived,

the special programming event would have aired in January 2002 and included two hours of

military-related programming, one of which would be the Documentary.  (Patterson Dep. 42:9-

12, 51:18-52: 40, 62:10-16.)  When Fox Film advanced the release date to November 2001, the

proposal was scaled back to one hour of military-related programming composed of the

Documentary alone.  (Patterson Dep. 52:5-8.)  The Discovery Channel guaranteed Fox Film a

certain number of male viewers between 18-49, the target audience for Fox Film's Movie.

(Patterson Dep. 166:11-14, 173:3-25, 174:3-13, 182:6-8; Marks Dep. 50:19-20; Siskind 36:4,

38:2-15; *see also* Godsick Dep. 47:3-11.)  Fox Film's Michelle Marks gave the green light to the

special programming event.  (Patterson Dep. 105:10-12; 106:14-107:8; Marks Dep. 53:11-59:16;

Siskind Dep. 25:12-19, 26:14-20; 34:1-35:18; Godsick Dep. 49:22-24, 50:1-12.)  Fox Film

ultimately made a $400,000 advertising buy of air time on the Discovery Channel to broadcast

advertising created by Fox Film for the Movie, approximately 1-1.3% of its total advertising and

marketing budget for the Movie.  (Siskind Dep. 34:1-35:18; Godsick Dep. 49:22-24, 50:1-12; *see

also* Patterson Dep. 59:9-14, 104:23-107:8; Rothman Dep. 49:11-50:10.)

### E.   The Interstitials Created By DCI And Approved By Fox Film For The Special Programming Event

The material produced by the Discovery Channel and approved by Fox Film stressed the

distinction between the Discovery Channel and its fact-based Documentary and Fox Film and its

fictional Movie inspired by the O'Grady story. (Anderson Dep. 43:16-21.) The focus of Robert Anderson, who produced the material for the special programming event (Patterson Dep. 50:20-24; 64:21-65:12; 167:22-168:4; Anderson Dep. 41:10-17), and his boss (Mary Clare Baquet) was and is to promote the Discovery Channel brand and the association of that brand with high quality, informative non-fiction programming as distinct from fictional dramas on related themes. (Anderson Dep. 28:25-29:3, 45:16-25, 48:23-51:18, 77:16-81:19; Baquet Dep. 81:21-84:18; *see also* Patterson Dep. 149:14-20, 150:22-25.)

Anderson produced the following elements: two "tune-ins," material aired in the week preceding the broadcast encouraging viewers to tune in at a certain date and time ("Tune-Ins" plus "interstitials," the material created to air during the program ("Interstitials") (Anderson Dep. 22:1-24:13, 26:24-29:3, 32:19-34:10.) The Interstitials included an "opening" which is the introductory sequence to the special programming event, "bump-outs" and "bump-ins" which are the lead out and back into the program respectively containing three "factoids" which were informational segments related to the programming and a "credit bed" at the end which ran credits for the Documentary along with a tune-in for an upcoming documentary on Pearl Harbor on the Discovery Channel. (Anderson Dep. 22:1-24:13, 32:19-34:10.)

Anderson took footage from the electronic press kit Fox Film provided of behind-the-scenes, the movie trailer and interviews (or "soundbites") with the actors, director and producer. (Anderson Dep. 25:19-21, 26:24-29:3, 44:24-45:3.) DCI hoped the footage about the upcoming movie and factoids would "freshen" the Documentary, relating to a conflict now six years old, and be of interest to Discovery Channel's primarily male viewers. (Anderson Dep. 32:1-35:20.) Conversely, Fox Film hoped that audiences interested in the Documentary about an American pilot caught and rescued "behind enemy lines" would be interested in a fictional movie with similar military theme, a Movie inspired by O'Grady's real life events. (Davis Dep. 11; Plf. Dep. 136-11:14; Marks Dep. 50:19-20; Siskind Dep. 36:4, 38:2-15.)

Although inspired by the events involving O'Grady, the Discovery Channel personnel were expressly told by Fox Film's Michelle Marks that the Movie was <u>not</u> the Scott O'Grady

story. (Patterson Dep. 54:15-24, 55:3-17, 101:17-20, 102:7-10; Anderson Dep. 46:17-48:22; Baquet Dep. 64:9-65:4; Marks Dep. 49:9-25, 50:23-51:4.) The Interstitials and Tune-Ins were accordingly designed to underscore the distinction between the "fact and fiction of true survival," as the opening said, to contrast the Discovery Channel's fact-based Documentary, "how America responded to the real thing" and "one hero's true story," with Fox Film's fictional movie about "Owen Wilson's character, Naval Aviator, Chris Burnett," inspired by the "true story" of Air Force pilot Scott O'Grady, as told in the Documentary. (Exs. 114, 114A, 335, 335A.) (Patterson Dep. 149:10-151:8; Anderson Dep. 43:16-21, 45:16-25, 48:23-51:18, 77:4-81:19.)

Neither the material created by DCI nor the material created by Fox Film anywhere says that the Movie – in contrast to the Documentary – is the story of Scott O'Grady. (Exs. 335, 335A.) Neither the material created by DCI nor the material created by Fox Film anywhere says that the Movie was authorized or endorsed by O'Grady. (Exs. 114, 114A, 335, 335A.) Neither the material created by DCI nor the material created by Fox Film uses O'Grady's name or likeness or that of the actor recreating O'Grady's ordeal in reference to the Movie – not one frame. The only use of O'Grady's name or likeness or that of the actor recreating O'Grady's ordeal is only in reference to the Documentary. (Exs. 114, 114A, 335, 335A.)

The Documentary itself, as broadcast, bore throughout the well-known logo identification of the Discovery Channel in the lower right-hand corner. (Ex. 335; *see* stills Ex. 340B.) The logo of the Discovery Channel preceded and introduced the references to the Documentary in the Interstitials and Tune-Ins. (Ex. 335; *see* still Ex. 340D.) Whenever reference is made to the Movie, the equally well-known logo for Twentieth Century Fox is flashed. (Ex. 335; *see* still Ex. 340F.)

Immediately preceding the Discovery Channel logo are flashes of light, again a visual signal marking the distinction between promotion for the Movie and promotion for the Documentary. (Ex. 335.) The logo for the Movie supplied by Fox was distinct in color and typeface from that for the Documentary. The logo for the Movie was in light blue in block lettering and the logo for the Documentary was shown in gold and white with two white stars in

11

a Times Roman style font. (Ex. 335, *see* stills attached as Exs. 340A and 340E.)

The text of the opening for the special programming event on November 28, 2001 underscored the contrast between the "fact" of the Documentary and the "fiction" of the Movie. (Exs. 335, 335A; *see* stills Ex. 340G.) The text signaled the viewer the segue to the Documentary from the Movie by using the tag line "before you cross the line in theaters" accompanied by the flash of the Discovery Channel logo. The text then says "how did America respond to the real thing?" This is followed by "The Discovery Channel remembers one hero's true story," text, accompanied by images from the Documentary, again distinguishing the true story – O'Grady's – from the fictional. The opening also includes one of the most recognizable real life people in the world, President Clinton, in obviously contemporaneous news footage from the time and clearly referring to O'Grady, saying "We're following the situation closely." The opening further underscores the comparison between the Movie and the Documentary with this text:

> Plus, we'll take a behind the scenes look and get a sneak peek at
> Twentieth Century Fox's new film "Behind Enemy Lines," a
> detailed look at the fact and fiction of true survival.

(Exs. 335, 335 A; *see* stills Ex. 340G.) Accompanying the words "the fact" is an image of the actor recreating O'Grady's ordeal in the Documentary. The visual accompanying "the fiction" is an image of the Movie's character Chris Burnett, played by actor Owen Wilson. (Exs. 335, 335A; *see* stills Ex. 340G.) Neither O'Grady's image nor that of the actor recreating his ordeal is used in reference to the Movie but rather is used solely in reference to the Documentary.

In the two Tune-Ins broadcast in the days preceding the broadcast on November 28, 2001, the factual nature of the Documentary is similarly reinforced. (Exs. 114, 114A.) One Tune-In said, for example, "The Discovery Channel remembers one hero's true story of survival told by the people that were there" followed immediately by a clip from the Documentary of one of O'Grady's actual rescuers. (Exs. 114, 114A.) This is followed by "How did America respond?" The question is answered by a contemporaneous news clip, with President Clinton saying "I'm very concerned about the loss of the American pilot," clearly referring to O'Grady.

(Exs. 114, 114A.)  The only mention of the Movie is a tag at the end, "brought to you by the new 20th Century Fox film, *Behind Enemy Lines*, in theaters November 30."  The reference to the Documentary and the Movie are accompanied by their distinctive logos and by the logos for the two companies. (Ex. 114.)

The three factoids created by DCI for the special programming event focused exclusively on editorial content related to the facts of either the Documentary or the making of the Movie. (Exs. 335, 335A.)  Since the Documentary had aired many times before to diminishing audiences, the Documentary was updated and enhanced by including these "factoids." (Anderson Dep. 33:23-34:10.)  For example, one factoid distinguishes between the fictional character in the Movie and the real person in the Documentary.  "Like Scott O'Grady," the narrator says, "Owen Wilson's character, Naval Aviator Chris Burnett, runs into some challenges once his plane is down." (Exs. 335, 335A.)  The challenge is shown – Wilson trying to convince Bosnian villagers that he is their friend, not foe:  "I am an American.  I am on your side," he says to villagers. (Exs. 335, 335A; *see* stills Ex. 340H.)  O'Grady's "major challenge," and the subject of the factoid – "finding food for survival." (Exs. 335, 335A; *see* stills Ex. 340H.)  The factoid says "Just how safe are tree leaves, bugs and rainwater. (Exs. 335, 335A; *see* stills Ex. 340H.) The nutritional facts when we return to *Behind Enemy Lines: The Scott O'Grady Story* on the Discovery Channel." (Exs. 335, 335A; *see* stills Ex. 340H.)  Unlike the Chris Burnett character, O'Grady successfully evaded and never engaged in any way with any Bosnian, friend or foe, at any time during those six days, as the Documentary makes apparent. (Exs. 335, 335A.) The factoid then proceeds to answer its own question "how safe are tree leaves, bugs and rainwater?" with information about the iron, vitamins, protein and carbohydrates of insects and the importance of water to maintain the body. (Exs. 335, 335A; *see* stills Ex. 340H.)  Another factoid was about U.S. military survival training such as O'Grady would have received and a third referenced the fact that the U.S.S. *Carl Vinson*, the aircraft carrier used in the Movie, was also engaged in the conflict in Afghanistan in 2001. (Exs. 335, 335A; see still Ex. 340I.)  This scientific, educational information is exactly what the Discovery Channel is best known for and

is consistent with promoting the Discovery Channel brand and its fact-based programming. (Patterson Dep. 20:1-14, 33:20-23; Ex. 336.)

### F.     The Broadcast On November 28, 2001

The Discovery Channel aired the special programming event on November 28, 2001 at 8 p.m. EST and again at 12:00 a.m. EST.  (Ex. 116.)  Accompanying the Documentary and the Interstitials were a "sneak peek" and two ads all produced by Fox Film.  (Exs. 335, 335A.) There were also tune-ins  for five upcoming programs on the Discovery Channel including for a program titled *Pearl Harbor: Death of the Arizona* (Exs. 335, 335A.)  There was also advertising created by other third parties, including Petsmart, Sears and Kay Jewelers stressing Christmas gifts in keeping with the season.  (Exs. 335, 335A.)

The program failed to deliver the audience the Discovery Channel had guaranteed to Fox Film, particularly males 18-49.  (Patterson Dep. 166:11-14, 182:5-183:4; Ex. 119.)  As a result of this underdelivery, Discovery Channel had to give Fox Film some free advertising for its subsequent advertising campaign for Fox Film's movie *Ice Age*, which ran during a Discovery special programming event called *Engineering the Impossible*.  (Patterson Dep. 178:22-179:9; 183:5-15.)  With this credit and production costs for the Tune-Ins and Interstitials, the Discovery Channel cleared only approximately $80,000 of revenue connected in any way to the special programming event.  (Ex. 119; Patterson Dep. 116:11-14, 178:22-178:9; 182:5-183:15; Anderson Dep. 22:1-24:13, 32:19-34:10.)

### G.     This Lawsuit

Plaintiff commenced this lawsuit on August 19, 2002, alleging five causes of action against DCI and Fox Film:  common law invasion of privacy by misappropriation of name and likeness without consent for advertising on trade (Count 1); a federal claim for false advertising and false endorsement under the Lanham Act, 15 U.S.C. § 1125(a)(1) (Count 2); unfair competition (Count 3); tortious interference with prospective relations (Count 4) and civil conspiracy (Count 5).  (*See* Amended Compl.)  The crux of his claims, cast under five different rubrics, is that "Fox struck a deal with Discovery to sponsor the airing of the [Documentary] to

promote the release of its new film . . . Fox and Discovery were obviously aware that . . . Fox's sponsoring of the program would lead consumers to believe, incorrectly, that Captain O'Grady was affiliated and endorsed the Fox movie, and that the Fox movie was Captain O'Grady's story." (Amended Compl. ¶ 36.)

The parties have engaged in extensive discovery. Plaintiff has taken depositions of the three DCI employees involved in the special programming event of November 28, 2001 and nine persons connected with Fox Film. Defendants have taken the deposition of plaintiff and his father as well as that of his literary agent (Esther Newberg of ICM), his agent for speaking engagements (Robert Parsons of The Washington Speakers Bureau), his agent who sold the motion picture rights to his book to Orion Pictures (Diane Cairns, formerly of ICM) and two agents involved in commercial endorsement opportunities for plaintiff (Tom Mills of Track Record Enterprises and Chaz Corzine). Defendants have also taken the deposition of the author of the book *Good to Go*, also about O'Grady's rescue, rights to which were also sold for motion picture production to Orion. Defendants have deposed plaintiff's three experts and depositions of defendants' experts are contemplated. The parties have exchanged thousands of pages of documents, dozens of tapes, responses to interrogatories and requests for admissions. Extensive documents from third parties have also been obtained.

In short, the case is ready for consideration for summary judgment. Jury selection is scheduled for November 4, 2003.

## GROUNDS FOR SUMMARY JUDGMENT

Plaintiff has conceded – as he must – that DCI had the right by contract and by law to broadcast a documentary about his story and to use his name and likeness to promote it. Even if plaintiff had not signed a release, DCI could broadcast a documentary about such events and use his name and likeness to promote the documentary as both within the newsworthy privilege and an incidental use, both recognized under the First Amendment and Texas law. Since the use of O'Grady's name and likeness was used in reference to the Documentary, not the Movie, no claim for commercial misappropriation can be stated. But even if there were reference to

O'Grady, it is strictly to contrast the "fact" of the true story with the "fiction" of the new Movie inspired by the true story and, as such, the use remains squarely outside commercial misappropriation and within the newsworthy privilege and incidental use. (Point II.)

Because the Documentary is itself protected by the First Amendment as a factual report of a newsworthy event and because the Movie is itself expressive material protected by the First Amendment, even if O'Grady had been referred to by name or likeness in the promotions for the Movie, which he was not, as long as there is "some artistic relevance" and the use is "not explicitly misleading," it is protected by the First Amendment and can not state a claim under the Lanham Act or for unfair competition. *Rogers v. Grimaldi*, 875 F.3d 999 (2d Cir. 1989). Any reference to O'Grady's story had "some artistic relevance" to demonstrate the contrast between the "fact and the fiction of true survival," the fiction inspired by the fact. There is no dispute – and review of the tape of the broadcast confirms – that there are no "explicitly misleading" statements – no statement that the Movie was "authorized by Scott O'Grady," no statement that the Movie was "the Scott O'Grady Story." Accordingly, no claim is stated under the Lanham Act or for unfair competition. (Point III A-D.)

Courts have reached the same conclusion under a related argument of a fair or nominative use defense to a Lanham Act claim. Where the use is not to designate origin or endorsement but rather to describe content – here to describe Discovery Channel's content – the true story – in contrast to Fox Film's fictional account inspired by the true story, reference to O'Grady by way of contrast and to explain "the fact and fiction of true survival" is necessary. For such nominative uses, likelihood of confusion is wholly beside the point. (Point III E.)

In any event, even if the special programming were capable of being understood as implying endorsement – a threshold question for the Court to decide as a matter of law and not based on focus groups, surveys or actual viewers (*see* cases cited at n.5, *infra*) – O'Grady, a public figure, would have to show by clear and convincing evidence that DCI intended to falsely imply his endorsement or falsely imply the Movie was O'Grady's true story. This record offers no such evidence – just the contrary. DCI personnel made efforts to distinguish the factual

Documentary from the fictional Movie, if only to maintain and highlight Discovery's brand of factual, informational programming as well as for accuracy sake. (Point IV.)

The unfair competition and tortious interference claims rest solely on DCI's legitimate business activity of broadcasting programming along with third-party advertising. Such legitimate business activity does not state the requisite elements of intent to harm and unlawful purpose and, if it did, the claims would be barred by the First Amendment. The only prospective business advantage plaintiff cites is a movie deal he claims he would have realized, notwithstanding that the deal he actually had and for which he received $250,000, died because, by his own and his agent's account, the company folded. The deal was never revived and O'Grady made no effort to obtain another deal even after the movie rights reverted to him. But even if the movie deal was a real prospect, DCI did not make any movie in competition with or otherwise unlawfully interfere with this prospective movie. Moreover, O'Grady does not cite any canceled speaking engagements or endorsement opportunities – in fact, his speaking engagements have gone up since the broadcast of the Documentary on November 28, 2001 and release of the Movie. Rather than harm, the Documentary has enhanced his speaking career – at least enough that his speaker's biography makes reference to the Discovery Channel Documentary (ironically without DCI's permission). (Point V.)

Finally, the conspiracy count, depending as it must on the fate of all the other counts, must fall with the rest. (Point VI.)

## ARGUMENT AND AUTHORITIES

### POINT I

### THE STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper when the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, show that there is no genuine issue as to any material fact and, based upon facts not in dispute, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *King v. Ames*, 179 F.3d 370, 373 (5th

Cir. 1999).

Once the moving party has made its initial showing, in order to defeat a motion for summary judgment, the nonmovant must provide summary judgment evidence sufficient to establish the existence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 322; *King*, 179 F.3d at 373; *Matthews v. Wozencraft*, 15 F.3d 432, 436 (5th Cir. 1994). The nonmovant "must come forward with evidence establishing each of the challenged elements of its case for which the movant will bear the burden of proof at trial." *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992).

For a dispute to be genuine, the court must be satisfied that evidence exists upon which the finder of fact could reasonably find for the nonmoving party. *Liberty Lobby*, 477 U.S. at 248-52. Mere assertions of a factual dispute unsupported by probative evidence are insufficient to prevent summary judgment. *Liberty Lobby*, 477 U.S. at 248-50. Conclusory statements, speculation, and unsubstantiated assertions will not suffice to defeat a motion for summary judgment. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which he bears the burden of proof at trial, summary judgment must be granted. *Henley v. Dillard Dep't Stores*, 46 F. Supp. 2d 587, 590 (N.D. Tex. 1999) (citing *Celotex*, 477 U.S. at 322).

Courts in this Circuit and elsewhere have routinely granted motions for summary judgment on plaintiffs' Lanham Act and commercial misappropriation claims based on review on it face of the content of the advertising, movie, book or other material.[5]

---

[5] *See, e.g.*, *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1144 (9th Cir. 2002) (affirming grant of summary judgment on Lanham Act false endorsement claim brought by estate of Princess Diana based upon Franklin Mint's use of her name and image on its products and awarding attorney's fees to defendant); *Oliveira v. Frito-Lay, Inc.*, 251 F.3d 56, 60 (2d Cir. 2001) (affirming grant of summary judgment where "fact finder could not reasonably find an implied endorsement" from use of song "Girl from Ipanema" for commercial); *King v. Ames*, 179 F.3d 370, 373 (5th Cir. 1999) (affirming grant of summary judgment for record producer on plaintiff's Lanham Act, 15 U.S.C. 1125(a), and unfair competition claims based upon alleged misattribution of production credit on the back of a compact disks of live recordings of plaintiff's father, a deceased,

## POINT II

### BASED UPON THE UNDISPUTED MATERIAL FACTS, DCI IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S COMMERCIAL MISAPPROPRIATION CLAIM

#### A.    O'Grady Gave His Consent for Use of His Name and Likeness for Promotion

The *sine qua non* of a commercial misappropriation claim is that someone's name or

likeness has been used for advertising or trade <u>without</u> this person's consent. Restatement

(Second) of Torts § 652a.[6]  Here, O'Grady gave his consent, executing a release which

explicitly allowed promotional use of his name, likeness and interview and which specifically

---

internationally-recognized blues musician); *Groden v. Random House, Inc.*, 61 F.3d 1045, 1047-48 (2d Cir. 1995) (affirming summary judgment for book publisher on plaintiff's commercial misappropriation claim under N.Y. Civ. Rights Law Sections 50 and 51, and Lanham Act, 15 U.S.C. 1125(a), claim arising from use of plaintiff's name and photograph in advertisement for book concerning assassination of JFK); *Matthews v. Wozencraft*, 15 F.3d 432, 437 (5th Cir. 1994) (affirming grant of summary judgment for publisher, movie studio, and plaintiff's ex-wife in former undercover narcotics officer's misappropriation claim based upon book authored by ex-wife about their story "because Texas law does not recognize a cause of action for appropriation of one's life story and because if it did, there would be an exception for biographies and "fictionalized biographies"); *Pirone v. MacMillan Inc.*, 894 F.2d 579, 584-85 (2d Cir. 1990) (affirming finding as a matter of law that plaintiff "cannot possibly show confusion as to source or sponsorship" for Babe Ruth's picture in a calendar); *Playboy Enter. v. Webbworld, Inc.*, 991 F. Supp. 543, 555 (N.D. Tex. 1997) (granting "the Court finds that any confusion would be unreasonable here . . . the effect of [Playboy's] marks on the overall tenor of Webbworld site is, in the Court's view, *de minimis*"), *aff'd*, 168 F.3d 543 (5th Cir. 1999); *Lane v. Random House, Inc.*, 985 F. Supp. 141, 153 (D.D.C. 1995) (granting summary judgment for book publisher on plaintiff's commercial misappropriation/right of publicity claim arising from use of plaintiff's name and photograph in advertisement for book concerning assassination of JFK); *Brown v. Twentieth Century Fox Film Corp.*, 799 F. Supp. 166, 173 (D.D.C. 1992) ("nor could any reasonable jury" find implied endorsement, granting judgment as a matter of law for use of a clip of James Brown performance in a movie), *aff'd*, 15 F.3d 1159 (D.C. Cir. 1994).

[6] Under Texas law, there are three elements to a misappropriation claim:

> (1) that the defendant misappropriated the plaintiff's name or likeness for the value associated with it, and not in an incidental manner, or for a newsworthy purpose; (2) that the plaintiff can be identified from the publication; and (3) that there was some advantage or benefit to the defendant.

*Id.* at 437.

waived rights of further approval. (Ex. 45) Thus, DCI had the right to use his name or likeness in promotion for the Documentary as O'Grady has conceded. No commercial misappropriation claim can be stated for such use.

**B.  Even If O'Grady Had Not Given His Consent, The Documentary About Public Events Can Not, As A Matter Of Law, Constitute Commercial Misappropriation.**

As a threshold matter, even if DCI had not had plaintiff's express permission – which it did – DCI could broadcast a non-fiction account of public events and use the name and likeness of the central figure in those events in promotions for the program. The Fifth Circuit has acknowledged that "[c]ourts long ago recognized that a celebrity's right of publicity does not preclude others from incorporating a person's name, features or biography in a literary work, motion pictures, news or entertainment story." *Matthews*, 15 F.3d at 439. Indeed, Texas does not recognize a cause of action for misappropriation of events in one's life story, and even if it did, the Fifth Circuit has stated that Texas would likely recognize an exception for biographies.[7] *Id.* at 437, 439. In *Matthews*, this Circuit rejected plaintiff's misappropriation claim because most of the material facts of his life were a matter of public record as a defendant in a highly publicized trial, and thus "it is especially difficult for Matthews to claim that his likeness was unfairly appropriated, as a name cannot be appropriated by reference to it in connection with the legitimate mention of public activities." *Id.*

Like the plaintiff in *Matthews*, as O'Grady concedes, by the time DCI aired the Documentary, the story of his downed plane and his daring escape had been the stuff of national and even international news – reporting for which his consent was not requested nor required. (Amended Compl. ¶ 15; Plf. Dep. 20:1-21:6, 29:14-17, 29:23-25, 316:14-19.) O'Grady has no right to control documentaries, or other accounts, that mention or depict his very public, very newsworthy experience.

---

[7] The Texas Constitution grants broader protection to speech and press than the First Amendment does and both require that privacy torts should be narrowly construed. *Id.* at 440.

C.   **The Promotions Aired On The Discovery Channel Did Not Constitute Commercial Misappropriation.**

Even if there had been no express release for promotional use – and there was – plaintiff fails to make out a claim for misappropriation based upon DCI's use of his name and likeness in the promotions for the Documentary since such use was both "for a newsworthy purpose" and "in an incidental manner" – categories of speech that Texas law and the First Amendment specifically carves out from the ambit of the misappropriation cause of action. *Matthews*, 15 F.3d at 437.

1.   **The Promotions On The Discovery Channel Are Protected Under The Newsworthiness Privilege.**

Courts have long recognized a newsworthiness privilege which protects use of name and likeness not only in books, newspapers, movies, broadcasts and other publications about matters of public concern but also in the advertising and promotion for those works unless the promotional use bears "no real relationship" to the subject matter of the publication. *Lane v. Random House*, 985 F. Supp. 141, 146 (D.D.C. 1995). In *Lane*, Random House published an advertisement in the *New York Times* for the book, *Case Closed*, an examination of the assassination of President Kennedy that supported the Warren Commission finding that one man – Lee Harvey Oswald – acted alone in the assassination. *Id.* at 144. The ad featured a photograph of plaintiff and five other critics who had espoused theories about the Kennedy assassination contrary to those expressed in the book, accompanied by a quote from the featured critic and the tag "Guilty of Misleading the American Public." Attorney Mark Lane alleged, in part, that Random House misappropriated his photograph, name and notoriety to promote the sale of the book in its advertisements. *Id.* at 145.

Applying the newsworthiness privilege to the advertisement, the court rejected outright plaintiff's attempt to characterize the advertisement as commercial speech entitled only to a lesser degree of constitutional protection, stating "it is a far-fetched contention that a photograph is used for purposes of trade merely because it is employed to illustrate a book dealing with the subject to which the plaintiff has made important contributions." *Id.* at 146-47 (internal

quotations omitted). Thus, the court concluded that the advertisement promoting the sale of a book containing analysis of plaintiff's theories about a public issue enjoyed newsworthiness immunity against a claim for misappropriation. *Id. See Montana v. San Jose Mercury News*, 34 Cal. App. 4th 790, 793, 40 Cal. Rptr. 2d 639 (Cal. Ct. App. 1995) (affirming summary judgment of Joe Montana's commercial misappropriation claim against a newspaper's reproduction and sale to the public of newspaper pages reporting on plaintiff's football team's fourth Super Bowl championship, a newsworthy event in which plaintiff was a central figure).

In this case, DCI's Documentary about Scott O'Grady's experience in Bosnia is indisputably speech about a matter of public concern, which is entitled to full First Amendment protection. DCI therefore had the derivative right – a right which O'Grady does not dispute – to broadcast promotions encouraging viewers to tune-in to the Documentary. Clearly, the promotions for the Documentary, which include clips of interviews of O'Grady and his fellow pilots and rescuers discussing his ordeal, of President Clinton addressing the status of the rescue effort, and images of plaintiff immediately following his rescue, bear a "real relationship" to the newsworthy events surrounding O'Grady's experience that are also the subject matter of the Documentary.[8]

Plaintiff argues nonetheless that the rebroadcast of the Documentary was "an infomercial" for the Movie (Amended Compl. ¶ 34), even while he concedes Discovery could rebroadcast its Documentary and could promote its Documentary using his name or likeness. (Plf.'s Obj. and Responses to DCI's Requests for Admission No. 3; Plf. Dep. 449:1-450:1: Ex. 45.) The fact that the rebroadcast of the Documentary was "brought to you by the new Fox film *Behind Enemy Lines*" (Exs. 335, 335A) does not, however, turn the editorial programming into

---

[8] *New Kids on the Block v. News America Pub., Inc.*, 971 F.2d 302, 309-10 (9th Cir. 1992) (recognizing that newspapers had "complete defense to misappropriation claim relating to use by papers of New Kids' name in 900-number telephone survey to determine most popular band member if they used New Kids' name "in connection with any news, public affairs, or sports broadcast or account which was true in all material respects" and affirming holding that publishers' use of New Kids' name was "in connection with" news accounts about the singing group and its popularity and therefore barred New Kids' misappropriation claim).

advertising or trade.  That would make *The News Hour with Jim Lehrer* advertising or trade just because it is sponsored by Archer Daniel Midlands – obviously not the case.

Indeed, the argument advanced by O'Grady was rejected by the Fifth Circuit in *Benavidez v. Anheuser Busch, Inc.*, 873 F.2d 102 (5th Cir. 1989).  In that case, the corporate relations department of the beer company produced a documentary titled "Heroes" recounting the exploits of Hispanic Congressional Medal of Honor recipients, including an eighty-second segment on the military exploits of plaintiff, Roy Benavidez.  *Id.* at 103.  The documentary showed in the credits, "Heroes was [m]ade possible by Anheuser Busch, Inc. and its family of wholesalers."  *Id.* at 104.  The documentary was shown at hospitality centers at company conventions where company produced refreshments were distributed.  *Id.* at 103.  The court assumed that the company's purpose was to engender "increased goodwill in the Hispanic community."  *Id.* at 104.  Notwithstanding the production and sponsorship by the beer company, notwithstanding that the documentary was shown at events clearly promoting the company and its products and even if the company's goal was "an attempt to capitalize on Benavidez's good name and reputation and thereby commercially benefit from it" – all the arguments O'Grady advances here -- the Fifth Circuit held these facts "would not transform the otherwise unobjectionable into a commercial advertisement for [Anheuser Busch]."  *Id.* at 103.

The fact that promotions for the Movie also ran does not transform the "otherwise unobjectionable" Documentary "into a commercial advertisement," anymore than the commercials for Petsmart and Sears which also aired with the Documentary.  *Id.*  There is not one frame referring to the Movie – not the material created by DCI, not the material created by Fox Film – that uses O'Grady's name or likeness or that of the actor recreating his experience in the Documentary.  (Ex. 335.)  Even if the Court were to find that O'Grady's name or image was used in connection with the Movie – which it was not – it was used for a newsworthy purpose to contrast "the fact and fiction of true survival."  (Exs. 335, 335A.)  The factoids, the sneak peek, the behind-the-scenes footage all added editorial value to the Discovery Channel's rebroadcast of the Documentary, a documentary about a conflict in the mid 1990's.  To "freshen" the content

and make it more current (Anderson Dep. 32:1-35:20), one factoid, for example, tied the U.S.S. *Carl Vinson*, used in the Movie, to its role in the Afghan conflict. (Exs. 335, 335A.) Another factoid provided scientific and educational content about the "nutritional facts" of bugs, leaves and water – the nutrients on which O'Grady was forced to survive – *i.e.*, "the facts...of true survival." (Exs. 335, 335A.) Another factoid gave information about military survival training such as O'Grady would have undergone, again the "facts ...of true survival." (Exs. 335, 335A.)

By contrast, the sneak peek, the behind-the-scenes footage and the movie trailers all provided the "fiction of true survival," contrasting O'Grady's story with the fictional movie it had inspired. (Exs. 335, 335A.) The audience was treated to entertainment news about an upcoming movie, a movie inspired by the story of Air Force Pilot Scott O'Grady but with a fictional character, Naval Aviator, Chris Burnett, who, like O'Grady, was rescued in Bosnia by a daring Marine team but, unlike O'Grady, had far more action-filled several days, replete with tragedies (death of his plane-mate), danger (countless dramatic engagements with the enemy) and support (friendly encounters with local villagers). (Exs. 335, 335A.) This was the "fiction of true survival."

The educational content of the factoids would not constitute advertising or trade. Entertainment news, including news about upcoming movies and television shows, has been specifically held <u>not</u> to be advertising or trade for purposes of a misappropriation claim. *See, e.g., Matthews*, 15 F.3d at 439 ("[c]ourts long ago recognized that a celebrity's right of publicity does not preclude others from incorporating a person's name, features or biography in a[n] . . .entertainment story"). The fact that this is a "of hybrid nature" with promotional as well as editorial purposes "inextricably intertwined," *Rogers*, 875 F.2d at 998 (referring to a title of a movie) would not make the use of O'Grady's image – if, in fact, there was any use – one for advertising or trade. *See New York Magazine v. Metropolitan Transit Auth.*, 987 F. Supp. 254, 261, 268-69 (S.D.N.Y. 1997) (ad for *New York Magazine* saying "possibly the only good thing in New York Rudy hasn't taken credit for" was a "hybrid of commercial speech and political satire" and, as such, was an incidental use and within the public interest except to the commercial

misappropriation law), *aff'd on other grounds*, 136 F.3d 123 (2d Cir. 1998).

> **2.    The Use, If Any, Of Plaintiff's Name And Likeness For The Movie Would Have Been at Most, Incidental And, As Such, Does Not State A Commercial Misappropriation Claim.**

But even if a fleeting reference to O'Grady could be viewed as part of the promotion for the Movie, notwithstanding that his name and likeness were used only in reference to the Documentary, it is exactly the kind of incidental use that courts regularly allow, especially when First Amendment expressive or newsworthy content is being advertised. The incidental use defense provides that the "value of the plaintiff's name is not appropriated by mere mention of it, or by reference to it in connection with legitimate mention of his public activities." Restatement (Second) of Torts § 652c comment. *Accord Matthews*, 15 F.3d at 437 (Texas misappropriation claim is not stated if used "in an incidental manner or for a newsworthy purpose"). *See Groden*, 61 F.3d at 1049-51 (advertisement promoting sales of book about JFK assassination which used name and photograph of plaintiff to inform potential readers about content of book is protected under incidental use defense). *Lane*, 985 F. Supp. at 147-48 (same).[9] Indeed, courts have held that the " 'incidental use' exception implements, and might even be required by, First Amendment considerations." *Groden*, 61 F.3d at 1050. *See Rogers*, 875 F.2d at n.11 ("[c]ommentators have also advocated limits on the right of publicity to accommodate First Amendment concerns").

The incidental use exception, protecting the media's right to promote its own

---

[9] *See also Lerman v. Flynt Distributing Co.*, 789 F.2d 164 (2d Cir. 1986) (republication of magazine cover in advertisement for magazine held to be "incidental use"); *Cher v. Forum Int'l Ltd.*, 692 F.2d 634, 638 (9th Cir. 1982) (holding that *Forum* magazine did not misappropriate actress and singer Cher's likeness when it used her picture in advertisements for contents of its publication, an interview with Cher that it was to publish in its magazine); *Page v. Something Weird Video*, 960 F. Supp. 1438 (C.D. Cal. 1996) (where defendants' videos are protected by the First Amendment, advertising demonstrating the quality and content of the videos is also protected because the advertising is incidental to the protected publication of the videos); *Namath v. Sports Illustrated*, 371 N.Y.S.2d 10, 11-12 (N.Y. App. Div. 1st Dep't 1975) (use of sports figure's photograph to solicit magazine subscriptions was protected incidental use where photograph gave reader indication of contents of magazine), *aff'd*, 386 N.Y.S.2d 387 (N.Y. 1976).

communications, is simply the logical corollary to the media's right to publish those communications. *See Lane*, 98 F. Supp. at 147 ("[i]t would be illogical to allow respondents to exhibit [speech products] but effectively preclude advance discussion or promotion of their lawful enterprise" (quoting *Guglielmi v. Spelling-Goldberg Prods.*, 603 P.2d 454, 462 (Cal. 1979) (advertisement for constitutionally protected docudrama is constitutionally protected as adjunct to the docudrama)); *Brown v. Twentieth Century Fox Film Corp.*, 799 F. Supp. 166, 172 and n.9 (D.D.C. 1992) ("since defendants had the right to use the clip of the film, they certainly had the right to use that scene [of James Brown performing] from the film in promotional activities"); *Velez v. VV Publishing Corp.*, 135 A.D.2d 47, 50 (N.Y. App. Div. 1st Dep't 1988) (incidental use exception "is a necessary and logical extension of the clearly protected editorial use of the content of the publication"). Even where a media defendant is engaged in, and profits from, the business of publication, the incidental use of a person's name or likeness in connection with that publication is insufficient to make such use commercial. *Lane*, 985 F. Supp. at 147 (citing Restatement (Second) of Torts § 652C, cmt. d (1977)) ("[t]he very nature of the incidental use privilege is to exclude certain material from the rubric of commercial speech").

As the *Lane* court aptly noted, the advertisement in issue, like the promotions for the Documentary, "was not about laundry detergent" and could not be "divorced" from the book *Case Closed*, which was protected speech. *Lane*, 985 F. Supp. at 152. Similarly, here, the promotions for the Documentary do not use O'Grady's name and image to advertise a product unrelated to him but to describe the Documentary about him and compare the "fact and fiction" of the real story and the Movie it inspired. The Second Circuit in *Groden v. Random House, Inc.* specifically refused to limit the "incidental use" defense to content actually used in the underlying work, extending it to include the use of a photograph of plaintiff Robert Groden, another JFK conspiracy theorist, a photograph that appeared only in the ad and not in the book being advertised. 61 F.3d at 1049. Similarly, in *Rand v. Hearst Corp.*, 31 A.D.2d 406, 298 N.Y.S.2d 405 (N.Y. App. Div. 1st Dep't 1969), *aff'd*, 26 N.Y.2d 806, 309 N.Y.S.2d 348 (1970), cited approvingly by the Second Circuit in *Groden*, the writer Ayn Rand complained that a book

26

jacket that compared her writing style to that of the book's author, using her name, was a commercial misappropriation. In rejecting the claim, the court observed, "[t]o hold otherwise would constitute an impermissible restriction on what we deem to be the right of a publisher in informing the public of the nature of his book and comparing it with the works of other authors." *Id.* at 411, 298 N.Y.S.2d at 412. *See New York Magazine v. Metropolitan Transportation Auth.*, 987 F. Supp. at 268 (advertisement for *New York Magazine* on the side of New York City buses, "The Only Thing Rudy doesn't claim credit for" was an incidental use of Mayor Guiliani's name, relating generally to the magazine's coverage of local politics).[10]

Since documentaries about real people and fictional movies inspired by real people – be it The Temptations, Black Panther Bobby Seale, Craig Mathews or Scott O'Grady – are not commercial misappropriation, advertising or promotion that refers to these real life people can not violate a real person's right of publicity. *See Ruffin-Steinback v. dePasse*, 267 F.3d 457, 462 (6th Cir. 2001) ("[plaintiff's] fictionalized [likeness] in a work protected by the First Amendment and the advertising incidental to such uses [does] not give rise to claim for relief under the [plaintiff's rights] of publicity . . ."); *Seale v. Gramercy Pictures*, 964 F. Supp. 918 (E.D. Pa. 1997), *aff'd*, 156 F.3d 1225 (3d Cir. 1998) (finding use of photos of actor who played Bobby Seale on promotional material for a docudrama on Black Panthers did not constitute use for advertising or trade).[11]

---

[10] The kind of uses that are typically found to be commercial misappropriation have involved outright use of a name to advertise a commercial product. *E.g., National Bank of Commerce v. Shaklee Corp.*, 503 F. Supp. 533, 537-38 (W.D. Tex. 1980) (cover of special edition of book, *Heloise's Housekeeping Hints*, which advertised for defendant's household products, saying "Heloise and Shaklee all around the house just naturally make your day easier" constituted commercial misappropriation); *Henley v. Dillard Dept. Stores*, 46 F. Supp. 2d 587 (N.D. Tex. 1999) (department store advertisement for shirt called "henley" using the name of the rock star, Don Henley, constituted commercial misappropriation).

[11] *See also* Fox Film's Motion for Summary Judgment.

**POINT III**

**BASED UPON THE UNDISPUTED MATERIAL FACTS, THE PROMOTIONS ON THE DISCOVERY CHANNEL DO NOT STATE A CLAIM UNDER THE LANHAM ACT OR FOR UNFAIR COMPETITION**

Conceding, as he must, that there is no express language of endorsement, no express representation that the Movie is his story, and no use of his name and likeness for the Movie, plaintiff makes claims under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and for unfair competition, arguing that the promotion of the Movie on the Discovery Channel falsely implied that O'Grady had endorsed the Movie and that the Movie was O'Grady's story. O'Grady relies essentially on three facts for his false implication claims – one, the Movie is about an American pilot downed in Bosnia and rescued by the Marines and the Documentary is similarly about an American pilot downed in Bosnia and rescued by the Marines; two, promotion for the Movie aired with the rebroadcast of the Documentary; and three, the Movie and Documentary share the title "Behind Enemy Lines" although the Documentary – but not the Movie – bears the identifying tag line "The Scott O'Grady Story." None of those three facts, either singly or together, can constitute claims for false endorsement or false advertising of the Movie's content.

**A.      Since Both The Documentary And The Movie Are Protected First Amendment Expression, Lanham Act And Unfair Competition Claims Can Only Be Stated If There Is No Artistic Relevance And If There Is An Explicitly Misleading Statement.**

Both the works at issue here, the DCI Documentary and the Fox Film Movie, are works squarely protected by the First Amendment. As such, the Lanham Act must be "narrowly" construed when First Amendment values are at issue. The traditional factors considered by courts in weighing whether there is a likelihood of confusion test have been held by at least three Circuits "not appropriate because it fails to adequately consider the interests protected by the First Amendment." *ETW Corp. v. Jireh Publishing, Inc.*, 2003 WL 21414521 *7 (6th Cir. 2003); *Rogers v. Grimaldi*, 875 F.2d 994 (2d. Cir. 1989); *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894 (9th Cir. 2002), *cert. denied*, 123 S. Ct. 993 (2003).   In these cases, unlike here, the

celebrity's name was used ("Ginger" in the movie "Ginger and Fred" in *Rogers*), the celebrity's likeness was used (a painting of Tiger Woods in *ETW*), or a very recognizable trademark was used in the title ("Barbie" in the song "Barbie Girl" in *Mattel*).  Nonetheless, even conceding the risk of some public confusion, these courts all held that, "the public interest in free expression should prevail if the use of the celebrity's image has artistic relevance, unless it is used in such a way that it explicitly misleads as to the source of the work." *ETW*, 2003 WL 21414521 *9.  *A fortiori*, here, where the two works are protected by the First Amendment, where O'Grady's name or likeness is used only in reference to the Documentary and not in the title or advertising for the Movie and where there is no explicitly misleading language of endorsement nor express false representation of content, the Lanham Act and unfair competition claims must fail.

The seminal case, *Rogers v. Grimaldi*, involved the Fellini movie "Ginger and Fred" about two fictional Italian cabaret performers, Pippo and Amelia, who imitated the legendary dance pair, Rogers and Astaire, and became known as "Ginger and Fred." 875 F. 2d 994.  In granting summary judgment for the filmmakers on her Lanham Act and right of publicity claims, the Second Circuit rejected Ginger Rogers' claim that the title implied her endorsement or falsely advertised the content of the film.  *Id.*  Because "[t]itles, like the artistic works they identify, are of a hybrid nature, combining artistic expression and commercial promotion" and "[b]ecause overextension of Lanham Act restrictions in the area of titles might include the First Amendment value," the Act should be "construed narrowly to avoid such conflict" and "apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression." 875 F.2d at 999.  Under the test enunciated by the Second Circuit and followed by the Fifth, Sixth and Ninth Circuits[12] in the context of titles using celebrity's names, no Lanham Act violation is stated:

> unless the title has no artistic relevance to the underlying work
> whatsoever, of, if it has some artistic relevance, unless the title

---

[12] *ETW Corp. v. Jireh Publishing, Inc.*, 2003 WL 21414521 (6th Cir 2003); *Parks v. La Face Records*, 329 F.3d 437 (6th Cir. 2003); *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894 (9th Cir. 2002); *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658 (5th Cir. 2000).

explicitly misleads as to source or the content of the work.

*Id.* The court suggested examples of such explicitly misleading references, if the subtitle had said "an authorized biography" or if the film had said, "The True Life Story of Ginger and Fred."[13] In that case, the title, "Ginger and Fred" bore an obvious relevance to the content and no such explicit reference was included. The court dismissed survey evidence on likelihood of confusion as well as actual confusion, conceding that "some members of the public would draw the incorrect inference that Rogers has some involvement with the film" or that some "might think the film was about Rogers and Astaire in a direct biographical sense." 875 F.2d at 1001. This risk of confusion was "outweighed by the danger of suppressing an artistically relevant though ambiguous title [which] will unduly restrict expression." *Id.*

The *Rogers* test has been taken beyond the context of titles to any claim "where an expressive work is alleged to infringe a trademark, it is appropriate to weigh the public interest in free expression against the public interest in avoiding consumer confusion." *Cliff Notes v. Bantam Doubleday Dell Pub. Group,* 886 F.2d 490, 494 (2d Cir. 1989) (extending to parody by Spy Notes which replicated distinctive cover of Cliff Notes). Ten days ago, the Sixth Circuit, in a scholarly review of the precedents, extended the *Rogers* test "where the defendant has articulated a colorable claim that the use of a celebrity's identity is protected by the First Amendment." *ETW,* 2003 WL 21414521 *7. This was the second panel of the Sixth Circuit in the past few months to adopt the *Rogers* test for a protected work. *Parks v. La Face Records,* 329 F.3d 437 (6th Cir. 2003). In *ETW,* the Sixth Circuit applied the *Rogers* test not just to the painting of Tiger Woods but to the brochure and other literature using Woods' name to describe and promote the painting and lithographs featuring his image. 2003 WL 21414521 *3. In finding Woods' false designation of origin and false endorsement as "untenable," the Court held

---

[13] *Compare with Cher v. Forum Int'l Ltd.,* 692 F.2d 634, 638 (9th Cir. 1982) ("There are certain things that Cher won't tell People and would never tell Us. She tells Forum" implied endorsement of Forum in advertisement); *Better Business Bureau of Metropolitan Houston, Inc., v. Medical Directors, Inc.,* 681 F.2d 397, 403 (5th Cir. 1982) (testimonial from "investigators" or "spies" working "on behalf of the Better Business Bureau" imply that Better Business Bureau was satisfied with services).

that a "person's image or likeness cannot function as a trademark" – even one as well known as

Tiger Woods. *ETW*, 2003 WL 21414521 *4 (also dismissing right of publicity claim.)

> **B.    There Is No Implied Endorsement Arising Out Of The Fact That Both The Documentary And The Movie Are About An American Pilot Downed In Bosnia.**

The fact that the Movie is about a downed American pilot in Bosnia and that O'Grady

was a downed American pilot in Bosnia cannot form the basis for a claim of implied

endorsement.  Whether wholly fictional, inspired by, or wholly factual, a film can be made about

a downed American pilot without implying that O'Grady authorized or endorsed the film.  Here,

O'Grady is not even claiming exclusive rights to the incidents in his life but rather the

generalized scenario of an American pilot downed in Bosnia and rescued by Marines.  Even if

the story is associated in the public's mind as O'Grady's, O'Grady can not use the Lanham Act

to obtain the exclusive right to such a plot, a right that he can not otherwise obtain under either

Texas law, the First Amendment, copyright or trademark law.  *Matthews*, 15 F.3d at 440 (Fifth

Circuit assumes that public identified the story as the plaintiff but held "when the information in

question is in the public domain, for the public figure no longer has the right to control the

dissemination of information").  In *Hicks v. Casablanca Records*, 464 F. Supp. 426, 433

(S.D.N.Y. 1978), the court rejected the notion advanced by the Christie heirs that the use of

"Agatha" for the title and "Agatha Christie" for the character in a fictionalized movie about the

11 days when, in real life, the author was missing "would cause confusion in the minds of the

public in general, and Agatha Christie readers in particular, to the effect that the movie and novel

were authorized or even written by Mrs. Christie." *Id.* at 433.  More recently, in *Seale v.

Gramercy Pictures*, involving a "docudrama" about the Black Panthers, the use of photos of the

actor playing Bobby Seale on the video cover, cover of book and a brochure for the CD

soundtrack did not contain, as here, any explicit message of endorsement.  Nor was there

"evidence tending to show that the Defendants' use of his likeness in the brochure implies to the

consumer public that he endorses, approves, or is otherwise affiliated with the musical CD."  964

F. Supp. at 931.

Were it otherwise, every movie whether purporting to be a true account or, as here, merely inspired by a true story, would give rise to a false endorsement claim. That would be exactly contrary to the Fifth Circuit's holding in *Matthews* that the "narrative of an individual life" can not belong exclusively to the person, particularly where the narrative has been about very public events. 15 F.3d at 438-39.

### C.     The Fact That Promotion For The Movie Was Aired On The Rebroadcast Of The Documentary Does Not Imply False Endorsement

The fact that the promotion for the Movie was aired with the rebroadcast of the Documentary, the former a fictional movie inspired by O'Grady's ordeal and the latter a factual documentary about O'Grady's ordeal, could not imply any kind of endorsement or authorization by O'Grady of the fictional movie. This adjacency is not even the direct association of Bobby Seale and a docudrama about the Black Panthers or Agatha Christie and Ginger Rogers and the fictional movies that bear their first names. In fact, the promotions for the Movie make no direct association with O'Grady and enlist numerous visual and textual features to distinguish the fictional movie from the factual documentary on the Discovery Channel.

Even beyond those signals, the context here is one which viewers are accustomed to distinguishing the promos and advertising from the programming. If an advertisement for the movie *Primary Colors* ran on the History Channel when a profile of President Clinton was broadcast, would viewers assume President Clinton authorized or endorsed the movie? If the movie "Saving Private Ryan" about the rescue of a World War II soldier "behind enemy lines" was promoted with the Documentary, would O'Grady have asserted a claim of false endorsement of that movie as well?

When persons far more iconic than Scott O'Grady have been directly and explicitly associated with content, courts have rejected – as a matter of law – claims of implied endorsement. In *Pirone v. MacMillan, Inc.*, Babe Ruth's photograph and name were used without his heirs' permission for a baseball calendar. The Second Circuit held:

32

> In the context of such a compilation [of several ball players] an
> ordinarily prudent purchaser would have no difficulty discerning
> that these photos are merely the subject matter of the calendar and
> do not in any way indicate sponsorship. No reasonable jury could
> find likelihood of confusion.

894 F.2d 579, 585 (2d Cir.) (affirming summary judgment).

Similarly, *WCBV-TV v. Boston Athletic Ass'n*, 926 F.2d 42, 46 (1st Cir. 1991) involved a

Lanham Act claim arising out of a broadcast which used the words "Boston Marathon" in

televising the famous competition. The defendant television station, a former licensee of the

Boston Athletic Association ("BAA"), the sponsoring organization, no longer had a license but

could, like any other news outlet, broadcast the event. In rejecting the Lanham Act claim, the

First Circuit held "[c]ommon sense suggests . . . that a viewer who sees those words flash upon

the screen will believe simply that Channel 5 will show, or is showing, or has shown, the

marathon, not that Channel 5 has some special approval from the BAA to do so." *Id.* at 46.    *See*

*Brown v. Twentieth Century Fox Film Corp.*, 799 F. Supp. at 173 (use of clip of James Brown

performance in the movie "The Commitments" about an Irish band dismissed Lanham Act claim

since "no evidence whatsoever that any viewers believed that plaintiff had endorsed the film or

personally approved the use of the clip, nor could any reasonable jury reach that conclusion from

watching the film").

Even when the context is an advertisement not, as here, for a protected First Amendment

work but for a commercial product – potato chips, for example – courts have rejected implied

endorsement claims even when the use is clearly identified with the celebrity. *Oliveira v. Frito-*

*Lay*, 251 F.3d 56, 60 (2d Cir. 2001) (use of Astrid Gilberto's signature song, "The Girl from

Ipanema" in the Frito Lay commercial could not reasonably imply an endorsement by the

singer); *Storball v. Twentieth Century Fox Film Corp.*, 1993 WL 734117, 30 U.S.P.Q.2d 1394

(C.D. Cal. 1993) (use of music "Cool Jerk" in film did not result in false endorsement).

In all these cases, be it the facts of a celebrity's life, historical or sports events, or even

signature songs, the celebrity can not exercise exclusive control over this material and courts

have been reluctant to use the Lanham Act's implied endorsements as a vehicle to assert such control.  The U.S. Supreme Court this term cautioned against just such an expansion of the Lanham Act false designation of origin claim to become "a species of mutant copyright law." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, ___ U.S. ___, 123 S. Ct. 2041 (2003). Accordingly, in *Dastar*, the Court held that false designation of origin does not refer and can not refer to the creator or, in this case, Scott O'Grady.

A fact finder could not reasonably find an implied endorsement from the mere fact that that the Documentary is adjacent to promotion for a film inspired by O'Grady's six days "behind enemy lines."  Viewers are obviously familiar with advertising and promotion on television, each adjacent to the other but none necessarily related to the other.  To support his claim, O'Grady cites techniques such as fast paced editing, interviews interspersed with action footage and the fact that the voice-over is the same for the promotions for both the Documentary and the Movie – all techniques common to promotions generally, including those in this same broadcast for other Discovery Channel programs for *Pearl Harbor: Death of the Arizona*, *Mystery of the Alaskan Mummies* and *Walking with Prehistoric Beasts*.  (Ex. 335.)

But these techniques, even if they were to suggest an association between the Movie and the Documentary – and they do not – do not imply O'Grady's endorsement.  At most, they imply that the Discovery Channel created the promotions for the Movie and the Documentary – a true but insignificant fact.  The fact that the voice of the narrator (that of Bill St. James, the "voice" of the Discovery Channel, like James Earl Jones has been for CNN) (Anderson Dep. 96:14-15) is the same not only for promotions for the Movie and the Documentary, but also for the factoids and the tune-ins for the other Discovery Channel programs – and not for those promotions created by Fox Film, such as the "Sneak Peek" and advertising -- only reinforced the fact that the Interstitials were created by the Discovery Channel but imply nothing as to O'Grady's endorsement of the Movie's content.  (Ex. 335.)  In any event, any similarity of these techniques are countered by the very explicit distinctions made between the "fact" of the Documentary and the "fiction" of the Movie and by the constant repetition of the respective brands – the Discovery

34

Channel and Fox – and the different logos and flashing lights, among many other distinctions. (Exs. 335, 335A.)

### D.   Similarity Of Titles Does Not Imply O'Grady's Endorsement Or That The Movie Is O'Grady's True Story.

O'Grady had conceded that he does not have copyright or trademark in the title "Behind Enemy Lines." (Plf. Dep. 167:24-168:8.)   His own books were titled *Return with Honor*[14] and his children's book, *Basher Five-Two*. (Exs. 3, 4, 5.)   In the paperback version of *Return with Honor*, (Ex. 4) but not the hard cover (Ex. 3), there is a subtitle "An American fighter pilot's heroic tale of survival behind enemy lines," used in a descriptive sense to describe O'Grady's six days "behind enemy lines."

Having no ownership interest, O'Grady cannot object to DCI's use of the title "Behind Enemy Lines: The Scott O'Grady Story."   The Documentary has been broadcast under that title since it first began airing on the Discovery Channel in June 1997 and aired 31 more times without any protest from O'Grady. (Amended Compl. ¶ 26; Exs. 48, 116; Plf. Dep. 361:21-362: 1, 364:14-365:2, 405:17-23, 406:12-407:4; Anderson Dep. 40:21-25; *see* Baquet Dep. 21:3-20; Ex. 338.)   Nor does O'Grady have standing to object to Fox Film's choice of that descriptive term, "behind enemy lines" for its title.

Choice of title for expressive works has been accorded broad latitude and required plaintiff to make a heightened showing under the Lanham Act. *See* Point III A *supra*.   In this case, unlike Ginger Rogers, O'Grady's name is not used in the title for the Movie.   There is no explicit statement that the Movie is "The Scott O'Grady Story" or "authorized by Scott O'Grady."   Indeed, the only such explicit reference is with regard to the Documentary, subtitled

---

[14] O'Grady's *Return with Honor* received a claim from another author, Col. George E. Day, who used the title years before O'Grady for a book about his years as a POW during the Vietnam War. (Ex. 176.)   Col. Day claimed the title was associated with his book and was a military term reserved for those missing in action. (Ex. 176.)   The lawyers for the publisher explained that there could be no copyright in a title and the title had not acquired secondary meaning such as to be so associated with Col. Day as to preclude O'Grady's subsequent use – a view with which plaintiff's literary agent concurred. (Ex. 176; Newberg Dep. 23:18-26:25.)

"The Scott O'Grady Story" – a reference that, as O'Grady agrees, is not misleading in the least. The absence of such a reference in the Movie's title, in sharp contrast to the Documentary's, is just one more signal to the viewer that the Movie, unlike the Documentary, is not "The Scott O'Grady Story."

The title that is used, *Behind Enemy Lines*, has obvious relevance to the plot of the Movie about a pilot downed "behind enemy lines." The term is the very definition of descriptive and is used widely in reference to many military conflicts.[15]   O'Grady does not present any evidence, much less the "high degree of proof" that the public associates the title "Behind Enemy Lines" with O'Grady. *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 269 (5th Cir. 1999).

Given the highly descriptive nature of the title, the viewer would think – accurately – that the Movie and the Documentary were both about someone caught "behind enemy lines" or, at most -- again, accurately – that O'Grady's story has inspired the Movie but not that O'Grady had endorsed or authorized the Movie or that the Movie purported to be a true account of the Scott O'Grady story. Even if the public had so misunderstood, as the *Rogers* court held in disregarding survey evidence similar to what plaintiff may offer here, "the risk of misunderstanding, not engendered by any overt claim in the title, is so outweighed" by "the interests in artistic expression," "preclud[ing] application of the Lanham Act." *Rogers*, 875 F.2d at 1001.

Applying the *Rogers* test, now adopted in three other Circuits, O'Grady's story has more than "some artistic relevance" – it was, by all accounts, including O'Grady's, the inspiration for the Movie and parallels in the broadest strokes the downing and rescue of Naval Aviator Chris Burnett. (Amended Compl. ¶¶ 28, 30.) The promotions did not equate the two but instead

---

[15] Most recently, "Behind Enemy Lines" was the title of the last page of the May 11, 2003 edition of *The New York Times Magazine* with the subtitle: "What was left when the Iraqi Army retreated? Among the artifacts, a lot of ordinary junk." Since 1946, the phrase "Behind Enemy Lines" has been used in over 30 titles of books, movies and literary works, including an Orion home video movie "Behind Enemy Lines," starring Thomas Ian Griffith and *Behind Enemy Lines* – a field manual for "God's Army." (Exs. 302, 303.)

underscored the contrast between "the fact and fiction of true survival." O'Grady's story is relevant to that comparison. In the absence of any "explicitly misleading statements," the claims of false endorsement and false advertising are "untenable." *ETW*, 2003 WL 21414521 *4. The risk of whatever, if any, public "misunderstanding" is outweighed by the First Amendment interest in these protected works.

**E.      The Reference to O'Grady is a Nominative Fair Use.**

To the extent, if any, the promotions for the Movie could be said to include reference to O'Grady, the reference comes within the nominative fair use defense, an alternative ground for rejection of plaintiff's Lanham Act and unfair competition claims. That defense, described at length by the Ninth Circuit in *New Kids on the Block v. News America Publishing, Inc.*, 971 F.2d 302 (9th Cir. 1992),[16] recognized in the Fifth Circuit, *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526 (5th Cir. 1989) and applied recently in cases like *Cairns v. Franklin Mint Co.*, 292 F.3d 1139 (9th Cir. 2002), applies "where the defendant has used plaintiff's marks to describe the plaintiff's product, even if the defendant's ultimate goal was to describe his own product." *Cairns*, 292 F.3d at 1152. Where it applies, it "replaces the likelihood of customer confusion analysis" because the use " 'does not implicate the source identification function that is the purpose of the trademark.' " *Id.* at 1150 (emphasis in original).

In *Cairns*, the Ninth Circuit last year affirmed the rejection of the Lanham Act claim for false endorsement for use of the late Princess Diana's name and likeness on Diana-related products, including a doll in bolero jacket and royal tiara accompanied by a photo of Diana with

---

[16] The nominative fair use requires:

> First, the product or service in question must be one not readily identifiable without use of the trademark; second, only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and third, the use must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder.

*New Kids on the Block*, 971 F.2d at 308.

these accessories. *Id.* at 1144. The use was deemed a "nominative use" reasonably necessary to identify the products but not likely to suggest to purchasers that the memorabilia was authorized or endorsed by Diana's estate. *Id.* at 1155. As here, none of the advertisements for the Franklin Mint's Diana memorabilia expressly "claim that these products are sponsored or endorsed" by Diana's estate. *Id.* at 1154. But also, as here, there was no express disclaimer that "the products are <u>not</u> sponsored or endorsed." *Id.* at 1155. <u>Unlike</u> here, however, there was no distinguishing language but rather language that could be construed as suggesting some association: words such as "the <u>only authentic</u> replica of the stunning designer gown with bolero jacket" (emphasis in original), that proceeds from the sale of "the Princess Diana Tribute Plate" would go to "Diana, Princess of Wales' Charters" and "Join with the Franklin Mint to Continue Princess Diana's Important Work." *Id.* at 1155. Notwithstanding those direct associations with Princess Diana, the absence of any disclaimer and the fact that there were other similar products that had been authorized by Princess Diana's estate, the Ninth Circuit not only rejected the false endorsement claim but affirmed the award of over $2 million dollars in attorneys fees to Franklin Mint as the prevailing party in the Lanham Act claim against Princess Diana's Fund!! *Id.* at 1159.

The reference to O'Grady functioned here not as source-identification but, instead, to contrast the "fact" presented by the Documentary from the "fiction" presented by the Movie, the facts of the "real thing," "one hero's true story," as contrasted to the fictional version inspired by that "true story." (Exs. 35, 335A.) That contrast can not be made absent a reference to O'Grady and his story, satisfying the first element of the nominative fair use defense. The second element is also satisfied since "only so much of" references to O'Grady is "used as is reasonably necessary to identify" and to contrast with the Movie. *New Kids*, 971 F.2d at 308. The contrast is made in the span of, at its longest, a 45-second opening introduction to the program of November 28, 2001 where, for example, a two-second flash of the actor recreating O'Grady's ordeal accompanies the text "the fact." (Exs. 335, 335A.) This is contrasted with the "fiction of true survival," text accompanied by images of Owen Wilson playing the character, Chris Burnett. (Exs. 335, 335A.) Only two seconds of the interview of O'Grady from the Documentary is used

in the 45-second opening, <u>not</u> to identify the Movie, but to identify the Documentary and describe the Documentary's content. (Exs. 335, 335A.) Third and finally, there is, as discussed at length above, "nothing that would, in conjunction with the mark, suggest sponsorship or endorsement." *New Kids*, 971 F.3d at 308.

## POINT IV

### PLAINTIFF CANNOT SHOW BY CLEAR AND CONVINCING EVIDENCE THAT DCI INTENDED ANY FALSE IMPLICATION IN THE PROMOTIONS ON THE DISCOVERY CHANNEL

Even if a claim could be based on implication alone[17] and even if the challenged promotions were capable of such an implication, at a minimum, plaintiff would need to show that DCI <u>intended</u> the false implication of endorsement and <u>intended</u> the false representation of the content of the Movie. The underlying works here are protected by the First Amendment, making their promotion protected First Amendment speech as well. *Riley v. National Fed'n of the Blind of North Carolina, Inc.*, 487 U.S. 781 (1988) (advertisements do not retain "commercial character when inexplicably intertwined with otherwise fully protected speech); *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1185 (9th Cir. 2001) ("any commercial aspects are 'inextricably entwined' with expressive elements and so they cannot be separated out 'from the fully protected whole.' ") (citation omitted); *Rogers*, 875 F.3d at 998 (same with reference to the Movie title). Advertisements for protected First Amendment protected works, be it a documentary or a feature film, are not treated like pure commercial speech, even if they propose a commercial transaction but are accorded the full protections of First Amendment speech. *Groden v. Random House*, 61 F.3d at 1052 ("any attempt to apply the Lanham Act to [the book publisher's] ad would raise substantial free speech issues"); *Lane*, 985 F. Supp. at 147 (newsworthiness privilege applies "to advertisements for speech products – even those that propose a commercial transaction"). *See* Pt. II C (1) *supra*.

---

[17] O'Grady's Lanham Act claim depends entirely on implication – there is no false statement of fact. As such, it cannot state a claim under the Lanham Act. *King v. Ames*, 179 F.3d 370, 373-74 (5th Cir. 1999) ("persons bringing a Lanham Act action must demonstrate that (1) the defendants made false statements of fact . . .")

O'Grady is, at least by his own account, "a household name," the subject of national and international reporting particularly as regards his six days in Bosnia. (Amended Compl. ¶15.) As a public figure, O'Grady is required to show, by clear and convincing evidence, before he can prevail on his Lanham Act claim – indeed, on all his claims – that DCI "subjectively intended that the [viewer] believe [O'Grady] had endorsed the use of his name or likeness" for the Movie or subjectively intended to imply the Movie was the true account of O'Grady's story. *Hoffman,* 255 F.3d 1180 at n.3.

The evidence of intent on the part of DCI is just the opposite. The evidence – the uncontradicted evidence – is that Robert Anderson, the person who created the Interstitials, fashioned them to underscore the difference between "the fact" of the Documentary and the "fiction" of the Movie. In his deposition, acknowledging that it had occurred to him that the Interstitials he was creating "might suggest to [the Discovery Channel] audience that the Movie Behind Enemy Lines was based on the Scott O'Grady story," Anderson said: "My thought there was that if it wasn't his story, then I need to make sure that didn't come across." (Anderson Dep. 49:15-17). Asked what steps he took so that the audience would not believe the Movie was a true account of O'Grady's story, Anderson listed several:

> I wrote copy – I wrote – when I wrote any copy, I was sure to keep them [the Movie and the Documentary] both separate, visually and in language.

(Anderson Dep. 50:1-3.) Anderson cited, for example, a "couple of things that go on that . . . do make the contrast." "First, . . . putting a lot of the Fox stuff at the top and then our stuff at the bottom . . ." (Anderson Dep. 77:16-22.) He cited the language of the open: "a detailed look at the fact and fiction of true survival" as "one effort to separate the fact from the fiction," "[t]he fact being Scott O'Grady's story . . . [a]nd the fiction being a movie – or the movie." (Anderson Dep. 78:3-14.) Anderson also cited the reference in the bump-out which said "like Scott O'Grady, Owen Wilson's character, Naval aviator Chris Burnett, runs into some challenges over his place is shot down. In the case of Scott O'Grady, one major challenge came in finding food for survival." (Anderson Dep. 79:12-17.) Anderson cited the bump out as another example

because the audience "could see the difference between the two" (Anderson Dep. 79:22-23)

apparently referring to the visual image of the character of Chris Burnett trying to convince

villagers he is their friend and the actor recreating O'Grady trying to find food. Anderson also

cited the language in the tune-in, "Get ready to cross the line, *Behind Enemy Lines*, before you

cross the lines in theaters, how did America respond to the real thing? The Discovery Channel

remembers one hero's story, *Behind Enemy Lines: The Scott O'Grady Story*." (Anderson Dep.

80:1-5.) Asked if thought the juxtaposition of the reference to the Movie with "how did America

respond to the real thing" suggested that the Movie was based on O'Grady's story, Anderson

replied:

> No, I don't, and it continues to back up that reason why in the rest
> of the copy. One thing we do is try to continually put Discovery in
> the forefront of our audience as an educational device; very rarely,
> if at all, do we show fiction.

(Anderson Dep. 81:14-19.)

Anderson's effort to reinforce the brand of Discovery as a factual, information-based

television source was echoed by the other two DCI personnel who were involved in the special

programming event. Ms. Baquet said her job as Director of On-Air Promotions for the

Discovery Channel, particularly in connection with these special programming events, is "to

make sure Discovery's interests were represented" and "the Discovery Channel network – or we

call it a brand – would have to be represented appropriately and not tarnished." (Baquet Dep.

26:11-22.) In the context of special programming events, Ms. Baquet described her goal as:

> We always clearly try to distinguish movie versus fact on
> Discovery Channel because we frequent – we really do not want
> the consumer to think that the movie is going to air on Discovery
> Channel which could be a problem because that's false advertising.

(Baquet Dep. 84: 12-18.) With regard to this special programming event, Ms. Baquet recalls

telling Mr. Anderson "make sure you promote our program." (Baquet Dep. 84:1-3.) Shown a

tape of the various elements created by Mr. Anderson for the special programming event, Ms.

Baquet was asked if she had thought the viewer might think the Movie was the Scott O'Grady

story, she replied:

> I knew that we were promoting the fact which was The Scott
> O'Grady Story versus the fiction, which was a movie that
> Twentieth Century Fox was coming out with. And we tried to
> make that clear.

(Baquet Dep. 82: 4-8.)

Ms. Patterson similarly described the Discovery Channel's "theme" as:

> providing the highest quality non-fiction entertainment that we
> possibly could. And while we were bringing that entertainment to
> our viewers, it would also inform and educate. And that's an
> overall theme for all of our cable networks . . . You don't find
> anything that's not about real science, engineering, adventures,
> exploration on our network. We don't do anything that's
> fictionalized.

(Patterson Dep. 20:3-14.) The goal with regard to this special programming event was to:

> create an event that focused on the fictional elements that occur
> within the movie and highlight the factual pieces that were part of
> the real Scott O'Grady story . . .

(Patterson Dep. 149:15-18.) Shown the videotape of the elements created by Anderson and

asked repeatedly if the distinction between fact and fiction was achieved, she said, "Absolutely.

They very clearly state this is the real story and they make a very clear marker between the two."

(Patterson Dep. 149:25-150:2.) She stressed that Discovery Channel "never want[s] the viewer

to mix the two together just in terms of anything that we do." (Patterson Dep. 151:1-2.)

Based on the uncontradicted evidence, consistent with the mission to promote the non-

fiction brand of the Discovery Channel, DCI's intent was not to confuse – just the opposite, it

was to distinguish the "fact and fiction of true survival." Whether they succeeded or not is

beside the point, clear and convincing evidence of the requisite intent to imply false endorsement

or false advertising of content is wholly absent. "It is not enough to show that [DCI]

unknowingly misled" viewers; "mere negligence is not enough to demonstrate actual malice."

*Hoffman*, 255 F.3d at 1187. Since there is no evidence that DCI intended to confuse consumers

into believing that O'Grady actually endorsed the Movie, much less clear and convincing

evidence, the claims must be dismissed. Had DCI truly been attempting to confuse viewers into

believing that O'Grady endorsed the Movie, DCI would not have used the various features to

distinguish the fact of the Documentary from the fiction of the Movie.

## POINT V

## O'GRADY CANNOT SATISFY THE ELEMENTS OF A TORTIOUS INTERFERENCE CLAIM AGAINST DCI, AND THUS HIS CLAIM FAILS AS A MATTER OF LAW

O'Grady's tortious interference claims must likewise fail because he cannot satisfy even one of its elements. To prove that DCI tortiously interfered with plaintiff's prospective business relations, he must show: (1) a reasonable probability that he would have entered into a contract; (2) an independently tortious or unlawful act by defendant to prevent the relationship; (3) that the defendant acted with a conscious desire to prevent the relationship from occurring or knew that interference was certain or substantially certain to occur as a result of its conduct; and (4) actual damage or harm resulted from defendant's actions. *Allied Capital Corp. v. Cravens*, 67 S.W.3d 486, 491 (Tex. App. – Corpus Christi 2002, no pet.); *see also Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 713 (Tex. 2001); *Prudential Ins. Co. of Am. v. Financial Review Servs, Inc.*, 29 S.W.3d 74, 77 (Tex. 2000).

O'Grady has presented no evidence to make out any of the essential elements of his tortious interference claim. First, he has failed to show there was any reasonable probability that he would have entered into any contractual relationship with which DCI could have interfered. Plaintiff presents evidence of one movie deal -- with Orion Pictures, based on his book *Return With Honor* – which he claims he would have realized but for defendants' actions. Although he initially received $250,000 for the deal in 1996, the deal died because, by his own and his agent's admission, the company folded in 1997. (Cairns Dep. 51:21-52:6; Plf. Dep. 84:4-85:5, 86:8-14, 182:3-21.) In January 2001, the movie rights to *Return With Honor* reverted to O'Grady. (Ex. 19; Ex. 20; Plf. Dep. 175:18-180:11.)  The deal was never revived and, even after the movie rights had reverted, neither O'Grady nor his agents made any effort to sell the movie rights to his story and, had such an attempt been made, any sale would have been subject to Orion's lien of over $400,000. (Plf. Dep. 182:3-21; Cairns Dep. 54:2-56:5.)

Second, O'Grady cannot cite any independently unlawful or tortious act on the part of DCI.  Even if the movie deal was a viable prospect for O'Grady, DCI did not make any movie in

43

competition with this prospective movie and so it can not be said to have tortiously interfered. DCI did nothing but conduct its legitimate business of broadcasting television programming along with third-party advertising. Such legitimate business activity does not state the requisite elements of intent to harm and unlawful purpose. And, in any event, such activity is protected by the First Amendment and Art. 1 § 8 of the Texas Constitution. *See KTRK Television v. Felder*, 950 S.W.2d 100, 108 (Tex. App.-Houston 1997); *Rogers v. Dallas Morning News, Inc.*, 889 S.W.2d 467, 474 (Tex. App.-Dallas, 1994, writ denied) and thus cannot be the basis for a tortious interference claim.

Third, O'Grady presents no evidence that DCI intended to interfere with his prospective business relations. (*See* discussion Pt. IV *supra*.)

Finally, there is no evidence that O'Grady was harmed. O'Grady cites not a single canceled speaking engagement or endorsement opportunity. (Plf. Dep. 373:17-21; see also Parsons Dep. 58:18-59:16, 75:1-76:21.) In fact, his speaking fees have increased since the broadcast of the Documentary on November 28, 2001 and release of the Movie. (Exs. 136, 137, 28; Plf. Dep. 203:10-204:1; Parsons Dep. 30:7-38:6, 102:6-9.) If anything, as his agents concede, the Documentary has enhanced his speaking career and celebrity value. (Parsons Dep. 58:18-59:16, 75:1-76:21; Corzine Dep. 7:12-18, 64:16-25, 65:14; Mills Dep. 112:8-114:22.) O'Grady has capitalized on the Documentary by referencing it – ironically, without DCI's permission – on his Washington Speakers Bureau biography. (Exs. 49, 50, 144, 147, 148; Plf. Dep. 368:2-371:7, 373:23-25; Parsons Dep. 22:8-21, 62:18-63:2; Corzine Dep. 64:2-5; Plf. Dep. 373:23-25.)

Because plaintiff cannot satisfy his burden of proving the necessary elements of a claim of tortious interference with prospective business relations, DCI is entitled to judgment as a matter of law on this claim.[18]

---

[18] O'Grady's unfair competition claim similarly fails because it is based on the same facts as plaintiff's misappropriation, Lanham Act and tortious interference claims, and are therefore barred for the same reasons by the First Amendment, Art. 1 § 8 of the Texas Constitution and for failure to state a claim. *See Taylor Publ. Co. v. Jostens, Inc.*, 36 F. Supp. 2d 360, 374 (E.D. Tex.

## POINT VI

## PLAINTIFF'S CONSPIRACY CLAIM FAILS AS A MATTER OF LAW BECAUSE THERE IS NO EVIDENCE THAT DCI COMMITED AN INDEPENDENT UNDERLYING TORT

Because there is no independent unlawful act for which defendants can be held liable, O'Grady's conspiracy claim necessarily fails. To make out a claim of conspiracy under Texas law, O'Grady must prove the essential elements: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or cause of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Operation Rescue –Nat'l Planned Parenthood of Houston & Southwest Texas, Inc.*, 975 S.W.2d 546, 553 (Tex. 1998); *Massey v. Armco Steel Co.*, 652 S.W.2d 932 (Tex. 1983); *Garcia v. C.F. Jordan, Inc.*, 881 S.W.2d 155 (Tex. App. – El Paso 1994, no writ). A civil conspiracy requires specific intent -- that is, the parties must be aware of the harm or wrongful conduct at the inception of the agreement. *Triplex Communications v. Riley*, 900 S.W.2d 716, 719 (Tex. 1995).

No independent liability for conspiracy exists where the acts of the alleged conspirator are not themselves actionable. *Schoellkopf v. Pledger*, 778 S.W.2d 897, 900 (Tex. App -- Dallas 1989, writ denied). A necessary requirement of a conspiracy claim is that some act must be committed, which, if done alone, would give rise to a cause of action. *Bank One, Texas, N.A. v. Stewart*, 967 S.W.2d 419, 446 (Tex. App.-Houston [14th Dist.] 1998, pet. denied); *Markman v. Lachman*, 602 S.W.2d 350 (Tex. Civ. App. – Texarkana 1980); *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996) ("liability for conspiracy depends on participation in some underlying tort").

In this case, not only is there zero evidence that DCI entered into any agreement with specific intent to harm plaintiff (*see* Pt. IV *supra*), but also, most fundamentally, there is no independent underlying tortious conduct on the part of DCI. To the contrary, in broadcasting the

---

1999), *aff'd*, 216 F.3d 465 (5th Cir. 2000); *KTRK Television*, 950 S.W.2d at 108; *Rogers v. Dallas Morning News*, 889 S.W.2d at 474. DCI did not make a competing movie, thus the element of competition is missing here with respect to DCI.

Documentary, Interstitials and Tune-Ins, DCI consistently acted in a manner that was entirely lawful, even had plaintiff not signed a release which, of course, he had.

The conspiracy claim – based, as it is, on the same facts as plaintiff's misappropriation, Lanham Act, unfair competition and tortious interference claims – is also barred by the First Amendment and Art. 1 § 8 of the Texas Constitution. *See KTRK Television*, 950 S.W.2d at 108.

## CONCLUSION

For the foregoing reasons, Defendant DCI respectfully requests that summary judgment be entered in its favor and the Amended Complaint be dismissed in its entirety with prejudice and such other relief, including attorney's fees, be awarded as the Court deems appropriate to the prevailing party.

Dated:   June 30 , 2003

Respectfully submitted,

DAVIS WRIGHT TREMAINE L.L.P.

By: *Laura R. Handman* by permission
Laura R. Handman
D.C. Bar No. 444386
Constance M. Pendleton
D.C. Bar No. 456919
1500 K Street, N.W., Suite 450
Washington, D.C. 20005-1272
(202) 508-6600
(202) 508-6699 – Fax

Victor F. Hlavinka
ATCHLELY, RUSSELL, WALDROP, &
HLAVINKA, L.L.P.
1710 Moores Lane
Texarkana, Texas 75505
(903) 792-8246
(903) 792-5801 – Fax

ATTORNEYS FOR DISCOVERY
COMMUNICATIONS, INC.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Defendant Discovery Communications, Inc.'s Motion for Summary Judgment and Brief in Support was sent by facsimile to the following counsel of record this the _30_ day of June, 2003.

George E. Bowles, Esq.
C. W. Flynn
Locke, Liddell & Sapp. L.L.P.
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201

G. William Lavender, Esq.
Lavender Law
Landmark Building
210 N. State Line, Suite 50
Texarkana, TX 71854

Charles Babcock, Esq.
Jackson Walker, L.L.P.
901 Main Street
Suite 6100
Dallas, TX 75202-3797

Nancy Hamilton, Esq.
Jackson Walker, L.L.P.
1401 McKinney
Suite 1900
Houston, TX 77010

George L. McWilliams, Esq.
Patton, Haltom, Roberts, McWilliams & Greer, L.L.P.
Century Plaza
Suite 400
St. Michaels Drive
Texarkana, TX 75505

Victor F. Hlavinka