RECEIVED - CLERK

03 AUG 11 PM 5: 1

EASTERN DISTRICT
OF TEXAS

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

AUG 1 1 2003

BY  DAVID J. MALAND, CLERK
DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| SCOTT O'GRADY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. 502CV173 |
| v. | § | |
| | § | |
| TWENTIETH CENTURY FOX | § | |
| FILM CORPORATION and | § | |
| DISCOVERY COMMUNICATIONS, INC., | § | |

**DEFENDANT TWENTIETH CENTURY FOX FILM CORPORATION'S
OBJECTIONS TO PLAINTIFF'S SUMMARY JUDGMENT EVIDENCE,
AND REQUEST FOR RULING THEREON**

Defendant Twentieth Century Fox Film Corporation ("Fox Film") files the following

objections to certain evidence contained in the Appendix to Plaintiff Scott O'Grady's Response

in Opposition to Defendants Twentieth Century Fox Film Corporation's and Discovery

Communications, Inc.'s Motions for Summary Judgment and Brief in Support (the "Appendix"),

and in support thereof would show the Court as follows:

## I. OBJECTIONS

1.     **Exhibit 5:** Fox objects to the Gelb Report and Survey for failure to implement

and maintain "standards and controls" that would support the reliability of the survey utilized by

Gelb in reaching his opinions as required by Fed. R. Civ. Evid. 702. Fox attacks the methods

utilized by Gelb in constructing and conducting the survey, and thus Fox challenges the

reliability of the results and Gelb's opinions based on those results. O'Grady, as the party

seeking to have the district court admit expert testimony, must demonstrate that Gelb's findings

and conclusions based on the survey are reliable. *Moore*, 151 F.3d at 276. O'Grady cannot meet

this challenge.

65

### 1.  *Survey Methodology and Results*

Gelb conducted a survey in four markets – Houston, Los Angeles, Milwaukee, and Baltimore – to "explore the reactions of the relevant population to the Discovery Channel program, "BEL:SOS". (Gelb Report at p. 4, § IV). The 203 participants were chosen after a telephone interview in which they were asked whether they had the Discovery Channel in their home in 2001, and if they had seen one or more Discovery Channel programs in the past 3 months preceding the telephone interview. (*Id.* at Exh. B). The sample selected resulted in a group of 46% male and 54% female. (*Id.* at p. 4, § B).

### 2.  *Survey Reliability under Rule 702*.

The evidentiary value of a survey depends on its underlying objectivity as determined through many factors, such as "whether [the survey] is properly 'filtered' to screen out those who got no message from the advertisement, whether the questions are directed to the real issues, and whether the questions are leading or suggestive." *Johnson & Johnson-Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960 F.2nd 294, 300 (2nd Cir.1992).

The Gelb Survey is fatally flawed in several respects, including having an (1) unrepresentative survey universe, (2) failure to incorporate any form of control to measure error or bias, and (3) using leading and ambiguous question structures and sequences. (Declaration of Philip Johnson attached hereto (hereafter "Johnson Decl.").

#### a.  **Improper Universe**

There is a relevance problem when a survey's screening criteria does not produce a proper sample. Where the population sampled does not include any respondents from the proper

2

universe, the survey results will be irrelevant; where it is too broad (over-inclusive), the views of some respondents will be irrelevant; where the sample is too narrow (under-inclusive), the view of part of the universe will not have been measured, hence the survey results will be unreliable. *See R. Leighton*, "Using Daubert-Kumho Gatekeeping to Admit and Exclude Surveys in Lanham Act Advertising and Trademark Cases" 92 Trademark Reporter 743, 765-66 (2002).

Here the universe studied by Gelb bears little relationship to those who may have been exposed to the November 28th Broadcast. As Plaintiff admits, the target viewing audience for the November 28th Broadcast was a "demographic group of 18-49 males who are likely to be interested in war movies" (Resp. at 31). But Gelb did not consider the demographics of the Discovery Channel of November 28, 2001. (Gelb Dep. at 33:14-25)[1] Indeed, Gelb had no information about the type of people who saw the program on November 28, 2001. (Gelb Dep. at 34-35) In fact, the universe utilized in the Gelb Survey bears little relationship to those who may have actually seen the November 28th Broadcast. (Johnson Decl. at ¶ 20). While the audience who is attracted to a "military" style program is roughly two-thirds male, the Gelb Survey includes a preponderance of females (54%) in the survey universe. (Johnson Decl. at ¶ 9). Thus, the universe sampled does not represent the relevant population and, therefore, the survey results are irrelevant and unreliable.

### b.     No Control Group.

Gelb did not utilize a control group to take account of those respondents who would have been confused "regardless of the stimuli present." (Gelb Dep. at 145:12-14); *See Mattell, Inc. v.*

---

[1] The Gelb deposition pages, Exhibits, and the Declaration of Phillip Johnson ("Johnson Decl.") are attached hereto as App. I.

*MCA Records, Inc.*, 28 F.Supp.2d 1120, 1135 (C.D. Cal. 1998), aff'd, 296 F.3d 894 (9th Cir. 2002). In fact, Gelb did not even consider using an outside control. (Gelb Dep. at 169:4-11)

The use of a control group is absolutely essential in adjusting survey results to account for so-called "noise in the market" unassociated with the subject matter of the survey. 5 McCarthy on Trademarks and Unfair Competition, § 32:187 (4th ed.1996); see also Jacob Jacoby, *Experimental Designs in Deceptive Advertising and Claim Substantiation Research,* 954 PLI/Corp 167, 176 (1991) (using a control group in surveys is "absolutely necessary"). It is a survey flaw not to use a control group. *See, e.g., Greenpoint Financial Corp. v. Sperry & Hutchinson Co., Inc.*, 116 F. Supp.2d 405, 409 (S.D.N.Y. 2000); *see also* Jacob Jacoby, Amy H. Handlin, & Alex Simonson, *Survey Evidence in Deceptive Advertising Cases Under the Lanham Act: An Historical Review of Comments from the Bench,* 954 PLI/Corp. 83, 89 (1994) (emphasizing that "there can be no trustworthy or valid assessment of cause and effect unless surveys are intertwined with proper experimental designs (which, of necessity, involve the utilization of proper controls)"); David H. Kaye & David A. Freeman, *Reference Guide on Statistics,* in *Reference Manual on Scientific Evidence*, at 348-49 (1994) ("[O]utcome figures from a treatment group without a control group reveal very little and can be misleading. Comparisons are essential.").

Because Gelb did not use a control group in administering the survey, the responses "reveal very little" and are, in fact, misleading. Gelb did nothing to control the inevitable "noise in the market" that would affect survey responses, and the percentages of respondents who were purportedly confused in Gelb's survey is of no moment -- in *Winning Ways, Inc. v. Holloway Sportswear, Inc.*, 913 F.Supp. 1454, 1475-76 (D. Kan. 1996), the district court discounted a survey entirely when it showed 48-58% confusion when the survey contained only "numbers that

4

had not been adjusted to account for noise in the market." Thus, the survey and resulting data are unreliable and should be excluded. Other courts have similarly rejected survey results when a control group was not utilized. *See, e.g., Major League Baseball Properties, Inc. v. Sed Non Olet Denarius, Ltd.,* 817 F.Supp. 1103, 1123 (S.D.N.Y. 1993); *ConAgra, Inc. v. Geo. A. Hormel & Co.,* 784 F.Supp. 700, 728 (D. Neb. 1992), aff'd, 990 F.2d 368 (8th Cir.1993).

### c.   Inherent Bias.

The use of leading, suggestive, and ambiguous questions in the Gelb Survey further exacerbates the need for a control to measure the impact of the biases in the responses of the survey respondents. (Johnson Decl. at ¶ 11). A survey is "not credible if it relies on leading questions which are 'inherently suggestive and invite guessing by those who did not get any clear message at all.'" *Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharms., Inc.,* 19 F.3d 125, 134 (3rd Cir. 1994). A survey question that suggests its own answer, or presents a connection or association instead of allowing the respondents to form their own, is inherently biased and leading. *See Mattell, Inc. v. MCA Records, Inc.,* 28 F.Supp.2d 1120, 1135 (C.D. Cal. 1998), aff'd, 296 F.3d 894 (9th Cir. 2002); *Universal City Studios, Inc. v. Nintendo Co.,* 746 F.2d 112, 118 (2nd Cir. 1984).

For example, in *Universal City Studios, Inc.,* the plaintiff submitted a survey that asked whether "the Donkey Kong game [was] made with the approval or under the authority of the people who produce the King Kong movies?" *Universal City Studios, Inc.,* 746 F.2d at 118. The Second Circuit criticized the question because it was "an obvious leading question." *Id.* The participants were presented with the Donkey Kong-King Kong connection rather than permitted to make their own associations. *Id.* "A survey question which begs its answer cannot be a true

indicator of the likelihood of consumer confusion." *Id.* The district court in *Mattell, Inc.*, affirmed on appeal, reached the same conclusion with respect to a question that asked: "Do you think the company which owns the Barbie doll brand gave its permission to use the Barbie name on the music CD package?" *Mattell, Inc.*, 28 F.Supp.2d at 1134-35.

Here, the Gelb Survey questions are leading and suggestive in construction, while ambiguous in context. In fact, Gelb even changed a critical question when he obtained an unfavorable response to a pretest survey. Gelb's initial March 6th pretest question 7 read: "After seeing this program, do you think The Movie that was advertised is or is not the actual pilot's real life story." (See Exh. 336) But after looking at the results of the pretest, Gelb "decided that one question was not clear." (Gelb Dep. at 96:7-25). That question was number 7. (*Id.* at 97:1-9) The pretest results indicated that a total of six (6) respondents agreed it was an actual pilot's real life story and 13 did not think it was the actual pilot's real life story. (Gelb Dep. at 114:17; 115:9; 116:1-6, Exh. 338). Gelb conferred with Plaintiff's counsel about the test results. (Gelb Dep. at 113:25-114:16). Afterwards, there was a revision to question 7. (Gelb Dep. at 117:19-23).

Question 7 was changed to read: "After seeing this program, do you think that the movie that was advertised is or is not a ***Hollywood version of the actual pilot's real life story***." (Gelb Dep. at 118:7-18; Exh. 340). When asked why he changed the question, Gelb testified as follows:

> Q:    You wanted to get across that it … was a Hollywood movie version of the pilot's story?
>
> A:    Exactly.

(Gelb Dep. at 99:3-7).

Gelb continued later:

> Q:     And your intention was that they should think that … the documentary and the Fox movie were telling the same story?
>
> A:     No.
>
>        Mr. Flynn:     Object form.
>
> A:     No … I just want them to understand that this was a Hollywood version so they would get a little more feel. But when you do a Hollywood version of a movie, you don't tell somebody's exact life story. You embellish it.
>
> **Q:     So you wanted them to understand that it was a Hollywood version of the Scott O'Grady story?**
>
> **A:     Yes.**

(Gelb Dep. at 110:2-14).

Thus, Question 7 was revised to include "Hollywood version" because Gelb intended to illicit the response that the movie was "a Hollywood version fo the Scott O'Grady's story." This is a textbook example of an obviously leading question which begs its answer. As such it cannot possibly be a true indicator of the likelihood of consumer confusion and the survey should not be admitted because it is not credible or reliable. *See Mattel*, 28 F.Supp. 22 at 1135 and *Universal City Studios, Inc..*, 746 F.22 at 118.

Defendants' expert Philip Johnson also offered the following criticisms of the Gelb Survey:

> 16.     In Question 3, Gelb asks respondents, *"So far as you recall, did the actual pilot who was shot down in enemy territory appear in any part of this one-hour program?"* This is a leading question that is full of information that the respondent may or may not have recalled on their own, without being aided by the question. It does, at the minimum, suggest that there was *"an actual pilot,"* who was *"shot down in enemy territory,"* who did

7

appear in *"part of this one-hour program."* Instead of using this type of leading question structure that prompts respondents, the accepted methodological practice is to ask an open-ended question that allows the respondent to answer in their own words, or ask a series of questions such as, *"What was the program you saw about? PROBE: What else do you recall in this program?"*

18.     Inexplicably, the Gelb survey proceeds to ask Question 7 of all respondents, even of those who did not recall that the Fox movie "Behind Enemy Lines" was advertised: *"After seeing this program, do you think that the movie that was advertised is a Hollywood version of the actual pilot's real-life story, or is not a Hollywood version of the actual pilot's real-life story?"* This central question in the Gelb study is so poorly designed and constructed, and the alternatives are so unclear and ambiguous, that no conclusions can be drawn from the results. For instance, the "choices" forced on the respondent assume the respondent has a belief about the *"actual pilot's real-life story"* when it is uncertain whether respondents had thought about it before being asked the question. It is also impossible to decipher what the alternative choices mean given the introduction of the term *"Hollywood version."*

19.     The term "Hollywood" as an adjective is generally used to describe events that are made-up or fictional. At the least, the choice of the verbiage, *"Hollywood version of the actual pilot's real-life story"* appears to be a textbook example of an oxymoron. In such a situation, without any control cell to determine how a respondent would answer such a question, no conclusions can be drawn from the results of this question. Even the follow-up in Question 8, *"Why do you say that [this movie is a Hollywood version of the actual pilot's real-life story]?"* demonstrates this ambiguity. For example, the most frequent response listed in the table provided in the Gelb report suggests that one out of four (25%) of those respondents who agreed that it was a *"Hollywood version,"* said that this was because *"events in the movie were similar to a real story but more far-fetched."* This response suggests that the survey participant recognizes that it is not Scott O'Grady's story, but it is a similar story, a position that is consistent with the defendant's claim in this dispute.

20.     The creation of this confusing and ambiguous question apparently occurred as a "remedy" when a somewhat more appropriate question was tested in a preliminary survey (or pre-test), which asked. *"After seeing this program, do you think that the movie which was advertised is or is not the actual pilot's real life story?"* While sharing many of the leading characteristics and

tendency to inform the respondent as the later version, this question notably does not contain the words "Hollywood version." Without this confusing use of "Hollywood version" in the key survey question, just 32% of the "pre-test" respondents replied "yes." This result contrasts sharply with the results obtained by the "altered" version of this question where 70% answered "yes." In effect, these differences suggest that respondents understand quite clearly that the movie is not the "O'Grady story" but rather is simply a Hollywood movie that is only loosely related to or "inspired by" this story. In his deposition testimony, Mr. Gelb reports that he made this change to the key survey question because it was not working the way he would have liked.

21.   The Gelb study then continues to pursue this suggestive line of questioning, irrespective of whether the respondent had any views, by asking Question 9, *"After seeing the program, do you think the actual pilot endorses or doesn't endorse the movie advertised on the program you just saw?"* This is another poorly constructed question that suggests that the *"actual pilot"* should have a position or stance about the movie; i.e., endorse/does not endorse the movie advertised. This comes right after the previous suggestive questioning sequences that informed survey respondents that the movie may be a *"Hollywood version"* of the *"actual pilot's real-life story."*

22.   At this juncture, the question series may have confused respondents into thinking that the survey questions referred to the Discovery Channel program (which had been described to them as an action-adventure video when they were recruited), rather than to the Fox movie. For example, 22% of those who agreed with the idea that the pilot endorses the film say it is because *"he was talking on the program,"* or 3% of respondents said *"(It) showed true life of O'Grady with movie clips,"* and 2% of respondents said *"He'd like people to see what happened, not the Hollywood version."* These responses suggest that when they answered this survey question, respondents may have been referring to the Discovery Channel program, or scenes contained within the Discovery Channel program, and not the Fox movie. In addition, the structure of Question 9 is highly speculative and encourages guessing. This kind of question may result in respondents conducting a "mental coin toss," where about half (49%) of the respondents agree that the pilot endorses the movie, and the other half (51%) report either that the pilot does not endorse the movie (26%), or that they do not know (25%).

21.[*sic*]   By the end of the Gelb study, respondents have been exposed to a constant barrage of the following terms: *"the*

> *program," "the actual pilot," "the pilot's real-life story," "the*
> *movie," "the movie advertisement,"* and *"a Hollywood version."*
> In addition, the questions in the Gelb study repeat the phrase
> "advertised on the program," suggesting that the advertisements
> are contained in the Discovery Channel program itself, rather than
> occurring in the "commercial space" which interrupts the program.
> The cumulative impact of this confusion on the survey respondents
> is unknown. Again, without a measure of how respondents would
> answer such speculative questions when exposed to a control
> stimulus, no conclusions can be drawn from these responses other
> than the fact that they appear to reflect guessing behavior.

(See Johnson Decl.)

In his deposition, Gelb agreed there was confusion and ambiguity in the survey. For

example, in drafting the Survey, Gelb used the word "endorse" in Question 9. "Endorse,"

according to Webster's Seventh Collegiate Dictionary, is defined as," to express a definite

approval of." (Gelb Dep. at 89:14-18). Gelb's own definition of "endorse" means "to express

support or approval." (Gelb Dep. at 86:19-21). Gelb, however, did not provide the participants

with a definition of endorse but instead asked them what they meant by "endorse." (Gelb Dep. at

90:3-10, 92:10-93:2).

The participants responses to why they thought the pilot endorsed the movie (Question

10) included answers such as "Because I don't think the movie portrayed him in a bad light. The

movie portrayed him as a hero for surviving behind enemy lines" (Ex. 335-Gelb 836). When

Gelb was asked whether this particular answer comported with the dictionary definition of the

word, Gelb responded "I was not interested necessarily in a dictionary definition of endorse but

in whether or not the people gave the answer as to why the actual pilot endorses the movie, that it

had some representation of their personal truth." (Gelb Dep. at 127:13-25).

The same respondent answered Question 11 ("When you say the pilot endorses the

movie, what do you mean by endorses"?): "I think he agrees with the story line because it had

some kind of truth to it.  It was similar to his truth."  (Exh. 335-Gelb 836)  When asked what he thought about that response, Gelb answered "I think it's a good definition of the word from this person's point of view."  (Gelb Dep. at 128:15-23).

The confusion and ambiguity are clear from a sample of the responses set forth below to Question 10:  "Why do you say the pilot endorses the movie?"

> "I think if I was him and had this experience, I would want others to know what happens."

(Gelb Dep. at 137:16-24, Exh. 341-Gelb 218).

> "To show how rough it was for him and how wonderful it was that others came for him."

(Gelb Dep. at 152:4-14, Exh. 341-Gelb 299).

> "Because they are showing you what happened in the war, they are reenacting the real story so that we can see what actually happened since we can't be there."

(Gelb Dep. at 157:7-15, Exh. 342-Gelb 547).

> "Because he knew that showing that show would help someone out and also show them how to handle the situation so why keep it a secret when you know."

(Gelb Dep. at 160:23-161:14, Exh. 343-Gelb 1039).

> "Because he didn't say anything bad about the movie he was neutral."

(Gelb Dep. at 163:9-17, Exh. 343-Gelb 1089).

Other examples are included in Exhs. 341 through 343 attached hereto for the Court's review, if necessary.

In fact, Gelb admitted numerous times in his deposition that he did not know whether the participants, in answering the questions, were responding to the Discovery Channel documentary

or to the Fox Movie. (See Gelb Dep. at 138:25-139:12; 141:3-25; see Exh. 341-Gelb 233; Gelb Dep. at 152:4-14; Exh. 341-Gelb 299; Gelb Dep. at 156:6-158:2; see Exh. 342-Gelb 547, Gelb 607; Gelb Dep. at 157:7-158:2, Exh. 342-Gelb 547.

Moreover, regardless of the participants' explanations to Questions 10 and 11 as to why they said the pilot endorsed the movie or what they meant by endorse, the responses were included in the tabulation. (*See, e.g.,* Gelb Dep. at 156:6-157:6, Exh. 342 Gelb 607; Gelb Dep. at 160:23; Gelb Dep. at 137:16-138:6; Exh. 341 Gelb 218). In other words, so long as the participant answered Question 9 or 9A, that the actual pilot endorsed the movie, it didn't matter what they put down as their explanation. (See Gelb Dep. at 137:16-138:20).

Consequently, the survey responses offer little other than to illustrate that the confusion lay in the structure of the survey and its questions - not the November 28th Broadcast. Thus, the Gelb Survey does not withstand the scrutiny of Fed. L. Civ. P 702 and should be excluded.

2.    **Exhibit 8** - Fox Film objects to certain excerpts from the deposition of Patrick Byers ("Byers") which are attached as Exhibit 8 to the Appendix on the grounds that the portions on which Plaintiff relies to oppose summary judgment are not responsive to the questions, not based on personal knowledge as required by FED. R. EVID. 602; rather, they are either based on improper hearsay under FED. R. EVID. 801, sheer speculation, and/or bias. The specific portions of the deposition excerpts from Byers's deposition to which Fox Film objects and moves to strike are:

- • Fox Film objects to the testimony of Byers beginning on page 18, line 12 and continuing through page 19, line 16; page 36, lines 5-20; and page 37, beginning on line 16 and continuing through page 38, line 2 on the grounds that his impression of the DCI documentary that aired on November 28, 2001 is biased and incomplete. To place Byers' testimony in its proper context, Fox Film

invokes the rule of optional completeness. Fed. R. Evid. 106. Byers admits that he did not watch the entire broadcast of the DCI Documentary. <u>See</u> App. II; Byers Dep. 17:16-22.

- Fox Film objects to the testimony of Byers beginning on page 36, lines 5 and continuing through page 37, line 2 on the grounds that the witness's testimony is nonresponsive to the question asked by counsel and is not based on personal knowledge; rather, it is based on speculation, hearsay, or both and purports to give the opinion of an undisclosed opinion witness.

- Fox Film objects to the testimony of Byers on page 37, line 16 and continuing through page 38, line 2 on the grounds that the witness's testimony is nonresponsive to the question asked by counsel and is not based on personal knowledge; rather, it is based on speculation, hearsay, or both and purports to give the opinion of an undisclosed opinion witness.

3.    **Exhibit 9** - Fox Film objects to certain excerpts from the deposition of John Davis ("Davis") which are attached as Exhibit 9 to the Appendix on the grounds that the cited portions on which Plaintiff relies to oppose summary judgment have been mischaracterized and do not support Plaintiff's stated proposition.   Specifically, the deposition excerpts from Davis's deposition to which Fox Film objects beginning at page 27, line 20 and continuing through page 28, line 5 do not contain any testimony regarding the location where the Movie was shot or the release date for the Movie.

4.    **Exhibit 10** - Fox Film objects to certain excerpts from the deposition of Bill Flanagan ("Flanagan") which are attached as Exhibit 10 to the Appendix on the grounds that the portions on which Plaintiff relies to oppose summary judgment are not based on personal knowledge as required by FED. R. EVID. 602; rather, they are either based on improper hearsay under FED. R. EVID. 801, sheer speculation, and/or bias. The specific portions of the deposition excerpts from Flanagan's deposition to which Fox Film objects are:

- Fox Film objects to the cited testimony of Flanagan on the grounds that his impression of the DCI Documentary that aired on November 28, 2001 is biased and incomplete.  To place Flanagan's testimony in its proper context, Fox Film

13

invokes the rule of optional completeness. FED. R. EVID. 106. Flanagan admits that he "really wasn't paying attention" to the DCI Documentary as it aired on November 28, 2001 and that he "didn't really sit down and see all of it." See App. III; Flanagan Dep. 28:4-11.

- Fox Film objects to the following cited deposition excerpts of Flanagan: beginning on page 45, line 6 and continuing through page 46, line 2; beginning on page 46, line 14 and continuing through page 47, line 2; and beginning on page 50, line 19 and continuing through page 51, line 7 on the grounds that they purport to give the opinion of an undisclosed opinion witness.

5.    **Exhibit 12** - Fox Film objects to certain excerpts from the deposition of Thomas C. Grane ("Grane") which are attached as Exhibit 12 to the Appendix on the grounds that the portions on which Plaintiff relies to oppose summary judgment do not support Plaintiff's stated proposition. The specific deposition excerpts from Grane's deposition to which Fox Film objects begins at page 12, line 21 and continuing through page 13, line 16 does not contain any testimony regarding "any disclaimers" from Fox Film for the Movie.

6.    **Exhibit 13** - Fox Film objects to certain excerpts from the deposition of Michelle Marks ("Marks") which are attached as Exhibit 13 to the Appendix on the grounds that the portions on which Plaintiff relies to oppose summary judgment are not based on personal knowledge as required by FED. R. EVID. 602; rather, they are either based on improper hearsay under FED. R. EVID. 801, sheer speculation and/or assumes facts not established by evidence. The specific portions of the deposition excerpts from Marks's deposition to which Fox Film objects are:

- Fox Film objects to and moves to strike the question and answer from Plaintiff's counsel at page 61, lines 5-9 on the grounds that the question calls for and elicits speculation and/or hearsay.

- Fox Film objects to and moves to strike Plaintiff's repeated misrepresentation of Marks deposition testimony at page 49, lines 9-20. The line of questions was about "the same story as the Discovery Channel program" not whether the Movie had anything to do with Scott O'Grady himself.

14

7.     **Exhibit 54** - Fox Film objects to Exhibit 54 to the Appendix on the grounds that the document contained therein, a Twentieth Century Fox Interoffice Memo dated January 28, 2000 regarding Behind Enemy Lines is irrelevant and immaterial to any issue in this case under FED. R. EVID. 402/403.

8.     **Exhibit 58** - Fox Film objects to Exhibit 58 to the Appendix on the grounds that the document contained therein, a Recruited Audience Survey of Behind Enemy Lines conducted by the National Research Group, Inc. and bates labeled as FOX 03256 through 03274, constitutes impermissible hearsay under FED. R. EVID. 801 and is irrelevant and immaterial to any issue in this case under FED. R. EVID. 402/403.

9.     **Exhibit 59** – Fox Film objects to Exhibit 59 to the Appendix on the grounds that the document contained therein, bates labeled as FOX 065851 through 065852, as irrelevant and immaterial to any issue in this case under FED. R. EVID. 402/403, constitutes improper hearsay under FED. R. EVID. 801, and assumes facts not in evidence.

10.     **Exhibit 60** - Fox Film objects to Exhibit 60 to the Appendix on the grounds that the document contained therein, a Recruited Audience Survey of Behind Enemy Lines conducted by the National Research Group, Inc. and bates labeled as FOX 03234 through 03255, constitutes impermissible hearsay under FED. R. EVID. 801 and is irrelevant and immaterial to any issue in this case under FED. R. EVID. 402/403.

11.     **Exhibit 63** - Fox Film objects to Exhibit 63 to the Appendix on the grounds that the documents contained therein, an Interoffice Memorandum dated November 30, 2001 from Peter Lozlto to Allison Kramer and Flo Grace, with handwriting reflected thereon, and attaching news clippings, are irrelevant and immaterial to any issue in this case under FED. R. EVID.

402/403, constitutes improper hearsay under FED. R. EVID. 801, and assumes facts not in evidence.

## II. PRAYER

WHEREFORE, Defendant Twentieth Century Fox Film Corporation requests that the objections to summary judgment evidence contained herein be sustained, and that the Court strike said summary judgment evidence from the record for the reasons stated above, and that the Court not consider the above-referenced testimonial or documentary evidence in its determination of Defendants' Motions for Summary Judgment, and for such other and further relief at law or in equity to which it may justly be entitled, and for such other and further relief, at law or in equity, as the Court may deem appropriate.

Respectfully submitted,

JACKSON WALKER L.L.P.

By _____

Charles L. Babcock
State Bar No. 01479500
Nancy W. Hamilton
State Bar No. 11587925
Cedric D. Scott
State Bar No. 24013474
1401 McKinney, Suite 1900
Houston, TX 77010
(713) 752-4200
(713) 752-4221 - Fax

George L. McWilliams
PATTON, HALTOM, ROBERTS,
McWILLIAMS, & GREER, LLP
2900 St. Michael Drive, 4th Floor
Texarkana, Texas 75503
(903) 334-7000 (Telephone)
(903) 334-7007 (Fax)

ATTORNEYS FOR DEFENDANT
TWENTIETH CENTURY FOX
FILM CORPORATION

17

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing was served upon the following counsel of record on this 11th day of August, 2003:

George Bowles, Esq.                                  Via Federal Express
Locke Liddell Sapp L.L.P.
2200 Ross Avenue, Suite 2200
Dallas, TX 75201

G. William Lavender, Esq.                            Via Hand Delivery
Lavender Law
Landmark Building
210 N. State Line, Suite 503
Texarkana, Texas 71854

Laura R. Handman, Esq.                               Via Federal Express
Davis Wright Tremaine L.L.P.
1500 K Street, N.W., Suite 450
Washington, D.C.  20005-1272

Victor Hlavinka, Esq.                                Via Hand Delivery
Atchley, Russell, Waldrop & Hlavinka
P.O. Box 5517
Texarkana, TX 75503-5517

Cedric D. Scott   By permission

18

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
 2                     TEXARKANA DIVISION
 3   SCOTT O'GRADY,                 )
                                    )
 4           Plaintiff,             )
                                    )
 5   VS.                            ) CIVIL ACTION NO. 502CV173
                                    )
 6   TWENTIETH CENTURY FOX          )
     FILM CORPORATION, and          )
 7   DISCOVERY COMMUNICATIONS,      )
     INC.,                          )
 8                                  )
             Defendants.            )
 9
10   ***********************************************
             ORAL AND VIDEOTAPED DEPOSITION
11                 GABRIEL M. GELB
                   JUNE 19, 2003
12   ***********************************************
13
14
15       ORAL AND VIDEOTAPED DEPOSITION of GABRIEL M.
16   GELB, produced as a witness at the instance of the
17   Defendant, Twentieth Century Fox Film Corporation, and
18   duly sworn, was taken in the above-styled and numbered
19   cause on the 19th day of June, 2003, from 9:15 a.m. to
20   4:53 p.m., before Rhonda K. Ashman, CSR, RPR, in and
21   for the State of Texas, reported by stenographic
22   means, at the offices of Locke, Liddell & Sapp, LLC,
23   2200 Ross Avenue, Suite 2200, Dallas, Texas, pursuant
24   to the Federal Rules of Civil Procedure and the
25   provisions stated on the record or attached hereto.
```

Gabriel Gelb

June 19, 2003

**Page 230**

1    I, GABRIEL M. GELB, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5    _____
       GABRIEL M. GELB
6
7  STATE OF _____)
8  COUNTY OF _____)
9
10    Before me, _____, on this
11  day personally appeared GABRIEL M. GELB, known to me
12  (or proved to me under oath or through
13  _____) to be the person whose name is
14  subscribed to the foregoing instrument and
15  acknowledged to me that they executed the same for the
16  purpose and consideration therein expressed.
17    Given under my hand and seal of office this
18  _____ day of _____, 2003.
19
20    _____
       NOTARY PUBLIC IN AND FOR
21    THE STATE OF _____
22
23
24
25

**Page 231**

1  STATE OF TEXAS  )
2
3    I, Rhonda K. Ashman, Certified Shorthand Reporter
4  in and for the State of Texas, do hereby certify that,
5  pursuant to the agreement hereinbefore set forth,
6  there came before me on the 19th day of June, A.D.,
7  2003 at 9:15 a.m., at Locke, Liddell & Sapp, in the
8  City of Dallas, County of Dallas, and State of Texas,
9  the following named person to-wit:  Gabriel M. Gelb,
10  who was by me duly sworn to testify the truth and
11  nothing but the truth of his knowledge touching and
12  concerning the matters in controversy in this cause;
13  and that he was thereupon carefully examined upon his
14  oath and his examination reduced to writing under my
15  supervision; that the deposition is a true record of
16  the testimony given by the witness, same to be sworn
17  to and subscribed by said witness before any Notary
18  Public, pursuant to the agreement of the parties.
19    I further certify that I am neither attorney or
20  counsel for, nor related to or employed by, any of the
21  parties to the action in which this deposition is
22  taken, and further that I am not a relative or
23  employee of any attorney or counsel by the parties
24  hereto, or financially interested in the action.
25    I further certify that before the completion of

**Page 232**

1  the deposition, the Deponent _____, and/or the
2  Plaintiff/Defendant _____ did _____ did not ____
3  request to review the transcript.
4    Certified to me this        day of
5    , 2003.
6
7
8
9
10    RHONDA K. ASHMAN, Texas CSR 5259
       Expiration Date: 12-31-03
11    ESQUIRE DEPOSITION SERVICES
       703 McKinney Avenue
12    Suite 320
       Dallas, Texas  75202
13    (800) 852-9737
14
15
16
17
18
19
20
21
22
23
24
25

**Page 233**

1    COURT REPORTER DISCLOSURE STATEMENT
2  X  Please be advised that pursuant to Rule IV.B4 of
     the standards and rules for certification of Certified
3    Shorthand Reporters as promulgated by the Supreme
     Court of Texas with regards to disclosure, I have an
4    existing or past financial, business, professional,
     family or social relationships with any of the parties
5    or their attorneys which to some might reasonably
     create an appearance of partiality.
6
7    Please be advised that Esquire Deposition
     Services has entered into a volume-related discount
     fee structure with a party in this lawsuit; and that
8    if such discount is in effect, all parties in this
     case will receive the same discount for any like
9    product and/or service.
10    Please be advised that there is an existing or
     past financial, business, professional, family or
11    social relationship with counsel involved in this
     case, separate and apart from counsel simply doing
12    business with Esquire Deposition Services (or related
     companies) in the past.
13  This relationship is:
14
     Court Reporter: Rhonda K. Ashman, CSR, RPR
15  CSR Number:  5259
     Date: June 19, 2003
16
17
     Rhonda K. Ashman, CSR, RPR
18
19    CERTIFICATE OF SERVICE
20  This is to certify that a true and correct copy of the
     foregoing disclosure statement has been presented to
21  all counsel present at the deposition, and a copy of
     same will be attached to all transcript copies.
22
23    _____
     Rhonda K. Ashman, CSR, RPR
24
25

59 (Pages 230 to 233)

Gabriel Gelb

June 19, 2003

---

**Page 6**

1             GABRIEL M. GELB,
2 having been first duly sworn, testified as follows:
3        E X A M I N A T I O N
4 BY MS. HAMILTON:
5     Q. Would you state your name for the record,
6 please.
7     A. Gabriel Michael Gelb.
8     Q. Mr. Gelb, you've been retained as an expert
9 in this case?
10     A. Yes, I have.
11     Q. And that is on behalf of the Plaintiff, Scott
12 O'Grady?
13     A. Yes.
14     Q. Let me hand you first what's previously been
15 marked as Exhibit Number 325, which is the notice of
16 deposition. And ask you if you've had an opportunity
17 to review that prior to today?
18     A. Yes, I have.
19     Q. Okay. And did you bring any documents with
20 you today?
21     A. No.
22     Q. Okay. Did you have an understanding
23 already -- communications with counsel regarding
24 production of documents relating to your work in this
25 case?

---

**Page 7**

1     A. Did I have an understanding?
2     Q. Did you have a discussion with counsel about
3 production of documents that you worked on or that
4 were part of your work in relation to this case?
5     A. Yes.
6     Q. And have you produced all those documents?
7     A. To the best of my knowledge.
8     Q. Okay. How many times have you testified
9 before in trial?
10     A. In trial, about 10 or 12.
11     Q. Okay. And tell me what your understanding is
12 of your duties in this lawsuit.
13     A. To conduct a survey to determine whether or
14 not certain allegations by Captain O'Grady were
15 supported by the relevant population or not.
16     Q. And what were those allegations that you were
17 determining were supported or not?
18     A. Whether or not, after seeing the Discovery
19 Channel program, the relevant population believed that
20 Captain O'Grady was endorsing the Twentieth Century
21 Fox film, Behind Enemy Lines, and whether or not they
22 thought that that film told his story.
23     Q. Have you ever been retained as an expert
24 regarding false advertising claims?
25     A. I think so, maybe once or twice before.

---

**Page 8**

1     Q. And what cases were those?
2     A. I don't -- I don't remember offhand.
3     Q. Okay. What about false endorsement, have you
4 ever been retained as an expert to testify on matters
5 of false endorsement?
6     A. No.
7     Q. What is your understanding of what the
8 relevant population was? I think that was the term
9 that you were using. What -- what is the relevant
10 population that you were studying?
11     A. In my mind, the relevant population were
12 people who had access to the Discovery Channel in the
13 time period that the disputed program was shown.
14     Q. And how did you arrive at that determination?
15     A. Just seemed logical to me.
16     Q. No other reason other than it just seemed
17 logical?
18     A. That's correct.
19     Q. And how did you determine who -- and what was
20 the time frame that you're talking about?
21     A. Well, the disputed program was shown on
22 November 28th, 2001. So we wanted people who had
23 access to the Discovery Channel during that time
24 period and also were still watching the Discovery
25 Channel recently.

---

**Page 9**

1     Q. And why was it relevant, if at all, that they
2 were still watching the Discovery Channel?
3     A. Just so that they would be familiar with the
4 channel and still had access to it.
5     Q. Was there anything else that you considered
6 other than you were looking for people who had access
7 to the Discovery Channel as part of the relevant
8 population for your study?
9     A. Well, there were certain qualifications that
10 we screened for among those people who had access to
11 the Discovery Channel.
12     Q. And how did -- well, first of all, what were
13 those qualifications?
14     A. Those qualifications were people who had not
15 taken part in a research survey in the past six months
16 and -- let's see, that -- who -- who were part of any
17 entertainment company or video store.
18     Q. Any other qualifications?
19     A. No.
20     Q. What was the import, if anything, about
21 having people who had not taken part in a survey in
22 the last six months or past six months?
23     A. Well, you generally don't want people who are
24 professional surveyors, people who have been taking a
25 lot of surveys. You try to get a little bit more of a

---

3 (Pages 6 to 9)

Esquire Deposition Services          703 McKinney Avenue, Suite 320          Dallas, Texas 75202
Phone (214) 965-9200          (800) 852-9737          Fax (214) 965-9205
7df0e8f3-7efb-498c-a4e9-c8e0b233278e

Page 30

1  the movie itself.
2     Q. And do you have an understanding of where
3  this tape came from?
4     A. Mr. Flynn.
5     Q. Okay. Do you know whether it was produced by
6  any of the parties or how did it -- you know, if you
7  say strike one on the first tape that you got that was
8  truncated, strike two on the second tape, the DCI tape
9  because it didn't have the movie commercials, and then
10 you go back, number three works, that -- that meets
11 your criteria. Do you know how -- what the origin was
12 of that tape?
13    A. I know the origin of part of it.
14    Q. Okay. And this is part of the tape which has
15 been marked Exhibit 328?
16    A. Is that the last tape?
17    Q. Yes.
18    A. It was my understanding that the last tape
19 included the material that was in the original tape
20 given to me.
21    Q. It included the material in the original
22 tape, but did it also include other material?
23    A. No. You asked me what was in that tape. I
24 said that what I know is that part of the tape was the
25 same as I originally saw in the first tape and --

Page 31

1  which I understand was made by one of Captain
2  O'Grady's friends.
3     Q. Okay. Do you know the source of Exhibit 328?
4     A. Is that the third tape?
5     Q. Yes, that's the third tape.
6     A. I don't know where the beginning portion came
7  from, except that it was given to me by Mr. Flynn.
8     Q. Okay. And in fact, it's -- the tape is
9  labeled a combined -- November 28th combined Discovery
10 Channel?
11    A. Yes, it is.
12    Q. Okay. So is it a combination of tapes?
13    A. I believe so.
14    Q. Okay. And were you told that by Counsel?
15    A. Yes.
16    Q. Okay. And what were you told?
17    A. That it was the original tape that I saw,
18 plus they had gotten the front part of the program
19 added to that tape.
20    Q. And do you know who added that to the tape?
21    A. No.
22    Q. And do you know where it came from?
23    A. No.
24    Q. Okay. But you were satisfied to take the
25 tape that they had provided you?

Page 32

1     A. Yes.
2     Q. Okay. You said it was important that the
3  tape be complete. What do you mean by "complete"?
4     A. I mean that the second tape apparently, as I
5  said before, did not have commercials in it for other
6  than the movie, so we did not have the localized
7  retail and other commercials inserted in that.
8     Q. Okay. And -- and why was it important to
9  have those other commercials included in the tape?
10    A. Because I wanted to show the respondents the
11 tape as close to the actual program as we can get.
12    Q. Okay. Did you make any efforts to locate
13 other copies of this -- of the tape of the program as
14 aired on December 28th -- I'm sorry, November 28th --
15    A. No.
16    Q. -- 2001?
17    A. No.
18    Q. So you made no independent effort to obtain
19 the tape from Dec- -- November 28th, 2001?
20    A. No.
21    Q. Okay. But it was important to you that you
22 show the participants the tape as aired on
23 November 28th, 2001; is that correct?
24    A. Yes.
25    Q. And why was it important?

Page 33

1     A. To me it was -- obviously, if you're testing
2  what the relevant population might take away from a
3  program, you'd want them to see the program that was
4  shown.
5     Q. Okay. When you say the relevant population
6  was taking away -- what they were taking away from the
7  program?
8     A. That's right.
9     Q. And again, in your mind, the relevant
10 population were just people who had access to the
11 Discovery Channel through cable television; is that
12 correct?
13    A. Yes.
14    Q. Did you consider the population of viewers of
15 the Discovery Channel on November 28th, 2001?
16    A. Would you repeat the question?
17    Q. Did you consider the population that was
18 watching the Discovery Channel on November 28th of
19 2001?
20    A. I thought about whether or not that would be
21 possible to find those people, but then I gave that up
22 as impractical.
23    Q. Did you consider the demographics of the
24 Discovery Channel of November 28th, 2001?
25    A. No.

9 (Pages 30 to 33)

**Page 86**

1   response?
2          THE WITNESS:  No, I haven't finished my
3   response.
4      Q.  (BY MS. HAMILTON)  Okay.
5      A.  We -- I kind of had made a couple of
6   adjectives as we have just described in the previous
7   page and I didn't think we needed to get into any more
8   descriptions of the program.
9      Q.  Okay.  So you're saying that the one -- the
10  change from the one-hour -- I'm sorry, from the
11  documentary description in Exhibit 331 to a, quote,
12  one-hour program in Exhibit 332 was your suggested
13  change?
14  .   A.  Probably.
15  ..  Q.  But you don't remember, really, one way or
16  the other, do you?
17     A.  No.
18  .   Q.  The -- the change on the -- on the word
19  "endorse," what is your definition of the word
20  "endorse"?
21     A.  To express support or approval.
22     Q.  Okay.
23         MS. HAMILTON:  And using that
24  definition, let me go ahead and mark this exhibit --
25  actually, this can -- oh, why don't we make this

**Page 87**

1   combined.
2          MR. FLYNN:  Are we done with these?
3          MS. HAMILTON:  Yeah.  I think she's got
4   all three there.  I show it's missing one.
5          MR. FLYNN:  Okay.  Is this the one?
6          MS. HAMILTON:  Yeah.
7          MS. HANDMAN:  Thank you.
8          MS. HAMILTON:  And this is Exhibit 333?
9          THE REPORTER:  Yes.
10         MR. FLYNN:  Okay.  Are these extra for
11  me?  Do y'all have --
12         MS. HAMILTON:  They may -- well, they go
13  to the back.  They're two different dictionary
14  definitions.  I'm just going to go ahead and mark them
15  as one exhibit.
16         (Exhibit Number 333 marked.)
17         MS. HAMILTON:  The first one is marked
18  by the Webster's Seventh Collegiate Dictionary.  It .
19  has brown on the cover sheet, its insignia.
20         MR. FLYNN:  Okay.
21         MS. HAMILTON:  And then behind that is a
22  Yahoo Internet reference from the American Heritage
23  Dictionary.
24         MR. FLYNN:  It's not marked yet.
25         MS. HAMILTON:  It should be all part of

**Page 88**

1   one exhibit.  It's all going to be part of 333.
2   Thanks.
3      Q.  (BY MS. HAMILTON)  And if you would take a
4   look, Mr. Gelb, at the brown, which is the Webster's
5   Seventh New Collegiate Dictionary definition of
6   endorse.  I believe you have to go down to Number 2.
7          Would you agree with me that your definition
8   of endorse comports with that in the Webster's Seventh
9   New Collegiate Dictionary?
10         MR. FLYNN:  Object to form.
11     A.  Where --
12     Q.  (BY MS. HAMILTON)  Number two.  It says, to
13  express definite approval of.
14     A.  You were saying that my definition comports
15  with this one?
16     Q.  Yes.
17     A.  It's a little different.
18     Q.  Okay.  And what's the difference?
19     A.  Well, I use the word "support."  They didn't.
20  They use the word "definite."  I didn't.
21     Q.  Do you disagree with the definition in the
22  Webster's New Collegiate Dictionary of endorse as to,
23  quote, to express definite approval of, closed quote?
24         MR. FLYNN:  Object to form.
25     A.  I think there are some senses where

**Page 89**

1   endorsement could mean to somebody that if you didn't
2   object to something you were endorsing it.  So that's
3   why I have a little bit of a problem with this
4   specific definition.  In other words, in the general
5   population, if something goes on and you're aware of
6   it but you don't object to it, that could connote
7   endorsement.
8      Q.  (BY MS. HAMILTON)  So are you saying that
9   there's an ambiguity in the term "endorse"?
10         MR. FLYNN:  Object to form.
11     A.  Yes, I'm definitely saying that different
12  people have different educational levels, would have
13  different ways of describing that word.
14     Q.  (BY MS. HAMILTON)  Okay.  But you don't
15  dispute the fact that Webster's Seventh Collegiate --
16  New Collegiate Dictionary describes it as, quote, to
17  express a definite approval of?
18     A.  No.
19     Q.  Okay.  And then if you look at the document
20  behind that, which is the Yahoo reference.  I mean,
21  that's a definition of endorse from the American
22  Heritage Dictionary.  And I'll grant you that the
23  first three refer to endorsements of checks.  But
24  definition number four states, To give approval of or
25  support to, especially by public statement, colon,

23 (Pages 86 to 89)

Esquire Deposition Services
Phone (214) 965-9200

703 McKinney Avenue, Suite 320
(800) 852-9737

Dallas, Texas 75202
Fax (214) 965-9205
7df0e8f3-7efb-498c-a4e9-c8e0b233278e

Page 90

1  sanction, colon, to endorse a political candidate.
2     A. That's what it says.
3     Q. Okay. In drafting the survey, did you give
4  any consideration to the def- -- dictionary definition
5  of endorse?
6     A. No. Just my own general description.
7     Q. Did you provide a definition for endorse, the
8  word endorse to the participants in the survey?
9     A. No. As you know, I let them provide their
10  definition.
11     Q. Okay. And so you let them define the term
12  according to what their standard of education, their
13  lifestyle, whatever they may understand the word
14  endorse to mean; is that correct?
15     A. That's correct. And it goes through two,
16  really, the basic thrust of my study, which is one --
17  what do people understand or perceive as opposed to
18  what a dictionary definition might be.
19     Q. Did you consider -- but you specifically
20  chose the word "endorse," correct?
21     A. Yes.
22     Q. And so you -- you did not ask these
23  participants what did they perceive the picture to be
24  in --
25        MR. FLYNN: Object --

Page 91

1     Q. (BY MS. HAMILTON) -- so many words, did you?
2        MR. FLYNN: Object to form.
3     A. That question is not comprehensible to me.
4     Q. (BY MS. HAMILTON) Okay. Well, I'm just
5  trying to figure out what it is that -- that you asked
6  the participants specifically. You did not ask them,
7  for example, what they perceived the picture to be,
8  did you?
9     A. What picture?
10     Q. The -- the movie, the film, Behind Enemy
11  Lines?
12     A. The movie or the program?
13     Q. I'm asking about the movie.
14     A. Okay. You said picture.
15     Q. I'm sorry. Well, now -- now that we're
16  straight on the words.
17     A. Okay.
18     Q. The Fox movie, Behind Enemy Lines.
19     A. Would you repeat the question?
20     Q. Did you ask them what their perception was of
21  the movie, Behind Enemy Lines?
22     A. You're asking a question that --
23     Q. You just -- you didn't ask that question --
24     A. -- I'm finding hard to think about what
25  you're getting at. What their perception of a movie

Page 92

1  is as described in the commercials of a documentary
2  program; is that -- is that what you're asking me?
3        I mean, I don't -- I don't -- I don't see the
4  relevance. I don't -- no, I did not ask them that, if
5  that's --
6     Q. Okay.
7     A. -- the short version you're asking me.
8     Q. Thank you.
9     A. Okay.
10     Q. Did you consider any words other than endorse
11  with respect to -- I think it was question 7 of the
12  questionnaire?
13     A. No.
14     Q. Did you -- did -- who suggested the word
15  "endorse"?
16     A. I don't know.
17     Q. But just to be clear, you did not provide the
18  participants with a defined term for "endorse" in the
19  survey, did you?
20     A. I didn't want to insult my participants.
21        MS. HAMILTON: Objection, nonresponsive.
22     Q. (BY MS. HAMILTON) You did not provide them
23  with a defined term --
24     A. No, I just --
25     Q. -- for the word "endorse" in the survey?

Page 93

1     A. I just asked them about endorse, and I asked
2  them what they meant by endorse.
3        MS. HAMILTON: Let's go ahead and mark
4  this as the next exhibit. Is it 334?
5        THE REPORTER: Uh-huh.
6        (Exhibit Number 334 marked.)
7     Q. (BY MS. HAMILTON) And have you had a chance
8  to look at 334?
9     A. I haven't looked at it until you ask me a
10  question.
11     Q. Okay. Well, would you take a look at it,
12  please?
13     A. Yes.
14     Q. I did ask a question. I may have gave you a
15  direction.
16     A. Okay.
17     Q. And Exhibit 334 is -- the original message in
18  the middle of the page, it's from you to C.W. --
19  that's Peter Flynn at Locke, Liddell?
20     A. Yes.
21     Q. And attached to it was the -- it says 3/6
22  revised Q?
23     A. Right.
24     Q. And so were you transmitting the revised
25  questionnaire dated March 6th, 2002?

24 (Pages 90 to 93)

Page 94

1    A. Yes.
2    Q. Okay. And that was in accordance with the
3  suggested changes that -- that you and Mr. Flynn and,
4  perhaps, others had made to the questionnaire?
5    A. Yes.
6    Q. Okay. And did you discuss that revised
7  questionnaire with Mr. Flynn at that time?
8    A. I -- I can't recall really.
9    Q. What was the next step that you recall in
10  conducting this survey after March 6th?
11    A. Well, if I'm not mistaken, this -- and let me
12  look it over again.
13    Q. Sure.
14    A. But this appears to be the final version. I
15  would have to compare this with the questionnaires,
16  but except for some spacing issues, this -- the text
17  seems to be the final version of what we used.
18    Q. The text of Exhibit 334?
19    A. Yes.
20    Q. Okay. So then what was the next step?
21    A. The next step was for Marilyn MacRill to
22  organize this into making some formatting changes and
23  for her to write the interviewer instructions.
24    Q. Okay. And I take --
25    A. And --

Page 95

1    Q. I'm sorry.
2    A. And to test this in Houston, conduct a test.
3    Q. Okay. And you went forward with exhi- --
4  with the questionnaire 334 after the approval of
5  Mr. Flynn?
6    MR. FLYNN: Object to form.
7    A. If approval, he might have said, looks fine
8  to me. If you want to call that approval, fine. And
9  as I said, it looks like what we started to implement
10  in Houston.
11    Q. (BY MS. HAMILTON) Okay.
12    MS. HAMILTON: And let's go ahead -- I
13  think we've got time. What's the next exhibit? I
14  think 335.
15    (Exhibit Number 335 marked.)
16    Q. (BY MS. HAMILTON) And if you have a chance
17  to look at that, please.
18    (Soto voce discussion.)
19    Q. (BY MS. HAMILTON) Oops. You know what, I
20  gave you the wrong one. This is --
21    A. Okay.
22    Q. -- Exhibit 335. We'll leave it marked that
23  way.
24    A. Do you want these back?
25    Q. No, you can keep it.

Page 96

1    A. Keep it out here.
2    Q. Next one will be 336.
3    (Soto voce discussion.)
4    MS. HAMILTON: Just let me get through.
5    Okay. Let's go ahead and mark that one
6  as 336.
7    (Exhibit Number 336 marked.)
8    Q. (BY MS. HAMILTON) There you go. Now, I
9  think I got it in order.
10    And if you would identify those documents,
11  please.
12    A. These look like the initial interviews done
13  in Houston.
14    Q. Okay. When you say "the initial interviews,"
15  what do you mean "the initial interviews"?
16    A. Well, we did about 20 or so and then we took
17  a look at the results and whether or not we needed to
18  make any changes in terms of clarifying questions,
19  which is what we usually do.
20    Q. Okay. So is this a pretest?
21    A. Yes.
22    Q. Okay. And what did you decide after running
23  this pretest?
24    A. I decided that one of the questions was not
25  clear.

Page 97

1    Q. And what question was that?
2    A. Question 7.
3    Q. Okay. And question 7, as it appears in the
4  Houston pretest survey, which is Exhibit 336, reads:
5  After seeing this program, do you think that the movie
6  that was advertised is or is not the actual pilot's
7  real life story. Is that the question you're talking
8  about?
9    A. Yes, it is.
10    Q. And what was not clear about that question?
11    A. Well, when people answered the question, a
12  lot of them said that it was not the actual pilot's
13  real life story because of some very narrowly read
14  interpretations of the question.
15    And specifically, for example, they said,
16  some of them, that it was not the pilot's real life
17  story because that was not the actual pilot shown in
18  the movie or that there were some scenes in the movie
19  that were not in the documentary program, so they said
20  it was not his real life story.
21    So there were some people who were taking --
22  moving from the documentary to the movie extremely
23  literally, and I decided that it would be wise to
24  change that question.
25    Q. Because you didn't want a literal response?

25 (Pages 94 to 97)

Gabriel Gelb

June 19, 2003

Page 98

1   A. Well, I wanted a response that would -- that
2   was realistic and some people didn't understand that
3   when Hollywood does a movie, they don't do the actual
4   fact for fact for fact from -- from real life.
5       Q. But you -- you did not show these
6   participants the Fox movie, Behind Enemy Lines, did
7   you?
8       A. No.
9       Q. And so when you say -- I'm sorry. What --
10  what was the confusion?
11      A. The confusion was that some people didn't see
12  the exact translation of the documentary to the scenes
13  shown within the documentary of the movie. And so, as
14  I said, they didn't see the same pilot in there. They
15  saw some scenes that were added in the movie shown
16  within the program that were not part of the
17  documentary program. And they said, well, it's not
18  the same so the movie is not the actual pilot's real
19  life story.
20      Q. Well, that would be an accurate response,
21  wouldn't it?
22      MR. FLYNN: Object to form.
23      A. I felt that was a very literal and narrow
24  response, that the question needed to be made clear
25  that it was a Hollywood-type movie, doing the act- --

Page 99

1   doing -- asking them whether or not they thought that
2   was the actual pilot's real life story.
3       Q. (BY MS. HAMILTON) So you wanted to ask them
4   whether or not -- you wanted to get across that it the
5   Ho- -- it was a Hollywood movie version of the pilot's
6   story?
7       A. Exactly.
8       Q. If you give me one second, I can see if I can
9   line this stuff up.
10      And who conducted the survey -- the pretest
11  survey in Houston?
12      A. Creative Consumer Research.
13      Q. All right. So it was the same group that
14  conducted the later Houston survey?
15      A. Right.
16      Q. Were there any other pretest surveys done
17  other than -- than this one in Houston that is
18  reflected in Exhibit 336?
19      A. No.
20      Q. And did you discern that the responses to
21  question 7 were too literal from your personal review
22  of the questionnaires that are in Exhibit 336?
23      A. Yes.
24      Q. Okay. And did you tabulate the responses to
25  the various questions in the survey questionnaire that

Page 100

1   are reflected in 336?
2       A. Yes.
3       Q. Okay. And do you know whether the
4   respondents, or the participants, excuse me, to the
5   pretest, the Houston pretest, which was done off of
6   the March 6th questionnaire, were they obtained by the
7   random digit dialing or were they obtained from the
8   database?
9       A. I would assume it would be the same people as
10  we -- as -- that were in the whole sample. In other
11  words, both. We didn't call -- we didn't have any
12  separate criteria for any group of people in any of
13  these tests.
14      Q. Okay. So you don't know whether it was a
15  mixture of the people or the Cre- -- Creative Consumer
16  Research contacted or whether it was specifically the
17  random dialing group?
18      A. Well, the random dialing group were
19  interspersed in that entire sample, so there wasn't
20  any separation of that.
21      Q. Okay.
22      MS. HAMILTON: Let's mark this next --
23  next exhibit. It'd be 337.
24      (Exhibit Number 337 marked.)
25      Q. (BY MS. HAMILTON) And I'd ask you to

Page 101

1   identify that document.
2       Could you identify that document for the
3   record, please.
4       A. It looks like the same March 6th
5   questionnaire we've been talking about and that was
6   used in the Houston pretest.
7       Q. Okay. Do you know whose handwriting it is at
8   the top where it says, Pretest Q, 3/18/03?
9       A. It looks like Marilyn MacRill's.
10      Q. Okay. And so do you know why she marked this
11  document this way?
12      A. This was the first -- first day's work.
13      Q. Okay. So was the pretest done on March 18th,
14  '03?
15      A. Yes.
16      Q. Okay. And if you look at the last page of
17  Exhibit 337. Could you please identify that for me?
18      A. That's one of the questionnaires from the --
19  from the pretest.
20      Q. I'm sorry, what?
21      A. This -- this is a blank questionnaire.
22      Q. Right.
23      A. Right.
24      Q. So if you'd take a look at the last page of
25  Exhibit 337.

26 (Pages 98 to 101)

Gabriel Gelb

June 19, 2003

Page 102

```
1        A. The one that's not marked with a --
2        Q. Yes.
3        A. -- number?
4        Q. Yes. And that's -- that's the way it was
5   produced to us.
6        A. Right.
7        Q. Could you tell me what that document is?
8        A. It says, Version 2, reword question 7.
9        Q. Okay. So it -- it looks like --
10       A. I told --
11       Q. -- that's a Post-it?
12       A. Yes. I told her we were going to reword
13   question 7.
14       Q. Okay. So out of all the questions following
15   the March 18th pretest that are in the questionnaire,
16   the -- the one that was going to be reworded is
17   question 7?
18       A. Yes.
19       Q. Okay. And is that her handwriting; do you
20   know?
21       A. It's not mine, so I assume it's hers.
22       Q. Okay. And did you discuss rewording that
23   question with her?
24       A. Yes.
25       Q. And what did you discuss?
```

Page 103

```
1        A. I discussed -- when I looked over all of the
2   pretest questionnaires and saw the problem that we had
3   with the wording, as it was, and that there were
4   people who really didn't appreciate or understand that
5   a Holly-- -- Hollywood movie is not a documentary, I
6   discussed my thought as to how we would change the
7   wording.
8        Q. And had you discussed the results of the
9   March 18th pretest with counsel for Mr. O'Grady?
10       A. Yes.
11       Q. And who did you discuss it with?
12       A. Well, there is a part of your question that
13   needs possibly to be modified. It may not have only
14   been the March 18th -- it started March 18th, the
15   pretest. That probably took a couple of days to -- to
16   do --
17       Q. Okay.
18       A. -- the pretest.
19       Q. Can we refer to it as the March 18th pretest?
20       A. I'm happy to do so.
21       Q. Okay. Because it was only -- was there only
22   one pretest that was done with the questionnaires?
23       A. Well, there was several groups.
24       Q. But were they all done in one city?
25       A. No.
```

Page 104

```
1        Q. All right. What other cities were the
2   pretests done in?
3        A. Oh, no. I'm sorry. I thought you said were
4   they all done in one sitting.
5        Q. City. Sorry.
6        A. They were all done in one city.
7        Q. Urban.
8        A. Right.
9        Q. Right.
10       A. Houston.
11       Q. Okay.
12       A. Yes.
13       Q. And were they all conducted by the same
14   people?
15       A. Yes.
16       Q. Okay. And so there were no pretests done in
17   any other cities in the United States?
18       A. That's correct.
19       Q. Okay. And the pretest that was done in
20   Houston was done off of the March 6th, 2000 and -- it
21   should be 3, it says 2 -- draft?
22       A. Right.
23       Q. Okay. And did you have discussions with
24   counsel for Mr. O'Grady about your findings as a
25   result of the Houston pretest?
```

Page 105

```
1        A. Yes.
2        Q. And what discussions did you have with
3   Counsel?
4        A. I told him what I thought the problem with
5   the question was. I read him some of the responses
6   that indicated that they were giving a very narrowly
7   focussed answer, and I suggested the solution.
8        Q. And what was the solution that you suggested?
9        A. Adding the word Hollywood version of the --
10   well, adding the words "a Hollywood version."
11       Q. Did you discuss the responses to any of the
12   other questions with counsel for Mr. O'Grady other
13   than the question -- responses to question 7?
14       A. I told him in general what -- what the other
15   responses were, because we did have a tabulation of
16   those.
17       Q. Okay. Would you take a look at 3 --
18   Exhibit 336 and tell me, you know, specifically if you
19   find a response to 7 that you think typifies what your
20   concern was?
21       A. Well, I could do it from the -- I could do it
22   from the questionnaire, yes. Are we talking 336?
23       Q. Yes.
24       A. Okay. Great.
25          Well, the first one that I turn to --
```

27 (Pages 102 to 105)

Esquire Deposition Services
Phone (214) 965-9200

703 McKinney Avenue, Suite 320
(800) 852-9737

Dallas, Texas 75202
Fax (214) 965-9205
7df0e8f3-7efb-498c-a4e9-c8e0b233278e

Gabriel Gelb

June 19, 2003

Page 106

1  Q. What -- would you give me the Bates label at
2  the bottom of the page so I can follow along?
3  A. 718.
4  Q. Okay.
5  A. The person said in question 7 --
6  Q. And this question 7 on page Gelb marked --
7  A. 720.
8  Q. 720. Okay.
9  A. Right. He said, It is not the actual pilot's
10 real story. And then when we say, Why do you say
11 that? He or she said, It's historical fiction. There
12 are differences such as the action has two
13 characters --
14 Q. Is that fiction or action? I guess it could
15 be either.
16 A. It could be either. -- has two characters
17 that were shot down and the real event had only
18 O'Grady.
19     So that's why I say that in this particular
20 one, it was a very narrow interpretation. He could
21 not accept that the Hollywood movie was different from
22 the documentary.
23     Turning to 723, again, the person said in
24 question 7, It is not --
25 Q. And that's -- I'm sorry, that's at page

Page 107

1  Gelb 725?
2  A. Yes. Thank you for clarifying that.
3     Let me read it and see if that's one of the
4  ones that I think has that narrow interpretation.
5  Q. Okay. And you didn't want them to have a
6  narrow interpretation; is that correct?
7     MR. FLYNN: Object to form.
8  A. I didn't -- if the person thought that the
9  movie had to be exactly the same as the documentary,
10 then I thought we had missed out on the purpose of
11 that question.
12 Q. (BY MS. HAMILTON) Okay.
13 A. Such as in this person on 725 says he didn't
14 think it was the actual movie because some of the
15 events in the movie I don't think go along with what I
16 saw actually happen to him in the program.
17     Now, that's exactly what I'm talking about
18 here.
19 Q. Okay.
20 A. I turn to 728. Again, the same -- what I
21 think is the same problem. The person said, It is not
22 the actual pilot's real life story. And he or she
23 says as a reason, The movie had a lot more than what
24 we saw in the program. In the movie, there were other
25 people involved and more drama in the movie. In the

Page 108

1  program, he was just working around -- walking around
2  by himself and they found him. Parts of the movie
3  like when the wife and father get a phone call about
4  him, no one was actually telling --
5  Q. How about actually there filming?
6  A. Oh, was actually there filming, so I thought
7  it was a reenacted moment.
8  Q. Okay. Do you -- how can you tell at this
9  point -- and this is on Gelb -- marked Gelb 730, which
10 is part of Exhibit 336. Can -- can you -- looking at
11 this page and this question, can you tell whether
12 they're talking about the Fox movie, or are they
13 talking about the reenactment being the Discovery
14 Channel documentary?
15 A. Well, the answer to your question is that
16 that delineated separately in the question itself,
17 which is, after seeing this program, do you think the
18 movie that was advertised is not the actual pilot's
19 real life story or is the pilot's real life story.
20     That person said it is not the pilot's story
21 because there were additional things in the movie that
22 he didn't see in the documentary.
23 Q. Okay. But then in the response, as you read,
24 parts in the movie like when the wife and father got a
25 phone call about him, do you know whether that scene

Page 109

1  occurs in the movie, Behind Enemy Lines, the Fox film?
2  A. I didn't see the movie.
3  Q. So you don't know whether that respondent is
4  responding to the movie or the Discovery Channel
5  documentary at that point --
6  A. Right.
7  Q. -- of their answer; is that correct?
8  A. Right.
9  Q. Okay.
10 A. On Bates --
11     MR. FLYNN: Are we still going on this
12 question?
13     MS. HAMILTON: No.
14 Q. (BY MS. HAMILTON) Well, if you --
15     MR. FLYNN: Why don't we --
16     MS. HAMILTON: No. We're -- we're --
17 we're fine.
18 Q. (BY MS. HAMILTON) Unless there's something
19 more that you specifically want to point out, you're
20 welcome to.
21 A. No, I've pointed out several areas where
22 people took a very literal view. Maybe they were
23 attorneys. I don't know. Or engineers. Unless they
24 saw the same thing repeated in the advertisements for
25 the movie, they didn't think that the movie was

28 (Pages 106 to 109)

Esquire Deposition Services
Phone (214) 965-9200

703 McKinney Avenue, Suite 320
(800) 852-9737

Dallas, Texas 75202
Fax (214) 965-9205
7df0e8f3-7efb-498c-a4e9-c8e0b233278e

Page 110

1  telling the same actual story as the documentary did.
2      Q. And your intention was that they should think
3  that there's -- that the documentary and the Fox movie
4  were telling the same story?
5      A. No.
6          MR. FLYNN: Object to form.
7      A. No. That's not what I -- I just want them to
8  understand that this was a Hollywood version so they
9  would get a little more of a feel. But when you do a
10  Hollywood version of a movie, you don't tell
11  somebody's exact life story. You embellish it.
12      Q. (BY MS. HAMILTON) So you wanted them to
13  understand that it was a Hollywood version of the
14  Scott O'Grady story?
15      A. Yes.
16          MR. FLYNN: Object to form.
17          MS. HAMILTON: See if I can cut this
18  down. It will work a lot faster.
19          Let's mark this next exhibit.
20          (Exhibit Number 338 marked.)
21      Q. (BY MS. HAMILTON) And if you'd take a look
22  at that, please.
23          MS. HANDMAN: This is?
24          MS. HAMILTON: 338.
25          MR. FLYNN: 338.

Page 111

1          MS. HAMILTON: 338.
2          MR. FLYNN: You gave me two of these.
3          MS. HAMILTON: I'm sorry?
4          MR. FLYNN: You gave me two of these.
5          MS. HAMILTON: I didn't mean to. Did
6  Laura get one? Did I -- there may be --
7          MS. HANDMAN: Yeah, I got it.
8          MS. HAMILTON: -- extras.
9      Q. (BY MS. HAMILTON) It's Bates labeled
10  SOG 5460 on the first page; is that correct?
11      A. Let me make sure we got that one. Yeah.
12      Q. And Mr. Gelb, is this an E-mail that you sent
13  on March 20th, 2003? The original message shows an
14  E-mail from Gabe Gelb sent Thursday, March 20th, 2003
15  at 11:08 a.m. Subject: Forward Bosnia pretest tab.
16  And it says, Let's discuss. Is that correct?
17      A. Yes.
18      Q. And that's -- this is an E-mail that you
19  sent?
20      A. Yes.
21      Q. With the attachment behind it, which is Bates
22  labeled SOG 5461 through 5465?
23      A. Yes.
24      Q. Okay. And what was the purpose of this
25  attachment?

Page 112

1      A. The purpose was to let Mr. Flynn know what
2  the results of the pretest were.
3      Q. Okay.
4          MS. HAMILTON: And then let's go ahead
5  and mark this as 339.
6          (Exhibit Number 339 marked.)
7      Q. (BY MS. HAMILTON) And I'd ask you to
8  identify that document, please.
9      A. It looks like -- it looks like the same
10  document, except that there is some -- the answers to
11  questions 1 and 6 in this document that were not in
12  the previous document, 338.
13      Q. I'm sorry?
14      A. But otherwise, it's going to be the same.
15      Q. The answers to questions 1 and 6 in Exhibit
16  339 are not the same as the answers to questions 1 and
17  6 in Exhibit 338?
18      A. Wait a minute. I don't think I said that.
19          MR. FLYNN: Here, let's get --
20      Q. (BY MS. HAMILTON) That's why I want to -- I
21  want to clarify it.
22      A. No. Oh, I'm sorry. It wasn't a -- when I
23  picked it up, I didn't see the -- it looks like the
24  exact same --
25      Q. Okay.

Page 113

1      A. -- document.
2      Q. But maybe this will clarify it. Exhibit 339
3  is from you to George Bowles at Locke, Liddell. It's
4  dated Thursday, March 20th, 2003 at 11:27 a.m. So I
5  guess it's subsequent to Exhibit 338, which shows a
6  time of 11:08 a.m.?
7      A. Okay. What is the question?
8      Q. I just -- I'm just trying to clarify. Is
9  that correct, that this Exhibit 339 was sent shortly
10  after Exhibit 338?
11      A. Which exhibit?
12      Q. 339 --
13      A. Right.
14      Q. -- was sent shortly after Exhibit 338.
15          I'll clarify it further. Exhibit 338 was
16  sent at 11:08 a.m. and Exhibit 339 was sent at 11:27
17  a.m. Do you agree with that?
18      A. Yes.
19      Q. Okay. And on Exhibit 339 it says, Let's
20  discuss, brackets, already sent to Peter and Roy,
21  closed brackets.
22      A. Right. Somebody either was not available or
23  I messed up on the E-mail address and it didn't --
24  it -- it was not received so I had to resend it.
25      Q. Okay. Did you have a conference with counsel

29 (Pages 110 to 113)

Esquire Deposition Services
Phone (214) 965-9200

703 McKinney Avenue, Suite 320
(800) 852-9737

Dallas, Texas 75202
Fax (214) 965-9205
7df0e8f3-7efb-498c-a4e9-c8e0b233278e

Gabriel Gelb

June 19, 2003

**Page 114**

1   for Mr. O'Grady regarding the Bosnia pretest that's
2   reflected in Exhibits 338 and 339?
3       A. I talked to them on the telephone.
4       Q. And who all was on the call, if you recall?
5       A. So far as I know, just Mr. Flynn.
6       Q. Okay. You did not have a discussion with
7   Mr. Bowles about the Bosnia pretest that's reflected
8   in Exhibit 339?
9       A. I don't think so.
10      Q. Okay. Or -- and you did not have a
11  discussion with Mr. Hardin about the pretest?
12      A. No.
13      Q. Okay. What was your discussion with
14  Mr. Flynn?
15      A. I told him that I thought we needed to change
16  that question 7.
17      Q. And if you look at question 7 -- let's look
18  at Exhibit 338. This is question 7: After seeing
19  this program, do you think the movie that was
20  advertised is or is not the actual pilot's real life
21  story. And then it says -- then there's number 8, Why
22  do you say that? So is that question 7 followed by
23  question 8?
24      A. Yes.
25      Q. Okay. And so the answer to question 7, After

**Page 115**

1   seeing it, do you think the movie was advertised is or
2   is not the actual pilot's real life story. The
3   respondents said, yes, it is. That was a total of six
4   respondents who agreed that it was the actual pilot's
5   real life story?
6       A. Yes.
7       Q. And 13 did not think it was the actual
8   pilot's real life story?
9       A. That's right.
10      Q. And you have -- don't know is on page 3 and
11  that was zero; is that correct?
12      A. Yes.
13      Q. Okay. And is this document that's reflected
14  in Exhibit 338, which -- actually, that's the cover
15  page -- but it begins at SOG 5461 through 5465 a
16  summary of the results of the March pretest?
17      A. Yes.
18      Q. Okay. And are the comments that follow --
19  again, back to SOG 5462, which is page 2 of the
20  tabulation, are the comments that were
21  reflected in the March pretest research?
22      A. Yes.
23      Q. Okay. And were they taken down verbatim --
24      A. Yes.
25      Q. -- from --

**Page 116**

1       Okay. So when you asked the question, After
2   seeing the program, do you think that the movie that
3   was advertised is or is not the actual pilot's real
4   life story, only six responded with a yes, and 13
5   responded, no, it is not; is that correct?
6       A. Yes.
7       MR. FLYNN: Object to form.
8       Q. (BY MS. HAMILTON) And what impact, if any,
9   did that have on you -- your changing the question?
10      MR. FLYNN: Object to form.
11      A. I think I discussed that I felt that when you
12  look at the why answers, that the people are answering
13  in extremely narrow form based on the -- the answers,
14  and that question needed to talk about a Hollywood
15  version of the pilot's real life story.
16      Q. (BY MS. HAMILTON) And did you discuss that
17  with Mr. Flynn?
18      A. Yes.
19      Q. And did he agree with you?
20      A. Yes.
21      Q. Okay. And the Hollywood version language was
22  your -- your suggestion?
23      A. Yes.
24      Q. Did you do any testing of any kind with
25  respect to the questions in your questionnaire other

**Page 117**

1   than the pretest that was done in Houston in March of
2   2003?
3       A. No.
4       Q. Okay.
5       MS. HAMILTON: Do you want to take a
6   break for lunch?
7       MR. FLYNN: How much more do you think
8   you have?
9       MS. HAMILTON: It should go quicker than
10  this morning, but it's going to take a little while.
11  Do you want to go off the record?
12      MR. FLYNN: Yeah, let's go off the
13  record.
14      THE VIDEOGRAPHER: Off the record at
15  12:30.
16      (Lunch break taken.)
17      THE VIDEOGRAPHER: We're back on the
18  record at 1:45 p.m.
19      Q. (BY MS. HAMILTON) So after the pretesting in
20  Houston on March, then there was a revision to
21  question number 7 to the survey questionnaire; is that
22  correct?
23      A. Yes.
24      Q. Okay.
25      MS. HAMILTON: And let's go ahead and

30 (Pages 114 to 117)

Esquire Deposition Services
Phone (214) 965-9200

703 McKinney Avenue, Suite 320
(800) 852-9737

Dallas, Texas 75202
Fax (214) 965-9205
7df0e8f3-7efb-498c-a4e9-c8e0b233278e

**Page 118**

1  mark as the next exhibit -- is it 339?
2         THE REPORTER: 340.
3         MS. HAMILTON: 340.
4         (Exhibit Number 340 marked.)
5     Q. (BY MS. HAMILTON) Give you a chance to look
6  at that.
7         And does Exhibit 340, which is dated
8  March 24th, 2003 at the top, and it's Bates labeled
9  Gelb 66 through 71, reflect the changes that were made
10 to the que- -- questionnaire, from the March 6th
11 questionnaire?
12    A. Yes.
13    Q. Okay. And the changes on question 7 and 7A,
14 and that is -- change reads, After seeing this
15 program, do you think that the movie that was
16 advertised is or is not a Hollywood version of the
17 actual pilot's real life story; is that correct?
18    A. Yes.
19    Q. Okay. And you reviewed that change -- I
20 suggested -- I'm sorry, that change with counsel for
21 Mr. O'Grady?
22    A. Yes.
23    Q. And they agreed with that?
24    A. Yes.
25    Q. Okay. And I notice on Gelb Bates labeled 71,

**Page 119**

1  the last page of Exhibit 340, there is a closing that
2  asks for the name, address and interviewer for the
3  participants in the study; is that correct?
4     A. Yes.
5     Q. Is that the information that was sought?
6     A. Pardon me?
7     Q. Is that the information that was sought by
8  that page -- by those questions?
9     A. Yes.
10    Q. And we were not provided with that
11 information in the production, and I'd like to know,
12 first of all, do you have that information in your
13 possession?
14    A. Yes.
15    Q. And second of all, why hasn't it not been
16 provided?
17    A. Because that's standard operating procedure
18 for all market research studies including those in a
19 legal realm where we guarantee anonymity to the
20 respondent.
21    Q. And do you have a document that shows that
22 you're guaranteeing anonymity to the respondent?
23    A. Well, it says, Your name will not be used in
24 any way in the introduction.
25    Q. Okay. But beyond that, you have not provided

**Page 120**

1  the information that was requested of the respondents
2  who participated in your survey to -- not provided
3  that to counsel and then relayed that on to the
4  defendants, have you?
5     A. That's correct.
6     Q. Okay. And you've not provided the names of
7  the interviewers who participated in this survey, have
8  you?
9     A. No.
10    Q. And it is just your position that you --
11 you've arbitrarily decided not to produce this
12 information; is that correct?
13    A. No. I think the courts have held not --
14 myself that this information is not producible to
15 anyone other than the research company.
16    Q. And what courts are those?
17    A. Pardon me?
18    Q. What courts are those?
19    A. You can see them in McCarthy.
20    Q. Okay. Well, I'm going to put in a request
21 because I think not only did we request it in the
22 request for production, but you were also subpoenaed
23 pursuant to the notice of deposition to provide us
24 with all of the information and documentation that
25 resulted from your work in this case, and we'll take

**Page 121**

1  that up further.
2         But at this point you're saying you -- you
3  re- -- you refuse to produce that information; is that
4  correct?
5     A. That's correct.
6     Q. And you would agree with me, would you not,
7  that without that information, there is no way that
8  anyone can go back in and verify the responses that
9  are in this survey; is that correct?
10    A. No, that's not correct.
11    Q. So there is a way that the defendants can go
12 in and verify the responses?
13    A. Oh, no, you can't go in and verify the
14 responses. That's -- as I'm trying to maintain, that
15 is unethical according to the principles of our
16 profession.
17        But the person who validated the
18 questionnaires talked to the majority of these people
19 and testifies that they did take part in this survey.
20    Q. Okay. But the -- so you're saying that it's
21 unethical for the defendants to go in and find out --
22 to verify the participants' responses?
23    A. It's unethical for me to turn over these
24 names to anyone.
25    Q. Okay. So only you are privy to the

31 (Pages 118 to 121)

Gabriel Gelb

June 19, 2003

Page 126

1    Q. Okay. Let's go to, I think, what's
2 previously been marked as Exhibit 335.
3      And while you take a look at that, I would
4 like to ask: Is that representative of the survey
5 that was done in Houston according to the March 24th,
6 2003 questionnaire?
7    A. Yes.
8    Q. And the numbers in the upper right-hand
9 corner, it says, Location, Houston, and then there is
10 a number 1022, are those the numbers of the -- that
11 were assigned to the participants?
12    A. Yes.
13    Q. Okay. And Exhibit 335 includes the revised
14 version of question 7, and that is, Do you think that
15 the movie that was advertised is or is not a Hollywood
16 version of the actual pilot's life story, correct?
17    A. Yes.
18    Q. Okay. And that's the question -- the form of
19 the question that you had decided to go forward with
20 for the survey?
21    A. Yes.
22    Q. And were you satisfied with the responses
23 that you got to question 7 in the survey?
24      MR. FLYNN: Object to form.
25    A. I have no opinion about responses one way or

Page 127

1 another. I'm just there to do an objective survey.
2    Q. (BY MS. HAMILTON) Okay.
3    - (Mr. Babcock leaves proceedings.)
4    Q. (BY MS. HAMILTON) If you would look at --
5 let's see this -- what is Bates labeled Gelb 836 in
6 Exhi- --- Exhibit 335. And when you have a chance, I'd
7 like to draw your attention to question number 9A,
8 which apparently the respondent answered that it
9 was -- the actual pilot endorses the movie. And then
10 question 10, Why do you say that the pilot endorses
11 the movie?
12    A. Right.
13    Q. And the response reads, Because I don't think
14 the movie portrayed him in a bad light. The movie
15 portrayed him as a hero for surviving behind enemy
16 lines.
17      Does that comport with the dictionary
18 definition of the word "endorse" that we discussed
19 earlier?
20    A. Well, as I have tried to maintain, I was not
21 interested in the -- I was not interested necessarily
22 in a dictionary definition of endorse but in whether
23 or not when people gave the answer as to why the
24 actual pilot endorses the movie, that it had some
25 representation of their personal truth.

Page 128

1      MS. HAMILTON: Objection, nonresponsive.
2    Q. (BY MS. HAMILTON) Does that answer comport
3 with the dictionary definition of the word "endorse"
4 that we discussed earlier today?
5      Let me answer it this -- ask it this way: It
6 does not comport with the dictionary definition of the
7 word "endorse," does it?
8    A. No.
9    Q. And in question number 11: When you say the
10 pilot endorses the movie, what do you mean by
11 endorses?
12      The response is: I think he agrees with the
13 story line because it had some kind of truth to it.
14 It was similar to his truth.
15      And what do you, if anything, make of that
16 response?
17    A. I think that's a good definition of the word
18 "endorses" from this individual's viewpoint.
19    Q. Okay. So all this is is a measure of how
20 this individual is responding to the word "endorse"
21 with respect to this movie; is that what you're
22 saying?
23    A. That's correct.
24    Q. And so the fact that there are similarities
25 I think you -- or there -- there was a truth to the

Page 129

1 story and it was similar to his truth, in your mind,
2 is a good definition of endorse?
3    A. That's not what I said. I said this is the
4 respondent's definition of endorse. Not my
5 definition. I keep saying that. You ask me what my
6 definition is and I keep going back to the fact that
7 people said that -- those people who said that the
8 pilot endorsed gave their own personal definition of
9 how they saw that, not mine.
10    Q. Okay. Let's go on. Let's go to Gelb 871,
11 same document, Exhibit 335.
12    A. 871?
13    Q. Yeah.
14    A. Okay.
15    Q. This person also said that the -- responded
16 to question 9 and said that -- and then in question 10
17 it says: Why do you say that the pilot endorses the
18 movie? Answer: Because he was a part of the
19 documentary.
20      Do you know whether this person was talking
21 about the Discovery Channel documentary or whether he
22 was talking about the movie, Behind Enemy Lines, the
23 Fox movie?
24    A. This person uses the word "documentary." I
25 have to take this person at his or her word that he's

33 (Pages 126 to 129)

Esquire Deposition Services      703 McKinney Avenue, Suite 320      Dallas, Texas 75202
Phone (214) 965-9200      (800) 852-9737      Fax (214) 965-9205
7df0e8f3-7efb-498c-a4e9-c8e0b233278e

Page 130

1  talking about the Discovery Channel.
2      Q. Okay. So he's not talking about the movie,
3  Behind Enemy Lines, correct?
4      A. This is his reason -- you have to tie 9A,
5  which is what he said with the reason behind it. You
6  said, he's not talking about the movie. But actually
7  in 9A, the person in 9 has said, The actual pilot
8  endorsed the movie. So you're -- you're trying to
9  separate out the quantitative answer from the
10 qualitative answer. You can't do that.
11     Q. Well, he's the one who uses the word
12 "documentary."
13     A. That's right.
14     Q. So I would assume he knows what he's talking
15 about?
16     A. That's what I'm saying. All these people
17 know what they're talking about.
18     Q. Okay. So he's referring to the documentary?
19     A. Right.
20     Q. Okay. And Gelb 960. The answer to 9A, that
21 person said, The actual pilot endorses the movie. And
22 the answer to question 10, the question is: Why do
23 you say that the pilot endorses the movie? And the
24 answer is: It seemed that it ran along the general
25 true story line. Is that correct?

Page 131

1      A. That's correct. And --
2      Q. Okay.
3      A. -- a perfectly great answer for that specific
4  question.
5      Q. And so the fact that there are similarities
6  in the story line is sufficient to mean that he
7  endorsed the movie; is that your understanding?
8          MR. FLYNN: Object to form.
9      A. That's what he said, or she.
10     Q. (BY MS. HAMILTON) But you don't know if it's
11 a he or a she, do you?
12     A. That's right. No. Well, we knew it at the
13 time because we had the name on there.
14     Q. But the name's been taken off?
15     A. It doesn't make any difference whether it's a
16 he or a she.
17     Q. But the name's been taken off?
18     A. Oh, yes.
19     Q. And it doesn't say that it's been redacted,
20 it just isn't there; is that correct?
21     A. That is standard operating procedure.
22     Q. That's not my question. On Exhibit -- I'm
23 sorry.
24     A. The reason --
25     Q. Exhibit --

Page 132

1      A. -- why it doesn't say it's been redacted is
2  because it is standard operating procedure that it
3  would be unethical for me to give you the name of this
4  individual.
5          And as I have previously stated, this has
6  been the case with surveys conducted by other Jackson
7  and Walker attorneys, so I am confused by -- you keep
8  harping on this issue.
9          MS. HAMILTON: I'm going to object to
10 the responsiveness of the answer.
11     Q. (BY MS. HAMILTON) I'm just asking you, the
12 last page of each one of these questionnaires,
13 Exhibit 335 -- and if we need to, we'll go through the
14 others -- the final page of each one of the responses,
15 it does not contain that conclusion language nor does
16 it show on the document that it has been redacted from
17 the document, does it?
18     A. It doesn't show, right.
19     Q. And so we can't go back now and find out what
20 it is that that person did mean, can we? At least,
21 we, meaning the defendants, aren't able to do that,
22 are they?
23     A. You can't do that, and I can't do that. The
24 person gave his or her answer and we have to be
25 satisfied with that, which may or may not comport with

Page 133

1  the dictionary answer.
2      Q. And it's the answer that was taken down by
3  the interviewer?
4      A. Right.
5      Q. Correct.
6          Okay. Let's go on.
7          (Exhibit Number 341 marked.)
8      Q. (BY MS. HAMILTON) Just to clear up the
9  record back on 335, and this is true with these others
10 that I'm going to go through, I want to make sure that
11 these are true and correct copies of -- of the
12 documents that you have produced --
13     A. Yes.
14     Q. -- in this litigation. Okay.
15         Exhibit --
16         MS. HAMILTON: I'm sorry. What's the
17 number on this one?
18         MS. HANDMAN: 341.
19     Q. (BY MS. HAMILTON) -- 341 is a compilation of
20 the Bosnia Questionnaire, Gelb Consulting Group, Inc.,
21 March 24, 2003, location, Baltimore, Consumer Pulse of
22 Baltimore; is that correct?
23     A. Yes.
24     Q. So that indicates the group that -- the
25 research group that did this survey for you?

34 (Pages 130 to 133)

Page 134

1    A. Yes.
2    Q. Okay. And again, it's the March 24th
3  questionnaire. That was the one that you ultimately
4  decided to go forward with with this survey; is that
5  correct?
6    A. Yes.
7    Q. Okay. Draw your attention to document page
8  Gelb 198. And this person answered, number one, to
9  question 9A, The actual pilot endorses the movie.
10  Question 10: Why do you say that the pilot endorses
11  the movie? Quote, It's about him so it seems he did
12  or should do so.
13       Did I read that correctly?
14    A. Yes.
15    Q. Okay. And again, this does not comport with
16  the dictionary definition of the word "endorse" we
17  discussed earlier today, does it?
18    A. With your dictionary.
19    Q. It wasn't my dictionary.
20    A. Well, it was. There are --
21    Q. I'm not going to disagree.
22    A. There's --
23    Q. But we'll --
24    A. -- 50 dictionaries. You brought out one.
25    Q. No, I think --

Page 135

1    A. It's your dictionary.
2    Q. Well, we'll go back to the exhibits then.
3       There's a dictionary term and it was the
4  Webster's, and then I believe it was the American
5  Heritage dictionary --
6    A. Okay. So I --
7    Q. -- definition.
8    A. -- will agree that this does not comport with
9  the Webster's dictionary.
10    Q. Definition of the word "endorse"?
11    A. Right.
12    Q. Right. And did it matter to you how people
13  answered question 10 and 11.
14       MR. FLYNN: Object to form.
15    A. Well, it's kind of interesting that you read
16  that: Why do you say that the pilot endorses the
17  movie? And he or she says, It's about him so it seems
18  he did or should do. And then when we say -- when you
19  say the pilot endorses the movie, what do you mean by
20  endorses? He says, Promotes the movie.
21    Q. (BY MS. HAMILTON) Okay.
22    A. Now, that, to me, should go along with 10,
23  and it's a very clear kind of an answer.
24    Q. Okay. But the question 10 is: Why do you
25  say the pilot endorses? And the rational, I gather,

Page 136

1  is that, It's about him or it seems he did or should
2  do so.
3       Do you take into consideration the fact that
4  that -- you know, someone's judgment that he should
5  endorse the movie because of the way they looked at
6  this question?
7       MR. FLYNN: Object to form.
8    A. I -- I -- I don't believe you get the fact
9  that we are talking to people of varying educational
10  levels. This person could have been a cement mixer.
11  You're asking him to take a word that he's never
12  defined in the past and we've thrown this at him and
13  he comes up with something that you say does not
14  comport to the dictionary definition. I say that this
15  is reality.
16    Q. (BY MS. HAMILTON) Well, the answer stands.
17    A. This is his reality or hers real- -- or her
18  reality.
19    Q. Gelb 218.
20    A. Okay.
21    Q. And to go back on that, because it's an
22  interesting point, it's -- it's the viewer's reality,
23  so it's very subjective. It's not an object- --
24  objective test; is that correct?
25       MR. FLYNN: Object to form.

Page 137

1    A. I'm not going to characterize it as -- if you
2  make a statement, if you consider that subjective and
3  not objective, I would say that, for the same
4  reasoning, this person is making a subjective
5  statement. If -- if you'll go along with the fact
6  that when you make statements, they are subjective
7  also.
8    Q. (BY MS. HAMILTON) Okay. But if they're
9  speaking from their personal view of the world --
10    A. Right.
11    Q. -- which is what you said you were after --
12    A. Right.
13    Q. -- that would be a subjective view, would it
14  not?
15    A. I would agree with that.
16    Q. Back to Gelb 218. I think you're already
17  there. Question 10: Why do you say -- say that the
18  pilot endorses the movie? Answer: I think if I was
19  him and had this experience, I would want others to
20  know what happens. Did I read that correctly?
21    A. Right.
22    Q. Now, again, when you compiled the answers
23  from these research -- from this survey --
24    A. Right.
25    Q. -- so long as someone answered 9 or 9A,

35 (Pages 134 to 137)

Gabriel Gelb                                                                                          June 19, 2003

**Page 138**

1  answer one, that the actual pilot endorses the movie,
2  it didn't matter what they put down as their
3  explanation for why they thought the pilot endorses
4  the movie, did it?
5          MR. FLYNN: Object to form.
6      A. Largely true. But it also -- it's also true
7  that you have to take 10 in context. And again,
8  you're leaving out 11. The same person said -- when
9  we asked him, When you say the pilot endorses the
10  movie, what do you mean by endorses? In question 11,
11  he says: He's for people seeing what happened. I
12  think that's --
13      Q. (BY MS. HAMILTON) I agree with that.
14      A. -- a logical -- that -- from his viewpoint,
15  that's a logical statement. It may not comport to
16  your dictionary, but again, that's what he says.
17    - Q. Now, he says that, but do you --
18      A. Right.
19      Q. -- know what he's even referring to?
20      A. No, I don't know what he's referring to.
21      Q. Okay.
22      A. Except from the question --
23      Q. Let's look --
24      A. -- we asked.
25      Q. And let's go to Gelb 233.

**Page 139**

1      A. Okay.
2      Q. Question 10: Why do you say the pilot
3  endorses the movie? Because it was portrayed more
4  accurately and as it really happened. He feels it was
5  a good depiction of the story.
6          Do you know whether that person's -- you
7  don't know whether that person's responding to the
8  Discovery Channel documentary or the movie -- the Fox
9  movie, Behind Enemy Lines, do you?
10          MR. FLYNN: Object to form.
11      A. No. They -- they were both in the same
12  program.
13          MS. HAMILTON: What was your objection,
14  Peter?
15          MR. FLYNN: Just what you were -- the
16  reference in your question. You said, do you know
17  what -- what "it" was, I believe is the word you used.
18  The question was vague.
19          MS. HAMILTON: Well, leave it.
20      A. Well, I mean, he -- the question is: Why do
21  you say that pilot endorses the movie? So --
22      Q. (BY MS. HAMILTON) They didn't see the --
23      A. -- and the conte- --
24      Q. -- movie. But --
25      A. The connotation here is that he's talking

**Page 140**

1  about the movie. Because it says, because it was
2  portrayed more accurately and so it really happened.
3  And then he says he feels it was a good depiction of
4  the story.
5          Now, we had asked him, Why do you say the
6  pilot endorses the movie? He's saying it was
7  good depiction of the story.
8      Q. Well, I'll go along with Mr. Flynn's feeling
9  because "it" seems somewhat ambiguous. It is not
10  clear whether this person is responding to the movie,
11  the Fox movie, Behind Enemy Lines, or is he responding
12  to the documentary that -- that was on the Discovery
13  Channel, correct?
14          MR. FLYNN: Objection, argumentative.
15      A. The -- the person said that he felt that the
16  actual pilot endorses the movie that was advertised on
17  the program you just saw.
18      Q. (BY MS. HAMILTON) But -- now, that is not --
19      A. And then we say --
20      Q. -- in the document, is it, Mr. Gelb?
21      A. Pardon me?
22      Q. That's not in the document --
23          MR. FLYNN: Objection, argumentative.
24      Q. (BY MS. HAMILTON) -- is it, Mr. Gelb?
25      A. Yes, that's the question that was asked him.

**Page 141**

1      Q. Well, I was reading --
2      A. Yeah. 9A.
3      Q. Okay. Go back to question 10.
4      A. Okay.
5      Q. Why is it that you say that the pilot
6  endorses the movie? The response: Because "it" was
7  portrayed more accurately and as "it" really happened.
8  He feels "it" was a good depiction of the story,
9  period.
10          Now, you don't know what the "it" is that
11  this respondent is referring to, do you?
12      A. That's correct.
13      Q. And with question 11, it says, He agrees "it"
14  is an account -- I'm sorry. The answer is: He agrees
15  "it" is an accurate account and "it" is a good job of
16  what really happened, period. "It" is not like,
17  quote, Hollywood, closed quote, made-up version.
18          Did I read that correctly?
19      A. Right.
20      Q. So again, you don't know what the "it" is
21  that he is referring to, do you?
22      A. That's correct.
23      Q. And it could as easily be the Discovery
24  Channel documentary, could it not?
25      A. That's correct. But his answer was, The

36 (Pages 138 to 141)

Gabriel Gelb                                                                    June 19, 2003

**Page 142**

1 actual pilot endorses the movie, and these are
2 explanations of that answer.
3     Q. I understand what the answer is to 9A. I'm
4 talking about the answer to 11.
5     A. I know, but we do not take these things out
6 of context.
7     Q. Let me ask you this: Why did you ask these
8 questions, 10 and 11?
9     A. To find out what was on the minds of the
10 individual when they asked -- answered the question.
11     Q. And were they -- they -- were they asked what
12 was on their minds beyond what's on question 10 and
13 11?
14     A. What do you mean, were they asked what was on
15 their minds? They were asked, Why do you say the
16 pilot endorses the movie.
17     Q. Okay. And even if it is ambiguous --
18     A. Right. It's ambiguous to you. It was not
19 ambiguous to that person. We keep going back to --
20 you are parsing this as though it's a legal document.
21 It is not a legal document.
22         It is an answer by someone who, as I say
23 before, does not necessarily have a law degree or even
24 a college degree.
25   ·  Q. Mr. Gelb, because we're not able to go back

**Page 143**

1 in and ask these people these questions, I don't know
2 and I can't find out what it is -- what kind of
3 educational level this person had, I don't -- I
4 can't -- correct? Is that correct?
5     A. You cannot find out, yes.
6     Q. Okay. And I cannot find out whether or not
7 it was ambiguous to this individual at the time, can
8 I?
9     A. No. But I want to --
10     Q. And do you know whether it was ambiguous to
11 this person at this time or not? You don't, do you?
12     A. Right.
13     Q. But --
14     A. But --
15     Q. -- these responses were included in the
16 compilation and tabulation of your survey, were they
17 not?
18     A. Yes. And that's the difference between a
19 survey and the examination of a fact witness.
20         MS. HAMILTON: Objection to the final
21 part about the difference between a survey and
22 examination of a fact witness.
23     A. Well, you're treating this as though this
24 individual is up on the stand here. This is not what
25 this is all about.

**Page 144**

1     Q. (BY MS. HAMILTON) Gelb 239. Turn to that
2 page, please.
3     A. Okay.
4     Q. Same thing, answer to question 10: Why do
5 you say that the pilot endorses the movie? Answer: I
6 don't think they would be able to release it if he
7 didn't endorse the movie.
8         Does that answer, as it is -- would have been
9 included in your compilation or your final ta-- you
10 called it a tabulation?
11     A. Tabulation.
12     Q. Okay. In the tabu-- tabulation, correct?
13     A. Yes.
14     Q. Did you take into consideration, for example,
15 the answer to Number 11, which is -- the question is:
16 When you say the pilot endorses the movie, what do you
17 mean by endorses? And the answer is: Meaning
18 allowing it to be shown.
19         Was any consideration given to the -- sort of
20 en-- -- the difference between the legal term of
21 endorsement and just permission about whether or not
22 somebody can show a movie?
23         MR. FLYNN: Object to form.
24     A. Would you explain what you mean by the legal
25 definition of endorsement?

**Page 145**

1     Q. (BY MS. HAMILTON) Okay. Well, we'll move on
2 to another question.
3         Do you think that -- was any consideration
4 given to separating out the general confusion that
5 might be in the population about the word
6 "endorsement"?
7         MR. FLYNN: Object to form.
8     A. You will remember that all of these people
9 were allowed to say I don't know. And if they said I
10 don't know about endorsement, they were not asked 10
11 and 11.
12     Q. (BY MS. HAMILTON) Okay. Did you do a
13 control on this survey?
14     A. No.
15         MR. FLYNN: Object to form.
16         MS. HAMILTON: What's your objection,
17 Peter?
18         MR. FLYNN: What do you mean by
19 "control"?
20         MS. HAMILTON: I think it's --
21     Q. (BY MS. HAMILTON) Well, what is your term --
22 understanding of the word "control," Mr. Gelb?
23     A. Well, control -- you can have a control in --
24 within the survey that asks a question that you
25 believe disqualifies some people, which we did have in

Esquire Deposition Services            703 McKinney Avenue, Suite 320            Dallas, Texas 75202
Phone (214) 965-9200                        (800) 852-9737                      Fax (214) 965-9205
7df0e8f3-7efb-498c-a4e9-c8e0b2332278e

Gabriel Gelb                                                    June 19, 2003

**Page 146**

1   this survey.
2        Or you could have a control of asking a
3   second group of people some questions, which would be
4   completely irrelevant to this survey.
5        So there is certain instances when you use a
6   control and there is certain instances when you don't
7   use a control.
8        Q. Okay. So you're familiar with the term
9   "control"?
10       A. Yes.
11       Q. And what was the question that you used in
12  this survey — I think you referred that there was one
13  that you used in this survey?
14       A. Right.
15       Q. Which question is that?
16       A. That was — it was question 2.
17       Q. And that is: In your opinion, after seeing
18  this program, did the program tell about an event that
19  actually took place or not?
20       A. Right.
21       Q. And how is that a control?
22       A. If the person said that he didn't believe
23  that the program told about an actual event, that
24  meant that he had a problem with understanding that
25  program, perhaps, through a language difficulty or

**Page 147**

1   some other reason. And if he or she said, I'm not
2   sure the program is about an actual event, we also
3   decided that that person should not be included in the
4   survey.
5        And so the control was that unless people
6   said they believe that the program told about an
7   actual event and thus had an understanding of the
8   program, we took them out of the survey.
9        Q. And so the control was whether or not they
10  had an understanding that the program was about an
11  actual event?
12       A. Yes.
13       Q. But you didn't do any — was there any
14  control on the issue of endorsement?
15       A. No need for any control. You're asking a
16  very specific question and you're giving people the
17  ability to say I don't know.
18       Q. If you were to ask that question about
19  endorsement —
20       A. You don't have a control on every question.
21  You have a control either for the entire group or you
22  have something in the front that removes people who
23  are not understanding what's going on here.
24       Q. How is it that — what is really going on
25  here?

**Page 148**

1   A. What's going on here is that people are
2   showing — have been shown a documentary or what's
3   sometimes call a docudrama and they're asked questions
4   about it. And if they didn't understand that it was a
5   documentary or a docudrama, then we felt that they had
6   a language or other problem.
7        Q. And why was it important — why was it
8   important that they understood that it was a
9   documentary or a docudrama?
10       A. That was a control question to see whether or
11  not the person had complete comprehension of the
12  nature of the program.
13       If they didn't have comprehension of the
14  nature of the program, then later questions would —
15  would be questionable.
16       Q. Are you talking about — I'm sorry — later
17  responses would be questionable?
18       A. Yes. Thank you.
19       Q. And you don't find that any of the responses
20  that you received in response to question 7 or 9 were
21  questionable?
22       MR. FLYNN: Object to form.
23       A. No. As I had mentioned to you, this — these
24  are the perceptions of ordinary people that range from
25  those who have an elementary school education to those

**Page 149**

1   who have professional degrees, and the way that they
2   answer these questions cannot be measured against the
3   dictionary definition, particularly when the word is
4   "endorse," which is something that I think even
5   attorneys would have some differing views on.
6        Q. Then under that analysis, you would agree
7   that the word "endorse" is ambiguous, would you not?
8        A. All words can be used ambiguously.
9        Q. I'm not talking about use. I'm just saying
10  the word is ambiguous.
11       A. There is no such thing as a word without use.
12       Q. Gelb 249, please. Never mind. Sorry about
13  that.
14       Let's look at 250. Answer to question number
15  10: Why do you say the pilot endorses the movie?
16  Quote, he gave out details and cooperated within the
17  movie, closed quote.
18       Now, you did not show the participants the
19  movie, Behind Enemy Lines, did you?
20       A. That's correct.
21       Q. And so to the extent they saw Scott O'Grady,
22  it was in the Discovery Channel program, correct?
23       MR. FLYNN: Object to form.
24       Q. (BY MS. HAMILTON) Well, to the extent that
25  they saw Scott O'Grady in the November 28th broadcast,

38 (Pages 146 to 149)

**Page 150**

1  it was in the Discovery Channel program, correct?
2      A. Yes.
3      Q. So in answer to question number 10, this
4  respondent -- it's not clear whether this respondent
5  is responding to the Discovery Channel program or the
6  Fox movie, is it?
7      MR. FLYNN: Object to form.
8      A. This is exactly what Captain O'Grady is
9  complaining about, that after seeing this -- and this
10  person has said it very specifically, as a matter of
11  fact. After seeing this program, he comes across that
12  Captain O'Grady has cooperated with the movie.
13      MS. HAMILTON: Objection, nonresponsive.
14      Q. (BY MS. HAMILTON) Let's go to Gelb 268.
15      A. You're -- you want to pass by his answer to
16  question 11?
17      MR. FLYNN: Just --
18      Q. (BY MS. HAMILTON) No, we've got --
19      MR. FLYNN: -- go with her question.
20      THE WITNESS: Okay.
21      Q. (BY MS. HAMILTON) We'll just keep going.
22      A. Okay. We had a pattern there.
23      268?
24      Q. 268.
25      A. Okay.

**Page 151**

1      Q. Question 10: Why do you say the pilot
2  endorsed this movie? Answer: It is about him so he
3  endorses it.
4      Now, again, the word "it," do you know -- you
5  can't tell whether he's talking about the movie,
6  Behind Enemy Lines, or the Discovery Channel
7  documentary, can you?
8      A. Well, I go with my question. The question
9  was: After seeing the program, do you think the
10  actual pilot doesn't endorse or does endorse the movie
11  that was advertised in the program you just saw.
12      It is about him so he does endorse it.
13      He comes away from seeing that program and
14  saying that -- after asked: Why do you say the pilot
15  endorses the movie? "It" -- to me, meaning the
16  movie -- is about him so he does endorse it.
17      Q. Okay. So the movie is about Scott O'Grady?
18      A. That's what --
19      Q. Is that your understanding?
20      A. -- this person thinks. Yeah.
21      Q. And how do you know what this person thinks?
22      A. That's what I get from the context of the
23  question I asked and the answer that he gave.
24      Q. And that's your interpretation of the answer,
25  isn't it?

**Page 152**

1      A. But I am merely reporting that in my report.
2  I am not interpreting what he said. Again, this is
3  not in my opinion.
4      Q. Let's go to Gelb 299. Question 10: Why do
5  you say that the pilot endorses the movie? Answer:
6  To show how rough it was for him and how wonderful it
7  was that the others came for him.
8      You can't tell me from this answer as it
9  stands on this piece of paper whether this respondent
10  is talking about the Discovery Channel documentary or
11  the Fox movie, Behind Enemy Lines, can you?
12      A. This is the answer -- his answer to the
13  question: Why do you say that the pilot endorses the
14  movie? That's all I can tell.
15      Q. Okay. Let's go on to Los Angeles.
16      MS. HAMILTON: It's going to be 342.
17      (Exhibit Number 342 marked.)
18      Q. (BY MS. HAMILTON) And I'll ask you: Is this
19  a true and correct copy of the questionnaires that
20  were used in the research that was done in Los
21  Angeles?
22      A. Yes.
23      Q. Okay. And let's look at Gelb 667.
24      MR. FLYNN: 667?
25      MS. HAMILTON: Uh-huh.

**Page 153**

1      MR. FLYNN: Mine starts with 669.
2      MS. HAMILTON: Yours starts with 669?
3  Yeah, I know. I'm sorry. It's Exhibit -- you know
4  what, they got out of order.
5      MS. HANDMAN: They got out of order.
6      MS. HAMILTON: They may be out of order.
7  Let's forget that.
8      MS. HANDMAN: It's in there.
9      MS. HAMILTON: That's all right. We can
10  go -- we'll go on to another one.
11      MS. HANDMAN: Here's -- it -- it's
12  here.
13      MS. HAMILTON: No. I know. We'll just
14  go on.
15      MS. HANDMAN: Okay.
16      Q. (BY MS. HAMILTON) Let's go to 652.
17      MR. FLYNN: This is all out of order.
18      A. They're out of order.
19      Q. (BY MS. HAMILTON) Sorry.
20      A. But -- but we -- but we can find it. I'm
21  not -- let's find it.
22      Q. I've got mine posted so I know where I'm
23  going.
24      A. 662.
25      Q. 652. I'm sorry.

39 (Pages 150 to 153)

Gabriel Gelb                                                                                    June 19, 2003

Page 154

1    A. Oh, -52.  Got it.
2    Q. Okay.  Now, I apologize.  I don't know why
3  these are all out of order, but...
4    Question 10:  Why do you say the pilot
5  endorses the movie?  Answer:  Because it explains how
6  he survived the actual experience that he went
7  through.
8    Was -- that answer would have been included
9  in your tabulation under the endorsement column,
10  wouldn't it?
11    A. Yes.
12    Q. Okay.  And question 11:  When you say the
13  pilot endorses the movie, what do you mean by
14  endorses?  Answer:  Um -- that's U-M -- I guess it
15  means agreeing to make a movie of what he experienced.
16    Now, the only thing that the participants
17  were shown was the -- other than the ads for the
18  movie, Behind Enemy Lines, they didn't see the movie,
19  Behind Enemy Lines, but they did see the
20  documentary --
21    A. Right.
22    Q. -- about Scott O'Grady.
23    So is it conceivable to you that the answer:
24  Because it explains how he survived the actual
25  experience that he went through, is a reference to the

Page 155

1  documentary and not to the movie?
2    A. All I can tell you, that he answered the
3  question that the actual pilot endorses the movie and
4  this is what he said.
5    Q. Okay.  And you -- and the question is -- you
6  don't ask them, Why do you say the pilot endorses the
7  movie Behind -- the Fox movie, Behind Enemy Lines --
8    A. Right.
9    Q. -- do you?
10    You just ask "the movie"?
11    A. Right.
12    Q. And so you have --
13    A. Wait a second.  No.
14    Q. I'm sorry?
15    A. The movie that was advertised on the program
16  you just saw.
17    Q. Okay.
18    A. I mean, let's have that context clear.
19    Q. Okay.  That's fine.
20    There were other movies that were advertised
21  on the program, were there not?
22    A. I think there was some Discovery programs
23  advertised.  I don't know about movies.
24    Q. Okay.  Gelb 607.  And again, if we go through
25  this -- I won't go through many on these because I

Page 156

1  know it's mixed up.
2    A. Is this before or after?
3    Q. It's afterwards.
4    A. Okay.
5    MR. FLYNN:  The Bates?
6    MS. HAMILTON:  607.
7    MR. FLYNN:  After what we just looked
8  at?
9    THE WITNESS:  Yeah.
10    MS. HAMILTON:  Uh-huh.
11    A. I got it.
12    Q. (BY MS. HAMILTON) Question:  Why do you say
13  the pilot endorses the movie?  Quote, He speaks during
14  the movie and I've seen it in news reports on what had
15  happened.
16    So this would be included in -- in your
17  tabulation under the endorsement --
18    A. Right.
19    Q. -- column?
20    A. Right.
21    Q. And without regard to the clarity of what is
22  being said in response to question 10, correct?
23    A. People are not as -- don't communicate as
24  much clarity as we do, unfortunately.
25    Q. Well, but it -- the clarity didn't matter to

Page 157

1  you when you tabulated the answers, did it?
2    A. I wouldn't say it didn't matter to me, but
3  you see it in a different light than I see it.  That's
4  our problem here.
5    Q. It did not affect the tabulation?
6    A. No.  I listed that in the tabulation.
7    Q. Okay.  And one last one on this document.  If
8  you go -- it's further to the back -- Gelb 547.
9    A. Got it.
10    Q. Gelb 547.  Question:  Why do you say the pilot
11  endorses the movie?  Answer:  Because they are showing
12  you what happened in the war, comma, they are
13  reenacting the real story so that we can see what
14  actually happened since we can't be there, period.
15    Did I read that correctly?
16    A. Yes.
17    Q. And again, can you -- you can't tell from
18  this answer whether they are responding to the
19  Discovery Channel documentary or to the Fox movie,
20  Behind Enemy Lines, can you?
21    A. I can tell you that they are responding to
22  the question about the movie that, quote, was
23  advertised on the program you just saw.
24    Q. But can you tell me whether or not this
25  response references the movie or the docudrama -- I'm

Esquire Deposition Services          703 McKinney Avenue, Suite 320          Dallas, Texas 75202
Phone (214) 965-9200                    (800) 852-9737                          Fax (214) 965-9205
                                                                                7df0e8f3-7efb-498c-a4e9-c8e0b233278e

Gabriel Gelb

June 19, 2003

Page 158

1 sorry, the documentary?
2    A. I can't tell you for sure.
3    Q. Okay. Sorry. Back up to page 576.
4    A. This is before?
5    Q. Yeah. Let me look at this one.
6    A. How much before?
7    Q. Oh, probably 20 pages.
8    A. 576?
9    Q. Uh-huh.
10   A. Okay. I got that one fast.
11   Q. Okay. That's question 7. Now, at the top of
12 that page where there's an "X", I'm assuming that
13 means that was the version of the question 7 or 7A and
14 the "X" would denote which one, 7 or 7A, was used?
15   A. Correct.
16   Q. Okay. And this is the question: After
17 seeing this program, do you think that the movie that
18 was advertised is not or is a Hollywood version of the
19 actual pilot's real life story. I'm sorry. I read
20 that incorrectly.
21       I got to go up to 7. After seeing this
22 program, do you think that the movie that was
23 advertised is or is not a Hollywood version of the
24 actual pilot's real life story?
25       Did I read that correctly?

Page 159

1    A. Okay. We're going from --
2    Q. It's question --
3    A. -- 9 to 7? You're switching?
4    Q. Yes, I'm on que- -- question 7.
5    A. Okay. You're switching to 7 now?
6    Q. Uh-huh.
7    A. Okay. I got it.
8       MR. FLYNN: Why don't you ask the
9 question again.
10   Q. (BY MS. HAMILTON) Just the ques- -- they're
11 asked about question 7.
12   A. Okay.
13   Q. Not 7A, correct?
14   A. Yes.
15   Q. Okay. And apparently they have answered,
16 yes, it is a Hollywood version of the actual pilot's
17 real life story. Do I understand that?
18   A. That's right.
19   Q. And then question 8: Why do you say that?
20   A. Right.
21   Q. Answer: The trailers for the movie had a lot
22 more action than the actual event had.
23   A. Right.
24   Q. So they're making a judgment off of the
25 action in the trailers as opposed to the substance of

Page 160

1 the movie; is that correct?
2       MR. FLYNN: Object to form.
3    A. I don't know. I guess so. Yeah.
4    Q. (BY MS. HAMILTON) Because they don't know
5 what the substance of the movie is because they
6 haven't seen the movie, have they?
7    A. Right.
8       MR. FLYNN: Object to form.
9    A. Well, some of them have seen the movie.
10 Remember? You know, we asked if they had seen the
11 movie.
12   Q. (BY MS. HAMILTON) Okay. Well, this person
13 answered no.
14   A. This person did not see the movie, but some
15 of them did.
16   Q. But he's talking about -- when he's talking
17 about the trailers, he's talking --
18   A. He's talking about what he's --
19   Q. -- about the Hollywood version, right?
20   A. Yes. Right. Right.
21       MS. HAMILTON: What's the next one, 342?
22       THE REPORTER: 343.
23       MS. HAMILTON: 3? 343.
24       (Exhibit Number 343 marked.)
25   Q. (BY MS. HAMILTON) Hopefully these are in

Page 161

1 order.
2       If you would turn -- first of all, this is
3 the questionnaire, the survey, I guess, responses to
4 the March 24th, 2003 questionnaire from the testing
5 site in Milwaukee, Wisconsin; is that correct?
6    A. Yes.
7    Q. And if you turn to Gelb 1039, please.
8    A. Got it.
9    Q. And in answer to question 10: Why do you say
10 the pilot endorses the movie?
11       Answer: Because he knew that showing that
12 show would help someone out and also show them how to
13 handle the situation, so why keep it a secret when you
14 know.
15   A. Right.
16   Q. And I -- and then there's some initials. Are
17 those the interviewer's initials; do you know? Or do
18 you know what that means?
19   A. No. That means that they -- A/E means
20 anything else.
21   Q. They asked anything else?
22   A. Right.
23   Q. Is that -- and then the response was no?
24   A. That's right.
25   Q. Okay. I didn't notice that notation with the

Esquire Deposition Services
Phone (214) 965-9200

703 McKinney Avenue, Suite 320
(800) 852-9737

Dallas, Texas 75202
Fax (214) 965-9205
7df0e8f3-7efb-496c-a4e9-c8e0b233278e

Gabriel Gelb                                                    June 19, 2003

**Page 162**

1  other cities. Okay. Do you know if, in the other
2  cities, anything was -- else was asked as a follow-up?
3      A. I don't think it was.
4      Q. So this answer would -- would fall into your
5  endorsement column on your tabulation; is that
6  correct? It's the answer to number 10 on Gelb 1039.
7      A. Well, again, 10 goes with 11.
8      Q. Okay. But it was included in the tabulation
9  for your survey results under the endorsement column?
10     A. Yes.
11     Q. And 11 says: When you say the pilot endorses
12  the movie, what do you mean by endorses? Answer:
13  That he let them know it was okay to show the
14  struggles in how to make it out there. And I guess
15  this A, slash, E: He gave them permission to make his
16  life story public.
17         Do you know -- that would be true of the --
18  do you know whether or not he's referring to the
19  Discovery Channel program or to the Fox movie?
20         MR. FLYNN: Object to form.
21     Q. (BY MS. HAMILTON) Or she, whoever the
22  respondent is.
23     A. When -- when you ask me all these questions,
24  do I know what he or she is referring to, all I can do
25  is go back to the question, and this is the answer

**Page 163**

1  that he or she gave. I can't interpret any more than
2  that.
3      Q. Okay. So again, the response doesn't factor
4  into your ultimate tabulation as far as the written
5  response? All that matters is that they checked
6  the -- or answered the question that the pilot
7  endorsed the movie?
8      A. In general, yes.
9      Q. If you go to Gelb 1089. And the answer to
10  question 10: Why did you say the pilot endorses the
11  movie? Is, quote, Because he didn't say anything bad
12  about the movie. He was neutral.
13         Did I read that correctly?
14     A. Yes. And I had made the earlier statement
15  that sometimes people think something is endorsed if
16  someone doesn't speak out against it or they just
17  accept it and this is -- this is one of those answers.
18     Q. And -- and that's one of the many examples of
19  how you think various people might interpret the word
20  "endorsement;" is that correct?
21         MR. FLYNN: Object to form.
22     A. I don't know what you mean by, that's one of
23  the many answers.
24     Q. I'm sorry, examples.
25         MR. FLYNN: Object to form.

**Page 164**

1      Q. (BY MS. HAMILTON) You said the omission
2  issue, that if you don't speak out against something
3  it means you endorse it.
4      A. That -- that is one interpretation, yes. And
5  that's what this person seems to be saying.
6      Q. Okay. Go to Gelb 1173, back end.
7      A. Okay.
8      Q. And the answer to 10: Why do you think the
9  pilot -- say that the pilot endorses the movie? The
10  answer is: Actual footage of what the plane being
11  shot down was part of the movie.
12         And so again, the -- that statement in and of
13  itself is enough to include it in the endorsement
14  column on your tabulation, correct?
15     A. No. That statement is enough to include it
16  after the person says that the actual pilot endorsed
17  the movie.
18     Q. Right. Because that's -- I'm sorry.
19  That's -- that's the most important part --
20     A. Right.
21     Q. -- for you?
22         The -- the explanation doesn't make any
23  difference to you one way or the other, does it?
24         MR. FLYNN: Object to form.
25     A. The explanation is in the minds of the

**Page 165**

1  individual who made that statement. I'm not here to
2  critique it --
3      Q. (BY MS. HAMILTON) Okay.
4      A. -- as perhaps you are.
5      Q. If you go to Gelb 1172, the page ahead of it.
6  And I'd ask you to look at question 7. And that's the
7  question that refers to the Hollywood version of the
8  actual pilot's real life story.
9      A. Right.
10     Q. Question 8: Why do you say that? Answer:
11  Quote, It is a dramatization of the actual event.
12     A. Pretty clear to me, if you're asking me.
13         MR. FLYNN: Well, wait for the question.
14         THE WITNESS: Well, she's looking at me.
15     Q. (BY MS. HAMILTON) I'll ask you, what is --
16  what is -- what is clear to you?
17     A. That person says that -- they answered --
18  again, you left out -- in answer to the question, yes,
19  it is a Holly-- a Hollywood version of the actual
20  pilot's real life story. And they say, Why? It is a
21  dramatization of the actual event. I don't know how
22  we can get any more clearer than that.
23     Q. So according to this person's understanding,
24  it would seem that a dramatization of a real, actual
25  event is a Hollywood version?

42 (Pages 162 to 165)

Esquire Deposition Services
Phone (214) 965-9200                 703 McKinney Avenue, Suite 320
                                     (800) 852-9737
                                                        Dallas, Texas 7520_
                                                        Fax (214) 965-9205
                                                        7df0e8f3-7efb-498c-a4e9-c8e0b233278e

Gabriel Gelb

June 19, 2003

**Page 166**

1    A. I guess you can read it that way.
2    Q. Okay.
3         MS. HAMILTON: Let's go ahead and take a
4    break.
5         THE VIDEOGRAPHER: Off the record at
6    2:55. This concludes the end of Tape Number 2.
7         (Exhibit Number 344 marked.)
8         THE VIDEOGRAPHER: This is Tape Number 3
9    in the deposition of Gabriel Gelb. We are back on the
10   record at 3:13.
11   Q. (BY MS. HAMILTON) Mr. Gelb, would you take a
12   look at what's been marked as Exhibit Number 344, and
13   tell us what that document is.
14   A. This is a code sheet.
15   Q. Okay. What's a code sheet?
16   A. Well, basically you're looking to categorize
17   the answers, because when you do a report, you can't
18   have every single verbatim listed. It gets confusing
19   and they don't see the main points.
20        So what we do is, we go through the first
21   number of questionnaires. We see what the answers are
22   and we see what are repeated and then we construct
23   this, and then all of the answers that come in later
24   are given a numerical number. So it makes it easier
25   to tabulate.

**Page 167**

1    Q. So the response sheets that we've just gone
2    through, there is a number --
3    A. Questionnaires.
4    Q. The questionnaires, if there is a number out
5    to the side, that reflects --
6    A. Code.
7    Q. -- the code --
8    A. Yeah.
9    Q. -- that is in Exhibit Number 344?
10   A. Yeah.
11   Q. Okay. And so these aren't the number of
12   responses, like on, say, question 6?
13   A. Oh, no, no.
14   Q. This is just the code that was given to --
15   A. Yeah.
16   Q. -- each one of those --
17   A. Yeah. You need a code --
18   Q. -- responses?
19   A. -- for computer tabulation.
20   Q. Okay.
21   A. That's basically what it is.
22   Q. Okay. I don't believe I asked you this
23   earlier, but what did you mean by "Hollywood version"?
24   That was the term in -- in question number 7.
25   A. That was my idea to try to indicate that we

**Page 168**

1    had a Hollywood movie here as opposed to a
2    documentary.
3    Q. Okay. Did you --
4    A. That's a --
5    Q. I'm sorry?
6    A. It's when you have a story of Gandhi or JFK
7    or Martin Luther King and it's done by Hollywood, it's
8    a Hollywood version.
9    Q. Okay. Did you provide the res- -- you didn't
10   provide the participants with that definition of a
11   Hollywood version, did you?
12   A. No.
13   Q. And you didn't make a distinction between
14   television shows out of Hollywood versus Hollywood
15   movies, did you?
16   A. No. But we've been talking about movies
17   throughout.
18   Q. Okay. And earlier, I think you said that
19   there were two types of controls; one, you said that
20   you did address in the questionnaire, and the other
21   was a control that would be a separate test?
22   A. Yes. I'll give you an example. If we are
23   asking people about cars and we are -- want to get
24   awareness of, say, the Kia, Subaru and the Barrett, if
25   someone said Barrett, we would throw that

**Page 169**

1    questionnaire out because there isn't any so he was
2    basically just guessing. I mean, that's one type of
3    control.
4    Q. Did you consider an outside control for this
5    study?
6    A. Well, by outside, you mean having another
7    sample which is another way of doing a control?
8    Q. A separate sample from what --
9    A. Right.
10   Q. -- you did?
11   A. No, I did not. That is not applicable here.
12   Q. And why isn't it applicable?
13   A. Because you are -- there -- there is no way
14   to do an outside control. I mean, what would you do?
15   You would have them see another program and ask them
16   questions about it. I mean, it doesn't -- it doesn't
17   relate here at all.
18   Q. Okay. Are you familiar with the television
19   program Hot Ticket?
20   A. No.
21   Q. Okay. Were you aware of Mr. O'Grady's
22   appearance on the television program Hot Ticket?
23   A. Yes.
24   Q. And what did you know about that appearance?
25   A. Mr. Flynn told me about that yesterday. He

43 (Pages 166 to 169)

Gabriel Gelb                                                                                          June 19, 2003

**Page 222**

1    A. Right.
2    Q. But then you would show one group the
3  documentary and, say, an advertisement prepared by
4  Fox about the movie to see, in essence, whether the
5  promotional material had any impact on the viewers to
6  show -- to try and have a control in that way. Would
7  that have been a useful activity?
8        MR. FLYNN: Object to form.
9    A. You mean to have doubled the size of the
10  sample and shown two different things to them?
11    Q. (BY MS. HANDMAN) Correct.
12    A. I don't really know. I'd have to think about
13  it. I -- I know that what we did was from the
14  viewpoint of survey research technique, the way it
15  should have been done, so far as I'm concerned, and
16  whether or not there was an -- an alternative that
17  could have contributed something, we would have to
18  talk about it at length.
19    Q. So it's possible that that would have
20  contributed something?
21        MR. FLYNN: Object to form.
22    Q. (BY MS. HANDMAN) Is it possible that that
23  would have contributed?
24    A. I -- I have --
25        MR. FLYNN: Object to form.

**Page 223**

1    A. -- to answer, I don't know.
2    Q. (BY MS. HANDMAN) As you sit here today, you
3  don't know that it would have contributed; is that
4  correct.
5        MR. FLYNN: Object to form.
6    A. It's like somebody calling me on the phone
7  and describing something in a couple of sentences and
8  saying, what kind of survey do you want to do. I
9  mean, I can't answer that. That's not -- I would have
10  to sit down with you and really go over this in detail
11  and how it would be done and what the advantages and
12  what the output would be. And then if you compared
13  the two statistics, how would you compare them. I
14  mean, I'm not sure what your objective is, so I can't
15  answer on technique.
16    Q. (BY MS. HANDMAN) Did you give any
17  consideration to doing such a control?
18    A. No.
19    Q. Did you consider showing two groups of people
20  two different -- two -- different material?
21    A. No.
22    Q. Did you do any -- you have talked about the
23  statistical study that you did with regard to the
24  Hollywood version compared to everyone else.
25        Did you look at any comparison between people

**Page 224**

1  who were asked question 9, which is endorses or
2  doesn't endorse, and people who were asked question
3  9A -- or doesn't -- doesn't endorse or does endorse,
4  you know, the -- the rotated question that you said.
5  Did you look at whether there was any statistical
6  significance there?
7    A. No.
8    Q. And were people instructed to ask at equal
9  numbers each type of question?
10    A. Yes.
11    Q. I think if you -- if you look at, for
12  example, Exhibit 336, which is the May 6, Houston
13  questions --
14        MS. HAMILTON: March 6th.
15    Q. (BY MS. HANDMAN) -- March 6th, rather,
16  Houston questionnaire. It's a large packet.
17        If you go to Gelb 747.
18    A. I've got 56, and then it jumps to --
19    Q. 747? Well --
20    A. Oh, wait a -- okay. I've got it.
21    Q. Now, it -- it -- does it look like the
22  male/female question was redacted here?
23    A. If it was, it wasn't deliberate, no.
24    Q. I think they're all like that for Houston.
25        MS. HANDMAN: And so I -- I'm asking

**Page 225**

1  you, Mr. Gelb, and you, Mr. Flynn, if they could be
2  produced to be male/female indications for Houston as
3  they are for the other cities?
4        MR. FLYNN: We'll look to see if --
5        THE WITNESS: We'll see if we have it.
6        MR. FLYNN: Yeah. We'll -- we'll take
7  it under advisement.
8    Q. (BY MS. HANDMAN) Mr. Gelb, would it have
9  informed you if a control group had been asked about
10  and shown just the documentary without any commercials
11  or promotions?
12    A. No.
13    Q. Why not?
14    A. Because it does -- it's not true to life.
15  It's not real.
16    Q. But as a control to see what they took away,
17  as you say?
18    A. No. I'm just interested what they took away
19  from the actual program.
20    Q. Well, is use of a control not a common
21  statistical device to ensure that your answers are
22  valid?
23    A. A lot of times, controls are used to measure
24  noise; that is, where people are guessing. But in
25  this type of survey, it's not necessary because people

57 (Pages 222 to 225)

Page 226

1 are explaining their answers, so I -- I don't see a
2 need for a control.
3       Now, there may be a design, as I said before,
4 and you may have it somewhere that it would be useful.
5 But I would have to give it -- give it a lot of
6 thought as to what it would be useful for, et cetera.
7     Q. And you said people gave explanations. But
8 these are the explanations that, in talking with
9 Ms. Hamilton, you said didn't affect whether they were
10 included in the tabulation on -- in one column or
11 another; is that correct?
12     A. Well, let me explain that a little bit more.
13 In general, I said they don't affect. But if the --
14 the why answer is so counter to the quantitative
15 answer, we would consider taking them out.
16     Q. Was there any instance in this -- in this
17 survey where you took someone out?
18     A. No.
19       MS. HANDMAN: I don't think I have any
20 further questions.
21       E X A M I N A T I O N
22 BY MR. FLYNN:
23     Q. Was there any connection between the original
24 viewers who saw the program on November 28th, 2001 and
25 the people who took part in your survey?

Page 227

1     A. Well, the first question we asked after we
2 showed the one-hour program was, Had you seen this
3 program before? And 18 percent of the sample said
4 they had.
5       MR. FLYNN: Pass the witness.
6       MS. HANDMAN: I have a follow-up on
7 that, then.
8       FURTHER EXAMINATION
9 BY MS. HANDMAN:
10     Q. Did you ask -- I think you've already said
11 that you don't know whether they saw the program on
12 November 28th, correct, of 2001?
13     A. All I know is -- I have to answer that
14 question and say, that's right.
15       MS. HANDMAN: No further questions.
16       FURTHER EXAMINATION
17 BY MS. HAMILTON:
18     Q. With respect to that, are you -- your
19 question was, had they ever seen the program before?
20     A. Yes.
21     Q. And, I'm sorry, what was your response?
22     A. I said 18 percent of the sample said they
23 had.
24     Q. And the program being the Discovery Channel,
25 Behind Enemy Lines, The Scott O'Grady program?

Page 228

1     A. Yes. And remembering that's one -- one
2 reason why we asked people if they had Discovery
3 Channel in 2001.
4       MS. HAMILTON: No further questions.
5       THE VIDEOGRAPHER: Off the record at
6 4:53.
7     (Proceedings concluded at 4:53 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 229

CHANGES AND SIGNATURE

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| 1 | | | |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

Esquire Deposition Services
Phone (214) 965-9200

703 McKinney Avenue, Suite 320
(800) 852-9737

Dallas, Texas 75202
Fax (214) 965-9205
7df0e8f3-7efb-498c-a4e9-c8e0b233278e



EXHIBIT NO. 333

R. ASHMAN

# Webster's
# Seventh
# New Collegiate
# Dictionary

*A Merriam-Webster*

REG. U.S. PAT. OFF.

**BASED ON**

**WEBSTER'S**

**THIRD**

**NEW INTERNATIONAL**

**DICTIONARY**



REG. U.S. PAT. OFF.

**G. & C. MERRIAM COMPANY,** *Publishers*

SPRINGFIELD, MASSACHUSETTS, U.S.A.

**end·odon·tia** \,en-də-'dän-ch(ē-)ə\ *n* [NL. fr. *end-* + *-odontia*] : a branch of dentistry concerned with diseases of the pulp — **end·odon·tic** \-'dänt-ik\ *adj* — **end·odon·tist** \-'dänt-əst\ *n*

**end·odon·tics** \-'dänt-iks\ *n pl but sing in constr* : ENDODONTIA

**en·do·en·zyme** \,en-(,)dō-'en-,zīm\ *n* [ISV] : an intracellular enzyme

**en·do·eryth·ro·cyt·ic** \,en-(,)dō-i-,rith-rə-'sit-ik\ *adj* : occurring 'thin red blood cells — used chiefly of stages of malaria parasites log·a·mous \en-'däg-ə-məs\ *adj* : of, relating to, or characized by endogamy

**en·dog·a·my** \-mē\ *n* 1 : marriage within a specific group as required by custom or law 2 : sexual reproduction between near relatives; *esp* : pollination of a flower by pollen from another flower of the same plant — compare AUTOGAMY

**en·do·gen** \'en-də-jən\, *n* [F *endogène*, fr. *end-* + *-gène* -GEN] : a plant that develops by endogenous growth

**en·dog·e·nous** \en-'däj-ə-nəs\ *adj* 1 a : growing from or on the inside : developing within the cell wall b : originating within the body 2 : constituting or relating to metabolism of the nitrogenous constituents of cells and tissues — **en·dog·e·nous·ly** *adv*

**en·dog·e·ny** \-nē\, *n* : growth from within or from a deep layer

**en·do·lymph** \'en-də-,lim(p)f\, *n* [ISV] : the watery fluid in the membranous labyrinth of the ear

**en·do·mic·tic** \,en-də-'mik-tik\ *adj* : of or relating to endomixis

**en·do·mix·is** \-'mik-səs\, *n* [NL. fr. *end-* + Gk *mixis* act of mixing, fr. *mignynai* to mix — more at MIX] : a periodic nuclear reorganization in ciliated protozoans

**en·do·morph** \'en-də-,morf\, *n* [ISV] 1 : a crystal of one species enclosed in one of another 2 [*endoderm* + *-morph*] : an endomorphic individual

**en·do·mor·phic** \,en-də-'mór-fik\ *adj* 1 a : of or relating to an endomorph b : of, relating to, or produced by endomorphism 2 [*endoderm* + *-morphic*] : characterized by predominance of the structures (as the internal organs) developed from the endodermal layer of the embryo — **en·do·mor·phy** \'en-də-,mór-fē\, *n*

**en·do·mor·phism** \,en-də-'mór-,fiz-əm\, *n* : a change produced in an intrusive rock by reaction with the wall rock

**en·do·par·a·site** \,en-(,)dō-'par-ə-,sīt\, *n* [ISV] : a parasite that lives in the internal organs or tissues of its host

**en·doph·a·gous** \en-'däf-ə-gəs\, *adj* : feeding from within; *esp* : consuming vegetation or plant debris by burrowing in and disintegrating plant structures

**en·do·phyte** \'en-də-,fīt\, *n* [ISV] : a plant living within another plant — **en·do·phyt·ic** \,en-də-'fit-ik\ *adj*

**en·do·plasm** \'en-də-,plaz-əm\, *n* [ISV] : the inner relatively fluid part of the cytoplasm — **en·do·plas·mic** \,en-də-'plaz-mik\ *adj*

**en·do·plo·dite** \en-'däp-ə-,dīt\, *n* [ISV] : the mesial or internal branch of a typical limb of a crustacean — **en·do·pc·dit·ic** \(,)en-,däp-ə-'dit-ik\ *adj*

**en·do·poly·ploid** \,en-(,)dō-'päl-i-,plóid\ *adj* : of or relating to a polyploid state in which the chromosome have divided repeatedly without mitosis or subsequent cell division — **en·do·poly·ploi·dy** \-,plóid-ē\, *n*

**~d organ** *n* : a structure forming the peripheral terminus of a path serve conduction and consisting of an effector or a receptor with associated nerve terminations

**dorse** \in-'dó(ə)rs\ *vt* [alter. of obs. *endoss*, fr. ME *endosen*, fr. MF *endosser*, fr. OF, to put on the back, fr. *en-* + *dos* back, fr. L *dorsum*] 1 a : to write on the back of; *esp* : to sign one's name as payee on the back of (a check) to obtain the cash or credit represented on the face b : to inscribe (one's signature) on a check, bill, or note c : to inscribe (as an official document) 2 : to make over to another (the value represented in a check, bill, or note) by inscribing one's name on the document a : to acknowledge receipt of (a sum specified) by one's signature on a document 2 : to express definite approval of **SYN see** APPROVE — **en·dors·ee** \in-,dór-'sē\, *n* — **en·dors·er** \in-'dór-sər\, *n*

**en·dorse·ment** \in-'dór-smənt\, *n* 1 : the act or process of endorsing 2 a : something that is written in the process of endorsing b : a provision added to an insurance contract altering its scope or application 2 : SANCTION, APPROVAL

**en·do·scle·rite** \,en-(,)dō-'skli(ə)r-,īt\, *n* : a sclerite that is part of the internal skeleton of an insect or other arthropod

**en·do·scope** \'en-də-,skōp\, *n* [ISV] : an instrument for visualizing the interior of a hollow organ (as the rectum or urethra) — **en·dos·co·py** \en-'däs-kə-pē\, *n*

**en·do·scop·ic** \,en-də-'skäp-ik\ *adj* : of, relating to, or by means of the endoscope or endoscopy

**en·do·skel·e·tal** \,en-(,)dō-'skel-ət-ʾl\ *adj* : of or relating to or an endoskeleton

**en·do·skel·e·ton** \-ət-ʾn\, *n* : an internal skeleton or supporting framework in an animal

**end·os·mo·sis** \,en-,däs-'mō-səs, -,däz-\, *n* [alter. of obs. *endosmose*, fr. F, fr. *end-* + Gk *ōsmos* act of pushing, fr. *ōthein* to push; akin to Skt *vadhati* he strikes] : passage (as of a surface active substance) through a membrane from a region of lower to a region of higher concentration — **end·os·mot·ic** \-'mät-ik\ *adj*

**en·do·sperm** \'en-də-,spərm\, *n* [F *endosperme*, fr. *end-* + Gk *sperma* seed — more at SPERM] : a nutritive tissue in seed plants formed within the embryo sac — **en·do·sper·mic** \,en-də-'spər-mik\ *adj* — **en·do·sper·mous** \-məs\ *adj*

**en·do·spore** \'en-də-,spō(ə)r, -,spó(ə)r\, *n* [ISV] : an asexual spore developed within the cell esp in bacteria — **en·do·spor·ic** \,en-də-'spór-ik, -'spōr-\, *adj* — **en·do·spo·rous** \-əs; en-'däs-pə-rəs\ *adj*

**end·os·te·al** \en-'däs-tē-əl\ *adj* 1 : of or relating to the endosteum 2 : located within bone or cartilage — **end·os·te·al·ly** \-ē-\ *adv*

**end·os·te·um** \-tē-əm\, *n, pl* **end·os·tea** \-tē-ə\ [NL, fr. *end-* + Gk *osteon* bone — more at OSSEOUS] : the layer of vascular connective tissue lining the medullary cavities of bone

**en·do·the·ci·um** \,en-də-'thē-sē-əm\, *n, pl* **en·do·the·cia** \-sē-ə\ [NL. *end-* + Gk *ostrakon* shell] : the inner layer of a shell (as of a crustacean)

**en·do·the·ci·um** \,en-də-'thē-sē-əm\, *n* (see above)

**en·do·the·ci·um** \-sē-ə\ [NL] : the inner lining of a mature anther

**endothel- or endothelio-** *comb form* [ISV, fr. NL *endothelium*] : endothelium (*endothelioma*)

**en·do·the·li·al** \,en-də-'thē-lē-əl\ *adj* : of, relating to, or produced from endothelium

**en·do·the·li·o·ma** \,en-də-,thē-lē-'ō-mə\, *n, pl* **en·do·the·lia** \-lē-ə\ [NL. fr. *end-* + *epithelium*] 1 : an epithelium of mesoblastic origin composed of a single layer of thin flattened cells that lines internal body cavities 2 : the inner layer of the seed coat of some plants — **en·do·the·loid** \-'thē-,lóid\ *adj*

**en·do·therm** \'en-də-,thərm\, *n* : a warm-blooded animal

**en·do·ther·mic** \,en-də-'thər-mik\ *or* **en·do·ther·mal** \-məl\ *adj* [ISV] : characterized for or formed with absorption of heat

**en·do·tox·in** \,en-dō-'täk-sən\, *n* [ISV] : a toxin of internal origin; *specif* : a poisonous substance present in bacteria (as of typhoid fever) but separable from the cell body only on its disintegration

**en·do·tra·che·al** \,en-(,)dō-'trā-kē-əl\ *adj* 1 : placed within the trachea (an ~ tube) 2 : applied or effected through the trachea

**en·dow** \in-'dau\ *vt* [ME *endowen*, fr. AF *endouer*, fr. MF *en-* + *douer* to endow, fr. L *dotare*, fr. *dot-, dos* gift, dowry] 1 : to furnish with a dower 2 : to furnish with an income 3 a : to provide or equip gratuitously : ENRICH b : CREDIT 5a, INVEST 5

**en·dow·ment** \-mənt\, *n* 1 : the act or process of endowing 2 : something that is endowed; *specif* : the portion of an institution's income derived from donations 3 : natural capacity, power, or ability

**en·due** \in-'d(y)ü\ *vt* [ISV] : living within or involving passage through an animal (~ distribution of weeds)

**end·pa·per** \'en(d)-,pā-pər\, *n* : a once-folded sheet of paper having one leaf passed flat against the inside of the front or back cover of a book and the other pasted at the base to the first or last page

**end plate** *n* : a flat plate or structure as the end of something; *specif* : a complex terminal arborization of a motor nerve fiber

**end run** *n* 1 : a football play in which the ball carrier attempts to run wide around his own end 2 : an evasive trick

**end·stopped** \'en(d)-,stäpt\ *adj* : of a verse : marked by a logical or rhetorical pause at the end — compare RUN-ON

**end table** *n* : a small table used beside a larger piece of furniture

**en·due** \in-'d(y)ü\ *vt* [ME *enduren* to bring in, introduce, fr. L *inducere* — more at INDUCE] 1 a : PROVIDE, ENDOW b : IMBUE, TRANSFUSE 2 [ME *induen*, fr. L *induere*, fr. *ind-* in (fr. OL *indu, endo*) + *uere* to put on] : to put on : DON

**en·dur·a·ble** \in-'d(y)ur-ə-bəl\, *adj* : capable of being endured — **en·dur·a·bly** \-blē\, *adv*

**en·dur·ance** \in-'d(y)ur-ən(t)s\, *n* 1 : PERMANENCE, DURATION 2 : the ability to withstand hardship, adversity, or stress 3 : SUFFERING, TRIAL

**en·dure** \in-'d(y)ü(ə)r\ *vb* [ME *enduren*, fr. MF *endurer*, fr. (assumed) VL *indurare*, fr. L, to harden, fr. *in-* + *durare* to harden, endure — more at DURING] *vi* 1 : to continue in the same state : LAST 2 : to remain firm under suffering or misfortune without yielding — *vt* 1 : to undergo (as a hardship) esp. without giving in : SUFFER 2 : TOLERATE, PERMIT **SYN see** BEAR, CONTINUE

**en·dur·ing** *adj* : LASTING, DURABLE — **en·dur·ing·ly** \-iŋ-lē\, *adv* — **en·dur·ing·ness** *n*

**end·ways** \'en-,dwāz\ *or* **end·wise** \-,dwīz\ *adv* (*or adj*) 1 : with the end forward 2 : LENGTHWISE 3 : at or on the end

**En·dym·i·on** \en-'dim-ē-ən\, *n* [L. fr. Gk *Endymiōn*] : a beautiful youth loved by Selene

**-ene** \,ēn\ *n suffix* [ISV, fr. Gk *-ēnē*, fem. of *-ēnos*, adj. suffix] : unsaturated carbon compound (*benzene*); *esp* : carbon compound with one double bond (*ethylene*)

**en·e·ma** \'en-ə-mə\, *n, pl* **en·e·mas** \-məz\ *or* **en·em·a·ta** \,en-ə-'mät-ə\ [LL, fr. Gk, fr. *enienai* to inject, fr. *en-* + *hienai* to send] 1 : the injection of liquid into the intestine by way of the anus 2 : material for injection as an enema

**en·e·my** \'en-ə-mē\, *n, often attrib* [ME *enemi*, fr. OF, fr. L *inimicus*, fr. *in-* 'in- + *amicus* friend] 1 : one that seeks the injury, overthrow, or failure of an opponent 2 : something harmful or deadly 3 a : a military adversary b *pl* : a hostile unit or force

**SYN** ENEMY, FOE mean one who shows hostility or ill will. ENEMY stresses antagonism showing itself in hatred or destructive attitude or action; FOE stresses active fighting or struggle but is used only figuratively of an enemy in war

**en·er·get·ic** \,en-ər-'jet-ik\ *adj* [Gk *energētikos*, fr. *energein* to be active, fr. *energos*] 1 : marked by energy : STRENUOUS 2 : operating with vigor or effect 3 : of or relating to energy (~ equation) **SYN see** VIGOROUS — **en·er·get·i·cal·ly** \-i-k(ə-)lē\ *adv*

**en·er·get·ics** \-iks\, *n pl but sing in constr* : a branch of mechanics that deals primarily with energy and its transformations

**en·er·gid** \'en-ər-jəd, -,jid\, *n* [Gk *energes*] : a nucleus and the body of cytoplasm with which it interacts

**en·er·gize** \'en-ər-,jīz\ *vt* : to put forth energy : ACT — *vt* 1 : to impart energy to 2 : to make energetic or vigorous 3 : to apply voltage to — **en·er·giz·er** *n*

**en·er·gy** \'en-ər-jē\, *n* [LL *energia*, fr. Gk *energeia* activity, fr. *energos* active, fr. *en* in + *ergon* work] 1 : vitality of expression 2 : the capacity of acting 3 : power forcefully exerted 4 : the capacity for doing work **SYN see** POWER

**energy level** *n* : one of the stable states of constant energy that may be assumed by a physical system — called also *energy state*

**en·er·vate** \'i-'nər-vət\ *adj* : ENERVATED

**en·er·vate** \'en-ər-,vāt\ *vt* [L *enervatus*, pp. of *enervare*, fr. *e-* + *nervus* sinew] 1 : to lessen the vitality or strength of 2 : to reduce the mental or moral vigor of **SYN see** UNNERVE — **en·er·va·tion** \,en-ər-'vā-shən\, *n*

**en·fant ter·ri·ble** \äⁿ-fäⁿ-te-rēbl'\, *n* [F] : one whose inopportune remarks or unconventional actions cause embarrassment

**en·fee·ble** \in-'fē-bəl\ *vt* : to make feeble — **en·fee·ble·ment** \-mənt\, *n*

**en·feoff** \in-'fef, -'fēf\ *vt* [ME *enfeoffen*, fr. AF *enfeoffer*, fr. OF *en-* + *fief*] 1 : to invest with a fief, fee, or other possession — **en·feoff·ment** \-mənt\, *n*

**en·fet·ter** \in-'fet-ər\ *vt* 1 : to bind in fetters : ENCHAIN

**'en·fi·lade** \'en-fə-,lād, -,läd\, *n* [F, fr. *enfiler* to thread, enfilade, fr. OF. to thread, fr. *en-* + *fil* thread] : a condition permitting the delivery of gunfire in a lengthwise direction at an objective

**'enfilade** *vt* : to rake or be in a position to rake with gunfire in a lengthwise direction

**enflame** *var of* INFLAME

**en·fleu·rage** \,äⁿ-flə-'räzh\, *n* [F] : a process of extracting per-

Page 1 of 3

**Bartleby.com**

YAHOO! REFERENCE

Education Home - Yahoo! - Help

find the college that's right for you
www.petersons.com
click here

## Yahoo! Reference: American Heritage® Dictionary

Home > Reference > American Heritage® Dictionary > Entry Index > endorse

**Inside Education**

**Search Dictionary**
Enter a word or phrase to look up (e.g. abacus):

[                    ] Search

**Distance Learning**
Strayer    Touro Int'l

**College & Grad School**
Applying, Test Prep, Rankings...

**endorse**
Email this definition to a friend

**Student Life**
CliffsNotes™, Student Travel...

<< endorphin                    endorsee >>

**Reference**
Dictionary, Encyclopedia...

## endorse

SYLLABICATION: en·dorse

Bachelor's &
Master's Degrees

PRONUNCIATION: AUDIO ĕn-dôrs'   KEY

☐ Accounting
☐ Business
☐ Management
☐ Nursing     GO

VARIANT FORMS: also in·dorse (ĭn-)

TRANSITIVE Inflected forms: en·dorsed, en·dors·ing,
VERB: en·dors·es

**Reference Tools**
• American Heritage®
  Dictionary

1. To write one's signature on the back of (a check,
for example) as evidence of the legal transfer of its
ownership, especially in return for the cash or
credit indicated on its face.

• American Heritage®
  Spanish Dictionary

2. To place (one's signature), as on a contract, to
indicate approval of its contents or terms.
3. To acknowledge (receipt of payment) by signing
a bill, draft, or other instrument.
4. To give approval of or support to, especially by

public statement; sanction: *endorse a political candidate.* See synonyms at **approve.**

ETYMOLOGY: Middle English *endosen,* from Anglo-Norman *endosser,* from Medieval Latin *indorsāre* : Latin *in-,* upon, in; see **en-**¹ + Latin *dorsum,* back.

OTHER FORMS: en·dors′a·ble —ADJECTIVE
en·dors′er, en·dor′sor —NOUN

## More on Yahoo! Education

- **Search for Distance Learning Degree and Certificate Programs**
  MBAs · Technology Management · Education · Health · More
- **College & Grad School - A Comprehensive Guide**
  College Search · Test Prep · Application Tips · Scholarship Search · More

ADVERTISEMENT

**Weekly Specials**
- **Petersons:** Tired of looking? Have Colleges Contact You!
- Find out your credit standing IN SECONDS
- Shop and Save on Car Insurance...GEICO.com
- $7.77 Web Hosting + 2 Months FREE!
- Buy stocks for only $4. FREE Money 2003.
- Save on Healthy Coral Calcium - As Seen on TV
- FREE 3-RM DIRECTV Satellite Sys. FREE Install
- The Princeton Review Career Quiz: Find Your Perfect Fit.
- eLibrary: Search by topic, pub, author, more
- Get a fresh start with ClearCredit

---

- Roget's II Thesaurus
- The Britannica Concise
- World Factbook
- Gray's Anatomy
- The Oxford Shakespeare
- Bartlett's Familiar Quotations
- Weights and Measures

## Shopping!

Feast Your Eyes on These!
- Encyclopedias & Almanacs
- Ebooks download now!
- Gift Center
- Bargains & Outlets
- Guides to the SAT

## More on Yahoo!

- Yahooligans! Reference
- World Yahoos!
- Y! News

## Yahoo! Categories

- Language Dictionaries
- Slang Dictionaries
- Dictionaries
- Science Dictionaries
- Thesauri



**Earn Your Degree While You Travel!**

Take your courses while you're On the Plane

Programs are offered in:
☐ Accounting
☐ Business
☐ Education
☐ Information Technology
☐ Management
☐ Nursing

LEARN MORE »

*The American Heritage® Dictionary of the English Language, Fourth Edition*
Copyright © 2000 by Houghton Mifflin Company.
Published by the Houghton Mifflin Company. All rights reserved

Dictionary - Yahoo! Reference

Other Important Information
Copyright © 2003 Yahoo! Inc. All Rights Reserved. Privacy Policy - Terms of Service - Copyright Policy - Ad Feedback

Bosnia Questionnaire                                    Location: Houston  1022
Gelb Consulting Group, Inc.
March 24, 2003

Interviewer:  Re-screen participants on arrival to the research center.

A.     Have you participated in a focus group discussion or research project with any research
       firm within the past 6 months?

       ☐ Yes                          ***Thank and terminate***
       ☑ No
       ☐ Don't know/ Don't remember   ***Thank and terminate***

B.     Do you, or does anyone in your household work for a marketing research firm,
       advertising agency, video store, or in the entertainment industry?

       ☐ Yes                          ***Thank and terminate***
       ☑ No
       ☐ Don't know/ Don't remember   ***Thank and terminate***

C.  Did you have the Discovery Channel available in your home in 2001?

       Yes ..............................1 Ask Screener D
       No ...............................2 Not qualified - ***Thank and terminate***

D.  Have you seen one or more Discovery Channel program(s) in the past 3 months?

       Yes ..............................1 Qualified – Continue with Q.1
       No ...............................2 Not qualified - Thank and terminate

*Thank you for taking time to participate in this study.  It will take about 90 minutes and you will
receive $40 after completing the interview for your time and travel expenses.  Please come with
me to the interview room.*

I'd like to show you a one-hour program that was shown on the Discovery Channel.  After you
have seen it, I'd like to ask you a few questions.  For any of the questions, it's OK to say if you
don't know.

{Start the videotape]

EXHIBIT NO.335
R. ASHMAN

GELB 823

Bosnia Questionnaire                                    Location:  Houston
Gelb Consulting Group, Inc.
March 24, 2003

9.  After seeing the program, do you think that the actual pilot endorses or doesn't endorse the
    movie that was advertised on the program you just saw?  *(Rotate asking Q.9 and Q.9a)*

    The actual pilot **endorses** the movie......................................1     Ask Q.10 and 11
    The actual pilot **does not endorse** the movie .........................2     Skip to Q.12
    I don't know.................................................................................3     Skip to Q.14

9a.  After seeing the program, do you think that the actual pilot doesn't endorse or does endorse
     the movie that was advertised on the program you just saw?

    The actual pilot **endorses** the movie......................................1     Ask Q.10 and 11
    The actual pilot **does not endorse** the movie .........................2     Skip to Q.12
    I don't know.................................................................................3     Skip to Q.14

10. Why do you say that the pilot endorses the movie?

    because I don't think the movie
    portrayed him in a bad light.
    The movie portrayed him as a hero,
    for surviving behind enemy lines.

11. When you say the pilot endorses the movie, what do you mean by "endorses"?

    I think he agress with the story
    line, because it, had some kind of
    truth to it, it was similiar to
    his truth.

12. Why do you say that the pilot does not endorse the movie?




13. When you say the pilot does not endorse the movie, what do you mean by "endorse"?



GELB  836

Bosnia Questionnaire                                    Location: Houston
Gelb Consulting Group, Inc.
March 24, 2003

9. After seeing the program, do you think that the actual pilot endorses or doesn't endorse the
   movie that was advertised on the program you just saw? *(Rotate asking Q.9 and Q.9a)*

   The actual pilot **endorses** the movie.....................................1  Ask Q.10 and 11
   The actual pilot **does not endorse** the movie ......................2  Skip to Q.12
   I don't know..........................................................................3  Skip to Q.14

9a. After seeing the program, do you think that the actual pilot doesn't endorse or does endorse
    the movie that was advertised on the program you just saw?

   The actual pilot **endorses** the movie.....................................1  Ask Q.10 and 11
   The actual pilot **does not endorse** the movie ......................2  Skip to Q.12
   I don't know..........................................................................3  Skip to Q.14

10. Why do you say that the pilot endorses the movie?

   because he was apart of the         3
   documentory.

11. When you say the pilot endorses the movie, what do you mean by "**endorses**"?

   he didn't have a problem   3
   with the making of the movie,
   he supports the movie.

12. Why do you say that the pilot does not endorse the movie?

13. When you say the pilot does not endorse the movie, what do you mean by "**endorse**"?

   GELB  871

Bosnia Questionnaire                                     Location:  Houston
Gelb Consulting Group, Inc.
March 24, 2003

9.  After seeing the program, do you think that the actual pilot endorses or doesn't endorse the
    movie that was advertised on the program you just saw?  *(Rotate asking Q.9 and Q.9a)*

    The actual pilot **endorses** the movie.....................................1    Ask Q.10 and 11
    The actual pilot **does not endorse** the movie ........................2    Skip to Q.12
    I don't know........................................................................3    Skip to Q.14


9a.  After seeing the program, do you think that the actual pilot doesn't endorse or does endorse
     the movie that was advertised on the program you just saw?

     The actual pilot **endorses** the movie.....................................①    Ask Q.10 and 11
     The actual pilot **does not endorse** the movie ........................2    Skip to Q.12
     I don't know........................................................................3    Skip to Q.14


10. Why do you say that the pilot endorses the movie?

    It seemed that = ror aory the general
    true story line.                              2



11. When you say the pilot endorses the movie, what do you mean by "endorses"?

    He told the story to the discovery      |
    channel so that the movie would be
    close to the truth.

12. Why do you say that the pilot does not endorse the movie?




13. When you say the pilot does not endorse the movie, what do you mean by "endorse"?



*100/*
*Houston*

Bosnia Questionnaire
Gelb Consulting Group, Inc.
March 6, 2002 - Draft

Interviewer:  Re-screen participants on arrival to the research center.

A.   Have you participated in a focus group discussion or research project with any research
     firm within the past 6 months?

      ☐ Yes                              *Thank and terminate*
      ☑ No
      ☐ Don't know/ Don't remember       *Thank and terminate*

B.   Do you, or does anyone in your household work for a marketing research firm,
     advertising agency, video store, or in the entertainment industry?

      ☐ Yes                              *Thank and terminate*
      ☑ No
      ☐ Don't know/ Don't remember       *Thank and terminate*

C.  Did you have the Discovery Channel available in your home in 2001?

     Yes ..................................1 Ask Screener D
     No .....................................2 Not qualified - *Thank and terminate*

D.  Have you seen one or more Discovery Channel program(s) in the past 3 months?

     Yes ..................................1 Qualified – Continue with Q.1
     No .....................................2 Not qualified - Thank and terminate


*Thank you for taking time to participate in this study.  It will take about 90 minutes and you will
receive $40 after completing the interview for your time and travel expenses.  Please come with
me to the interview room.*

I'd like to show you a one-hour program that was shown on the Discovery Channel.  After you
have seen it, I'd like to ask you a few questions.  For any of the questions, it's OK to say if you
don't know.

{Start the videotape]


GELB  718

EXHIBIT NO: 336
R. ASHMAN

Bosnia Questionnaire
Gelb Consulting Group, Inc.
March 6, 2002 - Draft

7.  After seeing this program, do you think that the movie that was advertised is or is not the
    actual pilot's real-life story? *(Rotate asking Q.7 and Q.7a)*

    Yes, it is ............................1          Ask Q.8
    No, it is not....................②          Ask Q.8
    Don't know .....................3          Skip to Q.9

7a.  After seeing this program, do you think that the movie that was advertised is not the actual
     pilot's real-life story or is the pilot's real-life story?

    Yes, it is ............................1          Ask Q.8
    No, it is not....................2          Ask Q.8
    Don't know .....................3          Skip to Q.9

*If Respondent answered "Yes" or "No" in Q.7 ask Q.8*

8.  Why do you say that?

    Its historical-fiction. There are differences
    such as the fiction two characters
    that were shot down, and the real
    event had only O'Grady.

GELB 720

Bosnia Questionnaire
Gelb Consulting Group, Inc.
March 6, 2002 - Draft

7.  After seeing this program, do you think that the movie that was advertised is or is not the
    actual pilot's real-life story? *(Rotate asking Q.7 and Q.7a)*

    Yes, it is ............................1          Ask Q.8
    No, it is not......................②          Ask Q.8
    Don't know .......................3          Skip to Q.9

7a.  After seeing this program, do you think that the movie that was advertised is not the actual
     pilot's real-life story or is the pilot's real-life story?

    Yes, it is ............................1          Ask Q.8
    No, it is not......................2          Ask Q.8
    Don't know .......................3          Skip to Q.9


*If Respondent answered "Yes" or "No" in Q.7 ask Q.8*

8.  Why do you say that?

In the movie he does things like traveling
a long way through a town. It didn't
say that he did any of this in the
program. Some of the events in the
movie I don't think go along with
what I saw actually happened to
him in the program.

2

GELB 725

Bosnia Questionnaire
Gelb Consulting Group, Inc.
March 6, 2002 - Draft

*1003*
*Houston*

Interviewer: Re-screen participants on arrival to the research center.

A.   Have you participated in a focus group discussion or research project with any research
     firm within the past 6 months?

     ☐  Yes                          ***Thank and terminate***
     ☑  No
     ☐  Don't know/ Don't remember   ***Thank and terminate***

B.   Do you, or does anyone in your household work for a marketing research firm,
     advertising agency, video store, or in the entertainment industry?

     ☐  Yes                          ***Thank and terminate***
     ☑  No
     ☐  Don't know/ Don't remember   ***Thank and terminate***

C. Did you have the Discovery Channel available in your home in 2001?

   Yes ...............................1  Ask Screener D
   No ...................................2  Not qualified - ***Thank and terminate***

D. Have you seen one or more Discovery Channel program(s) in the past 3 months?

   Yes ...............................1  Qualified – Continue with Q.1
   No ...................................2  Not qualified - Thank and terminate


*Thank you for taking time to participate in this study.  It will take about 90 minutes and you will*
*receive $40 after completing the interview for your time and travel expenses.  Please come with*
*me to the interview room.*

I'd like to show you a one-hour program that was shown on the Discovery Channel.  After you
have seen it, I'd like to ask you a few questions.  For any of the questions, it's OK to say if you
don't know.

{Start the videotape]


GELB 728

Bosnia Questionnaire
Gelb Consulting Group, Inc.
March 6, 2002 - Draft

7.  After seeing this program, do you think that the movie that was advertised is or is not the
    actual pilot's real-life story?  *(Rotate asking Q.7 and Q.7a)*

    Yes, it is ...........................1          Ask Q.8
    No, it is not.......................2          Ask Q.8
    Don't know ......................3          Skip to Q.9

7a.  After seeing this program, do you think that the movie that was advertised is not the actual
pilot's real-life story or is the pilot's real-life story?

    Yes, it is ...........................1          Ask Q.8
    No, it is not.....................(2)         Ask Q.8
    Don't know ......................3          Skip to Q.9

*If Respondent answered "Yes" or "No" in Q.7 ask Q.8*

8.  Why do you say that?

The movie had alot more then what
we saw in the program (P) In the
movie (even in the ada) there were
other people involved and more drama
in the movie. In the program he
was just walking around by himself
until they found him. Parts in the
movie like when the wife and father
got a phone call about him, no one
was actualy there filming them, so
I thought it was a reinact ment (TA)

GELB 730

**Hastings, Scott**

| | |
|---|---|
| From: | Flynn, C. W. |
| Sent: | Friday, June 06, 2003 10:25 AM |
| To: | Hastings, Scott |
| Subject: | FW: Bosnia Pre-test tab |



Bosnia Pre-test
tab_3-19-03.do...

```
C. W. "Peter" Flynn
Locke Liddell & Sapp LLP
2200 Ross Avenue
Suite 2200
Dallas, Texas  75201
Tel:  (214) 740-8654
Fax:  (214) 740-8800
Email: cwflynn@lockeliddell.com <mailto:cwflynn@lockeliddell.com>


-----Original Message-----
From: Gabe Gelb [mailto:ggelb@gelbconsulting.com]
Sent: Thursday, March 20, 2003 11:08 AM
To: 'cwflynn@lockeliddell.com'; 'gebowles@lockekliddell.com';
'rwhardin@lockeliddell.com'
Subject: FW: Bosnia Pre-test tab


Let's discuss.

Gabriel M. Gelb
Gelb Consulting Group Inc.
10260 Westheimer, Suite 240
Houston, TX. 77042
Phone: 713-526-5711 Ext 14
Fax: 713-526-4842
<ggelb@gelbconsulting.com>
<http://www.gelbconsulting.com/>

>  <<Bosnia Pre-test tab_3-19-03.doc>>
```

EXHIBIT NO. 338

R. ASHMAN

SOG 005460

1

Bosnia Pre-test Tabulation
March 19, 2003

**Total respondents**                  **19**

1. **Had you seen this program before or not?**
   Yes                         0
   No                          19

2. **In your opinion, after seeing this program, did the program tell about an event that actually took place or not?**
   I believe the program told about an actual event                    19
   I do not believe the program told about an actual event              0
   I'm not sure the program is about an actual event                    0

3. **So far as you can recall, did the actual pilot who was shot down in enemy territory appear in any part of this one-hour program?**
   Yes                         16
   No                          3
   Don't know                  0

4. **Do you recall the pilot's name?**
   **Yes**                     **18**
      Scott O'Grady            12
      Scott                    2
      Scott Grady              1
      Kevin O'Brady            1
      O'Brady                  1
      Scott O                  1

   **No**                      **1**

5. **Do you recall whether or not a movie was advertised on this program?**
   Yes                         19
   No                          0

6. **If Yes:  What was the name of the movie that was advertised?**
   Behind Enemy Lines          19

1

SOG 005461

Bosnia Pre-test Tabulation
March 19, 2003

7. **After seeing this program, do you think that the movie that was advertised is or is not the actual pilot's real-life story? 8. Why do you say that?**

**Yes, it is**                              **6**

There are a lot of similar events.  Like the pilot being shot down behind enemy lines and him being rescued.

It was showing a lot of parts of what was happening.  They were bringing him back from some other part of the country and what ever it took for them to do it.

They showed the way he was out there, and also towards the ending they were showing him and the president walking together.

Because what they said at the beginning described what type of person he was.

It was telling about the pilot and it seemed like it was telling the truth.

There were many context clues in the program that made me believe that it was about the pilot.  They showed the commercial for the movie Behind Enemy Lines many times in the program.  In the commercial for the movie it said it was based on a true story.  I don't think it said specifically who the movie was based on.  I just assumed it was about the pilot.

**No, it is not**                           **13**

I think that some of the events that happened in the movie didn't really happen in actuality.

It's historical fiction.  There are differences, such as the fiction has two characters that were shot down and the real event had only O'Grady.

In the movie he does things like traveling a long way through a town.  It didn't say that he did any of this in the program.  Some of the events in the movie I don't think go along with what I saw actually happened to him in the program.

The movie had a lot more than what we saw in the program.  In the movie (even in the ad) there were other people involved and more drama in the movie.  In the program he was just walking around by himself until they found him.  Parts in the movie, like when the wife and father got a phone call about him, no one was actually there filming them, so I thought it as a re-re-enactment.

There were more diverse scenes than what the pilot described as what actually happened.

The actual event was in Bosnia and the movie took place in Serbia.

2

SOG 005462

Bosnia Pre-test Tabulation
March 19, 2003

I think it may have elements of his life but not his life story. I think some of it may have been fictionalized.

The real person, Scott, looked different. The person we saw in the documentary was not Scott, it was an actor, playing Scott.

I think that the movie was similar to his life but not exactly. There were just a lot of things that were different in the movie than what actually happened in real life.

I didn't see enough of the movie, or advertisement, nor did I see anyone portray him. The name of the pilot in the movie was different. There were scenes in the preview of the movie that were not in the documentary part.

Th movie is overdone. They blow up stuff and make it for Hollywood. It is over dramatized.

In real life the actual pilot did what he had to do to survive. In the movie his role is highly glamorized.

From what the commercial was showing. More events happened to the person in the movie that what was actually shown in the documentary.

**Don't know**                          **0**

9. **After seeing the program, do you think that the actual pilot endorses or doesn't endorse the movie that was advertised on the program you just saw?**
   The actual pilot endorses the movie              13
   The actual pilot does not endorse the movie        3
   I don't know                                       3

10. **Why do you say that the pilot endorses the movie?**

Because it is about himself. (2)

He looks like he was there during some of the filming of Behind Enemy Lines.

It's his life story. He wants everyone to know what he went through and why he's so important.

It was his story. It was his own life story, why wouldn't he want to endorse it?

It involves some of the similar circumstances of the actual events. I believe the pilot understands that even though some events in the movie are facts, he realizes that a movie is fiction, therefore, I think he endorses the movie.

3

SOG 005463

Bosnia Pre-test Tabulation
March 19, 2003

If he did not endorse the movie then he would not have the documentary.

He participates in this show and it was promoting the movie.

He wanted you to go see the movie because it was a true story, the situation was true.

The movie portrays a real life experience of what happens in the Air Force.

It was more of a self documentation and autobiography of the event.  He actually talked about the events that happened to him.

He was talking in the program.

There is nothing on the tape to suggest that he doesn't.  It's assumed that he is supportive of the movie rather than not, because the documentary and advertisement is being shown at the same time.

## 11. When you say the pilot endorses the movie, what do you mean by "endorses"?

It parallels his incident that he survived in Bosnia.  He told his story so it could be retold.

That he is for the movie.

He gives his permission to have the movie made and tell his story.

He knows about the movie.

He contributes to the story, he gave them funding to be able to film and tell his story.

He thinks it's OK that they are making a movie that relates to his story.

The pilot's story seems to go with what the movie is about and he backs up most of the events that happened in the documentary part of this tape.

Probably he would back it up and supply some of the facts.

He kept talking about the next episodes, he lets you know if he is going to get killed or if he was going to survive.

It's close to what actually happened in his real life.

SOG 005464

Bosnia Pre-test Tabulation
March 19, 2003

He actually told the story himself.

Showing what's really behind enemy lines.

Although he states that this movie isn't a real life account, he endorses this film because it presents his occupation and the U.S. military in a positive way.

## 12. Why do you say that the pilot does not endorse the movie?

He didn't come out and say go watch the movie. If he was endorsing the movie, I would think that in the program he would say something about recommending it.

The pilot said that the characters in the movie were not portrayed realistically and that the movie overall was glamorized. He stated that in the movie Top Gun the pilots are not the way they are in real life. I am inferring from this statement that he probably would not endorse this movie.

I think the event was very emotional for him because he was crying when he was talking about it, so I don't think he would want a movie made about an event in his life that was so tragic.

## 13. When you say the pilot does not endorse the movie, what do you mean by "endorse"?

He recommends people go and see the movie.

The pilot approved of the movie, and through his approval he would in effect be standing behind and endorsing the movie.

He sponsors the movie and that he gets a check cut from the movie. Also, that he is all for the movie being made.

## 14. Finally, did you see the movie that was advertised on this program? (either in a theatre or on video or DVD). Do you recall the name of the movie?

| | |
|---|---|
| Yes | 7 |
| Behind Enemy Lines | 7 |
| No | 12 |

## 15. Are you aware of any dispute or litigation between Captain O'Grady and 20th Century Fox movie studio?

| | |
|---|---|
| Yes | 0 |
| No | 19 |

5

SOG 005465

Bosnia Questionnaire                                          Location: Houston
Gelb Consulting Group, Inc.
March 24, 2003

*Recruiting screener: Adult men and women between the ages of 18 and 65 will be randomly recruited by telephone to come to a research facility for the interview.*

Hello, my name is _____ with Gelb Consulting Group, an independent research firm in Houston. We are conducting a research study with Houston residents about cable television and the Discovery Channel.

A. Do you have cable television in your home?        Yes     No
B. Does it include the Discovery Channel?            Yes     No

If No in A and B, Discontinue

   I am calling today to invite you to participate in one of the interview sessions. During the interview you will be shown an action adventure video followed by a short interview. It will take about 90 minutes and you will receive $40 after completing the interview for your time and travel expenses. Your name will not be used in any way and there are no sales involved with the research. Would you be interested in participating and sharing your ideas with us?

*Yes*    □ **Continue**        *No*    □ **Thank and terminate**

A.    Have you participated in a focus group discussion or research project with any research
      firm within the past 6 months?

         □ Yes                              *Thank and terminate*
         □ No
         □ Don't know/ Don't remember       *Thank and terminate*

B.    Do you, or does anyone in your household work for a marketing research firm,
      advertising agency, video store, or in the entertainment industry?

         □ Yes                              *Thank and terminate*
         □ No
         □ Don't know/ Don't remember       *Thank and terminate*

C. Did you have the Discovery Channel available in your home in 2001?

      Yes ....................................1 Ask Screener D
      No .....................................2 Not qualified - *Thank and terminate*

D. Have you seen one or more Discovery Channel program(s) in the past 3 months?

      Yes ....................................1 Qualified
      No .....................................2 Not qualified - *Thank and terminate*

Great. The viewing and interview will be at (insert location). Please give me your name and address so I can send you a confirmation and direction to (insert location).

Name _____   Phone _____

Address _____

GELB 066

EXHIBIT NO. 34D

R. ASHMAN

Bosnia Questionnaire                                                    Location: Houston
Gelb Consulting Group, Inc.
March 24, 2003

Interviewer:  Re-screen participants on arrival to the research center.

A.    Have you participated in a focus group discussion or research project with any research
      firm within the past 6 months?

      ☐ Yes                          ***Thank and terminate***
      ☐ No
      ☐ Don't know/ Don't remember   ***Thank and terminate***

B.    Do you, or does anyone in your household work for a marketing research firm,
      advertising agency, video store, or in the entertainment industry?

      ☐ Yes                          ***Thank and terminate***
      ☐ No
      ☐ Don't know/ Don't remember   ***Thank and terminate***

C.  Did you have the Discovery Channel available in your home in 2001?

      Yes ....................................1 Ask Screener D
      No .....................................2 Not qualified - *Thank and terminate*

D.  Have you seen one or more Discovery Channel program(s) in the past 3 months?

      Yes ....................................1 Qualified – Continue with Q.1
      No .....................................2 Not qualified - Thank and terminate


*Thank you for taking time to participate in this study.  It will take about 90 minutes and you will
receive $40 after completing the interview for your time and travel expenses.  Please come with
me to the interview room.*

I'd like to show you a one-hour program that was shown on the Discovery Channel.  After you
have seen it, I'd like to ask you a few questions.  For any of the questions, it's OK to say if you
don't know.

{Start the videotape]


                                                                       GELB  067

Bosnia Questionnaire                                          Location:  Houston
Gelb Consulting Group, Inc.
March 24, 2003

*Ask the following questions after Respondent has viewed the Discovery Channel program.*

Now I have several questions to ask about the program you just saw.

1.  Had you seen this program before or not?

     Yes ...................................1          Continue
     No .....................................2          Continue
     Don't remember...............3          Continue

2.  In your opinion, after seeing this program, did the program tell about an event that actually
     took place or not?

     I believe the program told about an actual event....................1     Continue
     I do not believe the program told about an actual event........2     Skip to Q14
     I'm not sure the program is about an actual event.................3     Skip to Q.14

3.  So far as you can recall, did the actual pilot who was shot down in enemy territory appear in
     any part of this one-hour program?

     Yes ...................................1          Continue
     No .....................................2          Continue
     Don't remember...............3          Continue

4.  Do you recall the pilot's name?

     Yes ...................................1 ——➤ What was the pilot's name?  _____
     No .....................................2

5.  Do you recall whether or not a movie was advertised on this program?

     Yes ...................................1          Ask Q.6.
     No .....................................2          Skip to Q.7
     Don't remember...............3          Skip to Q.7

6.  If Yes:  What was the name of the movie that was advertised?

GELB  068

Bosnia Questionnaire                                              Location: Houston
Gelb Consulting Group, Inc.
March 24, 2003

7.  After seeing this program, do you think that the movie that was advertised is or is not a
    Hollywood version of the actual pilot's real-life story? *(Rotate asking Q.7 and Q.7a)*

       Yes, it is ............................1          Ask Q.8
       No, it is not........................2          Ask Q.8
       Don't know ......................3          Skip to Q.9

7a. After seeing this program, do you think that the movie that was advertised is not or is a
    Hollywood version of the actual pilot's real-life story?

       Yes, it is ............................1          Ask Q.8
       No, it is not........................2          Ask Q.8
       Don't know ......................3          Skip to Q.9

*If Respondent answered "Yes" or "No" in Q.7 ask Q.8*

8.  Why do you say that?

GELB 069

Bosnia Questionnaire                                    Location: Houston
Gelb Consulting Group, Inc.
March 24, 2003

9.  After seeing the program, do you think that the actual pilot endorses or doesn't endorse the
    movie that was advertised on the program you just saw?  *(Rotate asking Q.9 and Q.9a)*

    The actual pilot **endorses** the movie......................................1   Ask Q.10 and 11
    The actual pilot **does not endorse** the movie .........................2   Skip to Q.12
    I don't know.............................................................................3   Skip to Q.14

9a. After seeing the program, do you think that the actual pilot doesn't endorse or does endorse
    the movie that was advertised on the program you just saw?

    The actual pilot **endorses** the movie......................................1   Ask Q.10 and 11
    The actual pilot **does not endorse** the movie .........................2   Skip to Q.12
    I don't know.............................................................................3   Skip to Q.14

10. Why do you say that the pilot endorses the movie?

11. When you say the pilot endorses the movie, what do you mean by "**endorses**"?

12. Why do you say that the pilot does not endorse the movie?

13. When you say the pilot does not endorse the movie, what do you mean by "**endorse**"?

GELB 070

Bosnia Questionnaire
Gelb Consulting Group, Inc.
March 24, 2003

14. Finally, did you see the movie that was advertised on this program? (either in a theatre or on video or DVD) Do you recall the name of the movie?

    Yes ....................................1 ⟶ What was name of the movie?_____
    No .....................................2

15. Are you aware of any dispute or litigation between Captain O'Grady and 20th Century Fox movie studio?

    Yes ....................................1
    No .....................................2

**CLOSING:**

Thank you for taking time to participate in this study. In case my supervisor wants to check on my work, may I please have your name and phone number? You may be called to verify that I conducted this survey but you will not be contacted for any other reason.

Name: Mr./ Ms _____    Phone (____)_____

Address: _____    Houston, TX _____

Interviewer: _____    Date: _____

**Please sign the receipt below to verify that you have received your check for participating.**

_____

Bosnia Questionnaire
Gelb Consulting Group, Inc.
March 24, 2003

Location:  Baltimore – Consumer Pulse of Baltimore

*3001*

Interviewer:  Re-screen participants on arrival to the research center.

A.   Have you participated in a focus group discussion or research project with any research firm within the past 6 months?

    ☐ Yes                                ***Thank and terminate***
    ☑ No
    ☐ Don't know/ Don't remember        ***Thank and terminate***

B.   Do you, or does anyone in your household work for a marketing research firm, advertising agency, video store, or in the entertainment industry?

    ☐ Yes                                 ***Thank and terminate***
    ☑ No
    ☐ Don't know/ Don't remember        ***Thank and terminate***

C.  Did you have the Discovery Channel available in your home in 2001?

    Yes ...............................① Ask Screener D
    No ................................2 Not qualified - ***Thank and terminate***

D.  Have you seen one or more Discovery Channel program(s) in the past 3 months?

    Yes ...............................① Qualified – Continue with Q.1
    No ................................2 Not qualified = Thank and terminate

*Thank you for taking time to participate in this study.  It will take about 90 minutes and you will receive $40 after completing the interview for your time and travel expenses.  Please come with me to the interview room.*

I'd like to show you a one-hour program that was shown on the Discovery Channel.  After you have seen it, I'd like to ask you a few questions.  For any of the questions, it's OK to say if you don't know.

{Start the videotape}



EXHIBIT NO. 341
R. ASHMAN

GELB 195

Bosnia Questionnaire                          Location:  Baltimore – Consumer Pulse of Baltimore
Gelb Consulting Group, Inc.
March 24, 2003

9.  After seeing the program, do you think that the actual pilot endorses or doesn't endorse the
    movie that was advertised on the program you just saw?  *(Rotate asking Q.9 and Q.9a)*

    The actual pilot **endorses** the movie.....................................1   Ask Q.10 and 11
    The actual pilot **does not endorse** the movie........................2   Skip to Q.12
    I don't know........................................................................3   Skip to Q.14

9a.  After seeing the program, do you think that the actual pilot **doesn't endorse or does
     endorse** the movie that was advertised on the program you just saw?

    The actual pilot **endorses** the movie.....................................①  Ask Q.10 and 11
    The actual pilot **does not endorse** the movie........................2   Skip to Q.12
    I don't know........................................................................3   Skip to Q.14

10. Why do you say that the pilot endorses the movie?

    ② It's about him so it seems he did, or
    should do so.

11. When you say the pilot endorses the movie, what do you mean by "endorses"?

    ⑩ Promotes the movie

12. Why do you say that the pilot does not endorse the movie?

13. When you say the pilot does not endorse the movie, what do you mean by "endorse"?

GELB 198

Bosnia Questionnaire                          Location:  Baltimore – Consumer Pulse of Baltimore
Gelb Consulting Group, Inc.
March 24, 2003

9.  After seeing the program, do you think that the actual pilot endorses or doesn't endorse the
    movie that was advertised on the program you just saw? *(Rotate asking Q.9 and Q.9a)*

    The actual pilot **endorses** the movie......................................1   Ask Q.10 and 11
    The actual pilot **does not endorse** the movie.........................2   Skip to Q.12
    I don't know...................................................................3   Skip to Q.14

9a.  After seeing the program, do you think that the actual pilot **doesn't endorse** or **does**
     **endorse** the movie that was advertised on the program you just saw?

     The actual pilot **endorses** the movie......................................①   Ask Q.10 and 11
     The actual pilot **does not endorse** the movie.........................2   Skip to Q.12
     I don't know...................................................................3   Skip to Q.14

10. Why do you say that the pilot endorses the movie?

I think is I was him and had this
experience I would want others to know
what happens

11. When you say the pilot endorses the movie, what do you mean by "endorses"?

He's for people seeing what happened

12. Why do you say that the pilot does not endorse the movie?

13. When you say the pilot does not endorse the movie, what do you mean by "endorse"?

GELB  218

Bosnia Questionnaire                                    Location: Baltimore – Consumer Pulse of Baltimore
Gelb Consulting Group, Inc.
March 24, 2003

9. After seeing the program, do you think that the actual pilot endorses or doesn't endorse the
movie that was advertised on the program you just saw? *(Rotate asking Q.9 and Q.9a)*

The actual pilot **endorses** the movie......................................1    Ask Q.10 and 11
The actual pilot **does not endorse** the movie........................2    Skip to Q.12
I don't know................................................................3    Skip to Q.14

9a. After seeing the program, do you think that the actual pilot **doesn't endorse** or **does
endorse** the movie that was advertised on the program you just saw?

The actual pilot **endorses** the movie......................................(1)    Ask Q.10 and 11
The actual pilot **does not endorse** the movie........................2    Skip to Q.12
I don't know................................................................3    Skip to Q.14

10. Why do you say that the pilot endorses the movie?

Because it was portrayed more accurately & so it
really happened. He feels it was a good depiction of
the story. /TA

11. When you say the pilot endorses the movie, what do you mean by "endorses"?

He agrees it is an accurate account and it is a
good job of what really happened. It is not like
a "Hollywood"-made up version.

12. Why do you say that the pilot does not endorse the movie?

13. When you say the pilot does not endorse the movie, what do you mean by "endorse"?

GELB 233

Bosnia Questionnaire
Gelb Consulting Group, Inc.
March 24, 2003

Location: Baltimore – Consumer Pulse of Baltimore

9.  After seeing the program, do you think that the actual pilot **endorses** or **doesn't endorse** the movie that was advertised on the program you just saw? *(Rotate asking Q.9 and Q.9a)*

The actual pilot endorses the movie.....................................1    Ask Q.10 and 11
The actual pilot **does not endorse** the movie ........................2    Skip to Q.12
I don't know..............................................................................3    Skip to Q.14

9a.  After seeing the program, do you think that the actual pilot **doesn't endorse** or **does endorse** the movie that was advertised on the program you just saw?

The actual pilot endorses the movie.....................................(1)  Ask Q.10 and 11
The actual pilot **does not endorse** the movie ........................2    Skip to Q.12
I don't know..............................................................................3    Skip to Q.14

10.  Why do you say that the pilot endorses the movie?

He gave out details and cooperated with the movie

11.  When you say the pilot endorses the movie, what do you mean by "endorses"?

ndorses means agrees with his story

12.  Why do you say that the pilot does not endorse the movie?

13.  When you say the pilot does not endorse the movie, what do you mean by "endorse"?

GELB 250

Bosnia Questionnaire                          Location:  Baltimore – Consumer Pulse of Baltimore
Gelb Consulting Group, Inc.
March 24, 2003

9.   After seeing the program, do you think that the actual pilot **endorses or doesn't endorse** the
     movie that was advertised on the program you just saw? *(Rotate asking Q.9 and Q.9a)*

The actual pilot **endorses** the movie....................................1   Ask Q.10 and 11
The actual pilot **does not endorse** the movie........................2   Skip to Q.12
I don't know.................................................................................3   Skip to Q.14

9a.  After seeing the program, do you think that the actual pilot **doesn't endorse or does
     endorse** the movie that was advertised on the program you just saw?

The actual pilot **endorses** the movie....................................1   Ask Q.10 and 11
The actual pilot **does not endorse** the movie........................2   Skip to Q.12
I don't know.................................................................................3   Skip to Q.14

10. Why do you say that the pilot endorses the movie?

①   To show how rough it was for him, and how wonderful it was that the others came for him

11. When you say the pilot endorses the movie, what do you mean by "endorses"?

⑤   That he okayed it

12. Why do you say that the pilot does not endorse the movie?

13. When you say the pilot does not endorse the movie, what do you mean by "endorse"?

GELB  299

Bosnia Questionnaire                    Location: Los Angeles: Galleria at South Bay
Gelb Consulting Group, Inc.                                              2041
March 24, 2003

Interviewer: Re-screen participants on arrival to the research center.

A.      Have you participated in a focus group discussion or research project with any research
        firm within the past 6 months?

        ☐ Yes                           *Thank and terminate*
        ☐ No
        ☐ Don't know/ Don't remember    *Thank and terminate*

B.      Do you, or does anyone in your household work for a marketing research firm,
        advertising agency, video store, or in the entertainment industry?

        ☐ Yes                           *Thank and terminate*
        ☐ No
        ☐ Don't know/ Don't remember    *Thank and terminate*

C.      Did you have the Discovery Channel available in your home in 2001?

        Yes ...................................1 Ask Screener D
        No .....................................2 Not qualified - *Thank and terminate*

D.      Have you seen one or more Discovery Channel program(s) in the past 3 months?

        Yes ...................................1 Qualified – Continue with Q.1
        No .....................................2 Not qualified - Thank and terminate


*Thank you for taking time to participate in this study. It will take about 90 minutes and you will
receive $40 after completing the interview for your time and travel expenses. Please come with
me to the interview room.*

I'd like to show you a one-hour program that was shown on the Discovery Channel. After you
have seen it, I'd like to ask you a few questions. For any of the questions, it's OK to say if you
don't know.

{Start the videotape]


GELB  669

EXHIBIT NO: 36

R. ASHMAN

Bosnia Questionnaire                        Location:  Los Angeles:  Galleria at South Bay
Gelb Consulting Group, Inc.
March 24, 2003

9. After seeing the program, do you think that the actual pilot endorses or doesn't endorse the
movie that was advertised on the program you just saw?  *(Rotate asking Q.9 and Q.9a)*

The actual pilot **endorses** the movie.....................................(1)  Ask Q.10 and 11
The actual pilot **does not endorse** the movie........................2   Skip to Q.12
I don't know.....................................................................3   Skip to Q.14

9a. After seeing the program, do you think that the **actual pilot doesn't endorse or does
endorse** the movie that was advertised on the program you just saw?

The actual pilot **endorses** the movie.....................................1   Ask Q.10 and 11
The actual pilot **does not endorse** the movie........................2   Skip to Q.12
I don't know.....................................................................3   Skip to Q.14

10. Why do you say that the pilot endorses the movie?

he speaks during the movie and                    3
Ive seen it in news reports on                    30
what had happened

11. When you say the pilot endorses the movie, what do you mean by "endorses"?

He wants people to know what he                   1
went through in being rescued
the risk the pilot

12. Why do you say that the pilot does not endorse the movie?




13. When you say the pilot does not endorse the movie, what do you mean by "endorse"?

GELB  607

Bosnia Questionnaire                    Location: Los Angeles: Galleria at South Bay
Gelb Consulting Group, Inc.
March 24, 2003

9. After seeing the program, do you think that the actual pilot endorses or doesn't endorse the
   movie that was advertised on the program you just saw? *(Rotate asking Q.9 and Q.9a)*

   The actual pilot **endorses** the movie.....................................1   Ask Q.10 and 11
   The actual pilot **does not** endorse the movie .......................2   Skip to Q.12
   I don't know.................................................................3   Skip to Q.14

9a. After seeing the program, do you think that the actual pilot **doesn't endorse or does**
    endorse the movie that was advertised on the program you just saw?

    The actual pilot **endorses** the movie.............................(1)   Ask Q.10 and 11
    The actual pilot **does not** endorse the movie .......................2   Skip to Q.12
    I don't know.................................................................3   Skip to Q.14

10. Why do you say that the pilot endorses the movie?

Because they are showing you what happened in
the war, they are reenacting the real story so
that we can see what actually happened since we
cant be there.

11. When you say the pilot endorses the movie, what do you mean by "endorses"?

He is giving his approval

12. Why do you say that the pilot does not endorse the movie?

13. When you say the pilot does not endorse the movie, what do you mean by "endorse"?

GELB 547

osnia Questionnaire
lb Consulting Group, Inc.
rch 24, 2003

Location:  Milwaukee – Grand Avenue Mall

4005

Interviewer:  Re-screen participants on arrival to the research center.

A.    Have you participated in a focus group discussion or research project with any research firm within the past 6 months?

        ☐ Yes
        ☒ No                    *Thank and terminate*
        ☐ Don't know/ Don't remember    *Thank and terminate*

B.    Do you, or does anyone in your household work for a marketing research firm, advertising agency, video store, or in the entertainment industry?

        ☐ Yes
        ☒ No                    *Thank and terminate*
        ☐ Don't know/ Don't remember    *Thank and terminate*

C.    Did you have the Discovery Channel available in your home in 2001?

        Yes ...........................① Ask Screener D
        No ...........................2 Not qualified - *Thank and terminate*

D.    Have you seen one or more Discovery Channel program(s) in the past 3 months?

        Yes ...........................① Qualified – Continue with Q.1
        No ...........................2 Not qualified - Thank and terminate

*Thank you for taking time to participate in this study.  It will take about 90 minutes and you will receive $40 after completing the interview for your time and travel expenses.  Please come with me to the interview room.*

I'd like to show you a one-hour program that was shown on the Discovery Channel. After you have seen it, I'd like to ask you a few questions.  For any of the questions, it's OK to say if you don't know.

{Start the videotape}

GELB 987

EXHIBIT NO. 343

R. ASHMAN

Bosnia Questionnaire                                    Location:  Milwaukee – Grand Avenue Mall
Gelb Consulting Group, Inc.
March 24, 2003

9.  After seeing the program, do you think that the actual pilot **endorses or doesn't endorse the**
    movie that was advertised on the program you just saw?  *(Rotate asking Q.9 and Q.9a)*

The actual pilot **endorses the movie**.......................................1  Ask Q.10 and 11
The actual pilot **does not endorse the movie** ........................2    Skip to Q.12
I don't know..........................................................................3    Skip to Q.14

9a. After seeing the program, do you think that the actual pilot **doesn't endorse or does**
    **endorse** the movie that was advertised on the program you just saw?

The actual pilot **endorses the movie**.......................................1  Ask Q.10 and 11
The actual pilot **does not endorse the movie** ........................2    Skip to Q.12
I don't know..........................................................................3    Skip to Q.14

10. Why do you say that the pilot endorses the movie?

Because he knew that showing that show
would help someone out and also show
them how to handle the situation. So
why keep it a secret when you know. (A/E) No.

11. When you say the pilot endorses the movie, what do you mean by "endorses"?

That he let them know it was okay
to show the struggles in how to make it
out there. A/E He gave them permission to
make this life story public. (A/E) No.

12. Why do you say that the pilot does not endorse the movie?

13. When you say the pilot does not endorse the movie, what do you mean by "endorse"?

GELB  1039

Bosnia Questionnaire                          Location:  Milwaukee – Grand Avenue Mall
Gelb Consulting Group, Inc.
March 24, 2003

9.  After seeing the program, do you think that the actual pilot **endorses or doesn't endorse** the
movie that was advertised on the program you just saw?  *(Rotate asking Q.9 and Q.9a)*

The actual pilot **endorses** the movie....................................1    Ask Q.10 and 11
The actual pilot **does not endorse** the movie .......................2    Skip to Q.12
I don't know.............................................................................3    Skip to Q.14

9a.  After seeing the program, do you think that the actual pilot **doesn't endorse or does
endorse** the movie that was advertised on the program you just saw?

The actual pilot **endorses** the movie....................................1    Ask Q.10 and 11
The actual pilot **does not endorse** the movie .......................2    Skip to Q.12
I don't know.............................................................................3    Skip to Q.14

10. Why do you say that the pilot endorses the movie?

Because he didn't say anything bad     30.
about the movie. He was neutral,   E/A Nothing

11. When you say the pilot endorses the movie, what do you mean by "endorses"?

3

He favors or agrees with the movie.
He likes it.    a/A Nothing

12. Why do you say that the pilot does not endorse the movie?

13. When you say the pilot does not endorse the movie, what do you mean by "endorse"?

GELB  1089

Bosnia Questionnaire
Gelb Consulting Group, Inc.
March 24, 2003

Location:  Milwaukee – Grand Avenue Mall

7.  After seeing this program, do you think that the movie that was advertised is a Hollywood
version of the actual pilot's real-life story, or is **not** a Hollywood version of the actual pilot's
real-life story?  *(Rotate asking Q.7 and Q.7a)*

Yes, it is ..........................1        Ask Q.8
No, it is not......................2        Ask Q.8
Don't know .....................3        Skip to Q.9

7a.  After seeing this program, do you think that the movie that was advertised **is not** a
Hollywood version of the actual pilot's real-life story, or **is** a Hollywood version of the actual
pilot's real-life story?

Yes, it is ......................(1)        Ask Q.8
No, it is not......................2        Ask Q.8
Don't know .....................3        Skip to Q.9

*If Respondent answered "Yes" or "No" in Q.7 ask Q.8*

8.  Why do you say that?

8

It is a dramatization of the actual Event. (we) nonthing

GELB  1172

Bosnia Questionnaire
Gelb Consulting Group, Inc.
March 24, 2003

Location:  Milwaukee – Grand Avenue Mall

9.  After seeing the program, do you think that the actual pilot **endorses** or **doesn't endorse** the
movie that was advertised on the program you just saw?  *(Rotate asking Q.9 and Q.9a)*

The actual pilot **endorses** the movie.................................(1)   Ask Q.10 and 11
The actual pilot **does not endorse** the movie .....................2   Skip to Q.12
I don't know..........................................................................3   Skip to Q.14

9a.  After seeing the program, do you think that the actual pilot **doesn't endorse** or **does
endorse** the movie that was advertised on the program you just saw?

The actual pilot **endorses** the movie.................................1   Ask Q.10 and 11
The actual pilot **does not endorse** the movie .....................2   Skip to Q.12
I don't know..........................................................................3   Skip to Q.14

10.  Why do you say that the pilot endorses the movie?

Actual footage of what the plane
being shut down was part of the
movie (wp) nothing

11.  When you say the pilot endorses the movie, what do you mean by "**endorses**"?

Gave permission to run footage
of the actual event (wp) nothing

12.  Why do you say that the pilot does not endorse the movie?

13.  When you say the pilot does not endorse the movie, what do you mean by "**endorse**"?

GELB 1173

LEO J. SHAPIRO AND ASSOCIATES, L.L.C., 488 EAST ILLINOIS STREET, CHICAGO, ILLINOIS 60611 / (312) 321-8111

## DECLARATION OF PHILIP JOHNSON

I, Philip Johnson, state as follows:

## I. INTRODUCTION

1.      I am Chief Executive Officer of Leo J. Shapiro and Associates, Inc., a Chicago-based

market research and consulting firm that conducts surveys.

2.      I have been with this firm since 1971.  Over the past 32 years, I have designed and

supervised hundreds of surveys measuring consumer behavior, opinion, and beliefs

concerning brands and products, employing a wide range of research techniques.  I have

given lectures before the American Bar Association (ABA), the Practising Law Institute

(PLI), and the International Trademark Association (INTA) on the use of survey research

in litigation. I am a member of the American Marketing Association (AMA), the

American Association for Public Opinion Research (AAPOR), and the International

Trademark Association (INTA). I have a B.S. degree in Psychology from Loyola

University and an M.B.A. degree from the University of Chicago.  A description of my

background and a list of cases where I have offered survey evidence during the past five

years are attached in the Appendix of this Declaration.

-2-

3.     In April 2003, I was contacted by counsel for defendants, Twentieth Century Fox Film

Corporation (Fox) and Discovery Communications, Inc. (Discovery), concerning a

dispute that has arisen between the defendants and plaintiff, Scott O'Grady.  This dispute

involves the Fox motion picture "Behind Enemy Lines," and the advertisements for this

film that aired during the Discovery Channel program, "Behind Enemy Lines: The Scott

O'Grady Story." In this dispute, the plaintiff claims that showing advertising and

promotional spots for Fox's "Behind Enemy Lines" motion picture during the Discovery

Channel program falsely communicated to viewers that the Fox motion picture is based

upon Scott O'Grady's real life story, and that Scott O'Grady endorsed the Fox film in

some way.

4.     Counsel informed me that Gabriel Gelb, of the Gelb Consulting Group, Inc., conducted a

study on behalf of the plaintiff, Scott O'Grady, in an attempt to measure whether or not

viewers of the November 2001 Discovery Channel program would falsely believe that the

Fox film that was advertised during the "commercial space" is Scott O'Grady's real-life

story. The Gelb study also attempts to determine whether or not viewers of the

Discovery Channel program believe that O'Grady "endorses" the Fox film. Counsel

asked me to review the report, and the underlying materials that were provided with the

report, to determine whether or not it had any utility in this dispute. I agreed to conduct

such a review and proceeded to do so.

08/11/2003 13:29 FAX 713 752 4221    JACKSON WALKER LLP    Case 5:02-cv-00173-DF-CMC    Document 65    Filed 08/11/03    Page 88 of 115    ☑005

-3-

5.     This report summarizes my general observations and opinions resulting from my review of the Expert Report of Gabriel Gelb, and a videotape copy of the Discovery Channel program that aired in November 2001. It is clear from the methodology and results described in this report that the Gelb study has no merit. At this point I have been furnished with a deposition transcript of Mr. Gelb, as well as copies of the actual surveys used in the Gelb study. I have not yet been furnished with an electronic database and coding materials that identify how each survey response was treated in the tabulations, or any other back up survey documentation which may form a basis for the opinions expressed in Mr. Gelb's report. I anticipate that I may have further opinions regarding the Gelb study once these materials have been made available to me.

-4-

## II. DISCUSSION

6.    The Gelb study completely fails to measure what it sets out to measure. The survey is defective in many ways, including having an unrepresentative survey universe, failing to incorporate any form of a control to measure error or bias, using leading and ambiguous question structures and sequences, and reporting conclusions that are not supported by the survey results.

7.    The Gelb study universe is comprised of respondents who were largely recruited from pre-screened phone lists of individuals who had previously offered to participate in research focus groups in exchange for a cash payment. Members of this database were contacted by an agent for the Gelb Consulting Group and asked if they would be willing to watch an action adventure video and then participate in an interview. Potential respondents were offered a $40 cash incentive up front with the offer to participate in the survey.

8.    Those respondents who were willing to come to a research facility in exchange for this payment (as well as the promise of being entertained by an action adventure video) were subsequently qualified for inclusion based on having access to the Discovery Channel, and agreeing with a leading "screening" question that asked, *"Have you seen one or more Discovery Channel programs in the past three months?"*. It is obvious from the construction of this leading question that the "correct" answer would be "Yes," if the respondent wanted to obtain the $40 payment and participate in this offer that they had already agreed to.

-5-

9.    Moreover, even if potential respondents had actually seen one program on Discovery Channel in the past three months, it does not mean that they are regular viewers of the Discovery Channel or that they have any interest in the type of program of issue in this dispute. It is my understanding that viewers of cable television programs such as those on the Discovery Channel, which cover a diversity of topics, do not generally have equal interest in watching every program that is offered. For example, there is a type of Discovery Channel viewer who is attracted to the "military" style program that was shown in the Gelb survey. However, it is my understanding that a majority, roughly two-thirds, of viewers of this type of Discovery Channel programming are males, while the Gelb study includes a preponderance of females (54%) in the survey universe.

10.    In effect, the universe utilized in the Gelb study bears little relationship to those who may have actually been exposed to the Discovery Channel program in question. In fact, when survey respondents were asked whether they had seen this program prior to being interviewed, only 37 respondents (18%) report that they thought they had. Even this small proportion is likely to overstate reality due to "false recall," and/or the false assumption that they may have seen it before because they responded that they watch Discovery Channel during the screening process.

11.    The Gelb study fails to employ any form of control cell or control question in the survey. The purpose of a control is to measure what portion of the responses to the survey questions are artifacts of the survey design itself, the structure of the questions being asked, and any guessing or interpretation of the survey goals caused by the recruiting

-6-

process and subsequent experience among those who were interviewed. A proper control group of respondents should have been shown a different stimulus, for example, another "military" themed program featuring the story of a specific character, and then asking the same set of questions to determine how many respondents would have given similar answers in response to any stimulus as a function of the study design. The use of leading, suggestive, and ambiguous questions in the Gelb survey further exacerbates the need for a control group to measure the impact of these biases in the responses of the survey participants.

12. Control cells or control questions are also necessary when conducting a study such as this so that a baseline can be established to measure pre-existing beliefs and attitudes concerning the topics being discussed in the key survey questions. For example, in the case of the Gelb study, a control measurement would be necessary to determine what proportion of respondents already believe that any military adventure movie would be inspired by some form of an "actual" event. Absent a control, no conclusions may be reached in the Gelb study about respondents' general opinions about military programs on the Discovery Channel, military action adventure movies, or what general beliefs they hold about "approval or endorsement."

13. It is my understanding that the plaintiff in this dispute, Scott O'Grady, appeared on other televised programming that was broadcast at about the same time as the Discovery Channel program. For example, the "Hot Ticket" program that aired on December 1, 2001, featured the plaintiff discussing his actual experience in Bosnia and contrasting it

-7-

with the Fox movie, "Behind Enemy Lines." O'Grady's representations on that program would provide a control measure of what proportion of viewers believe that "he endorsed the Fox film and that it was his story," as he contends the Discovery Channel program does with its Fox movie advertisements. This program could have been incorporated into the Gelb study as a control stimulus to gauge how many respondents would have given similar answers to the survey questions, after exposure to this "non-infringing" program.

14.     Another possible approach to creating a "control" stimulus may have been to use the basic documentary program, which originally aired on the BBC and was produced with Scott O'Grady's permission, without the Discovery Channel promotional materials that were created to showcase this program or the advertising messages for the Fox film that were broadcast when Discovery Channel aired the program. To provide comparability, one would need to add promotional materials for other Discovery Channel programs, as well as advertising messages for other similar movies (e.g., Blackhawk Down). In any case, the Gelb study utilizes no control to measure how respondents would have answered the survey questions based simply on the survey design, the specific questions asked, or exposure to the O'Grady documentary, which he did, in fact, "endorse."

15.     The Gelb survey questions are leading and suggestive in construction, while ambiguous in context. For example, the survey begins by asking respondents (Question 1), *"Had you seen this program before or not?"* This is followed by Question 2, *"In your opinion, after seeing this program, did the program tell about an event that actually took place or not?"* Among the survey respondents, 8% said "No" or that they "Don't know" if it was

-8-

about an actual event, suggesting they had little understanding of what they had just seen. The balance (92%) say "Yes," but there is no way of knowing what they are referring to. For instance, they could simply be saying that the program talked about an actual event such as the war in Bosnia.

16.   In Question 3, Gelb asks respondents, *"So far as you recall, did the actual pilot who was shot down in enemy territory appear in any part of this one-hour program?"* This is a leading question that is full of information that the respondent may or may not have recalled on their own, without being aided by the question. It does, at the minimum, suggest that there was *"an actual pilot,"* who was *"shot down in enemy territory,"* who did appear in *"part of this one-hour program."* Instead of using this type of leading question structure that prompts respondents, the accepted methodological practice is to ask an open-ended question that allows the respondent to answer in their own words, or ask a series of questions such as, *"What was the program you saw about?  PROBE: What else do you recall in this program?"*

17.   The Gelb study continues to use leading question sequences while failing to offer a balanced set of response choices to the respondent. For example, Question 4 asks, *"Do you recall the pilot's name?  IF YES:  What was the pilot's name?"* Then follows Question 5, *"Do you recall whether or not a movie was advertised on this program?"* And then Question 6, *"IF YES:  What was the name of the movie that was advertised?"* These questions are structured with a demand effect by failing to pose alternative choices, such as, "do you or don't you." It also has a "yea saying" effect that drives respondents

-9-

to agree with such a positively stated question and respond "Yes" even if they do not have an opinion or do not understand the question. These failings are exacerbated by the lack of a proper control cell that could measure the error caused by such questioning. The results shown in the Gelb survey indicate that 89% of respondents agreed that a movie was advertised, and 84% of respondents correctly identified "Behind Enemy Lines" as the movie advertised.

18. Inexplicably, the Gelb survey proceeds to ask Question 7 of all respondents, even of those who did not recall that the Fox movie "Behind Enemy Lines" was advertised: *"After seeing this program, do you think that the movie that was advertised is a Hollywood version of the actual pilot's real-life story, or is not a Hollywood version of the actual pilot's real-life story?"* This central question in the Gelb study is so poorly designed and constructed, and the alternatives are so unclear and ambiguous, that no conclusions can be drawn from the results. For instance, the "choices" forced on the respondent assume the respondent has a belief about the *"actual pilot's real-life story"* when it is uncertain whether respondents had thought about it before being asked the question. It is also impossible to decipher what the alternative choices mean given the introduction of the term *"Hollywood version."*

19. The term "Hollywood" as an adjective is generally used to describe events that are made-up or fictional. At the least, the choice of the verbiage, *"Hollywood version of the actual pilot's real-life story"* appears to be a textbook example of an oxymoron. In such a situation, without any control cell to determine how a respondent would answer such a

-10-

question, no conclusions can be drawn from the results of this question. Even the follow-up in Question 8, *"Why do you say that [this movie is a Hollywood version of the actual pilot's real-life story]?"* demonstrates this ambiguity. For example, the most frequent response listed in the table provided in the Gelb report suggests that one out of four (25%) of those respondents who agreed that it was a *"Hollywood version,"* said that this was because *"events in the movie were similar to a real story but more far-fetched."* This response suggests that the survey participant recognizes that it is not Scott O'Grady's story, but it is a similar story, a position that is consistent with the defendant's claim in this dispute.

20. The creation of this confusing and ambiguous question apparently occurred as a "remedy" when a somewhat more appropriate question was tested in a preliminary survey (or pre-test), which asked. *"After seeing this program, do you think that the movie which was advertised is or is not the actual pilot's real life story?"* While sharing many of the leading characteristics and tendency to inform the respondent as the later version, this question notably does not contain the words "Hollywood version.". Without this confusing use of "Hollywood version" in the key survey question, just 32% of the "pre-test" respondents replied "yes." This result contrasts sharply with the results obtained by the "altered" version of this question where 70% answered "yes." In effect, these differences suggest that respondents understand quite clearly that the movie is not the "O'Grady story" but rather is simply a Hollywood movie that is only loosely related to or "inspired by" this story. In his deposition testimony, Mr. Gelb reports that he made this

-11-

change to the key survey question because it was not working the way he would have
liked.

21.   The Gelb study then continues to pursue this suggestive line of questioning, irrespective
of whether the respondent had any views, by asking Question 9, *"After seeing the
program, do you think the actual pilot endorses or doesn't endorse the movie advertised
on the program you just saw?"* This is another poorly constructed question that suggests
that the *"actual pilot"* should have a position or stance about the movie; i.e., endorse/
does not endorse the movie advertised. This comes right after the previous suggestive
questioning sequence that informed survey respondents that the movie may be a
*"Hollywood version"* of the *"actual pilot's real-life story."*

22.   At this juncture, the question series may have confused respondents into thinking that the
survey questions referred to the Discovery Channel program (which had been described
to them as an action-adventure video when they were recruited), rather than to the Fox
movie. For example, 22% of those who agreed with the idea that the pilot endorses the
film say it is because *"he was talking on the program,"* or 3% of respondents said *"(It)
showed true life of O'Grady with movie clips,"* and 2% of respondents said *"He'd like
people to see what happened, not the Hollywood version."* These responses suggest that
when they answered this survey question, respondents may have been referring to the
Discovery Channel program, or scenes contained within the Discovery Channel program,
and not the Fox movie. In addition, the structure of Question 9 is highly speculative and
encourages guessing. This kind of question may result in respondents conducting a

"mental coin toss," where about half (49%) of the respondents agree that the pilot endorses the movie, and the other half (51%) report either that the pilot does not endorse the movie (26%), or that they do not know (25%).

21. By the end of the Gelb study, respondents have been exposed to a constant barrage of the following terms: *"the program," "the actual pilot," "the pilot's real-life story," "the movie," " the movie advertisement,"* and *"a Hollywood version."*. In addition, the questions in the Gelb study repeat the phrase "advertised on the program," suggesting that the advertisements are contained in the Discover Channel program itself, rather than occurring in the "commercial space" which interrupts the program. The cumulative impact of this confusion on the survey respondents is unknown. Again, without a measure of how respondents would answer such speculative questions when exposed to a control stimulus, no conclusions can be drawn from these responses other than the fact that they appear to reflect guessing behavior.

-13-

### III. CONCLUSIONS

22. Overall, the Gelb study does not include the proper universe, does not incorporate a control group or even a single control question to measure error, uses biased and leading questions, and reaches conclusions that are not supported by the survey results.

23. Based on my review of this study, no valid conclusions can be drawn about whether persons who would have actually been exposed to the Discovery Channel program that aired in November of 2001, and that contained, among other advertising and promotional materials, advertisements for the Fox movie, "Behind Enemy Lines," would have been falsely led to believe that the Fox movie was in fact the true story of Scott O'Grady, or that he endorsed the Fox movie.

24. The work required in preparing this declaration is covered by a billing of $24,500. Additional time required for trial testimony or deposition will be billed at a rate of $5,000 per day, plus expenses.

Pursuant to 28 U.S.C., Section 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on July 11, 2003 in Chicago, Illinois.

_Philip Johnson_

Philip Johnson

## APPENDIX

- Philip Johnson Curriculum Vitae

- Recent Cases Where Philip Johnson Testified



LEO J. SHAPIRO AND ASSOCIATES, L.L.C., 455 EAST ILLINOIS STREET, CHICAGO, ILLINOIS 60611 / (312) 321-8111

# PHILIP JOHNSON

## CURRICULUM VITAE

Philip Johnson is the Chief Executive Officer of Leo J. Shapiro and Associates, a Chicago-based market research and behavioral consulting company. Mr. Johnson has been with this firm since 1971 and has held a number of positions. In recent years, he has concentrated his efforts in the areas of study design and the development of innovative research techniques.

Over the past years, Mr. Johnson has designed and supervised hundreds of surveys measuring consumer behavior and opinion, employing a wide range of research techniques. His area of expertise is in the use of survey research as a tool in litigation, including jury selection and trademark disputes.

Part of Mr. Johnson's training has been through working with Dr. Leo J. Shapiro, the Founder of the company; the late Dr. Philip M. Hauser, a former Director of the U. S. Census Bureau; and the late Dr. Hans Zeisel, who made significant contributions in the application of social science to the solution of legal questions.

2

Mr. Johnson has given lectures before the American Bar Association (ABA) and the

Practising Law Institute (PLI) on the use of survey research in litigation. He is a member of the

American Marketing Association (AMA), the American Association for Public Opinion

Research (AAPOR), and the International Trademark Association (INTA).

Mr. Johnson has a B.S. degree in Psychology from Loyola University and a M.B.A. degree from

the University of Chicago.



LEO J. SHAPIRO AND ASSOCIATES, L.L.C., 456 EAST ILLINOIS STREET, CHICAGO, ILLINOIS 60611 / (312) 321-8111

## RECENT CASES WHERE PHILIP JOHNSON
## TESTIFIED OR OFFERED SURVEY EVIDENCE...

**FEBRUARY 2003**
GATEWAY, INC. VS. COMPANION PRODUCTS, INC.
United States District Court for the
District of South Dakota (Southern Division)
Likelihood of Confusion

**DECEMBER 2002**
ORACLE CORPORATION AND ORACLE INTERNATIONAL
CORPORATION VS. LIGHT READING, INC.
United States District Court for the
Northern District of California (San Francisco Division)
Likelihood of Confusion and Fame

**NOVEMBER 2002**
COMPUTER ACCESS TECHNOLOGY CORPORATION VS.
CATALYST ENTERPRISES, INC.
United States District Court for the
Northern District of California (Oakland Division)
Likelihood of Confusion

**OCTOBER 2002**
GARY M. KAWESCH, M.D., INC. VS. ANTOINE L. GARABET,
M.D., INC. AND REFRACTIVE ASSOCIATES, INC.
United States District Court for the
Northern District of California (San Jose Division)
Likelihood of Confusion

**JUNE 2002**
GIANT BRANDS, INC., AND GIANT OF MARYLAND, L.L.C.
VS. GIANT EAGLE, INC., AND PHOENIX INTANGIBLES
HOLDING COMPANY
United States District Court for the
District of Maryland
Likelihood of Confusion

**MARCH 2002**
MICHAEL A. WAUL VS. CIRCUIT CITY STORES, INC., ET AL.
Superior Court of the State of California for the
County of San Francisco
False Advertising

**FEBRUARY 2002**
MICROSOFT CORPORATION VS. LINDOWS.COM, INC.
United States District Court for the
Western District of Washington
Likelihood of Confusion

2

| | |
|---|---|
| **FEBRUARY 2002** | FORD MOTOR COMPANY VS. FACTORY FIVE RACING, INC.<br>United States District Court for the<br>District of Massachusetts<br>    Likelihood of Confusion and Secondary Meaning |
| **DECEMBER 2001** | CLAIROL, INC. VS. XTREME COLOR, INC.<br>United States District Court for the<br>Southern District of New York<br>    Likelihood of Confusion |
| **AUGUST 2001** | BIG O TIRES, INC. VS. BIGFOOT 4X4, INC., ET AL.<br>United States District Court for the<br>District of Colorado<br>    Likelihood of Confusion |
| **MAY 2001** | HEALTHPOINT, LTD. VS. STRATUS PHARMACEUTICALS, INC.<br>United States District Court for the<br>Western District of Texas<br>    Likelihood of Confusion |
| **MARCH 2001** | CHATTANOGA MANUFACTURING, INC. VS. NIKE, INC., MICHAEL JORDAN<br>United States District Court for the<br>Northern District of Illinois (Eastern Division)<br>    Likelihood of Confusion |
| **OCTOBER 2000** | MOLDEX METRIC, INC. VS. AEARO COMPANY<br>United States District Court for the<br>Central District of California<br>    Likelihood of Confusion |
| **AUGUST 2000** | CASTROL, INC. VS. PENNZOIL COMPANY, ET AL.<br>United States District Court for the<br>District of New Jersey<br>    False Advertising |
| **MAY 2000** | WORLDWIDE TRAVEL PLACE, INC. VS. POWERMOUNT DEVELOPMENT, 1 TRAVEL, AND RICHARD ATTENBERG<br>United States District Court for the<br>Central District of California<br>    Genericness |
| **MARCH 2000** | PHARMACIA & UPJOHN COMPANY VS. SOLVAY, MERCK AND COMPANY, GLAXO WELLCOME<br>Food and Drug Administration<br>    Likelihood of Confusion |

3

| | |
|---|---|
| JUNE 1999 | HEWLETT-PACKARD VS. NU-KOTE INTERNATIONAL<br>United States District Court for the<br>Northern District of California (San Jose Division)<br>Likelihood of Confusion |
| JANUARY 1999 | NATIONAL GUARDIAN LIFE INSURANCE VS. THE<br>GUARDIAN LIFE INSURANCE COMPANY OF AMERICA<br>United States District Court for the<br>Western District of Wisconsin<br>Likelihood of Confusion |
| NOVEMBER 1998 | BIG TEN CONFERENCE, INC. VS. BIG TEN ENTERPRISES<br>United States District Court for the<br>Eastern District of Michigan<br>Likelihood of Confusion |
| AUGUST 1998 | THE CIT GROUP, INC. VS. CITICORP.<br>United States District Court for the<br>District of New Jersey<br>Likelihood of Confusion |
| AUGUST 1998 | BLACK & DECKER VS. PROTECH<br>United States District Court for the<br>Eastern District of Virginia<br>Likelihood of Confusion and Secondary Meaning |
| DECEMBER 1997 | ALBERT NIPON AND AMERICAN POP MARKETING GROUP,<br>INC. VS. THE LESLIE FAY COMPANIES, INC., ET. AL.<br>United States Bankruptcy Court for the<br>Southern District of New York<br>Likelihood of Confusion |
| SEPTEMBER 1997 | FRANKLIN RESOURCES, INC. VS. FRANKLIN CREDIT<br>MANAGEMENT CORPORATION<br>United States District Court for the<br>Southern District of New York<br>Likelihood of Confusion |
| APRIL 1997 | INTEL CORPORATION VS. ADVANCED MICRO DEVICES,<br>INC. AND CYRIX CORPORATION<br>United States District Court for the<br>District of Delaware<br>Genericness |
| APRIL 1997 | THE COCA-COLA COMPANY VS. R.J. CORR<br>United States District Court for the<br>Northern District of Illinois<br>Likelihood of Confusion |

4

MARCH 1997      MASTERCARD INTERNATIONAL, INC. VS. AMERICAN
                EXPRESS COMPANY, INC. AND ADVANTA CORPORATION
                United States District Court for the
                Northern District of California
                        Likelihood of Confusion

MARCH 1997      KENDALL-JACKSON VS. GALLO
                United States District Court for the
                Northern District of California
                        Likelihood of Confusion

JANUARY 1997    BABSON BROS. CO. VS. THE COCA-COLA COMPANY
                United States District Court for the
                Northern District of Illinois
                        Likelihood of Confusion

JUNE 1996       THE STANLEY WORKS VS. ARROW FASTENER COMPANY
                United States District Court for the
                Southern District of New York
                        False Advertising and Unfair Competition

MAY 1996        LEXINGTON FURNITURE VS. VAUGHAN-BASSETT
                United States District Court for the
                Middle District of North Carolina
                        Secondary Meaning

APRIL 1996      HINCKLEY & SCHMITT, INC. VS. ABSOPURE WATER
                COMPANY
                United States Patent and Trademark Office
                Trademark Trial and Appeal Board
                        Likelihood of Confusion

FEBRUARY 1996   MARICOPA FOUNDATION FOR MEDICAL CARE VS.
                FOUNDATION HEALTH CORPORATION
                United States District Court for the
                District of Arizona
                        Likelihood of Confusion

# Appendix II

1           IN THE UNITED STATES DISTRICT COURT

2           FOR THE EASTERN DISTRICT OF TEXAS

3               TEXARKANA DIVISION

4

5  ———————————————————————————

6  SCOTT O'GRADY              )

7        Plaintiff,      )

8     vs.              )   CIVIL ACTION NO. 502CV173

9  TWENTIETH CENTURY FOX    )
    FILM CORPORATION, and   )

10  DISCOVERY COMMUNICATIONS, )
    INC.,                )

11                   )
        Defendants.    )

12  ———————————————————————————

13

14    VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF

15               PATRICK BYERS

16

17                  COPY

18

19             July 11, 2003

20             11:05 a.m.

21      1501 Fourth Avenue, Suite 2600

22         Seattle, Washington

23

24

25      Reported by Alvena Burton, CCR

DEPOSITION OF PATRICK BYERS, 7/11/03

5

1           MS. PENDLETON:  Constance M. Pendleton of

2       Davis Wright Tremiane representing Discovery

3       Communications, Inc.

4           MR. HASTINGS:  Scott Hastings from Locke,

5       Liddell & Sapp representing the plaintiff Scott

6       O'Grady.

7

8   PATRICK BYERS,              being first duly sworn

9                              by the Notary Public to tell

10                             the whole truth, was

11                             examined and testified as

12                             follows:

13

14      (Deposition Exhibit Nos. 383 and 384 pre-marked.)

15

16                  E X A M I N A T I O N

17  BY MR. SCOTT:

18  Q.  Mr. Byers, can you state your full name for the

19      record, please.

20  A.  Patrick Michael Byers.

21  Q.  Okay.  And your address is -- well, your business

22      address is 10655 Northeast Fourth Street, Suite 104,

23      Bellevue, Washington 98004?

24  A.  Correct.  That's correct.

25  Q.  Have you ever been deposed before?

DEPOSITION OF PATRICK BYERS, 7/11/03

17

1   Q.   Okay.

2   A.   Is my -- that's my impression.

3   Q.   Just your impression, yeah.

4   A.   My impression.

5   Q.   That's all I'm asking.

6   A.   Right.

7   Q.   I'm not asking for anything more.  At the time of --

8        well, let me back up.  You mentioned that you've

9        seen -- you saw the DCI documentary the first time

10       it aired.

11  A.   Uh-huh.

12  Q.   Did you have an opportunity to talk to Scott O'Grady

13       about your impressions of that program after you saw

14       it the first time?

15  A.   If I did, I don't recall.

16  Q.   Okay.  Have you seen the program at any point in its

17       entirety since that first showing?

18  A.   Not in its entirety, but I occasionally like anybody

19       when channel surfing all of a sudden I'll happen

20       upon it, and I'll realize, oh, there's Scott's

21       documentary.  It's on again.  And, you know, but

22       I've seen it so I don't continue on it.

23  Q.   Sure.  Do you recall ever being contacted by Scott

24       O'Grady to record the program for any reason?

25  A.   Yes.  When the -- this was going to be airing with

DEPOSITION OF PATRICK BYERS, 7/11/03

44

1                    C E R T I F I C A T E

2    STATE OF WASHINGTON)
                        )  ss.
3    COUNTY OF KING      )

4        I, Alvena L. Burton, a Notary Public in and for the

5    State of Washington, do hereby certify:

6        That the foregoing deposition was taken before me at

7    the time and place therein set forth;

8        That the itinerary was by me first duly sworn to

9    testify to the truth, the whole truth, and nothing but

10   the truth; and that the testimony of the itinerary and

11   all objections made at the time of the examination were

12   recorded stenographically by me, and thereafter

13   transcribed under my direction;

14       That the foregoing transcript is a true record of

15   the testimony given by the itinerary and of all

16   objections made at the time of the examination, to the

17   best of my ability.

18       I further certify that I am in no way related to any

19   party to this matter nor to any of counsel, nor do I have

20   any interest in the matter.

21       Witness my hand and seal this 19th of July, 2003.

22

23                         *Alvena L. Burton*
                           ALVENA L. BURTON
24                         Notary Public in and for
                           the State of Washington,
25                         residing at Seattle
                           Commission expires 7/9/07

# Appendix III

```
 1              IN THE UNITED STATES DISTRICT COURT
 2               FOR THE EASTERN DISTRICT OF TEXAS
 3                       TEXARKANA DIVISION

 4    ─────────────────────────────────────────────
 5    SCOTT O'GRADY                    )
                                       )
 6              Plaintiff,             )
                                       )
 7         vs.                         )    CIVIL ACTION NO. 502CV173
                                       )
 8    TWENTIETH CENTURY FOX            )
      FILM CORPORATION, and            )
 9    DISCOVERY COMMUNICATIONS,        )
      INC.,                            )
10                                     )
                Defendants.            )
11    ─────────────────────────────────────────────

12        VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF

13                        BILL FLANAGAN

14    ─────────────────────────────────────────────

15

16                          COPY

17

18                      July 11, 2003

19                       9:06 a.m.

20              1501 Fourth Avenue, Suite 2600

21                    Seattle, Washington

22

23

24           Reported by Alvena Burton, CCR

25
```

DEPOSITION OF BILL FLANAGAN, 7/11/03

5

1    MS. PENDLETON:  Constance Pendleton of

2    Davis Wright Tremaine for defendant Discovery

3    Communications, Inc.

4        MR. HASTINGS:  Scott Hastings from Locke,

5    Liddell & Sapp for the plaintiff Scott O'Grady.

6

7  BILL FLANAGAN,                   being first duly sworn

8                                   by the Notary Public to tell

9                                   the whole truth, was

10                                  examined and testified as

11                                  follows:

12

13      (Deposition Exhibit Nos. 380 and 381 pre-marked.)

14

15              E X A M I N A T I O N

16  BY MR. SCOTT:

17  Q.   Can you please state your full name for the record.

18  A.   William J. Flanagan.

19  Q.   And, Mr. Flanagan, are you here pursuant to a

20       subpoena --

21  A.   Correct.

22  Q.   -- and deposition notice?

23  A.   I am.

24  Q.   I'm going to tender to you what's been marked as

25       Deposition Exhibit No. 380.  I want you to take a

DEPOSITION OF BILL FLANAGAN, 7/11/03

28

1      Scott O'Grady said that. What is that that you're

2      referring to?

3  A.   Well, I'm referring more to the tape of the movie,

4      and I didn't know -- that's what I'm saying. I

5      don't know if -- when I taped that I really wasn't

6      paying attention to it.

7  Q.   Okay.

8  A.   So I just caught phrases while I was walking

9      through, and I thought, well, I better record that

10     and that type of thing. So I didn't really sit down

11     and see all of it myself.

12 Q.   Okay.

13 A.   Okay.

14 Q.   Did you ever watch the tape that you recorded prior

15     to sending it to Scott O'Grady?

16 A.   I don't -- I don't recall.

17 Q.   Are you able to tell me now as we sit here what

18     language or whatever comments that were made on the

19     tape that you recorded that troubled you?

20 A.   No. I mean, if I saw it again I could, but it would

21     have to do that to refresh my memory.

22 Q.   Sure. In your conversations with Scott O'Grady

23     following your taping of the program, did he ever

24     comment on what his impressions were of the program?

25 A.   Of what program?

DEPOSITION OF BILL FLANAGAN, 7/11/03

55

1           C E R T I F I C A T E

2  STATE OF WASHINGTON)
                       )  ss.
3  COUNTY OF KING      )

4       I, Alvena L. Burton, a Notary Public in and for the

5  State of Washington, do hereby certify:

6       That the foregoing deposition was taken before me at

7  the time and place therein set forth;

8       That the itinerary was by me first duly sworn to

9  testify to the truth, the whole truth, and nothing but

10 the truth; and that the testimony of the itinerary and

11 all objections made at the time of the examination were

12 recorded stenographically by me, and thereafter

13 transcribed under my direction;

14      That the foregoing transcript is a true record of

15 the testimony given by the itinerary and of all

16 objections made at the time of the examination, to the

17 best of my ability.

18      I further certify that I am in no way related to any

19 party to this matter nor to any of counsel, nor do I have

20 any interest in the matter.

21      Witness my hand and seal this 18th of July, 2003.

22

23      _Alvena L. Burton_
        ALVENA L. BURTON
24      Notary Public in and for
        the State of Washington,
        residing at Seattle
25      Commission expires 7/9/07