



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

| | | |
|---|---|---|
| SCOTT O'GRADY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 502CV173 |
| | § | |
| TWENTIETH CENTURY FOX | § | JURY DEMANDED |
| FILM CORPORATION, and | § | |
| DISCOVERY | § | |
| COMMUNICATIONS, | § | ORAL HEARING REQUESTED |
| INC., | § | |
| | § | |
| Defendants | § | |
| | § | |

**DEFENDANTS' JOINT MOTION TO EXCLUDE TESTIMONY OF PLAINTIFF**
**EXPERT GABRIEL M. GELB AND BRIEF IN SUPPORT**

TO THE HONORABLE JUDGE OF THIS COURT:

Defendants TWENTIETH CENTURY FOX FILM CORPORATION ("Fox") and

DISCOVERY COMMUNICATIONS, INC. ("DCI") file this Motion to Exclude Testimony of

Plaintiff Expert Gabriel M. Gelb and Brief in Support, pursuant to Federal Rules of Evidence 401,

403 and 702, and in support thereof would show the following:

## I. INTRODUCTION

Gabriel M. Gelb ("Gelb") is Plaintiff's testifying expert on the results of a survey he conducted

concerning the "November 28, 2001 broadcast of the Discovery Channel documentary "Behind

Enemy Lines:  The Scott O'Grady Story" (hereafter the "November 28th Broadcast").  Gelb's

assignment was to determine whether or not, after seeing the November 28th Broadcast viewers

believed Plaintiff endorsed the Fox movie "Behind Enemy Lines", and whether or not they thought

that the movie told his story. (Gelb Dep. at 7: 11-12).  The survey and opinion testimony do not meet

the threshold requirements for admissibility under Federal Rule of Evidence 403 or 702.  Neither is

1



the evidence relevant under Rule 401 especially when the required analysis under the First Amendment is applied.

The Gelb survey suffers from multiple flaws which have led courts to reject similar testimony in the past. It asks leading and suggestive questions like No. 7 ("Do you think that the movie that was advertised, is or is not a Hollywood version of the actual pilot's real life story?") which was changed by Gelb when a preliminary survey using a different, less suggestive question, achieved an unfavorable result for Plaintiff. Furthermore, it canvasses an improper universe. The survey fails to measure the actual persons who saw the November 28th Broadcast, nor does it attempt to match the demographics of the Discovery Channel viewers that night. Gelb explained that it would have been "impracticable" to do so yet those viewers are the only ones who count since the November 28th Broadcast was a one time event and it is the subject of this litigation. By canvassing people in 2003 who had the Discovery Channel available in their homes in 2001, Gelb's survey offers, at best, nothing more than what the jury will be asked to decide under the appropriate guidance from the Court.

The Gelb survey does not provide an estimate for the range of statistical error. Consequently it does not satisfy the factor set forth by the U.S. Supreme Court in *Daubert* that there is "a known or potential rate of error. *Daubert,* 509 U.S. at 593-94; *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 275 (5th Cir. 1998) (en banc).

The format and structure of the questions, including leading questions that are result driven, are also legally impermissible. Gelb admitted that at least one question (Question 7) was drafted in order to get across to the respondents that the Fox movie "was a Hollywood version of the actual pilots' real life story." (Gelb Dep. At 93:3-7; 110: 2-14). The question format also has a demand effect that leads to a "yea-saying" consequence. The questions are also ambiguous in context.

The problems raised by the use of leading, suggestion and ambiguous questions are further compounded by the fact that Gelb's failure to do a control to measure the impact of the bias, "noise" or confusion resulting from the survey questionnaire itself rather than the subject stimuli. The need for a control to filter out noise is well established and is of particular necessity here where Gelb ignored the respondents' explanations as to why they thought the pilot endorsed the movie or that it was a Hollywood version of his story.

Finally, the survey fails on First Amendment grounds under the leading Second Circuit case *Rogers v. Grimaldi*, which has been adopted by the Fifth Circuit.

Each of the foregoing flaws, when considered individually or in combination, is fatal to the relevance, reliability and hence admissibility of the survey and Gelb's testimony. The Motion should be granted.

## II. ARGUMENT & AUTHORITIES

### A.    Rule 702 Criteria for Admission of Expert Witness Testimony

Federal Rule of Evidence 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." This rule of evidence "imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony ... is not only relevant, but reliable.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589 (1993). The expert testimony must be relevant, not simply in the sense that all testimony must be relevant, Fed. R. Evid. 402, but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue. *Daubert*,

509 U.S. at 591-92. Put differently, Rule 702 "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 592.

As to reliability, the U.S. Supreme Court has provided five, non-exclusive factors to consider when assessing whether a methodology is scientifically reliable. These factors are: (1) whether the expert's theory can be or has been tested, (2) whether the theory has been subject to peer review and publication, (3) the known or potential rate of error of a technique or theory when applied, (4) the existence and maintenance of standards and controls, and (5) the degree to which the technique or theory has been generally accepted in the scientific community. *Id.* at 593-94; *Moore v. Ashland Chem., Inc.,* 151 F.3d 269, 275 (5th Cir. 1998) (en banc), *cert. denied,* 526 U.S. 1064 (1999).

Fox challenges the Gelb Report because it is of no assistance to the fact finder and therefore is irrelevant and inadmissible. It fails to implement and maintain the requisite" standards and controls" or "a known or potential rate of error" that would support the reliability of the survey utilized by Gelb in reaching his opinions. O'Grady, as the party seeking to have the district court admit expert testimony, must demonstrate that Gelb's findings and conclusions based on the survey are reliable. *Moore*, 151 F.3d at 276. O'Grady cannot meet this challenge.

### 1.    *Survey Methodology and Results*

#### a.    **Improper Universe**

Gelb conducted a survey in four markets – Houston, Los Angeles, Milwaukee and Baltimore – to "explore the reactions of the relevant population to the Discovery Channel program, "BEL:SOS." (Gelb Report at p. 4, § 14). According to Gelb, the "relevant population were people who had access to the Discovery Channel through cable television." (Gelb Dep. at 33:5-13). Although the programming at issue occurred only on one evening, November 28, 2001 (the "November 28th Broadcast), Gelb thought it "impractical" to consider the population of viewers who

4

were watching the subject program on that evening. (Gelb Dep. at 33:14-22). Neither did he consider the demographics of those viewers (Gelb Dep. at 33:23-25). Although Plaintiff admits the target viewing audience for the November 28th Broadcast was a demographic group of 18-49 year old males who are likely to be interested in war movies" (Plaintiff's Opposition to Defendants' Motion for Summary Judgment at 31), the demographics of the viewers of the November 28th Broadcast were not considered to be part of the relevant population for the purposes of Gelb's survey. (Gelb Dep. at 35:14-18). Consequently, the Gelb survey did not measure those persons who saw the program on November 28, 2001 but instead "is a sample of people who are asked to look at the program in 2003 and see what they perceive it said." (Gelb Dep. at 39:13-21). For this reason alone, the survey is inadmissible because it fails to offer any insight which the jury themselves cannot arrive at after viewing the November 28th Broadcast during trial with appropriate instructions from the Court.

"Federal Rule of Evidence 403 gives the trial court broad discretion to exclude evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusion of the issues, or misleading the jury." *United States v. Edelman*, 873 F.2d 791, 795 (5th Cir. 1989) (upholding exclusion of expert where testimony would interpret language in ordinary usage and common knowledge would not assist jury); *reh'g denied*, 877 F.2d 972 (1989) (en banc). *See also Salem v. United States Line Company*, 370 U.S. 31, 35 (1962)("expert testimony not only is unnecessary but indeed may properly be excluded in the discretion of the trial judge 'if all the primary facts can be accurately and intelligibly described to the jury, and if they, as men of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation.'"); *Beech Aircraft Corp. v. United States,* 51 F.3d 834, 842 (9th Cir. 1995) ("trial court properly excluded the testimony [of two expert witnesses retained to decipher tapes] because it

did not concern a proper subject for expert testimony. . . . hearing is within the ability and experience of the trier of fact.") Here, because the Gelb "universe" consists of those who have the Discovery Channel in 2001 rather than the actual viewers, the proffered survey and related expert testimony is merely a means of attempting to put an expert "spin" on a matter within the purview of the jury and, thus, is improper and should be excluded pursuant to Fed. R. Civ. Evid. 403.

Rather than the population Gelb studied, the relevant universe in this instance are those persons who actually saw the November 28th Broadcast. (Johnson Dep. at 29:20-22)[1]. While it is not clear that a survey at this point in time can ever accurately answer the question posed by the Gelb survey (that is - how did people react to the November 28th Broadcast?) because subsequent events that happened after that date would change and influence their responses today or impact their recollection of their responses of November 28, 2001 (Johnson Dep. at 33:6-24), the result of using the wrong or an improper universe is that "it doesn't follow that anything you learn from that universe can tell you what you want it to know." (Johnson Dep. at 161:14-22). In other words, "garbage in – garbage out."

## 2. *Survey Reliability under Rule 702.*

Pursuant to Fed.R.Civ.P. 702, for an expert to testify, the testimony must be "the product of reliable principles and methods…, and the witness has applied the principles and methods reliably to the facts of the case." The evidentiary value of a survey depends on its underlying objectivity as determined through many factors, such as "whether [the survey] is properly 'filtered' to screen out those who got no message from the advertisement, whether the questions are directed to the real

---

[1] Defendant's expert Phillip Johnson's reports and curriculum vitae are attached as exhibits to Defendants' Fox Film Corporation Objections to Plaintiff's Summary Judgment Evidence and Request for Ruling Thereon as "Johnson Declaration" on file with the Court and are incorporated herein by reference for all purposes.

issues, and whether the questions are leading or suggestive." *Johnson & Johnson-Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 300 (2d Cir.1992).

In this regard, the survey constructed by Gelb is fatally flawed in at least four additional respects. First, the survey is not a probability survey and one cannot discern a range of statistical error. Second, the survey is inherently biased with leading questions, particularly Question Nos. 7, 7a, 9, and 9a, which serve as the sole basis for the two opinions offered by Gelb. Third, Gelb did not utilize a control group to take account of those respondents who would have been confused "regardless of the stimuli present." *See Mattel, Inc. v. MCA Records, Inc.*, 28 F.Supp.2d 1120, 1135 (C.D. Cal. 1998), *aff'd*, 296 F.3d 894 (9th Cir. 2002) *writ denied*, 123 S.Ct. 993 (2003). Moreover even though Gelb used follow-up questions to "control" for confusion, those answers played no part, whatsoever, in the final tabulation. Fourth, the results of the survey do not support a finding that the likelihood of confusion is "particularly compelling" to outweigh Defendants' First Amendment interests, the heightened standard applicable in this case. *See Sugar Busters LLC v. Brennan*, 177 F.3d 258, 269 n. 7 (5th Cir. 1999); *Twin Peaks Prods. v. Publ. Int'l, Ltd.*, 996 F.2d 1366, 1379 (2d Cir. 1993). Each of these criticisms are addressed below.

### a.    *Because the Gelb Survey Is Not A Probability Survey, One Cannot Discern the Range of the Statistical Error*

In selecting the participants, Gelb used national research consultants who were assigned to bring people to a research facility where they watched the November 28th broadcast and were later interviewed by questionnaire. (Gelb Dep. at 55:1-56:8) The research consultants used computer databases to contact individuals who had previously participated in a research survey. (Gelb Dep. at 59:1-20, 60:14-25). With the exception of a small number, the participants were not recruited randomly. (Gelb Dep. at 59:21-60:8). Each participant was paid $40. (Gelb Depo at 187: 13-14)

While Gelb's survey purports to be a quantitative study, it is qualitative in nature because of the focus group techniques and recruiting procedures. (Johnson Dep. at 138:7-12). As a result, it is neither fish nor fowl. The participants in the Gelb survey were focus group or professional respondents who are generally used for qualitative not quantitative studies which is what the Gelb survey purports to measure. (Johnson Dep. at 75:5-21) A qualitative interview measures generally how the interviewee feels about something. "It does not provide...[the] statistics to divide a population or project it to a larger population." (Johnson Dep. at 138:3-6) A quantitative interview, on the other hand, is "One that provides an accurate measurement of what the population believes. It allows you to divide the population up quantitatively"; in other words "to draw a cross-section of people that are not going to be biased." (Johnson Dep. at 137:6-138:2) According to Johnson, where, as here, the study consists of focus group or professional participants "it's a poor way to conduct a study if you want to know anything that's quantitative. There's a qualitative device, that's why people come to focus groups." In short, Gelb's study is "not a probability sample of anything." (Johnson Dep. at 75:3-17).

Moreover, it is not possible to estimate the range of statistical error in the Gelb survey. Simply put, the Gelb survey is not a probability survey. (Johnson Dep. at 245:16-246:1). If it were a probability sample, one could compute a confidence interval which would tell the Court and the jury – plus or minus - a certain percentage of what would be expected, based on the level of confidence. "But [Gelb's survey] is not a probability sample, so all you know is that the error is greater than you'd get using a probability sample, but you can't compute it. You don't know what it is. You just know its greater." (Johnson Dep. at 245:23–246:1).

      **b.**      **<u>Inherent Bias</u>.**

A survey is "not credible if it relies on leading questions which are 'inherently suggestive and invite guessing by those who did not get any clear message at all.'" *Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharms., Inc.*, 19 F.3d 125, 134 (3d Cir. 1994). A survey question that suggests its own answer, or presents a connection or association instead of allowing the respondents to form their own, is inherently biased and leading. *See Mattel,* 28 F.Supp.2d at 1135; *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984).

For example, in *Universal City Studios, Inc.*, the plaintiff submitted a survey that asked whether "the Donkey Kong game [was] made with the approval or under the authority of the people who produce the King Kong movies?" *Universal City Studios,* 746 F.2d at 118. The Second Circuit criticized the question because it was "an obvious leading question." *Id.* The participants were presented with the Donkey Kong-King Kong connection rather than permitted to make their own associations. *Id.* "A survey question which begs its answer cannot be a true indicator of the likelihood of consumer confusion." *Id.* The district court in *Mattel,* affirmed on appeal, reached the same conclusion with respect to a question that asked: "Do you think the company which owns the Barbie doll brand gave its permission to use the Barbie name on the music CD package?" *Mattel, Inc.*, 28 F.Supp.2d at 1134-35.

Here, the Gelb Survey questions are leading and suggestive in construction, while ambiguous in context. In fact, Gelb even changed a critical question when he obtained an unfavorable response to a pretest survey. Gelb's initial March 6th pretest question 7 read: "After seeing this program, do you think The Movie that was advertised is or is not the actual pilot's real life story." (See Ex. 336) But after looking at the results of the pretest, Gelb "decided that one of the questions was not clear." (Gelb Dep. at 96:7-25). That question was number 7. (*Id.* at 97:1-9) The pretest results indicated that a total of six (6) respondents agreed it was an actual pilot's real life story and 13 did not think it

was the actual pilot's real life story. (Gelb Dep. at 114:17; 115:9; 116:1-6, Ex. 338). Gelb conferred

with Plaintiff's counsel about the test results. (Gelb Dep. at 113:25-114:16). Afterwards, there was a

revision to question 7. (Gelb Dep. at 117:19-23).

Question 7 was changed to read: "After seeing this program, do you think that the movie that

was advertised is or is not a ***Hollywood version of the actual pilot's real life story***." (Gelb Dep. at

118:7-18; Ex. 340). When asked why he changed the question, Gelb testified as follows:

> Q:  You wanted to get across that it ... was a Hollywood movie version of the
>      pilot's story?
> A:  Exactly.

(Gelb Dep. at 99:3-7).

Gelb continued later:

> Q:  And your intention was that they should think that ... the
>      documentary and the Fox movie were telling the same story?
> A:  No.
>      Mr. Flynn:      Object form.
> A:  No ... I just want them to understand that this was a
>      Hollywood version so they would get a little more feel. But
>      when you do a Hollywood version of a movie, you don't tell
>      somebody's exact life story. You embellish it.
> **Q:  So you wanted them to understand that it was a**
>      **Hollywood version of the Scott O'Grady story?**
> **A:  Yes.**

(Gelb Dep. at 110:2-14).

Thus, question 7 was revised to include "Hollywood version" because Gelb intended to illicit

the response that the movie was "a Hollywood version of the Scott O'Grady story." This is a

textbook example of an obviously leading question which begs its answer. As such it cannot possibly

be a true indicator of the likelihood of consumer confusion and the survey should not be admitted

because it is not credible or reliable. *See Mattel*, 28 F.Supp. 2d at 1135, *Universal City Studios,* 746

F.2d at 118.

10

The question format used by Gelb also has a demand effect that leads to a "yea-saying" consequence. (Johnson Dep. at 283:12-284:7). For example, after a series of yes answers, the yea-saying bias becomes pronounced when you get to question 7 ("Do you think that the movie that was advertised is or is not a Hollywood version of the actual pilot's real life story.") (Johnson Dep. at 284:1-25). Defendants' expert Johnson testified in his deposition "What happens with the yea-saying bias is you've trained – now you've got people saying yes, yes, yes, so you're asking them more questions. What you have is a bias towards saying yes in the survey . . . a yea-saying bias." If you enforce it with these questions, it has some consequence later on." (Johnson Dep. at 284:19-15). There is a building cumulative effect in the yea-saying bias. (Johnson Dep. at 289:25-290:10).

While the follow-up question would normally screen out people who were guessing (Johnson Dep. at 285:4-10), the Gelb survey proceeds to ask question 7 of all respondents, even those who did not recall that the Fox movie *Behind Enemy Lines* was advertised." (Johnson Dep. at 293:9-296:14). At least four of the respondents mentioned Pearl Harbor. (*Id*). Consequently, it is impossible to tell what those persons are responding to when they answered question 7. (Johnson Dep. at 296:7-9).

In his Declaration, Defendants' expert Philip Johnson also offered the following criticisms of the Gelb Survey:

> 16.     In Question 3, Gelb asks respondents, *"So far as you recall, did the actual pilot who was shot down in enemy territory appear in any part of this one-hour program?"* This is a leading question that is full of information that the respondent may or may not have recalled on their own, without being aided by the question. It does, at the minimum, suggest that there was *"an actual pilot,"* who was *"shot down in enemy territory,"* who did appear in *"part of this one-hour program."* Instead of using this type of leading question structure that prompts respondents, the accepted methodological practice is to ask an open-ended question that allows the respondent to answer in their own words, or ask a series of questions such as, *"What was the program you saw about? PROBE: What else do you recall in this program?"*

18.     Inexplicably, the Gelb survey proceeds to ask Question 7 of all respondents, even of those who did not recall that the Fox movie "Behind Enemy Lines" was advertised: *"After seeing this program, do you think that the movie that was advertised is a Hollywood version of the actual pilot's real-life story, or is not a Hollywood version of the actual pilot's real-life story?"* This central question in the Gelb study is so poorly designed and constructed, and the alternatives are so unclear and ambiguous, that no conclusions can be drawn from the results. For instance, the "choices" forced on the respondent assume the respondent has a belief about the *"actual pilot's real-life story"* when it is uncertain whether respondents had thought about it before being asked the question. It is also impossible to decipher what the alternative choices mean given the introduction of the term *"Hollywood version."*

19.     The term "Hollywood" as an adjective is generally used to describe events that are made-up or fictional. At the least, the choice of the verbiage, *"Hollywood version of the actual pilot's real-life story"* appears to be a textbook example of an oxymoron. In such a situation, without any control cell to determine how a respondent would answer such a question, no conclusions can be drawn from the results of this question. Even the follow-up in Question 8, *"Why do you say that [this movie is a Hollywood version of the actual pilot's real-life story]?"* demonstrates this ambiguity. For example, the most frequent response listed in the table provided in the Gelb report suggests that one out of four (25%) of those respondents who agreed that it was a *"Hollywood version,"* said that this was because *"events in the movie were similar to a real story but more far-fetched."* This response suggests that the survey participant recognizes that it is <u>not</u> Scott O'Grady's story, but it is a similar story, a position that is consistent with the defendant's claim in this dispute.

20.     The creation of this confusing and ambiguous question apparently occurred as a "remedy" when a somewhat more appropriate question was tested in a preliminary survey (or pre-test), which asked. *"After seeing this program, do you think that the movie which was advertised is or is not the actual pilot's real life story?"* While sharing many of the leading characteristics and tendency to inform the respondent as the later version, this question notably does not contain the words "Hollywood version." Without this confusing use of "Hollywood version" in the key survey question, just 32% of the "pre-test" respondents replied "yes." This result contrasts sharply with the results obtained by the "altered" version of this question where 70% answered "yes." In effect, these differences suggest that respondents understand quite clearly that the movie is not the "O'Grady story" but rather is simply a Hollywood movie that is only

loosely related to or "inspired by" this story. In his deposition testimony, Mr. Gelb reports that he made this change to the key survey question because it was not working the way he would have liked.

21.     The Gelb study then continues to pursue this suggestive line of questioning, irrespective of whether the respondent had any views, by asking Question 9, *"After seeing the program, do you think the actual pilot endorses or doesn't endorse the movie advertised on the program you just saw?"* This is another poorly constructed question that suggests that the *"actual pilot"* should have a position or stance about the movie; i.e., endorse/does not endorse the movie advertised. This comes right after the previous suggestive questioning sequences that informed survey respondents that the movie may be a *"Hollywood version"* of the *"actual pilot's real-life story."*

22.     At this juncture, the question series may have confused respondents into thinking that the survey questions referred to the Discovery Channel program (which had been described to them as an action-adventure video when they were recruited), rather than to the Fox movie. For example, 22% of those who agreed with the idea that the pilot endorses the film say it is because *"he was talking on the program,"* or 3% of respondents said *"(It) showed true life of O'Grady with movie clips,"* and 2% of respondents said *"He'd like people to see what happened, not the Hollywood version."* These responses suggest that when they answered this survey question, respondents may have been referring to the Discovery Channel program, or scenes contained within the Discovery Channel program, and not the Fox movie. In addition, the structure of Question 9 is highly speculative and encourages guessing. This kind of question may result in respondents conducting a "mental coin toss," where about half (49%) of the respondents agree that the pilot endorses the movie, and the other half (51%) report either that the pilot does not endorse the movie (26%), or that they do not know (25%).

21.[*sic*]     By the end of the Gelb study, respondents have been exposed to a constant barrage of the following terms: *"the program," "the actual pilot," "the pilot's real-life story," "the movie," "the movie advertisement,"* and *"a Hollywood version."* In addition, the questions in the Gelb study repeat the phrase "advertised on the program," suggesting that the advertisements are contained in the Discovery Channel program itself, rather than occurring in the "commercial space" which interrupts the program. The cumulative impact of this confusion on the survey respondents is unknown. Again, without a measure of how respondents would answer such speculative questions when exposed to a control stimulus, no

> conclusions can be drawn from these responses other than the fact that
> they appear to reflect guessing behavior.

(See Johnson Decl., attached hereto as Ex. _____.)

Consequently, the questions, their structure, format and ambiguity are not a reliable indicator of likelihood of confusion as to the November 28th Broadcast but instead indicate confusion within the context of the survey itself.

### b.    No Control Group.

The use of leading, suggestive, and ambiguous questions in the Gelb Survey exacerbates the need for a control to measure the impact of the biases in the responses of the survey participants discussed below. (Johnson Decl. at ¶ 11). The use of a control group is absolutely essential in adjusting survey results to account for so-called "noise in the market" unassociated with the subject matter of the survey. 5 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 32:187 (4th ed. 1996); *see also* Jacob Jacoby, *Experimental Designs in Deceptive Advertising and Claim Substantiation Research,* 954 PLI/CORP 167, 176 (1991) (using a control group in surveys is "absolutely necessary"). It is a survey flaw not to use a control group. *See, e.g., Greenpoint Fin. Corp. v. Sperry & Hutchinson Co.*, 116 F. Supp.2d 405, 409 (S.D.N.Y. 2000); *see also* Jacob Jacoby, Amy H. Handlin, & Alex Simonson, *Survey Evidence in Deceptive Advertising Cases Under the Lanham Act: An Historical Review of Comments from the Bench,* 954 PLI/CORP. 83, 89 (1994) (emphasizing that "there can be no trustworthy or valid assessment of cause and effect unless surveys are intertwined with proper experimental designs (which, of necessity, involve the utilization of proper controls)"); David H. Kaye & David A. Freeman, *Reference Guide on Statistics,* in *Reference Manual on Scientific Evidence*, at 348-49 (1994) ("[O]utcome figures from a treatment group without a control group reveal very little and can be misleading. Comparisons are essential.").

But Gelb did not do a control in administering the survey. (Gelb Dep. at 145:12-14) ("Q: Did you do a control on this survey? A: No"). In fact, when asked whether there was any control on the question of endorsement, Gelb answered "No need for any control." (Gelb Dep. at 147:13-15). Thus, the responses "reveal very little" and are, in fact, misleading. Even though Gelb has defined "control are used to measure noise; that is, where people are guessing," (Gelb Dep. at 225:20-24) it is impossible to measure what percentage of the Gelb respondents are reacting to the stimuli and what percentage would be confused no matter what. For example, as set forth below, numerous respondents' answers to questions 6, 10, and 11 indicate confusion in their responses as to whether they were referring to the Fox movie or the Discovery Channel documentary. Without a control, one cannot tell. (Johnson Dep. at 299:19-25). In his deposition, Gelb agreed there was confusion and ambiguity in the survey. For example, in drafting the survey, Gelb used the word "endorse" in Question 9. "Endorse," according to Webster's Seventh Collegiate Dictionary, is defined as," to express a definite approval of." (Gelb Dep. at 89:14-18). Gelb's own definition of "endorse" means "to express support or approval." (Gelb Dep. at 86:19-21). Gelb, however, did not provide the participants with a definition of endorse but instead asked them what they meant by "endorse." (Gelb Dep. at 90:3-10, 92:10-93:2).

The participants' responses to why they thought the pilot endorsed the movie (Question 10) included answers such as "because I don't think the movie portrayed him in a bad light. The movie portrayed him as a hero for surviving behind enemy lines" (Ex. 335-Gelb 836). When Gelb was asked whether this particular answer comported with the dictionary definition of the word, Gelb responded "I was not interested necessarily in a dictionary definition of endorse but in whether or not the people gave the answer as to why the actual pilot endorses the movie, that it had some representation of their personal truth." (Gelb Dep. at 127:13-25).

The same respondent answered Question 11 ("When you say the pilot endorses the movie, what do you mean by endorses"?): "I think he agrees with the story line because it had some kind of truth to it. It was similar to his truth." (Ex. 335-Gelb 836) When asked what he thought about that response, Gelb answered "I think that's a good definition of the word "endorses" from this person's point of view." (Gelb Dep. at 128:15-23).

The confusion and ambiguity are clear from a sample of the responses set forth below to Question 10: "Why do you say the pilot endorses the movie?"

"I think if I was him and had this experience, I would want others to know what happens."

(Gelb Dep. at 137:16-24, Ex. 341-Gelb 218).

"To show how rough it was for him and how wonderful it was that others came for him."

(Gelb Dep. at 152:4-14, Ex. 341-Gelb 299).

"Because they are showing you what happened in the war, they are reenacting the real story so that we can see what actually happened since we can't be there."

(Gelb Dep. at 157:7-15, Ex. 342-Gelb 547).

"Because he knew that showing that show would help someone out and also show them how to handle the situation, so why keep it a secret when you know."

(Gelb Dep. at 160:23-161:14, Ex. 343-Gelb 1039).

"Because he didn't say anything bad about the movie he was neutral."

(Gelb Dep. at 163:9-17, Ex. 343-Gelb 1089).

Other examples are included in Exhs. 341 through 343 attached hereto for the Court's review.

In fact, Gelb admitted numerous times in his deposition that he did not know whether the participants, in answering the questions, were responding to the Discovery Channel documentary or

to the Fox Movie. (Gelb Dep. at 138:25-139:12; 141:3-25; see Ex. 341-Gelb 233; Gelb Dep. at 152:4-14; Ex. 341-Gelb 299; Gelb Dep. at 156:6-158:2; see Ex. 342-Gelb 547, Gelb 607; Gelb Dep. at 157:7-158:2, Ex. 342-Gelb 547). Consequently, the significance of the lack of a control is exacerbated here by the structure of the questions being asked. (Johnson Dep. at 159: 20-25). ("One purpose of a control is to measure what portion of the responses to the survey questions are artifacts of the structure of the questions being asked.")

Indeed, Gelb recognized this issue in his deposition when he testified:

> Q. (Ms. Handman) Well, is use of a control not a common statistical device to ensure that your answers are valid?
>
> A. A lot of times, controls are used to measure noise; that is where people are guessing. But in this type of survey, it's not necessary because people are explaining their answers, so...I don't see a need for a control.

(Gelb Dep. at 225: 20-226:2).

But inexplicably, Gelb included all the responses in the compilation and tabulation, regardless of the participants' explanations to questions 10 and 11 as to why they said the pilot endorsed the movie or what they meant by endorse. (Gelb Dep. at 142:7-143:18; 156:6-157:6, Ex. 342 Gelb 607; Gelb Dep. at 160:23; Gelb Dep. at 137:16-138:6; Ex. 341 Gelb 218). In other words, so long as the participant answered Question 9 or 9A, that the actual pilot endorsed the movie, it didn't matter what they put down as their explanation. (See Gelb Dep. at 137:16-138:20).

Thus, Gelb's rationale that he did not need a control because the participants explained their answers is simply incredulous when one considers his testimony referenced above that it didn't matter what the participant's explanation was: all answers were included in the tabulation regardless of their response. (Gelb Dep. at 142:7-143:18; 226: 7-15; 156: 6-157, 160:23-163:17, 137:16-138:6, 226:7-18, Ex. 341 – Gelb 218, Ex. 342-Gelb 607; Ex. 343-Gelb 1039, Ex. 343-Gelb 1089).

17

McCarthy explains the importance of a control in determining the "general background noise" in survey figures stating "in any survey, there will always be some interviewees who are bored, hurried, or just plain contrary and those responses must be filtered out through control questions. These responses also contribute to background noise and static in the numerical results." 5 McCarthy at § 32:187. For example, in *S. S. Kresqe Co. v. United Factory Outlet, Inc.*, 598 F.2d 694 (1st Cir. 1979), a survey found that 7.2 percent of persons surveyed believed that the plaintiff's local THE MART stores and defendant's K-MART national stores were owned by the same people was insufficient to prove likelihood of confusion because 5.7 percent of the same respondents reached the same conclusion as to THE MART and KING'S DEPARTMENT STORE, Similarly, in *Reed-Union Corp. v. Turtle-Wax*, 77 F.3d 909 (7th Cir. 1996), the court rejected a survey's results where the survey found a 25 percent rate of confusion between the contesting products but the control survey found "noise" of 20 percent. McCarthy further notes that when a survey uses a control question:

> Sometimes the noise rises to a surprisingly high level. For example, a
> survey result of 58.5 percent for those who mistakenly thought that
> the NOTORIOUS clothing of plaintiff and NOTORIOUS perfume of
> defendant were put out by the same company had to be discounted by
> the 24.5 percent in a control group who thought that SAND & SABLE
> perfume was put out by the same company that sold NOTORIOUS
> clothing. Thus, an accurate figure after deducting background noise
> was 34 percent, which was found not determinative because of other
> defects in the survey structure."

5 MCCARTHY § 32: 187 (citing *Edison Bros. Stores, Inc. v. Cosmair, Inc.*, 651 F. Supp. 1547 (S.D.N.Y. 1987).

In the case where, as here, there is no control, the survey should be excluded pursuant to *Daubert* and *Kumho Tire*. *See NFL Props., Inc. v. Prostyle, Inc.*, 57 F. Supp. 2d 665, 668-672 (E.D. Wis. 1999) (and cases cited therein); *Major League Baseball Props. v. Sed Non Olet Denarius, Ltd.*, 817 F. Supp. 1103, 1123-24 (S.D.N.Y. 1993) (holding that "both surveys show complete lack of

controls rendering the data meaningless and having no evidentiary value"), *vacated pursuant to*

*settlement* 859 F. Supp. 80 (S.D.N.Y. 1994). As the court noted in *Major League Baseball*:

> Because [plaintiff's survey] failed to use any controls, they have no
> measure of what percentage of respondents are reacting to the
> particular stimuli and what [percentage] would be confused no matter
> what they were asked. Thus the interpretation of their data is
> impossible, and any conclusion for their data must be seen as
> meaningless.

*Major League Baseball*, 817 F. Supp. at 1123.

The same is true here especially when one considers that there was actual noise in the market

of Plaintiff's own making. He gave the movie a "Hot" rating on the nationally syndicated television

show Hot Ticket, an express endorsement. Because Gelb did nothing to control the inevitable "noise

in the market" that would affect survey responses, the percentages of respondents who were

purportedly confused in Gelb's survey is of no moment. In *Winning Ways, Inc. v. Holloway*

*Sportswear, Inc.*, 913 F. Supp. 1454, 1475-76 (D. Kan. 1996), the district court discounted a survey

entirely when it showed 48-58% confusion when the survey contained only "numbers that had not

been adjusted to account for noise in the market." Thus, the survey and resulting data are unreliable

and should be excluded. Other courts have similarly rejected survey results when a control group was

not utilized. *See, e.g., Major League Baseball v. Sed Non Olet Denarius, Ltd.,* 817 F.Supp. at 1123

S.D.N.Y. 1993); *ConAgra, Inc. v. Geo. A. Hormel & Co.,* 784 F. Supp. 700, 728 (D. Neb. 1992),

*aff'd,* 990 F.2d 368 (8th Cir.1993). Consequently, the survey responses offer little other than to

illustrate that the confusion lay in the structure of the survey and its questions - not the November

28th Broadcast. Thus, the Gelb Survey does not withstand the scrutiny of Fed. R. Civ. P. Rule 702

and should be excluded.

        c.     **No "Particularly Compelling" Results**.

As addressed above, O'Grady has presented a survey that purports to show consumer confusion, but it simply does not. *Mattel, Inc. v. MCA Records, Inc.*, 28 F. Supp. 2d 1120, 1133 (C.D. Cal. 1998) (The "mere presentation of a survey purporting to show confusion . . . does not itself create a triable issue of fact."), *aff'd*, 296 F.3d 894 (9th Cir. 2002), *writ denied*, 154 L.Ed. 2d 912, 123 S. Ct. 993 (2003). It certainly cannot be said that O'Grady has met his heightened burden of showing a "particularly compelling" case of consumer confusion. *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 667-68 (5th Cir. 2000); *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 269 n.7 (5th Cir. 1999); *Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366, 1379 (2nd Cir. 1993). Therefore, the Gelb testimony should be excluded in its entirety.

3.    *Survey Admissibility under Rules 401 and 403*. Even assuming for purposes of argument that the survey and results contained in the Gelb Report are deemed reliable and admissible for purposes of Rule 702, they should be excluded under Rules 401 and 403.

Under Federal Rule of Evidence 403, the Court must determine whether the proffered testimony could result in unfair prejudice, confusion of the issues and mislead the jury. Fed. R. Evid. Rule 403; *Edelman*, 873 F.2d at 795. Thus, an expert's testimony is subject to exclusion under Rule 403 where its probative value is substantially outweighed by it likely prejudicial effect. *Id.*

Absent statement in the November 28th Broadcast that explicitly misleads as to the source or the content of the work, Defendants' First Amendment interest in protecting artistic expression precludes application of the Lanham Act. *Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir. 1989); *Westchester Media*, 214 F.3d at 664-65; *Seale v. Gramercy Pictures*, 949 F.Supp. 331, 339 (E.D. Pa. 1996) *aff'd*, 156 F.3d 1225 (3rd Cir. 1998); *New Kids on the Block v. News America Pub., Inc.*, 745 F.Supp. 1540, 1545 (C.D. Cal. 1990), *aff'd*, 971 F.2d 302 (9th Cir. 1992), (granting summary judgment finding "the Lanham Act does not apply unless the defendants falsely and explicitly

represented that New Kids sponsored or endorsed the O'Grady sponsored or endorsed the defendants' services: "The risk that some people might think that the New Kids implicitly endorsed or sponsored the Star Magazine's and USA Today's 900 number services is outweighed by the danger of restricting news gathering and dissemination."). As such, the results from the survey conducted by Gelb are simply not relevant to any issue that may be submitted to a jury. Even if marginally relevant, under Rule 403, the anticipated testimony would result in unfair prejudice, confusion of the issues, and would be misleading to the jury.

WHEREFORE, Defendants TWENTIETH CENTURY FOX FILM CORPORATION and DISCOVERY COMMUNICATIONS, INC. respectfully request that the Court grant this Motion to Exclude Testimony of Plaintiff Expert Gabriel M. Gelb, and exclude Plaintiff's expert, Gabriel M. Gelb, as an expert witness at trial, and for such other relief as Defendants may justly be entitled.

Respectfully submitted,

JACKSON WALKER L.L.P.

By *Charles L. Babcock*  *by permission* &RM

Charles L. Babcock
State Bar No. 01479500
Nancy W. Hamilton
State Bar No. 11587925
Cedric D. Scott
State Bar No. 24013474
1401 McKinney, Suite 1900
Houston, TX 77010
(713) 752-4200
(713) 752-4221 – Fax

George L. McWilliams
PATTON, HALTOM, ROBERTS,
     MCWILLIAMS, & GREER, LLP
2900 St. Michael Drive, 4th Floor
Texarkana, Texas 75503
(903) 334-7000
(903) 334-7007 – Fax

**ATTORNEYS FOR TWENTIETH CENTURY
FOX FILM CORPORATION**

Respectfully submitted,

**DAVIS WRIGHT TREMAINE LLP**

By: Laura R. Handman *by permission from*
D. C. Bar No. 444386
Constance M. Pendleton
D. C. Bar No. 456919
1500 K Street, N.W., Suite 450
Washington, D. C. 20005-1272
(202) 508-6600
(202) 508-6699 – Fax

**ATCHLELY, RUSSELL, WALDROP &
HLAVINKA, L.L.P.**
Victor F. Hlavinka
1710 Moores Lane
Texarkana, Texas 75505
(903) 792-8246
(903) 792-5801 – Fax

**ATTORNEYS FOR DISCOVERY
COMMUNICATIONS, INC.**

23

**CERTIFICATE OF SERVICE**

This is to certify that on this _29th_ day of _August_, 2003, a true and correct copy of the foregoing *Defendants' Joint Motion to Exclude Testimony of Gabriel M. Gelb and Brief in Support*, was served via facsimile and Federal Express, upon:

George E. Bowles
Locke, Liddell & Sapp. L.L.P.
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201

G. William Lavender
Lavender Law Firm
Post Office Box 1938
Texarkana, Arkansas 71854

Laura R. Handman
Davis, Wright, Tremaine, L.L.P.
1500 K Street, N.W., Suite 450
Washington, D.C. 20005-1272

Victor Hlavinka
Atchley, Russell, Waldrop & Hlavinka
Post Office Box 5517
Texarkana, Texas 75505-5517

_____
Charles L. Babcock *by permission JPM*