SCANNED

IN THE UNITED STATES DISTRICT COURT
OF THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

FILED-CLERK
U.S. DISTRICT COURT

03 DEC 19 PM 2: 41

TX EASTERN-TEXARKANA

BY _____

| | | |
|---|---|---|
| SCOTT O'GRADY | § | |
| Plaintiff | § | |
| | § | |
| V. | § | No. 5:02CV173 |
| | § | |
| TWENTIETH CENTURY FOX FILM | § | |
| CORP. and DISCOVERY | § | |
| COMMUNICATIONS, INC. | § | |
| Defendants | § | |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3) and the Amended Order for the

Adoption of Local Rules for Assignment of Duties to United States Magistrate Judges dated January

15, 1994, Defendant Twentieth Century Fox Film Corporation's Motion for Summary Judgment

(Docket Entry # 51), Discovery Communications, Inc.'s Motion for Summary Judgment (Docket

Entry # 53), and Twentieth Century Fox Film Corporation's Objections to Plaintiff's Summary

Judgment Evidence (Docket Entry # 65)[1] were referred to the Honorable Caroline M. Craven for the

purpose of making a report and recommendation.  The Court, after reviewing the relevant briefing

and hearing arguments of counsel,[2] recommends Defendants' motions for summary judgment be

**GRANTED IN PART and DENIED IN PART** as specified in Section X.  The Court reserves its

ruling on Defendants' objections to the Gelb Survey.

---

[1] DCI filed a Joinder in Fox Film's Objections to Plaintiff's Summary Judgment
Evidence.  (Docket Entry # 76).

[2] The Court conducted a hearing on Defendants' motions on September 17, 2003.

134

# I.

## BACKGROUND

Scott O'Grady ("Plaintiff") brings this cause of action against Twentieth Century Fox Film Corporation ("Fox Film") and Discovery Communications, Inc. ("DCI")(collectively "Defendants"). Plaintiff asserts two primary allegations against Defendants: (1) Fox Film's movie *Behind Enemy Lines* ("the Movie") was based on events involving Plaintiff, and Fox Film never obtained, nor did it seek, Plaintiff's permission to produce its Movie (First Amended Complaint at ¶ 33); and (2) Defendants should not have advertised the Movie by sponsoring the airing of DCI's documentary ("docu-drama") of the same title because the confusingly similar titles "would lead consumers to believe, incorrectly, that [Plaintiff] was affiliated with and endorsed the Fox movie, and that the Fox movie was [Plaintiff's] story." (First Amended Complaint at ¶ 36).

Based on these allegations,   Plaintiff asserts the following causes of action against Defendants: (1) invasion of privacy through the misappropriation of Plaintiff's name, likeness, and identity; (2) violation of the Lanham Act: false representations, false advertising, and false endorsement; (3) common law unfair competition: false advertising/representations, unjust enrichment, and misappropriation; (4) tortious interference with prospective business relations; and (5) civil conspiracy: conspiracy to misappropriate Plaintiff's name, likeness, and identity and to commit false representations, false advertising, unfair competition, and tortious interference with prospective business relations.

When considering a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmovant. Therefore, the majority of the following background facts come from the evidence submitted in Plaintiff's response. Plaintiff served in the United States Air

Force as a Captain and as a F-16 fighter pilot from 1991 to 1998. (O'Grady Aff. at ¶ 2). In 1994, Plaintiff was assigned to duty at the United States Air Force base near Aviano, Italy with the 555th Fighter Squadron. (*Id.* at ¶ 3). As part of his assignment, Plaintiff flew numerous missions over Bosnian airspace as part of an international peace keeping effort. (*Id.*).

On June 2, 1995, Plaintiff was shot down over Bosnia. (*Id.* at ¶ 4). Plaintiff evaded capture by hostile forces for six days. (*Id.*). On June 8, 1995, Plaintiff was rescued by a Marine helicopter as part of a daylight raid by NATO and U.S. forces. (*Id.*). Subsequently, Plaintiff was awarded the Bronze Star and the Purple Heart. (*Id.* at ¶ 5).

Plaintiff's experience received national publicity. (*Id.* at ¶ 6). Plaintiff co-authored two books, *Return With Honor* and *Basher 52*, a children's book. (*Id.* at ¶ 7). *Return With Honor* was on the New York Times best seller list for six weeks. (*Id.*). Beginning in 1996, Plaintiff began giving inspirational and motivational speeches through the Washington Speakers Bureau. (*Id.* at ¶ 8). Since that time, Plaintiff's primary source of income has been through giving speeches throughout the country. (*Id.* at ¶ 9).[3]

On January 22, 1996, Plaintiff entered into a written contract with Orion Pictures Corporation ("Orion") to make his book, *Return With Honor*, into a movie. (Pl. App. 22, Dep. Ex. 18 at SOG 003211). The agreement with Orion was essentially an option giving Orion five years to develop a movie. (*Id.* at 003214). The five-year term expired in January of 2001,[4] and the development

_____

[3] Plaintiff gives between 50 and 60 motivational speeches every year. (O'Grady Aff. at ¶ 9).

[4] In his deposition, Plaintiff testified the movie was never made because Orion "disbanded" and was bought out by MGM. Plaintiff was not aware of any other reason why the movie was not made. (O'Grady Depo. at 84, line 4 - 85, line 6).

rights for the book reverted to Plaintiff. (Pl. App. 23, Dep. Ex. 19).

In 1996, Plaintiff gave extended interviews of his experience to the British Broadcasting Company ("BBC"). (O'Grady Aff. at ¶10). The BBC used the interviews to create a docu-drama of Plaintiff's experience in Bosnia. (Id.).[5] The BBC docu-drama was entitled *Missing in Action*. (Id.). In March of 1997, the BBC amended an agreement it had with BBC Worldwide Americas, Inc. to grant BBC Worldwide Americas, Inc. the sole and exclusive nonstandard television rights in the Americas. (Def. App. II A.3, Chu Decl. at ¶5).

BBC Worldwide Americas, Inc. then licensed the documentary to DCI. (Id. at ¶ 6). DCI changed the title of the docu-drama to *Behind Enemy Lines: The Scott O'Grady Story*. (Pl. App. 32, Dep. Ex. 98). Otherwise, DCI made no editorial change to the BBC documentary.[6] (O'Grady Depo. Vol 2 at 342, lines 10-17). Between June 1, 1997 and November 28, 2001, DCI broadcast the docu-drama 34 times to millions of people in the United States. (Pl. App. 29, Dep. Ex. 48).

In November of 2001, Fox Film released the movie *Behind Enemy Lines*.[7] (O'Grady Aff. at ¶ 11). John Davis produced the Movie. (Pl. App. 9, Davis Depo. at 10l, lines 21-25). Davis testified the idea for the Movie was inspired by and loosely based on the events of Plaintiff's

---

[5] The BBC also interviewed members of the Marine helicopter rescue team, Plaintiff's fellow pilots, and Plaintiff's father and sister.

[6] According to Plaintiff, with the exception of the title and commercial advertisements shown, the pre-November 28, 2001 version of DCI's docu-drama was the same as the BBC program *Missing in Action*. (Pl. App. 7, Anderson Depo. at 100, lines 6-17)(identifying the BBC script as DCI's *Behind Enemy Lines: The Scott O'Grady Story*).

[7] Fox Film moved up the release date of *Behind Enemy Lines* to November 30, 2001 from January of 2002. In his deposition, the chairman of Fox Film, Thomas Rothman, conceded that the September 11th tragedy and the post-patriotic fervor played a part in Fox Film's decision to move the Movie release up. (Pl. App. 20, Rothman Depo. at 47, line 9 - 49, line 10).

experience as reported in the news. (*Id.* at 11, line 1 - 12, line 7).   It is undisputed that *Behind Enemy Lines* is not Plaintiff's story.

On October 23, 2001, Kelly Patterson, an account executive with DCI, wrote an email to Michelle Marks, the Fox executive in charge of advertising *Behind Enemy Lines*, proposing a "stunt night" to be aired on January 16, 2002, two days before the original release date of *Behind Enemy Lines*. (Pl. App. 33, Dep. Ex. 99).   A "stunt night" is a "special programming event."  DCI's proposal to Fox Film as set forth in Patterson's October 23 email stated:

Hello.   Do we have a great stunt night for you?   Yes.   Naomi – as I mentioned, Discovery Channel has the non-fiction story of Scott O'Grady – who was shot down Behind Enemy Lines. (Hence the title and the impetus for us pulling this together). The network is really enthusiastic about airing our 'Behind Enemy Line' program on Wednesday January 16th, prior to your January 18th release.  We have put together the attached deck which outlines the stunt and shows all of the interstitial elements that can be incorporated into the night.

This is obviously a strong link and our Discovery Channel program is like one GIANT interstitial.[8]  We will kick off this with a minimum of 30 Promo Tune-in's tagged with your :30 commercial. . .

Here's the deck and we'll fax over the plan and send everything in hard copy (unless we can come onto the Lot and present it in person?)

(See attached file: Behind Enemy Lines.ppt)

Thanks and let me know what you think?

Kelly.
310-975-5914

Attached to Patterson's email was a PowerPoint presentation.

One week later, Fox Film moved the release date for the Movie up to November 30, 2001.

---

[8] According to Plaintiff, an interstitial is material used to advertise and promote a film. (Pl. App. 13, Marks Depo. at 35, lines 18-22).

(Pl. App. 34, Dep. Ex. 100). The "stunt night" was then moved up to November 28, 2001, to air two days before the release date for the Movie. (Pl. App. 35, Dep. Exs. 101 & 102).    In this special programming event, Fox Film would pay to advertise the Movie on the Discovery Channel during the airing of the docu-drama. (Patterson Depo. at 50, line 1 - 51, line 10).

The proposed "stunt night" involved the creation of "interstitial"[9] video segments to be incorporated into a rebroadcast ("the Rebroadcast") of DCI's docu-drama about Scott O'Grady. (Pl. App. 33, Dep. Ex. 99). DCI's interstitials consisted of the opening introduction, "bump-ins" leading from the program into advertising, "bump-outs" leading from the advertising back into the programming, and a "sneak peak" at the Movie. (Patterson Depo. at 50, lines 20-24; 167, line 22-168, line 4)(Def. Exs. 113, 114, 114A, 335 and 335A). The interstitials include interviews with the actors, trailers from the Movie which were edited by DCI, and "factoids," which were educational elements. (Anderson Depo. at 32, line 19 - 34, line 10).

DCI's Robert Anderson created and produced the interstitials to be incorporated into the DCI docu-drama. (Pl. App. 40, Dep. Ex. 110). Anderson used material from two sources, an electronic press kit supplied by Fox Film concerning the Movie and the DCI docu-drama, to incorporate interstitials into the docu-drama. (Pl. App. 7, Anderson Depo. at 29, lines 10-23 & 42, lines 21-25)(Pl. App. 38, Dep. Ex. 105). As mentioned above, the interstitials included an opening segment inserted at the beginning of the program and eight other segments inserted throughout the program. (Pl. App. 42, Dep. Ex. 113; Pl. App. 7, Anderson Depo. at 25, lines 19-21; 26, lines 24 - 29, line 3; & 44, line 24 - 45, line 3).

---

[9] Defendants contend the interstitials are not advertisements.

Using the same sources, Anderson also created "tune-in" material to be aired during the week before the November 28 Rebroadcast of the docu-drama which referenced the Movie and the upcoming November 28 Rebroadcast. (Pl. App. 42, Dep. Ex. 113). A "tune-in" or "promo" is a commercial created from material from the program that is being promoted. (Anderson Depo. at 23, line 14 - 24, line 13). Here, the tune-ins showed clips for the November 28 docu-drama broadcast and stated that the airing would be sponsored by the Movie. (Def. Exs. 113, 114, and 114A).

The November 28 Rebroadcast was presented to Fox Film on a video compilation reel which Anderson prepared. Fox Film approved the Rebroadcast prior to the airing of the Rebroadcast. (Pl. App. 41, Dep. Ex. 111; Def. App. IV, Dep. Ex. 114). On November 28, 2001, DCI aired at two different times the one-hour broadcast *Behind Enemy Lines: The Scott O'Grady Story* which contained the interstitial segments created for the "stunt night." (Pl. App. 48, Dep. Ex. 135; Def. App. IV, Dep. Ex. 114).

The tune-ins, opening, and other interstitial segments were narrated by a single narrator and referenced and juxtaposed material from both the docu-drama and the Movie, including frequent references to the titles of the Movie *Behind Enemy Lines* and to the title of the docu-drama *Behind Enemy Lines: The Scott O'Grady Story*. (Pl. App. 42, Dep. Ex. 113). The opening segment for the November 28 Rebroadcast is revealed in Anderson's script as follows:

| Copy | Video |
|------|-------|

(See following page.)

7

| | |
|---|---|
| ON NOVEMBER 30th | See origin... Tune-in and Sponsored spots |
| | For visuals references |
| ONE MAN. . . | |
| (NAT) "Eject, eject!!" | |
| FINDS HIMSELF <u>INSIDE</u> ENEMY TERRITORY | See original Tune-in and Sponsored spots |
| | For visual references. |
| "I'm NOT leaving that kid out there." | |
| "You will lose your command here." | |
| "So be it!" | |
| <u>BEHIND ENEMY LINES.</u> | |
| BUT BEFORE YOU CROSS THE LINES IN THEATERS | See original Tune-in and Sponsored spots |
| | For visual references. |
| FIND OUT HOW AMERICA RESPOND TO THE REAL THING? | |
| "We're following the story very closely." (NAT) | Bill Clinton |
| TONIGHT. . . THE DISCOVERY CHANNEL REMEMBERS ONE HERO'S TRUE STORY. | |
| "I said . . . Dear God, don't let me die."  (SOT) | Scott O'Grady |
| "I was not ready to bury Scott O'Grady."  (SOT) | Scott's wing man |
| PLUS . . . | Behind the screen's footage (SEE EPK) |
| WE'LL TAKE A BEHIND-THE-SCENES LOOK AND GET A SNEAK PEAK AT TWENTIETH CENTURY FOX'S NEW FILM <u>BEHIND ENEMY LINES</u> | (mix with a little footage from the trailer) |
| A DETAILED LOOK AT THE FACT AND FICTION . . . OF <u>TRUE</u> SURVIVAL. | Visual transition |
| | (a little footage from Scott O'Grady's show) |
| BEHIND ENEMY LINES – THE SCOTT O'GRADY STORY | Title treatment for show |
| (KISS BLACK, SHOW BEGINS)   :45 | |

8

Other interstitial segments also utilized linkage, including the following reference to Plaintiff beside the film actor's name who played the role of the aviator in the Movie:

> In the New Twentieth Century Fox Feature Film, *Behind Enemy Lines*, like Scott O'Grady, Owen Wilson's character, naval aviator Chris Burnett, runs into some challenges once his plane is shot down.

The tune-in segments which aired during the week before the November 28 Rebroadcast contained similar treatment as that contained in Anderson's script quoted above.

Excluding the advertisement for the Movie in connection with the docu-drama, O'Grady acknowledges that he does not know of any other advertisements or promotions for the Movie that used Plaintiff's name, likeness, image, or picture to promote the Movie. (O'Grady Depo. Vol. 1 at 127, line 11 - 130, line 2). Defendants contend not one frame of what was aired on the Discovery Channel that referred to the Movie used Plaintiff's name or likeness. Defendants further assert the promotions for the docu-drama never said that the Movie, as contrasted with the docu-drama, was a true account of Plaintiff's experience, and the promotions never said Plaintiff endorsed, authorized, or participated in the Movie. Plaintiff, however, asserts the Rebroadcast gave the false and misleading impression that Plaintiff endorsed the Movie or that the Movie was his story, and nowhere in connection with the November 28 Rebroadcast is there a written or oral statement that the Fox Film Movie is *not* Plaintiff's story. (Pl. App. 48, Dep. Ex. 135).

## II.

## DEFENDANTS' MOTIONS

### A.   Defendants' Motions for Summary Judgment

Fox Film and DCI separately move for summary judgment pursuant to Federal Rule of Civil Procedure 56 on all of Plaintiff's claims, asserting there is no genuine issue as to any material fact

and Defendants are entitled to summary judgment as a matter of law. Defendants submitted a single summary judgment record which includes the following evidence: (1) Appendix I - Deposition Excerpts; (2) Appendix II - Declarations and DCI's Rule 56 Statement of Undisputed Facts; (3) Appendix III - Responses to Interrogatories and Requests for Admissions; (4) Appendix IV - Exhibits; and (5) Appendix V - DVD Exhibits Made from Videotape Exhibits.

## III.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the movant is able to demonstrate that the pleadings, affidavits, and other evidence available to the Court establish that there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The movant bears the responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Topalian v. Ehrman*, 954 F.2d 1125 (5th Cir. 1992), *cert. denied*, 506 U.S. 825 (1992).

The nonmovant is not required to respond to a motion for summary judgment until the movant first meets its burden of demonstrating that there are no factual issues warranting trial. *Ashe v. Corley*, 992 F.2d 540 (5th Cir. 1993). Once the movant has shown the absence of material fact issues, however, the opposing party has a duty to respond, via affidavits or other means, asserting specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e). It is not enough for the party opposing summary judgment to rest on mere conclusory allegations or denials in his pleadings. *Topalian*, 954 F.2d at 1131. The nonmovant must point out, with factual specificity,

10

evidence demonstrating the existence of a genuine issue of material fact on every component of the nonmovant's case. *Dunn v. State Farm & Casualty Co.,* 927 F.2d 869, 872 (5th Cir. 1991). If the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). In assessing the proof, the court views the evidence in the light most favorable to the nonmovant. *Matshusita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986).

IV.

**PLAINTIFF'S CLAIMS OF INVASION OF PRIVACY BY
MISAPPROPRIATION AND LANHAM ACT CLAIMS AS TO THE MOVIE**

**A.      Fox Film's Arguments**

Fox Film asserts the following three grounds in support of its motion for summary judgment on Plaintiff's claims of invasion of privacy by misappropriation as to the Movie: (1) the misappropriation claim as to the Movie fails because Texas law does not protect a person's life story; (2) the misappropriation claim as to the Movie is barred because Texas law does not allow such a claim for information that is newsworthy or in the public domain; and (3) the misappropriation claim as to the Movie is barred under the First Amendment and the Texas Constitution Art. I, § 8.

In support of its motion for summary judgment as to Plaintiff's Lanham Act claims as to the Movie, Fox Film asserts as follows: (1) false designation of Origin Claims under the Lanham Act does not apply to ideas, concepts, or communications such as the Movie; (2) the Movie is not commercial speech, and therefore the Lanham Act does not apply nor could it be applied consistent with the First Amendment; and (3) there is no evidence of false or misleading statements of fact, thus

negating an essential element of Plaintiff's Lanham Act claims as to the Movie.

At the hearing, Defendants argued as follows:

I WOULD START OUT WITH THREE STATEMENTS FROM THE
PLAINTIFF'S BRIEF. SO THESE ARE THINGS THAT THEY DO NOT
CONTEST, AND I THINK THEY ARE IMPORTANT FOR THE
DISPOSITION OF THE MOTION BECAUSE THEY TAKE CERTAIN PARTS
OF THE MOTION OUT OF PLAY. IN OTHER WORDS, THEY DON'T
CONTEST OUR RIGHT TO HAVE SUMMARY JUDGMENT ON CERTAIN
THINGS.

THE FIRST IS THEY SAY O'GRADY DOES NOT CHALLENGE FOX'S
RIGHT TO MAKE A FICTIONALIZED MOVIE INSPIRED BY O'GRADY
AND HIS LIFE STORY. THAT CONCESSION, OF COURSE, IS
COMPELLED BY THE FIFTH CIRCUIT CASE IN MATTHEWS V.
WOZENCRAFT, WHICH HAS BEEN HEAVILY CITED BY THE
DEFENDANTS AND RESPONDED TO BY THE PLAINTIFFS AS WELL.

THEY ALSO SAY IN THEIR SECOND CONCESSION, AND, BY THE
WAY, THIS FIRST ONE I THINK IS FOUND AT PAGE 29, NOTE 5
OF THEIR BRIEF. ON THE FIRST PAGE, THEY SAY THAT THIS
CASE IS NOT ABOUT DISCOVERY CHANNEL'S RIGHT TO AIR A
DOCUDRAMA DESCRIBING O'GRADY'S EXPERIENCES IN BOSNIA.
THIS, OF COURSE, IS CLASSIC FIRST AMENDMENT PROTECTED
PROGRAMMING, NOTWITHSTANDING THE FACT THAT, AND WE WILL
GET INTO THIS A LITTLE BIT LATER AND MS. HANDMAN WILL
ADDRESS THIS MORE FULLY, NOTWITHSTANDING THE FACT THAT
MR. O'GRADY GAVE A RELEASE WHICH RELEASED ALL RIGHTS FOR
ALL PURPOSES EVERYWHERE WITH RESPECT TO THE PROGRAMMING
THAT WAS AIRED BY THE DISCOVERY CHANNEL AS AN ASSIGN OF
THE BBC.

* * *

AT ANOTHER POINT, AND I DON'T HAVE A GRAPHIC ON THIS, BUT
AT ANOTHER POINT IN THEIR BRIEF, IN THEIR RESPONSE, THEY
CONCEDE THAT THEY HAVE NO CLAIM FOR TORTIOUS INTERFERENCE
WITH CONTRACT OR WITH RESPECT TO BUSINESS RELATIONS.

AS A RESULT OF THESE CONCESSIONS, OUR GROUNDS FOR SUMMARY
JUDGMENT 1 THROUGH 3, WHICH DEAL WITH MISAPPROPRIATION AS
TO THE MOVIE, 8 THROUGH 10, WHICH DEAL WITH LANHAM ACT AS
TO THE MOVIE, AND 16 THROUGH 19, WHICH DEAL WITH TORTIOUS
INTERFERENCE, ARE NOT CONTESTED AND SHOULD BE GRANTED.

12

> **SO WHAT THIS CASE BOILS DOWN TO AFTER ALL THESE REAMS OF PAPER WHICH WE HAVE INUNDATED THE COURT WITH, IS LESS THAN TWO HOURS OF PROGRAMMING, THAT BEING THE DISCOVERY CHANNEL PROGRAM AT 8 P.M. ON NOVEMBER 28[TH] OF 2001, WHICH WAS REPEATED VERBATIM AT MIDNIGHT THAT NIGHT, ON ONE DAY, NOVEMBER 28[TH] OF 2001. THE SHOWING OF THIS DCI DOCUMENTARY WAS SPONSORED BY OR BROUGHT TO YOU BY THE TWENTIETH CENTURY FOX FILM "BEHIND ENEMY LINES," AND THAT IS WHAT THIS CASE HAS DEVOLVED TO.**

(Transcript at 8, line 5 - 10, line 4).

### B.    Plaintiff's Response

In their briefing and oral argument at the hearing, Plaintiff did not respond to Defendants' argument as to the misappropriation and Lanham Act claims as they relate to the Movie.  At the hearing, Plaintiff stated as follows:

> We are not claiming that making the movie is the basis for this, for this lawsuit.  It is the November 28 program that's the basis for the lawsuit.

(Transcript at 90, lines 21-23).

### C.    Discussion

Plaintiff seems to have abandoned any claims of misappropriation or Lanham Act violations as to Fox Film's making the Movie.  Even if Plaintiff has not abandoned his claims of misappropriation and Lanham Act violations as to the Movie, the Court agrees with Fox Film that the protection of name or likeness under Texas law does not include a person's life story.  *See Matthews v. Wozencraft*, 15 F.3d 432, 437 (5th Cir. 1994).  Plaintiff has created no genuine issues of material fact as to his claims, if any, for misappropriation and Lanham Act violations as to the Movie. Fox Film is entitled to summary judgment on all claims emanating from its making the Movie. Therefore, the Court recommends Defendants' motion for summary judgment as to these

13

claims, if any, be **GRANTED**.

**V.**

**PLAINTIFF'S CLAIMS OF INVASION OF PRIVACY BY
MISAPPROPRIATION AS TO THE REBROADCAST**

**A.     Fox Film's Arguments**

In support of its motion for summary judgment on Plaintiff's claims of invasion of privacy

by misappropriation as to the Rebroadcast, Fox Film refers to the advertisements, interstitials, and

tune-ins added to the docu-drama for the November 28 Rebroadcast as "the Challenged Material."

Fox Film asserts the following: (1) the Challenged Material does not use Plaintiff's name or likeness,

thus negating an essential element of Plaintiff's claim; (2) Plaintiff released "all rights" regarding

the DCI docu-drama, thereby waiving any right to complain as to its use in the Challenged Material

or otherwise; (3) the newsworthiness and incidental use privileges bar the claim; and (4) even if the

Challenged Material used Plaintiff's name and likeness, that use is protected by the First

Amendment and Article I, § 8 of the Texas Constitution.

**B.     DCI's Arguments**

It is undisputed that in 1996, Plaintiff executed a release for the BBC docu-drama ("the

Release")(Def. Exs. 44, 45).  In the Release, Plaintiff relinquished all rights he had in the interview

and granted the BBC the right to broadcast the BBC docu-drama anywhere in the world.  (*Id.*).  The

Release provides that the BBC and its "licensees and assigns" shall be entitled to "ALL RIGHTS"

in the material Plaintiff contributed "FOR ALL PURPOSES EVERYWHERE" including, but not

limited to, "all television . . . pay cable television and basic cable television."  (Def. Ex. 44 at ¶ 5).

The Release also allowed the BBC and "its licensees and assigns" to adapt or modify the program

14

(Def. Ex. 44 at ¶ 5) and the "programme titles . . . may be changed at the discretion of the BBC." (Def. Ex. 44 at ¶ 15).

DCI contends Plaintiff does not and cannot contest DCI's right to broadcast the docu-drama. DCI relies on the Release, asserting DCI had the right to use Plaintiff's name and likeness, including footage from Plaintiff's interview, to promote the docu-drama. Even if Plaintiff had not given his consent, DCI states it could broadcast a non-fiction account of public events and use the name and likeness of the central figure in those events in promotions for the program. DCI asserts Plaintiff has no right to control documentaries, or other accounts, that mention or depict his very, public, newsworthy experience. According to DCI, the use of Plaintiff's name and likeness were only used in reference to the docu-drama, not the Movie, and therefore, no claim of misappropriation can be stated.

## C.   Plaintiff's Response

Plaintiff asserts he did not consent to the use of his name, likeness, or image to promote *Behind Enemy Lines*. Plaintiff contends he has presented sufficient evidence to establish, at a minimum, a genuine issue of material fact on each element of his misappropriation claim.

## D.   The Effect of the Release

Defendants first assert Plaintiff consented to the November 28 Rebroadcast because he consented to the creation of the original docu-drama. Plaintiff asserts the only commercial advertisements mentioned in the Release related to the advertising of the docu-drama itself. Plaintiff states when he signed the Release, he was not granting the BBC and its assigns the right to use his name, likeness, and image to promote commercial products apart from the docu-drama itself. The Court is of the opinion a genuine issue of material fact exists regarding whether Plaintiff's consent

15

by signing the Release extended to the advertisement of the Movie. *See, e.g. Kimbrough v. Coca-Cola/U.S.A.*, 521 S.W.2d 719, 720-24 (Tex. App. – Eastland 1975, writ ref'd n.r.e.). The Court will now consider whether Plaintiff can establish the essential elements of his misappropriation claim as to the November 28 Rebroadcast.

**E.      Elements of a Misappropriation Claim**

To prevail on a misappropriation claim, Plaintiff must prove that (1) Defendants misappropriated his name, likeness, or image for the value associated with it, and not in an incidental manner or for a newsworthy purpose, (2) Plaintiff can be identified from the broadcast in question, and (3) Defendants derived some advantage or benefit from their use of Plaintiff. *Brown v. Ames*, 201 F.3d 654, 657 (5th Cir. 2000).

**1.      Whether Defendants misappropriated Plaintiff's name, likeness, or image for the value associated with it, and not in an incidental manner or for a newsworthy purpose**

**a.      The Value Associated With Plaintiff**

Plaintiff has presented evidence that he gained notoriety as a national hero after he was shot down, evaded capture, and rescued from Bosnia.  (Pl. App. 4, O'Grady Aff. ¶¶ 5-7).  Plaintiff authored two books and delivered speeches throughout the country.  There is sufficient evidence in the record to create a genuine issue of material fact as to the commercial value associated with Plaintiff's name, likeness, and image.

Defendants rely on *Benavidez v. Anheuser Busch, Inc.*, 973 F.2d 102 (5th Cir. 1989), asserting the November 28 Rebroadcast cannot be characterized as a commercial advertisement.  In *Benavidez*, the Fifth Circuit upheld the district court's post-trial decision that Anheuser Busch was not liable to the plaintiff, a Hispanic war hero, for misappropriation of name and likeness. *Id.* at 103-

04. The documentary at issue in *Benavidez* documented facts about the plaintiff and other Hispanics who made heroic contributions to American military efforts. *Id.* at 104. The court held the documentary, created by Anheuser Busch, did not advertise or promote Anheuser Bush or its products in any way. "The film's only reference to [Anheuser Busch] whatsoever is the innocuous statement, shown in the credits at the end of the film that [the documentary] was '[m]ade possible by Anheuser Busch, Inc. and its family of wholesalers." *Id.*

Plaintiff distinguishes *Benavidez*, arguing unlike Anheuser Busch, Defendants created the Rebroadcast for the purpose of promoting the Movie and selling tickets to the Movie. Plaintiff also asserts unlike the only reference to Anheuser Busch in the credits of the documentary in *Benavidez*, Defendants "spliced two works together . . . to create their promotional program, running numerous promotions, interviews, and clips for *Behind Enemy Lines*."[10]

The Court concludes there is a genuine issue of material fact as to whether the November 28 Rebroadcast was created to capitalize upon the commercial value associated with Plaintiff's name, likeness, and image to promote the Movie. The November 28 Rebroadcast, by itself, is sufficient to raise a genuine issue of material fact regarding whether Plaintiff and his story were being used for a commercial purpose - to promote the Movie. In addition, as will be discussed in greater detail below in subsection F below, the correspondence between Fox Film and DCI relating to the production of the Rebroadcast creates a fact issue as to whether Defendants created the program for a commercial purpose.

---

[10] Plaintiff's response at 50.

**b.    Incidental Use Exception**

Both Defendants contend any use of Plaintiff's name, likeness, or image qualifies as use in an incidental manner.  Defendants assert even if a fleeting reference to Plaintiff could be viewed as part of the promotion for the Movie, "notwithstanding that his name and likeness were only used in reference to the Documentary, it is exactly the kind of incidental use that courts regularly allow, especially when First Amendment expressive or newsworthy content is being advertised."[11]

An example of a case where "incidental use" was found by the court includes *Merle v. Sociological Research Film Corp.*, 166 A.D. 376, 152 N.Y.S. 829 (1 Dept. 1915), wherein a motion picture showed a factory building upon which there was a sign bearing the name and business of the plaintiff.  In *Merle*, "the court held that no violation of the New York statute had taken place, since in order to constitute such a violation, it must appear that the use of plaintiff's picture or name is itself for the purpose of trade and not merely an incidental part of a photograph of an actual building."  *Henley v. Dillard Department Stores*, 46 F.Supp.2d 587, 594 n.6 (N.D. Tex. 1999).

In this case, the reference to Plaintiff was more meaningful and purposeful as opposed to the more casual and incidental use found in *Merle*.  The Court finds the reference to Plaintiff was not merely incidental.

**c.    Newsworthiness Exception**

Both Defendants also contend the Rebroadcast is protected by the newsworthiness exception.  In asserting the Rebroadcast is protected under the newsworthiness exception, DCI asserts its docu-drama is undisputable speech about a matter of public concern, which is entitled to full First

---

[11] DCI's mot. at 25.

Amendment protection.  Specifically, DCI contends even if the Court were to find that Plaintiff's name or image was used in connection with the Movie, which DCI contends it was not, it was used as a newsworthy purpose to contrast "the fact and fiction of true survival." (Def. Exs. 335, 335A).

The Court is not convinced Defendants' use of Plaintiff's name, likeness, and image was for a historical or newsworthy purpose.  There is a fact issue of whether the Rebroadcast constitutes commercial speech notwithstanding the fact that the Rebroadcast contained educational elements intended to contrast "the fact and fiction of true survival" and the fact that Plaintiff's ordeal was newsworthy at one time.

## 2.   Whether Plaintiff can be identified from the broadcast in question

The second element of a misappropriation claim is whether Plaintiff can be identified from the broadcast in question.  There are many ways a plaintiff can be identified in a defendant's use. *Henley*, 46 F.Supp.2d at 594.  "To establish liability, plaintiff need prove no more than that he or she is reasonably identifiable in defendant's use to more than a de minimus number of persons." *Id.* at 595, *quoting* J. Thomas McCarthy, 1 *The Rights of Publicity & Privacy* § 3.2 (1998)(McCarthy II).

Defendants focus upon the commercial clips from the Movie that do not show or mention Plaintiff.  However, this claim is about the creation of the November 28 Rebroadcast in its entirety. One example of the evidence creating a fact issue as to this element is one scene of the Rebroadcast, wherein the narrator says, "like Scott O'Grady, Owen Wilson's character, naval aviator Chris Burnett. . ." while showing clips from the Movie.  There is sufficient evidence in the record to create a genuine issue of material fact that Plaintiff's name, likeness, or image are identifiable from the November 28 Rebroadcast.

3.      **Whether Defendants derived some advantage or benefit from their use of Plaintiff**

The third essential element of a misappropriation claim is whether Defendants derived some advantage or benefit from their use of Plaintiff. In *Henley*, the court stated "[i]f a defendant appropriates a plaintiff's name or likeness for his own commercial advantage, he necessarily derives a benefit from its use." *Henley*, 46 F.Supp.2d at 596.

Fox Film asserts the goal of the Rebroadcast was to reach a certain demographic age group that appreciated military dramas. (Pl. App. 13, Marks Depo. at 50, lines 16-20; Pl. App. 11, Godsick Depo. at 47, lines 3-11, Pl. App. 21, Siskind Depo. at 38, lines 8-15). DCI required a commitment of $400,000 from Fox Film as a condition to going forward with the Rebroadcast. (Pl. App. 19, Patterson Depo. at 103, line 20 - 105, line 22). Patterson testified DCI needed "a total expenditure, a media buy, on our network to support *Behind Enemy Lines* of $400,000." (*Id.* at 105, lines 15-22). DCI received the $400,000 from Fox Film. (*Id.*). At the hearing, Fox Film explained it spent about $65,000 on the "stunt night" out of the $400,000 total spent on the Discovery Channel. (Transcript at 18, lines 3-6).

After the "stunt night," DCI reported to Fox Film that the Rebroadcast delivered over 25 million household impressions at an estimated $300,000 value. (Pl. App. 44, Dep. Ex. 117). There is sufficient evidence in the record to create a genuine issue of material fact that Defendants created the November 28 Rebroadcast in furtherance of their economic motivations.

F.      **First Amendment**

1.      **Arguments**

Defendants assert the Movie and docu-drama are expressive works protected by the First Amendment, and the Fifth Circuit has "emphasized the need to narrowly construe commercial

misappropriation and false endorsement/false advertising claims when, as here, First Amendment protected works are at issue, even at the risk of some public confusion or misunderstanding."[12]

Plaintiff generally responds that Defendants' actions in creating and airing the November 28 Rebroadcast are not protected by the First Amendment because the actions constitute false and misleading commercial speech. In asserting the speech is commercial speech, Plaintiff argues Fox Film's motive was to sell additional tickets to its Movie, and DCI's motive was to make money on advertisements or "media buys" from Fox Film.

As for Plaintiff's argument that the Rebroadcast delivers a false and misleading message that Plaintiff endorsed or was involved in the Movie and that the Movie is Plaintiff's story, Plaintiff relies, among other things, on a research study ("the Survey") conducted by Mr. Gabriel Gelb. Gelb conducted the Survey in Houston, Los Angeles, Milwaukee, and Baltimore. (Pl. App. 5, Gelb Report at 4, ¶ IV). The 203 participants were chosen after a telephone interview in which they were asked whether they had the Discovery Channel in their home in 2001, and if they had seen one or more Discovery Channel programs in the past 3 months preceding the telephone survey. (*Id.* at Ex. B).

The sample selected resulted in a group of 46% male and 54% female. (*Id.* at 4, § B). From his Survey, Gelb concluded that "a substantial segment of this relevant population believes that Capt. O'Grady endorsed the Fox motion picture, 'Behind Enemy Lines'" and that "a majority of the surveyed sample believes that the motion picture as advertised on the docu-drama is Capt. O'Grady's real-life story." (*Id.* at 3).

---

[12] *Id.* at 4.

2.     **Defendants' Objections**

Defendants object to the Gelb Report and Survey for failure to implement and maintain "standards and controls" that would support the reliability of the Survey utilized by Gelb in reaching his opinions as required by Federal Rule of Evidence 702. Defendants attack the methods utilized by Gelb in constructing and conducting his Survey, thus challenging the reliability of the results and Gelb's opinions based on those results. Specifically, Defendants assert the Survey is flawed in several respects, including having an (1) unrepresentative survey universe, (2) failure to incorporate any form of control to measure error or bias, and (3) using leading and ambiguous question structures and sequences.

Plaintiff asserts the use of consumer surveys is an accepted method to prove consumer confusion in Lanham Act cases. *See Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.2d 489, 497 (5th Cir. 2000). Plaintiff contends: (1) Gelb is qualified; (2) he selected an appropriate universe for the Survey; (3) he asked relevant questions; and (4) he pre-tested the questions to improve the quality and clarity of the survey questionnaire. Plaintiff argues the Gelb Survey is powerful circumstantial evidence of actual confusion among viewers of DCI's November 28 Rebroadcast.

In ruling on Defendants' motions for summary judgment, the Court will not rely on the Gelb Report and Survey. The Court reserves its ruling on the reliability of the Survey. Without relying on the Gelb Survey, the Court finds there is a fact issue as to whether the November 28 Rebroadcast is false and misleading commercial speech outside the protection of the First Amendment.

3.     **Discussion**

If the Court determines the Rebroadcast was commercial speech, there is no heightened protection under the First Amendment. *Central Hudson Gas & Electric Corp. v. Public Service*

*Comm'n of New York*, 447 U.S. 557, 562-63 (1980). If the Rebroadcast was not commercial speech, it is protected by First Amendment expression, and the statements contained in the Rebroadcast must be expressly misleading. To determine whether speech is "commercial," the Court focuses on the common-sense distinction between speech proposing a commercial transaction and other varieties of speech. *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 637 (1985). Although not dispositive of the issue, the Supreme Court has provided the following three factors to help determine whether speech is commercial: (1) whether the speech is an advertisement; (2) whether the speech relates to a specific product or service; and (3) whether the speaker has an economic movie for the speech. *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 66-67 (1983).

In asserting the Rebroadcast was not false and misleading commercial speech, Defendants emphasize the differences and the distinctions drawn in the Rebroadcast as to the docu-drama about Plaintiff and the Movie, which was inspired by Plaintiff. For example, Defendants contend the docu-drama bore throughout the well-known logo identification of the Discovery Channel in the lower right-hand corner. (Def. Ex. 335). According to DCI, the Discovery Channel logo preceded and introduced the references to the docu-drama in the interstitials and tune-ins. "Whenever reference is made to the Movie, the equally well-known logo for Twentieth Century Fox is flashed."[13]

Defendants further assert the tag phrase used in the interstitials, "but before you cross the line in theaters," as well as the little flashes or "kisses to black" indicate the difference between the fact (the docu-drama) and the fiction (the Movie). Defendants also state the narrator of the material

---

[13] *Id.* at 11.

created by DCI is known as the "voice of Discovery." According to Defendants, the fact that the narrator is sometimes discussing the Movie and sometimes discussing the docu-drama will not make the viewer think that the Movie is endorsed by Plaintiff just because the narrator is the same.[14] Instead, Defendants assert the viewer will think all of the materials were created by DCI.

In addition, Defendants assert the Rebroadcast added "factoids," with nutritional information, a reference to survival training, and a reference to the U.S.S. Carl Vincent, which is the aircraft carrier that Fox Film used when filming the Movie. (Transcript at 21, lines 16-18). According to Defendants, these educational "factoids" are fully protected as editorial content, which DCI has the right to and is expected to do in its programming.

DCI again relies on *Benavidez*, asserting the fact that the Rebroadcast of the docu-drama was "brought to you by the new Fox film *Behind Enemy Lines*" does not turn the editorial programming into advertising or trade. DCI explains that the "factoids," the sneak peek, and the behind-the-scenes footage all add editorial value to the Rebroadcast of the docu-drama, a documentary about a conflict in the mid-1990s. DCI asserts the "factoids" attempted to "freshen" the context and make it more current. DCI also asserts the educational context of the "factoids" would not constitute advertising or trade. DCI states entertainment news, including news about upcoming movies and television shows, has been specifically held not to be advertising or trade for purposes of a misappropriation claim.

Whether an ordinary viewer would recognize the distinctions between fact and fiction in the Rebroadcast and whether an ordinary viewer would find the Rebroadcast is false or misleading are

---

[14] DCI also adds that the sneak preview and the behind-the-scenes ads, all prepared by Fox Film, have a different narrator's voice. (Transcript at 47, lines 15-17).

questions for the jury.  The Court finds there is sufficient evidence in the record as to each of the

three elements of commercial speech.  Considering the combination of all the characteristics of the

Rebroadcast, namely the evidence that the Rebroadcast was an advertisement for the Movie,[15] the

Rebroadcast related to the Movie, and Defendants had an economic motive for the speech, the Court

concludes there is a fact issue whether the Rebroadcast is commercial speech.

The Court is also not convinced as a matter of law that the speech is "hybrid speech" because

Defendants' commercial advertisements and promotional materials are not "inextricably intertwined"

with expressive speech.[16]  Even if the Rebroadcast is "hybrid speech," at a minimum, there is a fact

issue on whether Defendants' actions in creating the Rebroadcast are sufficiently related to the

expressive elements of the Movie to qualify for First Amendment protection.  *See Parks v. LaFace*

*Records*, 329 F.2d 437 (6th Cir. 2003), *cert. denied*, 2003 WL 22303348 (2003)(reversing summary

judgment on First Amendment grounds due to fact issue regarding the relationship between Rosa

---

[15] In Patterson's October 23 email to Fox Film, Patterson stated the Discovery program was like one "GIANT" interstitial.  Although Defendants contend interstitials are not advertisements, Michelle Marks testified an "interstitial is a segment of material used to promote the film and it is used to promote the product and it's an unpaid promotional piece."  (Marks Depo. at 35, lines 19-22).  Defendants timed the Rebroadcast to air two days before the opening of the Movie.  There is also evidence in the record that Fox Film paid DCI for the "stunt night."

[16] This is not like the situation in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), wherein the court held a movie title "may be both an integral element of the film-maker's expression as well as a significant means of marketing the film to the public."  *Id.* at 998. According to the Second Circuit, the artistic and commercial elements of titles are "inextricably intertwined."  *Id.*    In this case, the Court is not convinced the educational and commercial elements in the Rebroadcast are "inextricably intertwined" because the commercial message and the expressive message are capable of standing alone.  *See Board of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 474-75 (1989).

Parks and the underlying work).[17]

Defendants assert Plaintiff is required to show Defendants *intended* to convey the messages of false advertising and false endorsement. Plaintiff presents case law indicating the actual malice standard does not apply to cases of false commercial speech. *See Dial One of the Mid-South, Inc. v. BellSouth Telecommunications, Inc.*, 269 F.3d 525, 526 (5th Cir. 2001). Assuming Plaintiff must produce evidence of intent, the Court also finds a genuine issue of material fact as to whether Defendants intended to imply that the Movie was Plaintiff's story or that the Movie was endorsed by Plaintiff.[18] For these reasons, the Court recommends Defendants' motion for summary judgment as to Plaintiff's misappropriation claims as to the November 28 Rebroadcast be **DENIED**.

## VI.

## PLAINTIFF'S LANHAM ACT AND FALSE ADVERTISING CLAIMS AS TO THE REBROADCAST

### A.    Defendants' Arguments

Defendants argue Plaintiff's Lanham Act claims as to the Rebroadcast fail because Plaintiff cannot prove the essential elements of the claim. Specifically, Fox Film contends Plaintiff cannot prove Defendants made false statements of fact, that those statements deceived or had the potential to deceive a substantial segment of potential customers, and that the deception was material in that it tended to influence purchasing decisions. Next, Fox Film asserts Plaintiff's Lanham Act claims

---

[17] There is evidence in the record that while the Movie was "loosely inspired" by Plaintiff's experience, Fox Film never intended for the Movie to be about Plaintiff. Plaintiff presents evidence that Marks at Fox Film initially informed Patterson at DCI that *Behind Enemy Lines* was not Plaintiff's story. (Pl. App. 13, Marks Depo. at 49, lines 16-25).

[18] Even if the Rebroadcast was not commercial speech, Plaintiff contends the titles *Behind Enemy Lines* and *Behind Enemy Lines: The Scott O'Grady Story* are expressly misleading.

as to the Rebroadcast fails because there is no false, explicit representation of endorsement and is precluded by the First Amendment. Fox Film again relies on the newsworthy and incidental use privileges. Both Fox Film and DCI assert the *Rogers* test for "hybrid speech" applies, thus requiring Plaintiff to prove Defendants' speech was expressly misleading to prevail on his Lanham Act claims.

## B.     Discussion

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125, imposes liability on:

> Any person who, in connection with any goods . . . uses in commerce any word, term, name . . . or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person[.]

15 U.S.C. § 1125(a)(1)(A). The scope of § 43(a) "permits celebrities to vindicate property rights in their identities against allegedly misleading commercial use by others." *Parks,* 329 F.2d at 445. The Fifth Circuit has interpreted § 43(a) as providing "protection against a 'myriad of deceptive commercial practices,' including false advertising or promotion." *Pizza Hut, Inc. v. Papa John's International, Inc.*, 227 F.3d 489, 495 (5th Cir. 2000), *quoting Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1387 (5th Cir. 1996).

A *prima facie* case of false advertising under § 43(a) requires the plaintiff to establish that: (1) the defendants made false statements of fact about a product; (2) such statement either deceived or had the potential to deceive a substantial segment of potential customers; (3) the deception is material in that it tended to influence purchasing decisions; (4) the product is in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the statement at issue. *Pizza Hut,*

27

227 F.3d at 495.

In cases involving titles, the Fifth Circuit has adopted the *Rogers v. Grimaldi* test to balance First Amendment interests with the protections of the Lanham Act. *Westchester Media v. PRL USA Holdings, Inc.,* 214 F.3d 658, 664-65 (5th Cir. 2000). The *Rogers* court adopted the following two-pronged test:

> In the context of allegedly misleading titles using a celebrity's name, that balance [between expression] will normally not support application of the Act unless [1] the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless [2] the title explicitly misleads as to the source or the content of the work.

*Rogers*, 875 F.2d at 999. Defendants assert the *Rogers* test, which concerns "hybrid speech" such as titles containing both artistic expression and commercial promotion, should apply to this Court's Lanham Act analysis.

Although one of Plaintiff's assertions as to the false and misleading nature of the Rebroadcast is the similarity of the docu-drama and Movie titles, Plaintiff asserts the present case is not about DCI's selection of its title for its own work (the docu-drama) before DCI created the Rebroadcast. Instead, Plaintiff contends the title *Behind Enemy Lines: The Scott O'Grady Story* used in connection with the Rebroadcast to promote the Movie *Behind Enemy Lines* is misleading and gives rise to an actionable claim. In addition, Plaintiff complains that even without the titles, the entire Rebroadcast is false and misleading because of the intermixing of advertisements, promotions, interviews, and other materials into the true docu-drama, giving viewers the false impression that Plaintiff endorsed the Movie or the Movie was Plaintiff's story.

As explained above, there is a fact issue whether this is a case about commercial speech, in which case the *Rogers* test may not apply. Even if the Court were to apply the "hybrid speech" test

28

utilized in *Rogers*, there is a genuine issue of material fact whether the title and Defendants' actions in creating the Rebroadcast are artistically related to the expressive elements of the Movie to qualify for First Amendment protection or whether the Rebroadcast is nothing more than a misleading advertisement for the Movie. *See Parks*, 329 F.3d at 458.

As for the elements of the Lanham Act/false advertising claim, it is undisputed that Defendants caused their products to enter interstate commerce. Therefore, the Court will determine whether there is sufficient evidence to create genuine issues of material fact as to the remaining elements of the Lanham Act/false advertising claims. Viewing the evidence in the light most favorable to Plaintiff, Plaintiff has offered sufficient evidence to withstand Defendants' challenges to his Lanham Act claims.

The evidence is sufficient to create a genuine issue of material fact that the November 28 Rebroadcast delivered a false implied endorsement message to consumers, or that Plaintiff collaborated in the Movie, or that the Movie is Plaintiff's story. The question of whether Defendants' message is actionable as "literally false" or as implicitly misleading is a question for the jury.

The Rebroadcast itself creates a fact issue as to whether the Rebroadcast had the capacity to deceive a substantial segment of the potential customers. There is also sufficient evidence in the record to create a fact issue as to whether the deception is material in that it tended to influence purchasing decisions. In an attempt to sell more tickets to the Movie, Fox Film hoped to tie its Movie to real soldiers because "patriotism sells." (Pl. App. 15, Moore Depo. at 64, line 11-65, line '2).

Finally, Plaintiff submitted sufficient evidence to create a fact issue as to whether he has been

29

or is likely to be injured as a result of the Rebroadcast. Plaintiff states the Rebroadcast reduced or eliminated the opportunities for Plaintiff to endorse other competing films. In addition, Plaintiff testified he has spent time and effort during his speeches and public interviews to correct the false impression that the Movie is his story. (O'Grady Aff. at ¶ 16). Defendants argue the Movie and the Rebroadcast actually increased the value of Plaintiff's story because Plaintiff was interviewed numerous times, and he was paid money to appear on several programs such as "Hot Ticket." However, there is, at a minimum, a genuine issue of material fact for the jury to decide as to whether Plaintiff was injured by the Rebroadcast.

Based on the Court's discussion on false and misleading commercial speech above, Defendants cannot rely on the First Amendment to get rid of Plaintiff's Lanham Act claims. Defendants cannot establish the fair use, incidental use, and newsworthiness exceptions to Plaintiff's Lanham Act claims.[19]  In sum, Defendants have failed to show that, as a matter of law, they are entitled to summary judgment on Plaintiff's Lanham Act claims as to the November 28 Rebroadcast. The Court recommends Defendants' motions for summary judgment as to Plaintiff's claims for Lanham Act violations and false advertising as to the November 28 Rebroadcast be **DENIED**.

## VII.

## COMMON LAW UNFAIR COMPETITION CLAIMS

A.    **Defendants' Arguments**

Defendants contend there is no evidence of unlawful competition or false advertising,

---

[19] The right to make a nominative "fair use" of another's mark or identifier "is limited in that the use cannot be one that creates a likelihood of confusion as to source, sponsorship, affiliation, or approval." *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 545 (5th Cir. 1998).

negating an essential element of Plaintiff's claim for unfair competition. According to Defendants, Plaintiff cannot produce any evidence that Defendants committed an unlawful act that interfered with Plaintiff's business efforts. In addition, Defendants assert Plaintiff's unfair competition, false advertising, and unjust enrichment claims are duplicative of the invasion of privacy and Lanham Act claims and are thus barred by the First Amendment.

**B.     Plaintiff's Response**

Plaintiff asserts he has raised issues of fact sufficient to present a cause of action for common law unfair competition to the jury. According to Plaintiff, misappropriation, false advertising, and Lanham Act violations each can serve as the underlying tort for an unfair competition claim in Texas. *See Blue Bell Bio-Medical v. Cin-Bad, Inc.*, 864 F.2d 1253, 1261 (5th Cir. 1989)("A ruling on the likelihood of confusion under the Lanham Act also controls an unfair competition claim under state law.").

**C.     Discussion**

"Unfair competition under Texas law 'is the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters.'" *Taylor Publ'g Com v. Jostens, Inc.*, 216 F.3d 465, 486 (5th Cir. 2000), *quoting American Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 14 (5th Cir. 1974). To prevail on this claim, Plaintiff must prove Defendants engaged in an underlying illegal or tortious act which interfered with his ability to conduct his commercial affairs. *Taylor Pub'g Co.* 216 F.3d at 486.

The Court has already considered Defendants' First Amendment arguments, and recommended Defendants' motions for summary judgment as to Plaintiff's misappropriation, false

advertising, and Lanham Act claims regarding the Rebroadcast be denied.  Viewing the evidence in the light most favorable to Plaintiff, Plaintiff has presented sufficient evidence to establish a genuine issue of material fact that Defendants' acts damaged his ability to conduct business.  The Court recommends Defendants' motions for summary judgment as to Plaintiff's unfair competition claims be **DENIED**.

## VIII.

## PLAINTIFF'S TORTIOUS INTERFERENCE CLAIMS

In his response, Plaintiff dismiss his tortious interference claims.  Therefore, the Court recommends the portion of Defendants' motion for summary judgment concerning Plaintiff's tortious interference claims be **DENIED AS MOOT**.

## IX.

## PLAINTIFF'S CIVIL CONSPIRACY CLAIMS

Under Texas law, the elements of civil conspiracy are: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Peavy v. WFAA-TV, Inc.*, 221 F.3d 158, 172 (5th Cir. 2000), *quoting Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983). "[L]iability for conspiracy depends on participation in some underlying tort." *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996).

Defendants assert Plaintiff's conspiracy claim fails because they did not commit an underlying tort.  As explained above, however, there are fact issues as to whether Defendants engaged in misappropriation of Plaintiff's name, likeness, and image in the Rebroadcast; false advertising and violations of the Lanham Act; and unfair competition under Texas common law.

Plaintiff has presented sufficient evidence to create a genuine issue of material fact as to each of the elements of civil conspiracy. The Court recommends Defendants' motions for summary judgment as to Plaintiff's civil conspiracy claims be **DENIED**.

## X.

## RECOMMENDATION

The Court recommends Defendants' motions for summary judgment as to Plaintiff's claims, if any, for misappropriation and Lanham Act violations as to the Movie be **GRANTED**. The Court further recommends Defendants' motions for summary judgment as to Plaintiff's claims for misappropriation, Lanham Act violations, and false advertising as to the November 28 Rebroadcast be **DENIED**. The Court further recommends Defendants' motions for summary judgment as to Plaintiff's unfair competition and civil conspiracy claims be **DENIED**. Because Plaintiff has dismissed his tortious interference claims, the Court recommends the portion of Defendants' motions seeking dismissal of such tortious interference claims be **DENIED AS MOOT**. Based on the foregoing, it is

**RECOMMENDED** that Defendant Twentieth Century Fox Film Corporation's Motion for Summary Judgment (Docket Entry # 51) be **GRANTED IN PART and DENIED IN PART** as specified in Section X above. It is further

**RECOMMENDED** that Discovery Communications, Inc.'s Motion for Summary Judgment (Docket Entry # 53) be **GRANTED IN PART and DENIED IN PART** as specified in Section X above.

Within ten (10) days after receipt of the magistrate judge's report, any party may serve and

file written objections to the findings and recommendations of the magistrate judge.  28 U.S.C.A. 636(b)(1)(C).

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988).

**SIGNED** this 19th day of December, 2003.

CAROLINE M. CRAVEN
UNITED STATES MAGISTRATE JUDGE

34