**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

F I L E D
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

DEC 31 2003

DAVID J. MALAND, CLERK

BY
DEPUTY

| | |
|---|---|
| SCOTT O'GRADY, | § |
| Plaintiff, | § |
| | § |
| v. | § |
| | § |
| TWENTIETH CENTURY FOX | § |
| FILM CORPORATION, and | § |
| DISCOVERY COMMUNICATIONS, INC., | § |
| Defendants. | § |

CIVIL ACTION NO. 502cv173 (Folsom)

JURY

**DEFENDANT DISCOVERY COMMUNICATIONS, INC.'S**
**OBJECTIONS TO THE REPORT AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

Laura R. Handman
D.C. Bar No. 444386
Constance M. Pendleton
D.C. Bar No. 456919
DAVIS WRIGHT TREMAINE LLP
1500 K Street, N.W., Suite 450
Washington, D.C. 20005-1272
(202) 508-6600
(202) 508-6699 – Fax

Victor F. Hlavinka
ATCHLELY, RUSSELL, WALDROP, &
HLAVINKA, L.L.P.
1710 Moores Lane
Texarkana, Texas 75505
(903) 792-8246
(903) 792-5801 – Fax



## TABLE OF CONTENTS

FACTUAL AND PROCEDURAL BACKGROUND...................................................1

OBJECTIONS.........................................................................................................5

I.    DISCOVERY OBJECTS TO THE REPORT'S RECOMMENDATION
THAT THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO
WHETHER THE NOVEMBER 28 BROADCAST WAS PROTECTED
BY THE FIRST AMENDMENT ..........................................................................6

    A.    The November 28 Broadcast Was Not Commercial Speech ...............6

    B.    Plaintiff's Name And Likeness Had Some Genuine Relevance
To The Documentary And The Movie Inspired By Plaintiff's Story
And, As Such, The November 28 Broadcast Is Protected By The
First Amendment ................................................................................7

    C.    The November 28 Broadcast Is Hybrid Speech.................................11

II.    DISCOVERY OBJECTS TO THE REPORT'S RECOMMENDATION
THAT THERE IS AN ISSUE OF FACTS AS TO WHETHER PLAINTIFF
CAN NOT SATISFY THE REQUISITE MISAPPROPRIATION CLAIM
FOR A COMMERCIAL..................................................................................13

    A.    The Scope Of The Consent Plaintiff Granted When He Signed The
BBC/O'Grady Release Is A Question Of Law For The Court, Not An
Issue Of Fact For The Jury..............................................................13

    B.    Discovery Objects To The Magistrate's Judge's Recommendations
That There Is A Genuine Issue of Material Fact That Defendants
Misappropriated Plaintiff's Name And Likeness For The Value
Associated With It And Not In An Incidental Manner Or For A
Newsworthy Purpose .......................................................................15

        1.    The November 28 Broadcast Use Was Not for The
Commercial Value Of Plaintiff's Name Or Likeness.............15

        2.    The Use Discovery And Twentieth Century Fox Made Of
Plaintiff's Name And Likeness Clearly Falls Within The
Incidental Use Exception To Commercial Misappropriation
Claims ................................................................................16

        3.    The Use Discovery And Twentieth Century Fox Made Of
Plaintiff's Name And Likeness Was For A Newsworthy
Purpose And Therefore Outside The Ambit Of A Commercial
Misappropriation Claim........................................................18

    C.    Discovery And Twentieth Century Fox Did Not Derive Some Unlawful
Advantage Or Commercial Benefit From Their Use Of Plaintiff......................21

III.   DISCOVERY OBJECTS TO THE REPORT'S RECOMMENDATION
THAT THERE IS AN ISSUE OF FACT AS TO WHETHER PLAINTIFF
CAN SATISFY THE REQUISITE ELEMENTS OF A LANHAM ACT
CLAIM...................................................................................................................22

    A.   The November 28 Broadcast Does Not Contain Any Explicitly
Misleading Statements...................................................................................22

    B.   There Is Not Credible Admissible Evidence Of Actual Deception
Or Materiality................................................................................................24

    C.   There Is No Evidence That Defendants Acted With Intent And Actual
Malice ...........................................................................................................25

IV.   DISCOVERY OBJECTS TO THE REPORT'S RECOMMENDATIONS
THAT THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO
WHETHER PLAINTIFF CAN SATISFY THE REQUISITE ELEMENTS
OF UNFAIR COMPETITION ...............................................................................27

V.   DISCOVERY OBJECTS TO THE REPORT'S RECOMMENDATION THAT
THERE ARE GENUINE ISSUES OF FACT AS TO WHETHER PLAINTIFF
CAN SATISFY THE ELEMENTS OF CIVIL CONSPIRACY ...................................27

CONCLUSION.......................................................................................................28

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................5

*Benavidez v. Anheuser Busch, Inc.*, 873 F.2d 102 (5th Cir. 1989) ........................15, 16

*Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983) ......................................6, 7

*Brown v. Ames*, 201 F.3d 654 (5th Cir. 2000) ..........................................................13

*Brown v. Twentieth Century Fox Film Corp.*, 799 F. Supp. 166 (D.D.C. 1992),
     *aff'd*, 15 F.3d 1159 (D.C. Cir. 1994) ...................................................10, 17

*Cairns v. Franklin Mint Co.*, 292 F.3d 1139 (9th Cir. 2002) ........................................10

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..........................................................5

*Cliff Notes v. Bantam Doubleday Dell Public Group*, 886 F.2d 490 (2d Cir. 1989) ....................12

*Daly v. Viacom*, 238 F. Supp. 2d 1118 (N.D. Cal. 2002) ..............................................20

*Davis v. Costa-Gravas*, 654 F. Supp. 653 (S.D.N.Y. 1987) ..........................................11

*ETW Corp. v. Jireh Publishing, Inc.*, 332 F.3d 915 (6th Cir. 2003) ......................................*passim*

*Groden v. Random House, Inc.*, 61 F.3d 1045 (2d Cir. 1995) ................................................*passim*

*Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985) ..............................21

*Henley v. Dillard Department Stores*, 46 F. Supp. 2d 587 (N.D. Tex. 1999) ..............................21

*Hicks v. Casablanca Records*, 464 F. Supp. 426 (S.D.N.Y. 1978) ..........................................8

*Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180 (9th Cir. 2001) ......................................26

*King v. Ames*, 179 F.3d 370 (5th Cir. 1999) ..........................................................5, 10, 15

*Lane v. Random House, Inc.*, 985 F. Supp. 141 (D.D.C. 1995) ..........................10, 17, 19,
                                                                                        20

*Matter of Maple Mortg. Inc.*, 81 F.3d 592 (5th Cir. 1996) ..........................................13

*Matthews v. Wozencraft*, 15 F.3d 432 (5th Cir. 1994)................................8, 10, 12, 18

*New Kids on the Block v. News America Public, Inc.*, 971 F.2d 302
(9th Cir. 1992)................................................................................20

*New York Magazine v. Metropolitan Transit Authority*, 987 F. Supp. 254
(S.D.N.Y. 1997), *aff'd on other grounds*, 136 F.3d 123 (2d Cir. 1998) ............8

*Oliveira v. Frito-Lay, Inc.*, 251 F.3d 56 (2d Cir. 2001)................................10

*Page v. Something Weird Video*, 960 F. Supp. 1438 (C.D. Cal. 1996) ...................6, 12

*Partington v. Bugliosi*, 825 F. Supp. 906 (D. Haw. 1993)................................11

*Pirone v. MacMillan Inc.*, 894 F.2d 579 (2d Cir. 1990)................................10

*Pizza Hut v. Papa John's International, Inc.*, 227 F.3d 489 (5th Cir. 2000) ................24

*Playboy Enterprises v. Webbworld, Inc.*, 991 F. Supp. 543 (N.D. Tex. 1997),
*aff'd*, 168 F.3d 486 (5th Cir. 1999) ................................................10

*Riley v. National Federation of the Blind of North Carolina, Inc.*,
487 U.S. 781 (1988)................................................................11

*Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989)................................ *passim*

*Ross v. Midwest Communications*, 870 F.2d 271 (5th Cir. 1989) ................20

*Ruffin-Steinback v. dePasse*, 82 F. Supp. 2d 723 (E.D. Mich. 2000)................11

*Ruffin-Steinback v. dePasse*, 267 F.3d 457 (6th Cir. 2001)................8, 17

*Seale v. Gramercy Pictures*, 964 F. Supp. 918 (E.D. Pa. 1997), *aff'd*,
156 F.3d 1225 (3d Cir. 1998)................................................8, 17

*Taylor Publ'g Co. v. Jostens, Inc.*, 36 F. Supp. 2d 360 (E.D. Tex. 1999),
*aff'd*, 216 F.3d 465 (5th Cir. 2000) ................................................27

*Time v. Hill*, 385 U.S. 374 (1967)................................................12, 26

*Topalian v. Ehrman*, 954 F.2d 1125 (5th Cir. 1992) ................................5

*Uhl v. Swanstrom*, 79 F.3d 751 (8th Cir. 1996)................................5

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,*
    425 U.S. 748 (1976).................................................................................................7

*Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658 (5th Cir. 2000)..............7

*Williams v. Newsweek, Inc.*, 63 F. Supp. 2d 734 (E.D. Va. 1999)................................16

### STATE CASES

*Dora v. Frontline Video, Inc.*, 15 Cal. App. 4th 536, 18 Cal. Rptr. 2d 790 (1993)......20

*Featherstone v. Independent Service Station Association of Texas, et al.,*
    10 S.W.2d 124 (Tex. Civ. App.- Dallas 1928, no writ)....................................27

*Finger v. Omni Publications International*, 564 N.Y.S.2d 1014 (N.Y. 1990)...............19

*Guglielmi v. Spelling-Goldberg Productions*, 25 Cal. 3d 860, 160 Cal. Rptr.
    352, 603 P.2d 454 (1979)......................................................................6, 8, 17

*Kimbrough v. Coca-Cola/USA*, 521 S.W.2d 719
    (Tex. App.- Eastland 1975, writ ref'd n.r.e.) ..................................................15

*People v. Fogelson*, 21 Cal. 3d 158, 145 Cal. Rptr. 542, 577 P.2d 677 (1978)..............6

*Rand v. Hearst Corp.*, 31 A.D.2d 406, 298 N.Y.S.2d 405,
    *aff'd*, 26 N.Y.2d 806, 309 N.Y.S.2d 348 (1970) ............................................9

*Schoellkopf v. Pledger*, 778 S.W.2d 897 (Tex. App.- Dallas 1989, writ denied).........27

*Shulman v. Group W Products*, 18 Cal. 4th 200, 955 P.2d 469 (1998).......................21

*Tilton v. Marshall*, 925 S.W.2d 672 (Tex. 1996).......................................................27

*Velez v. VV Publishing Corp.*, 135 A.D.2d 47, 50. N.Y. App. Div. 1st Dep't 1988.....17

### STATUTES

15 U.S.C. 1125(a) ...................................................................................................10

### CONSTITUTION

U.S. Const. Amend. 1 ...................................................................................... *passim*

## MISCELLANEOUS

Restatement (Second) of Torts § 652c comment ........................................................................18

Restatement (Third) of Unfair Competition § 47 ................................................................16, 27

Defendant Discovery Communications, Inc. ("Discovery"), by and through undersigned counsel, submits the following objections to the Report and Recommendation of the United States Magistrate Judge (the "Mag. Rep.") made upon review of Defendants Discovery and Twentieth Century Fox Film Corporations ("Twentieth Century Fox") respective motions for summary judgment and defendants' objections to plaintiff's summary judgment evidence, and in support thereof would show the Court as follows:

## FACTUAL AND PROCEDURAL BACKGROUND

Discovery is a non-fiction cable network which operates the Discovery Channel. The Discovery Channel airs non-fiction educational programs on science, technology, engineering, natural history, history, military history, adventure and exploration.

Plaintiff Scott O'Grady was a U.S. Air Force pilot whose F-16 was shot down over Bosnia on June 2, 1995. He evaded capture for six days and was rescued by the U.S. Marines. The news of O'Grady's six days behind enemy lines was widely reported in the national and international news.

Between 1995 and 1997, the British Broadcasting Corporation (the "BBC") produced a factual documentary about Plaintiff, interviewing Plaintiff, his family, his fellow pilots, Marine rescuers and their commanding officer (the "BBC Documentary"). The BBC Documentary included portions of these interviews as well as re-enactments of the real events using an actor and Plaintiff's father and sister recreating Plaintiff's six days behind enemy lines. Plaintiff and his family signed releases granting the BBC, and all licensees and assigns, "ALL RIGHTS" to the BBC Documentary without limitation, "FOR ALL PURPOSES EVERYWHERE," specifically agreeing to use of their name, likeness and "contribution" for "trailers" and for "promotional...purposes" (the "BBC/O'Grady Release(s)").

The BBC licensed the BBC Documentary through a chain of agreements to Discovery. The Discovery Channel first broadcast the documentary, retitled *Behind Enemy Lines: The Scott*

*O'Grady Story* (the "Documentary"), in the United States in June 1997, after which it aired 31 times over four years under the same title.[1]

Plaintiff admits that Discovery had the contractual right to broadcast the Documentary and that he never complained about the Documentary or its title before it was broadcast on November 28, 2001. Plaintiff also admits that Discovery had the contractual right to use Plaintiff's name and likeness to promote the Documentary and to encourage viewers to tune in to the Documentary. Plaintiff admits Discovery could sell and air third party advertising when it broadcast the Documentary on the Discovery Channel. Plaintiff admits that he does not have exclusive ownership of the events of his six days behind enemy lines and those events could be used as the basis for a factual documentary without his permission. Finally, Plaintiff now admits, and the Magistrate Judge has concluded – a conclusion to which Defendants do not object – that those events could also be the basis for a fictional movie inspired by Plaintiff's story and that Twentieth Century Fox could make the movie and title it *Behind Enemy Lines* (the "Movie"). The only issue in all of Plaintiff's claims is whether these wholly lawful acts, protected by the First Amendment, became unlawful when the Movie was advertised and promoted on a broadcast of the Documentary on November 28, 2001 on the Discovery Channel.

Discovery often airs special programming events involving factual programming of interest to Discovery Channel viewers, along with information about upcoming movies thematically related to that factual programming.[2] In the Fall of 2001, Discovery submitted a proposal to Twentieth Century Fox for a special programming event noting the similarity of the stories and titles of the Movie and the Documentary, both about downed American pilots behind

---

[1] The Documentary that aired was shortened from the BBC version to allow for commercial breaks. The title for the Documentary on the Discovery Channel was always the same.

[2] Examples of such special programming events have included advertising and promotion for Twentieth Century Fox's cartoon movie "Ice Age" aired with Discovery Channel's natural history program "Walking with Prehistoric Beasts," or Universal's movie, "The Mummy" with Discovery Channel's factual programming about the science and history of mummies. (Patterson Dep. at 107:19-24; 167:1-4.)

2

enemy lines in Bosnia who were rescued by the Marines. Twentieth Century Fox bought

advertising time for the Movie but did not pay for the air time for the special programming event

nor any of its production costs. Discovery paid $27,065 in production costs. Twentieth Century

Fox approved the material created for the special programming event.

 In preparation for the special programming event, Discovery created new material to

insert into the breaks in the Documentary (called "interstitials")[3] and created material

encouraging viewers to watch the special programming event (called "tune-ins"). The

interstitials and tune-ins described the Documentary and the Movie and stressed the difference

between the "fact" of the Documentary about Air Force pilot Scott O'Grady (with visuals from

the Documentary) and the "fiction" of the Movie about Navy pilot Chris Burnett (with visuals

from the Movie), the "fact and fiction of true survival." Since the Documentary had aired many

times before, the Documentary was updated by including new educational material called

"factoids." The factoids provided the viewer with, for example, information about the iron,

vitamins, protein and carbohydrates of insects – what Plaintiff survived on during his six days

downed in Bosnia -- and information about U.S. military survival training of the sort Plaintiff

would have received.

 Plaintiff apparently challenges <u>all</u> the material broadcast on the Discovery Channel on

November 28, 2001 (collectively the "November 28 Broadcast") – including the tune-ins aired in

the week before the event, the Documentary itself, the interstitial material (which included the

educational factoids, a sneak preview of scenes from the Movie, behind-the-scenes footage of the

making of the Movie and interviews with the actors, producer and director of the Movie), plus

two Twentieth Century Fox-created advertisements for the Movie – claiming that, combined,

---

[3] The term "interstitial" was not used by Discovery Channel personnel to refer to advertising. *See* Patterson Dep. 50:21-24; 64:17-65:6 (defining "interstitial" as "created elements that are edited into the show to add a level of interest or I think sort of a thought-provoking question"); Anderson Dep. 41:10-17 (defining interstitial material as "any of the on-air material that happens within the complete one-hour viewing of that program or event").

they constituted an unlawful advertisement for the Movie.[4]  The November 28 Broadcast used plaintiff's name or likeness in reference to the Documentary.  The November 28 Broadcast never said that the Movie, as contrasted with the Documentary, is a true account of Plaintiff's six days behind enemy lines.  The November 28 Broadcast never said that Plaintiff "endorsed," "authorized" or "participated in" the Movie or that the Movie was "made in cooperation with" him.

On June 30, 2003, Defendants Discovery and Twentieth Century Fox filed separate motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure seeking dismissal of Plaintiff's First Amended Complaint on the basis that no genuine issues of material fact exist in this case and that Defendants are entitled to dismissal as a matter of law. Plaintiff filed his opposition thereto on July 27, 2003.  The Court referred Defendants' motions to the Honorable Caroline M. Craven for the purposes of making a report and recommendation. On September 17, 2003, Judge Craven heard oral argument on the motions for summary judgment.

Judge Craven issued her Report and Recommendation ("Mag. Rep.") on December 19, 2003, recommending that Defendants' respective motions be granted in part and denied in part. The Magistrate Judge recommended that Defendants' motions as to Plaintiff's claims, if any, for commercial misappropriation and Lanham Act violations as to the Movie be granted.  The Magistrate Judge recommended that Plaintiff's claims for commercial misappropriation, Lanham Act violations and false advertising as to the November 28 Broadcast be denied.  The Magistrate Judge further recommended that Defendants' motions as to Plaintiff's unfair competition and civil conspiracy claims be denied.[5]  The Magistrate Judge reserved her ruling on Defendants'

---

[4]  The November 28 Broadcast also included advertisements for Petsmart, Sears and other third-party advertisers.

[5]  The Magistrate Judge also recommended that Defendants' motions for summary judgment with regard to Plaintiff's claim for tortious interference with prospective business advantage be denied as moot because Plaintiff dismissed that claim.  Discovery does not object to that recommendation.

objections to the Gelb survey and did not address Defendants' *Daubert* motions regarding Plaintiff's experts Mark Roesler and Gabriel Gelb.

## OBJECTIONS

The facts underlying this action are not in dispute. What is in dispute here fundamentally are the conclusions of law that may be drawn from those facts. The Magistrate Judge's Report and Recommendation contains a profound overarching omission – and one of constitutional import. It takes no account of the law applicable to the material in issue – promotions for a fictional movie and a factual historical documentary -- both works fully protected by the First Amendment and the Texas Constitution. The Magistrate Judge erred in finding that the promotions of those First Amendment protected works could be false and misleading commercial speech instead of speech entitled, like the works they promote, to full constitutional protection. This omission in the Report and Recommendation by itself compels a determination contrary to the recommendation of the Magistrate Judge and requires dismissal of Plaintiff's First Amended Complaint in its entirety as against both Twentieth Century Fox and Discovery. The conclusions that there are genuine issues of material fact as to each of the claims has been based on application of incorrect legal standards.

While the Magistrate Judge's conclusion that she must view the evidence in the light "most favorable to the non-movant" is entirely correct, that prescription does not mean that the non-movant is relieved of all responsibility to come "forward with evidence establishing each of the challenged elements of its case." *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). (Mag. Rep. at 10-11.) It also does not relieve the Court of its responsibility to draw conclusions of law when the underlying facts, as here, are not in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (when there is no genuine issue as to any material fact, the moving party is entitled to judgment as a matter of law); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (same); *King v. Ames*, 179 F.3d 370, 373 (5th Cir. 1999) (same); *Uhl v. Swanstrom*, 79 F.3d 751, 754-755 (8th Cir. 1996) (summary judgment is "particularly appropriate" where

unresolved issues are primarily legal rather than factual).  Discovery respectfully objects to the

Report and Recommendation because neither of those responsibilities has been satisfied here.

I.  **DISCOVERY OBJECTS TO THE REPORT'S RECOMMENDATION THAT THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER THE NOVEMBER 28 BROADCAST WAS PROTECTED BY THE FIRST AMENDMENT**

    A.  **The November 28 Broadcast Was Not Commercial Speech.**

Discovery objects to the Magistrate Judge's Report and Recommendation in finding a

genuine issue of material fact existed as to whether the November 28 Broadcast was commercial

speech or advertising and promotion protected by the First Amendment as based on application

of an incorrect legal standard.  Mag. Rep. at 19, 22-25, 28.

The traditional indicator of commercial speech – whether it promotes a commercial

transaction – has not been applied in regard to advertising and promotion for protected works

like films, non-fiction books and documentaries.  *Bolger v. Youngs Drug Products Corp.*, 463

U.S. 60, 67, n.14 (1983) ("Of course, a different conclusion may be appropriate where the

pamphlet advertises an activity itself protected by the First Amendment").

> Although "commercial speech" has not traditionally enjoyed
> constitutional protection, commercial solicitation or promotion of
> constitutionally protected works is protected as an incident to the
> First Amendment value of the underlying speech or activity.

*People v. Fogelson*, 21 Cal.3d 158, 165 n.7, 145 Cal. Rptr. 542, 577 P.2d 677 (1978).

The fact that the enterprise is designed to make a profit – be it moviemaking or

broadcasting – and that the promotion is designed to sell tickets or attract viewers, does not strip

the promotion of a protected work of its constitutional protection or satisfy the "commercial

purpose" element required for commercial misappropriation, the "trade" element required for

unfair competition or the advertising element required for the Lanham Act.

> Having established that any interest in financial gain in producing
> the film did not affect the constitutional stature of [defendant's]
> undertaking, it is of no moment that the advertisement may have
> increased the profitability of the film.  It would be illogical to
> allow [defendants] to exhibit the film but effectively preclude any
> advance discussion or promotion of their lawful enterprise.

*Guglielmi v. Spelling-Goldberg Productions*, 25 Cal.3d 860, 873, 160 Cal. Rptr. 352, 360, 603 P.2d 454 (1979) (Bird, C.J. concurring), *cited with approval*, *Page v. Something Weird Video*, 960 F. Supp. 1438, 1444 (C.D. Cal. 1996); *Bolger*, 463 U.S. at 67 ("the fact that Youngs has an economic motivation for mailing the pamphlets would clearly be insufficient by itself to turn the materials into commercial speech"); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 761 (1976) ("speech does not lose its First Amendment protection because money is spent to project it, as in a paid advertisement of one form or another").

> **B.**      **Plaintiff's Name And Likeness Had Some "Genuine Relevance" To The Documentary And The Movie Inspired By Plaintiff's Story And, As Such, The November 28 Broadcast Is Protected By The First Amendment**

Discovery objects to the Magistrate Judge's conclusion that there is a fact issue as to whether the title and Discovery and Twentieth Century Fox's actions in creating the November 28 Broadcast are sufficiently related to the expressive elements of the Movie to qualify for First Amendment protection. (Mag. Rep. at 25, 29.) The First Amendment permits reference to real people in advertising for movies and documentaries provided they bear "some artistic relevance" or "genuine relevance" to the underlying work and the promotion is not "explicitly mislead[ing] as to the source or the content of the work." *Rogers v. Grimaldi*, 875 F.2d 994, 999, 1001 (2d Cir. 1989); *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 664 (5th Cir. 2000) (adopting *Rogers* test, holds that First Amendment protected works "require more . . . protection than . . . ordinary commercial products").

All the parties are agreed, and the Magistrate Judge has concluded, that Twentieth Century Fox could make the Movie it did – one inspired by Scott O'Grady's six days "behind enemy lines" but fictionalized beyond the broad outline of the historic event. (Pl. Resp. at 1, 29 n.5.) That the Movie, "Behind Enemy Lines" was, in fact, inspired by Plaintiff's downing and rescue is confirmed not only by the Movie's creators (Twentieth Century Fox's undisputed facts at ¶ 16) but by Plaintiff himself (Pl. Resp. at 29 n.5, 45; Pl. Dep. 48:3-49:10 ("as far as the

making of the movie, it is definitely based [on] my story and my experience"); Pl. Response to

DCI's Statement of Undisputed Facts, not disputing DCI's ¶ 43).

Plaintiff has also conceded (Pl. Resp. at 1, 5, 37) that, not only works of fiction and non-

fiction, but also the advertising and promotion for those works can use the name and likeness of

those historic figures who are associated with the work, whether it be a promotion for a

fictionalized movie about the Temptations (*Ruffin-Steinback v. dePasse*, 267 F.3d 457, 462 (6th

Cir. 2001)), a fictional movie about author Agatha Christie titled "Agatha" (*Hicks v. Casablanca

Records*, 464 F. Supp. 426, 429-30, 432-33 (S.D.N.Y. 1978)), a fictional movie about the actor

Rudolf Valentino (*Guglielmi*, 603 P.2d at 462), a movie about an historic event with a central

character by another name who was inspired by the plaintiff (*Matthews v. Wozencraft*, 15 F.3d

432, 436, 437-41 (5th Cir. 1994)), or a movie about a fictional Italian cabaret couple titled

"Ginger and Fred" after the legendary dancers, Ginger Rogers and Fred Astaire (*Rogers*, 875 F.

2d at 998). In all of these cases, the fictional movie referred in some way to the real life person

and the promotion and advertising for the work – arguably, all for the purpose of selling tickets

and turning a profit – did as well. Twentieth Century Fox's Movie, while not the actual story of

Plaintiff, is, by <u>all</u> accounts, inspired by Scott O'Grady, therefore Plaintiff has "genuine

relevance to the film's story" (*Rogers*, 875 F.2d at 1001), and can be promoted as such.

Even had the Movie not been inspired by plaintiff's story, it is nonetheless related

thematically to the Documentary, both about survival and rescue behind enemy lines. As such,

the promotion is viewed as protected by the First Amendment and as a non-actionable incidental

use describing the work's content or as a non-commercial newsworthy use referring to the

broader political or historical context. *See, e.g., Groden v. Random House*, 61 F.3d 1045, 1050

(2d Cir. 1995) (the " 'incidental use' exception implements, and might even be required by, First

Amendment considerations"); *Seale v. Gramercy Pictures*, 964 F. Supp. 918, 931 (E.D. Pa.

1997) (rejecting at trial both right of publicity claim and Lanham Act claims of false

endorsement and false advertising based on use of image of actor portraying Bobby Seale in

promotional material for CD of soundtrack of movie about the Black Panthers), *aff'd*, 156 F.3d

8

1225 (3d Cir. 1998); *New York Magazine v. Metropolitan Transit Authority*, 987 F. Supp. 254, 267 (S.D.N.Y. 1997) (dismissing Mayor Guiliani's commercial misappropriation claim arising from advertisement on the side of buses "Possibly the only good thing in New York Rudy hasn't taken credit for" even though the advertisement did not refer to any particular article in the magazine but related in a more thematic way to the political coverage of the magazine generally), *aff'd on other grounds*, 136 F.3d 123 (2d Cir. 1998).

While acknowledging – indeed, emphasizing – the connection between his story and the Movie, the Magistrate's recommendation would limit Twentieth Century Fox to only the most literal kind of expression of that connection. Tacitly conceding that Twentieth Century Fox could have expressly promoted the Movie as "inspired by the Scott O'Grady story" or "loosely based on the Scott O'Grady story," Plaintiff nonetheless complains about the material on the Discovery Channel which says the same thing, just not in those precise words. The "interstitials" repeatedly contrasted the "fact and fiction of true survival," emphasizing in words and pictures, that the Documentary told the story of "how [] America respond[ed] to the real thing" and "the Discovery Channel remembers one hero's true story," as opposed to the fictional movie that was inspired by the true story. (Exs. 335, 335A.) This compare and contrast theme is no different than the book jacket that compared the author's style to the noted author Ayn Rand, even though there was no reference to or any connection with Ayn Rand in the book. *Rand v. Hearst Corp.*, 31 A.D.2d 406, 298 N.Y.S.2d 405 (N.Y. App. Div. 1st Dep't 1969), *aff'd*, 26 N.Y.2d 806, 309 N.Y.S.2d 348 (1970). In language that has been adopted with approval by the Second Circuit in *Groden*, 61 F.3d at 1049, that "[t]o hold otherwise would constitute an impermissible restriction on what we deem to be the right of an a publisher in informing the public of the nature of his book and comparing it with the works of other authors." *Rand* at 412.

Where, as here, what was broadcast is undisputed, it is a question of law, not a question for the jury, whether the broadcast is protected by the First Amendment and to what extent. In affirming summary judgment for defendant in Tiger Wood's Lanham Act false endorsement and commercial misappropriation claims arising out of the sale of a painting and lithograph posters

9

of him in *ETW Corp. v. Jireh Publishing, Inc.*, 332 F.3d 915 (6th Cir. 2003), the Sixth Circuit

found that, despite survey evidence indicating that some members of the public would draw the

incorrect inference that Tiger Woods had some connection with the print,

> The risk of misunderstanding, not engendered by any explicit indication on the
> face of the print, is so outweighed by the interest in artistic expression as to
> preclude application of the [Lanham] Act. We disagree with the dissent's
> suggestion that a jury must decide where the balance should be struck and where
> the boundaries should be drawn between the rights conferred by the Lanham Act
> and the protections of the First Amendment.

*ETW Corp.*, 332 F.3d at 937. Such questions as to "where the balance should be struck and

where the boundaries should be drawn" should not be and typically are not left to a jury.[6]

---

[6] Courts in this Circuit and elsewhere have routinely granted motions for summary judgment on
plaintiffs' Lanham Act and commercial misappropriation claims based on review on the face of
the content of the advertising, movie, book or other material. *See, e.g., Cairns v. Franklin Mint
Co.*, 292 F.3d 1139, 1144 (9th Cir. 2002) (affirming grant of summary judgment on Lanham Act
false endorsement claim brought by estate of Princess Diana based upon Franklin Mint's use of
her name and image on its products and awarding attorney's fees to defendant); *Oliveira v. Frito-
Lay, Inc.*, 251 F.3d 56, 60 (2d Cir. 2001) (affirming grant of summary judgment where "fact
finder could not reasonably find an implied endorsement" from use of song "Girl from Ipanema"
for commercial); *King v. Ames*, 179 F.3d 370, 373 (5th Cir. 1999) (affirming grant of summary
judgment for record producer on plaintiff's Lanham Act, 15 U.S.C. 1125(a), and unfair
competition claims based upon alleged misattribution of production credit on the back of a
compact disks of live recordings of plaintiff's father, a deceased, internationally-recognized
blues musician); *Groden v. Random House, Inc.*, 61 F.3d 1045, 1047-48 (2d Cir. 1995)
(affirming summary judgment for book publisher on plaintiff's commercial misappropriation
claim under N.Y. Civ. Rights Law Sections 50 and 51, and Lanham Act, 15 U.S.C. 1125(a),
claim arising from use of plaintiff's name and photograph in advertisement for book concerning
assassination of JFK); *Matthews v. Wozencraft*, 15 F.3d 432, 437 (5th Cir. 1994) (affirming grant
of summary judgment for publisher, movie studio, and plaintiff's ex-wife in former undercover
narcotics officer's misappropriation claim based upon movie and book authored by ex-wife
about their story "because Texas law does not recognize a cause of action for appropriation of
one's life story and because if it did, there would be an exception for biographies and
"fictionalized biographies"); *Pirone v. MacMillan Inc.*, 894 F.2d 579, 584-85 (2d Cir. 1990)
(affirming finding as a matter of law that plaintiff "cannot possibly show confusion as to source
or sponsorship" for Babe Ruth's picture in a calendar); *Playboy Enters. v. Webbworld, Inc.*, 991
F. Supp. 543, 555 (N.D. Tex. 1997) (granting summary judgment because "the Court finds that
any confusion would be unreasonable here . . . the effect of [Playboy's] marks on the overall
tenor of Webbworld site is, in the Court's view, *de minimis*"), *aff'd*, 168 F.3d 486 (5th Cir. 1999);
*Lane v. Random House, Inc.*, 985 F. Supp. 141, 153 (D.D.C. 1995) (granting summary judgment
for book publisher on plaintiff's commercial misappropriation claim arising from use of
plaintiff's name and photograph in advertisement for book concerning assassination of JFK);
*Brown v. Twentieth Century Fox Film Corp.*, 799 F. Supp. 166, 173 (D.D.C. 1992) ("nor could

Accordingly, the Magistrate Judge erred in concluding that there is a fact issue for the jury as to whether the title and Discovery and Twentieth Century Fox's actions in creating the November 28 Broadcast are sufficiently related to the expressive elements of the Movie to qualify for First Amendment protection.

### C.    The November 28 Broadcast Is Hybrid Speech

Discovery objects to the Magistrate Judge's conclusion that the November 28 Broadcast is not, as a matter of law, "hybrid speech." Mag. Rep. at 25, n. 16, 28-29. That the November 28 Broadcast is "of a hybrid nature" with promotional as well as editorial purposes "inextricably intertwined," *Rogers*, 875 F.2d at 998, is a question of law based on review of the Broadcast. Such "hybrid" use is not commercial speech. *Riley v. National Fed'n of the Blind of North Carolina, Inc.*, 487 U.S. 781, 796 (1988) (advertisements do not retain "commercial character" when "inexplicably intertwined with otherwise fully protected speech").

Here, the sneak preview, interviews of the actors, director and producer, and behind-the-scenes footage added editorial content to the Documentary[7] about the then six-year-old Bosnian

---

any reasonable jury" find implied endorsement, granting judgment as a matter of law for use of a clip of James Brown performance in a movie), *aff'd*, 15 F.3d 1159 (D.C. Cir. 1994).

[7] Discovery objects to the Magistrate Judge's characterization of the Documentary as a "docu-drama." The Documentary *Behind Enemy Lines: The Scott O'Grady Story*, which aired on the Discovery Channel on November 28, 2001 and 32 times before that date beginning in 1997, is by legal definition a factual documentary, not a docu-drama. The law clearly distinguishes between the two forms. A documentary is a "non-fictional story or series of historical events" that maintains "strict fidelity to fact." *Davis v. Costa-Gravas*, 654 F. Supp 653, 658 (S.D.N.Y. 1987). A docu-drama, in contrast, "connotes a type of film or novelization in which real-life events are embellished with fictional dramatic events." *Ruffin-Steinback v. dePasse*, 82 F. Supp. 2d 723, 726 n.1 (E.D. Mich. 2000). Docu-dramas are "widely recognized as dramatizations of historical events that frequently take considerable liberties with the truth." *Partington v. Bugliosi*, 825 F. Supp. 906, 925 (D. Haw. 1993). The Discovery Documentary contained historical information about Plaintiff's downing and rescue, including interviews with Plaintiff and his actual rescuers and contemporaneous news footage of President Clinton discussing the Plaintiff's situation and news footage of Plaintiff shortly after his rescue. The limited recreations by an actor depicting Plaintiff during his six days behind enemy lines and by Plaintiff's family were in no way fictionalized. The producers of the Documentary did not take any of the sort of artistic liberties associated with docu-dramas and the accuracy of the Documentary is not in dispute. Accordingly, the moniker "docu-drama" is not only a misnomer, but it is also

conflict and constituted entertainment news and information about the upcoming movie inspired by Plaintiff's experience. The "factoids" provided educational and historical information contrasting "the fact and the fiction of true survival." Even when about entertainment and even with a promotional aspect and purpose, courts have specifically held such material does not constitute commercial speech for advertising or trade for purpose of a misappropriation claim. *See Time v. Hill*, 385 U.S. 374, 376-79 (1967) (finding that news article about opening of new play linked to an actual incident was a matter of public interest even "if done to advertise and attract further attention to the play, and to increase present and future circulation as well."); *Matthews v. Wozencraft*, 15 F.3d 432, 439 (5th Cir. 1994) ("[c]ourts long ago recognized that a celebrity's right of publicity does not preclude others from incorporating a person's name, features or biography in a[n] . . . entertainment story"); *Page v. Something Weird Video*, 960 F. Supp. 1438, 1444-45 (C.D. Cal. 1996) (granting summary judgment for defendant, finding no commercial misappropriation in use of a drawing of the actress Betty Page in cover of a catalogue advertising not only videos in which she appeared, but also videos in which she did not appear, because "promotion of vintage videos is itself a medium for transmission of news" protected by the First Amendment).

The Magistrate Judge bases her conclusion regarding hybrid speech on a finding that the material for the Movie and the Documentary are capable of "standing alone." Mag. Rep. at 25, n.16. The Magistrate Judge's test is tantamount to the "no alternative avenues" test specifically rejected by the Second Circuit in *Rogers*, 875 F.2d at 998-1001, and by the Sixth Circuit in *ETW Corp.*, 332 F.3d at 944 as too restrictive on the editorial and creative choices of broadcasters and filmmakers .

Discovery also objects to the Report and Recommendation's finding that the *Rogers v. Grimaldi* test has been limited to titles. (Mag. Rep. at 25 n. 16.) *Rogers* itself included advertising for the movie, "Ginger and Fred," *Rogers* at 875 F.2d at 1005. More importantly,

---

inherently misleading and prejudicial.

*Rogers* has been applied more broadly to all expressive works. *See, e.g., Cliff Notes v. Bantam Doubleday Dell Pub. Group*, 886 F.2d 490, 494 (2d Cir. 1989) (extending *Rogers* test to parody by Spy Notes replicating distinctive cover of Cliff Notes; in any claim "where an expressive work is alleged to infringe a trademark, it is appropriate to weigh the public interest in free expression against the public interest in avoiding consumer confusion"); *ETW Corp.*, 332 F.3d at 926 (extending the *Rogers* test not just to the painting of Tiger Woods but to brochure Woods' name to promote painting and posters "where the defendant has articulated a colorable claim that the use of a celebrity's identity is protected by the First Amendment").

## II.   DISCOVERY OBJECTS TO THE REPORT'S RECOMMENDATION THAT THERE IS AN ISSUE OF FACTS AS TO WHETHER PLAINTIFF CAN NOT SATISFY THE REQUISITE MISAPPROPRIATION CLAIM FOR A COMMERCIAL

Even apart from the First Amendment protections, plaintiff must prove three elements to prevail on his commercial misappropriation claim: (1) that Defendants misappropriated his name or likeness for the value associated with it and not in an incidental manner or for a newsworthy purpose; (2) Plaintiff can be identified from the broadcast; and (3) that there was some advantage or benefit to Defendants. *Brown v. Ames*, 201 F.3d 654, 657 (5th Cir. 2000). Consent by Plaintiff to the use of his name or likeness defeats a claim for commercial misappropriation.

### A.   The Scope Of The Consent Plaintiff Granted When He Signed The BBC/O'Grady Release Is A Question Of Law For The Court, Not An Issue Of Fact For The Jury

As a threshold matter, Discovery objects to the conclusion in the Report and Recommendation that a genuine issue of material fact exists concerning whether the consent Plaintiff gave when he executed the BBC/O'Grady Release would include the use made on the November 28 Broadcast. Mag. Rep. at 15-16. The question of contract interpretation, where, as here, the language is unambiguous, is a question of law for the Court. It is not a question for the jury. *See, e.g., Matter of Maple Mortg. Inc.*, 81 F.3d 592, 597 (5th Cir. 1996) ("[u]nder Texas law, an interpretation of a contract is a question of law, and if a contract is written so that a court may properly give it a certain definite legal meaning or interpretation, it is not ambiguous").

Plaintiff has never made any assertion that the language of BBC/O'Grady Release is ambiguous – nor could he. Instead, Plaintiff admits he signed the BBC/O'Grady Release which granted the BBC and all licensees and assigns all rights to his "contribution" without limitation.[8] These rights expressly included: "[w]ithout further payment the BBC and BBC Worldwide Limited and its/their licensees and assigns shall be entitled . . . to ALL RIGHTS in the contribution(s) (including any recordings(s) or translation(s) thereof) FOR ALL PURPOSES EVERYWHERE." (Exs. 44, 45; Plf. Dep. 363:19-364:13.) These rights included broadcasts such as this on cable and, for educational programs, the right "to adapt and modify and make other use of any material and scripts supplied by you for promotional . . . purposes." (¶ 5 (e).) The BBC/O'Grady Release provided (at ¶ 8) that BBC and its licensees and assigns "shall have the further right without payment to broadcast as required for trailer [i.e., promotional] purposes: (a) extracts live and recorded from the contribution(s)...." (Exs. 44, 45.) Under the BBC/O'Grady Release (at ¶ 7), the BBC and its licensees and assigns "shall be entitled to edit the contribution(s) and the rights granted to the BBC under this Contract shall apply to the whole or any excerpt(s) from the contributions(s)." (Exs. 44, 45.) The BBC/O'Grady Release also waived all rights of approval of content and titles; the dates and times of broadcast were also at the discretion of the BBC and its licensees. (Exs. 44, 45.)

Plaintiff thus gave permission for the use to which his contribution was put.[9] Plaintiff does not dispute that Discovery had the right by contract, as well as by law, to broadcast a documentary about his famous story and to use his name and likeness and excerpts from his "contribution" to promote it. To make out a commercial misappropriation claim, a plaintiff must show that his name or likeness was used without his consent. Here, the clear and unambiguous terms of the BBC/O'Grady Release, which Plaintiff concedes he executed, explicitly allowed

---

[8] The BBC/O'Grady Release defines Plaintiff's "contribution" in the documentary as "to be interviewed and to participate in short actuality sequence concerning your rescue in Bosnia." (Ex. 45.)

[9] O'Grady was paid $500 by the BBC (which he directed to charity).

promotional use of his name and likeness and imposed no limitation on the exercise of those

rights.  Discovery had the contractual right to use Plaintiff's name or likeness in the manner it

did here in the November 28 Broadcast. [10]

**B.**  **Discovery Objects To The Magistrate Judge's Recommendations That There Is A Genuine Issue Of Material Fact That Defendants Misappropriated Plaintiff's Name And Likeness For The Value Associated With It And Not In An Incidental Manner Or For A Newsworthy Purpose.**

**1.**  **The November 28 Broadcast Use Was Not For The Commercial Value Of Plaintiff's Name Or Likeness**

Discovery objects to the Report and Recommendation to the extent that the Magistrate

Judge concludes, based on an incorrect legal standard, that there is a genuine issue of material

fact as to whether the November 28 Broadcast was created to "capitalize upon the commercial

value associated with Plaintiff's name, likeness and image to promote the Movie." (Mag. Rep. at

17.)  The fact that the November 28 Broadcast was "brought to you by the new Twentieth

Century Fox film *Behind Enemy Lines*" (J.A. Exs. 335, 335A) does not turn the otherwise non-

commercial editorial programming into advertising or trade for Twentieth Century Fox.  Even if

the November 28 Broadcast were created to capitalize upon the commercial value associated

with Plaintiff's name and likeness, which the Magistrate Judge concludes is a genuine issue of

material fact precluding summary judgment in this case, the Fifth Circuit has expressly rejected

the argument asserted by Plaintiff and adopted by the Magistrate Judge.  In *Benavidez v.*

*Anheuser Busch, Inc.*, 873 F.2d 102 (5th Cir. 1989), the Fifth Circuit held that a documentary

---

[10]  The Magistrate Judge relies on *Kimbrough v. Coca-Cola/USA*, 521 S.W.2d 719, 720-24 (Tex. App. -- Eastland 1975, writ ref'd n.r.e.) -- a case involving not First Amendment protected works, but promotion of Coca-Cola -- in concluding that a genuine issue of material fact exists regarding whether, by signing the BBC/O'Grady Release, Plaintiff consented to the use made on the November 28 Broadcast. (Mag. Rep. at 16.)  *Kimbrough* is inapposite.  The Fifth Circuit has expressly refused to apply *Kimbrough* to a misappropriation case, like the one at bar, where the rights at issue were granted by contract.  As the Fifth Circuit stated, "[i]n *Kimbrough*, the court recognized that a party may bring an action for the unauthorized appropriation or exploitation of his name or likeness.  Unlike the case before us, the *Kimbrough* court was not confronted with an express written contract between he parties.  We find Kimbrough more instructive in those instances where the parties have not entered into a formal agreement." *King v. Ames*, 179 F.3d 370, 375 n.5 (5th Cir. 1999).

produced by the corporate relations department of a beer company recounting the military

exploits of the plaintiff and other Hispanic Congressional Metal of Honor recipients, which

stated in its credits that it was "made possible by Anhauser Busch" and was shown at hospitality

centers at Anhauser Busch conventions where Anhauser Busch beer was clearly promoted and

distributed, did "not transform the otherwise unobjectionable into a commercial advertisement

for [Anhauser Busch]," notwithstanding that the Fifth Circuit specifically concluded that

company's goal was "an attempt to capitalize on Benavidez's good name and reputation and

thereby commercially benefit from it." *Id.* at 103. *See, e.g., Williams v. Newsweek, Inc.*, 63 F.

Supp. 2d 734, 736-37 (E.D. Va. 1999) (even if *Newsweek* article which included photo of

plaintiff was intended to promote book featured in article, article was not "for advertising

purposes" and plaintiff could not make out commercial misappropriation claim; "the mere fact

that defendants are spurred by the profit motive and engaged in the commercial exploitation . . .

does not negate their right to depict a matter of public interest . . ." (internal citations omitted)).

*See* discussion at IA and IIC.

### 2.    The Use Discovery And Twentieth Century Fox Made Of Plaintiff's Name And Likeness Clearly Falls Within The Incidental Use Exception To Commercial Misappropriation Claims

Discovery objects to the Report and Recommendation in that the Report finds, based on

an incorrect legal standard, that the reference to Plaintiff in the November 28 Broadcast is not an

"incidental" use. (Mag. Rep. at 18.) The Report applies a 1915 definition of the incidental use

exception – a "casual" or "fleeting" use – and omits completely a second definition of the

incidental use exception equally applicable here:  That advertisements for First Amendment

protected works may use the name or likeness of a person who is the subject of that work to

promote the content of the work.  Restatement (Third) of Unfair Competition § 47 ("for purposes

of trades does not ordinarily include the use of a person's identity in news reporting,

commentary, entertainment , works of fiction or non-fiction, or in advertising that is incidental to

the such uses") (emphasis added).  As the Second Circuit stated in *Groden v. Random House,

Inc.*, in holding that an advertisement for a book using the name and photograph of a plaintiff to

inform potential readers about the content of book was protected under the incidental use exception, "it is clear what drives the incidental use exception is a First Amendment interest in protecting the ability of news disseminators to publicize, to make public, their own communications." 61 F.3d 1045, 1049-51 (2d Cir. 1995).

The incidental use exception, protecting the media's right to promote its own communications, is simply the logical corollary to the media's right to publish those communications. *See Lane v. Random House, Inc.*, 985 F. Supp. 141, 147 (D.D.C. 1995) ("[i]t would be illogical to allow respondents to exhibit [speech products] but effectively preclude advance discussion or promotion of their lawful enterprise" (quoting *Guglielmi v. Spelling-Goldberg Prods.*, 603 P.2d 454, 462 (Cal. 1979) (advertisement for constitutionally protected docudrama is constitutionally protected as adjunct to the docudrama)); *Brown v. Twentieth Century Fox Film Corp.*, 799 F. Supp. 166, 172 and n.9 (D.D.C. 1992) ("since defendants had the right to use the clip of the film, they certainly had the right to use that scene [of James Brown performing] from the film in promotional activities"); *Velez v. VV Publishing Corp.*, 135 A.D.2d 47, 50 (N.Y. App. Div. 1st Dep't 1988) (incidental use exception "is a necessary and logical extension of the clearly protected  editorial use of the content of the publication").

As the *Lane* court aptly noted, the advertisement in issue, like the promotions for the Documentary, "was not about laundry detergent" and could not be "divorced" from the book *Case Closed*, which was protected speech. *Lane*, 985 F. Supp. at 152. Similarly, in this case, the promotions for the Documentary do not use Plaintiff's name and image to advertise a product unrelated to him but to describe the Documentary about him and compare the "fact and fiction" of the real story and the Movie it inspired.

Since documentaries about real people and fictional movies inspired by real people are not commercial misappropriation, advertising or promotion that refers to these real life people cannot violate a real person's right of publicity. *See Ruffin-Steinback v. dePasse*, 267 F.3d 457, 462 (6th Cir. 2001) ("[plaintiff's] fictionalized [likeness] in a work protected by the First Amendment and the advertising incidental to such uses [does] not give rise to claim for relief

under the [plaintiff's rights] of publicity . . ."); *Seale v. Gramercy Pictures*, 964 F. Supp. 918

(E.D. Pa. 1997) (finding use of photos of actor who played Bobby Seale on promotional material

for a docudrama on Black Panthers did not constitute use for advertising or trade), *aff'd*, 156

F.3d 1225 (3d Cir. 1998).

In any event, the use of Plaintiff's name and likeness that the Magistrate Judge identifies

as being made in connection with the Movie – "like Scott O'Grady, Owen Wilson's character,

naval aviator Chris Burnett . . ." – is also exactly the sort of incidental use protected under the

second "casual" or "fleeting" definition of that exception.[11]   Restatement (Second) of Torts

§ 652c comment (incidental use defense provides that the "value of the plaintiff's name is not

appropriated by mere mention of it, or by reference to it in connection with legitimate mention of

his public activities"). *Accord Matthews v. Wozencraft*, 15 F.3d 432, 437 (5th Cir. 1994).

> **3.    The Use Discovery And Twentieth Century Fox Made Of Plaintiff's
> Name And Likeness Was For A Newsworthy Purpose And Therefore
> Outside The Ambit Of A Commercial Misappropriation Claim**

Discovery objects to the Report and Recommendation to the extent that the Report finds,

based on an incorrect legal analysis, that the use of Plaintiff in the November 28 Broadcast is not

for a historical or newsworthy purpose. (Mag. Rep. at 18-19.)  Even assuming *arguendo* that

there were reference to Plaintiff in the November 28 Broadcast relating to the Movie, rather than

---

[11]  Accordingly, Discovery objects to the Magistrate Judge's conclusion in the Report and
Recommendation as to the second element of a cause of action for commercial misappropriation,
namely that Plaintiff's name, likeness and image are identifiable from the November 28
Broadcast. (Mag. Rep. at 19.)  Discovery objects to the threshold assumption that the second
element of a commercial misappropriation claim is satisfied if Plaintiff may be identifiable from
the November 28 Broadcast as a whole, rather than from advertisements or promotions for the
Movie, specifically.  Such a broad interpretation would lead to the conclusion that Plaintiff's
name and likeness also was used to advertise other third party products advertised during the
November 28 Broadcast, such as Petsmart and Kay Jewelers.  Throughout the November 28
Broadcast, Plaintiff's name and likeness are clearly used in reference to the Documentary, *i.e.*, in
the Documentary itself and in tune-ins, promotions and factoids relating to the Documentary.
His name and likeness are not used in advertisements or promotions for the Movie, and this
passing "incidental" reference contrasting the well-publicized fact versus the fictional story does
not make Plaintiff identifiable in advertisement for the Movie.

just to the Documentary, it was strictly to contrast the "fact" of the true story with the "fiction" of the new Movie inspired by the true story and, as such, the use is squarely protected by the newsworthy exception.

Courts have long recognized newsworthiness exceptions which protect use of name and likeness not only in books, newspapers, movies, broadcasts and other publications about matters of public concern but also in the advertising and promotion for those works, unless the promotional use bears "no real relationship" to the subject matter of the publication. *Lane*, 985 F. Supp. at 146. The Documentary about Plaintiff's widely-covered experience in Bosnia is indisputably speech about a matter of public concern entitled to full First Amendment protection. Accordingly, Discovery had a derivative right – which Plaintiff does not dispute -- to broadcast tune-ins and other promotions for the Documentary. The promotions for the Documentary – including as they do clips of Plaintiff and his rescuers discussing the highly publicized ordeal and of President Clinton updating the press corps on the status of Plaintiff's rescue and of Plaintiff immediately after his rescue – bear a "real relationship" to the newsworthy events surrounding Plaintiff's experience in Bosnia. They also bear a "real relationship" to news and information about an upcoming movie about a fictional pilot inspired by plaintiff's experiences in Bosnia. *Finger v. Omni Publications Int'l*, 564 N.Y.S.2d 1014, 1016-18 (N.Y. 1990) (urging deference to editorial choices and finding use of stock house photo of family of eight was not a commercial misappropriation but, rather, bore a "real relationship" illustrative of the subject or an article about caffeine-injected sperm in invitro fertilization, even though none of the family was so conceived).

Discovery objects to the Magistrate Judge's conclusion that a "fact issue exists as to whether the November 28 Broadcast constitutes commercial speech notwithstanding the fact that the November 28 Broadcast contained educational elements intended to contrast 'the fact and fiction of true survival' and the fact that Plaintiff's ordeal was newsworthy at one time." (Mag. Rep. at 19.) That the promotions at issue were for a documentary and a movie, both expressive works, removes the promotions, and the November 28 Broadcast as a whole, from the category

of commercial speech. *Lane*, 985 F. Supp. at 147 ("[w]hile the newsworthiness privilege may

not apply to an advertisement for a non-speech product, it does apply to advertisements for

speech products – even those that propose a commercial transaction"). Moreover, the Magistrate

having found that there were educational elements and a newsworthy subject in the November 28

Broadcast, it necessarily follows *as a matter of law* that the use was for a newsworthy purpose

and, therefore, not commercial misappropriation.

Moreover, the newsworthy exception is not eviscerated merely because Plaintiff's highly

publicized experience occurred five years before the November 28 Broadcast, as the Magistrate

Judge suggests. *See, e.g., Ross v. Midwest Communications*, 870 F.2d 271 (5th Cir. 1989)

(Houston television station documentary about rape occurring three years earlier is protected

against private facts claim because details about rape, including identity of victim, are

newsworthy); *Lane*, 985 F. Supp. at 146-47 (concluding that advertisement promoting -- 30 years

after historic event -- the sale of a book about JFK assassination containing analysis of plaintiff's

theories about assassination enjoyed newsworthiness immunity against a claim for

misappropriation); *Dora v. Frontline Video, Inc.*, 15 Cal. App. 4th 536, 542-43, 18 Cal. Rptr. 2d

790, 792 (1993) (1987 video documentary about surfers, "The Legends of Malibu," including

depiction of plaintiff's exploits in 1950s, is protected against misappropriation claim as a

"documentary [was] about a certain time and place in California history, and indeed, in

American legend," and surfer lifestyle "has become world-famous and celebrated in popular

culture"; "[m]atters in the public interest are not 'restricted to current events; magazines and

books, radio and television may legitimately inform and entertain the public with reproduction of

past events, travelogues and biographies").

The "newsworthiness" exception is not limited to hard news but has been broadly applied

and includes matters of human and historical concern, including the public's interest in

celebrities and entertainment news. *See, e.g., New Kids on the Block v. News America Pub., Inc.*,

971 F.2d 302, 309-10 (9th Cir. 1992) (recognizing that newspapers had "complete defense to

misappropriation claim relating to use by papers of New Kids' name in 900-number telephone

survey to determine most popular band member, affirming holding that publishers' use of New

Kids' name was "in connection with" news accounts about the singing group and its popularity);

*Daly v. Viacom*, 238 F. Supp. 2d 1118, 1123 (N.D. Cal. 2002) (MTV cable television music

reality show, "Bands on the Run" is protected against misappropriation claims because program

is constitutionally protected "expressive work" and broadcast of plaintiff's likeness is protected

as part of that work; "entertainment is entitled to the same constitutional protection as the

exposition of ideas"); *Shulman v. Group W Prods.*, 18 Cal. 4th 200, 227, 955 P.2d 469, 487

(1998) ("[n]ewsworthiness is not limited to 'news' in the narrow sense of reports of current

events. It extends also to the use of names, likenesses and facts in giving information to the

public for purposes of education, amusement, or enlightenment, when the public may reasonably

be expected to have a legitimate interest in what is published").

In view of the variety of topics covered by news shows and the shadowy boundary

between "news" and "entertainment," the Supreme Court has observed that "courts should be

chary of deciding what is and what is not news." *Harper & Row Publishers, Inc. v. Nation

Enters.*, 471 U.S. 539, 561 (1985).

**C.**    **Discovery And Twentieth Century Fox Did Not Derive Some Unlawful
Advantage Or Commercial Benefit From Their Use Of Plaintiff**

Discovery objects to the Report and Recommendation to the extent that the Report, in

addressing the third element of a commercial misappropriation claim, finds, based on an

incorrect legal standard, that there is a genuine issue of material fact as to whether Defendants

created the November 28 Broadcast in furtherance of their economic motivations. (Mag. Rep. at

20.) As discussed *supra* at IA and IIB1, whether or not Twentieth Century Fox and/or Discovery

had an economic motivation in creating the Broadcast is of no moment here where the works

involved are – unlike the T-shirt advertised in the *Henley v. Dillard Department Stores*, 46 F.

Supp. 2d 587 (N.D. Tex. 1999), upon which the Magistrate Judge relies – First Amendment

protected works. Even if the motivation was to sell tickets and attract viewers and advertising,

the November 28 Broadcast does not constitute commercial speech, let alone false and

misleading commercial speech. [12]

> [T]he mere fact that the [ad] was published and the defendant[]
> intended to make a profit from the ad is not enough to constitute
> commercial benefit . . .   Defendants must use the name or likeness
> for the express purpose of appropriating the commercial benefit
> that is particularly associated with the name or likeness is the
> plaintiff.

*Id.* at 596.

Accordingly, Defendants' motions for summary judgment as to Plaintiff's commercial

misappropriation claim should be granted.

## III.   DISCOVERY OBJECTS TO THE REPORT'S RECOMMENDATION THAT THERE IS AN ISSUE OF FACT AS TO WHETHER PLAINTIFF CAN SATISFY THE REQUISITE ELEMENTS OF A LANHAM ACT CLAIM

### A.   The November 28 Broadcast Does Not Contain Any Explicitly Misleading Statements

Discovery objects to the Magistrate Judge's recommendation that there is a genuine issue

of material fact as to whether the November 28 Broadcast contained any explicitly misleading

statements.  Plaintiff has not cited – and can not cite – to any part of the material on the

Discovery Channel, not the audio not the video, which explicitly states that the Movie is the

actual story of Scott O'Grady or that O'Grady authorizes or endorses the Movie.  Indeed, he does

not dispute that there was no such express statement.  *See* Pl. Response to DCI's Statement of

Undisputed Facts, not disputing DCI's ¶ 62.  Despite the absence of a single such reference,

Plaintiff nevertheless argues that the material on the Discovery Channel involved an "expressly

misleading statement of fact." (Pl. Resp. at 63.)  Nowhere, however, are there any such express

---

[12] Discovery further objects to the Magistrate Judge's conclusion that there is evidence that Twentieth Century Fox paid for the special programming event. (Mag. Rep. at 25 n.5.)  The evidence shows that, separate and apart from any discussions about a special programming event, Twentieth Century Fox made an initial "media buy" of $275,000 for air time for Fox-created advertising for the Movie to broadcast over the course of several weeks on the Discovery Channel.  Twentieth Century Fox made an additional "media buy" of $125,000, after which Discovery agreed to produce the special programming event.  Only the additional $125,000 can be attributed to the special programming event.  The $27,065 in production costs of the special programming event were absorbed by Discovery, not Twentieth Century Fox.

statements such as that the Movie is "the Scott O'Grady story" or that it was "authorized by" or "made in cooperation with" Scott O'Grady. Again, the facts are undisputed – the November 28 Broadcast is what it is. The Court – not a jury – must determine, based on the only material facts – the Broadcast itself – that there was no explicitly misleading statement of fact. *ETW Corp.*, 332 F.3d at 937.

Discovery objects to the Report and Recommendation to the extent that the Magistrate Judge bases conclusions upon a misapprehension concerning Discovery's selection and use of the title *Behind Enemy Lines: The Scott O'Grady Story*. The titles of the Movie and the Documentary are not, as Plaintiff contends, expressly misleading and do not falsely state that the Movie is O'Grady's actual story. (Mag. Rep. at 25 n.18.) Discovery titled the Documentary *Behind Enemy Lines: The Scott O'Grady Story* when it purchased the Documentary for the BBC and has aired it under that title since it first started airing the Documentary in 1997. Indeed, Plaintiff concedes that the Discovery Channel could – and always did – use the title *Behind Enemy Lines: The Scott O'Grady Story* for its Documentary and that he never complained. (Pl. Response to DCI's Statement of Undisputed Facts, not disputing DCI's ¶¶ 33-34, 36-38.) Plaintiff concedes he has no trademark or other interest of his own in the title (Pl. Dep. 167:24-168:8; Pl. Response to DCI's Statement of Undisputed Facts, not disputing DCI's ¶ 82). There is no authority for the proposition that Discovery should have nonetheless abandoned its lawful title when Twentieth Century Fox advertised its Movie "Behind Enemy Lines" on the Discovery Channel on November 28, 2001 – a title that is so generically descriptive that is used for many other titles for similar works. *See* Rule 56 Statement of Undisputed Facts Supporting Discovery Communications Inc.'s Motion for Summary Judgment, ¶ 84 and Twentieth Century Fox's Statement of Undisputed Facts at E.1-2.

In the absence of any "explicit indication that [plaintiff] endorsed the film or had a role in producing it" and where, as here, the "survey evidence, even if its validity is assumed, indicates at most that some members of the public would draw the incorrect inference that [plaintiff] had

some involvement with the film," the "risk of misunderstanding, not engendered by any overt claim" is "so outweighed by the interests in artistic expression as to preclude application of the Lanham Act." *Rogers*, 875 F.2d at 1001. The Report applied an incorrect legal standard concluding that there may be a finding of liability in the absence of an expressly false statement of endorsement or that the Movie is Plaintiff's actual story. *Rogers*, 875 F.2d at 1001.[13]

### B.  There Is No Credible Admissible Evidence Of Actual Deception Or Materiality

Even if that an explicitly misleading statement were not required for protected First Amendment works, even if these works could be treated the same as laundry detergent or pizza, Plaintiff must show, in the absence of an explicitly false and misleading statement, both <u>actual</u> deception of Discovery Channel viewers and that "the impliedly false and misleading statements were material to, that is, they had a tendency to influence the purchasing decisions of, the customers to which they were directed." *Pizza Hut v. Papa John's Int'l, Inc.*, 227 F.3d 489, 502 (5th Cir. 2000). Discovery objects to the Magistrate's recommendation that there is a fact issue as to whether the Broadcast had the capacity to deceive a substantial segment of consumers and whether any deception was material. (Mag. Rep. at 29.) In the absence of a "literally false" statement, the test is not "capacity to deceive" but actual deception.

Plaintiff has not produced one single person who watched on November 28, 2001 the one-hour program on the Discovery Channel and believed the Movie was an accurate account of Scott O'Grady's story or that he endorsed or authorized the Movie. Plaintiff says that, during his speaking engagements, he has "had to clear up misperceptions by members of the public that the movie "Behind Enemy Lines" was my story." (O'Grady Affidavit ¶ 16.) But nowhere in his affidavit, nor in deposition, has Plaintiff been able to identify who those people are, much less that they formed this misperception having seen the references to the Movie on the Discovery

---

[13] Discovery objects to the Magistrate Judge's conclusion that there is a genuine issue of material fact as to whether the November 28 Broadcast falsely implied that plaintiff endorsed or collaborated in the Movie or that the Movie is Plaintiff's story. (Mag. Rep. at 29.) Discovery also objects to the Report's recommendation to reject as a matter of law the nominative use defense. (Mag. Rep. at 30.)

Channel. If those misperceptions were just the result of the similarity of the stories, then, as Plaintiff himself now concedes, that confusion is not actionable. (Pl. Resp. at 29 n.5.). Plaintiff has not even alleged, much less provided any evidence, that anyone, based on a misperception caused by the November 28 Broadcast, bought a ticket to the Movie – none. The materiality question was not even asked in the Gelb survey. Plaintiff has thus not met his burden of showing, "with factual specificity, evidence demonstrating the existence of a genuine issue of material fact on every component "of the nonmovant's case" (Mag. Rep. at 11) including actual and material deception. Therefore, the Report erred in finding a genuine issue of material fact.

Discovery objects the Magistrate Judge's conclusion that there is a genuine issue of material fact as to whether Plaintiff has been or is likely to be injured as a result of the Broadcast. Plaintiff has presented no evidence that he would have entered into any competing movie deal but for Defendants' actions. The movie deal he had with Orion fell through because the production company disbanded in 1997, as the Magistrate Judge's Report and Recommendation finds. (Cairns Dep. 51:21-52:6; Plf. Dep. 84:4-85:6, 86:8-14, 182:3-21.) Plaintiff cites not a single canceled speaking engagement or endorsement opportunity. (Plf. Dep. 373:17-22; *see also* Parsons Dep. 58:18-59:16, 75:1-76:21.) In fact, his speaking fees have increased since the broadcast of the Documentary on November 28, 2001 and release of the Movie. (Exs. 136, 137; Plf. Dep. 203:10-204:1; Parsons Dep. 30:7-38:6, 102:6-9.) If anything, as his agents concede, the Documentary has enhanced his speaking career and celebrity value; hence, the Documentary on the Discovery Channel is mentioned in plaintiff's biographical material prepared by his speaker's agency. (Parsons Dep. 58:18-59:16, 75:1-76:21; Corzine Dep. 64:16-25, 65:1-4; Mills Dep. 112:8-114:22.)

### C.   There Is No Evidence That Defendants Acted With Intent and Actual Malice

The Magistrate Judge assumed without deciding that, as Discovery contends, to make out his claim, Plaintiff must present evidence that Twentieth Century Fox and Discovery intended to imply that the Movie was Plaintiff's actual story and that Plaintiff endorsed the Movie. (Mag. Rep. at 26.) Since Plaintiff has produced no evidence of such intent, Discovery objects to the

25

Magistrate Judge's recommendation that a genuine issue of material fact remains as to Discovery's intent.

Even if the November 28 Broadcast were otherwise actionable, because the November 28 Broadcast involves protected First Amendment speech, providing educational material and information about an upcoming movie and the true story that inspired it, because Plaintiff is a public figure and because it rests on an implication of endorsement, not an express false statement, Plaintiff's claim will fail because he cannot show, as he must, by clear and convincing evidence, that Discovery or Twentieth Century Fox intended falsely to imply his endorsement or falsely to imply that the Movie was the true account of Plaintiff's story and that Discovery or Twentieth Century Fox acted with actual malice. *See Time, Inc. v. Hill*, 385 U.S. at 376-78 (holding that plaintiffs must show actual malice to make out misappropriation claim based on article in *Life* reporting entertainment news about a new play inspired by plaintiffs' true story but otherwise fictional); *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1189 n.3 (9th Cir. 2001) (public figure plaintiff required to show by clear and convincing evidence that defendant "subjectively intended that the reader believe [plaintiff] had endorsed the use of his name or likeness").

The undisputed testimony of Discovery employees makes clear that, both in the proposal for the special programming event and in its execution, Discovery's intent consistently was to reinforce the Discovery brand of factual, informational programming and to distinguish Discovery Channel's factual Documentary from the fictional Movie inspired by Plaintiff's story. There is no evidence, direct or circumstantial, supporting the claim that Discovery intended to imply that Plaintiff endorsed the Movie or that the Movie was a factual account of his story. Even if the jury were to find such implication existed, there would be no evidence on which to sustain such a finding that that was Discovery's intent.

## IV.   DISCOVERY OBJECTS TO THE REPORT'S RECOMMENDATION THAT THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER

### PLAINTIFF CAN SATISFY THE REQUISITE ELEMENTS OF UNFAIR COMPETITION

Discovery objects to the Magistrate Judge's recommendation with regard to Plaintiff's unfair competition claim. The unfair competition claim (like the tortious interference claim, which Plaintiff has abandoned, and his misappropriation and Lanham Act claims) rests solely on Discovery's legitimate, honest business activity of broadcasting "news reporting, commentary, entertainment, works of . . . non-fiction" along with "advertising that is incidental to such use" and third-party advertising. Restatement (Third) of Unfair Competition § 47. Such legitimate business activity does not state the requisite elements of intent to harm and unlawful purpose and, if it did, the claims would be barred by the First Amendment and Art. 1 § 8 of the Texas Constitution.

Plaintiff has failed to put forward any evidence that Defendants engaged in an underlying illegal or tortious act which interfered with his ability to conduct business or that Defendants produced the November 28 Broadcast to "pass off" the Movie as Plaintiff's story. Nor does the element of competition exist with respect to Discovery as Discovery has not created a movie in competition with Plaintiff. *See Taylor Publ'g Co. v. Jostens, Inc.*, 36 F. Supp. 2d 360, 374 (E.D. Tex. 1999), *aff'd*, 216 F.3d 465 (5th Cir. 2000); *Schoellkopf v. Pledger*, 778 S.W.2d 897, 904 (Tex. App.—Dallas 1989, writ denied); *Featherstone v. Independent Service Station Ass'n of Texas, et al.*, 10 S.W.2d 124, 128 (Tex. Civ. App.—Dallas 1928, no writ).

Since there is zero evidence to support Plaintiff's unfair competition claim, Discovery objects to the Magistrate Judge's finding a genuine issue of material fact that Twentieth Century Fox and Discovery damaged Plaintiff's ability to conduct business. Accordingly, Defendants' motions for summary judgment as to Plaintiff's unfair competition claims should be granted.

### V.    DISCOVERY OBJECTS TO THE REPORT'S RECOMMENDATION THAT THERE ARE GENUINE ISSUES OF FACT AS TO WHETHER PLAINTIFF CAN SATISFY THE ELEMENTS OF CIVIL CONSPIRACY

Discovery objects to the Magistrate Judge's proposed findings with regard to Plaintiff's conspiracy claim. Plaintiff's conspiracy claim necessarily fails because, in addition to the fact that there is no evidence that Discovery entered into an agreement with Twentieth Century Fox

with specific intent to harm Plaintiff, there is no independent unlawful act for which Twentieth Century Fox or Discovery can be held liable. *Tilton v. Marshall*, 925 S.W.2d 672, 681 (1996) ("liability for conspiracy depends on participation in some underlying tort"). Even had Plaintiff not signed the BBC/O'Grady Release, Discovery's actions in preparing the special programming event were at all times entirely lawful. Discovery objects to the Magistrate Judge's conclusion that there is evidence to create a genuine issue of material fact as to each of the elements of civil conspiracy. (Mag. Rep. at 32-33.) Accordingly, Defendants' motions for summary judgment as to Plaintiff's conspiracy claim should be granted.

## CONCLUSION

For the foregoing reasons, Defendant Discovery respectfully requests that its objections to the Report and Recommendation of the Magistrate Judge be sustained and that the Court enter summary judgment in Discovery's favor, dismissing the First Amended Complaint in its entirety with prejudice and awarding such other relief, including attorney's fees, as the Court deems appropriate to the prevailing party.

Dated:    December 31, 2003

Respectfully submitted,

DAVIS WRIGHT TREMAINE L.L.P.

By: _____
Laura R. Handman
D.C. Bar No. 444386
Constance M. Pendleton
D.C. Bar No. 456919
1500 K Street, N.W., Suite 450
Washington, D.C. 20005-1272
(202) 508-6600
(202) 508-6699 – Fax

Victor F. Hlavinka
ATCHLELY, RUSSELL, WALDROP, &
HLAVINKA, L.L.P.
1710 Moores Lane
Texarkana, Texas 75505

Case 5:02-cv-00173-DF-CMC   Document 139   Filed 12/31/03   Page 36 of 152

(903) 792-8246
(903) 792-5801 – Fax

ATTORNEYS FOR DISCOVERY
COMMUNICATIONS, INC.

29

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Defendant Discovery Communications, Inc.'s Objections to the Report and Recommendation of the United States Magistrate Judge  and proposed order was sent by Federal Express to the following counsel of record this the 31st day of December, 2003.

George E. Bowles, Esq.
C. W. Flynn
Locke, Liddell & Sapp. L.L.P.
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201

G. William Lavender, Esq.
Lavender Law
Landmark Building
210 N. State Line, Suite 50
Texarkana, TX 71854

Charles Babcock, Esq.
Jackson Walker, L.L.P.
901 Main Street
Suite 6100
Dallas, TX 75202-3797

Nancy Hamilton, Esq.
Jackson Walker, L.L.P.
1401 McKinney
Suite 1900
Houston, TX 77010

George L. McWilliams, Esq.
Patton, Haltom, Roberts, McWilliams & Greer, L.L.P.
Century Plaza
Suite 400
St. Michaels Drive
Texarkana, TX 75505

Victor F. Hlavinka

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

SCOTT O'GRADY,                         §
                                       §
        Plaintiff,                     §
                                       §
                                       §   CIVIL ACTION NO. 502cv173 (Folsom)
v.                                     §
                                       §   JURY
TWENTIETH CENTURY FOX                  §
FILM CORPORATION, and                  §
DISCOVERY COMMUNICATIONS, INC.,        §
                                       §
        Defendants.                    §

ATTACHMENTS TO
DEFENDANT DISCOVERY COMMUNICATIONS, INC.'S OBJECTIONS
TO THE REPORT AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE

Robert Alan Anderson Deposition Excerpts

Diane Cairns Deposition Excerpts

Charles Corzine Deposition Excerpts

Thomas Mills Deposition Excerpts

Scott O'Grady Deposition Excerpts

Robert Parsons Deposition Excerpts

Kelly Patterson Deposition Excerpts

| | |
|---|---|
| Tab 44 | March 22, 2002 Letter from BBC transmitting BBC contract with O'Grady to O'Grady (O'Grady Deposition Ex. 44) |
| Tab 45 | Agreement between BBC and O'Grady (O'Grady Deposition Ex. 45) |
| Tab 136 | Speaking Engagements for Calendar Year 2001 for Scott O'Grady (O'Grady Deposition Ex. 136) |
| Tab 137 | Speaking Engagements for Calendar Year 2002 for Scott O'Grady (O'Grady Deposition Ex. 137) |

Tab 335      Videotape entitled November 28, 2001 Broadcast of the Discovery Channel
             Documentary "Behind Enemy Lines: The Scott O'Grady Story" including all
             advertisements (Bates No. DCI 00335)

Tab 335A     Certified transcript of Videotape Ex. 335

Page 1

1           CIVIL ACTION NO. 502 CV 173

2    SCOTT O'GRADY,          )  IN THE UNITED STATES DISTRICT

3        Plaintiff,          )              COURT

4           v.               )

5    TWENTIETH CENTURY FOX    )

6    FILM CORPORATION,        )  FOR THE EASTERN DISTRICT

7    and DISCOVERY            )          OF TEXAS

8    COMMUNICATIONS, INC.,    )

9        Defendants.          )     TEXARKANA DIVISION

10   ————————————————————————————————————————————————

11              ORAL DEPOSITION OF

12            ROBERT ALAN ANDERSON

13                 May 7, 2003

14   ————————————————————————————————————————————————

15

16        THE ORIGINAL OF THIS TRANSCRIPT

17         WILL BE IN THE CUSTODY OF:

18

19            C. W. FLYNN, ESQ.

20         Locke, Liddell & Sapp

21            2200 Ross Avenue

22              Suite 2200

23         Dallas, Texas 75201

24            (214) 740-8654

25

Page 38

1   movie and in the Discovery Channel program?
2      A.  I did not ask her that.
3      Q.  Were you curious about that?
4      A.  No.
5      Q.  It seemed like just a coincidence to you?
6      MS. HANDMAN: Objection as to form.
7      BY MR. FLYNN:
8      Q.  Did it occur to you that this was simply a
9   coincidence?
10     A.  At that time.
11     Q.  At the time you were working on the
12  project?
13     A.  Those early stages of the project.
14     Q.  Okay. At any point in time, did you
15  discuss with anyone, other than your lawyer, how it
16  was that the same three words, "Behind Enemy Lines,"
17  appeared in both the Discovery Channel program title
18  and in the Fox movie?
19     MS. HAMILTON: Objection to form.
20     THE WITNESS: I don't understand.
21     BY MR. FLYNN:
22     Q.  At any point in time did you discuss with
23  anyone, other than your lawyer, how it came about or
24  why it was that the same three words, "Behind Enemy
25  Lines," was in both the Discovery Channel program

Page 39

1   title and in the Fox movie?
2      MS. HAMILTON: Objection to form.
3      THE WITNESS: The answer to that question
4   is no.
5      BY MR. FLYNN:
6      Q.  Okay. So the only conversation you ever
7   had about that subject was with Ms. Baquet?
8      A.  Yes.
9      Q.  And did she provide you with any
10  explanation as to why -- strike that.
11         Did she provide you as to any understanding
12  that she had as to how it was that the same three
13  words appeared in the title of the Discovery Channel
14  program and in the disk -- and in the Fox movie?
15     A.  No.
16     Q.  Are you aware that -- that when the
17  Discovery Channel program about Mr. O'Grady was first
18  produced, it was produced by the BBC?
19     A.  Yes.
20     Q.  Do you know whether there was a different
21  title to the show back at the time it was first made
22  by the BBC?
23     A.  Yes.
24     Q.  What's your understanding about that?
25     A.  That when it aired on the BBC, it was

Page 40

1   called something else. I don't remember what it was
2   called.
3      Q.  Fortune Favors The Brave, does that sound
4   familiar?
5      A.  No.
6      Q.  Okay. Do -- do you have any understanding
7   as to why the title of the program changed from what
8   it was originally called when it was produced by the
9   BBC to the Behind Enemy Lines Scott O'Grady title
10  that was used in the fall of 2001?
11     MS. HANDMAN: Objection as to form.
12     THE WITNESS: Can you reform that?
13     BY MR. FLYNN:
14     Q.  Yeah. Do you -- do you have any
15  understanding as to how -- do you have any
16  understanding as to how the title Behind Enemy Lines,
17  The Scott O'Grady Story, came to be used?
18     A.  No.
19     Q.  Did you ever ask anyone?
20     A.  No.
21     Q.  Do you know how long Discovery has used the
22  title Behind Enemy Lines, The Scott O'Grady Story?
23     A.  I think since they've acquired it.
24     Q.  From the BBC?
25     A.  Yes.

Page 41

1      Q.  What did you do next in terms of your
2   efforts on this project?
3      A.  Let's see, formulate graphics. Then I
4   started writing script for the bumps, the other
5   interstitials -- what we call interstitials or the
6   bumps.
7      Q.  The bump-ins and the bump-outs that you
8   described earlier?
9      A.  Yes.
10     Q.  Now, you used the word interstitial.
11  What's an interstitial?
12     A.  Interstitial to -- to my understanding is
13  any of the on-air material that happens within the
14  complete one-hour viewing of that program or event.
15     Q.  Does -- does interstitial refer to
16  newly-created material?
17     A.  Yes.
18     Q.  Did you create new material that was
19  interstitials?
20     A.  Yes.
21     Q.  Did you write the script for the
22  interstitials?
23     A.  Yes.
24     Q.  Did anyone else on this project write any
25  of the script other than you?

Esquire Deposition Services
Phone (214) 965-9200

703 McKinney Avenue, Suite 320
(800) 852-9737

Dallas, Texas 75202
Fax (214) 865-9205
380ab471-378c-49af-a4c6-62e67ddce104

**Page 106**

CHANGES AND SIGNATURE
PAGE LINE   CHANGE                    REASON

1
2
3 _____
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

**Page 107**

1        I, ROBERT ALAN ANDERSON, have read the
2  foregoing deposition and hereby affix my signature
3  that same is true and correct, except as noted above.
4
5
6            _____
7  THE STATE OF _____ )
8  COUNTY OF _____ )
9
10       Before me, _____, on
11  this day personally appeared ROBERT ALAN ANDERSON,
12  known to me (or proved to me on the oath of or
13  through _____ (description of identity
14  card or other document) to be the person whose name
15  is subscribed to the foregoing instrument and
16  acknowledged to me that he executed the same for the
17  purposes and consideration therein expressed.
18       (Seal) Given under my hand and seal of office
19  this _____ day of _____, 20 ___.
20
21            NOTARY PUBLIC IN AND FOR
22            THE STATE OF _____
23
24
25

**Page 108**

1              CIVIL ACTION NO. 502 CV 173
2  SCOTT O'GRADY,        ) IN THE UNITED STATES DISTRICT
3    Plaintiff,           )    COURT
4    v.                   )
5  TWENTIETH CENTURY FOX )
6  FILM CORPORATION,     ) FOR THE EASTERN DISTRICT
7  and DISCOVERY          )    OF TEXAS
8  COMMUNICATIONS, INC., )
9    Defendants.    ) TEXARKANA DIVISION
10
11            REPORTER'S CERTIFICATION
12      ORAL DEPOSITION OF ROBERT ALAN ANDERSON
13               MAY 7, 2003
14       I, Cindy L. Sebo, Registered Merit Reporter,
15  Registered Professional Reporter and Certified
16  Realtime Reporter, hereby certify to the following:
17       That the witness, ROBERT ALAN ANDERSON, was
18  duly sworn by the officer and that the transcript of
19  the deposition is a true record of the testimony
20  given by the witness;
21       That the deposition transcript was submitted
22  on _____ to the witness or to the
23  attorney for the witness for examination, signature,
24  and return to me by _____;
25       That pursuant to information given to the

**Page 109**

1  deposition officer at the time said testimony was
2  taken, the following includes all parties of record
3  and the amount of time used by each party at the
4  deposition:
5       C. W. FLYNN, ESQ., Attorney for Plaintiff,
6  Scott O'Grady: 9:44 AM - 10:58 AM; 12:08 PM -
7  1:27 PM;
8       I further certify that I am neither
9  counsel for, related to, nor employed by any of
10  the parties in the action in which this proceeding
11  was taken, and further that I am not financially or
12  otherwise interested in the outcome of this action.
13       Further certification requirements pursuant
14  to Rule 203 of TRCP will be complied with after they
15  have occurred.
16       Certified to by me on this _____ day of
17  _____, 20 ___.
18
19
20       Cindy L. Sebo RMR, RPR, CRR
21       Esquire Deposition Services
22       1019 19th Street, N.W., Suite 620
23       Washington, D.C. 20036
24       (202) 429-0014
25

28 (Pages 106 to 109)

Esquire Deposition Services
Phone (214) 965-9200

703 McKinney Avenue, Suite 320
(800) 852-9737

Dallas, Texas 75202
Fax (214) 865-9205
380ab471-378c-49af-a4c6-62e67ddce104

# Diane Cairns

Page 1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

SCOTT O'GRADY,                    )
                                  )
              Plaintiff,          )
                                  )
     vs.                          )    No.  502CV173
                                  )
TWENTIETH CENTURY FOX FILM        )
CORPORATION, and DISCOVERY        )
COMMUNICATIONS, INC.,             )
                                  )
              Defendants.         )
_____ )

DEPOSITION OF DIANE CAIRNS
Los Angeles, California
Thursday, May 1, 2003

Reported by:
LORI SCINTA, RPR
CSR No. 4811
JOB No. 883179

---

Page 2

1           UNITED STATES DISTRICT COURT
2        FOR THE EASTERN DISTRICT OF TEXAS
3                TEXARKANA DIVISION
4    SCOTT O'GRADY,                    )
                                       )
5                  Plaintiff,          )
                                       )
6         vs.                          )    No.  502CV173
                                       )
7    TWENTIETH CENTURY FOX FILM        )
     CORPORATION, and DISCOVERY        )
8    COMMUNICATIONS, INC.,             )
                                       )
9                  Defendants.         )
     _____ )
10
11
12
13
14
15        Videotaped deposition of DIANE CAIRNS, taken
16   on behalf of Defendant Twentieth Century Fox Film
17   Corporation, at 865 South Figueroa Street,
18   24th Floor, Los Angeles, California, beginning at
19   4:06 P.M. and ending at 6:28 P.M. on Thursday,
20   May 1, 2003, before LORI SCINTA, RPR, Certified
21   Shorthand Reporter No. 4811.
22
23
24
25

---

Page 3

1    APPEARANCES:
2
3    For Plaintiff:
4
         LOCKE LIDDELL & SAPP LLP
5         BY:  C.W. PETER FLYNN, IV
          Attorney at Law
6         2200 Ross Avenue, Suite 2200
          Dallas, Texas 75201-6776
7         (214) 740-8654
          E-mail:  cwflynn@lockeliddell.com
8
9    For Defendant Discovery Communications, Inc.:
10
11        DAVIS WRIGHT TREMAINE LLP
          BY:  LAURA R. HANDMAN
12        Attorney at Law
          1500 K Street, N.W., Suite 450
13        Washington, D.C. 20005-1262
          (202) 508-6624
14        E-mail:  laurahandman@dwt.com
15
16   For Defendant Twentieth Century Fox Film Corporation:
17
         JACKSON WALKER L.L.P.
18        BY:  NANCY W. HAMILTON
          Attorney at Law
19        1401 McKinney, Suite 1900
          Houston, Texas 77010
20        (713) 752-4200
          E-mail:  nhamilton@jw.com
21
22
23
24
25

---

Page 4

1    APPEARANCES (Continued):
2
3    For the deponent:
4
         INTERNATIONAL CREATIVE MANAGEMENT, INC.
5         BY:  RICK LEVY
          Attorney at Law
6         8942 Wilshire Boulevard
          Beverly Hills, California 90211
7         (310) 550-4046
          E-mail:  rlevy@icmtalent.com
8
9
     Also Present:
10
11        DISCOVERY COMMUNICATIONS, INCORPORATED
          BY:  LAURA YAGER-KATZ
12        Attorney at Law
          One Discovery Place
13        Silver Spring, Maryland 20910-3354
          (240) 662-3536
14        E-mail:  laura_yager-katz@discovery.com
15
16   Videographer:
17
         STAN BEVERLY
18        ESQUIRE DEPOSITION SERVICES
          6222 Wilshire Boulevard
19        Los Angeles, California 90048
          (800) 640-2461
20
21
22
23
24
25

---

1 (Pages 1 to 4)

## Diane Cairns

1    Q   Yes.

2    A   There it is.  It's on the bottom.  Okay.  I'm

3  sorry?

4    Q   You were involved in the Orion contract; is

5  that correct?

6    A   Uh-huh.

7    Q   And you were involved in -- with respect to

8  this draft term sheet for Motion Picture Corporation of

9  America.

10   A   Uh-huh.

11   Q   Can you explain to me why they both have the

12  same date, or what was going on at that time?

13   A   Well, I think -- the question you're asking is

14  the relationship between Motion Picture Company and

15  Orion Pictures.

16            (Telephone interruption.)

17       THE WITNESS:  Go ahead, if somebody needs to do

18  that.

19            Is that my phone?  Oh, it's my phone.  Sorry.

20  I thought it was off.  It will go away in a sec.

21            Motion Picture Corporation at that particular

22  time was either involved when -- or concluded an

23  arrangement with Orion Pictures.

24            And so if you're asking me why the two

25  different names, I would imagine that they were a matter

1  of business affairs' confusion as to what the auspice of

2  that arrangement was.

3  BY MS. HAMILTON:

4    Q   Were they the same entity, do you know?

5       MR. LEVY:  Objection.  Lacks foundation.

6       THE WITNESS:  We treated them as such, but no.

7  That's -- I didn't work at Orion Pictures and I

8  didn't work at Motion Picture Corporation so I can't

9  tell you --

10  BY MS. HAMILTON:

11   Q   I just want your understanding of what you --

12  why these two contracts --

13   A   If you're asking me if I was making a deal with

14  one, was I making a deal with both of them, the answer

15  is yes.  But my primary focus, the deal I was making was

16  with Orion Pictures or Orion Pictures by any other name.

17   Q   Okay.  Is Motion Pictures of America still in

18  existence today, to your knowledge?

19   A   I don't know.  I believe it is in a different

20  form.

21   Q   And do you know whether Orion Pictures is in

22  business today?

23   A   I don't know.

24   Q   Did you ever have any communications with

25  Scott O'Grady as to why Orion Pictures did not make a

1  theatrical release of the book Return With Honor?

2    A   I don't have a specific recollection of

3  why.  I'm sure we had a conversation that it didn't

4  happen, but -- but I don't recall why, because whys in

5  show business are hard to define, anyway.

6    Q   Did he ever contact you about the fact that

7  Orion Pictures had not made a theatrical movie of his

8  book?

9    A   Yes, he did.

10   Q   When was that contact?

11   A   This is so long ago.  I don't want to guess.

12       MR. LEVY:  You shouldn't.

13       THE WITNESS:  Okay.  Let me not guess.

14  BY MS. HAMILTON:

15   Q   Do you in your own mind have an understanding

16  of why that movie was -- the Orion Pictures movie wasn't

17  made?

18       MR. FLYNN:  Object to form.

19       THE WITNESS:  I could venture guesses.

20  BY MS. HAMILTON:

21   Q   Do you have a personal opinion as to why the

22  movie was never made?

23       MR. LEVY:  Objection.

24       MR. FLYNN:  Form. .

25  BY MS. HAMILTON:

1    Q   You can still answer.

2       MR. LEVY:  If you have an opinion.

3       THE WITNESS:  Yeah, I have an opinion.

4  BY MS. HAMILTON:

5    Q   I'd like to know what your opinion is.

6    A   Yeah.  Orion folded.

7    Q   Has Scott O'Grady contacted you about this

8  litigation?

9    A   Not since it was official.

10   Q   Not since --

11   A   Well, I -- yes, he contacted me in January to

12  say that there may be something coming forward.  That's

13  all that was said.

14   Q   Okay.  Did you have any -- you said -- did you

15  meet with him in Las Vegas?

16   A   Yes.

17   Q   Have you met with him personally since that

18  meeting in Las Vegas?

19   A   Not that I recall.

20   Q   Again, what were the circumstances of the

21  meeting in Las Vegas?

22   A   I think it was simply, "Gee, after all this

23  time, we should have met."

24            So I was there on a social thing and he was

25  there giving a motivational speech to somebody, and we

13 (Pages 49 to 52)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

```
SCOTT O'GRADY,              )
            Plaintiff,     )
                           )  Civil Action
vs.                        )  No. 502CV173
                           )
TWENTIETH CENTURY FOX      )
FILM CORPORATION, and      )
DISCOVERY COMMUNICATIONS,  )
INC.,                      )
            Defendants.    )
--------------------------- )
```

Videotaped Deposition of:

CHARLES LOUIS CORZINE

Taken on behalf of Defendant

June 11, 2003

---

VOWELL & JENNINGS
Court Reporting Services
Suite 328 Washington Square
222 Second Avenue North
Nashville, Tennessee 37201
(615) 256-1935

---

**APPEARANCES**

For the Plaintiff:
    SCOTT HASTINGS
    Attorney at Law
    Locke, Liddell & Sapp
    2200 Ross Avenue
    Suite 2200
    Dallas, TX 75201
    (Present By Telephone)

For the Defendant Twentieth Century Fox
Film Corporation:
    CHARLES L. BABCOK
    NANCY W. HAMILTON
    Attorneys at Law
    Jackson, Walker
    1401 McKinney, Suite 1900
    Houston, TX 77010
    713/752-4200

For the Defendant Discovery Communications,
Inc.:
    CONSTANCE M. PENDLETON
    Attorney at Law
    Davis, Wright, Tremaine
    Suite 450
    1500 K Street, NW
    Washington, DC 20005-1272
    202/508-6629

Videotaped by:
    Matthew Coble
    VCE, Inc.
    2804 Foster Avenue
    Nashville, Tennessee

---

**I N D E X**

Examination by Mr. Babcok      6

Examination by Ms. Pendleton      61

**EXHIBITS**

Exhibit No. 281 . . . . . . . . . . 23
Exhibit No. 282 . . . . . . . . . . 23
Exhibit No. 283 . . . . . . . . . . 37
Exhibit No. 284 . . . . . . . . . . 40
Exhibit No. 285 . . . . . . . . . . 52

---

**S T I P U L A T I O N**

The deposition of **CHARLES LOUIS CORZINE** was taken by counsel for the Defendants at the offices of Loeb & Loeb, 1906 Acklen Avenue, Nashville, Tennessee, beginning at 9:00 a.m. on June 11, 2003, for all purposes under the Federal Rules of Civil Procedure.

The formalities as to notice, caption, and reading and signing of the deposition are waived. All objections, except as to the form of the questions, are reserved to the hearing.

It is agreed that Nancy Satoloe, being a Notary Public and Court Reporter for the State of Tennessee, may swear the witness, and that the reading and signing of the completed deposition by the witness are waived.

\* \* \*

COPY

1  THE VIDEOGRAPH'  We are on the
2  record at 9:20 a.m.  This is the videotaped
3  deposition of Chaz Corzine taken in the
4  matter of Scott O'Grady versus Twentieth
5  Century Fox Film Corporation and Discovery
6  Communications, Inc. in the United States
7  District Court for the Eastern District of
8  Texas, Texarkana Division, Civil Action No.
9  502CV173 held in the offices of Loeb &
10  Loeb, 1906 Acklen Avenue, Nashville,
11  Tennessee 37212 on June 11th, 2003.
12  The court reporter is Nancy
13  Satoloe from the firm of Vowell & Jennings,
14  222 Second Avenue North, Nashville,
15  Tennessee 37201.
16  My name is Matt Coble from the
17  firm of VCE, Inc., 2604 Foster Avenue,
18  Nashville, Tennessee 37210, and I am the
19  videotape specialist.
20  Will counsel please introduce
21  themselves?
22  MR. BABCOK:  Scott, that's up to
23  you.  You get to announce yourself.
24  MR. HASTINGS:  Scott Hastings
25  here, Locke, Liddell & Sapp for the

5

1  plaintiff, S  O'Grady.
2  MR. BABCOK:  Charles Babcok and
3  Nancy Hamilton for the defendant Twentieth
4  Century Fox Film Corporation.
5  MS. PENDLETON:  Constance
6  Pendleton, Davis, Wright, Tremaine for the
7  defendant Discovery Communications, Inc.
8  MR. SULLIVAN:  And Robert
9  Sullivan of Loeb & Loeb for the deponent.
10  THE VIDEOGRAPHER:  Please swear
11  in the witness.
12
13  **CHARLES LOUIS CORZINE**
14  called as a witness, by and on behalf of
15  the Defendant, and, having been first duly
16  sworn, testified as follows:
17
18  **EXAMINATION**
19  BY MR. BABCOK:
20  Q.  Would you state your name for the
21  record, sir?
22  A.  Yes.  Charles Corzine.  I go by Chaz.
23  Q.  Okay, Mr. Corzine, are you still a
24  partner with Blanton, Harrell, Cooke &
25  Corzine?

6

1  A.  Corzine.
2  Q.  Corzine.  Sorry.  Is that correct?
3  A.  Yes.
4  Q.  All right.  I don't know if you've
5  ever had your deposition taken before, but
6  you have to answer yes or no.  If you say
7  uh-huh or huh-uh, it's hard for the court
8  reporter to get that down.
9  A.  Okay.
10  Q.  How long have you been a partner in
11  Blanton, Harrell, Cooke & Corzine?
12  A.  I have been with the company for 19
13  years and a partner for the last two.
14  Q.  So you became a partner sometime in
15  2001?
16  A.  Yes.
17  Q.  What is the nature of the business of
18  that partnership or that company?
19  A.  We manage primarily the recording
20  artists and authors.
21  Q.  And when you say you manage them,
22  what do you do to manage recording artists
23  and authors?
24  A.  19 years, and I'm still trying to
25  explain that.

7

1  Basically, career direction, try and
2  -- career direction, career advice.
3  Q.  Would you tell me a little bit about
4  your educational background, please, sir?
5  A.  I have a degree in Youth Ministry
6  from Greenville College.  It's a small
7  school in Greenville, Illinois.
8  Q.  No postgraduate work?
9  A.  No.
10  Q.  When did you graduate from Greenville
11  College?
12  A.  1981.
13  Q.  Could you tell me your work history
14  following your graduation from college in
15  1981?
16  A.  Yes.  Straight out of college I moved
17  to Atlanta and worked at a small Christian
18  booking agency, called the Malcolm
19  Greenwood Agency, and that was as a booking
20  agent.
21  Q.  Okay.
22  A.  And then --
23  Q.  And how long did you do that?
24  A.  Just for a year.
25  Q.  And a booking agent, just generally

8

1  never discussed a movie pr    ct based on
2  the book "Good to Go" with you?
3  A.  No.  Not that I recall.
4        MR. BABCOK:  Okay.  That's all I
5  have right now.  The other lawyer may have
6  some questions, but thank you very much
7  Chaz, I appreciate it.  Thank you.  You can
8  have my mike.
9
10  BY MS. PENDLETON:
11  Q.  Good morning, Mr. Corzine.  I'm
12  Connie Pendleton from Davis, Wright,
13  Tremaine for Discovery Communications,
14  Inc., and I just have a couple of questions
15  for you.
16  A.  Okay.
17  Q.  Did there ever come a time when you
18  became aware that Discovery Communications
19  was airing a documentary about Scott
20  O'Grady's experience?
21  A.  I'm not aware who Discovery is.  I'm
22  sorry.
23  Q.  Are you aware of the Discovery
24  channel?
25  A.  Channel, yes.

61

1  Q.  Did yc    er become aware that a
2  documentary had been made about Scott
3  O'Grady's experience?
4  A.  Yes.
5  Q.  And when did you become aware of
6  that?
7  A.  I've seen it on TV.
8  Q.  And when did you see the documentary?
9  A.  Years ago.
10  Q.  Do you recall if it was before the
11  release of -- you saw it live on TV?
12  A.  Yes.
13  Q.  Do you know if you saw the November
14  28th broadcast of the documentary aired on
15  Discovery channel?
16  A.  November 28th, this year?
17  Q.  2001.
18  A.  I have no idea.
19  Q.  Do you remember if the documentary
20  contained promotions for Behind Enemy
21  Lines, the movie by Fox?
22  A.  No.
23        MR. HASTINGS:  Could you try to
24  get a little closer to the mike?  I'm not
25  hearing your questions.

62

1        THE WITNESS:  I'm sorry.  Yes.
2  BY MS. PENDLETON:
3  Q.  So you don't recall when you saw the
4  document?
5  A.  No.  I don't.  It was aired many
6  times, if I recall.
7  Q.  And you don't recall whether when you
8  saw it there were promotions for Fox's
9  movie Behind Enemy Lines aired?
10  A.  I don't recall ever seeing
11  promotions.
12  Q.  Did you ever discuss with Scott
13  O'Grady the documentary?
14  A.  Other than my kids were a fan of it.
15  I don't recall.
16  Q.  Did you ever give him any advice
17  about the airing of the documentary?
18  A.  No.
19  Q.  Did you ever talk to anyone at
20  Discovery about Scott O'Grady?
21  A.  No.
22  Q.  Did you ever discuss with Scott
23  O'Grady whether the Discovery documentary
24  would be helpful to him in getting
25  endorsements?

63

1  A.  No.
2  Q.  Have you ever seen the bio that was
3  prepared for Scott O'Grady on the
4  Washington Speakers Bureau Web site?
5  A.  No.
6  Q.  Did you ever discuss with Coca Cola
7  the fact that Scott O'Grady had appeared in
8  this Discovery Channel documentary?
9  A.  No.  I don't think so.
10    I don't.
11  Q.  Do you recall discussing with anyone
12  else when you were talking about
13  endorsements for Scott O'Grady that he had
14  appeared in a Discovery documentary?
15  A.  No.
16  Q.  Do you think that the fact that
17  O'Grady had appeared in a documentary would
18  be a hinderance in his getting
19  endorsements?
20  A.  No.
21  Q.  Do you think the fact that he had
22  appeared in a documentary would be helpful
23  in his getting endorsements?
24  A.  Yes.  In my opinion, yes.
25  Q.  In what respect do you think that it

64

1   would be helpful that he ha~ ~ppeared in
2   the Discovery documentary:
3   A.   Would further the celebrity of his
4   name. ~
5         MS. PENDLETON:  Thank you.  I
6   pass the witness.
7         MR. BABCOK:  Nobody outside of
8   Tennessee gets to ask questions.
9         MR. HASTINGS:  I don't have any
10  questions anyway.
11        MR. BABCOK:  That's all we have
12  for you, sir.  Thank you.
13        THE VIDEOGRAPHER:  This
14  concludes the video deposition of Chaz
15  Corzine.  We are off the record at 10:35.
16        (Discussion off the record)
17        (Whereupon, the deposition was
18  concluded at 10:35 a.m.)
19
20
21
22
23
24
25

65

FUR~ ~ER THIS DEPONENT SAITH NOT.


SWORN to before me when taken,
June 11, 2003.




_____

Nancy Satoloe, Notary Public

State of Tennessee at Large


My commission expires: 10-25-03

66

REPORTER'S CERTIFICATE


        I, Nancy Satoloe, Notary Public
and Court Reporter, do hereby certify that
I recorded to the best of my skill and
ability by machine shorthand all the
proceedings had in the foregoing
transcript, and that said transcript is a
true, accurate, and complete transcript to
the best of my ability.
        I further certify that I am not
an attorney or counsel of any of the
parties, nor a relative or employee of any
attorney or counsel connected with the
action, nor financially interested in the
action.


        SIGNED this 12th day of June,
2003.


        _____

        Nancy Satoloe

        Court Reporter

67

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF TEXAS

3                   TEXARKANA DIVISION

4

5    SCOTT O'GRADY,                    )

6                  Plaintiff,          )

7           vs.                        )   Civil Action No.

8    TWENTIETH CENTURY FOX FILM        )   502CV173

9    CORPORATION, and DISCOVERY        )   Pages 1 to 140

10   COMMUNICATIONS, INC.,             )

11                  Defendants.        )

12                                     )

13

14

15

16

17            DEPOSITION OF THOMAS R. MILLS

18                    TAKEN ON

19            WEDNESDAY, MAY 14, 2003

20

21

22

23

24   Reported by:  PHILIP D. NORRIS

25            CSR NO. 4980

12:09:11 1  this document?
12:09:12 2     A. It says "Missing in Action."
12:09:14 3     Q. It says: "999/Discovery Channel video,
12:09:18 4  'Missing in Action'"; is that correct?
12:09:21 5     A. Yes. Yes, it does.
12:09:26 6     MR. BOWLES: Laura, have you produced this
12:09:27 7  document?
12:09:28 8     MS. HANDMAN: No, I'm producing it today.
12:09:30 9  I only got it fairly recently, and I don't know if
12:09:33 10  it was called for.
12:09:36 11     MR. BOWLES: All right. Well, it's not
12:09:38 12  Bates stamped.
12:09:39 13     MS. HANDMAN: No, that's true.
12:09:40 14     MR. BOWLES: You don't think that this
12:09:41 15  document would have been called for?
12:09:44 16     MS. HANDMAN: I don't know. Why don't we
12:09:45 17  take it up at another time.
12:09:48 18     MR. BOWLES: Are there any other documents
12:09:50 19  that you've received?
12:09:52 20     MS. HANDMAN: I think we can talk about it
12:09:53 21  at another time. I don't want to take up this
12:09:54 22  witness' deposition.
12:09:57 23     MR. BOWLES: Good point.
24  BY MS. HANDMAN:
12:10:03 25     Q. Mr. Mills, on Exhibit 188, where it says

110

12:10:06 1  "Tom Mills, Track Record Enterprises, 15 Olympic
12:10:11 2  Plaza, 11500 Olympic Boulevard, Fourth Floor, Los
12:10:16 3  Angeles, California 90064," would that be where you
12:10:19 4  were located on -- in April 1997?
12:10:23 5     A. That's where I was located, but the address
12:10:25 6  is incorrect.
12:10:26 7     Q. Aha. What should the address have been?
12:10:29 8     A. Well, there should not be a 15 Olympic
12:10:31 9  Plaza. That could have been confusing to the
12:10:34 10  delivery people.
12:10:35 11     Q. Was 11500 Olympic Boulevard correct?
12:10:38 12     A. 11500 is correct.
12:10:44 13     Q. Why did Scott O'Grady want you to have this
12:10:47 14  document, copy of this documentary?
12:10:49 15     A. You'd have to ask Scott.
12:10:51 16     Q. Did you ever have a discussion with him
12:10:53 17  about the fact that there was a documentary that had
12:10:56 18  been made about his life?
12:10:58 19     A. I don't recall any discussion, other than
12:11:01 20  the fact that he might want me to have it.
12:11:04 21     Q. Did he discuss whether he wanted you to
12:11:10 22  have it because he thought it might be helpful in
12:11:12 23  obtaining commercial endorsements?
12:11:17 24     A. I can't recall.
12:11:19 25     Q. You mentioned that you prepared various

111

12:11:23 1  biograph. ...material for Mr. O'Grady at various
12:11:27 2  times, but you haven't produced it today, but you
12:11:32 3  said you might still have some; is that correct?
12:11:35 4     A. I wasn't -- I wasn't asked for it, but from
12:11:38 5  time to time I would -- I did prepare just a summary
12:11:41 6  so that people could be better informed as to who
12:11:44 7  Scott was.
12:11:45 8     Q. And have you ever seen the biography that
12:11:48 9  has been prepared for Mr. O'Grady by the Washington
12:11:51 10  Speakers Bureau?
12:11:55 11     A. I briefly looked at it online, you know, a
12:11:57 12  few months ago when I checked out Scott on -- just
12:12:01 13  to see how he was positioned on the web site.
12:12:04 14     Q. And do you remember if the Washington
12:12:06 15  Speakers Bureau referred to the Discovery Channel's
12:12:14 16  broadcast --
12:12:15 17     A. I have no idea.
12:12:16 18     Q. Let me finish the question.
12:12:17 19     A. Okay.
12:12:19 20     Q. -- the Discovery Channel's broadcast of
12:12:25 21  "Behind Enemy Lines, The Scott O'Grady Story"?
12:12:25 22     A. I'm not aware of that.
12:12:26 23     Q. Did the bio that you prepared for
12:12:30 24  Mr. O'Grady, did it refer to the Discovery Channel
12:12:33 25  broadcast of "Behind Enemy Lines, The Scott O'Grady

112

12:12:37 1  Story"?
12:12:37 2     A. I don't think I ever mentioned it. That's
12:12:39 3  just off the top of my head. Because I prepared a
12:12:42 4  few things, but it wasn't to me the most important
12:12:45 5  thing to mention about Scott.
12:12:47 6     Q. Was it an important thing even if not the
12:12:50 7  most important?
12:12:53 8     A. That's speculation. I mean, it's a fact
12:12:56 9  that he had a biography.
12:12:58 10     Q. Well, you mentioned before that all
12:13:00 11  celebrities and other people are happy to be on
12:13:06 12  "Entertainment Tonight."
12:13:06 13     A. Yes.
12:13:06 14     Q. And is that because it gives them
12:13:08 15  visibility?
12:13:09 16     MS. FOGO: Object to the form of the
12:13:09 17  question.
18  BY MS. HANDMAN:
12:13:11 19     Q. Why are they happy to be on "Entertainment
20  Tonight"?
12:13:13 21     MS. FOGO: Object to the question.
22  BY MS HANDMAN:
12:13:15 23     Q. If you know.
12:13:18 24     A. You know, I guess to receive coverage.
12:13:23 25     Q. And would that also be true for a

113

29

12:13:26 1 biographical documentary      discovery about Scott
12:13:30 2 O'Grady?
12:13:31 3     MS. FOGO: Object to the form of the
12:13:31 4 question. He has no personal knowledge.
          5 BY MS. HANDMAN:
12:13:35 6     Q. Well, you represented Mr. O'Grady in
12:13:37 7 seeking commercial endorsements; correct?
12:13:40 8     A. Yes.
12:13:40 9     Q. And did you believe that the fact that he
12:13:44 10 appeared -- there was a documentary that appeared on
12:13:48 11 Discovery Channel about him would be a helpful fact
12:13:52 12 in trying to obtain commercial endorsements?
12:13:56 13     A. I don't think it would be very important,
12:14:00 14 just off the top of my head, and I don't think I
12:14:02 15 ever mentioned it in a bio for Scott. But, you
12:14:07 16 know, and it depends on the quality of the
12:14:13 17 biography. I mean, there are a lot of factors that
12:14:13 18 go into things. But if, you know, if it were well
12:14:17 19 done, then it certainly wouldn't hurt.
12:14:19 20     Q. Well, I think you did say it was a
12:14:20 21 well-done biography.
12:14:22 22     A. Yes.
12:14:23 23     Q. Did Captain O'Grady approve the bios that
12:14:28 24 you did for him?
12:14:32 25     A. Yes.

114

12:14:32 1     Q. And you said you might and still have some
12:14:35 2 of that material?
12:14:37 3     A. I can check. I'm sure I have at least a
12:14:40 4 couple of them, yeah.
12:14:42 5     Q. Do you recall if any of your discussions
12:14:44 6 with the potential -- the organizations that were
12:14:49 7 considering using Mr. O'Grady for commercial
12:14:52 8 endorsement or spokesman if any -- you discussed
12:14:55 9 with any of those companies the fact that his
12:14:59 10 biography had appeared on Discovery Channel?
12:15:03 11     A. I kind of doubt it. I mean, I can't recall
12:15:06 12 my discussions, you know, from six years ago, and
12:15:10 13 when they happened, but I would tend to doubt -- I
12:15:13 14 would look at that as a very important to --
12:15:16 15 obviously it's -- you know, I don't want to
12:15:18 16 denigrate it, but I don't think I would have started
12:15:20 17 the conversation off with that.
12:15:28 18     Q. Were you surprised to see it mentioned on
12:15:29 19 the web site bio, the Washington Speakers Bureau?
12:15:35 20     A. I don't recall seeing it mentioned.
12:15:37 21     Q. Do you ever think that the fact that there
12:15:41 22 was a biography of Mr. O'Grady appearing on the
12:15:46 23 Discovery Channel was a hindrance to your obtaining
12:15:52 24 a commercial endorsement opportunity for him?
12:15:54 25     A. I didn't think about it one way or the

115

12:15:57 1 other.
12:15:57 2     Q. Well, when you think about it today, do you
12:15:59 3 think it would be a hindrance?
12:16:01 4     A. Probably not a hindrance because it was
12:16:03 5 well done.
12:16:05 6     Q. Did Mr. O'Grady --
12:16:08 7     A. Actually, I'd like to revise that. Okay?
12:16:17 8 I don't think it was -- I think it would have been
12:16:20 9 in Scott's interest probably not to have done, not
12:16:23 10 to have allowed that to have been done at the time
12:16:26 11 it was done.
12:16:27 12     Q. In 1997 when it aired?
12:16:30 13     A. No. I'm talking about when it was -- when
12:16:32 14 the, you know, the discussions or negotiations were
12:16:36 15 made to do it.
12:16:37 16     Q. I see. That was in --
12:16:39 17     A. 1995 or six, whatever.
12:16:42 18     Q. That was with the BBC you mean?
12:16:44 19     A. Yeah. Because I think if I were involved
12:16:45 20 with him at that time, I would say that the fact
12:16:47 21 probably should have this be a major motion picture.
12:16:51 22 So I think that to some degree it may have been a
12:16:54 23 hindrance to him because it, you know -- I would
12:17:02 24 have been -- his story would not have been told by
12:17:06 25 anybody then.

116

12:17:08 1     Q. You said you were aware that he had sold
12:17:10 2 his motion picture rights; correct?
12:17:14 3     A. I didn't get into that with him, but I knew
12:17:17 4 that that had been previously done.
12:17:20 5     Q. And --
12:17:23 6     A. But you asked me a question about whether
12:17:25 7 or not having this, and I would say that the fact
12:17:27 8 that he had this done -- I mean, it was well done by
12:17:31 9 the BBC. However, if I had been in a position where
12:17:36 10 I had been talking to him back whenever it was
12:17:38 11 commissioned, I would have -- I would have advised
12:17:41 12 him to hold out for a motion picture deal, but I
12:17:45 13 didn't get into that area with him so it's all
12:17:47 14 speculation.
12:17:48 15     Q. Do you know whether he agreed to
12:17:51 16 participate in the documentary prepared by the BBC?
12:17:56 17     A. It would only be an assumption.
12:17:59 18     Q. Do you remember watched it back then
12:18:01 19 that he appeared in the documentary?
12:18:03 20     A. I remember that he appeared in that.
12:18:05 21     Q. And do you remember that his father also
12:18:07 22 appeared in the documentary?
12:18:10 23     A. I didn't remember that.
12:18:11 24     Q. You remember that his sister appeared in
12:18:12 25 the documentary?

117

30

| | | |
|---|---|---|
| 12:46:54 | 1 | MR. BOWLES: I have questions. |
| 12:46:55 | 2 | MS. HANDMAN: We're done. |
| 12:46:57 | 3 | THE WITNESS: Thank you. Thank you very |
| 12:46:58 | 4 | much. |
| 12:46:58 | 5 | MR. BOWLES: Appreciate your time. |
| 12:47:01 | 6 | THE VIDEOGRAPHER: Here ends Tape No. 2 and |
| 12:47:03 | 7 | concludes Volume I in the deposition of Tom Mills. |
| 12:47:06 | 8 | The number of tapes used was two and those tapes |
| 12:47:10 | 9 | will be retained by Legalink. We are off the |
| 12:47:13 | 10 | record. The time on the monitor is 12:47. |
| 12:49:23 | 11 | (Discussion held off the record.) |
| 12:49:32 | 12 | MS. FOGO: We want a copy of the transcript |
| 12:49:33 | 13 | for his review and signature. Send it to me, |
| 12:49:46 | 14 | Credence. |
| 12:51:43 | 15 | THE REPORTER: Would you like a copy of the |
| 12:51:45 | 16 | transcript, counsel? |
| 12:51:47 | 17 | MR. BOWLES: Yes. |
| 12:51:51 | 18 | MS. HANDMAN: Yes. |
| | 19 | /// |
| | 20 | /// |
| | 21 | /// |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

138

1    STATE   CALIFORNIA   )

2    COUNTY OF LOS ANGELES  )  ss.

3

4        I, Philip D. Norris, a Certified Shorthand

5    Reporter for the State of California, do hereby

6    certify:

7        I am the deposition officer that

8    stenographically recorded the testimony in the

9    foregoing deposition;

10       Prior to being examined the deponent was

11   first duly sworn by me;

12       The foregoing transcript is a true record

13   of the testimony given;

14       Before completion of the deposition, review

15   of the transcript [ x ] was [   ] was not requested.

16   If requested, any changes made by the deponent (and

17   provided to the reporter) during the period allowed

18   are appended.

19

20   Dated

21

22

23            Philip D. Norris
             CSR NO. 4980

24

25

140

Declaration

1

2

3

4

5        I hereby declare I am the deponent in the

6    within matter; that I have read the foregoing

7    deposition and know the contents thereof, and I

8    declare that the same is true of my knowledge,

9    except as to the matters which are therein stated

10   upon my information or belief, and as to those

11   matters, I believe it to be true.

12       I declare under the penalties of perjury of

13   the State of California that the foregoing is true

14   and correct.

15       Executed on the   day of       , 2003

16   at                  , California.

17

18

19

         W i t n e s s

20

21

22

23

24

25

139

# In The Matter Of:

*O'Grady   v.*
*Twentieth Century Fox Film Corp.*

---

*Scott O'Grady*
*February 20, 2003*

---

*United American Reporting Services, Inc.*
*2725 Turtle Creek Blvd*
*Suite 200*
*Dallas, TX  75219*
*(214) 855-5300     FAX: (214) 855-1478*

*Original File 030220SO.TXT, 209 Pages*
*Min-U-Script® File ID: 2129154128*

**Word Index included with this Min-U-Script®**

Page 48

[1]    **A:** I had no involvement with making the movie.

[2] 20th Century Fox never came to me about making the

[3] movie. And as far as the making of the movie, it is

[4] definitely based off of my story and my experience.

[5] And 20th Century Fox has admitted that.

[6]    **Q:** Okay. But is the movie your story? Is Behind

[7] Enemy Lines —

[8]    **MR. BOWLES:** Objection to form.

[9]    **Q:** (BY MR. BABCOCK) — the movie your story?

[10]    **MR. BOWLES:** Objection, form.

[11]    **MR. BABCOCK:** Object to the prior answer

[12] as nonresponsive.

[13]    **A:** In what ways? I guess the question is — the

[14] reason, I don't — I want to be cooperative, but in

[15] what way is — I mean, that's a pretty general

[16] question.

[17]    **Q:** (BY MR. BABCOCK) Yeah, and it was provoked

[18] by — by your answer a few questions ago and some of

[19] the pleadings in the case. And I don't think I've

[20] gotten a responsive answer yet to that question. And I

[21] will try it one more time and we'll see where this

[22] goes.

[23]    But do you believe that the movie, Behind

[24] Enemy Lines, is your story?

[25]    **A:** In the essence that the movie was made off of

Page 49

[1] an American fighter pilot and the fact that I'm in a

[2] sit- — let me rephrase all that.

[3]    The fact that the movie was made off of

[4] an — off of a fighter pilot that was shot down in

[5] Bosnia and rescued in daylight by the Marines, yeah,

[6] the premise of the story, and that's why — you're

[7] asking a very general question here, and that's why

[8] it's very difficult to answer, is — is that the

[9] premise for making the movie was based off of my

[10] experience.

[11]    **Q:** Okay. There is a — there have been other

[12] literary works created based off your experience,

[13] correct?

[14]    **A:** Correct.

[15]    (Deposition Exhibit No. 13 marked.)

[16]    **Q:** (BY MR. BABCOCK) Okay. Let me show you one

[17] such example. This is Exhibit 13.

[18]    **A:** Uh-huh.

[19]    **Q:** That's the book that we talked about earlier

[20] by Mary Pat Kelly, called Good to Go, the rescue of

[21] Scott O'Grady from Bosnia?

[22]    **A:** Uh-huh.

[23]    **Q:** And Exhibit 13 is that book, correct?

[24]    **A:** That's correct.

[25]    **Q:** This has a picture on the cover that looks

Page 50

[1] very much like you, although you're better shaven

[2] today. That would be you on the cover, correct?

[3]    **A:** That is correct.

[4]    **Q:** And that's the same Scott O'Grady on the cover

[5] that is yourself, correct?

[6]    **A:** That is correct.

[7]    **Q:** All right. You say Mary Pat Kelly is a good

[8] friend of yours. Tell me about how you and Ms. Kelly

[9] became friends.

[10]    **A:** That would have been through Admiral Layton

[11] Smith.

[12]    **Q:** And did Admiral Smith introduce you to

[13] Ms. Kelly? Is that how it happened?

[14]    **A:** Not directly, no.

[15]    **Q:** Would it be fair to say that you met Ms. Kelly

[16] after you were rescued on June 8th, 1995?

[17]    **A:** Yeah, it would be fair to say that.

[18]    **Q:** And did you — did you become friends through

[19] this book project that she was engaged in?

[20]    **A:** I would say that that would be one of the ways

[21] we became friends.

[22]    **MR. BOWLES:** Chip, when you get to a

[23] point in your line of questioning, I think it would be

[24] a good time to take a break. We've been at it for

[25] about an hour and a half.

Page 51

[1]    **MR. BABCOCK:** Good. Let me just finish

[2] up. I've got a few things on the book.

[3]    **MR. BOWLES:** Just however you want to go.

[4]    **MR. BABCOCK:** Yeah.

[5]    **Q:** (BY MR. BABCOCK) The — would you agree that

[6] this book describes the events surrounding your being

[7] shot down in Bosnia and rescued by a whole bunch of

[8] people, but Marines on the ground?

[9]    **A:** I would say it describes some of the events,

[10] yes.

[11]    **Q:** Okay. And have you read this book?

[12]    **A:** Parts of it.

[13]    **Q:** Okay. The part dealing with you?

[14]    **A:** Just various parts.

[15]    **Q:** Okay. Did you consent to be interviewed by

[16] Ms. Kelly with respect to this book?

[17]    **A:** Yes, I did.

[18]    **Q:** Were those interviews tape recorded?

[19]    **A:** That's a good question. I can't remember how

[20] she recorded it.

[21]    **Q:** Okay. Were those interviews conducted in one

[22] session or multiple sessions?

[23]    **A:** I can't recall if there was more than one.

[24] But if there was, there wasn't — wasn't a multitude of

[25] them. In fact, if — if I recall it was just one

Page 84

[1] chose to?

[2]    A: Honestly, I would have to look at the contract
[3] to see the date.

[4]    Q: Okay. Was a movie ever made based on your
[5] book?

[6]    A: With which company?

[7]    Q: With Orion.

[8]    A: No.

[9]    Q: Why not?

[10]    A: I think you would have to ask the producers,
[11] to be honest with you.

[12]    Q: Do you have any understanding of why it was
[13] not made?

[14]    A: To my — to the best of my knowledge, the
[15] production company had internal problems and disbanded.

[16]    Q: Okay. Is there any other reason that you're
[17] aware of why the movie was not made?

[18]    A: I think that's the main reason.

[19]    Q: Okay. When there's a main reason sometimes
[20] there are other —

[21]    A: I really don't know of the other — any other.
[22] I mean, the production company that I was dealing
[23] with —

[24]    Q: Right.

[25]    A: — it disbanded and Orion got bought out by

Page 85

[1] MGM.

[2]    Q: Okay.

[3]    A: I would say those are two major

[4] contributing — those are two reasons.

[5]    Q: And are you aware of any other reason?

[6]    A: No, not really.

[7]    (Discussion off the record.)

[8]    (Deposition Exhibit 18 marked.)

[9]    Q: (BY MR. BABCOCK) Let me hand you Exhibit 18.
[10] And is this the agreement between yourself and Orion
[11] Pictures where the — where the movie rights to the —
[12] to the book, Return With Honor, were being sold?

[13]    A: I'm sorry, could you restate the question
[14] again?

[15]    Q: Sure. Whether it's the same question or not,
[16] but here's what I'm interested in.

[17]    Is Exhibit 18 the agreement between
[18] yourself and Orion Pictures with respect to the movie
[19] rights to the book, Return With Honor?

[20]    A: Yes.

[21]    Q: I notice on the last page of this document
[22] there's a thing that says, "Motion Picture Corporation
[23] of America guarantee." Is that — was that part of the
[24] agreement, this guarantee? I mean, was this how the
[25] document was tendered to you with that guarantee

Page 86

[1] attached to it?

[2]    A: That's a good question.

[3]    Q: I'm full of them today, aren't I?

[4]    A: I can't remember if — the previous page is
[5] where I signed.

[6]    Q: Yeah. And that is your signature on the
[7] previous page, right?

[8]    A: Right. Motion Picture Corporation of America
[9] is the production company —

[10]    Q: Okay.

[11]    A: — that disbanded.

[12]    Q: Okay.

[13]    A: Orion is — is the corporation that was going
[14] forward with this project.

[15]    Q: Okay.

[16]    A: But the — there are two separate entities.

[17]    Q: Got you.

[18]    A: I think that guarantee is more for Orion.

[19]    Q: Okay. Although it says it's to induce you,
[20] but anyway we won't get into that.

[21]    The — I'm interested in the money
[22] that — that changed hands here.

[23]    You got $250,000.00 less whatever ICM was
[24] entitled to from the — from this deal when you signed
[25] it; is that correct?

Page 87

[1]    I'm talking about the Orion Pictures
[2] contract.

[3]    A: Yes.

[4]    Q: Okay. And then the next item says there's —
[5] you were supposed to get $400,000.00 payable upon
[6] commencement of the principal photography of the
[7] picture. And you never got that, right?

[8]    A: No, I didn't.

[9]    Q: Okay. And it said $400,000.00 less the
[10] purchase price. So if they started filming you were
[11] going to basically get 150,000, right? Under this
[12] production bonus? I'm just trying to see if that's how
[13] it was — how it worked.

[14]    A: I'm sorry, the question is?

[15]    Q: Yeah. The question is, this — this
[16] subparagraph B says, "$400,000.00 payable upon
[17] commencement of principal photography of the picture
[18] less the purchase price." So I'm just trying to see if
[19] it's your understanding that you really weren't going
[20] to get $400,000.00 upon the commencement of the
[21] principal photography, you would really only get 150,
[22] because they had already paid the you purchase price,
[23] which was 250?

[24]    A: That would make sense.

[25]    Q: So your understanding and mine are the same?

Page 164

[1] A: Well, you stated a lot in that statement. As
[2] far as is — if the question is, was the helicopter in
[3] flight with somebody dangling below it while I was
[4] rescued to be extracted into the helicopter, the answer
[5] is no.

[6] Q: Let's — let's turn to the last one, which is
[7] 7.45. In the movie the — the movie the Owen Wilson
[8] character had indicated to Gene Hackman that he was
[9] going to resign. He didn't want to be in — didn't
[10] want to be in it anymore. And this scene I think
[11] depicts him crumpling up his letter of resignation
[12] which he had intended to hand in. And you didn't have
[13] any — any such conversations or thoughts about
[14] resigning, right?

[15] A: No.

[16] Q: Okay. So that's — that's another area where
[17] the — where the movie had — had a dramatic plot line,
[18] theme line that was completely different from your life
[19] story, right?

[20] A: I didn't have intention to resign, no.

[21] Q: And you know that the Owen Wilson character
[22] had become disenchanted with the military and had
[23] informed his commander, Mr. Hackman, that he was going
[24] to resign in a short — in short order, right?

[25] A: I recall that.

Page 165

[1] Q: Okay. And you had not been disenchanted with
[2] the military in any way, shape or form? In fact, one
[3] of the reasons you took active reserve is so you could
[4] keep flying your F-16's, right?

[5] A: That would be correct.

[6] (Deposition Exhibit 3 marked.)

[7] Q: (BY MR. BABCOCK) Let me hand you what has
[8] been marked as Exhibit 3. That's the book, Return With
[9] Honor, correct? The hard cover?

[10] A: Yes.

[11] Q: Okay. And that has — that bears a copyright
[12] notice of 1995, right?

[13] A: That would be copyright of 1995, yes.

[14] Q: Okay. And the phrase "Behind Enemy Lines" is
[15] no where contained on the book jacket of this — of
[16] this hard cover book, correct? Is that correct?

[17] A: That's correct.

[18] Q: Okay. And the title of your book is Return
[19] With Honor, correct?

[20] A: That's true.

[21] Q: Okay. And is that a phrase that — that just
[22] popped into your head or was that derived from
[23] something else? Some military expression or code of
[24] conduct or something?

[25] A: It was derived.

Page 166

[1] Q: Okay. What was it derived from?

[2] A: The 31st Fighter Wing.

[3] Q: And what about the 31st Fighter Wing was that
[4] derived from?

[5] A: If you look at the back of the book.

[6] Q: Uh-huh.

[7] A: 31st Fighter Wing was at Aviano Air Base.

[8] Q: And the patch for the 31st Fighter Wing
[9] featured the mythical figure — the mythical fighting
[10] dragon the wyvern and the motto, Return With Honor.
[11] And that's where you get the idea for your book, the
[12] title?

[13] A: From the words "Return With Honor," yes.

[14] Q: By the way, what is a wyvern?

[15] A: I don't know.

[16] Q: It's a new one on me.

[17] (Deposition Exhibit No. 4 marked.)

[18] Q: (BY MR. BABCOCK) Let me hand you what's been
[19] marked as Exhibit 4, which is the paperback. And was
[20] that published simultaneously with the hardback or did
[21] it come out some time later?

[22] A: That would have been after the hardback.

[23] Q: Okay. Do you know how much after the
[24] hardback?.

[25] I'm told typically people — authors and

Page 167

[1] publishers want to sell as many hardbacks as they can
[2] for the smooth price of 24.95, I noticed on your book,
[3] and then when those sales start to slide then they —
[4] then they introduce the paperback. Is that what
[5] happened with you?

[6] MR. BOWLES: I'm going to have to have
[7] that question read back. Can you — I'm going to
[8] object to form.

[9] MR. BABCOCK: I will restate it.

[10] Q: (BY MR. BABCOCK) Do you remember how long
[11] after the — the hardback was published that the
[12] paperback came out?

[13] A: To the best of my knowledge?

[14] Q: Uh-huh. This was all to the best of your
[15] knowledge, by the way.

[16] A: I'm thinking, to give you as accurate an
[17] answer as I can get.

[18] Q: Yeah.

[19] A: I think approximately a year.

[20] Q: Okay. And do you have a month that — that
[21] that would have been published? The paperback I'm
[22] talking about.

[23] A: I don't know the exact month at this time.

[24] Q: Would it be correct to say that you have not
[25] filed a trademark application for the phrase "Behind

Page 168

[1] Enemy Lines?"

[2] **A:** Not that I know of, I haven't.

[3] **Q:** Okay. Have you attempted to file any sort of

[4] registration, be it trademark, copyright, I don't know

[5] what else there is, patent, any — anything in order to

[6] register — domain name now, to register the phrase

[7] "Behind Enemy Lines?"

[8] **A:** Not to my knowledge.

[9] **Q:** So as far as you know — as far as you are

[10] concerned, you have the right to use the phrase as you

[11] see on the cover of your paperback, "Behind Enemy

[12] Lines," just as Discovery Channel had it to use on

[13] theirs and Fox had it to use on the movie?

[14] **MR. BOWLES:** I'm going to object to the

[15] question.

[16] **Q:** (BY MR. BABCOCK) Would that be correct?

[17] **A:** I need that question back.

[18] **Q:** Okay. I will try it again.

[19] As far as you're concerned, I'm just

[20] asking for you now.

[21] **A:** Uh-huh.

[22] **Q:** You have the right to use the phrase "Behind

[23] Enemy Lines" on your — on the cover of your paperback,

[24] right?

[25] **A:** As far as I know, yes.

Page 169

[1] **Q:** Okay. And Discovery Channel had the right to

[2] use the phrase "Behind Enemy Lines" on their

[3] documentary that was derived from the BBC broadcast?

[4] **A:** I don't know if there's a legal issue there or

[5] not.

[6] **Q:** Okay. And Fox had the right to use the phrase

[7] "Behind Enemy Lines" as far as you're concerned on

[8] their movie?

[9] **A:** As far as I know, I don't — I don't know if

[10] there's a legal issue there or not.

[11] **Q:** You're not aware of any, as you sit here, are

[12] you?

[13] **A:** Not that know of.

[14] **Q:** Okay. Just — we'll take his deposition next.

[15] But I'm just trying to get what you know.

[16] **MR. BOWLES:** Today?

[17] **MR. BABCOCK:** Huh? Yeah. I think that

[18] will be the — the 8:00 to 10:00 shift, as it were.

[19] **MR. BOWLES:** The dog rush.

[20] **MR. BABCOCK:** Yeah, the dog rush.

[21] (Deposition Exhibit No. 5 marked.)

[22] **Q:** (BY MR. BABCOCK) Here's Exhibit 5. And this

[23] would be a book called Basher Five-Two. And that is a

[24] book that you wrote with a fellow by the name of

[25] Michael French, correct?

Page 170

[1] **A:** That is correct.

[2] **Q:** And how does Basher Five-Two differ from

[3] Return With Honor? Is it the same story or is it a

[4] different story?

[5] **A:** It's basically the same story.

[6] **Q:** What was the purpose of — you had a different

[7] co-author on Basher Five-Two, did you not, than you did

[8] on Return With Honor?

[9] **A:** That's correct.

[10] **Q:** Okay. Why did you select a different

[11] co-author if it was basically the same story?

[12] **A:** It's a different audience.

[13] **Q:** What was the audience for Basher Five-Two?

[14] **A:** The young adult readers.

[15] **Q:** And do you — do you — can you — as somebody

[16] pointed out today, age is getting relative for some of

[17] us. But what do you define as "young adult?"

[18] **A:** I would roughly say somewhere between 6 to 13

[19] years of age.

[20] **Q:** Did the sales of these three books go up, stay

[21] flat or decrease following the release of the movie,

[22] Return With Honor — I'm sorry, Behind Enemy Lines.

[23] Let me restate that.

[24] Did the sales of these three books

[25] increase, decrease or stay the same following the

Page 171

[1] release of the movie, Behind Enemy Lines?

[2] **A:** I know that — I know —

[3] **Q:** Easy for you to say?

[4] **A:** Yeah, I know. I know that they did not

[5] benefit from the movie at all.

[6] **Q:** And how do you know that?

[7] **A:** From — be from inference that I never had the

[8] ability to market the book with the movie and therefore

[9] the books were not in — in the store as like — let's

[10] say Blackhawk Down. Blackhawk Down had a movie. Well

[11] now they promote the book by putting a new cover on the

[12] book that has the movie.

[13] **Q:** Right.

[14] **A:** And then they also have distribution set up

[15] where the books are out in the store when the movie is

[16] coming out and is promotional for the book and all of

[17] that.

[18] As far as my publisher or my agents

[19] taking any action and being able to promote the book

[20] off of the movie to benefit, that was not accomplished.

[21] Nothing was done.

[22] **Q:** Did you ask your publisher, any one of the

[23] publishers of those three books, to take action to

[24] attempt to get a bounce for your book sales from the

[25] movie?

Page 180

[1] they wanted to extend the contract.

[2] **Q:** Okay. But you said prior to this August thing

[3] they had already told you they were going to pass. I

[4] think you just testified to that.

[5] **MR. BOWLES:** I think he was responding to

[6] your —

[7] **A:** Yeah, I'm trying to — I'm trying to figure

[8] out. I'm pretty sure it's fair to say. I mean, I'm

[9] not — I'm pretty sure it's fair to say that on August

[10] 21st I had already received communication that they

[11] were going to pass.

[12] **Q:** (BY MR. BABCOCK) Okay. So on August 21st,

[13] 2001, whatever your rights might have been prior to

[14] that, at least as of August 21, 2001, you believed that

[15] you owned the movie rights to the book, right?

[16] **A:** I would say that's fair to say, yes.

[17] **Q:** Okay. I will go back to the question I asked

[18] before, but break it down a little bit in the time

[19] periods.

[20] Between January 22nd of 2001 and August

[21] 21 of 2001 did you make any efforts to sell the movie

[22] rights to another company other than Orion or MGM?

[23] **A:** Between what dates?

[24] **Q:** Between January 22nd, 2001 and August 21st,

[25] 2001?

Page 181

[1] **A:** January 22nd to August? No, because it — you

[2] can't really go off and sell your — your rights to a

[3] company without expressing to them what the lien is.

[4] You have to know exactly what you're selling.

[5] **Q:** Okay. And so in that time period the reason

[6] you didn't market your movie rights was because there

[7] was an issue of Orion having a lien on the rights?

[8] **A:** Well, that and also good faith. If they

[9] wanted to extend, I would have to offer in good faith

[10] an extension too.

[11] **Q:** Okay. So those are the two reasons why you

[12] didn't try to market the movie rights between January

[13] 22nd, 2001 and August 21st, 2001, right?

[14] **A:** I would say that's fair.

[15] **Q:** Okay. Did MGM say why they were passing on

[16] extending it? Did they give you a reason why they

[17] weren't interested in extending it?

[18] **A:** Not to my knowledge, no.

[19] **Q:** Okay.

[20] **THE WITNESS:** Could I take a bathroom

[21] break?

[22] **MR. BABCOCK:** Yeah, sure. You bet.

[23] **VIDEO TECHNICIAN:** Off the record at 5:28

[24] p.m.

[25] (An 11 minute recess was taken.)

Page 182

[1] **VIDEO TECHNICIAN:** Back on the record at

[2] 5:39 p.m.

[3] **Q:** (BY MR. BABCOCK) We've been talking about

[4] what efforts you made to sell your movie rights. And I

[5] now want to focus on the time period from August 21,

[6] 2001 to today. And tell me each and every effort, if

[7] any, that you've made to sell the movie rights to your

[8] book?

[9] **A:** From what time frame to what time frame again?

[10] **Q:** Yeah. August 21 of 2001 to the present?

[11] Either sell the rights or make the movie?

[12] **A:** Sell the right to my book to be made into a

[13] movie?

[14] **Q:** Yes, sir.

[15] **A:** I haven't had anything present itself at this

[16] time.

[17] **Q:** Did you make any — you or your agents make

[18] any active effort to sell the movie rights to your book

[19] in that time period I'm talking about, August 21, 2001

[20] to today?

[21] **A:** Not that I know of.

[22] **Q:** In that time period, again August 21, 2001 to

[23] today, what agents or agency has been representing you

[24] in that time period?

[25] **A:** I don't really know right now if I have

Page 183

[1] representation, to be honest.

[2] **Q:** Okay. Let's start with the date of August 21,

[3] 2001. Did you have representation from anyone as of

[4] that date?

[5] **A:** On what date did you say again?

[6] **Q:** August 21, 2001?

[7] **A:** August 21, 2001? I would have to go back and

[8] refer back to my ICM contracts to see if they were

[9] still valid or not.

[10] **Q:** And you say that today you're still being

[11] represented by the Washington Speaker's Bureau? We

[12] know that, right?

[13] **A:** That's true.

[14] **Q:** Okay. Other than the Washington Speaker's

[15] Bureau, you don't believe today that you're represented

[16] by anyone else; is that correct?

[17] **A:** To the best of my knowledge, I still have

[18] obligation with ICM for the life time of the two books

[19] that I have published.

[20] **Q:** And what — and by "obligation," what do you

[21] mean?

[22] **A:** Well, when the books — when the book is

[23] purchased by a consumer that ICM, for the length and

[24] duration of the books, would be a part of the

[25] compensation of that purchase.

Page 200

[1] with the smooth flow of the presentation.

[2] **MR. BABCOCK:** Smooth flowing.

[3] **Q:** (BY MR. BABCOCK) Okay. What was your income

[4] in — in 1999, as reflected by your tax return, Exhibit

[5] 25? Yeah, gross income.

[6] **A:** It states here this is income of 431,000.

[7] **Q:** All right. And let's look at 2000. What was

[8] your income in 2000?

[9] **A:** Be business income of 327,488.

[10] **Q:** So a dip of about 100,000 from '99 to 2000,

[11] right? Is that right?

[12] **A:** That would be fair to say.

[13] **Q:** Okay. And then what about your income in

[14] 2001? What was your gross income in 2001?

[15] **A:** Well, the business income here is 466,177.

[16] **Q:** So it was an increase of approximately

[17] $140,000.00 over your 2000 income, correct?

[18] **A:** I'm sorry, how much did you say?

[19] **Q:** About 140,000 more than you earned in 2000,

[20] right?

[21] **A:** Approximately, yes.

[22] **Q:** Okay. And how much did you earn in 2002?

[23] Unless you're extraordinary you probably haven't done

[24] your return yet.

[25] **A:** I haven't done my return yet.

Page 201

[1] **Q:** So you're not extraordinary. What —

[2] **MR. BOWLES:** That's the test? Who is

[3] extraordinary?

[4] **MR. BABCOCK:** I think we'll all come up

[5] blank on that.

[6] **Q:** (BY MR. BABCOCK) How much did you earn in

[7] 2002?

[8] **A:** In 2002?

[9] **Q:** Yes, sir.

[10] **A:** I don't have the figure in my mind, to be

[11] honest. I don't know.

[12] **Q:** Is it more than you earned in 2001?

[13] **A:** I would say it would be fair to say that.

[14] **Q:** By more — by a factor of a couple hundred

[15] thousand dollars?

[16] **A:** I don't know the number.

[17] **Q:** Okay. Take a quick look at Exhibit 24. Is it

[18] fair to say that the number of your speaking

[19] engagements — engagements dipped as between —

[20] **A:** I don't have Exhibit 24.

[21] **Q:** It's another one of those nifty looking

[22] charts. And it's — it says, O'Grady speaking

[23] engagements. That's because I didn't give it to you

[24] yet. Tricky.

[25] **MR. BOWLES:** Old ESP, huh?

Page 202

[1] **MR. BABCOCK:** Yes. You guys have 24.

[2] **MR. BOWLES:** No, but that's okay.

[3] **Q:** (BY MR. BABCOCK) Is it fair to say that your

[4] speaking engagements dipped as between 1999 and 2000?

[5] The number of speaking engagements?

[6] **A:** I would say it's fair to say.

[7] **Q:** Okay. And would it also be fair to say that

[8] the number of speaking engagements that you've had has

[9] been on the rise since the end of 2000, if you go year

[10] to year?

[11] **A:** Since 2000, yes.

[12] **Q:** And that's reflected, of course, in your

[13] income? That you receive more income the more you

[14] speak and the more you get fees from your speaking,

[15] correct?

[16] **A:** I wouldn't say it's necessarily as straight

[17] forward as you're — as you're stating it. You know,

[18] it's a matter of how much you get paid per speech.

[19] **Q:** Sure. Okay. Would it be fair to say that

[20] since the release of Behind Enemy Lines your income has

[21] increased, not decreased?

[22] **A:** I don't have an assessment of that.

[23] **Q:** And are you planning on making an assessment

[24] of that?

[25] **A:** I don't know if I have a necessary reason to

Page 203

[1] make an assessment at this time.

[2] **Q:** You — you testified that your income, as

[3] between 2001 and 2002, has increased by some amount,

[4] correct?

[5] **A:** I would say that's a fair assessment, yes.

[6] **Q:** Okay. And we know that Behind Enemy Lines was

[7] released in November of 2001, correct?

[8] **A:** Behind Enemy Lines was released in November of

[9] 2001.

[10] **Q:** And so since the release of Behind Enemy Lines

[11] in November of 2001 your income has increased, correct?

[12] **A:** I don't know how to judge or scale that as far

[13] as from November of 2001 to what day and comparative to

[14] what day.

[15] **Q:** Yeah. To —

[16] **A:** And I haven't done a comparison to be able to

[17] make a fair assessment to give you an honest answer on

[18] that.

[19] **Q:** Your — and I guess the only thing the tax

[20] return allows us to do is compare year to year. So

[21] if — if Behind Enemy Lines was — was released in

[22] November of '01, then we would be comparing income in

[23] '01 to income in '02, and that's increased, right?

[24] **A:** Well, comparing income of '01, which we

[25] already looked at, and my assessment as comparing

Page 204

[1] income to '02 would have been an increase.

[2]    MR. BABCOCK: Why don't we — why don't

[3] we hang them up for the night? Unless you guys want to

[4] do this some more.

[5]    MR. BOWLES: No. And you're not going to

[6] take my deposition.

[7]    MR. BABCOCK: I'm not.

[8]    MR. BOWLES: That was really a question.

[9]    VIDEO TECHNICIAN: Off the record at 6:12

[10] p.m.

[11]    (Deposition recessed at 6:12.)

Page 205

[1]         CHANGES AND SIGNATURE
[2] PAGE  LINE    CHANGE         REASON
[3]
[4]
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 206

[1]         CHANGES AND SIGNATURE (Cont'd)
[2] PAGE  LINE    CHANGE         REASON
[3]
[4]
[5]
[6]
[7]
[8]    I, SCOTT O'GRADY, have read the foregoing
    deposition and hereby affix my signature that same is
[9] true and correct, except as noted above.
[10]
[11]         SCOTT O'GRADY
[12] THE STATE OF _____ )
[13] COUNTY OF _____ )
[14]    Before me, _____, on this
    day personally appeared SCOTT O'GRADY, known to me (or
[15] proved to me under oath or through _____
    (description of identify card or other document) to be
[16] the person whose name is subscribed to the foregoing
    instrument and acknowledged to me that they executed
[17] the same for the purposes and consideration therein
    expressed.
[18]
    Given under my hand and seal of office
[19] this _____ day of _____, 2003.
[20]
[21]    NOTARY PUBLIC IN AND FOR
    THE STATE OF _____
[22]
[23]
[24]
[25]
_____

Page 362

[1]   **A:** No, I don't believe so.

[2]   **Q:** Have you ever had any contact with anyone at

[3] Discovery prior to that date?

[4]   **A:** I don't recall any — any communication or

[5] contact.

[6]   **Q:** And how about any of your agents? Did any of

[7] them have any contact with Discovery prior to that date

[8] of November 28, 2001?

[9]   **A:** Not that I'm aware of.

[10]   **Q:** You've mentioned that your mother got copies

[11] of the BBC broadcast. Do you remember whether it was

[12] also sent at your request to Track, Mr. Mills and to

[13] the Motion Picture Corporation?

[14]   **A:** I'm totally confused by your question.

[15]   **Q:** Okay. Let me — you're right. It is

[16] confusing.

[17]     Mr. O'Grady, did you review your

[18] responses to Discovery's interrogatories prior to them

[19] being served on the defendants in this case?

[20]   **A:** I'm sorry?

[21]   **Q:** Did you review your responses to

[22] interrogatories which we propounded, we, Discovery,

[23] propounded in connection with this litigation prior to

[24] their being served on the defendants?

[25]   **A:** Yes, I did.

Page 363

[1]   **Q:** And is —

[2]   **MS. HANDMAN:** Let's mark as Deposition

[3] Exhibit 47 Plaintiff's Objections and Responses to

[4] Defendant Discovery Communication, Inc.'s first set of

[5] interrogatories.

[6]     (Deposition Exhibit No. 47 marked.)

[7]   **Q:** (BY MS. HANDMAN) And ask you if that's your

[8] signature on the verification? Should be at the end.

[9] Is that your signature on the verification?

[10]   **A:** The very last page where it says

[11] "verification?"

[12]   **Q:** Uh-huh.

[13]   **A:** That is my signature. The top signature, yes,

[14] it is.

[15]   **Q:** And by that verification, you swear that the

[16] answers are within your personal knowledge, are true

[17] and correct; is that correct?

[18]   **A:** That would be correct.

[19]   **Q:** And I would ask you to turn to interrogatory

[20] number 10, and ask you to review the question and

[21] response. The question being, "Identify all agreements

[22] or release of rights plaintiff, plaintiff's agents

[23] and/or family members have entered into with the BBC,

[24] BBC WA or DCI," which is Discovery. And your answer

[25] is, "Plaintiff knows of none"?

Page 364

[1]   **A:** That's true.

[2]   **Q:** After having seen the agreements executed by

[3] your father, your sister and yourself, do you still

[4] maintain that you know of no such agreements?

[5]   **A:** No —

[6]   **MR. FLYNN:** Object to form.

[7]   **A:** I have — I know that I entered into an

[8] agreement, but prior today I didn't know.

[9]   **Q:** (BY MS. HANDMAN) But now you would amend the

[10] answer to say, yes, there are agreements that those

[11] family members and yourself have entered into; is that

[12] correct?

[13]   **A:** Today I'm in knowledge of them, yes.

[14]   **Q:** Was the Discovery document — the documentary

[15] which Discovery aired entitled, Behind Enemy Lines, the

[16] Scott O'Grady Story, do you know whether it has been —

[17] whether it has had that title since it began being

[18] aired in the United States on the Discovery Channel?

[19]   **A:** To the best of my knowledge, I believe it

[20] does — I believe it did.

[21]   **Q:** Did you ever object or complain to Discovery

[22] about the choice of that title?

[23]   **A:** Not to my knowledge, I didn't.

[24]   **Q:** Do you have any objection to Discovery having

[25] chosen the title, Behind Enemy Lines, the Scott O'Grady

Page 365

[1] Story for its documentary?

[2]   **A:** I don't believe I do.

[3]   **Q:** Do you have any basis for believing that

[4] Discovery does not have the license — does not have a

[5] license from the BBC to broadcast the documentary,

[6] Behind Enemy Lines, the Scott O'Grady Story?

[7]   **A:** I'm sorry, can you repeat that again? That's

[8] along question.

[9]   **Q:** Sure.

[10]   **MS. HANDMAN:** Maybe you can read it

[11] again.

[12]     (Record read back.)

[13]   **A:** I have no knowledge of what permission

[14] Discovery Channel has or what kind of agreement

[15] Discovery Channel made with BBC.

[16]   **Q:** (BY MS. HANDMAN) Do you have any reason to

[17] believe it does not have the right to broadcast Behind

[18] Enemy Lines, the Scott O'Grady Story?

[19]   **A:** Can you say that again?

[20]     (Record read back.)

[21]   **A:** I don't have any evidence of reason right now

[22] that would say that I have an ability to say that

[23] Discovery Channel has that right or doesn't have that

[24] right. But I think I make an assumption as of today

[25] from some of the documents that you portrayed to me. I

Page 370

[1] presentation, Behind Enemy Lines"?

[2] **A:** Yes.

[3] **Q:** Did you approve that reference to the

[4] Discovery Channel on your Speaker's Bureau biography?

[5] **A:** I would say that would be fair to say.

[6] **Q:** And if you would look at Exhibit 50, is this

[7] your web site biography? Your web site on the

[8] Washington Speaker's Bureau?

[9] **A:** That's what it looks like they post.

[10] **Q:** And you see there, "Captain O'Grady's story

[11] was feature on the Discovery Channel, Behind Enemy

[12] Lines?"

[13] **A:** I'm sorry, where are we looking?

[14] **Q:** The second graph, first line.

[15] **A:** Second paragraph?

[16] **Q:** Uh-huh. Third paragraph, I'm sorry.

[17] **A:** Third paragraph?

[18] **A:** Uh-huh.

[19] **A:** Okay.

[20] **Q:** You see the reference to the Discovery

[21] Channel's Behind Enemy Lines?

[22] **A:** Yes, ma'am.

[23] **Q:** And did you also approve that reference?

[24] **A:** I would assume that — that this was just

[25] taken off of what you already explained from Exhibit

Page 371

[1] 49, so I have no problem with it.

[2] **Q:** And why did you and Washington Speaker's

[3] Bureau include a reference to the Discovery Channel

[4] documentary?

[5] **A:** Huh. I don't know. I don't know — I didn't

[6] type this up. I didn't write it. But I did approve

[7] it.

[8] **Q:** Do you think it's helpful in attracting

[9] speaking engagements that you were featured in a

[10] documentary on the Discovery Channel?

[11] **A:** Actually, from what I've been told from

[12] representatives of the Washington Speaker's Bureau that

[13] it hasn't done anything positively or negatively to

[14] help out my speaking career whatsoever.

[15] My speaking career has been solely based

[16] upon my performance and my relationships with the

[17] people that I work with. And then therefore, it's

[18] references.

[19] Once you do a good job you get referred

[20] to other people or the people that you do a good job

[21] with might have other opportunities for you to be able

[22] to speak. And therefore, it's more of a word of mouth

[23] of your reputation of being a good speaker that, you

[24] know, even allows you to sustain a speaking career.

[25] It's not anything in reference to having, you know —

Page 372

[1] well, what you're insinuating, Discovery Channel,

[2] Behind Enemy Lines documentary being aired. That has

[3] absolutely no impact as far as my speaking career is

[4] concerned or whether my speaking career goes up or my

[5] speaking career goes down.

[6] What totally impacts my speaking career

[7] is my own performance when I'm giving a speaking

[8] engagement.

[9] **Q:** How do you know it has no impact in attracting

[10] speaking engagements?

[11] **A:** Well, I've never had anybody hire me because

[12] of that reason.

[13] **Q:** How do you know?

[14] **A:** I usually engage with clients. And when they

[15] talk to me the bulk of the people will refer that

[16] either they got a reference from someone else that I

[17] had done a good job for a client and that they

[18] recommended me, or they had either previewed my

[19] speaking tape. Because one of the things that goes out

[20] is that once you do a speech and you get it on tape you

[21] will send that out to clients. And that's, from being

[22] in the speaking business now for the last couple of

[23] years, really is the number one key.

[24] You know, a bio and other biographical

[25] material or reference material is really not a key to

Page 373

[1] you being hired by somebody. People want to see, does

[2] this person engage the audience. Does this person

[3] deliver a message that we really enjoy. Does this

[4] person have a speech that will fit the theme of the

[5] meeting or the conference or the dinner or lunch or

[6] school, group that we're a part of.

[7] So I've never had anybody come up to

[8] me — I've had a lot of people come up to me say, okay,

[9] we like your — your videotape. We want — we hired

[10] you because of watching your videotape. We've hired

[11] you because we've heard you've got a good reputation.

[12] We've hired you because we've heard you in the past

[13] giving speaking engagements.

[14] I've absolutely never had anybody come up

[15] to me and say we've hired you for what you are

[16] inferring.

[17] **Q:** So it's your testimony that the broadcast on

[18] Discovery has had no impact on your speaking career; is

[19] that right?

[20] **A:** To my knowledge it hasn't had —

[21] **Q:** Neither plus nor minus?

[22] **A:** Hasn't had an impact plus or minus.

[23] **Q:** Have you ever discussed removing the reference

[24] from your bio?

[25] **A:** Not to my knowledge.

# In The Matter Of:

## *Scott O'Grady    v.*
## *Twentieth Century Fox Film Corp., et al*

---

## *Deposition of Robert Parsons*
## *May 6, 2003*

---

## *Miller Reporting Company*
## *735 8th Street, SE*
## *Washington, DC  USA  20003*
## *(202) 546-6666*

*Original File 0506PARS.ASC, 107 Pages*
*Min-U-Script® File ID: 3774470114*

# Word Index included with this Min-U-Script®

1—10:06:25   22—10:07:33                                Page 30

[1]   **A:** I would have to assume so.

[2]   **Q:** Were you representing Mr. O'Grady in

[3]   1999?

[4]   MR. FLYNN: Objection to form.

[5]   THE WITNESS: I believe so, yes.

[6]            BY MS. HANDMAN:

[7]   **Q:** Take a look at, if you would, 4247 and

[8]   4248 and 4249, and they list specific engagements

[9]   for 1999; is that correct?

[10]  **A:** Appears to be, yes.

[11]  **Q:** Were these engagements that Scott O'Grady

[12]  spoke at?

[13]  **A:** I would have to assume so, yes.

[14]  **Q:** These would be engagements that you and

[15]  your colleagues had arranged for Mr. O'Grady?

[16]  **A:** Again, I didn't come up with these forms,

[17]  so I have to assume that is correct.

[18]  **Q:** You can look down the list and perhaps

[19]  recognize some of these engagements as some of the

[20]  ones you had arranged for Mr. O'Grady in 1999?

[21]  **A:** Yes.

[22]  **Q:** And the total dollar amount, under

---

1—10:07:37   22—10:08:33                                Page 31

[1]   amount, is that the amount that he was paid for the

[2]   year for the speaking?

[3]   **A:** Again, I would have to assume. I didn't

[4]   make the chart, so I don't know how to read it.

[5]   **Q:** Do you know what Mr. O'Grady received as

[6]   speaking fees in 1999?

[7]   **A:** No.

[8]   **Q:** Do you have a ballpark sense of it?

[9]   **A:** Not really, no.

[10]  **Q:** Do you have any reason to doubt that

[11]  the —

[12]  **A:** No.

[13]  **Q:** Let me finish the question — that the

[14]  numbers reflected on Exhibit 134 are indeed the

[15]  speaking fees that Mr. O'Grady was paid in 1999?

[16]  **A:** Do I have any reason to doubt them?

[17]  **Q:** Yes.

[18]  **A:** No.

[19]  **Q:** And the amount was $446,481.41?

[20]  **A:** According to this.

[21]  **Q:** Is that consistent with your general

[22]  ballpark recollection of what he was paid in '99?

---

1—10:08:36   22—10:10:17                                Page 32

[1]   **A:** I don't have a recollection of the

[2]   ballpark amount, but I have no reason to doubt

[3]   these amounts.

[4]   **Q:** Let's mark as Exhibit 135 a document that

[5]   was Bates stamped WSB 17.

[6]      (Parsons Exhibit No. 135 was

[7]   marked for identification.)

[8]            BY MS. HANDMAN:

[9]   **Q:** I would ask if you could take a look at

[10]  it and identify it.

[11]  **A:** I can identify — it is what it is. I

[12]  didn't produce the document.

[13]  **Q:** What is it?

[14]  **A:** I assume it is the same thing as the

[15]  other one except for — looks like for events in

[16]  2000.

[17]  **Q:** And do you recognize these events as

[18]  events that Scott O'Grady spoke at?

[19]  **A:** By and large, yes.

[20]  **Q:** I see about 45 events in 2000. Is that

[21]  consistent with your recollection?

[22]  **A:** It seems to be.

---

1—10:10:23   22—10:11:22                                Page 33

[1]   **Q:** For the most part, the fee he received

[2]   was $10,000; is that correct?

[3]   **A:** Yes.

[4]   **Q:** And the total amount that he received was

[5]   352,000.

[6]   **A:** According to this, yes.

[7]   **Q:** Is that consistent with your recollection

[8]   of what Mr. O'Grady did by way of —

[9]   **A:** Again, I don't have a recollection —

[10]  **Q:** Let me finish the question.

[11]  Do you have any reason to doubt the

[12]  accuracy of Exhibit 135?

[13]  **A:** No.

[14]  **Q:** Is that a document kept in the normal

[15]  course of business of Washington Speakers Bureau?

[16]  **A:** Again, that would be in accounting. I

[17]  don't know how the accounting office keeps their

[18]  records, but I don't have any reason to doubt it.

[19]  **Q:** What kind of records do you maintain to

[20]  keep track of Scott O'Grady's speaking engagements?

[21]  **A:** I don't personally keep any records.

[22]  **Q:** What kind of records does the agency

---

1—10:11:24   22—10:12:10                    Page 34

[1] maintain?

[2]    A: Again, I would assume this is what the

[3] accounting office has.

[4]    Q: Do they maintain copies of contracts?

[5]    A: Yes.

[6]    Q: Did you produce those in connection with

[7] the subpoena?

[8]    A: I haven't produced any of the documents

[9] myself personally.

[10]   Q: But I am correct in understanding that

[11] there are contracts that are — underlie each of

[12] these engagements that are reflected on, for

[13] example, Exhibit 135?

[14]   A: Yes.

[15]   Q: And they show the fee; is that correct?

[16]   A: Yes. They would show the gross fee.

[17]   Q: And the terms for the engagement?

[18]   A: Yes.

[19]   Q: And the expenses that were to be

[20] reimbursed?

[21]   A: That would not be reflected on the

[22] contract itself, although the fee line would

1—10:12:15   22—10:13:53                    Page 35

[1] include the fee plus expenses.

[2]    Q: Does the contract for Scott O'Grady

[3] typically require first-class airfare?

[4]    A: Yes.

[5]    Q: Let's mark as Exhibit 136 a document

[6] Bates stamped WSB 18 to 19.

[7]    (Parsons Exhibit No. 136 was

[8] marked for identification.)

[9]    MS. FRIES: Can we have one moment to

[10] confer?

[11]   (The witness consulted with counsel.)

[12]              BY MS. HANDMAN:

[13]   Q: Mr. Parsons, I would ask you if you can

[14] identify what has been marked as Exhibit 136?

[15]   A: Again, it looks like it is the 2001

[16] dates.

[17]   Q: The dates that Scott O'Grady spoke?

[18]   A: Right.

[19]   Q: And the fees that he received?

[20]   A: Yes.

[21]   Q: And the commission?

[22]   A: Yes.

1—10:14:06   22—10:15:02                    Page 36

[1]    Q: And the number of engagements reflected

[2] on this document for 2001 are how many — if you go

[3] to the second page, there is an events number, and

[4] it says 64?

[5]    A: Yes.

[6]    Q: Is that consistent with your recollection

[7] that Mr. O'Grady had 64 engagements in 2001?

[8]    A: Yes, it appears to be.

[9]    Q: And is that a large number of engagements

[10] for a speaker?

[11]   MR. FLYNN: Objection to form.

[12]   THE WITNESS: It is not an unusual amount

[13] of dates.

[14]              BY MS. HANDMAN:

[15]   Q: Do you have other speakers that have that

[16] many?

[17]   A: Yes.

[18]   Q: And his fee for most of these engagements

[19] was about 10,000?

[20]   A: According to this, yes.

[21]   Q: And the total amount of money that he

[22] received in 2001 is $496,200; is that correct?

1—10:15:10   22—10:17:01                    Page 37

[1]    A: According to this.

[2]    Q: Do you have any reason to doubt the

[3] accuracy of those numbers?

[4]    A: No reason to doubt it, no.

[5]    Q: Let's mark as Exhibit 137 a document

[6] Bates stamped WSB 20 and 21.

[7]    (Parsons Exhibit No. 137 was

[8] marked for identification.)

[9]              BY MS. HANDMAN:

[10]   Q: I would ask you, can you identify this

[11] document produced pursuant to subpoena?

[12]   A: Appears to be appearance dates for Scott

[13] for 2002.

[14]   Q: How many events are listed here?

[15]   A: Seventy.

[16]   Q: That is an increase from 2001?

[17]   A: Yes.

[18]   Q: Looking at the total dollar amount that

[19] he received in 2002, it is listed as $657,000?

[20]   A: Correct.

[21]   Q: Is that consistent with your recollection

[22] of approximately what Mr. O'Grady made from

---

1—10:17:03  22—10:18:29                              Page 38

[1] speaking in 2002?

[2]    A: I have no reason to doubt.

[3]    Q: And if you compare it to 2001, when he

[4] made 496,000, it is more than 150,000 more than in

[5] 2001, that he made in 2002; is that correct?

[6]    A: Yes.

[7]    Q: And what accounts for that, would you

[8] say?

[9]    MR. FLYNN: Objection to form.

[10]    MS. FRIES: This calls for speculation.

[11]    THE WITNESS: My guess or — my feeling,

[12] anyway, is that it is reflective of the tone of the

[13] country vis-a-vis people looking for patriotic

[14] speakers, looking for the type of speaker that

[15] Scott O'Grady is. We, by and large, attribute that

[16] to 9/11.

[17]              BY MS. HANDMAN:

[18]    Q: Was he able to charge a higher amount per

[19] speaking fee in 2002?

[20]    A: Was he able to?

[21]    Q: Well, did he?

[22]    A: According to these figures, yes.

---

1—10:18:32  22—10:20:21                              Page 39

[1]    Q: And that reflected demand?

[2]    A: Yes.

[3]    Q: Did other speakers that the Washington

[4] Speakers Bureau represent benefit from 9/11?

[5]    A: I don't know if benefit is the right

[6] word, but other speakers got more speaking

[7] engagements, yes.

[8]    Q: For example — can you give me some

[9] examples?

[10]    A: Again, people like Gen. Schwarzkopf, Gen.

[11] Barry McCaffrey, anybody who had a patriotic theme.

[12] Also speakers that — well, you asked about 9/11.

[13] Anybody with a patriotic theme.

[14]    Q: What were you going to say?

[15]    A: The economy of the country changed things

[16] as well, so it was a twofold thing.

[17]    Q: How did that affect the number of

[18] engagements that Mr. O'Grady received?

[19]    MR. FLYNN: Objection to form.

[20]    THE WITNESS: Speakers with a lower

[21] fee — groups didn't have the money to pay other

[22] fees.

---

1—10:20:21  22—10:23:03                              Page 40

[1]              BY MS. HANDMAN:

[2]    Q: So speakers like Mr. O'Grady with a lower

[3] fee had more engagements?

[4]    A: Yes.

[5]    Q: When you would talk to potential

[6] organizations that were thinking of — that was

[7] asking about speakers, would you mention Scott

[8] O'Grady's patriotic theme?

[9]    A: It usually works backwards, where the

[10] client would tell us what the theme was and what

[11] their event was all about.

[12]    Q: Are you familiar with the — strike that.

[13] Let's mark as Exhibit 138 a document

[14] Bates stamped SOG 4803.

[15]    (Parsons Exhibit No. 138 was

[16] marked for identification.)

[17]              BY MS. HANDMAN:

[18]    Q: I would ask you if you can identify

[19] Exhibit 138?

[20]    A: This is one of our standard contracts

[21] that would have gone to Scott — it was signed by

[22] Scott.

---

1—10:23:03  22—10:24:02                              Page 41

[1]    Q: Who is Theresa Brown?

[2]    A: One of my colleagues.

[3]    Q: And does the fact that she signed this

[4] mean that she obtained the engagement for

[5] Mr. O'Grady?

[6]    A: Yes.

[7]    Q: And from this Exhibit 138, can you read

[8] what the fee is to be paid to Mr. O'Grady?

[9]    A: To be paid to the Washington Speakers

[10] Bureau, 15,000 plus first-class accommodations for

[11] one.

[12]    Q: Who is the client?

[13]    A: This is another speakers bureau,

[14] Christian Speakers Bureau is our client. Their

[15] client is Adventist Health Care.

[16]    Q: So you arrange speaking engagements for

[17] the Christian Speakers Bureau?

[18]    A: That is another one of the bureaus that

[19] would split commissions with us.

[20]    Q: And do they represent O'Grady?

[21]    A: They represent Scott in conjunction with

[22] us. We actually allow them not to represent him

---

Scott O'Grady    v.
Twentieth Century Fox Film Co., et al
Case 5:02-cv-00173-DF-CMC    Document 139    Filed 12/31/03    Page 67 of 152

Deposition of Robert Parsons
May 6, 2003

**Page 58**

[1]    **Q:** Have you ever seen the Discovery
[2]  Channel's documentary "Behind Enemy Lines:The
[3]  Scott O'Grady Story"?
[4]    **A:** I may have seen bits and pieces. I have
[5]  not seen it all.
[6]    **Q:** Have you a tape of that in your
[7]  possession or in the possession of the Washington
[8]  Speakers Bureau?
[9]    **A:** I don't know. We may. I don't know.
[10]    **Q:** Has Mr. O'Grady ever asked your advice as
[11]  to whether he should do — appear in the
[12]  documentary that was ultimately aired on Discovery
[13]  Channel, "Behind Enemy Lines:The Scott O'Grady
[14]  Story"?
[15]    **MR. FLYNN:** Objection to form.
[16]    **THE WITNESS:** No.
[17]              **BY MS. HANDMAN:**
[18]    **Q:** Looking at Exhibit 144, do you know who
[19]  prepared this biographical material that appears on
[20]  your Web site?
[21]    **A:** This would have been our marketing
[22]  department.

**Page 59**

[1]    **Q:** And did you review this biographical
[2]  material before it was posted?
[3]    **A:** Yes.
[4]    **Q:** And you see the reference there in the
[5]  last paragraph, "Captain O'Grady's story was
[6]  featured on the Discovery Channel's Behind Enemy
[7]  Lines"?
[8]    **A:** Yes.
[9]    **Q:** Do you know why that reference was
[10]  included?
[11]    **A:** It is factual.
[12]    **Q:** And is it a fact that is helpful to
[13]  Mr. O'Grady?
[14]    **MR. FLYNN:** Objection to form.
[15]    **MS. FRIES:** Object.
[16]    **THE WITNESS:** It is helpful.
[17]              **BY MS. HANDMAN:**
[18]    **Q:** Is it a fact that you think will attract
[19]  more speaking engagements?
[20]    **MS. FRIES:** That calls for speculation.
[21]    **THE WITNESS:** It is factual.
[22]              **BY MS. HANDMAN:**

**Page 60**

[1]    **Q:** There are a lot of facts, where he was
[2]  born, where he went to school and a number of other
[3]  facts, but you chose to include this fact regarding
[4]  the Discovery Channel, correct?
[5]    **MR. FLYNN:** Objection to form.
[6]    **THE WITNESS:** I didn't choose it, but it
[7]  has been chosen.
[8]              **BY MS. HANDMAN:**
[9]    **Q:** You approved the text?
[10]    **A:** Yes. It is not incorrect.
[11]    **Q:** No. Do you think that it adds to the
[12]  attractiveness of Mr. O'Grady as a speaker, the
[13]  fact that his story was featured on Discovery
[14]  Channel?
[15]    **MR. FLYNN:** Objection to form.
[16]    **MS. FRIES:** It is speculation.
[17]    **MS. HANDMAN:** It is speculation by
[18]  someone who gets Mr. O'Grady speaking engagements.
[19]  I think he can say whether this was included
[20]  because it is a helpful fact in Mr. O'Grady's
[21]  ability to attract speaking engagements and you to
[22]  obtain them for him.

**Page 61**

[1]    **MR. FLYNN:** What is your question?
[2]              **BY MS. HANDMAN:**
[3]    **Q:** Was this included because it was a
[4]  helpful benefit to you and to Mr. O'Grady's ability
[5]  to attract speaking engagements and you to obtain
[6]  them for him.
[7]    **MR. FLYNN:** Objection.
[8]    **MS. FRIES:** Objection.
[9]    **THE WITNESS:** I don't know. It is a
[10]  fact. It is a biographical listing.
[11]              **BY MS. HANDMAN:**
[12]    **Q:** Do you make selections of what
[13]  biographical listings should be included in Mr.
[14]  O'Grady's biographical information?
[15]    **A:** There would probably be more omission
[16]  than admittance. In other words, there may be more
[17]  things we would not put in than we would put in.
[18]    **Q:** Why was this put in?
[19]    **MR. FLYNN:** Objection to form.
[20]    **MS. FRIES:** Objection.
[21]    **THE WITNESS:** Again, because it is what
[22]  it is. It happened and it is listed.

Scott O'Grady v.
Twentieth Century Fox Film Corp., et al
Case 5:02-cv-00173-DF-CMC    Document 139    Filed 12/31/03    Page 68 of 152
Deposition of Robert Parsons
May 6, 2003

[1]  MS. FRIES: Objection.

[2]           BY MS. HANDMAN:

[3]  Q: Did Scott O'Grady object to the reference

[4] to the Discovery Channel documentary that has been

[5] included in this brochure?

[6]  A: He did not object to it. I don't know

[7] that he read it.

[8]  Q: But he was present where these were being

[9] circulated?

[10]  A: Yes.

[11]  Q: Exhibit 146 was a brochure that was

[12] handed out at the conference?

[13]  A: No. This was an invitation. This would

[14] have gone out prior.

[15]  Q: Was there a brochure handed out at the

[16] conference?

[17]  A: I don't know. Typically what we do is

[18] hand out the bio's of the speakers.

[19]  Q: Let's mark as Exhibit 147 WSB 00007.

[20]  (Parsons Exhibit No. 147 was

[21] marked for identification.)

[22]           BY MS. HANDMAN:

[1]  Q: Can you identify Exhibit 147?

[2]  A: This would be Scott's bio as of 9/02.

[3]  Q: And to your knowledge, was this fairly

[4] similar to what was his biography prior to 9/02?

[5]  A: I don't know offhand.

[6]  Q: Looking at Exhibit 147, do you see a

[7] reference to the Discovery Channel's presentation,

[8] "Behind Enemy Lines"?

[9]  A: Yes.

[10]  Q: And do you know whether Mr. O'Grady ever

[11] objected to the reference in this biography?

[12]  MR. FLYNN: Objection to form.

[13]  THE WITNESS: He did not object to me or

[14] to anybody else that I know of.

[15]           BY MS. HANDMAN:

[16]  Q: Again, you don't know why the reference

[17] to the Discovery Channel was included other than it

[18] was a fact?

[19]  A: As is his book and other things, yes.

[20]  Q: His book — presumably — the lectures he

[21] gives are titled what?

[22]  A: "Return With Honor."

[1]  Q: And what is the name of his book?

[2]  A: "Return With Honor" — unless it is the

[3] kids book. Then it is "Basher Five-Two,"

[4]  Q: Is the reference to the book included in

[5] his biography because it is a positive selling

[6] feature to obtain engagements for Mr. O'Grady?

[7]  MR. FLYNN: Objection to form.

[8]  THE WITNESS: I don't decide what is

[9] positive or not.

[10]           BY MS. HANDMAN:

[11]  Q: Do you have a view as to whether it is a

[12] helpful reference?

[13]  MR. FLYNN: Objection. Form.

[14]  MS. FRIES: Calls for speculation.

[15]  THE WITNESS: My speculation would be

[16] yes.

[17]           BY MS. HANDMAN:

[18]  Q: Would that also be your speculation as to

[19] the Discovery Channel documentary?

[20]  MR. FLYNN: Objection to form.

[21]  THE WITNESS: I have to assume so, yes.

[22]           BY MS. HANDMAN:

[1]  Q: Let's mark as Exhibit 148 a document

[2] bearing the Bates stamp WSB 33 through WSB 35.

[3]  (Parsons Exhibit No. 148 was

[4] marked for identification.)

[5]           BY MS. HANDMAN:

[6]  Q: Can you identify what has been marked as

[7] Exhibit 148?

[8]  A: This would be the 2003 brochure page for

[9] Scott O'Grady.

[10]  Q: And looking at the 2003 brochure page for

[11] Scott O'Grady, does it contain a reference to

[12] Discovery Channel's "Behind Enemy Lines"?

[13]  A: Yes.

[14]  Q: And did Mr. O'Grady ever object to that

[15] reference?

[16]  MR. FLYNN: Objection to form.

[17]  THE WITNESS: Not that I know of.

[18]  MS. HANDMAN: Let's mark as Exhibit 149 a

[19] document Bates stamped WSB 28 through 32.

[20]  (Parsons Exhibit No. 149 was

[21] marked for identification.)

[22]           BY MS. HANDMAN:

---

1—12:00:03   22—12:01:19                                Page 102

[1]   **A:** No.

[2]   **Q:** Has he ever discussed with you that he

[3] intends to stop his speaking engagements at any

[4] point in time?

[5]   **A:** No.

[6]   **Q:** And again, from the time period of late

[7] 2001 until today, his speaking engagements have

[8] increased?

[9]   **A:** According to the documents, yes.

[10]   **Q:** And he has been — in the Washington

[11] Speakers Bureau continues to receive positive

[12] reports about his speaking engagements?

[13]   **A:** Yes, absolutely, every one of them.

[14]   **Q:** Have you ever been contacted by anyone

[15] who said that they did not want to be — that they

[16] had concerns about Capt. O'Grady?

[17]   **A:** No.

[18]   **Q:** Have you ever been contacted by anyone,

[19] had any discussions with anyone about the 20th

[20] Century Fox movie "Behind Enemy Lines" and Scott

[21] O'Grady?

[22]   **A:** Have I had any discussions with anybody?

---

1—12:01:23   22—12:03:08                                Page 103

[1]   **Q:** Yes.

[2]   **A:** Not that I know of.

[3]   **Q:** Has the 20th Century Fox movie "Behind

[4] Enemy Lines" ever been the topic of conversation at

[5] the Washington Speakers Bureau?

[6]   **A:** I don't think it has been.

[7]   **Q:** And you have not seen the movie?

[8]   **A:** I have not seen it, no.

[9]   **Q:** Let's go ahead and mark that document

[10] that I handed to you earlier. It will be Exhibit

[11] 151.

[12]   (Parsons Exhibit No. 151 was

[13] marked for identification.)

[14]   **MR. FLYNN:** For the record, it is 4805

[15] and 4806, Scott O'Grady Bates sheet.

[16]   **BY MS. HAMILTON:**

[17]   **Q:** And the first sheet is a fax to Scott

[18] O'Grady from Bernie Swaine of the Washington

[19] Speakers Bureau?

[20]   **A:** That is correct.

[21]   **Q:** And attached is a letter from Fox. Do

[22] you know whether or not — would the Washington

---

1—12:03:18   22—12:04:40                                Page 104

[1]   Speakers Bureau handle endorsements of any sort for

[2] Mr. O'Grady?

[3]   **A:** No.

[4]   **Q:** If you would look at the second page of

[5] the document which is that letter. The publicity

[6] activities that are referenced on that, 4826, is

[7] that the sort of engagement that the Washington

[8] Speakers Bureau would be involved in at all,

[9] representing Mr. O'Grady and getting that kind of

[10] contract and arrangement?

[11]   **A:** Primarily not, no.

[12]   **Q:** When you say primarily not, what do you

[13] mean?

[14]   **A:** If a speaker asked us to do it we may

[15] enter into the foray, but it is not our expertise

[16] at all.

[17]   **Q:** And as far as you know, there was never

[18] any discussion with Mr. O'Grady about this?

[19]   **A:** As far as I know, no.

[20]   **Q:** This may have been asked earlier, but Mr.

[21] O'Grady's television appearances, are you — is the

[22] Washington Speakers Bureau involved in setting

---

1—12:04:42   22—12:09:03                                Page 105

[1]   those up at all?

[2]   **A:** No.

[3]   **Q:** Do you know who is?

[4]   **A:** I think they contact him directly.

[5]   **Q:** So you have not had any involvement with

[6] Mr. O'Grady's appearances with respect to September

[7] 11 on the television stations?

[8]   **A:** No.

[9]   **Q:** Nor with the Iraq war?

[10]   **A:** No.

[11]   **MS. HAMILTON:** If you can hold on and we

[12] go off for a minute we will wrap up.

[13]   **VIDEOGRAPHER:** Time on the monitor is

[14] 12:05. The tape is stopped.

[15]   (Discussion off the record.)

[16]   (Recess.)

[17]   **VIDEOGRAPHER:** Going back on the record.

[18] The time on the monitor is 12:08. Please continue.

[19]   **BY MS. HAMILTON:**

[20]   **Q:** Back to your conversation with

[21] Mr. O'Grady about the movie "Behind Enemy Lines."

[22] You said he was upset there was cursing in the

---

1—12:09:07    14—12:09:41                                    Page 106

[1] movie?
[2]    **A:** Right.
[3]    **Q:** Did he specifically say what cursing
[4] there was that disturbed him?
[5]    **A:** No, not that I remember.
[6]    **Q:** No further questions.
[7]    **MS. HANDMAN:** I am finished.
[8]    **MR. FLYNN:** No questions of this witness.
[9]    **VIDEOGRAPHER:** Here marks the end of tape
[10] 2 if the deposition of Robert Parsons. The
[11] original videotape will be archived by Videolink on
[12] behalf of Miller Reporting Company and Davis Wright
[13] Tremaine. Going off the record, the time on the
[14] monitor is 12:09. The tape is stopped.
[15]    (Whereupon, at 12:09 p.m., the taking of
[16] the deposition was concluded.)
[17]    (Signature not waived.)
[18]
[19]
[20]
[21]
[22]

Page 107

CERTIFICATE OF DEPONENT
I have read the foregoing 106 pages,
which contain the correct transcript of the answers
made by me to the questions therein recorded.
ROBERT PARSONS
Subscribed and sworn to before me this
_____ day of _____, 2003.
Notary Public in and for
My commission expires: _____

# Kelly Patterson

G-30

## Page 1

```
 1           UNITED STATES DISTRICT COURT
 2        FOR THE EASTERN DISTRICT OF TEXAS
              TEXARKANA DIVISION
 3
 4   SCOTT O'GRADY,                    )
                                       )
 5           Plaintiff,                )
                                       )
 6      vs.                            )
                                       )   No.  502CV173
 7   TWENTIETH CENTURY FOX FILM        )
     CORPORATION, and DISCOVERY        )
 8   COMMUNICATIONS, INC.,             )
                                       )
 9           Defendants.               )
                                       )
10   _____)
11
12
13
14
15         DEPOSITION OF KELLY PATTERSON
16              Los Angeles, California
17              Thursday, May 1, 2003
18
19
20
21
22
23
24   Reported by:
     LORI SCINTA, RPR
25   CSR No. 4811
     Job No. 882915
```

## Page 2

```
 1           UNITED STATES DISTRICT COURT
 2        FOR THE EASTERN DISTRICT OF TEXAS
              TEXARKANA DIVISION
 3
 4   SCOTT O'GRADY,                    )
                                       )
 5           Plaintiff,                )
                                       )
 6      vs.                            )
                                       )   No.  502CV173
 7   TWENTIETH CENTURY FOX FILM        )
     CORPORATION, and DISCOVERY        )
 8   COMMUNICATIONS, INC.,             )
                                       )
 9           Defendants.               )
                                       )
10   _____)
11
12
13
14
15       Videotaped deposition of KELLY PATTERSON, taken
16   on behalf of Plaintiff, at 865 South Figueroa
17   Street, 24th Floor, Los Angeles, California,
18   beginning at 9:18 A.M. and ending at 3:25 P.M. on
19   Thursday, May 1, 2003, before LORI SCINTA, RPR,
20   Certified Shorthand Reporter No. 4811.
21
22
23
24
25
```

## Page 3

```
 1   APPEARANCES:
 2
 3   For Plaintiff:
 4
 5       LOCKE LIDDELL & SAPP LLP
         BY:  C.W. PETER FLYNN, IV
 6       Attorney at Law
         2200 Ross Avenue, Suite 2200
 7       Dallas, Texas 75201-6776
         (214) 740-8654
 8       E-mail:  cwflynn@lockeliddell.com
 9
     For Defendant Discovery Communications, Inc.:
10
11       DAVIS WRIGHT TREMAINE LLP
12       BY:  LAURA R. HANDMAN
         Attorney at Law
13       1500 K Street, N.W., Suite 450
         Washington, D.C. 20005-1262
14       (202) 508-6624
15       E-mail:  laurahandman@dwt.com
16   For Defendant Twentieth Century Fox Film Corporation:
17       JACKSON WALKER L.L.P.
18       BY:  NANCY W. HAMILTON
         Attorney at Law
19       1401 McKinney, Suite 1900
         Houston, Texas 77010
20       (713) 752-4200
21       E-mail:  nhamilton@jw.com
22
23
24
25
```

## Page 4

```
 1   APPEARANCES (Continued):
 2
 3   Also Present:
 4
 5       DISCOVERY COMMUNICATIONS, INCORPORATED
         BY:  LAURA YAGER-KATZ
 6       Attorney at Law
         One Discovery Place
 7       Silver Spring, Maryland 20910-3354
         (240) 662-3536
 8       E-mail:  laura_yager-katz@discovery.com
 9
     Videographer:
10
11       STAN BEVERLY
         ESQUIRE DEPOSITION SERVICES
12       6222 Wilshire Boulevard
         Los Angeles, California 90048
13       (800) 640-2461
14
15
16
17
18
19
20
21
22
23
24
25
```

1 (Pages 1 to 4)

# Kelly Patterson

Page 49

1  support what happened to him.  There would describe --
2  have a little bit more description about the hour of
3  programming.
4      Q   Did you at that time ask to actually view the
5  Discovery Channel program called BEHIND ENEMY LINES:
6  THE SCOTT O'GRADY STORY?
7      A   No.
8      Q   Have you ever seen that program?
9      A   In part.
10     Q   When was the first time you saw it?
11     A   The first time I saw it was probably after it
12  aired on November 28th.
13     Q   2001?
14     A   2001.
15     Q   What were the circumstances that you happened
16  to be watching a part of that program?
17     A   I had taped it for an air check and so I just
18  sort of glanced through it.  I didn't watch it in depth.
19     Q   What were your reasons for taping it for an air
20  check?  What does that mean?
21     A   From my perspective, whenever we do any type of
22  a promotional stunt on our networks, I always tape
23  off -- I always tape them for our own in-house copy.
24     Q   You used the word "stunt."  What does "stunt"
25  mean?

Page 50

1      A   "Stunt" is a term that's used by broadcast and
2  cable networks whenever they are creating a special
3  programming event.  For example, FRIENDS on NBC, they'll
4  create a three-hour FRIENDS mara- -- stunt.  It will be
5  a one-night only event.
6      Q   Have you ever sat through and watched the
7  entire program from start to finish, the Discovery
8  Channel program the Scott O'Grady story, BEHIND ENEMY
9  LINES?
10     A   No.
11     Q   When you -- when you -- when you viewed and
12  glanced through the BEHIND ENEMY LINES: THE SCOTT
13  O'GRADY STORY after the November 28th, 2001 airing, did
14  what you viewed contained what was aired on
15  November 28th, 2001?
16     A   Yes.
17     Q   And it contained the various stunt -- stunts
18  that were created by the Discovery Channel that were
19  placed within that program?
20     A   Those are called "interstitials," and it did.
21     Q   And "interstitials" refers to what?
22     A   Created elements that are edited into the show
23  to add a level of interest or I think sort of a
24  thought-provoking question.
25         That's the way Discovery does it.

Page 51

1      Q   And these interstitials are created in
2  connection with clients who want to use those
3  interstitials to promote their product?
4          MS. HANDMAN:  Objection as to form.
5  BY MR. FLYNN:
6      Q   Is that correct?
7      A   They could be.
8      Q   Okay.  You worked on creating this stunt for
9  Twentieth Century Fox in the fall of 2001, did you not?
10     A   Yes.
11     Q   Okay.  From the time that you first learned
12  about Discovery Channel having this program, BEHIND
13  ENEMY LINES:  THE SCOTT O'GRADY STORY, until the program
14  aired on November 28th, 2001, did you see any previews
15  or any footage from the Twentieth Century Fox movie,
16  BEHIND ENEMY LINES?
17     A   No.
18     Q   Did you talk with anyone at Fox about what the
19  movie was about during that period?
20     A   Well, we learned -- before I knew what the
21  movie was about, we had only the information that we had
22  obtained through upcoming movies.com, so -- and I had
23  made several attempts to see if Twentieth Century Fox
24  was interested in looking at any of the military
25  programming that Discovery Channel had for either one of

Page 52

1  the two movies it had coming up in the fall and they
2  weren't.  They weren't interested.  BEHIND ENEMY LINES
3  was not a "tent-full" movie for them and they weren't
4  really going to be doing much promotion with it.
5          The movie moved from October where it was
6  initially scheduled to release to January, and then
7  later on it was moved back into November of 2001, so the
8  movie was all over the place.
9          The first time I got any kind of synopsis from
10 Twentieth Century Fox on what the movie was about was
11 when they requested a media plan for a movie by -- which
12 did not have anything to do with the promotion -- for
13 $275,000.  And with that the buyer included a small
14 synopsis of what the movie was about.
15     Q   Was this in written form?
16     A   Yes.
17     Q   Who provided you with that synopsis?
18     A   Jenny Rhoades.
19     Q   Do you have that synopsis today?
20     A   I don't have it with me.
21     Q   Do you have it in your files?
22         MS. HANDMAN:  You have it.
23         MR. FLYNN:  It's been produced?
24         MS. HANDMAN:  Uh-huh.
25  BY MR. FLYNN:

**Esquire Deposition Services**

D.C. - 1-800-441-3376
MD - 1-800-539-6398

# Kelly Patterson

## Page 61

1  October 11th.

2      Q   If you look at the bottom of page -38, does it

3  say from Mary Baquet "To: Roger Henry," October 9th,

4  2001 at 7:56 A.M.?

5      A   Yes.

6      MS. HANDMAN:  You had asked about Roger Henry

7  to Mary Baquet.

8  BY MR. FLYNN:

9      Q   I'm sorry.  Mary Baquet sent an e-mail to

10  Roger Henry on the same day, October 9th, 2001, of which

11  you received a copy, correct?

12      A   Yes.

13      Q   And she says:

14          "Hey Roger, I know we discussed Behind

15          Enemy Lines and running the Scott O'Grady

16          Story, I think we said the wednesday [sic]

17          before the opening on January 19th.

18          However, Kelly and I need to know what the

19          paln [sic] for the night might be."

20          You got a copy of that e-mail, correct?

21      A   Yes.

22      Q   Does that refresh your recollection that on

23  October 9th you were looking to work at -- work on some

24  sort of promotion between the Twentieth Century Fox

25  movie, BEHIND ENEMY LINES, and the Discovery program,

## Page 62

1  BEHIND ENEMY LINES:  THE SCOTT O'GRADY STORY?

2      A   I think at the time from our perspective with

3  Discovery, January is a very quiet month for the

4  network.  We don't have a lot going on in January

5  because our big premieres all happen in December.

6          And with BEHIND ENEMY LINES moving into

7  January, the movie, we were more interested in trying to

8  do something promotionally with the theatrical release

9  for the month of January.

10          And it looks like at the time when we thought

11  it was opening on January 19th, Scott O'Grady -- the

12  BEHIND ENEMY LINES:  THE SCOTT O'GRADY STORY would have

13  been one of probably two hours of programming that we

14  would have aired prior to the 12 -- the 1/19

15  opening.  So that nothing had been agreed upon or

16  discussed, it's all -- it's all developing.

17      MR. FLYNN:  Okay.  Object.  Nonresponsive.

18      Q   I simply want to know that having read this

19  e-mail, do you now believe that on October 9th you had

20  at least started working on a possible tie-in between

21  the Twentieth Century Fox movie, BEHIND ENEMY LINES, and

22  the Discovery Channel program, BEHIND ENEMY LINES:  THE

23  SCOTT O'GRADY STORY?

24      MS. HANDMAN:  Objection as to form.

25      THE WITNESS:  I would say that's probable.

## Page 63

1      MR. FLYNN:  Let's have marked as Exhibit 97 an

2  e-mail dated October 22nd, 2001, Bates-stamped DCI-37.

3          (Exhibit 97 was marked for identification by

4          the court reporter and is attached hereto.)

5  BY MR. FLYNN:

6      Q   Ms. Patterson, can you identify Exhibit 97 as

7  an e-mail that you received from Mary Baquet on

8  October 22nd?

9      A   Yes.

10      Q   Ms. Baquet says to you, "I think this looks

11  good, can you get us between 20" to 30,000 "in

12  production dollars."

13          First of all, what is she referring to when she

14  says, "I think this looks good"?

15      A   I must have completed a deck that I sent to her

16  for her review.

17      Q   She says, "Can you get us" -- and a "deck" is,

18  what, a description of the promotional idea --

19      A   Yes.

20      Q   -- of the tie-in between the Twentieth Century

21  Fox movie and the Discovery Channel program, right?

22      MS. HANDMAN:  Objection as to form.

23      You can answer.

24      THE WITNESS:  Yes.

25  BY MR. FLYNN:

## Page 6

1      Q   She says, "...can you get us between 20" to

2  30,000 "in production dollars."

3          What was she referring to there?

4      A   She works off of a budget to promote Discovery

5  on-air programming so it's a finite amount of money that

6  she has, so there is always the request whenever we do

7  movie promotions that the studios help to fund the

8  production that Discovery Channel will undertake to

9  create the interstitials and the promotional spots.

10      Q   So she was asking you if you could get $20- to

11  $30,000 from Fox to help fund the production?

12      A   She's asking me to let Michelle Marks know that

13  in order to probably pull this together, we would need

14  20- to 30,000 in production.

15      Q   And that would be to produce what?

16      A   Interstitials.

17      Q   "Interstitials" meaning new created material to

18  promote the Twentieth Century Fox movie on the Discovery

19  Channel program?

20      MS. HAMILTON:  Objection to form.

21      THE WITNESS:  No.  Interstitials are the

22  creative elements that we try to pull together whenever

23  we do a movie tie-in that focus on the fact versus the

24  fiction, and it is why we look for thematic programming

25  when we do partner with the movie studios because our

16 (Pages 61 to 6

## Kelly Patterson

Page 65

1  whole objective is to bring the cachet of something that
2  is new and timely, which is the theatrical release, into
3  the realm of the fact versus fiction.
4        And so those are the creative elements that we
5  would produce that support that sort of theme that we
6  feel is thought-provoking.
7  BY MR. FLYNN:
8     Q   And in this case the fact was Discovery Channel
9  program BEHIND ENEMY LINES:  THE SCOTT O'GRADY STORY and
10 the fiction would be the movie by Twentieth Century Fox
11 BEHIND ENEMY LINES?
12    A   Yes.
13    Q   So you think at this time you had already
14 prepared a deck that outlined the promotion that you had
15 been working on?
16    A   Yes.
17    Q   You would have sent that to Mary Baquet for her
18 review?
19    A   Yes.
20    Q   Who had to review and approve any promotional
21 idea of a tie-in between a movie and a Discovery Channel
22 program?
23        MS. HANDMAN:  Objection as to form.
24        THE WITNESS:  In a case -- whenever I probably
25 am working on something like this, I would discuss it

Page 66

1  with Mary Clare and some of the Discovery Channel --
2  what we've created as sort of our own team of people
3  that work on these.  We would discuss the ideas and
4  whether or not we felt that it was significant enough
5  from a content form that it wouldn't make the Discovery
6  Channel viewers feel like they were at all being
7  over-advertised to because that would never be our
8  goal.  And so that would be one part of it.
9        The other person that would be key to -- from
10 my perspective from any ad-sell side letting know what
11 was going on would be Marc Goodman and Adam Stewart.
12 BY MR. FLYNN:
13    Q   So Mr. Goodman would have to approve a stunt?
14    A   It's not so formal as he would approve it as
15 much as I would let him know as my manager what I'm
16 working on.
17    Q   Would anyone at Discovery have to approve a
18 stunt that you created?
19    A   Well, if programming and marketing are behind
20 it, then Adam Stewart would be the only person that
21 would say "no" based on some other situation.  But
22 chances are if programming is interested and marketing
23 is interested in it, there's -- there's a strong reason
24 why they would be interested and they are the best
25 gatekeepers for knowing what events are on our air, that

Page 67

1  we wouldn't be compromising any other program on
2  Discovery Channel.  I'm still not sure I understand.  I'm
3     Q   Okay.  I'm still not sure I understand.  I'm
4  just trying to find the names of anyone at Discovery
5  that has to approve a stunt.
6     A   Well, it's all of these people.
7     Q   Okay.
8     A   Mark Goodman, Adam -- I mean, everybody's in
9  agreement.
10    Q   Let's get the names.  Mr. Goodman would have
11 to approve --
12        MS. HANDMAN:  Objection as to form.  She says
13 it's not approval.
14 BY MR. FLYNN:
15    Q   All right.  My question is:  Do you understand
16 what the word "approval" means?
17    A   There is not a person that stamps it and goes
18 "Approved."
19    Q   My question, you understand generally what the
20 term "approved" means, correct?
21    A   I do.
22    Q   Did anyone at the Discovery Channel program
23 have to give their approval or consent to this stunt
24 that you were working on?
25    A   Well, ultimately, Roger Henry, probably,

Page 68

1  because he has to decide whether or not he can even air
2  the show.
3     Q   Anyone else other than Mr. Henry?
4     A   Perhaps Dan Stanton as he is Mary Clare's
5  manager.
6     Q   And who is Mr. Henry?  What is his position?
7     A   I think he was -- his position at the time was
8  program scheduling.  He works with programmers who are
9  also in development but he schedules the network.
10    Q   Did anyone else at Discovery have to approve
11 this stunt?
12        MS. HANDMAN:  Objection as to form.
13        THE WITNESS:  No.
14 BY MR. FLYNN:
15    Q   Do you know whether Mr. Henry or Mr. Stanton
16 approved this stunt?
17    A   I would think they did.
18    Q   I'm not interested in what you assume.  But do
19 you have any personal knowledge as to whether they did
20 or not?
21    A   Based on the fact that we did it, I would think
22 they approved it.
23    Q   Did anyone tell you that they approved it?
24    A   No.
25    Q   Did anyone at Fox have to approve this stunt?

Esquire Deposition Services

D.C. - 1-800-441-3376
MD - 1-800-539-6398

## Kelly Patterson

Page 105

1    MS. HAMILTON:  Objection.  Form.
2    THE WITNESS:  Can I answer?
3  BY MR. FLYNN:
4    Q    Yes.
5    A    Our threshold from our perspective, what we
6  felt was fair for us to be able to move forward with
7  doing this because it is a lot of work was $400,000.
8  They had already spent $275,000 on our network with the
9  regular media buy per Jenny Rhoades that we negotiated
10  and we booked.  So if they wanted us to move forward
11  with this, we would need their agreement to move forward
12  as well as an additional commitment of $125,000.
13    Q    I guess -- let me just try to --
14    How much money did Fox -- strike that.
15    How much money did Discovery need to receive
16  from Fox to do this promotional stunt with the BEHIND
17  ENEMY LINES: THE SCOTT O'GRADY STORY?
18    A    We wanted a total expenditure, a media buy, on
19  our network to support BEHIND ENEMY LINES of $400,000.
20    Q    How much did Discovery end up receiving from
21  Fox to do the stunt and the promotion?
22    A    $400,000.
23    Q    All right.
24    A    But that $400,000 does not -- is not the
25  promotion.

Page 106

1    Q    What is the $400,000?
2    A    It's a media buy.
3    Q    Well, what I'm trying to get at is:  Fox is
4  doing other things with you and I want to know a total
5  amount of money that the Discovery Channel received for
6  doing the promotional on the Discovery Channel program.
7    A    Well --
8    MS. HANDMAN:  Are you -- I'm sorry.  Go ahead.
9    THE WITNESS:  I was going to say if you
10  extrapolate it out exactly what the promotion was it
11  would probably be $75,000.
12  BY MR. FLYNN:
13    Q    Have you done that?
14    A    I haven't added it all up but that's about what
15  it would be because they only aired two units within the
16  hour, two 30-second units, and I think they added up to
17  about $50-, $65,000.  And then all the rest of the spots
18  that air on our network that are part of that $400,000
19  are just sheer media.  They're not the promotion.
20    Q    And what do those spots -- what did those spots
21  show?
22    A    Those are the 30-second advertising spots that
23  are produced by Twentieth Century Fox.  They are
24  commercials that they ran on our network as well as
25  every other network they purchased to promote BEHIND

Page 107

1  ENEMY LINES.
2    Q    So Fox was running ads for its movie on the
3  Discovery Channel, correct?
4    A    Correct.
5    Q    And that's what part of the $400,000 went for,
6  correct?
7    A    That was probably 99 percent of what the
8  $400,000 went for.
9    Q    Now, Ms. Baquet, turning back to Exhibit 102,
10  says:
11    "Wednesday November 28th from 8 to
12    9 PM the Scott O'Grady story as a 1 hour
13    event packaged with intro, behind the
14    scenes bumpers and possible hosted
15    Scott O'Grady element..."
16    What did you understand her to mean by
17  "possible hosted Scott O'Grady element"?
18    A    I believe at this particular point in time, and
19  I'm not really certain -- as I mentioned before, many
20  times with these promotions that we do, we have hosted
21  pieces.  For example, we did a promotion with Universal
22  Studios for U-571 and Matthew McConaughey hosted the
23  night.  We also did a promotion with Universal Studios
24  for the MUMMY and Brendan Fraser hosted the night.
25    So a lot of times we have hosts either from the

Page 108

1  movie or from some aspect of science or the show that
2  will come on to host the night.
3    When we did the PLANET OF THE APES event with
4  Twentieth Century Fox -- I can't think of Nigel's last
5  name, one of our on-air talent, Nigel, who is a
6  behavioral on -- animal naturalist, he hosted the
7  Twentieth Century Fox PLANET OF THE APES night.
8    So what I believe that what Mary Clare is
9  referring to here is that there would be -- this would
10  be a hosted piece where we could have a hosted element
11  that maybe Scott O'Grady could host an element, maybe
12  Gene Hackman could host an element.  It would be hosted
13  pieces.
14    MR. FLYNN:  Object.  Move to strike as
15  nonresponsive.
16    Q    Had you at this time discussed with Ms. Baquet
17  or anyone else the possibility of having Scott O'Grady
18  do some sort of interview as part of this promotion?
19    A    I'm not sure if at this time it had come up
20  yet, but I do know that it did come up that Mary Clare
21  thought if it was possible it could be added to the
22  event for Scott O'Grady to be able to talk about --
23  do -- do a little bit of an interview and talk about the
24  realities of his experience versus any kind of
25  fictionalized similar events, sort of that

# Kelly Patterson

Page 165

1   A   I can identify it.
2   Q   What is it?
3   A   This is a post-sell piece that we would have
4   done to let the studio know the type of delivery or what
5   their interstitial value was of the elements that we
6   created for the night would have been worth.
7   Q   So we're clear here, this was a document that
8   was created after the program aired on November 28th,
9   2001 --
10  A   Uh-huh.
11  Q   -- correct?
12  A   Yes.
13  Q   And it attempts to show Twentieth Century Fox
14  the value that it received in dollars for the various
15  promotional pieces the Discovery Channel created for
16  it?
17  A   Yeah.
18      MS. HAMILTON:  Objection as to form.
19      THE WITNESS:  This is something -- this is
20  standard operating procedure.  We do this with all the
21  studios.
22  BY MR. FLYNN:
23  Q   Taking a look, if you will, and the second page
24  of this exhibit, DCI-80, says, "Discovery Channel
25  Delivers Big!"

Page 166

1       Did you write that?
2   A   I did.
3   Q   Is this exhibit something that you created?
4   A   I created -- with Christa, the two of us put
5   this together.
6   Q   And you believe the November 28th, 2001 program
7   delivered big for Twentieth Century Fox?
8   A   No.
9   Q   You don't believe that?
10  A   Well, let me explain.
11      If you looked at the actual estimates for the
12  night versus the actual delivery for the night, the show
13  under-delivered by over 4 million adults age 18 to 49,
14  which was our guaranteeing demographic.
15      But part of my -- the way I do my business is
16  try to always justify to the studios that when they
17  spend their money they've spent it and they've gotten a
18  good promotion or a good delivery.
19      I write here what I have tried to do is not
20  focus on the fact that there was a big under-delivery
21  from the event but more or less focus on the fact that
22  they got added value through their overall promotion on
23  the network.
24      So that's why the focus of what I put together
25  here was focused on the interstitial value.

Page 167

1       Normally, through other promotions that we do
2   for your JURASSIC PARK III, for example, that was one of
3   the big promotions that we did with Universal, ICE AGE
4   which we did with Twentieth Century Fox, as well.  We
5   usually have huge over-deliveries of our actual
6   estimates by anywhere from 80 to 150 percent so we
7   usually have a much larger tune-in.  And with this
8   particular event, our viewership was down so my focus
9   was really just to focus them back on the added value of
10  part of the promotions.
11      MR. FLYNN:  Move to strike, nonresponsive.
12  Q   So looking at exhibit -- at the exhibit and
13  looking at page 2 where you wrote "Discovery Channel
14  Delivers Big!" is that a true statement or a false
15  statement?
16  A   It's a true statement if you just look at the
17  interstitial value but not if you look at the
18  under-delivery.
19  Q   If you turn to the third page of the exhibit,
20  DCI-81, it says, "Behind Enemy Lines:  The Scott O'Grady
21  Story, Interstitial Value."
22      Can you tell me and the jury what "interstitial
23  value" means?
24  A   "Interstitial value" purports to be the
25  creative elements that Discovery Channel produced, the

Page 168

1   introduction to the night, the bumps, in and out of
2   breaks, and the sneak peek that was incorporated into
3   the one-hour presentation of the BEHIND ENEMY LINES:
4   THE SCOTT O'GRADY STORY, and the value that is attached
5   to it is determined by the Nielsen overnight research.
6       So if a 30-second spot would deliver 900,000
7   households, a 60-second spot would deliver 18 -- would
8   deliver 1.8 million households.  So it's just a
9   mathematical calculation based on 30-second delivery
10  multiplied out by the time the interstitial ran within
11  our air.
12  Q   This is something that you gave to Fox?
13  A   Yes.
14  Q   And then this is to show the value to them of
15  this -- of these promotional pieces that Mr. Anderson
16  created?
17  A   Correct.
18  Q   Okay.  Looking at page -81 of this exhibit,
19  DCI-81, I gather what it's doing is it's attempting to
20  break out for each of, say, the six elements of the
21  interstitials created by Mr. Anderson some sort of
22  analysis as to the number of households each of those
23  parts reached and the interstitial value for each of
24  those parts?
25  A   In essence.

D.C. - 1-800-441-3376
MD - 1-800-539-6398

Esquire Deposition Services

**Kelly Patterson**

Page 193

1
2
3
4          I, the undersigned, a Certified Shorthand
5  Reporter of the State of California, do hereby certify:
6          That the foregoing proceedings were taken
7  before me at the time and place herein set forth; that
8  any witnesses in the foregoing proceedings, prior to
9  testifying, were placed under oath; that a verbatim
10  record of the proceedings was made by me using machine
11  shorthand which was thereafter transcribed under my
12  direction; further, that the foregoing is an accurate
13  transcription thereof.
14          I further certify that I am neither
15  financially interested in the action nor a relative or
16  employee of any of the attorney of any of the parties.
17          IN WITNESS WHEREOF, I have this date
18  subscribed my name.
19
20  Dated: _____
21
22
                    _____
                         LORI SCINTA, RPR
23                       CSR No. 4811
24
25

49 (Page 193)

# BBC

Facsimile

**BBC South Contracts Department**
**Broadcasting House**
**Whiteladies Rd.**
**Bristol BS8 2LR**

To:    Scott O'Grady          **Phone:**
                              **Fax No: 0019 728260429**

From:  David Crockford         **Phone: +44 117 - 9742157**
       Assistant Manager Contracts   **Fax No:+44 117 - 9237779**
                              **E-mail: david.crockford@bbc.co.uk**

Date:   22 March 2002          **No.of Pages (including this one): 3**

☐ Urgent ☐ Please Reply    ☐ Private and Confidential

## Re: BBC FILMING

Dear Mr O'Grady

I understand that you contacted one of our production offices to ask for a copy of the agreement that you signed for our "999" series in 1996, to be faxed to you.

Please find a copy attached.

Yours sincerely

David Crockford

**DEPOSITION**
**EXHIBIT**
**44**

Exhibit **44**

SOG 003188
CONFIDENTIAL

CONFIDENTIALITY: This is a private facsimile transmission intended for the named recipient only, and its contents may be confidential. If you are not the named recipient, you must not read, copy or use the contents, or disclose them to any other person. Please notify the sender immediately by telephone that you

FROM : BBC CONTRACTS        PHONE NO. : 01179 237779        22 Mar. 2002 11:17AM P2

# BBC Bristol

BRITISH BROADCASTING CORPORATION
BROADCASTING HOUSE
WHITELADIES ROAD
BRISTOL BS8 2LR
TELEPHONE: 0117 973 2211
FAX: 0117 923 7779
Email : bristol.contracts@bbc.co.uk

## CONTRACT

Paypoint: Bristol                                                                    TELEVISION ML6A

BBC Ref : JCS/VB (IIP01 N/A M)          Ext : 42157          Date : 14/05/96          Contract No : 27856

OFFER OF ENGAGEMENT to you for the contribution(s) described below at the fee specified on the terms and conditions set out on this page and overleaf.

Title : "999 SPECIAL"

Producer           : ANDREA WILLS
Service            : BBC1
Programme Duration :          Cont. Duration :
Union Code         :
Broadcast Date     : TBA
Insurable Days     : N/A

Contribution : TO BE INTERVIEWED AND TO PARTICIPATE IN
               SHORT ACTUALITY SEQUENCE CONCERNING YOUR
               RESCUE IN BOSNIA

Location : SALT LAKE CITY, UTAH, U.S.A.

Reh/Rec.: HALF DAY - MONDAY 10 JUNE 1996
          HALF DAY - WEDNESDAY 12 JUNE 1996

CLAUSE A
The Contributor(s) agree(s) that he/she will not tell their story covered by this contract to any other U.K. Television Company (terrestrial and satellite) until transmission of their story for the first time on the 999 series or until 30 June 1997, whichever is the sooner.

| Programme No | Fee | Recording Date |
|---|---|---|
| 01/NBS Q096R | 500.00 | 10/06/96 |

| | |
|---|---|
| 500.00 | FEE |
| | IF ANY ADDITIONAL FILMING IS REQUIRED THIS WILL BE PAID ON A PRO RATA BASIS |
| | PLEASE COMPLETE: SOCIAL SECURITY NO. .................. |
| 500.00 | Total          US DOLLARS |

Payments to : CAPT. SCOTT O'GRADY
Contract Index : CIO1265101

VAT: I wish to be self-billed and I agree to advise the BBC if I de-register.

VAT Registration Number  [ ] [ ] [ ] [ ] [ ] [ ] [ ] [ ]

CAPT. SCOTT O'GRADY
C/O HILL AIR FORCE BASE
UTAH
U.S.A.

Signed on behalf of the BBC        Contracts Manager, South

1. If you wish to accept please sign and return the attached Acceptance or let us know otherwise as soon as possible.
2. If you should receive notice of any claim for defamation in respect of the contribution(s), you are asked to notify the BBC before taking any steps to deal with the claim.
3. Letters addressed to speakers c/o the BBC will be forwarded, but for statistical purposes the letters may be opened before being forwarded unless we are notified of any objection. Letters marked 'personal' are forwarded unopened.
I agree to carry out this engagement on the terms and conditions offered.

(Contributor's Signature)                              (Date)
Sign and return one copy to BBC Contracts Manager

Normal Country of Residence (if not UK) of each Artist covered hereby

Page 1 of 1

SOG 003189
CONFIDENTIAL

FROM : BBC CONTRACTS          PHONE NO. : 01179 237779          22 Mar. 2002 11:18AM P3

CONDITIONS REFERRED TO IN THE OFFER OF ENGAGEMENT

1. You agree to carry out this engagement and to attend such rehearsals as are necessary in the opinion of the BBC and to be made up (if required) by a person appointed by the BBC and to wear such everyday articles of dress which are necessary to ensure satisfactory reception of your picture on the receiving screen.

2. Where you are to provide a programme outline(s) and/or treatment(s) and/or script(s) this contract is subject to such outline treatment and/or script(s) and any exhibit(s) provided by you conforming with the BBC's requirements both as to content and date of delivery. In the case of contributions to educational programmes you agree if required to provide short descriptive notes on the contribution(s) for possible inclusion in the published programme(s) of the BBC and/or any other material (including suggestions for illustrations and book lists) to be used in the issue of a pamphlet relating to the contribution(s).

3. You agree that:
   (a) the contribution(s) (including exhibit(s)) provided by you shall not contain anything which is an infringement of copyright or which is calculated to bring the BBC into disrepute or which is defamatory provided however that you shall not be liable in respect of any defamatory material which was included without negligence or malice on your part.
   (b) the contribution(s) including any exhibit(s) provided by you shall not contain any advertisement or anything of an advertising nature
   (c) in the case of scripted contributions the contribution(s) shall be your original work and shall not contain any previously published material written by you which the BBC has not accepted in writing and that you hold all licences and permissions necessary to authorise the use of such original work for all the purposes of this contract and that no such original work is copyright material in relation to which you are the assignee of copyright and in which assignment the rights in Section 77 of the Copyright, Designs and Patents Act 1988 have been asserted by the assignor and if the contribution(s) contain any copyright material which you have not written you shall disclose this so that the BBC may make any necessary arrangements for the use for the purposes of this contract and you shall further disclose if you are the assignee of copyright in such copyright material and in which assignment the rights of Section 77 of the Copyright, Designs and Patents Act 1988 have been asserted by the assignor.
   (d) prior to the first broadcast of the contribution(s) by the BBC you will not make or authorise the making of any recording(s) (leaving a substantially similar consent for broadcasting by any other broadcasting organisation
   (e) all "moral rights" which you may have now or in the future in respect of your contribution(s) (including but without limitation any of your rights under Sections 77 and 80 of the Copyright, Designs and Patents Act 1988 or any similar laws of any jurisdiction) are hereby waived irrevocably by you.

4. The word "recording(s)" shall include any contrivance whereby the performances may be mechanically reproduced. The word "contribution(s)" shall be deemed to include translation(s) excerpt(s) and recording(s) thereof wherever the context permits.

5. Without further payment the BBC and BBC Worldwide Limited and its/their licensees and assigns shall be entitled (except as provided in Clause 10(a)) to ALL RIGHTS in the contribution(s) (including any recording(s) or translation(s) thereof) FOR ALL PURPOSES EVERYWHERE. Such rights shall include but shall not be limited to:
   (a) all Television and radio broadcasting (including broadcasting or other forms of transmission by wire and/or cable television and/ or amplified rights
   (b) the right to show or authorise the showing of the contribution(s) to paying and non-paying audiences (including the right to sell or hire for such purposes)
   (c) the right to communicate(s) in a videogram(s) (which shall mean videocassettes, videodiscs and any other device for reproducing visual images and sound which may be played back or the sale of a playback device) and the right to sell or hire or authorise the sale or hire of such videogram(s) to the public for home use
   (d) the right to show or authorise the showing of the contribution(s) on any television, pay cable television, basic cable television and by means of all other forms of television distribution whether now existing or developed in the future including services
   And in the case of contribution(s) to Educational programmes only:
   (i) to adapt and modify and make other use of any material and script(s) supplied by you for promotional and/or educational and/or demonstration purposes.

6. The complete copyright in any written material provided by you shall vest in the BBC but you shall retain such publication rights therein as are specified in Clause 10(a).

7. The BBC and BBC Worldwide Limited and its/their licensees and assigns shall be entitled to edit the contribution(s) and the rights granted to the BBC under this contract shall apply to the whole or any extract(s) from the contribution(s).

8. Trailers
   The BBC and BBC Worldwide Limited and its/their licensees and assigns shall have the further right without payment to broadcast as required for trailer purposes:
   (a) extracts live and recorded from the contribution(s) or any rehearsal(s) thereof
   (b) material live or recorded specially constructed by you for trailer programmes and not requiring a separate attendance.

9. Recording(s) of the contribution(s) may without payment be used by the British Film Institute and other archives of similar bodies and made and used by the National Sound Archive for their respective private purposes.

10. (a) You will if requested negotiate with BBC Publications (a division of BBC Worldwide Limited) in connection with the publication in written form of the contribution(s) or adaptation thereof and unless at the date of acceptance of this contract you declare to the contrary you confirm that you have not entered into any other contractual arrangement or otherwise disposed of or restricted your rights in this regard and will not do so prior to such negotiations.
    (b) During the period from the date of this Agreement until 28 days after the date of the first broadcast ("the restricted period") only the BBC and its licensees and assigns shall have the exclusive right to publish the contribution(s) (in the licensee at the BBC and its licensees and assigns. If the contribution(s) are published in whole or part in the Listener you will be entitled to a fee to be settled by mutual agreement or failing agreement by an arbitrator under the Arbitration Acts 1950/1979.
    (c) Subject to sub-clause (a) and (b) of this Clause, you shall retain the right to authorise publication of the contribution(s) or adaptations thereof after the restricted period.

11. The BBC shall be entitled at any time to cancel these arrangements
    (a) if their performance is prevented by force majeure or by any cause whatsoever beyond the reasonable control of the BBC upon any breach or continued non-observance by you of any of the terms and conditions herein contained subject to payment of a fair proportion of the fees accrued by the BBC after discussion with you for work already carried out.
    (b) for any other reason subject to payment of the full fee under this contract or to the offer of an alternative date(s) so the BBC shall decide and you shall have no further claim whatsoever upon the BBC. Any termination under this Clause shall be without prejudice to any other rights or remedies of the BBC.

12. The BBC shall not be liable to you or your legal personal representatives for any loss, damage or injury to your person or property during or in connection with this engagement unless caused by the negligence of the BBC and recoverable on that ground.

13. You shall be responsible for ensuring that any equipment (including any exhibit(s)) supplied by you is safe and complies with the BBC's safety requirements and you will abide by all safety rules and regulations which apply from time to time as made by the BBC.

14. All fee(s) specified herein shall unless otherwise stated be exclusive of VAT if this is relevant.

15. The programme titles and the date and time of transmission of the programme(s) stated overleaf may be changed at the discretion of the BBC.

Head Office: THE BRITISH BROADCASTING CORPORATION
BROADCASTING HOUSE LONDON W1A 1AA

P7329 TELEVISION MISA (ab 9.91) - MLGAB.01

SOG 003190
CONFIDENTIAL

O'Grady    Scott

**FROM:**   Anna Gol, Production Assistant, 999
Room 18, 25 WLR

**DATE:**   24 June 1996

**TO:**    Chris Stone, Manager Contracts

He wants the money to go to the following charity:

The Gift Programme
c/o Scott O'Grady
1160 State Office Building
Salt Lake City
Utah 84114

Tel: 001 801 538 9550

Could the cheque go out with a hard copy of the contract as the one he signed was a faxed copy.

He didn't complete the social security number because the money is going to charity.

We didn't interview Stacey because of time constraints, but we will do so at a later date.

Many thanks.

Anna

25 JUN 1996.

4/7/96
Sent copy of contract
to Scott O'Grady + told him
cheque sent to Gift Prog.
+
Sent cheque + comp slip to
The Gift Prog at above address

SOG 003191
CONFIDENTIAL



**BBC SOUTH**

BRITISH BROADCASTING CORPORATION
BROADCASTING HOUSE
WHITELADIES ROAD
BRISTOL BS8 2LR
TELEPHONE: 0117 973 2211
FAX: 0117 923 7770

**CONTRACT**

Keypoint: Bristol

TELEVISION DRAMA

BBC Ref : JCB/YB (HP01 N/A M)                TAX : 4213??        Date : 14/05/96        Contract No : 27856

OFFER OF ENGAGEMENT to you for the contribution(s) described below at the fee specified on the terms and conditions set out on this page and overleaf.

Title : "999 SPECIAL"

| | |
|---|---|
| Producer | : ANDREA WILLS |
| Service | : BBC1 |
| Programme Duration | :        Cont. Duration : |
| Union Code | : |
| Broadcast Date | : TBA |
| Insurable Days | : N/A |

Contribution : TO BE INTERVIEWED AND TO PARTICIPATE IN SECRET ACTUALITY SEQUENCE CONCERNING YOUR RESCUE IN BOSNIA

Location    : SALT LAKE CITY, UTAH, U.S.A.

Reh/Rec :    HALF DAY - MONDAY 10 JUNE 1996
             HALF DAY - WEDNESDAY 12 JUNE 1996

| Programme No | Fee | Recording Date |
|---|---|---|
| 01/HBS Q096R | 500.00 | 10/06/96 |

**CLAUSE A**
The Contributor(s) agree(s) that he/she will not tell their story covered by this Contract to any other U.K. Television Company (terrestrial and satellite) until transmission of their story for the first time on the 999 series or until 30 June 1997, whichever is the sooner.

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**IN CIVIL ACTION NO. 502CV 173**
**UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

PASSED FOR
25 JUN 1996

| | | |
|---|---|---|
| 500.00 | FEE | |
| | IF ANY ADDITIONAL FILMING IS REQUIRED THIS WILL BE PAID ON A PRO RATA BASIS | |
| | PLEASE COMPLETE: SOCIAL SECURITY NO. .................. | |
| 500.00 | Total | US DOLLARS |

Payments to : THE GIFT PROGRAMME
              : CAPT. SCOTT O'GRADY
Contract Index : CI01265101

VAT: I wish to be self-billed and I agree to advise the BBC if I de-register.

VAT Registration Number [ ][ ][ ][ ][ ][ ][ ][ ][ ]

CAPT. SCOTT O'GRADY
C/O HILL AIR FORCE BASE
UTAH
U.S.A.

Signed on behalf of the BBC        Contracts Manager, South

1. If you wish to accept please sign and return the attached Acceptance or let us know otherwise as soon as possible.
2. If you should receive notice of any claim for defamation in respect of the contribution(s), you are asked to notify the BBC before taking any steps to deal with the claim.
3. Letters addressed to speakers c/o the BBC will be forwarded, but for statistical purposes the letters may be opened before being forwarded unless we are notified of any objection. Letters marked 'personal' are forwarded unopened.

I agree to carry out this engagement on the terms and conditions offered.

_____        _____
(Contributor's Signature)             (Date)
Sign and return one copy to BBC Contracts Manager

_____
Normal Country of Residence (if not UK) of each Artist covered hereby

Page 1 of 1

DEPOSITION
EXHIBIT
45

Exhibit 45

DCI 000083                25 JUN 1996

**FROM:**   *Anna Gol, Production Assistant, 999*
            *Room 18, 25 WLR*                      44/28/6

**DATE:**   *24 June 1996*

**TO:**     *Chris Stone, Manager Contracts*

---

Wasn't there something you said about eating your hat? I am enclosing the signed Scott O'Grady contract which in your absence got changed to a fee of US$500 instead of £500!

He wants the money to go to the following charity:

> The Gift Programme
> c/o Scott O'Grady
> 1160 State Office Building
> Salt Lake City
> Utah 84114
>
> Tel: 001 801 538 9550

Could the cheque go out with a hard copy of the contract as the one he signed was a faxed copy.

He didn't complete the social security number because the money is going to charity.

We didn't interview Stacey because of time constraints, but we will do so at a later date.

Many thanks.

*Anna*

25 JUN 1996.

325-77

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER
IN CIVIL ACTION NO. 502CV 173
NITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

 **Lloyds Bank**

INTERNATIONAL BRANCH AYLESBURY
1 TRIANGLE BUSINESS PK WENDOVER RD
STOKE MANDEVILLE AYLESBURY BUCKS

Our Reference
FT00026147042402

Draft Number
00079275

Related Reference
BBB05629/00044/006

To:

LLOYDS BANK PLC
CLIFTON
57 F

As requested we enclose our
International Draft payable to:

THE GIFT PROGRAMME

Drawn On:

THE BANK OF NEW YORK
NEW YORK,N.Y..   U.S.A

Amount of Draft  USD        500.00

We debit you as follows Val 01JUL96

Account Number        00781853

By Order Of:

BC SOUTH

Principal Amount GBP      323.77
at 1.5443       USD      500.00

Charge Account Number    00781853

Charge Amount    GBP       2.00
SPECIAL NON-STD CHG

Bank Plc is registered in England no. 2065.
red Office: 71 Lombard Street, London EC3P 3BS

· of IMRO and the Banking Ombudsman Scheme.
tory to the Code of Banking Practice.

F501

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**IN CIVIL ACTION NO. 502CV 173**
**UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

DCI 000086

## SPEAKING ENGAGEMENTS FOR CALENDAR YEAR 2001 FOR SCOTT O'GRADY

| Organization | ContractNumber | AppearanceDate | CancelledDate | Fee | WSBCommission | ForServiceTo | Speaker Fee |
|---|---|---|---|---|---|---|---|
| Kansas City Life Insurance Company | C2420 | 01/13/01 | | $10,000 | $2,000 | | $5,000 |
| American Architectural Manufacturers Association | C1640 | 01/22/01 | | $10,000 | $2,000 | | $8,000 |
| TBA Corporate Communications & Entertainment | C2142 | 01/26/01 | | $10,000 | $2,000 | | $8,000 |
| Personalities & Promotions International | C2306 | 02/06/01 | | $10,000 | $2,000 | Georgia Pacific | $8,000 |
| Golf Course Superintendents Association of America (GCSAA) | B9070 | 02/13/01 | | $10,000 | $1,000 | Dell Computers | $8,000 |
| Kansas City Life Insurance Company | C3176 | 02/15/01 | | $10,000 | $2,000 | | $8,000 |
| Personalities & Promotions International | C2087 | 02/17/01 | | $7,500 | $1,000 | | $5,000 |
| National Association of Chain Drug Stores | C1941 | 02/22/01 | | $10,000 | $1,600 | | $8,000 |
| Robert E. Lee Boy Scouts of America | C2150 | 02/26/01 | | $10,000 | $2,000 | | $8,000 |
| Speaker Resource Center, Inc. | C1721R | 02/27/01 | | $10,000 | $2,000 | Baxter Health Care | $8,000 |
| Keppler Associates | C1519 | 03/02/01 | | $10,000 | $1,000 | American Red Cross, Western Colorado Chapter | $8,000 |
| Speakers Bureau, Inc. | C1721R | 03/15/01 | | $10,000 | $1,000 | Tennessee Health Care Management Association | $8,000 |
| KPMG | C1248 | 03/16/01 | | $10,000 | $1,000 | California Park and Recreation Society | $8,000 |
| Pharmaceutical Research and Manufacturers of America | B9636 | 03/17/01 | | $10,000 | $2,000 | | $8,000 |
| Speak Inc. | C3383 | 03/26/01 | | $10,000 | $2,000 | | $8,000 |
| Drury Design Dynamics | C3377 | 03/30/01 | | $10,000 | $1,000 | Gulf Power | $8,000 |
| Kansas City Life Insurance Company | C3488 | 04/01/01 | | $10,000 | $2,000 | Schering Plough Pharmaceuticals | $8,000 |
| National Business Education Association | C1344 | 04/09/01 | | $10,000 | $2,000 | | $8,000 |
| Gate Appliance Manufacturers Association | C2440 | 04/14/01 | | $10,000 | $2,000 | | $8,000 |
| Sports Marketing & Entertainment, Inc. | C2315 | 04/23/01 | | $8,000 | $1,000 | | $7,000 |
| Marriott Corporation | C2385 | 05/01/01 | | $10,000 | $1,000 | | $8,000 |
| Keppler Associates | C3513 | 05/04/01 | | $10,000 | $2,000 | Southwestern Bell | $8,000 |
| Community First | C3096 | 05/09/01 | | $10,000 | $2,000 | | $8,000 |
| New York Association of Convenience Stores | C2219 | 05/10/01 | | $9,000 | $2,000 | CBL Association Management Incorporated | $8,000 |
| Greater Arkansas College | C3680 | 05/14/01 | | $10,000 | $2,000 | | $8,000 |
| IMG Speakers | C3089 | 05/15/01 | | $10,000 | $1,000 | | $8,000 |
| Allegheny Valley Chamber of Commerce | C3533 | 05/16/01 | | $10,000 | $2,000 | American Red Cross of the Heartland | $8,000 |
| ChristianSpeakers.com | C3509 | 05/19/01 | | $10,000 | $1,000 | | $8,000 |
| Gail & Rice Productions | C1783 | 05/20/01 | | $10,000 | $1,000 | Michigan Gas & Oil | $8,000 |
| West Virginia Healthcare Financial Management Association | C1648 | 05/23/01 | | $10,000 | $2,000 | | $8,000 |
| McKinney Associates | C2102 | 06/00/01 | | $10,000 | $1,000 | Cincinnati Insurance Company | $8,000 |
| Personalities & Promotions International | C2390 | 06/14/01 | | $10,000 | $1,000 | Texas 4H | $8,000 |
| New England Securities | C2467 | 06/21/01 | | $10,000 | $1,500 | | $8,000 |
| Central Methodist Church | C4220 | 07/00/01 | | $10,000 | $1,500 | | $8,000 |
| The Harry, Lane and Community Leaders of America | C2852 | 07/00/01 | | $8,500 | $1,000 | Sports Executive Leadership Conference | $5,000 |
| Leadership Network | C1095 | 07/11/01 | | $10,000 | $2,000 | | $5,000 |
| Tennessee Hospital Association | C782R | 07/20/01 | | $10,000 | $2,000 | | $8,000 |
| Platinum Meetings, Inc. | C3516 | 07/26/01 | | $10,000 | $2,000 | Sunquest Users Group | $8,000 |
| Mississippi Hospital Association | C2546 | 07/29/01 | | $10,000 | $1,000 | | $8,000 |
| Entertainment Group | C2737 | 08/02/01 | | $12,125 | $2,425 | California Mid-State Fair | $8,000 |
| Personalities & Promotions International | C3513 | 08/07/01 | | $10,000 | $1,000 | Sysco | $9,700 |
| East Texas Christian Academy | C844 | 08/08/01 | | $10,000 | $1,000 | | $8,000 |
| St. John's School | C4852 | 09/21/01 | | $0 | $0 | | $0 |
| Sacramento Metropolitan Chamber of Commerce | C654 | 09/21/01 | | $10,000 | $2,000 | Rusty Hamar event | $0 |
| Orange Association of School Administrators | C3601 | 09/23/01 | | $10,000 | $2,000 | | $8,000 |
| Orange County Speakers Bureau | C2222 | 09/24/01 | | $10,000 | $1,000 | | $8,000 |
| Harris Trust and Savings | C458 | 10/02/01 | | $10,000 | $2,000 | Farmers Insurance Group of Companies | $8,000 |
| Amplify Professional Speaker Services | C4048 | 10/02/01 | | $10,000 | $2,000 | | $8,000 |
| Owens Illinois | C3870 | 10/08/01 | | $10,000 | $2,000 | | $8,000 |
| The Heritage Group | C841 | 10/09/01 | | $10,000 | $2,000 | Microsoft | $8,000 |
| Marriott Corporation | C4848 | 10/20/01 | | $10,000 | $1,000 | POSTPONED | $4,500 |
| Siebel Systems, Inc. | C4616 | 10/28/01 | | $10,000 | $2,000 | | $8,000 |
| Kentucky Wesleyan College | C980 | 11/09/01 | | $10,000 | $2,000 | | $8,000 |

WSB 00018

Exhibit 136





SPEAKING ENGAGEMENTS FOR CALENDAR YEAR 2001 FOR SCOTT OGRADY

| Organization | ContractNumber | AppearanceDate | CancelledDate | Fee | WSBCommission | PerServiceTo | Speaker Fee |
|---|---|---|---|---|---|---|---|
| Speakers Network | C5111 | 11/07/01 | | $10,000 | $1,000 | El Paso Corporation | $8,000 |
| Cohn & Wolfe-Atlanta | C3486R | 11/09/01 | | $12,000 | $2,000 | Coca-Cola Company | $10,000 |
| Robert W. Baird & Company, Inc. | C5105 | 11/13/01 | | $10,000 | $2,000 | | $8,000 |
| Prudential | C5138 | 11/15/01 | | $10,000 | $2,000 | | $8,000 |
| International Mass Retail Association | C5246 | 11/16/01 | | $10,000 | $2,000 | | $8,000 |
| Bureau of Workers' Compensation | C5024 | 11/26/01 | | $10,000 | $2,000 | | $8,000 |
| The Claremont Institute | C5272R | 12/01/01 | | $10,000 | $2,000 | | $8,000 |
| Greater Bluefield Chamber of Commerce | C5211 | 12/04/01 | | $10,000 | $2,000 | | $8,000 |
| Lutz Agency | C4908 | 12/06/01 | | $10,000 | $2,000 | | $8,000 |
| J.J. Keller & Associates, Inc. | C3372 | 12/09/01 | | $10,000 | $2,000 | Nebraska Cattlemen's Association | $8,000 |
| League of California Cities | C5041 | 12/18/01 | | $10,000 | $2,000 | | $8,000 |
| | # Events | | | | | | $498,300 |

84

WSB 00019

## SPEAKING ENGAGEMENTS FOR CALENDAR YEAR 2002 FOR SCOTT O'GRADY

| Organization | ContractNumber | AppearanceDate | CanceledDate | Fee | WSBCommission | ForServiceTo | Speaker Fee |
|---|---|---|---|---|---|---|---|
| State Street Research & Management Company | C5007 | 01/03/02 | | $10,000 | $2,000 | | $8,000 |
| American Cancer Society | C7722 | 01/09/02 | | $10,000 | $2,000 | | $8,000 |
| Clinton Chamber of Commerce | C4951 | 01/10/02 | | $10,000 | $2,000 | | $8,000 |
| Georgia Hospital Association | C5203 | 01/22/02 | | $10,000 | $2,000 | | $8,000 |
| Southwest Regional Professional Corporation | C6007 | 01/25/02 | | $10,000 | $2,000 | | $8,000 |
| National Cotton Council of America | C4926 | 02/07/02 | | $10,000 | $2,000 | | $8,000 |
| On Request | C6304R | 02/09/02 | | $10,000 | $2,000 | | $8,000 |
| Builders Association Serving Missouri and Kansas | C4347 | 02/14/02 | | $10,000 | $1,000 | California Agricultural Leadership Alumni | $8,000 |
| North American Logistics | C4440 | 02/22/02 | | $10,000 | $2,000 | | $8,000 |
| N49 Speakers | C4856 | 02/22/02 | | $10,000 | $2,000 | | $8,000 |
| Casey & Fishman | C4611 | 03/05/02 | | $20,000 | $2,000 | New England Regional Turfgrass Foundation | $18,000 |
| Lumbermens Merchandising Corporation | C5520 | 03/06/02 | | $10,000 | $2,000 | Toledo Town Hall | $8,000 |
| American Speakers Association-Bureau | C5583 | 03/08/02 | | $10,000 | $2,000 | | $8,000 |
| Elizabeth City Chamber of Commerce | C4728 | 03/13/02 | | $10,000 | $1,000 | VFPP | $8,000 |
| Leading Authorities | C4961 | 03/18/02 | | $10,000 | $2,000 | | $8,000 |
| International Council of Shopping Centers | C6690 | 03/18/02 | | $10,000 | $1,250 | Geospatial Information Technology Association | $10,000 |
| Premiere Speakers Bureau | C5894 | 03/21/02 | | $12,500 | $1,250 | | $10,000 |
| The Association of Collegiate Conference & Event Directors International | C5110 | 03/22/02 | | $12,500 | $1,250 | | $10,000 |
| International Mass Retail Association | C4747 | 03/24/02 | | $0 | $0 | | $0 |
| Indiana State University | C6332 | 04/11/02 | | $10,000 | $2,000 | | $8,000 |
| Sports Marketing & Entertainment, Inc. | C6045 | 04/15/02 | | $10,000 | $2,000 | | $8,000 |
| Equativ, Inc. | C5811 | 04/17/02 | | $12,500 | $1,000 | Hibernia National Bank | $8,000 |
| Royce 55 Speakers | C5869 | 04/18/02 | | $12,500 | $1,250 | | $10,000 |
| Pacific Film Consultants | C5794-R | 04/20/02 | | $10,000 | $2,000 | | $8,000 |
| Access Point, Inc. | C4470 | 04/22/02 | | $10,000 | $2,500 | Thomas Kinkad Group | $8,000 |
| J.J. Keller & Associates, Inc. | C4074 | 04/22/02 | | $12,500 | $2,000 | Aways | $10,000 |
| Archdiocese of Indianapolis | C4119 | 04/27/02 | | $10,000 | $2,000 | | $8,000 |
| Speakers Corner | C5668 | 04/30/02 | | $10,000 | $2,000 | | $8,000 |
| Greater Buffalo – Building Owners & Managers Association | C5887 | 05/02/02 | | $10,000 | $2,000 | Tennessee Grocers Association | $8,000 |
| Speak Inc. | C5893 | 05/03/02 | | $10,000 | $2,000 | | $8,000 |
| Juniata Valley Boy Scouts of America | C4724 | 05/14/02 | | $10,000 | $1,000 | | $8,000 |
| New Jersey Association of Health Underwriters | C4446 | 05/15/02 | | $10,000 | $2,000 | Iowa Utility Association | $12,000 |
| CB Richard Ellis | C4704 | 05/20/02 | | $10,000 | $2,000 | | $10,000 |
| Cassidy & Fishman | C5666 | 05/20/02 | | $16,750 | $3,000 | | $15,000 |
| The Life Church Of Memphis | C5646 | 05/21/02 | | $15,000 | $1,250 | American Society of Consultant Pharmacists | $8,000 |
| Marriott Corporation | C5760 | 05/26/02 | | $12,500 | $3,750 | | $10,000 |
| Ambassador Speakers Bureau | C5587 | 06/04/02 | | $10,000 | $3,000 | | $10,000 |
| Carpenter Speakers Bureau | C5982 | 06/07/02 | | $12,500 | $1,000 | Kentucky Hospital Association | $12,000 |
| Republic Speakers | C5800 | 06/11/02 | | $12,500 | $1,250 | | $10,000 |
| FPO (c/o Glassman) Lumber | C7008 | 06/14/02 | | $12,500 | $2,500 | | $10,000 |
| Orange Enterprises | C5809 | 06/15/02 | | $12,500 | $2,500 | | $10,000 |
| Maine Hospital Association Northwestern Region | C4432 | 06/25/02 | | $15,000 | $2,500 | Special Olympics | $12,000 |
| Wells Fargo Home Mortgage | C4167 | 06/27/02 | | $12,500 | $3,000 | Arizona Credit Union League | $10,000 |
| Wells Fargo Home Mortgage | C7168R | 07/18/02 | | $12,500 | $3,000 | Fort Worth Chamber of Commerce | $12,000 |
| Corinthian Colleges, Inc. | C5719 | 08/01/02 | | $15,000 | $3,000 | | $12,000 |
| Abilene Independent School District | C7007 | 08/14/02 | | $12,500 | $2,000 | | $8,000 |
| American Cancer Society | C7023 | 08/14/02 | | $10,000 | $3,000 | | $12,000 |
| 5G Crown Securities Corporation | C7027 | 08/26/02 | | $15,000 | $3,000 | | $12,000 |
| State National Bank | C7180 | 09/03/02 | | $15,000 | $1,000 | | $8,000 |
| Christian Speakers & Artists | C7310 | 09/06/02 | | $10,000 | $3,000 | Elsinore First Assembly | $12,000 |
| YPO/CCA, Inc. | C7250 | 09/09/02 | | $15,000 | $3,000 | | $8,000 |
| Illinois Hospital Association | C6038 | 09/13/02 | | $12,500 | $2,500 | | $10,000 |

WSB 00020

Exhibit 137



SPEAKING ENGAGEMENTS FOR CALENDAR YEAR 2002 FOR SCOTT O'GRADY

| Organization | ContractNumber | AppearanceDate | CancelledDate | Fee | WSBCommission | ForServiceTo | Speaker Fee |
|---|---|---|---|---|---|---|---|
| American Cancer Society - Florida Division, Inc. | C6083 | 08/20/02 | | $10,000 | $2,000 | | $8,000 |
| Florida Fruit & Vegetable Association | C7370 | 09/24/02 | | $16,000 | $3,000 | | $12,000 |
| West Virginia Hospital Association | C6671 | 09/28/02 | | $12,000 | $2,500 | | $10,000 |
| Eagles Talent Connection | C6623 | 10/16/02 | | $12,000 | $1,250 | | $10,000 |
| Bund Distribution, USA | C6060 | 10/12/02 | | $10,000 | $2,000 | | $8,000 |
| Martin Bastian Productions | C7761 | 10/12/02 | | $15,000 | $1,900 | | $6,000 |
| Key Speakers Bureau | C5090 | 10/15/02 | | $12,000 | $2,500 | Prelude Systems | $12,000 |
| National Automobile Merchandising Association | C6664 | 10/17/02 | | $15,000 | $1,250 | Wells Fargo | $10,000 |
| Council of Educational Facility Planners International | C7245 | 10/20/02 | | $12,000 | $3,000 | League of Kansas Municipalities | $12,000 |
| California Agricultural Production Consultants Association | C6478 | 10/21/02 | | $12,000 | $2,500 | | $10,000 |
| ChristianSpeakers.com | C6932 | 11/07/02 | | $10,000 | $2,600 | | $10,000 |
| Kansas Hospital Association | C6288 | 11/1/202 | | $12,500 | $1,000 | | $8,000 |
| Virginia Hospital & Healthcare Association | C7452 | 11/15/02 | | $15,000 | $2,500 | Grand Forks Christian School | $10,000 |
| Town Hall of Cleveland | C6514R | 11/18/02 | | $10,000 | $3,000 | | $8,000 |
| Commonwealth Health Corporation | C7226R | 11/2/02 | | $15,000 | $2,000 | | $12,000 |
| Christian Speakers.com | C6952 | 11/23/02 | | $15,000 | $1,500 | Adventist Health Care | $8,000 |
| Bund Distribution, USA | C6061 | 12/07/02 | | $10,000 | $2,000 | | $12,000 |
| | | | | | | Total | $467,000 |
| | | | | | | # Events | 78 |

WSB 00021

awt

T3387

1

DAVIS, WRIGHT, TREMAINE, LLP

BEHIND ENEMY LINES AIRCHECK

[FROM VIDEOTAPE]

- - -

ANNOUNCER:  Watch Wild Discovery at its new time, weeknights at 6:00 and 7:00, only on the Discovery Channel.

On November 30th, one man finds himself inside enemy territory.

MR. HACKMAN:  I'm not gonna let that kid die out there.

MR.       :  You will lose your command.

MR. HACKMAN:  So be it.

ANNOUNCER:  "Behind Enemy Lines."  But before you cross the lines in theaters, find out how America responded to the real thing.

MR.       :  "You're following that situation closely."

ANNOUNCER:  Tonight, the Discovery Channel remembers one hero's true story.

MR.       :  I said, Dear God, don't let me die.

Exhibit **33A**

awt                                                              2

          MR.       :  I wasn't ready to bury Scott

O'Grady.

          ANNOUNCER:  Plus we'll take a

behind-the-scenes look and get a sneak peak at 20th

Century Fox's new film, "Behind Enemy Lines," a

detailed look at the fact and fiction of true

survival.  "Behind Enemy Lines":  The Scott O'Grady

Story.

          MR.       :  Bosnia, 1995, a country torn

apart by war and filled with weapons, a country

with no friendly forces and no safe areas.  The

anarchy and tragedy of the conflict led the United

Nations to call upon NATO allies to help restore

peace.  The United States and other Air Forces

carried out routine patrols code-named Operation

Deny Flight.  One of the pilots was Scott O'Grady.

Here, he's played by an actor.

          MR.       :  I was stationed at Aviano Air

Base, Italy.  I was a member of the Triple Nickel

fighter squadron and we were performing

peacekeeping missions over Bosnia.  It was similar

to a police officer patrolling a neighborhood.  We

awt                                                                      3

were there to make sure that none of the parties

that were fighting there were using their airplanes

to bomb targets on the ground, to at least keep the

skies free from violence.

          MR.        :  Well, Scott and I have flown

together since '91.  We started at Kunsan, Korea,

and then we went from there to Ramstein and then to

Aviano.  The last five years we've flown together,

same squadron and everything, so it, it's really

got us tight.

          MR.        :  We always go up as a team.

You always have major [?] support.  My role for

that day was just to be the wingman.  Captain

Wright was the flight leader for the mission on 2nd

of June.

          MR.        :  That day, I did my normal

briefing and this was strange, because Scott really

went into detail on what he would do in a search

and rescue situation.

          MR.        :  The Hollywood, Tom Cruise

image of what a fighter pilot is is pretty far from

the truth.  I mean, most of the guys that I work

awt                                                                          4

with are old, balding, fat, have a station wagon
with four screaming kids in the back.  So this
thing about these young guys with their Ninja
motorcycles, running around, chasing women and
getting drunk in the bars is kind a far from the
truth.

The takeoff, going from dead zero,  you
know, ground speed, is like being strapped into a
rocket.  All it does is it, it's a controlled
explosion.

MR.     .:  Baxter 5B [?], you're cleared
to rejoin with this check [?].  We're climbing out,
15,050.

MR.      :  It was a bright beautiful day,
and just thinking that, you know, how lucky we are
to be flying a F-16.

MR.      :  Baxter, that heading on 1-8-0,
now we're going to be doing a--go ahead and do your
chaff [?] fires.

MR.      :  Baxter 5-2, roger.

MR.      :  We were flying in the
northwest corner of Bosnia, we were monitoring that

awt

5

entire area with our radar, and also with our
visual lookout, to see if there if there were any
violators.

       MR.     :  We'd been flying about two
hours now.  At this time, I received some warning
that a radar was looking at me; just a brief
warning.

       MR.     :  Baxter 5-1 spike to 0-9-0.

       MR.     :  Baxter 5-2 negative spike.

       MR.     :  Roger; push it up.

       MR.     :  It was very short but it was
enough to make me be concerned, so I sped the
flight up.  We wanted to get more maneuvering
airspeed in case it was a real threat.

       MR.     :  As we turned around to the
east now, I received a indication in my aircraft--

       MR.     :  Baxter 5-2, missile spike
0-9-0.

       MR.     :  Looking.

       MR.     :  I began looking vigorously
outside, just to ensure that nothing was coming up,
and then that's when, when it surprised me, to see

awt

6

actual missiles in the air.

        MR.        :   Missiles in the air; missiles
in the air.

        MR.       :   It was quite, quite a sight.
I mean, it was unbelievable to see one as I'm
maneuvering, miss, it goes between us, and then the
other one impacts Scott.  It's quite a scene, that
I never want to see again.

        MR.        :   Magic [?], Baxter 5-2 has just
been hit.  I say again, Baxter 5-2 has just been
hit.

        MR.        :   I can still see the, the
missile attached to the wing tip in my mind, and
then the right wing became engulfed with flames as
it began to fall, and again, I was ma--remained
focus on the cockpit area, looking for him to
eject, but I, I didn't see him do.

        MR. O'GRADY:  It was like having a
semitruck slam into my airplane with a warhead on
it, and the instrument panel in front a me starts,
is starting to break apart, and immediately I'm
engulfed in flames, and all I can see is fire

awt

around me.  It blew like a flying gas tank, and I'm reaching for the injection handle as fast as humanly possible, and, you know, the big thing was that I just prayed and I said, boy, dear God, don't let me die.  The next thing I saw was the debris flying around me from my airplane, and I was looking straight down at the ground because I ejected parallel with the horizon.

All I could think about was that I was gonna fall to my death, being up at that height, looking down at the ground was just a very scary thing because I'm afraid of heights, and so I didn't want to wait for the ejection seat to actually deploy the parachute on its automatic function, so I went ahead and manually deployed the parachute myself.

And then once it got down to 14,000 feet, the seat separated, and then from there my survival gear opened up below me.  Coming down in the parachute took almost up to a half an hour, it was a long descent, and unfortunately, when you get shot down you land on top of the people that shoot

awt

you down. So they were there, waiting for me, and
I knew that.

So I was pretty much left [?] up to the
wind and fate to land me in a safe area.

MR.       :   Baxter 5-1 [inaudible].

MR.       :   Roger. Baxter 5-1's
returning, single ship, good jets.

MR.       :   I called Aviano, my squadron,
and informed them that I would be coming alone, and
that was, that was very difficult.

MR.       :   Baxter 5-1, confirm single
ship.

MR.       :   Sorry but that's affirmative.

MR.       :   It's quite a shock, you see
your aircraft that you fly get blown up, and then t
know it's one a your friends is hard, and part of
you goes down with that airplane.

After that, I landed uneventfully, and
then I was met at the aircraft and then went into
an intelligence debrief, so I could give them as
much information as I could about what I saw and
where I thought Scott was, and, and that, so we

awt

could begin rescue procedures.

[Simultaneous conversation in background.]

MR.      :  --indications, and I saw

missiles come through the clouds, impact Scott.

MS.      :  Did you get good parachute?

MR.      :  No, we didn't.  However, I did

see the cockpit intact, and so there's a good

chance that he did get out.

MR. O'GRADY:  I'm looking around the

countryside and I see a small fire off to the

south, and I realize that that is where the pieces

of my airplane had impacted the ground.  That was

really a very surreal experience.  It wasn't

reality, and I had to come to reality and say,

Scott, you better get your act together, this is

real, and you better not make any mistakes because

the next mistake you make might be your last.

I mean, there were no safe areas.  There

were no friendlies.  There wasn't a French

underground to be able to take care of me.  I was

by myself.  I was alone.

[Grunting sounds.]

MR. O'GRADY:  I figured I could run about 20 miles to the south, and heck, while I was at it, I might as well just keep running and go home.  But that didn't happen.  I ran about a 100 yards and the whole overwhelming, you know, occurrence of, that this is actually happening came down on top me, and I had to stop, and so I, I hid.

MR. O'GRADY:  Dispatcher Flight 1, Dispatcher Flight 2.

I tried to talk to somebody but there was nobody there, and then, before long, I heard the vehicles approach the area along the highway and I could hear voices around my parachute area, and I had to turn off the radio in fear of the noise giving me away.

The first two individuals walked by me within just minutes of being in my hiding spot. They were looking straight ahead, so they, they walked right by me, and after that, I could see outta the corner of my eye the other people that walked around, and unfortunately, they all carried guns, too, and I saw those, and that didn't make me

11

too happy either.

ANNOUNCER:  The 336th Training Group
located at Fairchild Air Force Base in Washington
State manages all U.S. Air Force survival training.
Instruction concentrates on the techniques needed
to overcome the physical and psychological stresses
of surviving in any environment.

When we return, the hunt begins for downed
pilot, Scott O'Grady, and later in the show--

MR.      :  When a pilot bails out of an
airplane, you know, that's when the real adventure
starts.

ANNOUNCER:  A sneak peak at the new
feature film from 20th Century Fox, "Behind Enemy
Lines."

ANNOUNCER 2:  This program is brought to
you, in part, by "Behind Enemy Lines."  On November
30th, it's time to cross the line.

MR.      :  We ought to be flying for a
rock star.  We could save the music.

[Shouting with music overlay.  "Eject,
eject."

ANNOUNCER:   In two days, get ready--

MR.      :   Our man is down behind enemy lines.

ANNOUNCER:   --to cross the line.

MR.      :   The American people want their pilot back.

ANNOUNCER:   "Behind Enemy Lines."

MR.      :   [inaudible].

ANNOUNCER:   Rated PG-13, in two days, only in theaters.

ANNOUNCER 3:   Introducing the all-new Kia Spectra, an affordable car with so much more. Available with six-speaker stereo, air conditioning, map lights, power windows, and Kia's ten year, 100,000 mile warranty.

WOMAN:   Are you still reading that?

MAN:   Yeah.   I can't put it down.   Oh, wow!

ANNOUNCER 3:   The 2002 Kia Spectra, finally a car you can really get into.

ANNOUNCER:   You're watching the Discovery Channel.

WOMAN:  What do you give?  What gift can possibly say thank you to your best friend, accountant and massager of shoulders and egos?  You might want to start with these.  Kay Jewelers' diamond solitaire earrings, starting from only 99.95, and you can be assured of two things.  First, that Kay diamonds are hand-selected for exceptional beauty, and second, that she'll absolutely love them.

[SINGING: Every kiss begins with Kay.]

[Music playing.]

[Children laughing.]

CHILD:  Way to score, Mom.

WOMAN:  This holiday, there's only one place that has the look you want and the gifts you need.  Sears.  Where else?

ANNOUNCER:  A day that America will never forget.  An event that reshaped our world.  Sunday, on the Discovery Channel, see the filmed image that will change the way we remember Pearl harbor. Never-before-seen frame by frame analysis and forensic evidence unlock the secrets that sank with

the Arizona, one unforgettable frame at a time.
Pearl Harbor: Death of the Arizona, premiering
Sunday at 9:00 Eastern and Pacific on the Discovery
Channel.

MAN:  What if an Internet provider asked
you to draw from your imagination, to envision
taking your Internet experience from every day to
extraordinary?  You'd create AT&T WorldNet Service
Plus.  First, you'd start with the fastest log-ons
and better connections.  Then you'd add the latest
features like instant massaging and chat for
real-time communication, not to mention a
cutting-edge feature like video e-mail, so people
can see and hear you every time you send a message.

And you'd want live customer support.  Now
you can get it all from the provider rated best ISP
by PC World.  Call now for AT&T Worldnet Service
Plus at just 16.95 a month.  That's nearly 30
percent less than AOL.  So call 1-800 Worldnet
today and switch to AT&T Worldnet Service plus.
It's drawing lots of attention.

ANNOUNCER:  Now back to "Behind Enemy

Lines, the Scott O'Grady story.

WOMAN:  Excuse me, Dr. O'Grady, there's an urgent telephone call for you in reception.

DR. O'GRADY:  Oh, okay.  I'll be right there.

When I first heard the news, I was working, and when I heard the Air Force was trying to get in touch with me, I knew that it had to be associated with Scott, then that it had to be something that wasn't gonna bring good news, and once I identified myself, she said to hold on, and then there was silence for about a minute or two, and she came back to the phone and asked me to go home, that the Air Force wanted to send some personnel to my house to contact me.

MR. O'GRADY:  You know, you see these scenes in movies where you'll have military officials show up in their dress uniforms with a chaplain, to go and console the family members, and, you know, you're thinking about that happening, you know, to your family, is really kind a strange, and then the darn thing is is that that

really does happen.

     [Knocking on door.]

     DR. O'GRADY:  I was pretty well shaken up because I'd been crying, and I feared the worst. They greeted me very solemnly and handed me the document, and which I read, and it indicated what had happened to Scott.  That there no word from him after the event, and no one had seen him eject, and so things looked pretty grim.  The first thing to do was to contact his mother who lived in Seattle and I called her, and she contacted Stacey.

     STACEY:  I was told that I had a phone call from my mother while I was at work, at 3:30 in the afternoon, so I knew immediately that something was wrong.

     Mom?

     That something dreadful had happened. When she said Scott's name, I almost said it at the same time, and I broke down immediately.  I knew that he had--I thought he had died.

     [Sobbing.  Gunshot.]

     MR. O'GRADY:  When I heard the first

gunshot, that really immediately got my attention,
and concerning that they just destroyed my
airplane, they weren't too interested in not only
just capturing me, you know, the--so much as they
were there to try to kill me, and that wasn't a
very pleasant thought, and there was a lotta fear
there.

You know, life is a very precious thing,
and you forget about that until your life is
threatened and, you know, to, to think that this
was it, I might not ever get outta this, was a very
sad moment.

[Sound of airplane.]

MR.        :  I was the commanding officer
of the 24th Marine Expeditionary Unit which is
roughly a 2,100 man force embarked abroad three
U.S. amphibious ships.  We heard, as, as many
people did in the theater, and throughout Europe,
of the downing of the airplane on the 2nd of June,
really, just moments after it occurred, and I think
our feelings were probably similar to the feelings
that most people have.  It was a tragedy.  You

never like for those things to happen.

So we went into a process that we trained very hard for, which is to be prepared, if called, go in and, and help where we can.

MR. O'GRADY: When night came, and I was very fortunate not to have been caught for the first day, I had to come up with a game plan, and it came down to surviving, first of all, then concealment, then evading. You know, my big concern was, number one, get out to a better hiding spot. Every movement that I made was so slow and so meticulous, because I was afraid that the noise or any type of movement would be able to give me away, would highlight my position, and I didn't want to do that.

[Sound of helicopter flying.]

MR.        : The commander in chief of, of allied forces in the southern region, Admiral Smith, had several different forces at, at his disposal to respond to this type of crisis. We were but one of those forces. That essentially meant that for 12 hours a day, we had to be

awt                                                                          19

prepared to respond within an hour or two.

          MR.       :  The grunts were getting all
their ammunition and their weapons ready.  We were
getting the aircraft ready.

          MR.       :  Flight deck secure.  PT [?].

          MR.       :  The Marines are, are
constantly challenged with things to keep them busy
and sharp aboard ship, and it was no different
during this period of time as well.

          [Sound of machine gun.]

          MR.       :  Is it beneficial to go in and
jeopardize a whole bunch a Marines to rescue one
person?  I mean, can we do it?  I mean, and then,
ultimately, you have to make the decision, okay, is
he alive? first of all.  If he's dead, there's no
use jeopardizing the rest a the people.

          MR.       :  The things that, that we
needed to know before we could successfully execute
a mission like that were, number one, what's his
status?  Can he move himself?  Does he have
communications?  Those things are, are difficult,
early on, to try to figure out.

[Sound of jets.]

MR. O'GRADY:  When I didn't hear anybody on the radio the first, you know, day, and that night, I knew that because of the events that had occurred, nobody knew I was alive, and that nobody was gonna be able to come in and get me the next day.

MR.      :  Tensions and doubt seemed to grow by the hour in Bosnia-Herzegovina.  A television crew reached the scattered wreckage of a U.S. fighter jet shot down Friday while on patrol over Serb-held territory.

There is still no official confirmation of the fate of the F-16's pilot.

MR.      :  Absent--

WOMAN:  When I was the wreckage of Scott's plane--

MR.      :  --[inaudible] where the ejection seat is located--

WOMAN:  --I just could not fathom that somebody could survive.

MR.      :  No ejection seat was seen as

awt                                                                          21

the plane disappeared--

          WOMAN:  The first thing you think is he's,
he's dead.  There's no way.

          MR.      :  You simply did not know
whether he was alive, and if he was, where he was.
So all we could do was to continue to get ready to
go.

          MR.      :  Generally, the first 24 hours
are the most critical.  Most people are usually
rescued within the first 24 hours.  After that, the
probability of surviving, you know, diminishes.

          [Sound of helicopters.]

          MR. O'GRADY:  I was still free.  You know,
the hardest day of being in a place where you don't
have the right to live and people are hunting you
down is a heck of a lot better than the best day of
being in a POW camp.  There were people walking
around me every single day, and there was a
helicopter that was out there trying to find me,
and it flew overhead.  I'd have to wait until night
fell, where most people went to sleep, and that's
where I actually became active and would move out.

ANNOUNCER:  In the new 20th Century Fox feature film, "Behind Enemy Lines," like Scott O'Grady, Owen Wilson's character, naval aviator Chris Burnett, runs into some challenges once his plane is shot down.

MR. WILSON:  I am an American.  I am on your side.

ANNOUNCER:  In the case of Scott O'Grady, one major challenge came in finding food for survival.  Just how safe are tree leaves, bugs, and rainwater?  The nutritional facts, when we return to "Behind Enemy Lines," the Scott O'Grady story, on the Discovery Channel.

[Music playing.]

SINGER: You make me so very happy--

MAN:  A smart fact from Pet Smart.  Pets like getting new toys as much as people do.  That's why we have the widest selection of holiday gifts, like these limited edition ornaments, now just 4.99.  Pet Smart, all you need for the life of your pet.

MAN:  Bottled water getting expensive?

Try pure filtered water, just as good as bottled,
at a price that's ten times less.  Doesn't that
sound better?  Pure water filters.  Your water
should be pure.

[Rock music playing.]

ANNOUNCER:  You're watching "Behind Enemy
Lines," the Scott O'Grady story, on the Discovery
Channel.

WOMAN:  There's a place where people smile
big, eat good, and always score a sweet deal.  It's
got to be Applebee's.

SINGING:  Eating good in the neighborhood.

WOMAN:  What makes a honey of a deal?  Our
amazing new honey pepper sauce.  It makes
honey-grilled chicken and honey pepper steak a
taste of honey heaven.  Throw in our famous
riblets, now honey barbecue style, and you'll know
why it's got to be Applebee's.

SINGING: Eating good in the neighborhood.

MALE:  It's a different kind of Fixadent,
with no artificial flavors or colors.  It's
Fixadent Free.  Fixadent holds stronger, holds

longer than any other free adhesive.  Fixadent and
forget it with Fixadent Free.

ANNOUNCER:  Frame by frame, history is
changed forever.  Pearl Harbor: Death of the
Arizona, Sunday at 9:00 on the Discovery Channel.

MALE:  With the peace of mind you'll get
from the Lexus of warranties, owning a certified,
pre-owned Lexus feels just like owning a new Lexus.

WOMAN:  Honey.

MAN:  Yeah?

WOMAN:  Did you get the mail?

ANNOUNCER:  Don't be surprised if you
treat it like one.  Certified pre-owned vehicles
only at your Lexus dealer.

GIRL:  Dad.

MAN:  Yeah.

GIRL:  If dinosaurs disappeared 65 million
years ago and we've only been around a short time,
what happened in between?

MAN:  I don't know.  I'm not that old.
Ask your mother.

WOMAN:  After the dinosaurs, our world had

awt

strange and wondrous beasts you've never seen. Discover them on the only network that could bring them back to life. Walking With Prehistoric Beasts, Sunday, December 9th, at 7:00 Eastern and Pacific, only on the Discovery Channel.

GIRL:  Dad, mom didn't know either.

MAN: Oh!

ANNOUNCER:  Just how safe are tree leave, bugs, and rainwater?  Leaves from trees can provide the body with the essentials of iron and Vitamin B, and bugs, such as water beetles and grasshoppers can provide protein and carbohydrates.  Water is most essential.  It is involved in every function of the human body.  Water maintains blood circulation and helps new cell development.

Later on in the show--

MR.      :  Taking you out of your sort of comfort zone--

ANNOUNCER:  --Owen Wilson crosses the line.  A sneak peak at the new film from 20th Century Fox, "Behind Enemy Lines."

MR.      :  One thing that you take for

granted as an aviator is that if you do get shot down, somebody's gonna come and get you.

MR.       :  The plan was to take the right number of people and the right number of aircraft. I mean, that's essentially it.  What do we need to get 43 Marines who are able to protect themselves, conduct a search, and protect the downed pilot, in and out, safely?  That consists of two CH-53 large transport assault helicopters, two Cobra assault helicopters, and a total of four Harrier jets that were in our own little package, supported by other NATO aircraft that were invisible to us but there nonetheless.

As the days went on, it became more difficult to try to picture him still alive.

MR. O'GRADY:  Water was becoming critical. You know, you can go about 30 days without eating but you can only go a few days without drinking water before you get delirious and die, and being in a heightened state like I was, you become very dehydrated quickly, and you don't ration water, you ration sweat.  You drink as much water as you can

awt

27

and then worry about trying to find more water later. But what it came down to was that the water had a come to me.

You know, I, I prayed for a lotta things when I was out there, and everything I really needed I got.

[Sound of jets. Rain falling.]

MR. O'GRADY: The fact is is that your stomach shrinks after a while and your appetite actually goes away. But I knew that I need to have some type of nutritional, you know, substance. I took off some small leaves of the trees that were around me and I ate some of those, and when I came up to where I had an opportunity to eat some ants, because they were dining on a decayed worm, right by where I was hiding, I went ahead and grabbed one of the ants out of the pile and put in my mouth and ate it without hesitating, and, you know, they're just crunchy and they're a little sour. You know, it's really not that bad.

But it actually became more, not just for nutritional value, so much as it was for

awt

entertainment value, cause they're hard to catch.
It was a break from my combat, you know,
environment of having to survive, to where I
actually, you know, was the hunter versus being the
hunted.

[Sound of jets.]

ANNOUNCER:  The hunt for Scott O'Grady
continued day and night.  It was a race between his
friends in the air and his enemies on the ground.

MR. O'GRADY:  I would get up and I would
turn on the radio, and I heard nothing but static
the whole time.

MR.       :  Baxter 5-2, Baxter 5-2.
[unintell.]

MR.       :  Flashman, this is Baxter 5-2.

MR. O'GRADY:  I finally heard somebody on
the radio for the first time and I made a couple
radio calls back to him but he never heard me, and
you think that might be disappointing but actually
it was very uplifting to know that, number one, the
radio worked and that also to realize, as I always
knew in my heart, that they were out there trying

to find me, and that they were gonna come in and get me.

ANNOUNCER:   U.S. Air Force pilots continued to enforce the NATO no-fly zone, still not knowing whether their colleague was alive or dead.

MR.     :   Well, I've been flying F-16s for about 8.5 years now.   At the time of the shoot-down it had been about a little over seven years, about seven and a half since I've been flying, and about every year to two years you have a good friend pass away, and so you, you never have a happy ending.   There is yet to be one, and there's always the same waiting period.

Who is it? what happened? is he okay? and it always turned out that he wasn't.

MR. O'GRADY:   Hearing Flashman two nights before and to have him not respond to my radio call, I really want to make a more concerted effort to hopefully have somebody hear me, and to where I would even go to the point where if it meant, you know, possibly compromising myself by making these

awt

longer transmissions, that that would be okay, because I wanted somebody to know I was alive.

        [Sound of jets.  Male voice in background.]

        MR.     :  After the two and a half hours of our mission that night, the NATO Airborne Early Warning told us that we could go home, and, and in fact I did turn north, but I felt kind a foolish cause I have a friend that may be alive down there and I elected to stay.

        MR.     :  Baxter 5-2, this is Baxter 1-1 on alpha [?].

        MR.     :  All fighter pilots have a bond that no one else understands our job, and we can't count on anybody like we can each other.

        MR.     :  Baxter 5-2 listening on alpha.

        MR.     :  I wasn't ready to bury Scott O'Grady.

        [Indistinct voice.]

        MR.     :  Say again for Baxter 1-1.

        MR.     :  And about this time I'm hearing some irregular static, I'm not sure what it

awt

is, whether it's somebody else on the frequency or not.  I turn--so I turn my tape on.

      MR.    :  Baxter 1-1 has you loud and clear.  Who is this?

      MR.    :  At about 2:07 in the morning is when I heard the first voice that was distinct.

      MR.    :  Baxter 5-2.

      MR.    :  I understand you are Baxter 5-2.

      MR.    :  We had to verify that it was him and we knew that he, he was in Korea, in the Juvat [?] squadron, and that would be something I would ask him.

      MR.    :  Baxter 5-2, this is Baxter 1-1.  You're loud and clear.

      MR.    :  [Indistinct voice.]

      MR.    :  Copy that.  what was your squadron in Korea?

      MR.    :  [Indistinct voice.]

      MR.    :  Copy that.  You're alive.  Good to hear your voice.

      MR. O'GRADY:  That was a great moment in

awt

32

my life, you know, had every emotion rushing through my body that you could ever think of. I wanted to jump for joy. You want to laugh, want to scream, want to cry. You know, to le--to know that somebody knew that you were alive, after being dead for six days, to the outside world was a phenomenal thing.

MR.        : That was the most exciting feeling I could ever have in my life. It's, it's like losing somebody and, and they come back.

ANNOUNCER: During the filming of the new 20th Century Fox feature film, "Behind Enemy Lines," the crew was granted access to a U.S. Navy carrier. That carrier was later used in the initial strikes against Afghanistan in the war against terrorism. What U.S. Navy carrier was it? The USS Saratoga, the USS Carl Vinson, or the USS Lexington? The answer as "Behind Enemy Lines," the Scott O'Grady story, continues on the Discovery Channel.

MAN:   [inaudible].

MR.        : We have pilots down behind

awt

enemy lines.

ANNOUNCER:   There is a time for diplomacy.

MR.      :   [inaudible] search and rescue?

MR.      :   The American people want their pilot back.   Now what is the problem?

ANNOUNCER:   But in two days--

MR.      :   You will lose your command.

MR.      :   So be it.

ANNOUNCER:   --time is up.

MR.      :   How soon can your team be ready?

MR.       :   Say the word and we'll saddle up.

ANNOUNCER:   "Behind Enemy Lines."

MR.      :   Let's go get our boy back.

ANNOUNCER:   Rated PG-13, in two days, only in theaters.

ANNOUNCER:   You're watching the Discovery Channel.   Tomorrow, paranormal forces on Mysteries of the Sea.

MAN:   Ya-hoo [inaudible].

MAN:   Oh, shouldn't you be studying for

awt

your spelling test?

          BOY:  Uh-huh.

          MAN:  Well, then put the toys down.

          MAN:  [inaudible].

          MAN:  And go study.  Whoa.  Toys down.
Put the toys down.

          WOMAN:  Studying will never be the same.

          MAN:  Now go study.

          WOMAN:  Now it's fun with Turbotwist
spelling and the never-ending mind station from
Leapfrog, you can download your weekly spelling
list and play games while you prepare for quizzes.
Leapfrog.  Learn something new every day.

          MAN:  Like my fine paisley bird [?].
Thank you.

          [Applause.]

          MAN:  Okay.  Up next, we have a reading
entitled Manual.

          GIRL:  Windshield wiper maintenance.  Do
not operate the rear window wiper if the rear
window is dry.  It may scratch the glass.

          MAN:  With the Lexus of warranties, and

awt

new car-like financing, owning a certified,

pre-owned Lexus feels just like owning a new Lexus.

You might get a little carried away.

GIRL:  The cupholders in this vehicle are

designed--

MAN:  Only at your Lexus dealer.

[Rock music.  Shouts of eject, eject.]

ANNOUNCER:  You're watching "Behind Enemy

Lines," the Scott O'Grady story, on the Discovery

Channel.

MAN:  Cock-a-doodle, don't you just love

starting the day with a little sip of me, Folger's

Cafe Latte, so rich and frothy.  I'm delicious.

I'm scrumptious.  Who loves me, baby?  Oh, no, no,

no, no, no.  Not a paper cup.  I'm more along the

lines of fine china.  Paper cups are [inaudible].

MAN:  And you ain't exactly rinsing and

spitting.  You dig?

WOMAN:  Folger's Cafe Latte, the

big-headed coffee.

MAN:  Hey, baby, is there froth in here or

is it just me?

awt

ANNOUNCER:  A day that America will never forget, an event that reshaped our world, Sunday on the Discovery Channel, see the filmed image that will change the way we remember Pearl Harbor. Never-before-seen frame by frame analysis and forensic evidence unlock the secrets that sank with the Arizona, one unforgettable frame at a time. Pearl Harbor: Death of the Arizona, premiering Sunday at 9:00 Eastern and Pacific on the Discovery Channel.

ANNOUNCER:  Give the gift of Discovery. Shop at the Discovery Channel store at the mall or on the Web.  Explore deep space with the latest telescope technology.  Streamline your life with our high-capacity hand-held voice recorder.  Take a sleek peek around with our ultra cool cat-eye binoculars.  Capture the moment with our digital pocket camera and watch time fly on this amazing digital clock.  Plus Discovery Channel store gift certificates making shopping easy, quick and convenient.  Shop any time at discoverystore.com or more than 160 stores nationwide.

awt

Tonight on the Discovery Channel, get deep inside the mystery of the Alaskan mummies, and later, Deadline Discovery, a series bringing the stories of today to life.

WOMAN:  We need to talk.

MAN:  Really?

WOMAN:  I don't think we should see each other anymore.

MAN:  Well, is it Mr. Friskie?

WOMAN:  NO.  I love your cat.

MAN:  It's the rash, isn't it?  Listen, the doctor said it's just temporary.

WOMAN:  No.  It's your Web site.  I need more content than that.

GROUP SINGING:  Hey.

MAN:  Our customers expect a lot from a Web site because at progressive.com, you can get our price for auto insurance and the rates for up to three leading competitors, and that could save you hundreds.

WOMAN:  We want you to save money, even if it's not with us.

awt

MAN:  At progressive.com, you can get a quote, buy a policy instantly, even check on the status of a claim.  Our Web site is so fast and easy to use, it's been rated number one four times in a row.

MAN:  She says I need more content.

MAN:  Yeah--

MAN:  Yeah, that's about right; yeah. Yeah.

MAN:  You can start saving now. Call 1-800-progressive or visit progressive.com today.

ANNOUNCER:  This week on Deadline Discovery, a mountain expedition turns deadly.  For one wounded survivor, escape becomes an obsession to conquer Everest.  Whiteout, on Deadline Discovery, tonight at 10:00, Eastern and Pacific, on the Discovery Channel.

During the filming of the new 20th Century Fox feature film, "Behind Enemy Lines," the crew was granted access to a U.S. navy carrier.  That carrier was later used in the initial strikes against Afghanistan in the war against terrorism.

What U.S. navy carrier was it?  The USS Saratoga, the USS Carl Vinson or the USS Lexington?

A combined number of 25 F-14s and F-18s from the carriers USS Enterprise and USS Carl Vinson took part in the first strikes on Afghanistan.  The Saratoga and the Lexington were both used in World War II and are no longer active.

Coming up later--

MR. HACKMAN:  My character likes Burnett. I mean, he likes the kind of spunk he has.

Be glad you're not in a fight, Lieutenant. You wouldn't last long.

And there's kind of wonderful play between my character on the radio--

You still got your boots, haven't you, cowboy?

MR.       :  They were tied on.

MR. HACKMAN:  Trying to instill in him this kind of passion to, to survive.

Evade and survive and we will bring you home.

ANNOUNCER:  A sneak peak at the new film

awt

from 20th Century Fox.  "Behind Enemy Lines."

MR.      :  There was a knock on my door at 3:00 o'clock in the morning and it was the commanding officer, and he said hey, they got contact with O'Grady, it looks like we may be going.  We'd already had all the briefings, everybody was briefed.  It was just okay, let's take the last bit a information.

MR.      :  So I got a flight suit on and went down to the war room, and as soon as I saw General Burn's [?] face, I knew that, I knew it was game day, we were going.

MR.      :  I had already asked people within the force, particularly Lt. Col. Tarbutton [ph], Can we make this happen?  Is there anything that will keep us from doing this?  And he said no, we're okay.

MR.      :  The cliche we always use is, you know, like being a pro football team.  We practice, practice, practice, and we never play a game, and then this time it was the Superbowl.  I mean, you know, we got thrown right into the big

awt

41

one.

MR. O'GRADY:  They came back and they told me that they're rounding up the troops and they were coming in, and that was a good feeling, to know that that was happening.  I had, you know, my smoke grenade but also I had to think of some, some other way of identifying myself as being a friendly, and I had this hat that was green on one side and orange on the other, because I figure, you know, who else will be stupid enough to be walking around Bosnia with an orange hat on but a dumb American.

[Sound of helicopters.]

MR.        :  When you have a survivor that's in hostile territory, the one thing that you don't do in a rescue effort is send in a Lone Ranger.

MR.        :  Provided by, by NATO, we had command and control aircraft, F-16s.

MR.        :  You want to go in and dominate the scenario as you do in any type of a fight, when you call the military.

awt

MR.          :   F&A-18s out of Aviano, Italy.

MR.          :   There's no such thing as a
fair fight; okay.

MR.          :   U-2Cs.  We had A-10s.

MR.          :   We go in there to win,
completely.

MR.          :   We had F-15s.  We had KC-135
refueler airplanes combined with our own individual
package.

MR.          :   The total number of aircraft I
recall as being just under 40 airplanes altogether.

          [Sound of jets.]

MR.          :   My job is to get us there and
get us out.

MR.          :   Your main concern was probably
missiles.  You're worried about the missiles
locking on ya.

MR.          :   I was tasked with leading the
Cobras forward, to go in there first, to secure the
area, find him and authenticate him.  53s went into
holding, dropped down Stan [?], down below the
terrain, and I led the Cobras forward for the final

awt

ten miles and started my authentication procedure.

       [Radio transmission: [inaudible].]

       MR.     :   I went through my authentication process.   I asked him two questions. He came right back with the answers like that.

       MR.     :   Roger eight.

       MR.     :   I said okay, we're inbound, and start proceeding in.

       MR.     :   You know, about the time that I got over the top, Scott came on the radio and said you're overhead.

       MR.     .:   Directly overhead.

       MR.     :   Directly overhead.

       MR.     :   So I just went into a hard left-hand turn--

       MR.     :   Baxter, we gotcha.

       MR.     :   --padlocked that position and don't lose sight of it, and started getting 53's coming on in.

       MR.     :   Major [inaudible] [?] made contact and then he called back and said, hey, you know, bust her on up here, which means hurry up and

get up here, we, you know, we have contact with

him.

        MR. O'GRADY:  I started telling 'em, okay,

300 meters off your nose, keep coming forward.  Do

you see it?  No.  Okay.  200 meters off your nose.

Do you see it?  No.

        MR.       :  I can see you.  Keep it

coming.

        MR.       :  Now I said Button [?], you got

smoke off your nose for about a 100 meters, and as

I said that, that's when I knew that he saw it,

because as I said that I'd see the nose of, of, of

his aircraft come up.  I mean, he literally stood

the thing on its tail.  I didn't think a 53 could

do this.

        MR.       :  I saw it and it was like right

there, so I kind a had to stand the aircraft on its

tail, stop it.

        MR.       :  To get down in there was

incredible.  I was kind a looking like that cause

the way that he went down in there, and not being

able to see anything, I was expecting rotor blades

and parts and stuff to come up outta there, but,
you know, he went down in there and his, and his
w...[?] went right down in there with him.

       MR.      :  We were real close to, to bad
guys, and we're pulling him literally right out
from under the nose of the Serbs here, and I just
didn't have a whole lotta time, and we kind a had
to make this happen, we need to make it happen
fast.  So I made a conscious decision of getting
moving as soon as he saw where the 53s were.

       MR.      :  Move [inaudible].

       MR.      :  Copy that.  I'm on my way.

       MR.      :  So my guys went out and went
around like the 5:00 o'clock position and scattered
in, looking for Scott, cause Mick was telling me he
should be coming from my 3:00 o'clock position
which is over here; you know.

       So we were all looking over there, and he
walked out over here.

       MR.      :  Keep going [inaudible].  Keep
going [inaudible].

       MR. O'GRADY:  And I broke out through the,

through he small trees out into this clearing and saw these two helicopters sitting there, one in front a me, one off to the left. That was just amazing. That was a great thing. You know, I had my gun in my hand. That's the only time that I actually had finally loaded the 9 mm pistol.

MR.        :   I said I'm going out to get him. To me, he looked like a Bosnian Serb running at me with a pistol in his hand, just running at me with that, that scared look in his eyes, like a man that had been in enemy territory for six days.

So he had a kind a crazy look about him, that I was kind a skeptical at first, like, hey, this, this our guy or not?

I got his pistol from him, and to, to get him inside the helicopter, he's a small man, I'm big, so I picked him up and threw him inside the helicopter. I don't want to stick around this place.

MR.        :   Okay, let's get this show on the road. We've been in here too long.

MR.        :   I know this Mick. I gotta get

the people on board.

          MR.        :   Button came up on the radio
and said hey, Mick, get me a vector outta here.  I
said 2-3-0.  Took off, we started heading outta
there 2-3-0 as fast as we could go.

          MR.        :   [inaudible] we're outta the
zone.

          MR.        :   I understand everybody's outta
the zone.

          MR.        :   Affirmative.

          [Sound of helicopters.]

          MR.        :   He just couldn't say thank you
enough.  I mean he was saying thank you to anything
and everything that moved, and that was, that was a
nice gesture, we, and, and we acknowledged that.

          MR.        :   We flew tactically as close to
the ground as we could.  I mean, you try to hug the
ground as, as best you can.

          MR.        :   We were below 50 feet but as
Major Mickelbee [ph] said, there were time that we
were having to rise up to, to go over houses.

          MR.        :   It was a hellava ride but if

you weren't flying that profile, to keep somebody

from, from shooting at you, hey, it'd be fun, but

we were doing it so that nobody would, you know,

get a good whack at us.

MR.        :   The first thing I saw was I

saw like a corkscrew of smoke.

MR.        :   At first, it was like

disbelief.  I'm like "You gotta be kidding me."  We

went all the way in there, got this guy, 20 miles

from the beach, and now they're gonna start

shooting at us?

Okay.  I saw the guy shoot, by the time

helicopter brain processed what that was and where

it was going, and that I needed to do sumpin' about

it, that thing's halfway to me now.

MR.        :   [inaudible] SAMs in the air.

MR.        :   Hit the switch, flares come

off the right side and the missile went underneath.

MR.        :   We just had--we just had a SAM

shot at me from about 3:00 o'clock.

MR.        :   The biggest thing at that

point was that the thing had missed me, but it was

a real, real sobering experience.

ANNOUNCER:  After the break, behind the scene and a sneak peak at the new feature film from 20th Century Fox, "Behind Enemy Lines."

MAN:  Hey, Jim, you hear about Chanko Wireless?

MAN:  I just ordered 200 shares.

MAN:  I went for 300.  I locked in at 25.10.

MAN:  I got it for 25.05.

MAN:  But we ordered at the same time.

MAN:  That's too bad.

MAN:  Why did your broker get it cheaper?

MAN:  Because Ameritrade doesn't play favorites.  They go to multiple market centers to look for the best price.

MAN:  Well, my broker dose that.  Don't they?

MAN:  I don't know.  Some brokers buy from networks they own.  Sometimes they sell you stock outta their own portfolios, and sometimes, when you're really mad, your neck gets all blotchy.

MAN:   I don't want to talk about this anymore.

MAN:   Okay; fine.

MAN:   Attention everybody.   Please do not talk to Tom about his unfortunate stock purchase. See me for details.

MAN:   Switch to Ameritrade for better order routing and check out our 10-second guarantee.   Limitations apply.   Go to Ameritrade.com.

MAN:   Nickel for your thoughts.

[Laughter.   Rock music.]

ANNOUNCER:   You're watching "Behind Enemy Lines," the Scott O'Grady story, on the Discovery Channel.

MAN:   Ho, ho, ho.   And what would you like, Timmy?

MAN:   Okay.   Due to the length of this line and the unbearable constriction in my tights, I'm going to make this easy for everyone.

MAN:   I'm guessing young Timmy White's America's favorite PC.

awt

MAN:   Adele [ph].

MAN:   And as luck would have it, you can
get Timbo here a complete Dell system with an Intel
Pentium 4 processor for just 899, and right now it
comes with a free CD burner or an all-in-one print
center, plus every Dell is backed by award-winning
service and support.   You don't even have to load
up the sleigh.

MAN:   Ho, ho, ho.

MAN:   Just call or go on line and Dell
will help you build a PC that's right for you.

MAN:   At 899, a Dimension desktop with an
Intel Pentium 4 processor is the perfect gift for
anyone.   Call or go on line today and get a free CD
burner or an all-in-one print center that prints,
scans and copies in color.   There's great deals on
notebooks, too.

MAN:   Little dude, you are getting a Dell.

MAN:   Holiday values made easy; easy as
Dell.

ANNOUNCER:   Frame by frame, history is
changed forward.   Pearl Harbor: Death of the

Arizona, Sunday at 9:00 on the Discovery Channel.

Tonight, on the Discovery Channel, get deep inside the mystery of the Alaskan mummies, and later, Deadline Discovery, a series bringing the stories of today to life.

ANNOUNCER:  In "Behind Enemy Lines," the new feature film from 20th Century Fox, Owen Wilson plays a naval aviator whose F-18 was shot down over Bosnia.

MR. WILSON:  I went to Lamore [?] Naval Base and hung out with some a the pilots and went through some of the survival training and some of the water training.

ANNOUNCER:  Filmed in Slovakia and aboard the esteemed USS Carl Vinson, film makers got to see, firsthand, just how difficult life really is aboard an aircraft carrier.

MR.      :  It's just hot; it's constantly noisy; constantly.  24/7, you have planes landing and taking off, and it's basically like living in a garbage can with somebody outside beating it with a baseball bat.

awt

ANNOUNCER:  Now a look at the new feature film from 20th Century Fox, "Behind Enemy Lines."

MR. HACKMAN:  Unless we're parked in San Diego Bay, you're at war every time you step on this boat.  You understand that?

MR.     :  We pretend we're in the middle of the fight.  We're not fighting.  We're watching.

[Sound of jets.]

MR. HACKMAN:  You should be glad you're not in a fight, Lieutenant.  You wouldn't last long.

ANNOUNCER:  In a world where outlaw armies wage a secret war, the Navy's most powerful ship is not free to strike back.

MR.     :  You understand how important it is that your pilots don't stray from the agreed fly zone.

ANNOUNCER:  And no one felt it more than Lt. Chris Burnett.

MR.     :  Don't you forget what you're doing.

MR.     :  Are you kidding me?  I'm

awt

eating jello.  He's wiping his hands.

          ANNOUNCER:  But on a routine
reconnaissance mission--

          MR.    :  Could be a good opportunity to
test our shiny new digital camera.

          ANNOUNCER:  --he saw something no one was
supposed to see.

          MR.    :  Eliminate the problem.

          MR.    :  They're fired at us.

          MR.    :  We have [inaudible].

          MR.    :  Where is it?

          MR.    :  They're closing in.

          MR.    :  We're clipped.

          MR.    :  Eject, eject.

          [Loud drumbeats.]

          MR.    :  Sir, we've lost a bird.

          MR. HACKMAN:  What the hell happened?

          MR.    :  We've got a signal.

          MR.    :  Archangel is down and I am no
the run.

          MR. HACKMAN:  Evade and survive; do
whatever it takes.

        MR.        :   Do yo have any idea how much
damage this incident may cause to the peace
process?

        MR. HACKMAN:   All I know, Admiral, is that
our man is down behind enemy lines.   Now what is
the problem?

        [Explosions.]

        MR.        :   [Singing] I can hear
[inaudible] Dixie--

        MR.        :   I am an American.   I am on
your side.

        ANNOUNCER:   20th Century Fox presents--

        MR.        :   They killed my pilot cause we
took pictures of the grave, and I know where they
are.   I'm gonna get 'em.

        [Rock music.]

        MR. HACKMAN:   I'm not gonna let that kid
die out there.

        MR.        :   You will lose your command.

        MR. HACKMAN:   So be it.

        ANNOUNCER:   Owen Wilson, Gene Hackman.

        MR. HACKMAN:   Gentlemen, I intend to put

you in harm's way.  Any man who doesn't wish to
join this mission, step away right now.

      [Rock music playing.]

      ANNOUNCER:  "Behind Enemy Lines."

      [Sound of helicopters.]

      MR. O'GRADY:  When we landed on the
Kearsarge there was only one thing I could think
about and that was to duck, cause I'd never been
around a helicopter before and I thought that
that'd be pretty stupid, to hurt myself by walking
into the rotor blade after surviving six days in
Bosnia.

      MR.      :  It was kind a like Top Gun.  I
mean, there wasn't the screaming and the shouting,
but everybody was pretty excited.  I just kind a
wanted to get away from it.

      MR.      :  Nobody got hurt.  You know, 61
went in, 62 came out.  Can't get much more
successful than that.

      [Phone rings.]

      MR.      :  Hello?

      DR. O'GRADY [?]:  The next minute

President Clinton got on the line and he was
extremely happy, he said the country was happy,
that he was proud of Scott, and we just thanked him
for all of the good effort that he had put forth,
that the country had put forth, and were just
overwhelmed.

    MR. O'GRADY:  I was in pretty good shape.
I mean, dehydration and malnutrition and
hypothermia, and I had, you know, some burns.  For
the most part, I was in pretty good shape.

    MR.      :  He was talking about that he
was gonna go back and take some leave and do that
and I was teasing him and said hey, you know, your
private life's gone, pal; you know.  And I don't
think he believed me, so--

    PRESIDENT CLINTON:  Having followed this
almost hour by hour for the last six days, when he
gets back here and tells the whole story, it will
be an astonishing story, indeed.

    [Cheering.]

    MR. O'GRADY:  The men and women of the
Navy and the Marines came in there and saved me,

awt

and if you want to, if you want to find some

heroes, that's where you should look.

[Cheering.]

MR.       :  To me, it was like bringing a

part a me home.  The base was the same way.  It was

a long-lost friend that has finally returned.

MR. O'GRADY:  And Wilber said he didn't

see me eject, he didn't see a parachute, he thought

I was dead, and I told him, wow, that must a been

really cool to watch.

MR.       :  You know, not many people get

to see something like that.

MR.       :  Say again for Venture [?] 1-1.

MR.       :  [radio transmission]

[inaudible].

MR.       :  When they played that tape in

the, the press conference, I think it took us both

by surprise.

MR.       :  Copy that.  What was your

squadron in Korea?

MR. O'GRADY:  [inaudible].

MR.       :  Copy that; you're alive.

MR.     :  And I, I just looked over at him because I was starting to get teary-eyed listening to this and, and he was "losing it," which made me lose it, and all I could do was just hug him, and I said, "You dumb jerk, you made me cry on national TV."

[Cheering and band music.]

DR. O'GRADY [?]:  When he first got off the plane, to see him, to make eye contact, it was just absolute joy.  It was like he was born again, the fact that he was safe and he just looked so great.

WOMAN:  We didn't really speak.  We just knew what had happened to, you know, our experiences, though we were half a world away, and, you know, I was "thank God," I was so happy to have him back.  I asked him about the cross, and he pulled it out from underneath his flight suit, and he had it on.  He said I always have it on.  So that's when I started laughing and that's when things started feeling good again.

MR. O'GRADY:  I'm having fun, still being

able to fly the F-16 as a fighter pilot, enjoying my job.  I'm still the same normal guy as ever before.

MR.     :  And it was a--finally got a, a good ending to what had always in the past been a, a sad story.

ANNOUNCER:  A day that America will never forget, an event that reshaped our world.  Sunday, on the Discovery Channel, see the filmed image that will change the way you remember Pearl Harbor.  Never-before-seen frame by frame analysis and forensic evidence unlock the secrets that sank with the Arizona, one unforgettable frame at a time.  Pearl Harbor: Death of the Arizona, premiering Sunday at 9:00, Eastern and Pacific, on the Discovery Channel.

ANNOUNCER:  It is well-documented that for thousands of years many sophisticated ancient cultures developed elaborate burial practices in an effort to keep the spirits of the dead among the living.  Mummies have been found all over the world but little has been recorded of North American

mummies found in the unlikely cold wet climate of
the Aleutian Islands in Alaska.

It is here that, incredibly, a vast
civilization thrived for thousands of years, and
then nearly disappeared.  They call themselves the
Inungen [?].  Little of their culture remains.
What's left is found in artifacts, oral histories,
and mummies.  Who were these people and what
brought them to the brink of extinction?

MR.       :  He may have been hanged or
strangled.  There seems to be some trauma to the
neck.

ANNOUNCER:  Today, in the last brief weeks
of summer, four men will set off on an expedition
to remote Aleutian Islands.  They will seek out
unexplored ancient village sites.

MR.       :  No one's ever surveyed this
before.  This is a brand new one.

ANNOUNCER:  Look for evidence of huge
tidal waves.

MR.       :  It's very clear that people
had to accommodate periodic large inundations from

awt                                                                    62

earthquake-generated sunamis.

     ANNOUNCER:  Search for signs of human
artifacts in undisturbed caves.

     MR.       :  See anything back in there?

     MR.       :  Oh, my God, yeah.  Boy, we got
something down there.

     ANNOUNCER:  An attempt to prove that
stories of an ancient bloody massacre were true.

     MR.       :  They fired and fired until
everyone was killed.

     ANNOUNCER:  The Aleutians are one of the
most dangerous and forbidding chains of islands in
the world.  For most of the year, terrible storms
rake the shores and hurricane-force winds turn the
surrounding seas into an icy deathtrap.

     It is one of the most inhospitable places
on the planet.  But for a brief moment each year, a
weather window opens up in the summer when the
storms temporarily subside and the islands let down
their guard long enough for outsiders to safely
enter.

     In the summer lull of 1936, a famous

awt                                                                     63

anthropologist from the Smithsonian Institution

entered a dark cave on a legendary Aleutian island.

What he found were the well-preserved remains of an

ancient civilization.

      [END OF TAPED RECORDING.]

          -  -  -

# CERTIFICATE

I, hereby certify that the tape recording represented by the foregoing pages were transcribed by me; that the foregoing transcript is a correct and accurate record of the proceedings to the best of my knowledge, ability and belief.

ART W. TORIKKA

TRANSCRIBER