IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| SCOTT O'GRADY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 502CV173 |
| | § | |
| TWENTIETH CENTURY FOX | § | JURY DEMANDED |
| FILM CORPORATION, and | § | |
| DISCOVERY COMMUNICATIONS, | § | |
| INC., | § | |
| | § | |
| Defendants | § | |

### TWENTIETH CENTURY FOX FILM CORPORATION'S OBJECTIONS TO THE REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE DATED DECEMBER 19, 2003

To the Honorable Court:

Twentieth Century Fox Film Corporation ("Twentieth Century Fox") files its objections to the report and recommendations of the United States Magistrate Judge ("the "Report") served upon the parties on December 19, 2003 insofar as the Report denies Twentieth Century Fox's Motion for Summary Judgment as follows:

#### OBJECTION NO. 1:

Twentieth Century Fox objects to the Report to the extent that it denies Twentieth Century Fox summary judgment as to Plaintiff's claims for the reasons stated herein as well as in its Motion for Summary Judgment (the "Motion") and Reply brief (the "Reply"), Defendant Discovery Communications, Inc.'s ("Discovery") Motion for Summary Judgment and Reply and Discovery's Objections to the Report and Recommendation of the United States Magistrate Judge all of which are incorporated herein by reference.

-1-

3507310v4



Twentieth Century Fox does not object to that part of the Report that grants summary judgment as to the Twentieth Century Fox movie, "Behind Enemy Lines" (the "Movie"), and the finding that the claim for tortious interference is moot because Plaintiff has dismissed the claim.

**OBJECTION NO. 2: The Court Applied The Wrong Legal Standard To The November 28th Rebroadcast (Report at V. F.)**

The Report is fundamentally flawed in that even if the Rebroadcast as a whole is considered a promotional activity and/or commercial advertisements for the Movie, which it is not, nonetheless it is First Amendment protected speech. The Magistrate erred in equating such with non-speech products such as T-shirts, Coca-Cola and pharmaceuticals. (Report at F.3 at 22-26) The Report states that "[c]onsidering the combination of all the characteristics of the Rebroadcast, namely, the evidence that the Rebroadcast was an advertisement for the Movie, the Rebroadcast related to the Movie and Defendants had an economic motive for the speech, the Court concludes that there is a fact issue whether the Rebroadcast is commercial speech." (Report at F.3 at 25) This error is made despite the Plaintiff's concession in his Response in Opposition to Defendants Twentieth Century Fox Film Corporation's and Discovery Communications, Inc.'s Motions for Summary Judgment and Brief in Support ("Response") that:

> First Amendment protection also extends to certain advertisements of the underlying work. Speakers have the right to tell consumers about the content of their works. Several decisions cited by Defendants illustrate this non-controversial point.

(Response at 37, n. 12 and cases cited therein)

The Magistrate's finding not only ignores this undisputed and well settled point of law, but illustrates the dangers inherent in applying the commercial speech test set forth in the two cases it relied on, which involve advertisements for contraceptive devices and legal services: *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 637 (1985) and *Bolger v. Youngs Drugs Products Corp.*, 463 U.S. 60, 66-67 (1983). (Report at 23) As Twentieth

-2-

Century Fox pointed out in its Reply Brief ("Reply") and in oral argument at the summary judgment hearing, even the Court in *Bolger*, warned against the analysis applied by the Magistrate where the advertisement or promotion "advertises an activity protected by the First Amendment." *Id.* at 67 n.14 (*citing Murdock v. Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870 (1943)). (Reply at 8-9 and cases cited therein) Rather, "[i]t is the content of the speech which determines whether the particular speech is commercial not merely the economic motive of the speaker." *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1184 (9th Cir. 2001)(*citing Bolger*) (emphasis added); *Cincinnati v. Discovery Network Inc.*, 507 U.S. 410, 423, n. 18, 113 S.Ct. 1505 (1993); *Board of Trustees of the State of New York v. Fox*, 492 U.S. 469, 482, 109 S.Ct. 3028 (1989). (Reply at 8-9)("If the allegedly libelous statements would otherwise be constitutionally protected...they do not forfeit that protection because they were published in the form of a paid advertisement." *New York Times v. Sullivan*, 376 U.S. 254, 266 (1964); "Speech does not lose its First Amendment protection because money is spent to project it, as in a paid advertisement of one form or another." *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 761 96 S.Ct. 1817, 1825 (1976)).

The Supreme Court, in *Joseph Burstyn, Inc, v. Wilson*, expressly rejected economic motive as a factor in determining whether a movie is protected speech under the First Amendment:

> It is urged that motion pictures do not fall within the First Amendment's aegis because their production, distribution, and exhibition is a large-scale business conducted for private profit. We cannot agree. **That books, newspapers and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment. We fail to see why operation for profit should have any different effect in the case of motion pictures.**

*Joseph Burstyn, Inc, v. Wilson*, 72 S.Ct. 777, 780 (1952)(emphasis added).

Likewise, advertisements and commercials for those protected works are afforded the same First Amendment protection. **"The critical question is whether [the advertisements and]**

**promotional materials relate to a speech product that is itself protected."** *Lane v. Random House, Inc.*, 985 F. Supp. 141, 152 (D.D.C. 1995)(emphasis added). In *Lane*, for example, the plaintiff filed suit for misappropriation of his name and likeness where his name appeared in an advertisement for a book concerning conspiracy theories surrounding the assassination of President Kennedy. The plaintiff was a conspiracy theorist. The court, noting the relationship between the plaintiff and the subject matter of the book, drew a distinction between advertisements for commercial non-speech products versus advertisements whose subject matter was related to the underlying work which was protected by the First Amendment, stating, "[T]he challenged advertisement is not about laundry detergent; it cannot be divorced from the [movie or book] and the [movie or book] is protected speech." *Lane v. Random House, Inc.*, 985 F. Supp. 141, 152 (D.D.C. 1995). Thus, the *Lane* Court held paid advertisements and promotional materials were non-commercial speech because, "rather than propose an economic transaction, they expressed clearly protected speech." *Id.*

Here, the Movie is directly related and connected to the Documentary and the November 28th Rebroadcast: Plaintiff's experience in Bosnia is common to all. The Rebroadcast does more than propose an economic transaction as noted in the Report, it offers educational elements, interviews with actors and fact versus fiction analyses and comparisons. (See eg. Report at 6 and 19) The Rebroadcast does not lose its First Amendment protection just because of the economic motive of the speaker. In sum, "it would be illogical to allow respondents to exhibit [speech products] but effectively preclude advance discussion or promotion of their lawful enterprise. *Id.* at 147 (*quoting Guliemi v. Spelling Goldberg Prods.*, 603 P.2d 454, 463 (1979)).

The Court should refuse to adopt this portion of the Report and, instead, grant Defendants' motions for summary judgment.

**OBJECTION NO. 3: Interpretation Of The Effect Of The Release Is A Matter Of Law (Report at V.B-D at 14-16)**

Without referring to the record, the Report states that Plaintiff's assertion that "he did not consent to the use of his name, likeness or image to promote" the Movie and the assertion that "the only commercial advertisements mentioned in the Release related to the advertising of the docudrama itself" are sufficient to raise a genuine issue of material fact as to the effect of the Release. (Report at 15)

The record does not support the statement that Plaintiff "did not consent." Only Plaintiff's counsel, in argument, states that he did not consent. (See Plaintiff's Response In Opposition to Defendants' Discovery Channel Inc. and Twentieth Century Fox Film's Motions for Summary Judgment and Brief in Support ("the Response") at 52). Assertions and argument of Plaintiff's counsel as to the effect of the Release, however, are not sufficient to raise an issue of fact. *Carroll v. Magnolia Petroleum Company*, 223 F.2d 657, 665 (5th Cir. 1955). Rather, Plaintiff's Affidavit states only that "At no time did I grant BBC or anyone else <u>the right to control</u> my name, likeness, image or persona to promote or advertise commercial products such as Fox's *Behind Enemy Lines*." (Pl. App. 4, O'Grady Aff. at paragraph 10) "Consent"[1] versus "control,"[2] however, are two distinctly different concepts. No argument has been raised that Defendants had the "right to control" the use of Plaintiff's name, or likeness. Rather, the Release provides for the BBC and its assigns and licensees rights in the "contributions" (including any recordings or transcription(s) thereof) made by Plaintiff in conjunction with the BBC contract and Release. (See Def. Exh. 44).

---

[1] "Consent" is defined, in part, as "agreement, approval; permission; the act or result of coming into harmony or accord." HENRY CAMPBELL BLACK, BLACK'S LAW DICTIONARY, (6th ed. 1990).

[2] Black's Law Dictionary defines "control" as "[t]o exercise restraining or directing influence over. To regulate; restrain; dominate; curb; to hold from action; overpower; counteract; govern." HENRY CAMPBELL BLACK, BLACK'S LAW DICTIONARY, (6th ed. 1990).

Nowhere in the Release is there a statement that supports Plaintiff's assertion stated by the Magistrate that "the only commercial advertisements mentioned in the Release related to the advertising of the docu-drama itself." (Report at 15; *see* Pl. App. 27, Dep. Ex. 44) Furthermore, the statement that "when [h]e signed the Release, he was not granting the BBC [and its assigns] the right to use his name, likeness, and image to promote commercial products apart from the [docu-drama] itself" (Report at 15) is taken right out of Plaintiff's Response (Response at 52) and, likewise, is not supported by the cited evidence. Plaintiff's intent or understanding, after the fact, is simply not relevant.

Plaintiff's consent or lack thereof is immaterial when it comes to interpreting the plain language of an unambiguous contract. In construing a written contract, the court's primary concern is to ascertain the true intentions of the parties **as expressed by the written instrument.** *Lenape Resources Corp. v. Tennessee Gas Pipeline Co.*, 925 S.W.2d 565, 574 (Tex. 1996). Interpretation of an unambiguous contract is a matter of law for the Court. *Brown v. Palatine Ins. Co.*, 35 S.W. 1060, 1060-61 (Tex. 1896). Only the terms of the contract should be consulted when interpreting an unambiguous contract provision. *Id.* at 1061. ("The language used must be construed according to the evident intent of the parties, to be derived from the words used, the subject matter to which they relate, and the matters naturally or usually incident thereto.")

The plain language of the Release clearly states that the BBC and its "licensees and assigns' **shall be entitled to "ALL RIGHTS...in the contribution(s) (including any recordings or transcription(s) thereof) FOR ALL PURPOSES EVERYWHERE"** including but not limited to "all television...pay cable and basic cable television." (Def. Depo. Ex. 44). The Release further provides at paragraph 7 that "The BBC and ...its/their licensees and assignees shall be entitled to edit the contribution(s) and the rights granted to the BBC under this contract shall apply to the whole

or any excerpt(s) from the contributions." (*Id.*) Accordingly, pursuant to the plain and unambiguous language of the Release, the BBC and its assignee/licensee, Discovery, had the right to use the material contributed by Plaintiff, including the right to edit such material, "for all purposes everywhere." It is undisputed that Discovery had the right to broadcast the Plaintiff's name and likeness in the Documentary. The Documentary was the subject of and cannot be divorced from the Rebroadcast. *See Lane*, 985 F. Supp. at 152.

Accordingly, because the Release is unambiguous, and its clear language dictates that Plaintiff released "ALL RIGHTS...FOR ALL PURPOSES EVERYWHERE" including, but not limited to, "all television...pay cable and basic cable television," there can be no genuine issue of material fact as to its effect as a matter of law.

The Court should refuse to adopt the Report and, instead, grant Defendants' motions for summary judgment.

### OBJECTION NO. 4: The Court Applied The Wrong Standard In Evaluating the "Incidental Use" Exception. (Report at V. E.1.b. at 18).

The Magistrate erred in at least two respects on this issue. First, the Magistrate erroneously relied on a 1915 New York state case cited in a footnote in *Henley v. Dillard Department Stores*[3] for the proposition that an incidental use only occurs where it is "more casual" rather than a "more meaningful and purposeful" reference to the Plaintiff. (Report at V.E.1.b. at 18) Second, the Magistrate's finding that "the reference to Plaintiff was not incidental" is improper. (Report at V.E.1.b. at 18)

Neither *Henley* or *Merle v. Sociological Research Film Corp.*[4], the case cited in *Henley*, address the fundamental First Amendment issues inherent in this case. In fact, **neither case even**

---

[3] 46 F.Supp. 2d 687, 594 n.6 (N.D. Tex. 1999).
[4] 166 A.D. 376, 152 N.Y.S. 829 (1 Dept. 1915).

**mentions the First Amendment** or freedom of speech. *Henley* involved an advertisement for a t-shirt, a non-speech product. Consequently, they do not deal with the issues in this case or the defenses raised by Defendants as grounds for summary judgment nor should they serve as authority for denial thereof.

Instead, as Defendants set forth in their motions for summary judgment (*See, e.g.*, Motion at 30-33) and as specifically addressed by Twentieth Century Fox in its Reply (at 16 and 17), the defense of "incidental use," under a First Amendment analysis, is recognized in the context of ads for books, magazines, newspapers and other protected works. For example, in *Groden v. Random House*[5], the Second Circuit explained "incidental use" stating:

> In the particular context of ads for books and periodicals ... [the courts] have recognized ..."incidental use" in ads or other promotional items of material that 'proves the worth and illustrates the content of the works being advertised. The 'incidental use' exception has been applied to the use of: a photo of a community activist, originally appearing in a sports magazine, in advertisements promoting the sale of subscriptions to the magazine; a photograph of a well-known actress, originally appearing in a magazine, as a part of an advertisement for the magazine in other periodicals; and a person's name and picture originally appearing in a newsreel film, on posters used to advertise the exhibition of the film.

*Groden v. Random House*, 61 F.3d 1045, 1049 (2nd Cir. 1995)(citations omitted)

Furthermore, "incidental use" is not confined to the reproduction in advertising of an image, portrait or likeness that has appeared within the publication being advertised. Using the case, *Rand v. Hearst Corp.*[6], as an illustration, the Second Circuit observed:

> *Rand* concerned a book jacket in which a publisher had used the name of Ayn Rand in describing the writing style of the book's author. The [court] found this to be incidental use, even though Rand's name was not used anywhere in the book. The Court observed that 'to hold otherwise would constitute an impermissible restriction on what we deem to be the right of a publisher in informing the public of the nature of his book and comparing it with the works of other authors.

---

[5] 61 F.3d 1045, 1049 (2nd Cir. 1995).
[6] 31 A.D.2d 406, 298 N.Y.S.2d 405 (1st Dept. 1969), *aff'd*, 26 N.Y.2d 806, 309 N.Y.S.2d 348, 257 N.E.2d 895 (1970).

*Groden*, 61 F.3d at 1049.

The Second Circuit, in affirming summary judgment in favor of the defendant on a statutory right of publicity and Lanham Act claims, held:

> **Our conclusion that appellee's ad falls within the 'incidental use' exception implements, and might even be required by First Amendment considerations. …it is clear that what drives the 'incidental use' exception is the First Amendment interest in protecting the ability of news disseminators to publicize, to make public their own communications.**' Posner's book about the assassination of President Kennedy and the book Groden co-authored on that topic obviously concern a matter of significant public interest.

*Id.* (citations omitted)(emphasis added).

The Magistrate misapplied the law as to "incidental use" exception in the context of the First Amendment.

Furthermore, the Magistrate's finding that "the reference to Plaintiff was not merely incidental" (Report at 18) is improper. Defendants, not Plaintiff, moved for summary judgment and the Magistrate's finding in effect grants Plaintiff judgment as to that defense. *Leonard v. Dixie Well Service & Supply*, 828 F.2d 291, 294 (5th Cir. 1987)(the court may not adjudicate credibility of assertions in a summary judgment)

The Court should refuse to adopt the Report and, instead, grant Defendants' motions for summary judgment.

**OBJECTION NO. 5:** The Court Applied The Wrong Standard In Evaluating the "Newsworthiness Exception." (Report at V. E.1.c. at 18-19).

The Magistrate similarly misconstrues the "newsworthiness" exception stating that because there is a fact issue as to whether the Rebroadcast constitutes commercial speech notwithstanding the fact that the Rebroadcast contained educational elements intended to contrast 'fact and fiction of true survival' and the fact that Plaintiff's ordeal was newsworthy at one time.'" (Report at 19) There is

no mention or analysis of the First Amendment. It is error not to discuss and rely upon the controlling authority cited in Defendants' motions for summary judgment or reply briefs.

As Twentieth Century Fox set forth in its Motion (at 30-33) and its Reply (at 16-17), the Second Circuit, in addressing a similar claim by a plaintiff, who complained that the book publisher, Random House, had exploited his individuality by portraying him in an advertisement of a book for commercial gain, disposed of the argument as "without merit" stating:

> **While the newsworthiness privilege may not apply to an advertisement for a non-speech product, it does apply to advertisements for speech products—even those that propose a commercial transaction.** Lane's theories about a pivotal and baffling public issue are manifestly newsworthy, serious analysis of his theories are derivatively newsworthy; and **an advertisement promoting the sale of a book containing such analysis retains a newsworthiness immunity against a claim for misappropriation.**

(Reply at 16-17 (*citing Lane v. Random House, Inc.*, 985 F.Supp. 141, 147 (D.D.C. 1995))(emphasis added)).

Moreover, the court in *Lane* held:

> Because Lane's picture and quotation are newsworthy and incidentally related to a protected speech product, they cannot form the basis for a successful misappropriation claim. Random House may invoke either the newsworthiness privilege or incidental use privilege.

(Reply at 16 (*citing Lane*, 985 F.Supp. at 146)( emphasis added)).

As stated above, the November 28th Rebroadcast, interstitials, the documentary and the Movie all share as a common element Plaintiff's experience of being shot down "behind enemy lines" in Bosnia in 1995, in an ongoing conflict involving American armed forces. Use of Plaintiff's name in the November 28th Rebroadcast, therefore, is newsworthy and incidentally related to the subject matter of the Movie, which, as Plaintiff does not contest, is a protected speech product. Consequently, under the well settled case law set forth by Defendants in their Motions and Reply Briefs, the Rebroadcast cannot form the basis of Plaintiff's claims, as a matter of law.

Furthermore, the Report also seems to imply that the newsworthiness exception does not apply to someone who may have been "newsworthy at one time." No authority is cited for this statement and, indeed, it overlooks controlling authority cited by Defendants which hold that the passage of time is not an outcome determinative factor. *See e.g., Matthews v. Wozencraft*, 15 F.3d 432 (5th Cir. 1994).

The Court should refuse to adopt the Report and, instead, grant Defendants' motions for summary judgment.

### OBJECTION NO. 6: Plaintiff's Own Pleadings and Testimony Contradict The Statement "It Is Undisputed That Behind Enemy Lines Is Not Plaintiff's Story" (Report at I at 5).

Twentieth Century Fox, in its Reply Brief, specifically pointed out that a party cannot create a sham issue of fact by contradicting his pleadings and testimony via argument of counsel. (Reply at 4-6 (*citing Doe v. Dallas Independent School District*, 220 F.3d 380, 386 (5th Cir. 2000), *cert denied*, 531 U.S. 1073 (2001); *see also S. W. S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996))). Plaintiff's First Amended Complaint and deposition testimony plainly state that the Movie was based on him. (Reply at 4-5 (citing to Plaintiff's First Amended Complaint ("FAC") at paragraphs 29-30; *see also* Deposition of Scott O'Grady ("O'Grady Depo.") Vol. 1 at 48:03-49:10 ("as far as the making of the movie, it is definitely based off my experience... the essence that the movie was made off an American fighter pilot ...shot down in Bosnia and rescued...the premise for making the movie was my experience"))). It is undisputed that Scott O'Grady's experience in Bosnia inspired the Movie, (*see, e.g., Id.*; Twentieth Century Fox Film's Statement of Undisputed Facts at F. 2, 6, 7 and Exhibits 25 and 71 to Plaintiff's Response) and that same experience is the subject of the Documentary and the Rebroadcast. Thus, Plaintiff's experience in Bosnia is related to and a

-11-

**OBJECTION NO. 8:  The Magistrate Erred In Holding The Issue Of Whether Defendants' Message Is Actionable As "Literally False" Or As Implicitly Misleading Is A Question For The Jury. (Report at VI. at 26-30)**

In discussing Plaintiff's Lanham Act claims, the Magistrate found there is a genuine issue of material fact "whether the title and Defendants' actions in creating the Rebroadcast are artistically related to the expressive elements of the Movie to qualify for First Amendment protection or whether the Rebroadcast is nothing more that a misleading advertisement for the Movie citing *Parks v. LaFace*, 329 F.3d 437, 458 (6th Cir. 2003), *cert. denied*, WL22303348 (2003). The Magistrate also found there was a fact issue on "whether Defendants' actions in creating the Rebroadcast are sufficiently related to the expressive elements of the Movie to qualify for First Amendment protection." (Report at 25) The Magistrate has misconstrued the artistic relevance test set forth in *Rogers v. Grimaldi*, 875 F.2d 994 (2nd Cir. 1989) and *Parks*.

The Sixth Circuit in *Parks* made an extensive comparison of the protected and non-actionable use of "Ginger and Rogers" in *Grimaldi* to the use of "Rosa Parks" in the title to the rap song. Those comparisons and distinctions illustrate the application of the artistic relevance test here as well:

> In *Rogers*, the Court in discussing the title to the movie *Ginger and Fred*, observed that 'there is no doubt a risk that some people looking at the title 'Ginger and Fred' might think the film was about Rogers and Astaire in a direct biographical sense. For those gaining that impression, the title was misleading. Likewise, in the present case, some people looking at the title *Rosa Parks* might think that the song is about Rosa Parks and for those gaining that impression (as twenty-one consumer affidavits field in this court indicate happened, ...), the title is misleading. **This standing alone may not be sufficient to show a violation of the Lanham Act *if* the title is nevertheless artistically relevant to the content of the underlying work.**
>
> There is a clear distinction, however, between the facts in *Rogers* and the facts in the present case. In *Rogers*, the court had no difficulty in finding that the title chosen for the movie *Ginger and Fred* had artistic relevance to the content of the movie. 'The central characters in the film were nicknamed 'Ginger' and 'Fred,' and **those names were not arbitrarily chosen just to exploit the publicity value of their real life counterparts but instead have genuine relevance to the film's story.**' ...the title

-13-

common element of the Movie, the Documentary and the November 28, 2001 Rebroadcast. (Twentieth Century Fox Film's FAC ¶¶ 29-30; O'Grady Depo. Vol. 1 at 48:03-49:10)

The Court should refuse to adopt the Report and, instead, grant Defendants' motions for summary judgment.

**OBJECTION NO. 7**: **The Magistrate Erred In Finding A Genuine Issue of Material Fact As to Whether Plaintiff Has Been Injured As A Result Of The November 28th Rebroadcast. (Report at 29-30)**

The Magistrate, without reference to the record, erroneously found there was sufficient evidence to create a fact issue as to whether Plaintiff has been injured on the basis that the "Plaintiff states that the Rebroadcast reduced or eliminated the opportunities for Plaintiff to endorse other competing films.'"(Report at 30). But there is no such statement in Plaintiff's Affidavit. (See Pl. App. 4) The Magistrate further states, citing to Plaintiff's Affidavit, that "Plaintiff testified he has spent time and effort during his speeches and public interviews to correct the false impression that the Movie is his story." (Report at 30). But, as the Magistrate noted, Plaintiff has conceded that he is not contesting Twentieth Century Fox's right to make the Movie (Report at 13) and there simply is no evidence tying this alleged injury to the November 28th Rebroadcast. Conclusory statements, speculation and unsubstantiated assertions will not suffice to defeat a motion for summary judgment. *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996)(en banc). Where, as here, a nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case, and on which he bears the burden of proof at trial summary judgment must be granted. *See Celotex Corporation v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986).

The Court should refuse to adopt the Report and, instead, grant Defendants' motions for summary judgment.

-12-

3507310v4

in *Rogers* was obviously relevant and truthful as to the film's content, because the film was about the main characters known in the film as Ginger and Fred. **In contrast, it cannot be said that the title in the present case, *Rosa Parks*, is clearly truthful as to the content of the song which, as OutKast admits, is not about Rosa Parks at all and was never intended to be about Rosa Parks, and which does not refer to Rosa Parks or to the qualities for which she is known.**

Furthermore, the contrast between the real Fred and Ginger and the fictional Ginger and Fred in the film served the director's purpose of satirizing contemporary television and, in that sense, the title was 'an integral element of the film and the film maker's artistic expressions.' OutKast's only explanation for the use of Rosa Park's name in the title of the song, however, is that the name Rosa Parks is a 'symbol.'

*Parks,* 329 F.3d at 455-56 (emphasis added).

Also instructive is the discussion in *Parks* regarding *Seale v. Grammercy Pictures, Inc.,* 949 F.Supp. 331 (E.D.Pa. 1996) wherein the Court addressed the use of the plaintiff's name and likeness on the cover of a musical CD/cassette. The music contained in the CD/cassette consisted of various songs composed by different musicians. "The court pointed out: 'Clearly the use of Plaintiff's name and likeness on the cover of the musical CD/cassette does not relate to the content in the CD/cassette in the same manner as the use of the Plaintiff's name and likeness on the cover of the home video and pictorial history book relates to the content of the film and pictorial history book...*the musical CD/cassette is merely a collection of different songs performed by different musicians, which songs have no direct connection to the Plaintiff or the history of the Black Panther Party. Id.* at 456-57. Consequently, the artistic relevance test is an analysis of whether the complained of use of the celebrity's name and likeness has a "genuine relevance to the film's story" as opposed one where there is "no direct connection" but is instead "arbitrarily chosen just to exploit the publicity value" of the plaintiff's name. *Id.*

Here, it is undisputed that the Movie was originally titled "Behind Enemy Lines" by the writers, the Thomas brothers, in 1995. (Twentieth Century Fox Film's Statement of Undisputed Facts F. 3; Davis Depo. at 14:10-15:24; 29:18-24). It is also undisputed that Discovery began airing

-14-

3507310v4

the BBC documentary under the title "*Behind Enemy Lines: the Scott O'Grady Story*" on June 2, 1997. (Plaintiff's First Amended Complaint at paragraph 26; Exhs. 48, 116). Each of the respective titles are relevant and clearly truthful to the content of the underlying works: the Movie is about a pilot shot down behind enemy lines who evades capture for several days and the Documentary is a factual representation of Scott O'Grady's experience when he was shot down behind enemy lines.

Furthermore, here, as in *Rogers* and in stark contrast to *Parks* (where as the Sixth Circuit noted the song "is not about Rosa Parks *at all*") the Movie, while fictional, is undisputedly "a fictionalized movie inspired by O'Grady and his life story." (Response at n.5 at 29). As Twentieth Century Fox Film set forth in its Motion, the similarities between the Movie and Plaintiff's life story are set out in paragraph 30 of the First Amended Complaint as (i) an American fighter pilot shot down by a surface to air missile; (ii) while on a peace keeping mission over Bosnia; (iii) who must eject from an exploding aircraft and float down in broad daylight behind enemy lines; (iv) who must hide from armed Bosnian Serbs searching for the pilot for several days; (v) radio communications between the rescuers and the pilot play an important role; (vi) Marine rescuers launch off a Navy ship to rescue him in daylight; and (vii) enemy forces fire upon the helicopters as they carry the pilot to safety.

Consequently, here, unlike *Parks* (where the defendant's only explanation for the use of Rosa Parks' name in the title of their song was that it is a "symbol")[7] and *Seale*, (where the CD/cassette music had "no direct connection" to the Plaintiff)[8], there is a genuine relevance and a direct connection between Plaintiff, the Documentary and the Movie; that is his well publicized experience when he was shot down over Bosnia in 1995 and evaded capture from the enemy until the Marines

---

[7] *Parks*, 329 F.3d at 455-56.
[8] *Parks*, 329 F.3d at 457; *Seale*, 949 F. Supp. at 337-38.

-15-

rescued him. *See Parks*, 329 F.3d at 455. Thus, Defendants did not use Plaintiff for the value associated with his name.

Where, as here, and as in the cases cited by Discovery in its Motion and Reply and Twentieth Century Fox Film in its Motion and Reply Brief, [9] there is artistic relevance; consequently, there can be no violation of the Lanham Act *unless* there is an explicit false representation of endorsement or sponsorship. Here, there simply is no evidence of an **explicitly** false representation and the Magistrate's statement that "the question of whether Defendants' message is actionable as 'literally false' or as implicitly misleading is a question for the jury," is without legal basis. The risk that some might think there is an implicit endorsement or sponsorship is outweighed by the First Amendment. *Id.*

The Court should refuse to adopt the Report and, instead, grant Defendants' motions for summary judgment.

> **OBJECTION NO. 9:** The Magistrate Erred In Finding There Was Sufficient Evidence In the Record To Create A Fact Issue As To "Whether the Deception Was Material In That It Tended To Influence Purchasing Decisions." (Report at 29)

The Magistrate misconstrued the record in finding the Rebroadcast created a fact issue as to whether the Rebroadcast had the capacity to deceive a substantial segment of the potential customers and that it tended to influence purchasing decisions when it stated that "In an attempt to sell more tickets to the Movie, Fox hoped to tie its Movie to real soldiers because 'patriotism sells.'" (Report at 29 citing Pl. App. 15, Moore Depo. at 64:11-65:11).

First, as stated above, Plaintiff does not contest Twentieth Century Fox's right to make the Movie and, therefore, the marketing of the Movie generally is not at issue here. Moreover, the referenced testimony does not establish a genuine issue of material fact as to Defendants' actions

---

[9] See Reply Brief at 14-15 and cases cited therein: *Rogers, New Kids On the Block*, 745 F.Supp. 1540 (C.D. Cal. 1990); *Mattel, Inc., v. MCA Records*, 28 F.Supp. 2d 1120, 1133 (C.D.Cal. 1998), aff'd 296 F.3d 894 (9th Cir. 2002)

-16-

with respect to the November 28th Rebroadcast. Instead, the referenced testimony is from John Moore, the Movie's director, who was asked about a *Newsweek* interview wherein he allegedly discussed test screenings and marketing of the Movie **in the wake of the World Trade Center attacks not the Rebroadcast.** Taken in context, Moore's testimony is as follows:

> Q. (By Mr. Bowles): 280 is a document…that looks like a part of a *Newsweek* article or a *Newsweek* publication dated December 3, 2001. And the title of it is "Hollywood Goes to War." …in the middle of the page, statements are made:
>
> 'When BEHIND ENEMY LINES was test screened on September 6, the response was mediocre,' recalls John Moore, its young Irish director. 'Then the movie was shown in the wake of the World Trade Center attacks. The difference was unbelievable. In one month the cards went from really enjoyed it to we need this movie now. The response was stunningly different. And we hadn't changed a thing.'
>
> Do you recall making those statements?
>
> A. Yes.
>
> Q. Then in the next paragraph . . . **the author says:**
>
> **'What has changed is the marketing of the movie. As anyone who watches TV ads these days knows, patriotism sells.** Moore holds up two baseball caps to illustrate the strategic shift. <u>'One was designed before September 11, one after. On the first cap, the letters of the movie title are all in white. On the second cap, they're red, white, and blue.'</u>
>
> And those two sentences I read are in quotes. Do you recall saying what is quoted there?
>
> A. Yes.

(Pl. App. 15, Moore Depo. at 64:11-65:22)(emphasis added)

The two sentences Moore testified he recalled stating were about the two baseball caps only. The statement that "patriotism sells" is attributed to the *Newsweek* article author not Moore. The deposition testimony, therefore, simply does not support the alleged factual issue found by the Magistrate. Furthermore, it is not material because it is not testimony about the November 28th

-17-

Rebroadcast. Consequently, there is no evidence that the alleged "deception was material in that it tended to influence purchasing decisions" as stated by the Magistrate. (Report at 29).

The Court should refuse to adopt the Report and, instead, grant Defendants' motions for summary judgment.

## Conclusion

For the reasons stated, the Court should refuse to adopt the challenged portions of the Magistrate's report and either grant Twentieth Century Fox's motion for summary judgment or carry the legal issues raised herein during trial. Twentieth Century Fox prays for such additional relief as to which it might be entitled.

Respectfully submitted,

JACKSON WALKER L.L.P.

By: *Charles L. Babcock* (signature)
Charles L. Babcock
State Bar No. 01479500
Nancy W. Hamilton
State Bar No. 11587925
Cedric D. Scott
State Bar No. 24013474
1401 McKinney, Suite 1900
Houston, TX 77010
(713) 752-4200
(713) 752-4221 – Fax

George L. McWilliams
PATTON, HALTOM, ROBERTS,
    MCWILLIAMS, & GREER, LLP
2900 St. Michael Drive, 4th Floor
Texarkana, Texas 75503
(903) 334-7000
(903) 334-7007 – Fax

**ATTORNEYS FOR DEFENDANT TWENTIETH CENTURY FOX FILM CORPORATION**

## CERTIFICATE OF SERVICE

This is to certify that on this ___5th___ day of January, 2004, a true and correct copy of the foregoing Defendant Twentieth Century Fox Film Corporation's Objection to the Report and Recommendation of the U.S. Magistrate Judge was served via United States Mail, postage prepaid, upon

George E. Bowles
Locke, Liddell & Sapp. L.L.P.
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201

G. William Lavender
Lavender Law
Landmark Building
210 N. State Line, Suite 503
Texarkana, Texas 71854

Laura R. Handman
Davis Wright Tremaine L.L.P.
1500 K Street, N.W., Suite 450
Washington, D.C. 20005-1272

Gary Bostwick
Davis Wright Tremaine L.L.P.
865 South Figueroa Street, Suite 2400
Los Angeles, CA 90017-2566

Victor Hlavinka
Atchley, Russell, Waldrop & Hlavinka
P.O. Box 5517
Texarkana, TX 75505-5517

_____
Charles L. Babcock

3507310v4