IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| SCOTT O'GRADY, | § | CIVIL ACTION NO. 5:02CV173 |
| Plaintiff, | § | |
| | § | |
| v. | § | "JURY" |
| | § | |
| TWENTIETH CENTURY FOX FILM CORP. | § | |
| and DISCOVERY COMMUNICATIONS, INC., | § | JUDGE DAVID FOLSOM |
| Defendants. | § | |

## DEFENDANTS' SUPPLEMENT TO JOINT MOTION TO EXCLUDE TESTIMONY BY EXPERT WITNESS MARK A. ROESLER

TO THE HONORABLE MAGISTRATE JUDGE:

Twentieth Century Fox Film Corporation ("Twentieth Century Fox") and Discovery Communications, Inc. ("Discovery") ("Defendants") respectfully supplement their Joint Motion to Exclude Testimony by Expert Witness Mark A. Roesler ("Roesler"), as follows:

### I.

### Introduction

The Defendants filed a motion under Federal Rule of Evidence 702 to exclude Mr. Roesler's testimony. That motion was referred to this Court and is pending. After the filing of the motion, the Court heard and considered Defendants' Motion for Summary Judgment, granting in part and denying in part those motions. Twentieth Century Fox and Discovery both filed



objections to the Magistrate's Report to the extent the Motions for Summary Judgment were denied.  The Plaintiff did not file objections with respect to that part of the Magistrate's Report and Recommendation that granted the summary judgment.  The time for filing such objections has passed.  In light of the Magistrate Judge's rulings on summary judgment, the Defendants move additionally under Federal Rules of Evidence 401 and 403 because the Roesler testimony is not relevant to any issue remaining in the case.

## II.

### The Only Issue Mr. Roesler's Testimony Could Relate to Has Been Removed From the Case by Summary Judgment.

As will be shown below, Mr. Roesler's testimony was limited to an evaluation of the Plaintiff's "life rights" or "movie rights".  As Mr. Roesler stated in his report, "Scott O'Grady would be entitled to a fee of at least $1 million for his movie rights assuming that his story were told accurately.  Because the facts of the story were changed, Scott O'Grady could command a premium of two to three times the amount which would be required if his story were accurately told.  Thus, a reasonable fee in this particular case would be $2.5 million."  Exhibit "A" to the Joint Motion at p. 5.

As this Court correctly concluded, under applicable and binding Fifth Circuit precedent, the Plaintiff has no claim for rights to his life story.  The Court held as follows:

> Plaintiff seems to have abandoned any claims of misappropriation or Lanham Act violations as to Fox Film's making the movie.  Even if Plaintiff as not abandoned his claims of misappropriation and Lanham Act violations as to the movie, the Court agrees with Fox Film that the protection of name or likeness under Texas

law does not include a person's life story. See *Matthews v. Wozencraft*, 15 F.3d 432, 437 (5th Cir. 1994). Plaintiff has created no genuine issues of material fact as to his claims, if any, for misappropriation and Lanham Act violations as to the movie. ***Fox Film is entitled to summary judgment on all claims emanating from its making the movie.***

United States Magistrate Judge Report and Recommendation of December 19, at p. 13.

Mr. Roesler was specifically asked and disclaimed any other opinions in this case, as the following illustrates:

A.    (By Mr. Roesler)  My expertise was being sought to determine a fair remuneration for Mr. O'Grady for a movie, a feature film, that was based upon the events that happened to him, and which those events weren't entirely accurate.

Q.    (By Ms. Handman)  And that is the sum total of what your purpose was in serving as an expert?

A.    That's correct.

Q.    Were you -- did you -- were you asked at all about what the value of Mr. O'Grady's endorsement of the movie would be?

A.    Endorsement of the movie if it were not about his?

Q.    Correct.

A.    No, I was not.

Q.    And you don't have any plans to offer an opinion on that subject, is that correct?

A.    Yes, that is correct.

Roesler Deposition at pp. 30-31 attached as Exhibit "B" to the original Motion.

Mr. Roesler made clear throughout his deposition that he was talking about a life-rights transaction with respect to a motion picture.

> Q.    (By Ms. Hamilton)  And in this case you were speaking in terms of -- that you were opining on a life rights transaction for Mr. O'Grady?
>
> A.    That's correct, with respect to a motion picture.
>
> Q.    Correct.
>
> A.    I'll clarify that.  I'm opining as to the value of his intellectual property rights used in a motion picture, and in this case it was on his events that, certain events that transpired in his life at a particular time.

Roesler Deposition at pp. 127-128, attached hereto as Exhibit "1" and incorporated herein.

With respect to the $1 million figure found in the conclusion of Mr. Roesler's report, he was asked:

> Q.    How did you arrive at that $1 million figure?
>
> A.    I arrived at the $1 million figure as a, for a bottom line number that I would, that I would command for a personality that I represented where they were going to do a feature film centered around some or all of their life and also took into consideration that it might be a little more because of the current mood in the country at that time, i.e., back to the 911 situation.

Roesler Deposition at pp. 145-146.

Mr. Roesler was then asked about the $2.5 million figure.

> Q.    Now, with respect to the $2.5 million, $2.5 million because of the facts of the story that were changed, is that yours basis for increasing that amount from the $1 million to the $2.5 million?
>
> A.    Yes.

DEFENDANTS' SUPPLEMENT TO JOINT MOTION TO EXCLUDE TESTIMONY BY EXPERT WITNESS MARK A. ROESLER – PAGE 4

Roesler Deposition at pp. 155-156.

Finally, Mr. Roesler was asked whether he intended to offer expert opinions on other

damage issues.

> Q.    Do you intend to offer an opinion about whether or not the movie -- the
>        Fox movie "Behind Enemy Lines" had a negative impact on Scott
>        O'Grady's business?
>
> A.    No.

Roesler Deposition at p. 168.

It is thus clear that Mr. Roesler is only offering opinions on life-story rights, or as he

sometimes puts it, movie rights. That claim no longer exists in the lawsuit and, in fact, that point

was made clear by counsel for all parties at yesterday's voir dire of the jury. To inject Mr.

Roesler's testimony into this case at this time is not relevant to any remaining issue and would be

prejudicial because it would tend to confuse the jury (see Rule 403).

WHEREFORE, PREMISES CONSIDERED, Defendants request that the Magistrate Judge recommend that the testimony of Mr. Roesler be excluded.

Respectfully submitted,

Charles L. Babcock   by permission sem
Nancy W. Hamilton
Cedric D. Scott
JACKSON WALKER L.L.P.
1401 McKinney, Suite 1900
Houston, Texas 77010
(713) 752-4200 (Telephone)
(713) 752-4221 (Fax)
George L. McWilliams
PATTON, HALTOM, ROBERTS,
 McWILLIAMS & GREER, LLP
2900 St. Michael Drive, 4th Floor
Texarkana, Texas 75503
(903) 334-7000 (Telephone)
(903) 334-7007 (Fax)

ATTORNEYS FOR DEFENDANT
TWENTIETH CENTURY FOX
FILM CORPORATION

Laura R. Handman
Constance M. Pendleton
DAVIS WRIGHT TREMAINE LLP
1500 K Street, N.W., Suite 450
Washington, D.C.  20005-1272
(202) 508-6600 (Telephone)
(202) 508-6699 (Fax)

Victor F. Hlavinka
ATCHLEY, RUSSELL, WALDROP
 & HLAVINKA, L.L.P.
1710 Moores Lane
P.O. Box 5517
Texarkana, Texas 75505-5517
(903) 792-8246 (Telephone)
(903) 792-5801 (Fax)

ATTORNEYS FOR DEFENDANT
DISCOVERY COMMUNICATIONS, INC.

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the above and foregoing instrument was
sent as indicated to the following counsel on this _____ 7th _____ day of January, 2004:

George E. Bowles
C.W. Flynn
Roy W. Hardin
W. Scott Hastings
John D. Wiseman
LOCKE LIDDELL & SAPP LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201-6776
(214) 740-8000 (Telephone)
(214) 740-8800 (Fax)

_____ Via Certified U.S. Mail
✔ Via Facsimile
_____ Via Federal Express
_____ Via Hand Delivery

G. William Lavender
LAVENDER & BARNETTE, PLC
507 Hickory Street
Texarkana, AR 71854
(870) 773-3187 (Telephone)
(870) 773-3181 (Fax)

_____ Via Certified U.S. Mail
_____ Via Facsimile
_____ Via Federal Express
✔ Via Hand Delivery

_____
George L. McWilliams

**DEFENDANTS' SUPPLEMENT TO JOINT MOTION TO EXCLUDE TESTIMONY BY EXPERT WITNESS MARK A.
ROESLER – PAGE 7**

Page 1

1                IN THE UNITED STATES DISTRICT COURT

              FOR THE EASTERN DISTRICT OF TEXAS

2                     TEXARKANA DIVISION

3    SCOTT O'GRADY,               *

           Plaintiff,             *

4                                 *

     VS.                          *      CIVIL ACTION

5                                 *      NO. 502CV173

     TWENTIETH CENTURY FOX FILM   *

6    CORPORATION, and DISCOVERY   *

     COMMUNICATIONS, INC.,        *

7          Defendants.            *

8

9

10   ***********************************************************

11      ORAL AND VIDEOTAPED DEPOSITION OF MARK A. ROESLER

12   ***********************************************************

13

14

15          ANSWERS AND VIDEOTAPED DEPOSITION OF MARK A.

16   ROESLER, produced as a witness at the instance of the

17   Defendant Discovery Communications, Inc., taken in the

18   above-styled and -numbered cause on the 20th day of

19   June, 2003, A.D., beginning at 9:15 a.m., before

20   Kristel L. Wilkins, a Certified Shorthand Reporter in

21   and for the State of Texas, in the offices of Locke,

22   Liddell & Sapp, located at 2200 Ross Avenue, Suite

23   1900, Dallas, Texas, in accordance with the Federal

24   Rules of Civil Procedure and the agreements hereinafter

25   set forth.

**EXHIBIT**

1

Page 126

1    A. I looked at the Discovery Channel documentary.
2    Q. Okay. And was it just the Discovery Channel
3 documentary, or did it include third-party ads as well
4 as ads and promotions for the "Behind Enemy Lines," the
5 Fox movie?
6    A. Yes, it included those too.
7    Q. Okay. So it included the advertisements as
8 well?
9    A. Yes.
10    Q. Okay. Let me go through some of the names that
11 you went through this morning. I believe you testified
12 to a 20-second use of Sir Laurence Oliviet of his image
13 or likeness in a film this morning?
14    A. Yes.
15    Q. And that 20-second use, that was not a life
16 rights transaction, was it?
17    A. No.
18    Q. And in your opinion, is Sir Laurence Oliviet a
19 comparable property to Mr. O'Grady?
20    A. It's a comparable use and --
21    Q. And what -- I'm sorry.
22    A. I'm sorry. It's comparable use, in that it's
23 use in a feature film.
24    Q. Okay. So 20 seconds of Mr. -- of Sir Laurence
25 Oliviet's likeness in a film is a comparable use to

Page 127

1 what?
2    A. To a fee that you would charge for someone in a
3 case like this of a story on their -- a feature film on
4 their life story.
5    Q. So in order to have that, you're saying that
6 you are likening Sir Laurence Oliviet as a comparable
7 property to Scott O'Grady; is that correct?
8    A. A comparable use, not a comparable property.
9    Q. So the use is just the fact of the motion
10 picture?
11    A. That's right.
12    Q. Let me go to -- it will take a minute to get
13 this untangled. Let me go through the same thing. You
14 also referenced a feature-film use of President Nixon
15 for two to three minutes?
16    A. Okay.
17    Q. And that was not a life rights transaction, was
18 it?
19    A. That's correct.
20    Q. And in this case, you are speaking in terms
21 of -- that you are opining on a life rights transaction
22 for Mr. O'Grady?
23    A. That's correct, with respect to a motion
24 picture.
25    Q. Correct.

Page 128

1    A. I'll clarify that. I'm -- I'm opining as to
2 the value of his intellectual property rights used in a
3 motion picture, and in this case, it was on his --
4 events that -- certain events that transpired in his
5 life at a particular time.
6    Q. Okay. If you would, clarify that for me
7 because that's not what I understood your report to be
8 going through, so you're talking about all of his
9 intellectual property rights?
10    A. His -- well, we're talking about whatever
11 intellectual property rights apply in this particular
12 use.
13    Q. Okay. Let's start there just so we can -- so I
14 can be sure. What intellectual property rights apply
15 in this instance in this case that you are opining
16 about?
17    A. In my report?
18    Q. Yes.
19    A. In my report. His intellectual property rights
20 would be his right of publicity, which would include
21 his right of association, any trademark rights he has
22 and any copyrights that he has. I'm -- in this
23 particular case, it would be primarily right of
24 publicity issues, and so that --
25        I'm opining -- as I said, my first

Page 129

1 sentence is the value of Scott O'Grady's intellectual
2 property rights in relation to a feature film based
3 upon his real-life experience in Bosnia in 1995, so
4 it's not necessarily his life story rights. It's
5 his -- it's the rights as they relate to that
6 particular event in his life.
7    Q. Okay. And you named the right of publicity,
8 his trademark rights, his copyrights?
9    A. Uh-huh.
10    Q. His right of association?
11    A. Uh-huh.
12    Q. Any other rights?
13    A. I think that would basically cover what rights
14 he has.
15    Q. Okay. What --
16    A. I'm -- I'm defining what intellectual property
17 rights are.
18    Q. I understand, but what intellectual -- are you
19 saying that these four rights, the right of publicity,
20 the right of trademark, the copyright and right of
21 association, are all intellectual property rights that
22 relate to your opinion regarding the Fox film at issue
23 in this lawsuit?
24    A. No, that's not exactly what I said. What I
25 said was someone's intellectual property rights,

33 (Pages 126 to 129)

Page 142

1      (Requested portion was read.)
2   A.  I would say that's correct.
3   Q.  (BY MS. HAMILTON) Now, with respect to your
4   work in this case and accepting that you were using
5   this market approach that you reflect in your report,
6   what is the comparable property that you used in
7   determining the valuation that you arrived at in your
8   opinion?
9   A.  Any celebrity personality that I've represented
10  is a comparable property. Any celebrity property that
11  I've represented in a media-type use is a comparable
12  property.
13  Q.  So it's your testimony that any celebrity that
14  you have represented is a comparable property to Scott
15  O'Grady?
16  A.  That's correct.
17  Q.  And is it your opinion then that any celebrity
18  that you have represented is a comparable property with
19  a comparable value to Scott O'Grady?
20  A.  Well, the values go up and down --
21  Q.  I want to --
22  A.  -- depending upon the facts of a particular
23  situation.
24  Q.  Okay. What did you use -- specifically, who
25  did you consider as a comparable property to Scott

Page 143

1   O'Grady in reaching your opinion in this case?
2   A.  Again, all of the clients that I represent.
3   Q.  I want to know the names, please.
4   A.  Okay. Do you want me to read them off the
5   client list?
6   Q.  Wherever -- you know, whatever is best for you.
7   A.  Marilyn Monroe, James Dean, Princess Diana,
8   Sophia Loren, on down through the 200 clients that I
9   represent.
10  Q.  Okay. And what did you use as a comparable
11  value for Mr. O'Grady?
12  A.  A "comparable value" meaning --
13  Q.  Yes.
14  A.  I mean, I -- typically, you look at how --
15  what -- the length of time. If it's a feature film, is
16  the entire feature film about somebody, and if it's
17  about somebody, there is -- there is a fee that you
18  would charge for something like that.
19  Q.  Okay. So it would be based on the fee; it
20  would be based on the time or the length of the film,
21  the motion picture?
22  A.  Not -- well --
23  Q.  Assuming we have a movie -- I'm sorry.
24  A.  Yes.
25  Q.  Assuming you have a movie that the main

Page 144

1   character in the movie is based on some famous person,
2   are you saying that the fee would be based on the
3   length of the time of that film?
4   A.  Not -- not the length of the time, more the --
5   I mean, it could be anywhere from a -- whether it's a
6   70-minute film or a 270-minute film -- I guess there
7   aren't too many 270-minute films, but whether it's a
8   short film or a long film is irrelevant. It's more
9   what -- whether it's the primary focus of the film.
10  Q.  Okay.
11  A.  I mean, if it's -- if the film is all about a
12  particular personality, that's much different than if
13  it's not, if it's only a minor part of the film. If
14  it's a minor part, how minor is it? I mean, minor
15  can -- you know, there is the whole continuum of --
16  Q.  You might want to unravel the cord from around
17  your wrist or something so it doesn't go flying.
18      Sorry to interrupt you. Is there anything
19  else?
20  A.  No. I mean, there is -- there is a continuum
21  of -- you know, if -- if Scott O'Grady -- if they were
22  using a poster of him in the feature film and the
23  poster was shown in one scene for five seconds, there
24  might be a fee of $1,000, or if it's -- if there is ten
25  scenes where an image of him is used in some capacity,

Page 145

1   there is a higher fee, and that's typically the way it
2   works.
3   Q.  Okay.
4   A.  Is there a higher fee whether it's Scott
5   O'Grady on the wall or Princess Diana or Sophia Loren
6   on the wall? No, there isn't a higher fee.
7   Q.  They all command the same fee?
8   A.  For the most part. I mean, there might be --
9   one might be -- one might be more. One might be -- one
10  might be twice as much.
11  Q.  Okay. Let's go to the specifics of this
12  film --
13  A.  Yes.
14  Q.  -- and your analysis for this litigation.
15  A.  Okay.
16  Q.  When you sat down and arrived at the $1 million
17  figure that's in your conclusion -- it's one of two
18  figures, but we'll start with the $1 million figure.
19      How did you arrive at that $1 million
20  figure?
21  A.  I arrived at the $1 million figure as a -- for
22  a bottom-line number that I would -- that I would
23  command for a personality that I represented where they
24  were going to do a feature film centered around some or
25  all of their life and also took into consideration that

**Page 146**

1 it might be a little more because of the current mood
2 in the country at that time, i.e., back to the 9/11
3 situation.
4    Q. Okay. So in other words, it is your opinion
5 that the value associated with Scott O'Grady has
6 increased as a result of the tragic events of
7 September 11th?
8    A. Yes. I think I've said that several times.
9    Q. And so Scott O'Grady has benefitted from the
10 tragic events of September 11th, in that it has
11 increased his value; would you agree with that?
12    A. Well, I don't like the way you worded it, but I
13 agree with the general nature of what you're saying.
14    Q. Okay. So can you tell me, sitting here
15 today -- so it doesn't matter whether Scott O'Grady is
16 a pilot shot down in 1995 or he was, you know, a famous
17 motorcycle driver -- rider in the '60s; so long as
18 someone was making a major motion picture that centered
19 on that individual's life or events in that
20 individual's life, you would come up with the same $1
21 million valuation, including, I guess, the -- and we'll
22 get to the premium part of it later; is that your
23 testimony?
24    A. Let me repeat what I think you're saying, and
25 if you -- and then I'll --

**Page 147**

1    Q. Okay.
2    A. What you're saying is irrespective of what type
3 of personality you are --
4    Q. Right.
5    A. -- as long as you've had some level of fame --
6    Q. Correct.
7    A. -- and there is an interest by a movie studio
8 for a feature film, would any personality always
9 command a million dollars?
10    Q. Would you --
11    A. With me as an agent?
12    Q. Would you analogize it the same way?
13    A. Would me as an agent always charge a million
14 dollars?
15    Q. Yes.
16    A. Okay. No. I would -- I would say that you
17 could command for a personality -- a personality that
18 has some level of fame and that there is an interest by
19 a major studio, that as an agent, I'm confident that my
20 mindset as I would go in would be anywhere from maybe
21 $300,000 to $500,000 to be the low end to as much as
22 $10 million would be the high end.
23    Q. And so the value in large part, at least from
24 what I'm hearing you say here today, is also based on
25 your, Mark Roesler's, ability as an agent to negotiate

**Page 148**

1 the best deal for your client; isn't that correct?
2    A. Well, I'm assuming that I'm a competent agent,
3 but I'm also assuming that there are plenty of other
4 agents out there that are also competent, so I would --
5 my valuation would be someone with a reasonably high
6 degree of competence would be able to command that kind
7 of money.
8    Q. But isn't that dollar value based somewhat on
9 the ability of the agent, in this instance, your
10 ability to command that? It has nothing to do with the
11 personality being represented; wouldn't you
12 agree with me on that?
13    A. I'm sorry. I'm going to have to understand
14 that question once again. If we -- tell me what you
15 wanted to know again.
16    Q. I want to know the value that you are
17 placing -- that you are saying you can command --
18    A. Uh-huh.
19    Q. -- because what I understand, this is how you
20 went about this project.
21    A. Right.
22    Q. You went and thought, "What I am able to go in
23 as an agent and command for a personality" --
24    A. Uh-huh.
25    Q. -- "in a film" --

**Page 149**

1    A. Uh-huh.
2    Q. -- is the basis that you used for arriving at
3 this $1 million?
4    A. That's correct.
5    Q. Okay.
6    A. That's correct.
7    Q. And my question is: Is that then based in
8 large part on your abilities, Mr. Roesler, as an agent,
9 not necessarily on the personality's value, inherent
10 value?
11    A. Well -- well --
12    Q. Wouldn't you agree with me on that?
13    A. Not necessarily. I mean, any -- a celebrity
14 personality typically is represented by an agent,
15 whether that agent is a talent agent or a legal agent.
16    Q. I understand that. My point is, your opinion
17 in this case is based on the amount of money that you,
18 Mark Roesler, would command for someone that you
19 represented who was in a -- who was a personality who
20 would -- on whom a film would be done?
21    A. Are you saying that it's not -- it's not based
22 on what Scott O'Grady would command? It's based on --
23    Q. I asked you what your basis was for your
24 opinion, and that's where I got started on this.
25    A. The basis of my opinion is what I believe as an

Page 154

1  mean -- I'm sorry -- in the Orion Pictures movie that
2  was never made was a fictionalized account of what
3  happened to Mr. O'Grady?
4      A.  I'm not aware that the whole -- no, I'm not
5  aware of any specifics of that.
6      Q.  Okay.  And on the million-dollar fee -- and you
7  say -- is that something that you believe a third-party
8  major motion picture company would pay for Scott
9  O'Grady for his right of publicity for a major motion
10  picture?
11      A.  Yes.
12      Q.  And do you have any major motion picture
13  companies that you are aware of that have agreed to
14  that fee?
15      A.  I'm sorry.  With respect to Scott O'Grady?
16      Q.  Yes.
17      A.  I didn't fully understand the question because
18  I don't -- do I know of any that have agreed to that
19  figure?
20      Q.  Yes.
21      A.  No, I don't.
22      Q.  Do you know if there have been any discussions
23  with any major motion picture companies who are
24  considering paying a million dollars for Mr. O'Grady's
25  story for a major motion picture film?

Page 155

1      A.  Do you mean after Fox came out with theirs?
2      Q.  Well --
3      A.  I don't think --
4      Q.  Okay.  After Fox came out with theirs; we'll
5  start there.
6      A.  Well, I think that's a given that no one would.
7      Q.  Okay.
8      A.  No one --
9      Q.  Do you know of anyone who was willing to pay a
10  million dollars before the Fox movie came out?
11      A.  Well, the motion picture industry is a small
12  industry where people know what other people are
13  producing, so, I mean, I think you have to -- you have
14  to take your question and really say before anybody
15  else knew that Fox was coming out with one, because no
16  one is going to come out with the identical movie.
17  There is only going to be one movie made of that
18  situation.
19          MS. HAMILTON:  Objection; nonresponsive.
20      Q.  (BY MS. HAMILTON) Do you know of any film
21  company, motion picture company, that has ever
22  considered paying $1 million for Scott O'Grady for a
23  major motion picture film?
24      A.  I don't know of any that have or have not.
25      Q.  Now, with respect to the $2.5 million because

Page 156

1  of the facts of the story that were changed, is that
2  your basis for increasing that amount from the $1
3  million to the $2.5?
4      A.  Yes.
5      Q.  Okay.  Specifically what facts in the movie
6  "Behind Enemy Lines" are you basing that increase on?
7      A.  What specific facts?
8      Q.  Yes.
9      A.  I mean, there were -- there were various things
10  changed.  I mean, the basis of the story was that there
11  were a lot of -- the basis of the story was similar,
12  but there were a lot of facts that were changed.
13      Q.  Okay.  And what facts do you believe were
14  changed that would entitle Mr. O'Grady to command a
15  premium of two to three times the amount required of
16  his life story?
17      A.  Well, I think the -- I'm sorry I cut you off.
18  I didn't hear the last four or five words.
19      Q.  I was just reading out of your report, but
20  anyway, what facts were changed that you believe would
21  entitle Scott O'Grady to command a premium of two to
22  three times the amount for his life story?
23      A.  I think the primary facts would be the nature
24  of how he was portrayed as, I guess, kind of a hot-dog,
25  disobeying orders, some of the foul --

Page 157

1      Q.  What orders did he disobey?
2      A.  I think as far as where he was supposed to fly.
3      Q.  And what -- what facts do you have that he
4  was -- and you're talking about Owen Wilson, the Chris
5  Burnett character?
6      A.  Uh-huh.
7      Q.  What facts do you have that he was a hot-dog
8  pilot?
9      A.  I think it goes back to the orders.  I think
10  those are one in the same.
11      Q.  Does that come from the characterization in
12  Mr. O'Grady's complaint?
13      A.  I think it also comes from that.
14      Q.  Any other facts?
15      A.  Did I say -- did I say the foul language?
16      Q.  No, but you can add that.
17      A.  Okay.  Thank you.
18      Q.  Okay.  Is there a dollar amount that you get --
19  that he gets as a premium for the foul language?
20      A.  I don't know if there is a specific dollar
21  amount.  I think in this case, you add the -- we can do
22  the arithmetic on the foul language and the disobeying
23  orders and so forth, and I guess that amounts to $1.5
24  million.
25      Q.  You're familiar with the motion picture

Page 166

1  factors that you considered in arriving at the fee?
2    A.  No.
3    Q.  Okay.  So it was those four factors that you
4  used to arrive at the $1 million fee that you state in
5  your conclusion and nothing else?
6        MR. HARDIN:  Objection as to form.
7    A.  Well, are you -- are you saying my experience
8  and knowledge is not -- is or isn't a factor?
9    Q.  (BY MS. HAMILTON) I'm just asking you.  If it
10  was a factor, then we'll include that as a factor.
11    A.  Well, then I guess we might as well say that's
12  a factor.
13    Q.  So your experience and knowledge?
14    A.  And the -- in this particular case, the
15  commercial history of the books, speaking engagements
16  and the prior movie deals would be factors, and I think
17  that would probably be it.
18    Q.  That's the sum total?
19    A.  I would think that would be it, yes.
20    Q.  Okay.  And then can you name for me an
21  individual who you would consider to have had similar
22  experiences to Scott O'Grady and who would command the
23  same price?
24    A.  That's -- that's a difficult question that
25  you're asking.  I mean, who -- I mean, I would consider

Page 167

1  Jessica Lynch very comparable to Scott O'Grady.
2    Q.  Okay.  So you're saying her experience in Iraq
3  is the same as or similar to Captain O'Grady's?
4        MR. HARDIN:  Objection as to form.
5    A.  I would -- I would say has analogies to Scott
6  O'Grady.
7    Q.  (BY MS. HAMILTON) I understand there are
8  analogies; they're in the military, but anything more
9  than that?
10    A.  Well, I don't think I said -- you're putting --
11    Q.  Was her experience used by you in arriving at
12  the million-dollar figure?
13    A.  No.
14    Q.  Can you name me -- give me the name of any
15  individual who you used specifically in an analogous
16  way to arrive at the million-dollar number that you
17  used for Scott O'Grady?
18    A.  I can't say there is one individual I used.
19  I -- the totality of my experience in negotiating
20  movie-related deals.
21    Q.  I understand that.  I want specific -- a
22  specific name.
23    A.  You want specific names of --
24    Q.  No.  I just want to know who specifically you
25  considered, the name of an individual whom you

Page 168

1  specifically considered as part of the basis of your
2  arriving at the million-dollar figure for Scott
3  O'Grady.
4    A.  I don't know that when I valued Scott O'Grady
5  that I had any particular celebrity in mind and said,
6  "This is the same type of use."
7    Q.  Okay.
8    A.  And that's typically not the way it's done.
9  There is -- you have a knowledge of the industry and
10  you know what you charge for a -- it's almost like a
11  commodity.  You charge a fee for the use of these
12  intellectual property rights.
13        MS. HAMILTON:  Object as nonresponsive to
14  everything after, "That's typically not the way it's
15  done."
16    Q.  (BY MS. HAMILTON) Do you intend to offer an
17  opinion about whether or not the movie -- the Fox movie
18  "Behind Enemy Lines" had a negative impact on Scott
19  O'Grady's business?
20    A.  No.
21    Q.  You have a website, do you not?
22    A.  Yes.
23    Q.  And are there two websites?  I'm sorry.  I
24  haven't gone in to find out.
25        Is there a specific website for CMG

Page 169

1  Worldwide and then a separate one for roesler.com?
2    A.  Markroesler.com, yes.
3    Q.  Okay.  And what is the purpose of those
4  websites?
5    A.  As a company, we have a lot of domain names --
6    Q.  Uh-huh.
7    A.  -- with, you know, hundreds of them, so there
8  is a company website.  Our clients have websites.  I
9  have a website.  They're all kind of interrelate --
10  they're interrelated a lot.  If it's a client, you can
11  go back to the company website.  The company --
12    Q.  So they're linked?  Is that how you're talking
13  about the link?
14    A.  Aspects -- aspects of it are linked, yes, yes.
15    Q.  Okay.  But do you use -- you use -- the purpose
16  of the website is to -- to promote your company, is it
17  not?
18    A.  The purpose of what website?
19    Q.  Well, how about the markroesler.com website is
20  to promote you --
21    A.  The purpose of --
22    Q.  -- over the Internet?
23    A.  I wouldn't say that's accurate.  My -- my
24  personal website markroesler.com is -- talks about me,
25  who I am, what -- some of the different community